**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| LASHAWN EZELL, )<br>)<br>   Plaintiff, )<br>)<br>     v. )<br>)<br>CHICAGO POLICE OFFICERS JAMES CASSIDY (#2027), )<br>KENNETH BOUDREAU (#20435), LUKE DALY (#21064), )<br>FRANCIS VALADEZ (#21008), BERNARD RYAN )<br>(#20867), JOHN BLOORE (#3081), J. FINE (#20213), )<br>the ADMINISTRATOR OF THE ESTATE OF )<br>THOMAS COUGHLIN (#20983), THOMAS )<br>RICHARDSON (#3385), DWAYNE DAVIS (#21075), )<br>LARRY TUIDER (#1638), FRED BONKE (#2108), )<br>CHERYL GREEN (#10738), UNIDENTIFIED EMPLOYEES )<br>OF THE CITY OF CHICAGO, former COOK COUNTY )<br>STATE'S ATTORNEY JOSEPH ALESIA, the COUNTY )<br>of COOK, and the CITY OF CHICAGO, )<br>)<br>   Defendants. )<br>) | JURY DEMAND |

## COMPLAINT

Plaintiff, LASHAWN EZELL, by his undersigned attorneys, complains of Defendants,

Chicago Police Department Officers JAMES CASSIDY, KENNETH BOUDREAU, LUKE

DALY, DWAYNE DAVIS, FRANCIS VALADEZ, BERNARD RYAN, JOHN BLOORE, J.

FINE, the ADMINISTRATOR of the ESTATE of THOMAS COUHGLIN, THOMAS

RICHARDSON, SERGEANT LARRY TUIDER, SERGEANT FRED BONKE, CHERYL

GREEN, former COOK COUNTY ASSISTANT STATE'S ATTORNEY JOSEPH ALESIA, the

COUNTY OF COOK, the CITY OF CHICAGO, and as-yet UKNOWN CITY OF CHICAGO

EMPLOYEES, as follows:

## INTRODUCTION

1.     In 1998, LaShawn Ezell was convicted of armed robbery in connection with the execution-style murders of Khaled Ibrahim and Yousef Ali, a brutal crime with which he had absolutely no involvement.  Arrested at the age of 15, he spent ten years in custody and had to try to rebuild his life branded as a violent criminal before ultimately being exonerated.

2.     There is no question that LaShawn Ezell is innocent of any involvement in this horrific crime.  No physical evidence and no witnesses ever connected him to the murders and later-discovered forensic evidence has now conclusively proven his and his co-defendants' innocence.  Nonetheless, determined to close this case, the Defendants – the Defendant Officers and Defendant former-Assistant State's Attorney Joseph Alesia – coerced false and inculpatory statements from LaShawn Ezell and his co-defendants.  The Defendant Officers also withheld exculpatory evidence from the trial prosecutor and from the defense that would have proven Plaintiff's innocence.

3.     As a result of the Defendants' misconduct, LaShawn Ezell was charged and wrongfully convicted, and sentenced to twenty years in prison.  He served ten years in custody and then, once released, had to try to rebuild his life with the stigma of having been convicted of a violent felony.

4.     Nineteen years after they were convicted, the charges against LaShawn Ezell and his co-defendants were dropped when new fingerprint testing and other evidence confirmed their innocence.

5.     The misconduct that gave rise to LaShawn Ezell's wrongful prosecution and conviction was not an aberration. To the contrary, the Chicago Police Department (the "Department"), including officers working within the Department "Area" where this

2

investigation occurred, engaged in a pattern of unlawfully coercing confessions over a period of years, frequently targeting young African-American men in order to close unsolved cases through overzealous and unlawful methods of interrogation. Defendants James Cassidy and Kenneth Boudreau, in particular, have long track records of coercing false confessions and fabricating evidence against those in their custody. The City of Chicago permitted these officers to act with impunity for years. They have never been disciplined for their egregious acts, committed within the scope of their employment.

6. Plaintiff LaShawn Ezell now files this civil rights action to bring the Defendants' misconduct to light, and to ensure that they are finally held accountable for their misconduct. Although Plaintiff has won back his freedom, he will never regain the lost years of his life in which he was incarcerated for a crime he did not commit. This lawsuit seeks redress for these grievous injuries.

## JURISDICTION AND VENUE

7. This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of law of Plaintiff's rights as secured by the United States Constitution.

8. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367. Venue is proper under 28 U.S.C. § 1391(b). The events giving rise to the claims asserted herein occurred in this judicial district, the parties reside in this district, and Defendant City of Chicago is a municipal corporation located here.

## PARTIES

9. Plaintiff LaShawn Ezell is 38 years old. At the time of the murders, he was in his second year of high school at Harper High School and living with his grandmother (then his legal guardian), and other family members including his cousins and his two sisters at 7316 S.

Claremont in Chicago, Illinois.

10.     At all relevant times, James Cassidy, Kenneth Boudreau, Bernard Ryan, John Bloore, Cheryl Green, Thomas Coughlin, Dwayne Davis, Luke Daly, J. Fine, Thomas Richardson, and Frances Valadez were officers with the CPD, employed by Defendant City of Chicago, and acting within the scope of their employment.  They are sued in their individual capacities.  Detective Coughlin is deceased and, accordingly, the administrator of his estate is named as a party-defendant herein.  These individuals are referred to collectively as "Defendant Officers."

