*Ezell v. City of Chicago, et al*
Case No. 18 CV 01049

# EXHIBIT C

Charles Johnson Complaint

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

_____

| | |
|---|---|
| CHARLES JOHNSON, | ) |
| | ) |
|    Plaintiff, | ) |
| | ) |
|    v. | ) |
| | ) |
| CHICAGO POLICE OFFICERS JAMES CASSIDY (#2027), | ) |
| KENNETH BOUDREAU (#20435), LUKE DALY (#21064), | ) |
| FRANCIS VALADEZ (#21008), BERNARD RYAN | )    Case No. 18 C 1062 |
| (#20867), JOHN BLOORE (#3081), J. FINE (#20213), | ) |
| the ADMINISTRATOR OF THE ESTATE OF | ) |
| THOMAS COUGHLIN (#20983), | ) |
| THOMAS  RICHARDSON (#3385), | )    JURY DEMAND |
| DWAYNE DAVIS (#21075), LARRY TUIDER (#1638), | ) |
| FRED BONKE (#2108), UNIDENTIFIED EMPLOYEES | ) |
| OF THE CITY OF CHICAGO, former COOK COUNTY | ) |
| ASSISTANT STATE'S ATTORNEY JOSEPH ALESIA, | ) |
| the COUNTY of COOK, and the CITY OF CHICAGO, | ) |
| | ) |
|    Defendants. | ) |

_____ )

## CIVIL RIGHTS COMPLAINT

Plaintiff, CHARLES JOHNSON, by his undersigned attorneys, complains of Defendants,

Chicago Police Department Officers JAMES CASSIDY, KENNETH BOUDREAU, LUKE

DALY, DWAYNE DAVIS, FRANCIS VALADEZ, BERNARD RYAN, JOHN BLOORE, J.

FINE, the ADMINISTRATOR of the ESTATE of THOMAS COUGHLIN, THOMAS

RICHARDSON, SERGEANT LARRY TUIDER, SERGEANT FRED BONKE, former COOK

COUNTY ASSISTANT STATE'S ATTORNEY JOSEPH ALESIA, the COUNTY of COOK,

the CITY OF CHICAGO, and as-yet UKNOWN CITY OF CHICAGO EMPLOYEES, as

follows:

## INTRODUCTION

1. In 1998, Charles Johnson was convicted of the execution style murders of Khaled Ibrahim and Yousef Ali, a brutal crime he did not commit. Arrested at the age of 19, he spent nearly half his life in prison before ultimately being exonerated and certified innocent.

2. Charles Johnson's wrongful conviction was no accident. Determined to close the murder cases, the Defendants – the Defendant Officers and Defendant former-Assistant State's Attorney Joseph Alesia – coerced false and inculpatory statements from Charles Johnson and his co-defendants. The Defendant Officers also withheld exculpatory evidence from the trial prosecutor and from the defense that would have proven Plaintiff's innocence.

3. As a result of the Defendants' misconduct, Charles Johnson was charged and wrongfully convicted, and sentenced to life in prison without the possibility of parole.

4. Nineteen years after they were convicted, and more than 21 years after being arrested and taken into custody by the Defendant Officers, the charges against Charles Johnson and his co-defendants were dropped when new fingerprint testing and other evidence confirmed their innocence.

5. The misconduct that gave rise to Charles Johnson's wrongful prosecution and conviction was not an aberration. The Chicago Police Department ("CPD"), including officers working within the CPD "Area" where this investigation occurred, engaged in a pattern of unlawfully coercing confessions over a period of years, frequently targeting young African-American men in order to close unsolved cases through overzealous and unlawful methods of interrogation. Defendants James Cassidy and Kenneth Boudreau, in particular, have long track records of coercing false confessions and fabricating evidence against those in their custody.

The City of Chicago permitted these officers to act with impunity for years. They have never been disciplined for their egregious acts, committed within the scope of their employment.

6. Plaintiff Charles Johnson now files this civil rights action to bring the Defendants' misconduct to light, and to ensure that they are finally held accountable for their misconduct. Although Plaintiff has won back his freedom, he will never regain the lost years of his life in which he was incarcerated for crimes he did not commit. This lawsuit seeks redress for these grievous injuries.

## JURISDICTION AND VENUE

7. This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of law of Plaintiff's rights as secured by the United States Constitution.

8. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367. Venue is proper under 28 U.S.C. § 1391(b). The events giving rise to the claims asserted herein occurred in this judicial district, the parties reside in this district, and Defendant City of Chicago is a municipal corporation located here.

## PARTIES

9. Plaintiff Charles Johnson is 41 years old. At the time of the murders, Charles was a high school graduate and living with his family at 7251 South Claremont Avenue in Chicago. He worked for the Coca-Cola Company as a delivery driver.

10. At all relevant times, James Cassidy, Kenneth Boudreau, Bernard Ryan, John Bloore, Thomas Coughlin, Dwayne Davis, Luke Daly, J. Fine, Thomas Richardson, and Frances Valadez were officers with the CPD, employed by Defendant City of Chicago, and acting within the scope of their employment. They are sued in their individual capacities. Detective Coughlin is deceased and, accordingly, the administrator of his estate is named as a party-defendant herein.

