IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| LaSHAWN EZELL, | ) | |
| | ) | No. 18 C 1049 |
| Plaintiff, | ) | |
| | ) | The Hon. Virginia Kendall |
| v. | ) | |
| | ) | Magistrate Judge Jeffrey Cole |
| CITY OF CHICAGO, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS'
MOTION TO BAR EXPERT OPINIONS OF DR. BRIAN CUTLER**

## INTRODUCTION

Defendants have moved to bar Plaintiffs' eyewitness identification expert, Dr. Brian Cutler. Dkt. 362. They offer no challenges to his extensive qualifications. Instead, they argue that his opinions are unreliable, based primarily on their contention that a 2014 report by the National Research Council "expressed skepticism of much of the research Dr. Cutler relies on." *Id.* at 6. They also argue that his opinions are not helpful to the jury because, according to Defendants, "none of the Plaintiffs allege their due process rights were violated as a result of any misconduct relating to the eyewitness identification procedure in this case," *id.* at 1, and because Dr. Cutler opines only that the identification procedures used by police in this case increased the risk of false identification but does not offer the opinion that the identifications were actually false.

Defendants' arguments are misplaced. Their contention that Dr. Cutler's expert opinions are unhelpful given the issues in the case fails to account for the fact that the suggestive identification procedures and the resulting unreliable identifications are relevant to Plaintiffs' due process claims, to Defendants' intent and state of mind, and as proof of Plaintiffs' innocence. Their torqued and overstated reading of the NRC Report[1] unconvincingly tries to convert a matter of garden variety cross-examination into a wholesale rejection of the underpinnings of Dr. Cutler's opinions, which is unsupported by the actual contents of the Report. And their argument that Dr. Cutler should have opined that the identifications were false, not just that the manner in which they were reached increased the risk that they were, is exactly backwards—Dr. Cutler's opinions are more helpful to the jury, not less, because of his appropriately measured and limited

---

[1] Defendants' refer to the "2014 NAC Report" in their motion, apparently an inadvertent portmanteau of NRC (National Research Council) and NAS (National Academy of Sciences).

1

conclusions, which strike the correct balance by offering relevant opinions to aid the factfinder while preserving the ultimate evaluation of the evidence at trial for the jury.

## LEGAL STANDARD

Under Rule 702, "the rejection of expert testimony is the exception rather than the rule," Fed. R. Evid. 702 (Advisory Note, 2000 amends.), and the Rule's inquiry is a "flexible one" focusing on an expert's principles and methodology, not her conclusions. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 594-95 (1993). Factual questions about an expert's opinions are for the jury because they go to weight of testimony—the credibility of the expert— not admissibility. *Smith v. Ford Motor Co.*, 215 F.3d 713, 718-19 (7th Cir. 2000). Thus, rather than exclusion, "[v]igorous cross- examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 595. "A Daubert inquiry is not designed to have the district judge take the place of the jury to decide ultimate issues of credibility and accuracy*." Lapsley v. Xtek, Inc*., 689 F.3d 802, 805 (7th Cir. 2012).

## SUMMARY OF DR. CUTLER'S QUALIFICATIONS AND OPINIONS

### I.  Dr. Cutler's qualifications

Dr. Cutler's CV is attached to his expert report, Dkt. 362-1 at 25-35,[2] and reveals a deep expertise in the science of witness perception and identification stretching back more than three decades. Dr. Cutler holds a Bachelor's degree, Master's degree, and Ph.D. in psychology, and has held positions as an academic and researcher in that field since 1987. *Id.* at 25. He has published more than sixty peer-reviewed journal articles on topics related to eyewitness

---

[2] Plaintiffs' citations to previously-filed documents refer to the CM/ECF page numbers, rather than the document's internal pagination.

identifications and police identification procedures dating back to 1986, and has written dozens of books and book chapters on these topics. *Id.* at 26-33.

## II. Dr. Cutler's opinions

Dr. Cutler authored a 23-page expert report detailing his opinions in this case, including six pages listing some of the academic references from the field of forensic psychology which support his opinions. *Id.* at 2-24. He groups his opinions into five categories.