11.     At all relevant times, Defendants Larry Tuider and Fred Bonke were sergeants with the CPD, employed by Defendant City of Chicago, and acting within the scope of their employment.  They are sued in their individual capacities.

12.     At all relevant times, Defendant Joseph Alesia was an Assistant State's Attorney in the Cook County State's Attorney's Office.  He is sued in his individual capacity.

13.     The Defendant City of Chicago is a municipal corporation under the laws of the State of Illinois.

14.     Defendant Cook County is a governmental entity within the State of Illinois, and it is obligated to indemnify employees of the Cook County State's Attorney's Office.

## FACTS

### The Murders of Khaled Ibrahim and Yousef Ali

15.     At approximately 6:30 p.m. on December 4, 1995, two men perused cars at Elegant Auto, a used car lot on Chicago's South Side.  While there, the men examined and touched two vehicles.  They then went to Prestige Auto, a car lot next door, where they examined a third car.

4

16.     At around 7:00 p.m., the two men returned to Elegant Auto, entered an office at the back of the lot, and open fired on owners Khaled Ibrahim and Yousef Ali.  The perpetrators killed Ibrahim and Ali execution-style, but left two other employees alive.

17.     The perpetrators then stole two cars from the lot and sped away from the scene. The stolen cars were not the same vehicles that the men had examined and touched earlier that evening.

18.     CPD forensic investigators arrived at the scene at around 7:30 p.m. that night. They lifted finger and palm prints from the two cars at Elegant Auto and the one car at Prestige Auto that the perpetrators had touched.

19.     At approximately 2:00 a.m. on December 5, 1995, CPD officers recovered the two stolen cars five miles away from the crime scene.  They also recovered marketing stickers that had been displayed on the cars and subsequently peeled off.  Fingerprints were lifted from both the cars and from the stickers.

20.     None of these recovered prints matched either LaShawn Ezell or any of his eventual co-defendants.

**Defendant Officers Arrest and Obtain False and Coerced Inculpatory Statements From Teenagers Troshawn McCoy, Larod Styles, and Charles Johnson**

21.     On the afternoon of December 6, 1995, the day after the murders, Defendant Officers including Detectives Cassidy, Davis, and Daley arrested 17-year-old Troshawn McCoy at his high school and took him to the Area One police station, located at 51st and Wentworth.

22.     Although the Defendants had no reason to believe that Mr. McCoy was involved in the murders, they harshly interrogated the teenager, isolating him, denying him the right to counsel, and feeding him information about the murders.  The Defendants used such tactics to coerce him into adopting their version of events.

23.     Even though he was innocent of the crimes, Troshawn McCoy eventually succumbed to the Defendants' coercion and manipulation and falsely implicated himself and three other teenagers—Larod Styles, Charles Johnson, and Plaintiff LaShawn Ezell—in the murders.  He gave a false and inculpatory statement to the Defendant Officers and to Defendant Alesia.

24.     Defendant Alesia was at the police station and actively working on this investigation with the Defendant Officers starting in the afternoon of December 5, 1995 and continuing into the early morning hours of December 6, 1995.  He participated with the Defendant Officers in the unlawful interrogations of each of the four teenagers and cooperated with the Defendant Officers in obtaining the false and inculpatory statements.

25.     In his transcribed statement, Mr. McCoy parroted the Defendant Officers' concocted scenario in which he and Mr. Ezell acted as lookouts for Charles Johnson and Larod Styles, who planned to steal a car from Elegant Auto.  Mr. McCoy falsely stated that he and Mr. Ezell watched Mr. Johnson and Mr. Styles enter the Elegant Auto office, heard gunshots seconds later, and then saw Mr. Johnson and Mr. Styles run out and drive away in the two stolen cars from the lot.

26.     The Defendant Officers, including Defendant Cassidy, knew that Mr. McCoy's statement was coerced and false and merely a recitation of their fabrications.  Nevertheless, the Defendant Officers used Mr. McCoy's coerced confession to arrest and interrogate Mr. Ezell, Mr. Styles, and Mr. Johnson, all without probable cause.

27.     The Defendant Officers, including Detectives Bloore, Coughlin, and Fine, then arrested Larod Styles at his home at around 5:00 p.m. on December 5, 1995.  Mr. Styles had just

turned 16 years old two weeks earlier, on November 19, 1995, and did not even have a driver's license.

28.     Despite having knowledge of Larod Styles's young age, the Defendant Officers interrogated him off and on for several hours outside the presence of a parent, guardian, attorney or other adult interested in his welfare.

29.     It was only after Mr. Styles had been interrogated multiple times that the Defendant Officers brought in a youth officer.  That officer never actually spoke to Mr. Styles, and he did nothing to intervene to prevent his false confession, or to protect Mr. Styles' interests and rights during the interrogations.

30.     Although the 16-year-old Mr. Styles, who was handcuffed to the wall of an interrogation room, adamantly denied any involvement in the murders, the Defendant Officers, including Defendant Bloore, obtained a false and involuntary inculpatory statement from Mr. Styles around 1:00 a.m. on December 6, 1995.

31.     Defendant Alesia, who was at the police station and actively working on this investigation with the Defendant Officers starting in the afternoon of December 5, 1995 and continuing into the early morning hours of December 6, 1995, participated and/or cooperated in the coercive interrogation, obtaining a false inculpatory statement from Mr. Styles, and the signing of the false, inculpatory statement.