These individuals are referred to collectively as "Defendant Officers."

11.    At all relevant times, Defendants Larry Tuider and Fred Bonke were sergeants with the CPD, employed by Defendant City of Chicago, and acting within the scope of their employment.  They are sued in their individual capacities.

12.    At all relevant times, Defendant Joseph Alesia was an Assistant State's Attorney in the Cook County State's Attorney's Office.  He is sued in his individual capacity.

13.    Defendant City of Chicago is a municipal corporation under the laws of the State of Illinois.

14.    Defendant Cook County is a governmental entity within the State of Illinois, and it is obligated to indemnify employees of the Cook County State's Attorney's Office.

## FACTS

### The Murders of Khaled Ibrahim and Yousef Ali

15.    At approximately 6:30 p.m. on December 4, 1995, two men perused cars at Elegant Auto, a used car lot on Chicago's South Side.  While there, the men examined and touched two vehicles.  They then went to Prestige Auto, a car lot next door, where they examined a third car.

16.    At around 7:00 p.m., the two men returned to Elegant Auto, entered an office at the back of the lot, and open fired on owners Khaled Ibrahim and Yousef Ali.  The perpetrators killed Ibrahim and Ali execution-style, but left two other employees alive.

17.    The perpetrators then stole two cars from the lot and sped away from the scene. The stolen cars were not the same vehicles that the men had examined and touched earlier that evening.

18.     CPD forensic investigators arrived at the scene at around 7:30 p.m. that night; they lifted finger and palm prints from the two cars at Elegant Auto and the one car at Prestige Auto that the perpetrators had touched.

19.     At approximately 2:00 a.m. on December 5, 1995, CPD officers recovered the two stolen cars five miles away from the crime scene.  They also recovered marketing stickers that had been displayed on the cars and subsequently peeled off.  Fingerprints were lifted from both the cars and from the stickers.

20.     None of these recovered prints matched either Charles Johnson or any of his eventual co-defendants.

### Defendant Officers Arrest and Obtain False and Coerced Inculpatory Statements From Teenagers Troshawn McCoy, Larod Styles, and LaShawn Ezell

21.     On the afternoon of December 6, 1995, the day after the murders, Defendant Officers including Detectives Cassidy, Davis, and Daley, arrested 17-year-old Troshawn McCoy at his high school and took him to the Area One police station, located at 51st and Wentworth.

22.     Although the Defendants had no reason to believe that Mr. McCoy was involved in the murders, they harshly interrogated the teenager, isolating him, denying him the right to counsel, and feeding him information about the murders.  The Defendants used such tactics to coerce him into adopting their version of events.

23.     Even though he was innocent of the crimes, Troshawn McCoy eventually succumbed to the Defendants' coercion and manipulation and falsely implicated himself and three other teenagers – Larod Styles, LaShawn Ezell, and Plaintiff Charles Johnson – in the murders.  He gave a false and inculpatory statement to the Defendant Officers and to Defendant Alesia.

24.     Defendant Alesia was at the police station and actively working on this investigation with the Defendant Officers starting in the afternoon of December 5, 1995 and continuing into the early morning hours of December 6, 1995. He participated with the Defendant Officers in the unlawful interrogations of each of the four teenagers and cooperated with the Defendant Officers in obtaining the false and inculpatory statements.

25.     In his transcribed statement, Mr. McCoy parroted the Defendant Officers' concocted scenario in which he and Mr. Ezell acted as lookouts for Charles Johnson and Larod Styles, who planned to steal a car from Elegant Auto. Mr. McCoy falsely stated that he and Mr. Ezell watched Mr. Johnson and Mr. Styles enter the Elegant Auto office, heard gunshots seconds later, and then saw Mr. Johnson and Mr. Styles run out and drive away in the two stolen cars from the lot.

26.     The Defendant Officers, including Defendant Cassidy, knew that Mr. McCoy's statement was coerced and false and merely a recitation of their fabrications. Nevertheless, the Defendant Officers used Mr. McCoy's coerced confession to arrest and interrogate Mr. Ezell, Mr. Styles, and Mr. Johnson, all without probable cause.

27.     The Defendant Officers, including Detectives Davis and Valadez, arrested 15-year-old LaShawn Ezell at around 4:15 p.m. on December 5, 1995.

28.     Using many of the same unconstitutional techniques that they used on Mr. McCoy, the Defendant Officers interrogated Mr. Ezell for over six hours. These officers, including Defendant Coughlin, with the participation and full cooperation of Defendant Alesia, obtained a false and involuntary inculpatory statement from the young teenager at or around 11:00 p.m. that night.

6

29.     Mr. Ezell was interrogated outside the presence of a parent, guardian or an attorney.  Although a youth officer was present for Mr. Ezell's interrogation and false confession, she did nothing to intervene to prevent his false confession, or to protect Mr. Ezell's interests and rights during the interrogations.