First, Dr. Cutler offers a brief history of the scientific psychological research on eyewitness memory and eyewitness memory, and describes how research in this field is well-accepted as a legitimate area within the broader field of psychology. *Id.* at 4. He also describes the basic processes by which human experiences are converted into episodic memories, the factors which influence the accuracy of memory recall, and how subsequent events (such as police identification procedures) can influence an eyewitness's memory. *Id.* at 4-5.

Second, Dr. Cutler describes the psychological processes—"memory searching," "inference processes," and "memory contamination from multiple exposures"—that an eyewitness may go through when subjected to an identification test like a police line-up, and how "[t]he procedures used to procure an eyewitness identification can encourage or discourage identifications from inference processes"—that is, how the design of the identification procedures can make it more or less likely that an eyewitness identification is based on their actual memory of the perpetrator, versus non-memory bases for an identification such as their deduction about who the police believe to the perpetrator, process of elimination, etc. *Id.* at 6-7. Dr. Cutler describes the various factors that can make an identification procedure more or less likely to be suggestive, including the number and quality of "fillers," the nature of any instructions given to the eyewitness by police prior to viewing the line-up, and the use of

3

"double-blind administration" (where the officer administering the line-up does not know which person is the suspect). *Id.* at 7-10.

Third, Dr. Cutler reviews the record evidence about the eyewitness identification procedures in this case, and concludes that the lack of appropriate fillers, the lack of cautionary instructions, and lack of independent administration rendered the procedures used in this case "highly suggestive" and "lack[ing] common safeguards to reduce the risk of false identification. *Id.* at 10-14.

Fourth, Dr. Cutler explains how these suggestive identification procedures, combined with the failure to accurately record the witness's initial levels of confidence in their identifications and the presence of confirmatory feedback by police after their identifications would enhance the risk both of false identifications, and a witness's "false confidence" in their identification—that is, the ways in which the circumstances of the identifications in this case might lead to inflated levels of confidence later expressed by the witnesses.

Fifth, Dr. Cutler analyzed the conditions under which the purported eyewitnesses viewed the perpetrators of the crime, discussed the relevant factors which can impact the strength of the witness's memory of the perpetrator, and how the evidence of "impoverished viewing conditions" in this case magnified the impact that the suggestive identification procedures would have on the eyewitnesses. *Id.* at 15-18.

**ARGUMENT**

**I.    A long line of precedent in the Seventh Circuit establishes that expert testimony on eyewitness identifications is admissible in civil cases.**

There is a long line of precedent in the Seventh Circuit holding that expert testimony on eyewitness identifications satisfies the *Daubert* standard and can be useful to a jury in a civil case like this one, where the accuracy and reliability of eyewitness identifications is at issue.

4

In *Cage v. City of Chicago*, a 2013 opinion resolving another *Daubert* motion challenging the admissibility of Dr. Cutler's opinions, this Court offered a detailed history of the jurisprudence on admissibility of eyewitness identification expert testimony. *Cage v. City of Chicago*, 979 F. Supp. 2d 787, 836-41 (N.D. Ill. 2013) (Kendall, J.). Describing how "the Seventh Circuit has been receptive to eyewitness identification expert testimony in the civil arena," *id.* at 839, the Court began with a discussion of *Newsome v. McCabe,* 319 F.3d 301 (7th Cir. 2003), in which the Seventh Circuit affirmed the trial court's decision to admit testimony from an eyewitness identification expert. In *Newsome*, the court noted that "[a]n important body of psychological research undermines the lay intuition that confident memories of salient experiences . . . are accurate," and held that permitting the jury to hear expert testimony about this area of forensic psychology "was important in this civil action to explore the question of whether the testimony of [the witnesses] identifying [the plaintiff] at the criminal trial was attributable to deliberate manipulation or instead to chance." *Newsome*, 319 F.3d at 305-06. The Court in *Cage* also identified a significant trend of district court cases supporting the admissibility of expert testimony on eyewitness identifications. *Cage*, 979 F. Supp. 2d at 841.