32.     At around 5:30 p.m. on December 5, 1995, the Defendant Officers, including Detectives Bloore, Daly, and Davis, arrested Plaintiff Charles Johnson, then 19 years old, at his home.

33.     Mr. Johnson had just returned from a full day of work as a Coca-Cola Company delivery driver.

34.     The Defendant Officers had no probable cause to effectuate his arrest, yet they handcuffed Mr. Johnson and refused to tell him why he was under arrest.

35.     As they transported Mr. Johnson to the Area One police headquarters, the Defendant Officers taunted him, calling him stupid, telling him to shut up, and offering to get him food but then refusing to stop for anything.  When Mr. Johnson discovered that he had been arrested for murder, he immediately and consistently denied any involvement in the crime.

36.     Mr. Johnson was held in a small interrogation room where he was handcuffed to the wall.  Over the course of several hours, the Defendant Officers, including Defendants Cassidy, Boudreau, and Valadez, subjected Mr. Johnson to a hostile and aggressive interrogation concerning the double murder.  Throughout the interrogation, Charles Johnson proclaimed his innocence.

37.     Unsatisfied with Mr. Johnson's protestations of innocence, the Defendant Officers worked to overbear Mr. Johnson's will and force him to falsely implicate himself in the murders.

38.     The Defendant Officers gave Mr. Johnson information relating to the crime, including facts concerning the number of people in the car lot office, the color of the stolen get-away vehicles, and the location where the stolen vehicles were abandoned.  These are the same facts that the Defendant Officers fed to Mr. Johnson's co-defendants.

39.     After approximately ten hours of intermittent questioning by the Defendant Officers, Charles Johnson was taken to a different interrogation room.  At some point while Plaintiff was in this room, Defendant Alesia and an as-yet-unidentified Assistant State's Attorney entered the room.  They asked Mr. Johnson to provide some background information, and left shortly thereafter.

40.     Before speaking to Mr. Johnson, Defendant Alesia met with Defendant Valadez, in order to obtain information about the investigation and to plan for Johnson's interrogation.

41.     At around 3 a.m., Defendant Alesia returned to the room, and moved Mr. Johnson to a general office area, where he began showing Mr. Johnson photographs of individuals and asking Mr. Johnson to identify them.

42.     After each identification, Defendant Alesia asked Mr. Johnson to sign his name. Defendant Alesia then intentionally tricked and misled Mr. Johnson into signing a document, though Mr. Johnson did not understand what it was.  Exhausted from the grueling interrogation, terrified, confused and utterly worn down by the Defendant Officers' mistreatment, Mr. Johnson agreed to sign.

43.     It was only later that Mr. Johnson realized he had actually signed a false confession to being a shooter in the murders.

44.     At no point during the custodial interrogation or false confession did either the Defendant Officers or the Assistant State's Attorneys tell Mr. Johnson that he had the right to have an attorney present or to remain silent.  To the contrary, the Defendant Officers denied Mr. Johnson's repeated requests to contact an attorney on the grounds of "procedure," stating that he would be allowed to call his lawyer only after the interrogation was completed.

45.     As a result of the coercive and unconstitutional tactics used by both the Defendant Officers and Defendant Alesia, Mr. McCoy, Mr. Styles, and Mr. Johnson gave false confessions to crimes they did not commit.

**Officers Arrest, Interrogate, and Obtain a**
**False and Involuntary Inculpatory Statement from LaShawn Ezell**

46.     The Defendant Officers, including Detectives Davis and Valadez, arrested 15-

year-old LaShawn Ezell at around 4:15 p.m. on December 5, 1995, and brought him to Area One

police headquarters.

47.     Using many of the same techniques that they used on Mr. McCoy, the Defendant

Officers interrogated Mr. Ezell for hours.  These officers, including Defendant Cassidy,

Defendant Coughlin and Defendant Green, with the participation and full cooperation of

Defendant Alesia, obtained a false and involuntary inculpatory statement from the young

teenager.

48.     During his interrogation, detectives alternatively threatened and encouraged him

to confess his involvement in the armed robbery and murders.  They falsely told him that he had

been implicated in these murders by witnesses.  They promised him that if he just confessed, he

would be able to go home.  Mr. Ezell repeatedly told the Defendant Officers who questioned him

that he was not involved in this crime and that Mr. McCoy was not his friend.  He told the

Defendant Officers what he had been doing that afternoon, which had nothing to do with armed

robbery and murder.  Despite this, the Defendant Officers, with the involvement of Defendant

Alesia, wore down Mr. Ezell, repeatedly waking him up to interrogate him and coercing him into

signing a false handwritten confession.

49.     At no point during the custodial interrogation or false confession did either the

Defendant Officers or Defendant Alesia inform Mr. Ezell that he had the right to have an

attorney present or to remain silent.

50.     Mr. Ezell was interrogated outside the presence of a parent, guardian or an

attorney, and during his interrogation was also questioned, at times, without a youth officer

10

present. Although a youth officer, Defendant Green, was present for portions of Mr. Ezell's interrogation and false confession, she did nothing to intervene to prevent the false confession, or to protect Mr. Ezell's interests and constitutional rights.