30.     The Defendant Officers, including Detectives Bloore, Coughlin, Richardson, and Fine, then arrested Larod Styles at his home at or around 5:00 p.m. on December 5, 1995.  Mr. Styles had just turned 16 years old two weeks earlier, and did not yet have a driver's license.

31.     Despite having knowledge of Larod Styles's young age, the Defendant Officers interrogated him off and on for several hours outside the presence of a parent, guardian, attorney or other adult interested in his welfare.

32.     It was only after Mr. Styles had been interrogated multiple times that the Defendant Officers brought in a youth officer.  That officer never actually spoke to Mr. Styles, and he did nothing to intervene to prevent his false confession, or to protect Mr. Styles' interests and rights during the interrogations.

33.     Although Mr. Styles, who was handcuffed to the wall during the interrogation, adamantly denied any involvement in the murders, the Defendant Officers, including Defendant Bloore, obtained a false and involuntary inculpatory statement from Mr. Styles around 1:00 a.m. on December 6, 1995.  Defendant Alesia participated and fully cooperated in the coercive interrogation and the signing of the false, inculpatory statement.

### Officers Arrest, Interrogate, and Obtain a
### False and Involuntary Inculpatory Statement from Charles Johnson

34.     At around 5:30 p.m. on December 5, 1995, the Defendant Officers, including Detectives Bloore, Daly, Richardson, Ryan, and Davis, arrested Plaintiff Charles Johnson, then 19 years old, at his home.

35.     Mr. Johnson had just returned from a full day of work as a Coca-Cola Company delivery driver.

36.     The Defendant Officers had no probable cause to effectuate Mr. Johnson's arrest. Yet, the Defendants handcuffed Mr. Johnson and refused to tell him why he was under arrest.

37.     As they transported Mr. Johnson to the Area One police headquarters, the Defendant Officers taunted him, calling him stupid, telling him to shut up, and offering to get him food but then refusing to stop for anything.  When Mr. Johnson discovered that he had been arrested for murder, he immediately and consistently denied any involvement in the crime.

38.     Mr. Johnson was held in a small interrogation room where he was handcuffed to the wall.  Over the course of several hours, the Defendant Officers, including Defendants Cassidy, Boudreau, Valadez, and Ryan, subjected Mr. Johnson to a hostile and aggressive interrogation concerning the double murder.  Throughout the interrogation, Charles Johnson proclaimed his innocence.

39.     Unsatisfied with Mr. Johnson's protestations of innocence, the Defendant Officers worked to overbear Mr. Johnson's will and force him to falsely implicate himself in the murders. The officers' coercive tactics included:

a.   Threatening Mr. Johnson that he would get the death penalty if he failed to cooperate and adopt the confession as fabricated by the Defendant Officers;

b.   Shouting at Mr. Johnson, swearing at Mr. Johnson, and telling him that he would never see his family again unless he confessed to the crime;

c.   Telling Mr. Johnson that he would be sexually assaulted in prison unless he confessed to the crime;

d.   Falsely telling Mr. Johnson that he had been identified in witness lineups and implicated in the murders by witnesses;

e.   Ignoring Mr. Johnson's repeated assertions to the Defendant Officers that he had an alibi, *i.e.*, that he had been at his girlfriend's house at the time of the murders;

    f.   Promising Mr. Johnson that he would receive a more lenient sentence if he inculpated himself in the murders;

    g.   Telling Mr. Johnson he would be charged as the "trigger man" if he did not inculpate himself; and

    h.   Failing and refusing to terminate questioning when Mr. Johnson repeatedly requested a lawyer.

40.    The Defendant Officers gave Mr. Johnson information relating to the crime, including facts concerning the number of people in the car lot office, the color of the stolen get-away vehicles, and the location where the stolen vehicles were abandoned. These are the same facts that the Defendant Officers fed to Mr. Johnson's co-defendants.

41.    After approximately ten hours of intermittent questioning by the Defendant Officers, Charles Johnson was taken to a different interrogation room. At some point while Plaintiff was in this room, Defendant Alesia and an as-yet-unidentified Assistant State's Attorney entered the room. Before speaking to Mr. Johnson, Defendant Alesia met with Defendant Valadez, in order to obtain information about the investigation.

42.    The Assistant State's Attorneys asked Mr. Johnson to provide some background information. The as-yet-unidentified Assistant State's Attorney left shortly thereafter. At that point, Defendant Alesia personally interrogated Mr. Johnson, and repeatedly pressured Charles to incriminate himself in the crime. Mr. Johnson again denied any involvement.

43.    At around 3:00 a.m., Mr. Johnson was moved to a general office area. In that space, Defendant Alesia began showing Mr. Johnson photographs of individuals and asking Mr. Johnson to identify them. After each identification, Defendant Alesia asked Mr. Johnson to sign his name. Defendant Alesia then intentionally tricked and misled Mr. Johnson into signing and initialing the document, though Mr. Johnson did not understand what it was.

44.     Exhausted from the grueling interrogation, terrified, confused, and utterly worn down by the Defendant Officers' mistreatment, Mr. Johnson agreed to sign.  It was only later that Mr. Johnson realized he had actually signed a false statement that he was a shooter in the murders.