That trend has continued, and in another decision issued just a month ago, this Court held that "the kind of expert testimony about human perception and memory that [plaintiff's eyewitness identification expert] would present is widely considered helpful to juries." *Blackmon v. City of Chicago*, No. 19 C 767, 2022 WL 3908593, at *5 (N.D. Ill. Aug. 30, 2022) (Kendall, J.). The Court in *Blackmon* cited a litany of Seventh Circuit cases in support of the admissibility of eyewitness identification expert testimony.[3] "In sum, the Seventh Circuit's guidance . . .

---

[3] As noted in these cases: there are "dangers of relying on 'common sense' when social science reveals that common assumptions are wrong," *Webster v. Daniels*, 784 F.3d 1123, 1143 (7th Cir. 2015); "nothing is obvious about the psychology of eyewitness identification" and it is "well

5

teaches that nothing is obvious about the psychology of eyewitness identification, evaluating the fallibility of eyewitness testimony often takes more than common sense, and expert evidence helps jurors evaluate the reliability of eyewitness testimony . . . ." *Sanders v. City of Chicago Heights*, No. 13 C 0221, 2016 WL 4398011, at *6 (N.D. Ill. Aug. 18, 2016) (St. Eve., J.).

**II.     Defendants' motion fails to recognize the multiple ways in which the reliability of the eyewitness identifications are relevant.**

Much of the Defendants' argument flows from their premise that, since "none of the Plaintiffs allege their due process rights were violated as a result of any misconduct relating to the eyewitness identification procedure in this case," and "none of the eyewitnesses testified that they were manipulated by the police to identify anyone," therefore "expert testimony regarding the eyewitness identifications is far afield from the issues of the case." Dkt. 362 at 4-5. This premise is wrong for at least three reasons.

    A.    <u>Plaintiffs each allege a claim for due process violations, which encompasses unduly suggestive identification procedures.</u>

Each of the Plaintiffs alleges, as Count I of their Complaint, that Defendants caused their wrongful convictions by violating their due process right to a fair trial under the Fourteenth Amendment. Ezell Dkt. 1 at 16-17; Johnson Dkt. 1 at 15-16; Styles Dkt. 1 at 16-17; McCoy Dkt. 1 at 16-17. The Constitution "guarantee[s] the right to a fair trial—in this context, via the due process clause of the Fourteenth Amendment—and that right is violated if unduly suggestive identification techniques are allowed to taint the trial." *Alexander v. City of S. Bend*, 433 F.3d

---

established in the psychology literature [] that most people's intuitions on the subject of identification are wrong."), *Phillips v. Allen*, 668 F.3d 912, 916 (7th Cir. 2012); that "jurors have beliefs about [the fallibility of memory] does not make expert evidence irrelevant; to the contrary, it may make such evidence vital," *United States v. Bartlett*, 567 F.3d 901, 906 (7th Cir. 2009); and with regard to eyewitness identifications, "'common sense' misleads more often than it helps" and "[i]t takes data rather than intuition to answer questions [about the psychology of identification procedures], *United States v. Williams*, 522 F.3d 809, 811-12 (7th Cir. 2008).

550, 555 (7th Cir. 2006). Regardless of the extent to which the line-up procedures in this case were specifically discussed in the pleadings,[4] they have been a significant focus by both sides during the lengthy discovery period over the past four years, and it is disingenuous for Defendants to suggest that the circumstances of the identifications are a non-issue.

Defendants are also wrong to suggest that there is no evidence of police manipulation regarding the lineups. As Dr. Cutler explains in his report, in this case the police constructed line-ups where either four out of the five, or all five lineup participants were suspects—between zero and one fillers—despite the department's lineup policy requiring at least four fillers in addition to the suspect. Dkt. 362-1 at 12-13. Furthermore, there is evidence that police made suggestive comments to witnesses prior to and during the lineups. *See id.* at 10 (police told Ali before the lineup they had the guys who committed the murders); *id.* at 11 (police told Neira before the lineup that they got the perpetrators, and during the line-up an officer said "now we got him"). And there is evidence that police outright fabricated an identification from the lineups. *See id.* at 13 ("Mr. Hudley testified that he did not make a positive identification from the lineup, yet the detective's report indicates that Mr. Hudley did make a positive identification.").