51.     Defendants repeatedly ignored Mr. Ezell's requests to see his grandmother, who was then his legal guardian. Defendants did not inform Mr. Ezell's family and/or legal guardian that he was in custody until sometime on, about, and/or after 11:00 p.m. on December 5, 2018, and did not allow Mr. Ezell himself to contact his family and/or guardian. In fact, Defendants actively prevented Mr. Ezell's grandmother from coming to the station by failing to inform her of Mr. Ezell's arrest and by later providing her false information about their conduct and intentions toward her grandson.

52.     As a result of the coercive and unconstitutional tactics used both by the Defendant Officers and Defendant Alesia, at the end of the long interrogation, Mr. Ezell signed a false confession to a heinous crime that he did not commit.

## PLAINTIFF'S CONVICTION

53.     In November of 1998, LaShawn Ezell stood trial for the murders of Khaled Ibrahim and Yousef Ali. Mr. Ezell was tried jointly with Mr. McCoy, although before separate juries.

54.     Mr. Ezell's statement was introduced against him at his trial, and was the State's primary evidence of his guilt. No physical or forensic evidence linked Mr. Ezell to the crime, and no witnesses testified to observing him at the scene.

55.     None of the Defendants who testified against Mr. Ezell at his trial or during his motion to suppress, including Defendants Alesia, Cassidy, Davis, Coughlin, Bloore, and Green,

disclosed how they obtained false and involuntary inculpatory statements from the four young

men. The same is true for the Defendants who testified at his co-defendants' trials.

56. As a result of the above-described misconduct on the part of the Defendants,

LaShawn Ezell was wrongfully convicted of armed robbery, and sentenced to twenty years in

prison. He served ten years in prison and was released in 2005.

## PLAINTIFF'S EXONERATION

57. Throughout his prosecution and before and after his incarceration, LaShawn Ezell

continued to maintain his innocence and pursued all possible legal avenues to prove it.

58. In 2009, the Circuit Court of Cook County entered an order allowing the

fingerprints from the murder investigation to be reanalyzed and, where applicable, uploaded into

the Automated Fingerprint Identification System (AFIS). That testing excluded Mr. Johnson, Mr.

Styles, Mr. Ezell, and Mr. McCoy. The AFIS upload also led to matching the latent crime scene

fingerprints to the fingerprints of three other previously unidentified men – convicted felons with

no connection to Plaintiff or his co-defendants.

59. LaShawn Ezell subsequently filed a petition under 735 ILCS 5/2-1401 based on

newly-discovered evidence that he was innocent. The Court set this matter for an evidentiary

hearing. Ultimately, the State agreed that Mr. Ezell was entitled to a new trial. On February 15,

2017, the Cook County State's Attorney's Office dismissed all charges against Mr. Ezell.

60. On April 21, 2017, Mr. Ezell filed a petition in the Circuit Court of Cook County

for a Certificate of Innocence. The Circuit Court granted his petition on January 22, 2018.

## THE DEFENDANT OFFICERS' PATTERN OF MISCONDUCT AND
## THE CITY'S POLICIES AND PRACTICES FACILITATING SUCH MISCONDUCT

61. The Defendant Officers' egregious misconduct in this case was not an isolated

occurrence. It was undertaken pursuant to, and proximately caused by, the *de facto* policies and

practices of the City of Chicago, acting through the CPD and its officers, which were in place at all relevant times pertaining to this case.

62.     LaShawn Ezell and his co-defendants were coerced into giving false and inculpatory statements pursuant to such municipal policy.  The CPD and its detectives and police officers have a long history of using physically and psychologically coercive interrogation tactics in order to elicit statements from suspects and witnesses in criminal cases, causing hundreds of false confessions and wrongful convictions in the City of Chicago.

63.     Defendants Cassidy and Boudreau are two notorious homicide detectives who, under disgraced Chicago Police Commander Jon Burge, had lengthy track records of coercing and manufacturing confessions from youth as young as 7 years old.  Both Defendants, as well as Defendant Valadez, conspired with other Area One detectives, including Sergeant Tuider, to coerce the false confessions of five teenagers from the Englewood neighborhood of Chicago (Terrill Swift, Harold Richardson, Michael Saunders, Vincent Thames and Jerry Fincher) in March 1995 – just six months before the events in this case occurred.  Those teenagers were subsequently exonerated after each served almost 15 years in prison.

64.     At all relevant times, the City of Chicago had a policy and practice of coercing false confessions from those in police custody and using these statements to obtain wrongful convictions.  Pursuant to this municipal policy and practice, CPD officers, including the officers at Area One, used interrogation tactics identical or similar to those employed by the Defendants in this case to extract confessions.  These tactics included: (a) psychological intimidation and manipulation; (b) the use of clearly unreliable or coerced informants and/or witnesses; (c) the fabrication of confessions; (d) the misleading of parents/guardians and denial of access to their children during interrogations; (e) the denial of access to counsel; (f) the concealment of

exculpatory information; (g) false promises of leniency in exchange for "cooperation" in the

form of a confession; (h) sleep and food deprivation; and (i) the use of other unlawful tactics to

secure the arrest, prosecution, and conviction of persons, including juveniles and teenagers,

without regard to their actual guilt or innocence of the offense.