45.     Defendant Valadez was present for and participated in the signing of the false statement.

46.     At no point during the custodial interrogation or the signing of the false statement did either the Defendant Officers or the Assistant State's Attorney tell Mr. Johnson that he had the right to have an attorney present or to remain silent.  To the contrary, the Defendant Officers denied Mr. Johnson's repeated requests to contact an attorney on the grounds of "procedure," stating that he would be allowed to call his lawyer only after the interrogation was completed.

47.     As a result of the coercive and unconstitutional tactics used by both the Defendant Officers and Defendant Alesia, at the end of the long interrogation, Mr. Johnson signed a false statement inculpating himself in a heinous crime that he did not commit.

## PLAINTIFF'S CONVICTION

48.     In January of 1998, Charles Johnson stood trial for the murders of Khaled Ibrahim and Yousef Ali.  Mr. Johnson was tried jointly with Mr. Styles, although before separate juries.

49.     Mr. Johnson's statement was introduced against him at his trial, and was the State's primary evidence of Mr. Johnson's guilt.  No physical or forensic evidence linked Mr. Johnson to the crime.

50.     None of the Defendants who testified against Mr. Johnson, including Defendants Cassidy, Valadez, Daly, Boudreau, Coughlin, Fine, Ryan, and Alesia, disclosed how they obtained false and involuntary inculpatory statements from the four young men.

51.     As a result of the above-described misconduct on the part of the Defendants, Charles Johnson was wrongfully convicted of first-degree murder and armed robbery, and sentenced to life in prison without the possibility of parole.

## PLAINTIFF'S EXONERATION

52.     Throughout his prosecution and incarceration, Charles Johnson continued to maintain his innocence and pursued all possible legal avenues to prove it.

53.     In 2009, the Circuit Court of Cook County entered an order allowing the finger and palm prints from the murder investigation to be reanalyzed and, where applicable, uploaded into the Automated Fingerprint Identification System (AFIS).  That testing excluded Mr. Johnson, Mr. Styles, Mr. Ezell, and Mr. McCoy.  The AFIS upload also led to matching the latent crime scene fingerprints to the fingerprints of three other previously unidentified men – convicted felons with no connection to Plaintiff or his co-defendants.

54.     On November 17, 2010, Mr. Johnson filed a post-conviction petition based on his actual innocence.  The State filed a motion to dismiss, which the court granted.  Mr. Johnson appealed the ruling, and on March 29, 2013, the Illinois Appellate Court reversed and remanded the matter.

55.     On remand, the State agreed that Mr. Johnson was entitled to a new trial, and he was released, on bail, on September 23, 2016, after spending almost 21 years in prison for a crime he did not commit.

56.     Thereafter, on February 15, 2017, the Cook County State's Attorney's Office dismissed all charges against Mr. Johnson.

57.     On April 21, 2017, Mr. Johnson filed a petition in the Circuit Court of Cook County for a Certificate of Innocence.  The Circuit Court granted his petition on January 22,

2018.

## THE DEFENDANT OFFICERS' PATTERN OF MISCONDUCT AND
## THE CITY'S POLICIES AND PRACTICES FACLITATING SUCH MISCONDUCT

58.     The Defendant Officers' egregious misconduct in this case was not an isolated

occurrence.  It was undertaken pursuant to, and proximately caused by, the *de facto* policies and

practices of the City of Chicago, acting through the CPD and its officers, which were in place at

all relevant times pertaining to this case.

59.     Charles Johnson and his co-defendants were coerced into giving false and

inculpatory statements pursuant to these municipal policies and practices.  The CPD and its

detectives and police officers have a long history of using physically and psychologically

coercive interrogation tactics in order to elicit statements from suspects and witnesses in criminal

cases, causing hundreds of false confessions and wrongful convictions in the City of Chicago.

60.     Defendants Cassidy and Boudreau are two notorious homicide detectives who,

under disgraced Chicago Police Commander Jon Burge, had lengthy track records of coercing

and manufacturing confessions from youth as young as seven years old.  Both Defendants, as

well as Defendant Valadez, conspired with other Area One detectives, including Sergeant

Tuider, to coerce the false confessions of five teenagers from the Englewood neighborhood of

Chicago (Terrill Swift, Harold Richardson, Michael Saunders, Vincent Thames and Jerry

Fincher) in March 1995 – just six months before the events in this case occurred.  Those

teenagers were subsequently exonerated after each served almost 15 years in prison.

61.     At all relevant times, the City of Chicago had a policy and practice of coercing

false confessions from those in police custody and using these statements to obtain wrongful

convictions.  Pursuant to this municipal policy and practice, CPD officers, including the officers

at Area One, used interrogation tactics identical or similar to those employed by the Defendants

in this case to extract confessions. These tactics included: (a) psychological intimidation and manipulation; (b) the use of clearly unreliable or coerced informants and/or witnesses; (c) the fabrication of confessions; (d) the misleading of parents/guardians and denial of access to their children during interrogations; (e) the denial of access to counsel; (f) the concealment of exculpatory information; (g) false promises of leniency in exchange for "cooperation" in the form of a confession; (h) sleep and food deprivation; and (i) the use of other unlawful tactics to secure the arrest, prosecution, and conviction of persons, including juveniles and teenagers, without regard to their actual guilt or innocence of the offense.