   B. <u>Evidence about the suggestive identification procedures is relevant to Defendants' intent and state of mind.</u>

Plaintiffs allege that Defendants knowingly and intentionally fabricated false evidence against them, and knowingly and intentionally subjected them to coercive interrogation tactics in order to obtain false confessions from them. Thus, evidence of Defendants' state of mind and intent during the police investigation is highly relevant to Plaintiffs' claims. *See, e.g.*, *Petty v. City of Chicago*, 754 F.3d 416, 422 (7th Cir. 2014) ("In fabrication cases, the police or

---

[4] Which is unimportant, since "[c]omplaints need not plead law or match facts to every element of a legal theory. *Bennett v. Schmidt*, 153 F.3d 516, 518 (7th Cir. 1998).

prosecutor manufactures evidence that he knows to be false."). Regardless of whether Plaintiffs proceed to trial with a due process claim related to the unduly suggestive identifications, the fact that Defendants used identification procedures that were suggestive and risked generating false identifications of Plaintiffs is squarely relevant circumstantial evidence that they were not pursuing an honest police investigation but were engaged in intentional misconduct designed to frame Plaintiffs for a crime they did not commit.

      C.      <u>Evidence about the suggestive identification procedures is relevant to show that Plaintiffs are innocent of the Elegant Auto murders.</u>

Finally, Dr. Cutler's expert opinions are vital evidence for Plaintiffs to establish that they are in fact innocent of the Elegant Auto murders.[5] While not an element of any of Plaintiffs' constitutional claims, Plaintiffs' innocence is central to their damages case. *See Parish. v. City of Elkhart, Ind.*, 702 F.3d 997, 1003 (7th Cir. 2012) (remanding for new damages trial where district court "improperly limited the introduction of evidence relating to [plaintiff's] innocence"). Even if the identification procedures were entirely divorced from Plaintiffs' constitutional claims (which is not the case, as discussed above), Plaintiffs would be entitled to argue at trial that the eyewitnesses were incorrect when they identified Johnson and Styles as perpetrators of the Elegant Auto murders. Dr. Cutler's expert opinions are highly relevant on this topic, and will aid the jury's consideration of the circumstances in which each witness purportedly came to observe the perpetrators of the crime, the circumstances in which they made one or more later identifications, and what the science of human memory and perception has to say about the reliability of those resulting identifications.

---

[5] While only two of the four Plaintiffs were ever identified by any purported eyewitness, in order to establish their innocence, each Plaintiff has a need to explain why the eyewitness identifications of any of the Plaintiffs are unreliable and ultimately erroneous, since the prosecution theory (and the narratives created in the allegedly fabricated and coerced confessions) was that all four Plaintiffs committed the crime together.

8

### III. Defendants are wrong that the 2014 NRC Report undermines the reliability of Dr. Cutler's opinions.

Perhaps recognizing that they are swimming upstream against a strong current of authority holding that eyewitness identification expert testimony is helpful to juries, , Defendants point to a 2014 report of the National Research Council ("NRC Report") entitled "Identifying the Culprit: Assessing Eyewitness Identification." *See* Ex. A (NRC Report). Tellingly, the Defendants do not attach the entire NRC Report to their motion, instead quoting from their own expert's selective quotes and characterizations of what that Report signifies.

According to Defendants, the psychological research Dr. Cutler "relies on to support [his] opinions" has "been undermined and called into question" as a result of the NRC Report, and the NRC Report "expressed skepticism of much of the research Dr. Cutler relies on." It would be a significant understatement to describe this as a significant overstatement of what the NRC Report actually says. The NRC Report is a 119 page document (not including its lengthy appendices), from which Defendants cherry-pick two paragraphs. *See* Dkt. 362 at 6-7, *citing* Dkt. 362-4 (Wixted report) at 3-4, *quoting* NRC Report at 74-76. Defendants then use those two paragraphs to argue that "four studies that Dr. Cutler relies on to support his findings" were found by the NRC Report to be "potentially biased and lacking in credibility." Dkt. 362 at 7-8.

First, as a matter of basic arithmetic, it is remarkable that Defendants suggest that Dr. Cutler's opinions are undermined by the fact that four of the approximately sixty academic sources cited by Dr. Cutler in his list of references (*see* Dkt. 362-1 at 19-24) have been, according to them, called into question by the NRC Report.