65.     Juveniles and young adults, in particular, including Mr. Ezell, Mr. Styles, Mr.

Johnson, and Mr. McCoy, were the most vulnerable targets of this municipal policy.  Law

enforcement officers are trained to know that youth are inherently more suggestible, susceptible

to manipulation, and frequently lack the ability to fully understand – let alone assert – their rights

during an interrogation.  As a matter of widespread custom and practice, CPD officers, including

but not limited to the Defendant Officers, exploited the vulnerability and suggestibility of the

youth in their custody in order to obtain false confessions and close open cases.  CPD detectives

systematically denied juvenile and teenage suspects access to their guardians and to counsel, fed

them details of the crime, made false promises of leniency, and generally subjected these youth

to immense physical and psychological pressure until they "confessed."  This practice is aided,

perpetuated, and enhanced by the Chicago Police Department's policy and practice of using so-

called "youth officers" to assist in coercion of juveniles during interrogations as set forth more

fully in this Complaint.

66.     Also pursuant to municipal policy and practice, members of the CPD, including

the Defendant Officers, systematically suppressed evidence pertaining to the fabricated and

coerced confessions obtained in interrogations.  This exculpatory information was concealed

both from trial attorneys within the Cook County State's Attorney's Office and from criminal

defendants and their counsel.  In furtherance of this municipal policy and practice, CPD officers,

including the Defendants in this case, repeatedly committed perjury while testifying in criminal

proceedings in order to conceal their use of coercive interrogation techniques. Defendants Valadez, Cassidy, and Boudreau, in particular, committed this same misconduct in the aforementioned Englewood case in the same year Mr. Ezell went to trial.

67.     At all relevant times, the City of Chicago also had in place *de facto* policies and practices by which CPD officers, including the Defendant Officers, were led to believe they could act with impunity, which served to facilitate and further their misconduct. These policies and practices include: failing to identify and track officers who commit serious misconduct; failing to investigate cases in which CPD officers are implicated in obtaining coerced and false confessions, as well as unfounded charges and wrongful convictions; failing to meaningfully discipline officers accused of such unlawful conduct; and facilitating a code of silence within the CPD. Pursuant to the City's code of silence, CPD officers were trained and required to lie or remain silent about misconduct committed on the job by their fellow officers.

68.     The City of Chicago's failure to train, supervise, and discipline its officers effectively condoned, ratified, and sanctioned the kind of misconduct that the Defendant Officers committed against Plaintiff and his co-defendants in this case.

69.     The City of Chicago and officials within the CPD failed to act to remedy the abuses described in the preceding paragraphs, despite actual knowledge of the patterns of misconduct. They thereby perpetuated the unlawful practices and ensured that no action would be taken (independent of the judicial process) to remedy Plaintiff's ongoing injuries.

70.     All of the policies and practices described in the foregoing paragraphs were knowingly approved by City of Chicago policymakers, who were deliberately indifferent to the fact that CPD officers systematically violated the rights of the people they were sworn to protect.

## LASHAWN EZELL'S DAMAGES

71.     LaShawn Ezell spent ten years in custody for a crime he did not commit.  He has

attempted, over the years, to make a life for himself outside of prison without the benefit of a

decade of life experience – including his late teens and early twenties—which normally equip

adults for that task.

72.     Mr. Ezell's emotional pain and suffering stemming from the loss of these

formative years has been substantial. During his incarceration, LaShawn Ezell was stripped of

the basic pleasures of human experience, from the simplest to the most important, which all free

people enjoy as a matter of right. He missed the opportunity to begin living independently, to

share holidays, births, funerals, and other life events with loved ones, to have girlfriends, to fall

in love, to marry, and to pursue a career, and the fundamental freedom to live his life as an

autonomous human being. Upon his release, he had to live his life as a person branded as being a

violent criminal who was involved in murder, and faced all the stigma and deprivation of

experiences that result from this labeling.

73.     As a result, LaShawn Ezell has suffered tremendous damage, including but not

limited to physical harm, mental suffering, and loss of a normal life, all proximately caused by

Defendants' misconduct.

### Count I – 42 U.S.C. § 1983
### Violation of Due Process
### (Fourteenth Amendment)

74.     Each paragraph of this Complaint is incorporated as if restated fully herein

75.     As described more fully above, all of the Defendant Officers, acting individually,

jointly, and/or in conspiracy, deprived LaShawn Ezell of his constitutional right to due process

and to a fair trial.

76.     In the manner described more fully above, the Defendant Officers fabricated false inculpatory statements from Mr. Ezell and his co-defendants, deliberately withheld and suppressed exculpatory evidence from the prosecutors and defense counsel, and fabricated false reports and other evidence, thereby causing the wrongful prosecution of LaShawn Ezell. Absent this misconduct, the criminal prosecution of Mr. Ezell could not and would not have been pursued.

77.     The Defendant Officers' misconduct directly resulted in the unjust criminal conviction and continuing wrongful incarceration of LaShawn Ezell, thereby denying him his constitutional right to a fair trial, in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

78.     As a result of this violation of his constitutional right to a fair trial, LaShawn Ezell suffered injuries, including but not limited to the loss of his liberty, physical harm, severe emotional distress and anguish.

79.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice and willful indifference to Lashawn's clearly established constitutional rights.