62. Juveniles and young adults, in particular, including Mr. Johnson, Mr. Styles, Mr. Ezell, and Mr. McCoy, were the most vulnerable targets of this municipal policy. Law enforcement officers are trained to know that youth are inherently more suggestible, susceptible to manipulation, and frequently lack the ability to fully understand – let alone assert – their rights during an interrogation. As a matter of widespread custom and practice, CPD officers, including but not limited to the Defendant Officers, exploited the vulnerability and suggestibility of the youth in their custody in order to obtain false confessions and close open cases. CPD detectives systematically denied juvenile and teenage suspects access to their guardians and to counsel, fed them details of the crime, made false promises of leniency, and generally subjected these youth to immense physical and psychological pressure until they "confessed."

63. Also pursuant to municipal policy and practice, members of the CPD, including the Defendant Officers, systematically suppressed evidence pertaining to the fabricated and coerced confessions obtained in interrogations. This exculpatory information was concealed both from trial attorneys within the Cook County State's Attorney's Office and from criminal defendants and their counsel. In furtherance of this municipal policy and practice, CPD officers,

including the Defendants in this case, repeatedly committed perjury while testifying in criminal proceedings in order to conceal their use of coercive interrogation techniques. Defendants Valadez, Cassidy, and Boudreau, in particular, committed this same misconduct in the aforementioned Englewood case around the same time that Mr. Johnson went to trial.

64.    At all relevant times, the City of Chicago also had in place *de facto* policies and practices by which CPD officers, including the Defendant Officers, were led to believe they could act with impunity, which served to facilitate and further their misconduct. These policies and practices include: failing to identify and track officers who commit serious misconduct; failing to investigate cases in which CPD officers are implicated in obtaining coerced and false confessions, as well as unfounded charges and wrongful convictions; failing to meaningfully discipline officers accused of such unlawful conduct; and facilitating a code of silence within the CPD. Pursuant to the City's code of silence, CPD officers were trained and required to lie or remain silent about misconduct committed on the job by their fellow officers.

65.    The City of Chicago's failure to train, supervise, and discipline its officers effectively condoned, ratified, and sanctioned the kind of misconduct that the Defendant Officers committed against Plaintiff and his co-defendants in this case.

66.    The City of Chicago and officials within the CPD failed to act to remedy the abuses described in the preceding paragraphs, despite actual knowledge of the patterns of misconduct. They thereby perpetuated the unlawful practices and ensured that no action would be taken (independent of the judicial process) to remedy Plaintiff's ongoing injuries.

67.    All of the policies and practices described in the foregoing paragraphs were knowingly approved by City of Chicago policymakers, who were deliberately indifferent to the

fact that CPD officers systematically violated the rights of the people they were sworn to protect.

## CHARLES JOHNSON'S DAMAGES

68. Charles Johnson was incarcerated for almost 21 years for a crime he did not commit. He must now attempt to make a life for himself outside of prison without the benefit of over two decades of life experiences – including his young adulthood – that normally equip adults for that task.

69. Mr. Johnson's emotional pain and suffering stemming from the loss of these formative years has been substantial. During his incarceration, Charles Johnson was stripped of the basic pleasures of human experience, from the simplest to the most important, which all free people enjoy as a matter of right. He missed the opportunity to begin living independently, to share holidays, births, funerals, and other life events with loved ones, to have girlfriends, to fall in love, to marry, and to pursue a career, and the fundamental freedom to live his life as an autonomous human being.

70. As a result, Charles Johnson has suffered tremendous damage, including but not limited to physical harm, mental suffering, and loss of a normal life, all proximately caused by Defendants' misconduct.

### Count I – 42 U.S.C. § 1983
### Violation of Due Process
### (Fourteenth Amendment)

71. Each paragraph of this Complaint is incorporated as if restated fully herein.

72. As described more fully above, all of the Defendant Officers, acting individually, jointly, and/or in conspiracy, deprived Charles Johnson of his constitutional right to due process and to a fair trial.

73.     In the manner described more fully above, the Defendant Officers fabricated false inculpatory statements from Mr. Johnson and his co-defendants, deliberately withheld and suppressed exculpatory evidence from the prosecutors and defense counsel, and fabricated false reports and other evidence, thereby causing the wrongful prosecution of Charles Johnson. Absent this misconduct, the criminal prosecution of Mr. Johnson could not and would not have been pursued.

74.     The Defendant Officers' misconduct directly resulted in the unjust criminal conviction and continuing wrongful incarceration of Charles Johnson, thereby denying him his constitutional right to a fair trial, in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

75.     As a result of this violation of his constitutional right to a fair trial, Charles Johnson suffered injuries, including but not limited to the loss of his liberty, physical harm, severe emotional distress and anguish.

76.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice and willful indifference to Charles's clearly established constitutional rights.