Second, and more notably, even Defendants' own expert contradicts their position that the NRC Report undermines the reliability of Dr. Cutler's opinions. Dr. Wixted states directly in his report, referring to the studies cited by Defendants in their motion, that "[m]y point is not that

9

all these studies are necessarily problematic." Dkt. 362-4 at 4. He simply wants the Court to "be made aware that, in the judgment of the NRC committee," the findings of these studies "*may* be subject to unintended biases" and may have conclusions that "are less credible *than was hoped*." *Id.* (emphasis added). Since even Dr. Wixted concedes the studies are not "necessarily problematic," there is no basis for the Defendants to argue that they are so fatally flawed that they undermine the entirety of Dr. Cutler's opinions.

Third, when viewing the NRC Report in its full context, rather than two cherry-picked paragraphs, it is evident that it supports, rather than undermines, Dr. Cutler's conclusions. Dr. Cutler's report offers opinions that lack of fillers in the line-ups in this case made the identification procedures more suggestive, noting that a "lineup with all suspects is like a multiple-choice question with no wrong answer." Ex. 362-1 at 12. The NRC Report supports Dr. Cutlers opinion. *See* Ex. A (NRC Report) at 16 ("Research indicates that accuracy and reliability of eyewitness identifications may be influenced by . . . the likeness of non-suspect lineup participants (fillers) to the suspect, [and] the number of fillers . . . .").

Dr. Cutler's report offers opinions about the lack of cautionary instructions provided to eyewitnesses prior to the identification procedures, and that the police may have tainted the identifications by suggesting to the witnesses prior to the lineups that the perpetrators were in the lineup. Again, the NRC Report supports, rather than undermines these opinions. *See* Ex. A (NRC Report) at 107 (recommending, after its review of the scientific literature, the "development of a standard set of easily understood instructions to use when engaging a witness in an identification procedure," including that "[w]itnesses should be instructed that the perpetrator may or may not be in the photo array or lineup and that the criminal investigation will continue regardless of whether the witness selects a suspect."); *id.* at 106 (recommending double-blind lineup

administration because "[d]ecades of scientific evidence demonstrate that expectations can bias perception and judgment and that expectations can be inadvertently communicated.").

At most, Defendants offer some evidence that a handful of the dozens of studies that Dr. Cutler relied on might suffer from bias, or might be less persuasive than previously thought. These are axiomatic examples of matters that go to the weight rather than admissibility of expert testimony, and are properly handled on cross-examination and not as a matter of *Daubert* gatekeeping. The NRC Report offers no basis to exclude Dr. Cutler's testimony.

**IV.     Dr. Cutler does not fail to account for the confidence of the eyewitnesses**

Defendants argue that, apart from the NRC Report, Dr. Cutler's opinions are unreliable because "the academic field has now reversed [the] conclusion" that high confidence identifications may not be accurate, and the research now shows that "on average, highly confident witnesses are highly *accurate* in their identifications." Dkt. 362 at 8. Defendants argue that as a result, "the foundation for Dr. Cutler's opinions has been called into doubt, . . . and he does not account for that," so the Court should exclude his opinions. *Id.*

Again, Defendants miss the mark. Citing two paper co-authored by Dr. Wixted, the Defendants' own expert, Dr. Cutler acknowledges that "[u]nder certain limited circumstances, high levels of eyewitness confidence can be indicative of identification accuracy," and that "[t]hose circumstances include the use of pristine, non-suggestive identification procedures and confidence assessments taken immediately after an identification and before the eyewitness is provided with any confirmatory or disconfirmatory feedback." Dkt. 362-1 at 14. In Dr. Cutler's view, however, "[t]hose conditions are not present in this case." *Id.* And because non-pristine procedures were used, the high confidence of the eyewitnesses cannot be taken at face value. This accords with his deposition testimony as well—when asked "what do the psychological studies say about high confidence levels in relation to the accuracy of identifications," he

11

testified "when the identification procedures are pristine, high confident identifications tend to be accurate," and when asked "what do the studies show when there are less than pristine procedures but high confidence levels," he responded that "[c]onfidence becomes less diagnostic of accuracy." Dkt 362-5 at 133:7-17.