**Count II – 42 U.S.C. § 1983**
**Coerced and Inculpatory Statements**
**(Fifth Amendment and Fourteenth Amendment)**

80.     Each paragraph of this Complaint is incorporated as if restated fully herein.

81.     In the manner described more fully above, the Defendants, including the Defendant Officers and Defendant Alesia, individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, conducted an unconstitutional interrogation of Mr. Ezell, and coerced him into making involuntary statements

implicating himself in the armed robbery and murders of Khaled Ibrahim and Yousef Ali, in violation of his rights secured by the Fifth and Fourteenth Amendments.

82.     The false and involuntary inculpatory statement Defendants obtained from Mr. Ezell was used against Mr. Ezell to his detriment in his criminal case. Without this statement, Mr. Ezell never would have been prosecuted or convicted for armed robbery in connection with the murders of Khaled Ibrahim and Yousef Ali.

83.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Mr. Ezell's innocence.

84.     As a result of this violation of his constitutional right to a fair trial, LaShawn Ezell suffered injuries, including but not limited to the loss of his liberty, physical harm, severe emotional distress and anguish.

## Count III – 42 U.S.C. § 1983
## Failure to Intervene

85.     Each paragraph of this Complaint is incorporated as if restated fully herein.

86.     In the manner described above, during the constitutional violations described herein, one or more of the Defendants, including the Defendant Officers and Defendant Alesia, stood by without intervening to prevent the violation of LaShawn Ezell's constitutional rights, even though they had a reasonable opportunity to do so.

87.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with willful indifference to Mr. Ezell's constitutional rights.

88.     As a result of the misconduct described in this count, LaShawn Ezell suffered injuries, including but not limited to the loss of his liberty, physical harm, severe emotional distress and anguish.

**Count IV – 42 U.S.C. § 1983**
**Supervisory Liability**

89.     The violation of Plaintiff's constitutional rights as described above was proximately caused by the deliberate indifference and/or recklessness of the Supervisory Defendants, including but not limited to Bonke and Tuider.

90.     Specifically, these Defendants were personally involved in Plaintiff's placement in detention, the CPD's evaluation of his case and the cases of the other teenagers. They knew or, in the absence of their deliberate indifference and recklessness, should have known of their subordinates' unconstitutional actions and related misconduct in the case.

91.     The misconduct described in this Count was objectively unreasonable, and was undertaken intentionally, with malice, willfulness, and deliberate indifference to Plaintiff's clearly established constitutional rights.

92.     The personal involvement of these Defendant Officers, through their actions and omissions, proximately and directly caused the constitutional deprivations and grievous personal injuries suffered by Plaintiff, including the above-mentioned injuries and damages.

**Count V – 42 U.S.C. § 1983**
**Conspiracy to Deprive Plaintiff of His Constitutional Rights**

93.     Each paragraph of this Complaint is incorporated as if restated fully herein.

94.     After the murders of Khaled Ibrahim and Yousef Ali, the Defendant Officers, acting within the scope of their employment and under color of law, agreed among themselves and with other individuals to deprive LaShawn Ezell of his constitutional rights, including his rights to due process and to a fair trial, all as described in the various paragraphs of this Complaint.

95.     Additionally, before and after Mr. Ezell's conviction, the Defendant Officers further conspired to deprive him of exculpatory information to which he was lawfully entitled and which would have led to his not being charged, his acquittal, or his more timely exoneration.

96.     In furtherance of this conspiracy, each of the Defendant Officers engaged in and facilitated overt acts, including but not limited to those set forth above –fabricating evidence, withholding exculpatory evidence, and obtaining involuntary statements – and was an otherwise willful participant in joint activity.

97.     After the murders of Khaled Ibrahim and Yousef Ali, Defendant Alesia, acting within the scope of his employment and under color of law, agreed with the Defendant Officers and other individuals to deprive LaShawn Ezell of his constitutional right against compelled self-incrimination, as provided for by the Fifth Amendment, and described in the various paragraphs of this Complaint.

98.     In furtherance of this conspiracy, Defendant Alesia engaged in and facilitated overt acts, including but not limited to obtaining involuntary statements from Mr. Ezell and his co-defendants and concealing evidence of the coercive and unconstitutional tactics, and was an otherwise willful participant in joint activity.

99.     As a direct and proximate result of the illicit prior agreements and actions in furtherance of the conspiracies referenced above, Mr.  Johnson's rights were violated, and he suffered injuries, including but not limited to loss of liberty, physical harm, and emotional distress.

100.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, willfulness, and deliberate indifference to Lashawn's rights.

**Count VI - 42 U.S.C. §1983**
**Deprivation of Liberty Without Probable Cause**
**(Fourth Amendment)**

101.    Each paragraph of this Complaint is incorporated as if restated fully herein.

102.    In the manner described more fully above, the Defendant Officers caused Plaintiff

to be detained and imprisoned without probable cause.

103.    The misconduct described in this Count was objectively unreasonable and was

undertaken intentionally, with malice, willfulness, and deliberate indifference to LaShawn

Ezell's

104.    The misconduct described in this Count was undertaken by the Defendant

Officers under color of law and within the scope of their employment.

105.    The misconduct described in this Count was objectively unreasonable and was

undertaken intentionally, with malice, and/or with reckless indifference to the rights of others.

106.    As a direct and proximate result of the Defendant Officers' actions, Mr. Ezell

suffered injuries, including but not limited to the loss of his liberty, physical harm, severe

emotional distress and anguish.