### Count II – 42 U.S.C. § 1983
### Coerced and Inculpatory Statements
### (Fifth Amendment and Fourteenth Amendment)

77.     Each paragraph of this Complaint is incorporated as if restated fully herein.

78.     In the manner described more fully above, the Defendants, including the Defendant Officers and Defendant Alesia, individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, conducted an unconstitutional interrogation of Mr. Johnson, and coerced him into making involuntary

statements implicating himself in the murders of Khaled Ibrahim and Yousef Ali, in violation of his rights secured by the Fifth and Fourteenth Amendments.

79. The false and involuntary inculpatory statement Defendants obtained from Mr. Johnson was used against Mr. Johnson to his detriment in his criminal case. This statement was the only reason that Mr. Johnson was prosecuted for and convicted of the murders of Khaled Ibrahim and Yousef Ali.

80. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Mr. Johnson's innocence.

81. As a result of this violation of his constitutional right to a fair trial, Charles Johnson suffered injuries, including but not limited to the loss of his liberty, physical harm, severe emotional distress and anguish.

## Count III – 42 U.S.C. § 1983
## Failure to Intervene

82. Each paragraph of this Complaint is incorporated as if restated fully herein.

83. In the manner described above, during the constitutional violations described herein, one or more of the Defendants, including the Defendant Officers and Defendant Alesia, stood by without intervening to prevent the violation of Charles Johnson's constitutional rights, even though they had a reasonable opportunity to do so.

84. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with willful indifference to Mr. Johnson's constitutional rights.

85. As a result of the misconduct described in this count, Charles Johnson suffered injuries, including but not limited to the loss of his liberty, physical harm, severe emotional distress and anguish.

## Count IV – 42 U.S.C. § 1983
### Supervisory Liability

86.     The violation of Plaintiff's constitutional rights as described above was proximately caused by the deliberate indifference and/or recklessness of the Supervisory Defendants, including but not limited to Bonke and Tuider.

87.     Specifically, these Defendants were personally involved in Charles Johnson's placement in detention, and the CPD's evaluation of his case and the cases of the other teenagers. They knew or, in the absence of their deliberate indifference and recklessness, should have known of their subordinates' unconstitutional actions and related misconduct in the case.

88.     The misconduct described in this Count was objectively unreasonable, and was undertaken intentionally, with malice, willfulness, and deliberate indifference to Plaintiff's clearly established constitutional rights.

89.     The personal involvement of these Defendant Officers, through their actions and omissions, proximately and directly caused the constitutional deprivations and grievous personal injuries suffered by Plaintiff, including the above-mentioned injuries and damages.

## Count V – 42 U.S.C. § 1983
### Conspiracy to Deprive Constitutional Rights

90.     Each paragraph of this Complaint is incorporated as if restated fully herein.

91.     After the murders of Khaled Ibrahim and Yousef Ali, the Defendant Officers, acting within the scope of their employment and under color of law, agreed among themselves and with other individuals to deprive Charles Johnson of his constitutional rights, including his rights to due process and to a fair trial, all as described in the various paragraphs of this Complaint.

92.     Before and after Mr. Johnson's conviction, the Defendant Officers further conspired to deprive him of exculpatory information to which he was lawfully entitled and which would have led to his not being charged, his acquittal, or his more timely exoneration.

93.     In furtherance of this conspiracy, each of the Defendant Officers engaged in and facilitated overt acts, including but not limited to those set forth above – fabricating evidence, withholding exculpatory evidence, and obtaining involuntary statements – and was an otherwise willful participant in joint activity.

94.     After the murders of Khaled Ibrahim and Yousef Ali, Defendant Alesia, acting within the scope of his employment and under color of law, agreed with the Defendant Officers and other individuals to deprive Charles Johnson of his constitutional right against compelled self-incrimination, as provided for by the Fifth Amendment, and described in the various paragraphs of this Complaint.

95.     In furtherance of this conspiracy, Defendant Alesia engaged in and facilitated overt acts, including but not limited to obtaining involuntary statements from Mr. Johnson and his co-defendants and concealing evidence of the coercive tactics, and was an otherwise willful participant in joint activity.

96.     As a direct and proximate result of the illicit prior agreements and actions in furtherance of the conspiracies referenced above, Mr. Johnson's rights were violated, and he suffered injuries, including but not limited to loss of liberty, physical harm, and emotional distress.

**Count VI - 42 U.S.C. § 1983**
**Deprivation of Liberty without Probable Cause**
**(Fourth Amendment)**

97.     Each paragraph of this Complaint is incorporated as if restated fully herein.

98.     In the manner described more fully above, the Defendant Officers caused Plaintiff to be detained and imprisoned without probable cause.

99.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, willfulness, and deliberate indifference to Charles Johnson's rights.

100.     The misconduct described in this Count was undertaken by the Defendant Officers under color of law and within the scope of their employment.

101.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, and/or with reckless indifference to the rights of others.

102.     As a direct and proximate result of the Defendant Officers' actions, Mr. Johnson suffered injuries, including but not limited to the loss of his liberty, physical harm, severe emotional distress and anguish.