Defendants' expert, Dr. Wixted, agrees, acknowledging that non-pristine procedures reduce the accuracy of even a highly-confident identification. *See* Dkt. 362-4 at 9 ("the information value of confidence is highest when a pristine procedure is used and is not as high when a more suggestive procedure is used"). It is simply incorrect to state that Dr. Cutler has failed to take into account a new development in the field—he cites Dr. Wixted's own 2017 and 2020 papers. Dkt. 362-1 at 14, 24. Dr. Cutler simply disagrees with Defendants about the conclusions to be drawn from those studies, in light of the overall state of the field of research and the facts of this case. Again, that is entirely appropriate for Defendants to take up with him on cross-examination, but does nothing to undermine the reliability of his opinions.

**V.      Dr. Cutler's measured opinions make his testimony more useful, not less.**

Dr. Cutler offers the opinion that "the lineup procedures were highly suggestive and enhanced the risk of both false identification and false confidence." Dkt. 362-1 at 15. Dr. Cutler does *not* offer an opinion that the identifications were, in fact, false—such an opinion is impossible to reach using the tools of forensic psychology. He simply opines about the facts, based on his review of the record, that increased the *risk* of false identification and the *risk* of false confidence. It will be for the factfinder to determine, based on its review of all of the evidence, including Dr. Cutler's expert testimony about the science of human memory and perception, whether or not the identifications were false.

Defendants latch onto this measured aspect of Dr. Cutler's opinions, and try to twist it against him. They argue, for example, that "since Dr. Cutler does not opine that Ali's

12

identification was inaccurate at all" and "merely labels the lineup as 'suggestive,'" he "tacitly acknowledges that Ali could have identified Styles accurately based on memory" and therefore the "opinion that witnesses can be mistaken under some circumstances is only speculation and does not help the jury." Dkt. 362 at 9; *id.* at 10 (same argument for Tadros). But it is not speculation to talk about the *risk* of false identification—Dr. Cutler offers concrete factual details from the record about the suggestive qualities of the lineup procedures, and offers a plethora of scientific research to back up his conclusions. Similarly, Defendants boldly argue that since Dr. Cutler "cannot rule out that the witnesses identified a Plaintiff accurately based on memory, then that means Dr. Cutler cannot rule out an obvious explanation for why they might have made their identifications," thus rendering his opinions unreliable. But this argument is exactly backwards. This is an argument for why Dr. Cutler should *not* opine that the identifications were false, since he cannot scientifically rule out the possibility of a suggestive procedure leading nevertheless to an accurate identification. But it is not a reason to exclude Dr. Cutler's opinions about the *risk* of false identification or the *risk* of false confidence. Indeed, this Court rejected a similar argument in *Cage*, where Dr. Cutler opined about the "risk" of false identification. *See Cage*, 979 F. Supp. 2d at 844 ("As Dr. Cutler's testimony provides 'a probative piece of the evidentiary puzzle' regarding Cage's identification, his testimony will not be excluded on the basis that he does not conclude that the Defendants' techniques actually caused the faulty identification.").

**VI.     Dr. Cutler's opinions do not impermissibly touch on witness credibility.**

Defendants argue that Dr. Cutler impermissibly touches on witness credibility when he describes the possibility for "false" confidence. Dkt. 362 at 14. But this has nothing to do with credibility—he is not saying the witnesses are being untruthful, he is saying that the science of human memory and perception tells us that their subjective assessment of their own confidence

13

might be wrong. *See Blackmon*, 2022 WL 3908593, at *6 (rejecting similar argument that eyewitness expert who cast doubt on eyewitness identification was assailing witness credibility).