**Count VII – 42 U.S.C. §1983**
**Municipal Liability**

107.    Each paragraph of this Complaint is incorporated as if restated fully herein.

108.    The actions of the individual Defendant Officers were undertaken pursuant to the

policies and practices of the CPD, described above and below, which included (1) failing to

supervise, discipline and control Chicago Police officers and (2) maintaining a code of silence

within the CPD, all of which facilitated the Defendant Officers' misconduct here.

109.    These policies and practices were ratified by policymakers for the City of Chicago

with final policymaking authority.

110.     At all times material to this Complaint, Defendant City of Chicago, through its Police Department, the Office of Professional Standards (OPS), Police Superintendents, Police Board, Mayor, City Council and/or Corporation Counsel's Office, had interrelated de facto policies, practices, and customs which included, inter alia:

a.  conducting physically, psychologically, or otherwise illegal or improperly coercive interrogations of witnesses, suspects and arrestees, in order to obtain confessions, including from juveniles and teenagers;

b.  manufacturing, fabricating, and/or using improper suggestive tactics to obtain statements from suspects and witnesses, particularly juveniles or teenagers;

c.  the use of "youth officers" to disguise, excuse, and perpetuate the practice of conducting physically, psychologically, and otherwise illegal and improperly coercive interrogations of juveniles, including the practice of involving youth officers in such interrogations, denying parents and/or guardians access to the juvenile in custody, and failing to notify a parent and/or guardian of a juvenile in custody;

d.  filing false police reports, and giving false statements and testimony about these interrogations, confessions, and witness statements;

e.  suppressing evidence concerning the circumstances of these interrogations and confessions;

f.  pursuing and obtaining prosecutions and incarceration on the basis of confessions obtained during these interrogations, and otherwise covering up the true nature of the interrogations, confessions, and witness statements;

g.  failing to video and/or audio record the interrogation or questioning of suspects, arrestees, and witnesses, particularly in the circumstances set forth in parts (a) and (b), above;

h.  failing to properly train, supervise, discipline, transfer, monitor, counsel, and/or otherwise control police officers, particularly those who were repeatedly accused of physically, psychologically, or otherwise illegally or improperly engaging in coercive questioning or interrogation of witnesses, suspects and arrestees; of torture and related physical abuse of suspects; of false arrests, wrongful imprisonments, malicious prosecutions, and wrongful convictions; and/or of making false reports and statements. This failure to properly train, supervise, discipline, transfer, monitor, counsel, and/or otherwise control specifically includes the "repeater" Defendants named herein, including, but not limited to, Defendants Cassidy, Alesia, Daly, Davis, Valadez, Bloore, Fine, and Coughlin, who have been accused on numerous occasions of such misconduct, including prior to the time period implicated in this case;

i. the police code of silence, specifically in cases where officers engaged in the violations articulated in paragraphs a through e, above, whereby police officers refused to report or otherwise covered up instances of police misconduct, and/or fabricated, suppressed, and/or destroyed evidence of which they were aware, despite their obligation under the law and police regulations to so report. This code of silence also has resulted in police officers either remaining silent or giving false and misleading information, and/or testimony during official investigations and grand jury proceedings, in order to protect themselves and/or fellow officers from internal discipline, civil liability, or criminal charges, and perjuring themselves in criminal cases where they and/or their fellow officers have been accused of misconduct.

111. The interrelated pattern and practices alleged above were or should have been well-known within the CPD, both before and after LaShawn Ezell was interrogated and wrongfully convicted, as well as by successive mayors, police superintendents and OPS directors, and by the Chicago City Council and the Chicago Police Board, and other policy-making, command, and supervisory City and police personnel, who participated in the cover-up and/or continuation of the policies and practices for years.

112. The interrelated policies, practices, and customs set forth above, both individually and together, were maintained and implemented with deliberate indifference. They encouraged, *inter alia*, the coercing of statements from suspects, witnesses, and arrestees, particularly from juveniles and other teenagers; the construction and fabrication of confessions, admissions, statements, and other false witness evidence; the suppression and destruction of exculpatory evidence, the intimidation of witnesses, the making of false statements and reports, the giving of false testimony, and the obstruction of justice; and the pursuit and continuation of wrongful convictions and false arrests and imprisonments. The interrelated policies, practices and customs set forth above were, separately and together, a direct and proximate cause (*i.e.* a moving force) of the unconstitutional acts and perjury committed by the named Defendants and their co-conspirators, and the injuries suffered by LaShawn Ezell, including his wrongful conviction and imprisonment.

113.     Additionally, the City of Chicago's failure to properly train, discipline, monitor, control, assign, transfer, supervise, and counsel the Defendant Officers, including but not limited to Defendants Cassidy, Boudreau, and Valadez, was also done with deliberate indifference and likewise acted as a direct and proximate cause (*i.e.* a moving force) of the injuries to LaShawn Ezell.

**Count VIII – State Law Claim**
**Malicious Prosecution**

114.     Each paragraph of this Complaint is incorporated as if restated fully herein.

115.     The Defendant Officers, despite knowing that probable cause did not exist to prosecute LaShawn Ezell for armed robbery in connection with the murders of Khaled Ibrahim and Yousef Ali, acted individually, jointly, and/or in concert and in conspiracy, to cause Mr. Ezell to be arrested and prosecuted for that crime.  The Defendant Officers made statements to trial prosecutors with the intent of exerting influence and to institute and continue the unjust judicial proceedings.