### Count VII – 42 U.S.C. §1983
### Municipal Liability

103.     Each paragraph of this Complaint is incorporated as if restated fully herein.

104.     The actions of the individual Defendant Officers were undertaken pursuant to the policies and practices of the CPD, described above and below, which included (1) failing to supervise, discipline and control Chicago Police officers and (2) maintaining a code of silence within the CPD, all of which facilitated the Defendant Officers' misconduct here.

105.     These policies and practices were ratified by policymakers for the City of Chicago with final policymaking authority.

106.     At all times material to this Complaint, Defendant City of Chicago, through its Police Department, the Office of Professional Standards (OPS), Police Superintendents, Police

Board, Mayor, City Council and/or Corporation Counsel's Office, had interrelated de facto policies, practices, and customs which included, inter alia:

a. conducting physically, psychologically, or otherwise illegal or improperly coercive interrogations of witnesses, suspects and arrestees, in order to obtain confessions, including from juveniles and teenagers;

b. manufacturing, fabricating, and/or using improper suggestive tactics to obtain statements from suspects and witnesses, particularly juveniles or teenagers;

c. filing false police reports, and giving false statements and testimony about these interrogations, confessions, and witness statements;

d. suppressing evidence concerning the circumstances of these interrogations and confessions;

e. pursuing and obtaining prosecutions and incarceration on the basis of confessions obtained during these interrogations, and otherwise covering up the true nature of the interrogations, confessions, and witness statements;

f. failing to video and/or audio record the interrogation or questioning of suspects, arrestees, and witnesses, particularly in the circumstances set forth in parts (a) and (b), above;

g. failing to properly train, supervise, discipline, transfer, monitor, counsel, and/or otherwise control police officers, particularly those who were repeatedly accused of physically, psychologically, or otherwise illegally or improperly engaging in coercive questioning or interrogation of witnesses, suspects and arrestees; of torture and related physical abuse of suspects; of false arrests, wrongful imprisonments, malicious prosecutions, and wrongful convictions; and/or of making false reports and statements. This failure to properly train, supervise, discipline, transfer, monitor, counsel, and/or otherwise control specifically includes the "repeater" Defendants named herein, including, but not limited to, Defendants Cassidy, Daly, Davis, Valadez, Bloore, Fine, and Coughlin, who have been accused on numerous occasions of such misconduct, including prior to the time period implicated in this case;

h. the police code of silence, specifically in cases where officers engaged in the violations articulated in paragraphs a through e, above, whereby police officers refused to report or otherwise covered up instances of police misconduct, and/or fabricated, suppressed, and/or destroyed evidence of which they were aware, despite their obligation under the law and police regulations to so report. This code of silence also has resulted in police officers either remaining silent or giving false and misleading information, and/or testimony during official investigations and grand jury proceedings, in order to protect themselves and/or fellow officers from internal discipline, civil liability, or criminal charges, and perjuring themselves in criminal cases where they and/or their fellow officers have been accused of misconduct.

107.     The interrelated pattern and practices alleged above were or should have been well known within the CPD, both before and after Charles Johnson was interrogated and wrongfully convicted, as well as by successive mayors, police superintendents and OPS directors, and by the Chicago City Council and the Chicago Police Board, and other policy-making, command, and supervisory City and police personnel, who participated in the cover-up and/or continuation of the policies and practices for years.

108.     The interrelated policies, practices, and customs set forth above, both individually and together, were maintained and implemented with deliberate indifference.  They encouraged, *inter alia*, the coercing of statements from suspects, witnesses, and arrestees, particularly from juveniles and other teenagers; the construction and fabrication of confessions, admissions, statements, and other false witness evidence; the suppression and destruction of exculpatory evidence, the intimidation of witnesses, the making of false statements and reports, the giving of false testimony, and the obstruction of justice; and the pursuit and continuation of wrongful convictions and false arrests and imprisonments.  The interrelated policies, practices and customs set forth above were, separately and together, a direct and proximate cause (*i.e.* a moving force) of the unconstitutional acts and perjury committed by the named Defendants and their co-conspirators, and the injuries suffered by Charles Johnson, including his wrongful conviction and imprisonment.

109.     Additionally, the City of Chicago's failure to properly train, discipline, monitor, control, assign, transfer, supervise, and counsel the Defendant Officers, including but not limited to Defendants Cassidy, Boudreau, and Valadez, was also done with deliberate indifference and likewise acted as a direct and proximate cause (*i.e.* a moving force) of the injuries to Charles Johnson.

## Count VIII – State Law Claim
### Malicious Prosecution

110.    Each paragraph of this Complaint is incorporated as if restated fully herein.

111.    The Defendant Officers, despite knowing that probable cause did not exist to prosecute Charles Johnson for the murders of Khaled Ibrahim and Yousef Ali, acted individually, jointly, and/or in concert and in conspiracy, to cause Mr. Johnson to be arrested and prosecuted for that crime. The Defendant Officers made statements to trial prosecutors with the intent of exerting influence and to institute and continue the unjust judicial proceedings.