**VII.    Dr. Cutler's voice identification opinion is admissible.**

Dr. Cutler touches briefly on voice identifications, opining that the relevant research reveals that voice identification can be challenging and that the accuracy of voice identifications is influenced by some of the same factors as visual identifications, and that he does not believe there is scientific support for the claim that adding a voice identification component to a visual lineup increases that lineups accuracy. Dkt. 362-1 at 13. Defendants take only the third point— that there is no scientific basis for *their contention* (that Ali's voice identification makes his overall identification more reliable)—and try to argue that it makes Dr. Cutler's opinion inadmissible. Dkt. 362 at 9-10. But it is not that voice identification "has not been studied," as Defendants claim, but that the studies that have been done do not support the proposition that Defendants wish to advance. That does not make Dr. Cutler's opinions inadmissible.

**VIII.   Dr. Cutler was not required to quantify his opinions for them to be admissible.**

Defendants argue that Dr. Cutler's opinions are unhelpful because he cannot quantify them. Dkt. 362 at 12-13. But there is nothing in Rule 702 that requires an expert to put a number on their opinion. All that is required is that the expert "will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid 702(a). Dr. Cutler can opine about the different factors present in the record, what the science of human memory and perception teaches us about those factors, and can qualitatively discuss the relative significance of those factors, alone and in combination. No precise formula is required for this to aid the jury in its task.

**IX.     Dr. Cutler's opinions about viewing conditions are sufficiently reliable.**

Defendants seek to bar Dr. Cutler's opinions about the conditions under which the eyewitnesses saw the perpetrators of the crime, because not all of the factors he discusses are

applicable for every witness, and because he cannot quantify the effect each factor had. Neither is a basis to bar the testimony. Dkt. 362 at 15. The fact that Dr. Cutler accurately parsed out which factors were relevant for which witness is a strength, not a weakness, of his opinions. And Defendants cite no support for their apparent proposition that an expert witness must be able to quantify their opinion for it be helpful to the jury. Dr. Cutler's report cites ample scientific support for the factors he discusses, and their effect in diminishing the encoded memory of a witness, taken singularly or in combination, is not so obvious to a lay juror that Dr. Cutler's opinions are rendered unhelpful.

### X. Dr. Cutler should be permitted to testify about the scientific basis of his opinions.

Defendants seek to exclude Dr. Cutler's opinion "that the eyewitness identification research is established in the field." Dkt. 362 at 16. To be clear, Dr. Cutler does not intend to offer that as a stand-alone opinion in the case. However, Dr. Cutler should be permitted to testify about the scientific basis for his opinions, both as affirmative support for those opinions and in response to Defendants' cross-examination.

Respectfully submitted,

**LaShawn Ezell**

By: /s/ Sam Heppell
*One of his attorneys*

/s/ Alexa Van Brunt

Alexa Van Brunt
Noor Tarabishy
MacArthur Justice Center
375 East Chicago Avenue
Chicago, Illinois 60611
(312) 503-1336
a-vanbrunt@law.northwestern.edu
noor.tarabishy@macarthurjustice.org
**Counsel for Plaintiff Charles Johnson**

15

/s/ Sam Heppell

Locke E. Bowman
Sam Heppell
Arthur Loevy
Jonathan I. Loevy
Joshua A. Tepfer
LOEVY & LOEVY
311 North Aberdeen St., 3rd Floor
Chicago, Illinois 60607
(312) 243-5900
locke@loevy.com
sam@loevy.com
arthur@loevy.com
jon@loevy.com
josh@loevy.com
**Counsel for Plaintiffs Charles Johnson and Lashawn Ezell**

/s/ Terence H. Campbell

Terence H. Campbell
Michael Maione
Cotsirilos, Tighe, Streicker, Poulos & Campbell, LTD
33 N. Dearborn, Suite 600
Chicago, Illinois 60602
(312) 263-0345
**Counsel for Plaintiff Larod Styles**


/s/ Jon Neuleib

Jon Neuleib
Jon F. Erickson
Michael Oppenheimer
Erickson & Oppenheimer, Ltd
223 W. Jackson Blvd
Suite 200
Chicago, Illinois 60606
(312) 327-3370
jonn@eolawus.com
jon@eolawus.com
michael@eolawus.com
**Counsel for Plaintiff Troshawn McCoy**

## Certificate of Service

I, Sam Heppell, an attorney, hereby certify that on October 7, 2022, I caused this motion to be served upon all parties of record by filing it through the Court's CM/ECF system.

/s/ Sam Heppell