116.     Specifically, the Defendant Officers were aware that, as described more fully above, no true or reliable evidence implicated LaShawn Ezell in having involvement in these murders, all inculpatory evidence, including the supposed lineup identification of Larod Styles, was coerced and fabricated, and forensic evidence indicated LaShawn's innocence. Furthermore, the Defendant Officers intentionally withheld from and misrepresented to prosecutors and the grand jury facts that further vitiated probable cause against LaShawn Ezell, as set forth above, and failed to investigate evidence that could have led to the actual assailant. The Defendant Officers performed the above-described acts deliberately, with malice, and with reckless disregard for LaShawn Ezell's rights.

117.     In February 2017, the Cook County State's Attorney's Office *nolle prossed*

LaShawn Ezell's case, and on January 22, 2018, the Circuit Court of Cook County awarded Mr.

Ezell a Certificate of Innocence, which constitutes a termination of the criminal proceedings in

his favor.

118.     As a direct and proximate result of this misconduct, Mr. Ezell sustained, and

continues to sustain, injuries as set forth above, including pain and suffering.

**Count IX – State Law Claim**
**Intentional Infliction of Emotional Distress**

119.     Each paragraph of this Complaint is incorporated as if restated fully herein.

120.     The acts and conduct of the Defendants, including the Defendant Officers and

Defendant Alesia, as set forth above were extreme and outrageous.  The Defendants' actions

were rooted in an abuse of power or authority, and they were undertaken with intent to cause, or

were in reckless disregard of the probability that their conduct would cause, severe emotional

distress to LaShawn Ezell, as is more fully alleged above.

121.     As a direct and proximate result of the Defendants' actions, Mr. Ezell suffered

and continues to suffer severe emotional distress.

**Count X – State Law Claim**
**Civil Conspiracy**

122.     Each paragraph of this Complaint is incorporated as if restated fully herein.

123.     As described more fully in the preceding paragraphs, the Defendants, including

the Defendant Officers and Defendant Alesia, acting in concert with other known and unknown

co-conspirators, conspired by concerted action to accomplish an unlawful purpose by unlawful

means.

124.     In furtherance of the conspiracy, the Defendant Officers committed unlawful

overt acts and were otherwise willful participants in joint activity including but not limited to the

malicious prosecution of LaShawn Ezell and the intentional infliction of emotional distress upon

him.

125.     In furtherance of the conspiracy, Defendant Alesia committed unlawful overt acts

and was otherwise willful participants in joint activity including but not limited to the intentional

infliction of emotional distress upon LaShawn Ezell.

126.     The misconduct described in this Count was undertaken intentionally, with

malice, willfulness, and reckless indifference to the rights of others.

127.     As a direct and proximate result of the Defendants' conspiracies, Mr. Ezell

suffered damages, including severe emotional distress and anguish, as is more fully alleged

above.

**Count XI – State Law Claim**
**Respondeat Superior**

128.     Each paragraph of this Complaint is incorporated as if restated fully herein.

129.     In committing the acts alleged in the preceding paragraphs, each of the Defendant

Officers were members of, and agents of, the CPD, acting at all relevant times within the scope

of their employment and under color of law.

130.     Defendant City of Chicago is liable as principal for all torts in violation of state

law committed by its agents.

**Count XII – State Law Claim**
**Indemnification**

131.    Each paragraph of this Complaint is incorporated as if restated fully herein.

132.    Illinois law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

133.    The Defendant Officers are or were employees of the CPD who acted within the scope of their employment in committing the misconduct described herein.

134.    Defendant Alesia was at all times material to this complaint the employee of the Cook County State's Attorney's Office, and Defendant Cook County is therefore responsible for any judgment entered against Defendant Alesia and for any judgment entered against him arising from said employment with the County, making the County a necessary party to this complaint.

WHEREFORE, Plaintiff, LASHAWN EZELL, respectfully requests that this Court enter judgment in his favor and against Defendants JAMES CASSIDY, KENNETH BOUDREAU, LUKE DALY, DWAYNE DAVIS, FRANCIS VALADEZ, BERNARD RYAN, JOHN BLOORE, CHERYL GREEN, J. FINE, the ADMINISTRATOR of the ESTATE of THOMAS COUHGLIN, THOMAS RICHARDSON, SERGEANT LARRY TUIDER, SERGEANT FRED BONKE, former COOK COUNTY ASSISTANT STATE'S ATTORNEY JOSEPH ALESIA, the COUNTY OF COOK, the CITY OF CHICAGO, as well as-yet UKNOWN CITY OF CHICAGO EMPLOYEES, awarding compensatory damages, attorneys' fees, and costs against each Defendant, and punitive damages against each of the individual Defendants, as well as any other relief this Court deems appropriate.

## JURY DEMAND

Plaintiff, LASHAWN EZELL, hereby demands a trial by jury pursuant to Federal Rule of

Civil Procedure 38(b) on all issues so triable.

Respectfully submitted,

**LASHAWN EZELL**

By:____/s/ Tara Thompson_____
        One of his attorneys

Arthur Loevy
Jon Loevy
Tara Thompson
Elizabeth Mazur
Joshua Tepfer
Loevy & Loevy
311 N. Aberdeen
Third Floor
Chicago, Illinois  60607
(312) 243-5900