112.    Specifically, the Defendant Officers were aware that, as described more fully above, no true or reliable evidence implicated Charles Johnson in the murders, all inculpatory evidence, including the supposed lineup identification of Larod Styles, was coerced and fabricated, and forensic evidence indicated Charles's innocence. Furthermore, the Defendant Officers intentionally withheld from and misrepresented to trial prosecutors and the grand jury facts that further vitiated probable cause against Charles Johnson, as set forth above, and failed to investigate evidence that could have led to the actual assailant(s). The Defendant Officers performed the above-described acts deliberately, with malice, and with reckless disregard for Charles Johnson's rights.

113.    In February 2017, the Cook County State's Attorney's Office nolle prossed Charles Johnson's case, and on January 22, 2018, the Circuit Court of Cook County awarded Mr. Johnson a Certificate of Innocence, which constitutes a termination of the criminal proceedings in his favor.

114.    As a direct and proximate result of this misconduct, Mr. Johnson sustained, and continues to sustain, injuries as set forth above, including pain and suffering.

### Count IX – State Law Claim
### Intentional Infliction of Emotional Distress

115.    Each paragraph of this Complaint is incorporated as if restated fully herein.

116.    The acts and conduct of the Defendants, including the Defendant Officers and Defendant Alesia, as set forth above were extreme and outrageous.  The Defendants' actions were rooted in an abuse of power or authority, and they were undertaken with intent to cause, or were in reckless disregard of the probability that their conduct would cause, severe emotional distress to Charles Johnson, as is more fully alleged above.

117.    As a direct and proximate result of the Defendants' actions, Mr. Johnson suffered and continues to suffer severe emotional distress.

### Count X – State Law Claim
### Civil Conspiracy

118.    Each paragraph of this Complaint is incorporated as if restated fully herein.

119.    As described more fully in the preceding paragraphs, the Defendants, including the Defendant Officers and Defendant Alesia, acting in concert with other known and unknown co-conspirators, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

120.    In furtherance of the conspiracy, the Defendant Officers committed unlawful overt acts and were otherwise willful participants in joint activity including but not limited to the malicious prosecution of Charles Johnson and the intentional infliction of emotional distress upon him.

121.    In furtherance of the conspiracy, Defendant Alesia committed unlawful overt acts and was otherwise willful participants in joint activity including but not limited to the intentional infliction of emotional distress upon Charles Johnson.

122.     The misconduct described in this Count was undertaken intentionally, with malice, willfulness, and reckless indifference to the rights of others.

123.     As a direct and proximate result of the Defendants' conspiracies, Mr. Johnson suffered damages, including severe emotional distress and anguish, as is more fully alleged above.

## Count XI – State Law Claim
### Respondeat Superior

124.     Each paragraph of this Complaint is incorporated as if restated fully herein.

125.     In committing the acts alleged in the preceding paragraphs, each of the Defendant Officers were members of, and agents of, the CPD, acting at all relevant times within the scope of their employment and under color of law.

126.     Defendant City of Chicago is liable as principal for all torts in violation of state law committed by its agents.

## Count XII – State Law Claim
### Indemnification

127.     Each paragraph of this Complaint is incorporated as if restated fully herein.

128.     Illinois law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

129.     The Defendant Officers are or were employees of the CPD who acted within the scope of their employment in committing the misconduct described herein.

130.     Defendant Alesia was at all times material to this complaint the employee of the Cook County State's Attorney's Office, and Defendant Cook County is therefore responsible for

any judgment entered against Defendant Alesia and for any judgment entered against him arising from said employment with the County, making the County a necessary party to this complaint.

WHEREFORE, Plaintiff, CHARLES JOHNSON, respectfully requests that this Court enter judgment in his favor and against Defendants JAMES CASSIDY, KENNETH BOUDREAU, LUKE DALY, DWAYNE DAVIS, FRANCIS VALADEZ, BERNARD RYAN, JOHN BLOORE, J. FINE, the ADMINISTRATOR of the ESTATE of THOMAS COUGHLIN, THOMAS RICHARDSON, SERGEANT LARRY TUIDER, SERGEANT FRED BONKE, former COOK COUNTY ASSISTANT STATE'S ATTORNEY JOSEPH ALESIA, the COUNTY of COOK, the CITY OF CHICAGO, as well as-yet UKNOWN CITY OF CHICAGO EMPLOYEES, awarding compensatory damages, attorneys' fees, and costs against each Defendant, and punitive damages against each of the individual Defendants, as well as any other relief this Court deems appropriate.

## JURY DEMAND

Plaintiff, CHARLES JOHNSON, hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

Respectfully submitted,

**CHARLES JOHNSON**

By:____/s/Alexa Van Brunt
One of his attorneys

Locke E. Bowman
Alexa Van Brunt
RODERICK AND SOLANGE
MACARTHUR JUSTICE CENTER
Northwestern University School of Law
375 East Chicago Avenue
Chicago, Illinois 60611
(312) 503-0844

Jon Loevy
Elizabeth M. Mazur
LOEVY & LOEVY
311 N. Aberdeen
Chicago, Illinois 60607
(312) 243-5900