# Exhibit 21

Deposition of Dwayne Davis
(Defendant Officer)

Taken on 10/2/2019

**Page 1**

```
 1              IN THE UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF ILLINOIS
 2                      EASTERN DIVISION
 3   LASHAWN EZELL,                    )
                                       )
 4        Plaintiff,                   ) No. 18 C 1049
          v.                           ) Hon. Virginia M.
 5   CITY OF CHICAGO, et al.,          ) Kendall
                                       )
 6        Defendants.                  )
     ------------------------------    )
 7   LAROD STYLES,                     )
                                       )
 8        Plaintiff,                   ) No. 18 C 1053
          v.                           )
 9   CITY OF CHICAGO, et al.,          )
                                       )
10        Defendants.                  )
     ------------------------------    )
11   CHARLES JOHNSON,                  )
                                       )
12        Plaintiff,                   ) No. 18 C 1062
          v.                           )
13   CITY OF CHICAGO, et al.,          )
                                       )
14        Defendants.                  )
     ------------------------------    )
15   TROSHAWN MCCOY,                   )
                                       )
16        Plaintiff,                   ) No. 18 C 1068
          v.                           )
17   CITY OF CHICAGO, et al.,          )
                                       )
18        Defendants.                  )
          The video deposition of DWAYNE DAVIS,
19   called for examination pursuant to the Rules of
     Civil Procedure for the United States District
20   Courts pertaining to the taking of depositions,
     taken before Tracy Jones, a Certified Shorthand
21   Reporter within and for the County of Cook and
     State of Illinois, at 375 East Chicago Avenue,
22   Chicago, Illinois, on the 2nd day of October 2019
     at the hour of 9:41 a.m.
23
     Reported by:   Tracy Jones, CSR, RPR, CLR
24   License No.:   084-004553
                                                      1
```

**Page 2**

```
 1   APPEARANCES:
 2        RODERICK & SOLANGE MacARTHUR
          JUSTICE CENTER, by
 3        ALEXA VAN BRUNT, ESQUIRE
          LOCKE E. BOWMAN, ESQUIRE
 4        MAGGIE FILLER, ESQUIRE
          375 East Chicago Avenue
 5        Chicago, Illinois  60611
          312.503.0844
 6        l-bowman@law.northwestern.edu
 7             Representing Plaintiff LaShawn Ezell;
 8        LOEVY & LOEVY, by
          KATHERINE A. ROCHE, ESQUIRE
 9        311 North Aberdeen Street
          3rd Floor
10        Chicago, Illinois 60607
          312.243.5900
11        katie@loevy.com
12             Representing Plaintiff Charles Johnson;
13        ERICKSON & OPPENHEIMER, LTD, by
          MICHAEL D. OPPENHEIMER, ESQUIRE
14        RONAK MAISURIA, ESQUIRE
          223 West Jackson Boulevard
15        Suite 200
          Chicago, Illinois 60606
16        312.327.3370
          ronak@eolawus.com
17
18             Representing Plaintiff Troshawn McCoy;
19        COTSIRILOS, TIGHE, STREIKER,
          POULOS & CAMPBELL, LTD, By
          TERENCE H. CAMPBELL, ESQUIRE
20        33 North Dearborn Street
          Suite 600
21        Chicago, Illinois 60602
          312.263.0345
22        tcampbell@cotsiriloslaw.com
23             Representing Plaintiff Larod Styles;
24
                                                      2
```

**Page 3**

```
 1   APPEARANCES (Cont'd):
 2        THE SOTOS LAW FIRM, P.C., by
          LISA MEADOR, ESQUIRE
 3        DANIEL J. MCGINNIS, ESQUIRE
          141 West Jackson Boulevard
 4        Suite 1240 A
          Chicago, Illinois 60604
 5        630.735.3300
          lmeador@jsotoslaw.com
 6        dmcginnis@jsotoslaw.com
 7             Representing Defendants City of Chicago;
 8        ROCK FUSCO & CONNELLY, LLC, by
          STACY A. BENJAMIN, ESQUIRE
 9        321 North Clark Street
          Chicago, Illinois 60654
10        312.494.1000
          sbenjamin@rfclaw.com
11
              Representing Individual Defendant
12            Officers;
13        COOK COUNTY STATE'S ATTORNEY, by
          DEREK KUHN, ESQUIRE
14        Assistant State's Attorney
          50 West Washington Street
15        Room 500
          Chicago, Illinois 60602
16        312.603.3369
          derek.kuhn@cookcountyil.gov
17
              Representing Defendant Alesia
18            and Cook County.
19   ALSO PRESENT:   Peter Prezano, Videographer
                     Karl Colbary, Student
20                   Nora Cygan, Student
21
22
23
24
                                                      3
```

**Page 4**

```
 1                  I N D E X
 2   WITNESS                          EXAMINATION
 3   DWAYNE DAVIS
 4     Examination By Attorney Van Brunt        6
 5     Examination By Attorney Oppenheimer    369
 6     Examination By Mr. Campbell            388
 7     Examination By Attorney Benjamin       443
 8
 9
10          E X H I B I T S
11   NUMBER                        IDENTIFICATION
12     Exhibit No. 2 (Ref'd)                  92
13     Exhibit No. 5                          94
14     Exhibit No. 6                          96
15     Exhibit No. 7                          97
16     Exhibit No. 8                         175
17     Exhibit No. 4 (Ref'd)                 216
18     Exhibit No. 9                         261
19     Exhibit No. 10                        271
20     Exhibit No. 11                        323
21
22
23
24
                                                      4
```



1    THE VIDEOGRAPHER:  Good morning.  My name is
2  Pete Prezano, Certified Legal Video Specialist
3  with McCorkle Litigation Services of Chicago,
4  Illinois.  I'm the videographer on October 2nd,
5  2019, for the recording of the deposition of
6  Dwayne Davis being taken at the Roderick and
7  Solange MacArthur Justice Center in the matter
8  of LaShawn Ezell v. City of Chicago, et al., and
9  related cases filed in the Northern District of
10  Illinois, United States District Court Case
11  No. 18 CV 1049.
12    The court reporter has noted counsels'
13  appearances for the record.
14    Will the court reporter please
15  administer the oath, and you may proceed.
16    THE COURT REPORTER:  Sure.  This is Tracy
17  Jones, Illinois CSR No. 084-004553 with McCorkle
18  Litigation Services.
19    (Witness sworn.)
20
21
22
23
24

5

1    A.   I'm a police officer assigned as a
2  detective.
3    Q.   Would you prefer that I refer to you as
4  Detective today?
5    A.   That's fine.
6    Q.   Sounds good?  Okay.
7    Have you ever given a deposition
8  before?
9    A.   I have.
10    Q.   How many times?
11    A.   I think, at least twice, maybe as many
12  as four.
13    Q.   And in what matters did you give a
14  deposition before?
15    A.   Three times -- Or I should say once in
16  a suit against the City, and then the other
17  times, suits, people suing other --
18  institutions, people suing institutions.
19    Q.   Okay.  And the suit against the City,
20  were you a defendant in that case?
21    A.   Yes.
22    Q.   And what was that case called?
23    A.   I don't recall.
24    Q.   Was it Jones v. City of Chicago?

7

1  WHEREUPON:
2    DWAYNE DAVIS,
3  called as a witness herein, having been first
4  duly sworn, was examined and testified as
5  follows:
6    EXAMINATION
7  BY ATTORNEY VAN BRUNT:
8    Q.   Good morning, sir.
9    A.   Good morning.
10    Q.   My name is Alexa Van Brunt.  I am one
11  of the counsel for the plaintiffs, and
12  specifically Charles Johnson in this case.  I
13  apologize for a slightly awkward angle that is
14  going on here.  The video is there, I'm here.
15  You can look at whichever may seem more
16  comfortable.
17    Would you mind stating and spelling
18  your full name for the record?
19    A.   Detective Dwayne Davis.  Dwayne is
20  spelled D-W-A-Y-N-E; Davis is spelled D-A-V-I-S.
21    Q.   And you're currently employed by the
22  Chicago Police Department, correct?
23    A.   Yes.
24    Q.   What is your rank?

6

1    A.   Could have been.
2    Q.   Okay.  Do you recall the outcome of
3  that case?
4    A.   I was told recently that it was -- I
5  was dismissed from the suit, and it was settled.
6  But I never received official notification.
7    Q.   Okay.  And the other two cases you said
8  involved institutions.  Were you a plaintiff or
9  a defendant or a witness in those cases?
10    A.   A witness.
11    Q.   A witness.  All right.
12    Well, so it sounds like you're pretty
13  familiar with how depositions work.  But just to
14  be clear, obviously, we're making a record here.
15  This is the same as court testimony in that
16  you're under oath.  Obviously, there's no judge
17  or jury.  But because we have a court reporter
18  here, we would ask that you say any answer
19  verbally and unambiguously, no shakes of the
20  head or "mm-hmm" "uh-uh."
21    A.   Okay.
22    Q.   Make sense?
23    If you don't understand a question I
24  ask, please let me know, and I'll rephrase.  If

8

Dwayne Davis 10/02/2019

1 you answer it, I'm going to assume you
2 understood the question. Okay?
3     A.   Okay.
4     Q.   I'll try not to talk over you if you
5 can try to not talk over me just so we get a
6 clear record.
7         And you can take a break at any time,
8 just please answer the question that's pending
9 first.
10    A.   Okay.
11    Q.   Sound good?  Okay.
12        Are you under a doctor's care for any
13 illness that would affect your ability to
14 testify?
15    A.   No.
16    Q.   All right.  Taking any medication that
17 could affect your ability to testify?
18    A.   No.
19    Q.   Any reason whatsoever you can't give
20 full and accurate testimony here today?
21    A.   No.
22    Q.   All right.  Regarding the Jones case,
23 did you ever receive any internal discipline
24 within the Chicago Police Department stemming

9

1     A.   At least an hour.  Less -- I think,
2 less than two, but I could be wrong.
3     Q.   When did it take place?
4     A.   Within the last 30 days.
5     Q.   Any other meetings with counsel to
6 prepare for your deposition?
7     A.   Besides that one, yes.  We met a couple
8 of times.
9     Q.   Okay.  And when was the next meeting?
10    A.   I couldn't tell you.
11    Q.   Was it after the one you just
12 described?
13    A.   It would be before.
14    Q.   I see.
15        And do you have an estimate as to when
16 that occurred?
17    A.   No.
18    Q.   Last month?
19    A.   I don't think so.
20    Q.   The last six months?
21    A.   Yes.
22    Q.   Okay.  And who was present for that
23 meeting?
24    A.   Myself, Ms. Benjamin, possibly someone

11

1 from that suit?
2     A.   No.
3     Q.   And from here on out, I might just say
4 CPD instead of Chicago Police Department.  Is
5 that okay with you?
6     A.   That's fine.
7     Q.   Sounds good.
8         You're represented by counsel today?
9     A.   Yes.
10    Q.   And that's Ms. Benjamin, correct?
11    A.   Yes.
12    Q.   All right.  What did you do to prepare
13 for this deposition, sir?
14    A.   I've met with her and looked over
15 reports and transcripts.
16    Q.   All right.  Who else was present for
17 that meeting?
18    A.   Luke -- Well, some people in her office
19 that I do not remember.
20    Q.   Okay.
21    A.   And Luke -- Detective Luke Daly.  I
22 don't know what his rank is.  Frank Valadez at
23 some points, at one point, and Bernie Ryan.
24    Q.   How long was that meeting?

10

1 from her office, and Luke Daly.
2     Q.   And it's Detective Daly, do you
3 believe?
4     A.   Mm-hmm.  It is detective.
5     Q.   Detective Daly was your partner during
6 the Ibrahim Ali murder investigation; is that
7 correct?
8     A.   Yes.
9     Q.   And you mentioned you reviewed some
10 documents, correct?
11    A.   Yes.
12    Q.   And which documents were those?
13            (whereupon, a discussion was had
14             off the record.)
15 BY ATTORNEY VAN BRUNT:
16    Q.   I forgot to close something up.
17        Is there another meeting that we
18 haven't discussed that you went to in
19 preparation for your deposition other than the
20 two we just discussed?
21    A.   It's -- I think it was more than two.
22 I think it was more than two, but I'm not
23 positive.  I'm pretty sure it was more than two,
24 but I don't know the number.

12

1    Q.    How many -- Sorry.
2          How many hours total do you believe you
3    met for?
4    A.    I want to say something like four.
5    Q.    Total?
6    A.    I could -- I'm sure I'm wrong, but
7    that's what I want to say.
8    Q.    All right. What documents did you
9    review in preparation for your deposition?
10   A.    Some old police reports, court
11   transcripts of my testimony, or previous
12   testimony.
13   Q.    Which police reports?
14   A.    I think I looked at a supplementary
15   report.
16   Q.    Was it a cleared/closed supplementary
17   report?
18   A.    I couldn't tell you that.
19   Q.    How many supplementary reports?
20   A.    I couldn't tell you that.
21   Q.    Did you look at any GPRs or general
22   progress reports?
23   A.    I know I looked at one GPR.
24   Q.    Do you recall the content of that GPR?

13

1    Were those from the criminal trials of the
2    original defendants in this case?
3    A.    Yes.
4    Q.    In which you testified?
5    A.    Yes.
6    Q.    So the Johnson matter, the Johnson
7    criminal case?
8    A.    Yes.
9    Q.    And the McCoy criminal case?
10   A.    Yes.
11   Q.    Did you review the testimony of anybody
12   else?
13   A.    No.
14   Q.    Any other documents that you reviewed
15   prior to this deposition?
16   A.    I don't think so.
17   Q.    Did you see any photographs?
18   A.    I think I did see a photograph with all
19   of the four defendants.
20   Q.    I see. And what kind of photograph was
21   it?
22   A.    I want to say it was a lineup, but I'm
23   not positive.
24   Q.    Was it one photograph or many?

15

1    A.    I think I had -- it had something on
2    there that I -- I thought I recognized as my
3    writing. But besides that, I couldn't tell you
4    what was on it.
5    Q.    Do you recall anything about the
6    subject matter of that report?
7    A.    The GPR?
8    Q.    Correct.
9    A.    No.
10   Q.    Did you, yourself, author any reports
11   in this case?
12   A.    No.
13   Q.    And this case being, just for the
14   record the, Ibrahim Ali case.
15   A.    No.
16   Q.    Do you recall sitting here today the
17   GPR that you reviewed, who the author of that
18   was?
19   A.    No.
20   Q.    Do you know who authored the
21   supplementary report that you reviewed?
22   A.    I believe it was Detective Cassidy,
23   retired Detective Cassidy.
24   Q.    You said you reviewed transcripts.

14

1    A.    I just saw one.
2    Q.    Did you recognize the four individuals
3    upon viewing the photograph?
4    A.    No.
5    Q.    Sitting here today, in your mind's eye,
6    do you have a picture of what the four look
7    like?
8    A.    No.
9    Q.    Could you describe them?
10   A.    Male blacks.
11   Q.    Could you give other description other
12   than that?
13   A.    And be accurate, no.
14   Q.    So you were involved in the
15   investigation of the murders of Claude Ibrahim
16   and Yousef Ali, correct?
17   A.    Yes.
18   Q.    How well do you remember your
19   involvement in that investigation?
20   A.    Not well.
21   Q.    Could you characterize the state of
22   your memory ranging from zero to good?
23   A.    Zero to good?
24   Q.    Well, is it good, fair, poor, zero?

16



1     A.   Poor.
2     Q.   Do you have recollection of this
3  investigation independent of the police reports
4  in the case?
5     A.   Some.
6     Q.   Okay.  What do you recall?  Prior to
7  reviewing any police reports, what did you
8  recall about your investigation in this case?
9     A.   I recall going -- accompanying
10 Detectives Cassidy and Daly to -- well, I didn't
11 remember what high school, to a high school, and
12 then bringing the subject back to Area Central.
13 And I remembered going by a defendant's house
14 and then driving back to the Area.  And then I
15 remembered one of the defendants, I'm assuming a
16 relative showing up at Area Central, or Area 1
17 at the time, and had a -- vest, a work vest, I
18 believe it was Coca-Cola, and was saying that he
19 worked, and it couldn't -- he couldn't have been
20 involved, I think, or something along those
21 lines.
22    Q.   Anything else?
23    A.   No.
24    Q.   Do you recall which subject was which

17

1  in the recollections you just described?
2     A.   Did I recall at the time, or do I know
3  now?
4     Q.   Prior to reviewing the reports, did you
5  recall?
6     A.   No.
7     Q.   Now after doing some preparation, has
8  your recollection been refreshed?
9     A.   I don't know if refreshed is the term,
10 but I think I have the correct people.
11    Q.   Okay.  And who did you go and get at
12 the high school?
13    A.   I think that was McCoy.
14    Q.   Okay.  And when you talked about going
15 to a defendant's house, who was that?
16    A.   The one that I remembered, I believe
17 that was Johnson.
18    Q.   You remember going to Johnson.  Did you
19 physically go in Johnson's house?
20    A.   No.
21    Q.   And you said a relative showed up with
22 a Coca-Cola vest.  A relative of whom?
23    A.   Johnson.
24    Q.   Have you discussed your deposition with

18

1  anyone else that we haven't already discussed?
2     A.   When you say "discussed," what do you
3  mean?
4     Q.   Just the fact that you were going to be
5  deposed in this matter.
6     A.   My supervisors are aware of my
7  whereabouts.
8     Q.   What about -- Well, so you mentioned at
9  one of your meetings, Luke Daly, Frank Valadez,
10 and Bernard Ryan were also present, correct?
11    A.   Correct.
12    Q.   Were any other named defendants present
13 at any of the meetings?
14    A.   No.
15    Q.   Have you discussed your deposition with
16 any other defendants named in this case who
17 weren't at that meeting?
18    A.   No.
19    Q.   Are you currently friends with any of
20 the other detectives who are named in this case?
21    A.   What's your definition of "friends"?
22    Q.   Do you see them socially outside of
23 work?
24    A.   No.

19

1     Q.   Do you consider yourself friendly at
2  work with any of them?
3     A.   No one works with me.
4     Q.   So you're not friends with anybody
5  currently?
6     A.   None of them work with me.
7     Q.   So you're not friends currently with
8  anybody who is named in this case?
9     A.   So you asked me if any of them that
10 work with me, I'm assuming you mean in my unit.
11    Q.   Let's start over.  Do you see any of
12 them socially outside of work?
13    A.   No.
14    Q.   Do you consider yourself friends with
15 any of them now?
16    A.   Again, not knowing your definition of
17 "friends"; but using my definition of
18 friendship, no.
19    Q.   Okay.  Are you currently friends with
20 any detectives who worked at Area 1 in 1995?
21    ATTORNEY BAGBY:  Object to form.
22    THE WITNESS:  Using my definition of
23 friendship, no.
24 BY ATTORNEY VAN BRUNT:

20

1    Q.   Can you describe what you looked like
2  in 1995, sir?
3    A.   I probably would say a younger version
4  of what you are looking at currently and a
5  lighter, less heavier version.
6    Q.   Okay.  If I were to suggest you were
7  6 foot 2 and about 220 pounds, does that sound
8  correct?
9    A.   The height right.  The weight might be
10 a little -- a little small.
11   Q.   Okay.  What would be a more accurate
12 description of your weight back in '95?
13   A.   I would probably say, like, 240, 245.
14   Q.   And how old were you in '95?
15   A.   Okay.
16 ATTORNEY MEADOR:  Math.
17 THE WITNESS:  Like, 30 something.
18 30 something.
19 BY ATTORNEY VAN BRUNT:
20   Q.   Mid 30s?
21   A.   Okay.
22   Q.   Were you a muscular guy?
23 ATTORNEY MEADOR:  Objection:  Form.
24 THE WITNESS:  Muscular.  I don't know what

21

1    Q.   Did you wear them in '95 from the time
2  you got up to the time you went to bed every
3  day?
4    A.   I doubt it.
5    Q.   What did Luke Daly look like back in
6  1995?
7    A.   A male white with dark hair.
8    Q.   How tall?
9    A.   I don't know.
10   Q.   No idea?
11   A.   I would say, about 5, 7.
12   Q.   How many pounds would you guess?
13   A.   200, 180.
14   Q.   Is he about your same age?
15   A.   I think so.  Maybe a couple of years
16 younger.
17   Q.   If I -- Do you recall what date that
18 the Ibrahim Ali murders occurred, sitting here
19 today?
20   A.   No.
21   Q.   If I told you they occurred on
22 December 4th, 1995, any reason to disagree with
23 me about that?
24   A.   No.

23

1  your definition of muscular is.  My definition
2  of muscular, no, I wasn't muscular.
3  BY ATTORNEY VAN BRUNT:
4    Q.   Did you ever work out?
5    A.   Oh, yes.
6    Q.   Did you lift weights?
7    A.   In my lifetime, yes.
8    Q.   In the mid '90s, in '95?
9    A.   No.  I wasn't lifting weights in '95.
10   Q.   Did you wear glasses back then?
11   A.   Yes.  I don't know how much.
12 Generally, I just wear them when it's darker
13 out.  So at night and on a day like today where
14 it's darker, I generally wear glasses.  But not
15 constant.
16   Q.   And that was true in '95 as well?
17   A.   I'm not positive.  I might have worn
18 them a little bit more than I wear them now.
19 It's possible I wore them a little bit more than
20 I wear them now.
21   Q.   But you would take them off and put
22 them on throughout the day?
23   A.   I couldn't tell you back in '95.  I'm
24 not sure.

22

1    Q.   All right.  If I tell you that, can you
2  tell me what dates you worked on the
3  investigation?
4    A.   What date did you say?
5    Q.   December 4th was the murders?
6    A.   December 5th.
7    Q.   Any other dates?
8    A.   Not that I can recall.
9    Q.   So December 5th was the one and only
10 date that you worked on this investigation?
11   A.   As far as I recall.
12   Q.   I would like you, to the best of your
13 ability, provide a list of every task you
14 completed in this investigation in chronological
15 order.
16   A.   A task I completed.  I completed going
17 to Dunbar High School.  I completed coming back
18 to Area 1.  I completed going to one of the
19 defendants' house and speaking with his
20 grandmother.  I completed that same defendant
21 going and assisting arresting him.  I completed
22 going by Johnson's house and sitting out in a
23 squad car.  And I completed going back to the
24 Area.

24



1    Q.   Any tasks you completed back at the
2  Area?
3    A.   Not that I can recall.
4         Oh.  I sat in, I believe it was McCoy,
5  sat in or went into a room where McCoy related
6  what had -- made a verbal statement.
7    Q.   Okay.  Anything else?
8    A.   Not that I can recall.
9    Q.   Were you present for any meetings on
10 December 5th with other detectives?
11   A.   Yes.
12   Q.   Okay.  Which meetings were those?
13   A.   I don't know what your definition of
14 meetings are, but I do know -- I do remember
15 that there was -- well, I can reasonably assume
16 that prior to going out and arresting the
17 defendants, there was some type of discussions
18 going on at the Area.  And then I do remember
19 that we met -- met somewhere and -- sort of like
20 a launching point and then went to two of the
21 defendants' residences, I believe.  That's the
22 only meetings I would have been a part of.
23   Q.   All right.  You mentioned you sat in on
24 an interview of Troshawn McCoy, correct?

25

1    A.   I believe that's what it was.
2    Q.   Were you present for any other suspect
3  interviews?
4    A.   No.
5    Q.   Were you present for any witness
6  interviews, non suspect witness interviews?
7    A.   One more time.
8    Q.   Were you present for any non suspect
9  witness interviews?
10   A.   No.
11   Q.   Were you present for any lineups?
12   A.   Well, can we backtrack?
13   Q.   Of course.
14   A.   I did speak to one of -- I think it was
15 Ezell, I might be confusing the names --
16 grandmother.
17   Q.   Right.  At her house, correct?
18   A.   Correct.
19   Q.   Any other civilian witnesses you recall
20 interviewing or speaking to right here?
21   A.   No.
22   Q.   Did you participate in any lineups?
23   A.   No.
24   Q.   Did you observe any lineups?

26

1    A.   No.
2    Q.   After December 5th, 1995, did you
3  discuss this case with any other detectives who
4  were working on it after the suspects were in
5  fact convicted of the crime?
6    A.   Not that I can recall.
7    Q.   Did you become aware at some point that
8  this case, meaning the Ibrahim ALI case, was
9  being investigated?
10   A.   No.
11   Q.   When is the first time you found that
12 out?
13   ATTORNEY BAGBY:  Object to form.
14
15 BY ATTORNEY VAN BRUNT:
16   Q.   If ever?
17   A.   Reinvestigated?  No.  I never found out
18 it was reinvestigated.
19   Q.   Did you ever find out that the four
20 plaintiffs in this case, McCoy, Ezell, Styles,
21 and Johnson had in fact been let out of prison?
22   A.   Yes.
23   Q.   And when did you find that out?
24   A.   When I was served as a, whatever my

27

1  term is for the lawsuit.
2    Q.   Is that also when you found out they
3  had been granted certificates of innocence?
4    A.   Or shortly thereafter.
5    Q.   All right.  So prior to being served in
6  this case, you had no knowledge as to the status
7  of the criminal cases of Johnson, Ezell, Styles,
8  and McCoy?
9    A.   Besides that they were convicted.
10   Q.   Correct?
11   A.   That's correct.
12   Q.   Have you ever discussed the civil case
13 with any of your other codefendants beyond the
14 dep preparation we talked about?
15   A.   No.
16   Q.   Do you know sitting here today a man
17 named Joseph Alesia?
18   A.   From the prep, yes.
19   Q.   Okay.  Did you know that name prior to
20 prepping for your dep?
21   A.   You would have -- You would have to
22 have given his title, then I would have
23 remembered him.
24   Q.   The felony review assistant in this

28

1 case?
2    A.    Yes.
3    Q.    I see.
4          Have you spoken to Joseph Alesia since
5 you've been served in this case?
6    A.    No.
7    Q.    Have you spoken to him prior to this
8 case?
9          Sorry.  Take that back.
10         Had you spoken to him at all after the
11 convictions of Johnson, et al.?
12   A.    Not about this case.  Definitely not
13 about this case.  And maybe not -- a total no.
14   Q.    Did you graduate high school, sir?
15   A.    Yes.
16   Q.    Which are high school?
17   A.    Lindblom Technical High School.
18   Q.    And where is that located?
19   A.    64th and Wolcott in Chicago.
20   Q.    And did you --
21   A.    No.  62nd and Wolcott in Chicago.
22   Q.    Okay.  What year did you graduate?
23   A.    1981.
24   Q.    And did you go to college?

                                            29

1    A.    Yes.
2    Q.    And which college?
3    A.    I started off at the University of
4 Platteville -- I mean Wisconsin in Platteville,
5 then I did some time at Chicago State University
6 Chicago.
7    Q.    Did you get a degree?
8    A.    No.  Not done, though.
9    Q.    Pardon?
10   A.    I'm not done with the list.
11   Q.    Keep going with the list.
12   A.    I possibly might have went to one of
13 the City Colleges.  It seems like I might have,
14 but I don't recall any specifics.  And then the
15 last college I attended was Loyola University.
16   Q.    Did you get a degree from Loyola?
17   A.    No.
18   Q.    What year did you leave Loyola?
19   A.    I want to say 1988.
20   Q.    What was your field of study?
21   A.    Accounting.
22   Q.    When did you start working at the CPD?
23   A.    March of 1990.
24   Q.    Between 1988 and '90, were you

                                            30

1 employed?
2    A.    Yes.
3    Q.    What were you doing?
4    A.    By day, I was working for Marsh
5 McClennan Associates or something like that as,
6 I don't know, I guess something like a clerk.
7 And then by evening, I was working at the United
8 Parcel Service as a loader of trucks.
9    Q.    Okay.  And was '90 the year you went to
10 the academy?
11   A.    Yes.
12   Q.    Do you have any recollection of the
13 academy?
14   A.    Some.
15   Q.    Do you have a recollection of what you
16 learned there?
17   A.    Some.
18   Q.    What sticks out in your mind sitting
19 here today?
20   A.    When you're tired, you can still run.
21   Q.    Anything else stick out in your mind?
22   A.    No.
23   Q.    What was your position when you first
24 started at CPD?

                                            31

1    A.    I believe it was, like, probationary
2 police officer.
3    Q.    And where were you stationed?
4    A.    I started off in the 23rd District.
5    Q.    So I'm going to ask if we can just go
6 through your positions, locations from that
7 point until now.  And I know this is probably
8 going to be a bit of a long list, but I
9 appreciate it.
10   A.    Short.
11   Q.    So you were at the 23rd District
12 starting in '90.  How long were you there?
13   A.    Less than a year.
14   Q.    All right.  And then where did you go?
15   A.    The 24th District.
16   Q.    And how long were you there?
17   A.    Less than four years.
18   Q.    So till about '95?
19   A.    Correct.
20   Q.    And what was your position at the
21 24th District?
22   A.    I probably started off as a
23 probationary police officer, and then at some
24 point, once I got off probation, a regular

                                            32



1  police officer.
2      Q.   What were your duties there?
3      A.   Fighting crime, patrolling, report
4  taking, arresting people, conducting preliminary
5  investigations, consoling people.
6      Q.   Did you have a regular partner there?
7      A.   No.  I had a few, what do you call it,
8  short-term, not someone I would say was my
9  regular partner.
10      Q.   And did you go to detective school in
11  '95?
12      A.   Yes.
13      Q.   So that was a promotion, correct?
14      A.   I think, yes, they -- yes.  I think
15  it's considered a promotion.
16      Q.   How did you get promoted?
17      A.   There was a test for -- to be promoted
18  to detective.  I took the test, apparently I
19  scored high, and I was -- so at the time,
20  depending on how high you scored, you could have
21  your choice of assignments between detective,
22  gang specialist, and youth officer.  And I chose
23  detective.
24      Q.   And why did you choose detective?

33

1      A.   Some people told me that I would be
2  stupid not to is probably one reason.  And then
3  the second reason, when I was in the academy for
4  police officer, they had a detective speak to
5  us, and he spoke about his experiences
6  undercover, which has nothing to do with
7  detective work.  But I was so impressed with
8  him, I always -- at that time, I was, like, I
9  want to be a detective.  But what he was talking
10  about wasn't detective work.
11      Q.   So when did you go to detective school,
12  which months, if you recall?
13      A.   I don't.
14      Q.   Early '95, though?
15      A.   So if you said the murder happened in
16  December, I'm assuming it was early.  I don't
17  remember how long we were in the academy for
18  detective school, but I'm assuming it had to
19  have been in the beginning parts of the year.
20      Q.   Who taught your classes in detective
21  school?
22      A.   I can't remember.
23      Q.   Was it multiple teachers?
24      A.   Yeah.  I'm pretty sure.

34

1      Q.   Great.
2           Who was your supervisor while you were
3  in detective school?  Did you have one?
4      A.   I don't know if we had -- I'm sure
5  there was someone over the training academy
6  while we were in there, but I couldn't tell you
7  who it was.
8      Q.   Were any of the people you later worked
9  with at Area 1 in detective school with you?
10      A.   Yes.
11      Q.   Who?
12      A.   Luke Daly.  He was at detective school
13  with me.
14      Q.   Did you graduate at the same time?
15      A.   Yes.
16      Q.   Anyone else?
17      A.   Frank Valadez might have been.  I'm not
18  positive.  I don't know, it seems like he came
19  in after me.  But it's possible he was there.
20           I'm sorry.  Did you ask me anyone who
21  became -- worked with me as a detective?
22      Q.   Did anyone who you later worked with at
23  Area 1 go to detective school with you?
24      A.   A bunch of people.  My class was, like,

35

1  300.  Sam Brown, Lynn Turner, Felicia Davis, my
2  wife.  I know I'm forgetting -- Tony Powell.
3  Bunch of people.
4      Q.   And then you were assigned to Area 1
5  after that?
6      A.   After detective school, yes.
7      Q.   And that was at 51st and Wentworth?
8      A.   Yes.
9      Q.   And how long were you at Area 1?
10      A.   I think I've been there 20 -- 25 years.
11      Q.   You're still there?
12      A.   Yes, ma'am.
13      Q.   But it's now called Area Central,
14  correct?
15      A.   I'm sorry.  It is now called Area
16  Central?
17      Q.   Yes.
18      A.   Yes.
19      Q.   Do you recall when that change
20  happened?
21      A.   Exact date, no, ma'am.
22      Q.   What was your position when you first
23  joined Area 1?
24      A.   Detective.

36



1    Q.   Were you a probationary detective or
2  full detective?
3    A.   I don't think there was ever -- No. I
4  don't think we were probationary. I'm sure
5  there are some provisions about, you know,
6  sending you back to the districts, but I think
7  we're always considered detectives.
8    Q.   Who was your partner when you were
9  first assigned to Area 1?
10   A.   So you don't have a -- Well, back then.
11 I can't tell you what you do now. You're not
12 assigned a partner. Back then, we were placed
13 with seasoned or experienced detectives. And
14 then at some point, you were allowed to get a
15 partner.
16   Q.   Who were you placed with?
17   A.   I remember working with Bernie. Not a
18 lot, but I remember working with Bernie Ryan and
19 his partner, Cliff Gerke (phonetic) and his
20 partner some. Joe Ellen Johnson and Greg
21 Frazier (phonetic). Some other people. I just
22 don't recall their names. It was nothing
23 like -- you know, like a permanent thing. It
24 depended upon who was available, and you bounced

37

1  people at 3:00, some people at 4:00.
2    Q.   And how long in the day would the third
3  shift go to?
4    A.   3:00 to 11:00, 11:30, and then
5  4:00 o'clock to 12:00, 12:30.
6    Q.   Okay. And Daly was also working the
7  7:00 to 3:00 shift with you in December '95?
8    A.   I believe so.
9    Q.   Great. And who was your sergeant that
10 month?
11   A.   I couldn't tell you.
12        Well, I should say from this prep that
13 Tuider, Larry Tuider was mentioned. But I
14 don't -- that day, I don't remember him; I don't
15 remember who the daytime sergeants were.
16   Q.   Do you recall any of the sergeants who
17 supervised you in that first year you were at
18 Area 1 in 1995?
19   A.   I recall Fred Bonke and Marshall
20 Andrews.
21   Q.   Do you recall -- I'm sorry. Go ahead.
22   A.   And Lieutenant Jack Reagan. And I do
23 remember Tuider, I just don't remember him being
24 around that day.

39

1  around.
2    Q.   And who was Bernard Ryan's partner?
3    A.   I want to say his last name was
4  Lenehan. I can't think of his first time.
5    Q.   Were you ever placed with Ken Boudreau?
6    A.   No.
7    Q.   Were you ever placed with Jim Cassidy?
8    A.   No.
9    Q.   And then when did you become -- when
10 did you have a full-time partner?
11   A.   Well, I think by the time this
12 happened, me and Luke were partners. But I
13 can't tell you when that happened.
14   Q.   All right. What shift did you work in
15 December 1995?
16   A.   Days.
17   Q.   And what hours does that entail?
18   A.   I think it was, like, 7:00 to 3:00.
19   Q.   What shift number is that?
20   A.   Second.
21   Q.   Second.
22        What time does the third shift start?
23   A.   I believe at the time it started at
24 3:00, 3:00 or 4:00 or a combination. Some

38

1    Q.   Got it.
2        Was Tuider on days, to your
3  recollection?
4    A.   Well, based on what I've learned here,
5  yes. But I don't know.
6    Q.   What about Bonke, what shift did he
7  work that year?
8    A.   I remember him working afternoons.
9    Q.   And that would be the 3:00 to
10 11:30 shift?
11   A.   Or their hours might be slightly
12 different.
13   Q.   What about Andrews, what shift did he
14 work?
15   A.   I only remember him working midnights.
16   Q.   Is that also called first watch?
17   A.   Correct.
18   Q.   And Lieutenant Reagan, was he your
19 Lieutenant in 1995?
20   A.   Yes.
21   Q.   And what shift did he work?
22   A.   I'm assuming he worked whenever he
23 wanted to.
24   Q.   Did you see him during the day?

40

1    A.   Sometimes.
2    Q.   Daly was also relatively new when you
3  worked the Ibrahim Ali case, correct?
4    A.   Correct.
5    Q.   To your knowledge based on your
6  experiences at Area 1, was it common to put two
7  new detectives together as partners?
8    A.   Once you became partners?
9    Q.   Well, was it common to put two new
10  detectives together as partners back in '95?
11    A.   I don't know if I would use the term
12  "common." There hadn't been a detective class
13  in quite a while. The new -- I mean, we had to
14  work with somebody. So basically, if there was
15  a couple of people for you to, some older
16  detectives who had been around, if they needed a
17  partner, you could -- nothing was forced. You
18  just matched up where you matched up.
19    Q.   Did you request to be partnered with
20  Daly?
21    A.   Yes.
22    Q.   Because you got along well?
23    A.   Well, we had worked in the 23rd -- not
24  necessarily worked -- when you say "got along

41

1  well," we knew each other.
2    Q.   Okay. You said he was at the
3  23rd District with you?
4    A.   Correct.
5    Q.   All right. Who was Valdez's partner in
6  '95, if you recall?
7    A.   No.
8    Q.   Did the fact that both of you were
9  relatively new affect the kind of tasks you were
10  assigned in 1995?
11    A.   Who would that be?
12    Q.   You and Daly.
13    A.   I'm sure.
14    Q.   Why do you say that?
15    A.   We were new. Didn't know much.
16    Q.   I see.
17       So it's fair to say that you would
18  often be assisting other detectives who had more
19  experience that year?
20    A.   Yes.
21    Q.   In '95 as a detective, how many cases
22  did you personally investigate that year?
23    A.   In '95?
24    Q.   Yeah. Any estimate you can provide?

42

1    A.   Zero.
2    Q.   Why do you say that?
3    A.   You asked me for an estimate.
4    Q.   Well, you investigated the case we're
5  here to talk about today, right?
6    A.   I assisted.
7    Q.   I see. Okay. So let's nail that down.
8       How many cases did you work on
9  investigating in 1995?
10    A.   I can't tell you.
11    Q.   Well, was it more than five?
12    A.   I don't know.
13    Q.   You have absolutely no recollection
14  sitting here today?
15    A.   No. I know it was one, I assisted on
16  this case.
17    Q.   Do any other cases from '95 stand out
18  in your mind?
19    A.   Generally years -- years with cases
20  don't stand out. Cases stand out, but not the
21  year.
22    Q.   What about cases from the mid '90s
23  generally, do any stand out for you?
24    A.   Generally, the cases stand out, not the

43

1  year. So I can say, like, I know what current
2  cases I have that stand out, and then I can say
3  that a case that's older stands out. But I
4  couldn't tell you the year, whether it was from
5  the '90s, 2000s.
6    Q.   Do any cases that you believe to be
7  from the '90s stand out to you today?
8    A.   Generally, yeah. A couple, yes.
9    Q.   What are those?
10    A.   I don't know the names. I just know
11  circumstances.
12    Q.   What were the circumstances, generally
13  speaking, of those cases that stand out to you?
14    A.   Generally homicides. Well, generally
15  homicides. There's one aggravated battery
16  that -- that I know -- that's, I have a little
17  bit more about that agg. batt. that stands out.
18  It was an elderly woman, I remember her name,
19  Ruth Claxton. She was in her house getting
20  ready for church, and a bullet sailed through
21  the side of her house and struck her. And I
22  remember working that case. I remember a double
23  homicide investigation that went unsolved. I
24  remember a stabbing homicide that went unsolved.

44

1  Generally, it's the unsolved cases that -- the
2  older cases that have stuck with me.
3      Q.  Do you know what the murder solve rate
4  was at Area 1 in '95?
5      A.  No.
6      Q.  Was the clearance rate something that
7  was discussed in the Area that year?
8      ATTORNEY MEADOR:  Objection:  Form.
9      THE WITNESS:  No.
10 BY ATTORNEY VAN BRUNT:
11     Q.  To your knowledge, was it a factor in
12 detective promotions?
13     ATTORNEY MEADOR:  Objection:  Form;
14 foundation; calls for speculation.
15     THE WITNESS:  Not that I know.
16 BY ATTORNEY VAN BRUNT:
17     Q.  What about in demotions?
18     ATTORNEY MEADOR:  Same objections.
19     THE WITNESS:  I don't ever remember anyone
20 ever -- I heard that before I became a
21 detective.  I had actually worked with a guy who
22 got demoted.  Or -- well, he worked in the same
23 district.  But I don't think that practice has
24 ever been employed since I've been at -- a

45

1  detective.
2  BY ATTORNEY VAN BRUNT:
3      Q.  The practice being demotions?
4      A.  Correct.
5      Q.  How many murders did you work in a
6  given week in '95?
7      A.  I don't know.  One or -- I mean, work
8  on, assist?
9      Q.  Correct.
10     A.  It really depends upon what -- whoever
11 I was working with, what they were doing.  I
12 couldn't tell you.
13     Q.  About one a week?
14     A.  I don't know.
15     Q.  What about in a given month?
16     A.  I don't know.
17     Q.  Can you tell me how many murders you
18 worked on in '95?
19     A.  No.
20     Q.  Any estimate?
21     A.  Well, I know the one.
22     Q.  Do you have a larger estimate for the
23 year?
24     A.  No.

46

1      Q.  In '95, were you familiar with the area
2  around 70th and Western?
3      A.  I don't know what your definition of
4  familiar.  I am a South-Sider.  I was a
5  South-Sider at the time.  So ...
6      Q.  Had you worked any cases around that
7  area in '95?
8      A.  I don't recall any.
9      Q.  Where is the 23rd District located?
10     A.  At the time, it was located at Addison
11 and, I want to say, Broadway.
12     Q.  What about the 24th District?
13     A.  Devon and Clark.
14     Q.  I'm sorry.  What was the first one?
15     A.  Devon.
16     Q.  Devon.  Got it.
17         Do you recall any offenses that took
18 place while you were at Area 1 in the mid '90s
19 around 70th and Western?
20     A.  Do I recall any what?
21     Q.  Specific offenses that took place in
22 the area of 70th and Western in the mid '90s.
23     A.  No.
24     Q.  Can you describe what that area was

47

1  like in 1995 --
2      A.  No.
3      Q.  -- based on your personal knowledge?
4      A.  No.
5      Q.  Do you recall sitting here today what
6  kind of businesses were in that area in 1995?
7      A.  I do recall -- well, my general opinion
8  is there's a lot of car dealerships on Western.
9  I do remember that.  That's my general opinion.
10     Q.  You remember seeing those?
11     A.  As I would drive down the street.
12     Q.  In '95?
13     A.  My general opinion, it's always been
14 car dealerships on Western.  I can't tell you
15 specifically in '95 or not.
16     Q.  Were you familiar with if there were
17 any gangs in that area in '95 or not?
18     ATTORNEY MEADOR:  Objection as to form.
19     THE WITNESS:  I can assume, but I don't -- I
20 don't have any firsthand knowledge.
21 BY ATTORNEY VAN BRUNT:
22     Q.  Well, that was going to be my next
23 question.  Did you participate or assist on any
24 investigations having to do with gangs in 1995

48

1  at Area 1?
2      A.   I don't recall.
3      Q.   Did you consider yourself an expert in
4  gangs in 1995?
5      A.   No.
6      Q.   Did you have any specific knowledge of
7  gangs in 1995?
8      A.   Yes.
9      Q.   Okay.  Which gangs?
10     A.   The big ones, Vice Lords, Gangster
11 Disciples, Black P. Stones, Latin Kings maybe.
12     Q.   Were you familiar with the gang
13 structure of the gangs you just mentioned?
14     A.   Roughly.
15     Q.   So you knew who was in charge?
16     A.   No.  No.
17     Q.   You didn't know actual people who were
18 in the gangs?
19     A.   Yeah.  I mean, I knew that they had
20 structure back then, they had structure.  I knew
21 that Larry Hoover of the Gangster Disciples was
22 in prison.  I knew that Willie Lloyd of the Vice
23 Lords was in prison.  And I knew that -- I can't
24 think of his name right now, the guy who was

49

1  founder of the Black P. Stones, Fort, Fort, I
2  knew he was in prison.
3      Q.   Did you know the names of any lower
4  level gang members in any of these gangs back in
5  '95?
6      A.   I don't know.
7      Q.   Is it something that you likely did
8  know and you've just forgotten?
9      A.   It's likely that I did not know.
10     Q.   You mentioned before that gang crimes
11 specialist was a role that one could be promoted
12 into, correct?
13     A.   Correct.
14     Q.   Were they considered detectives?
15     A.   They were considered gang crimes
16 specialists.
17     Q.   And what was the role of the gang crime
18 specialist in '95?
19     A.   I'm not sure.  I know that they -- I'm
20 assuming that they had a better knowledge of
21 gangs than your regular officer.
22     Q.   Okay.  Were they also stationed at Area
23 1?
24     A.   My understanding was that they had --

50

1  I'm not sure.  I know that there were -- I mean,
2  you didn't see, like, a parade of gang
3  specialists, so there were -- there were gang
4  specialists assigned to Area 1, but I'm not sure
5  what all of their responsibilities included, if
6  that was it or they -- just part of it.  I don't
7  know what
8  their ...
9      Q.   In '95, did you work regularly with
10 gang crimes specialists on cases?
11     A.   No.
12     Q.   Was it a pretty rare occurrence that
13 you would work with the gang crimes specialists?
14     A.   In '95?
15     Q.   Yes.
16     A.   I can't remember any other case besides
17 this case.
18     Q.   All right.  In '95, Area 1 was divided
19 into Violent Crimes and Property Crimes; is that
20 right?
21     A.   And Youth.
22     Q.   And Youth.
23          How many Violent Crimes detectives were
24 there at Area 1 in December of '95?

51

1      A.   I don't know.
2      Q.   Do you have a guess?
3      A.   No.
4      Q.   In '95, how would you come to be
5  assigned to work on a case?
6      A.   I'm not sure.  I know they had to be --
7  So, say, like, a crime just happened, and they
8  wanted to send some detectives out to start the
9  follow-up investigation, so I know that
10 sergeants sometimes came out and -- I don't know
11 if they gave you a physical document back then,
12 they came out and told you they wanted you to go
13 follow up something or do something.  But then
14 there also had to be a mechanism in place so
15 crimes can happen, and there's no -- besides the
16 initial -- the initial investigation by the
17 Patrol Division, there's no immediate follow-up
18 from the Detective Division, and there would be
19 -- there was some type of, I don't know, process
20 where that case came from Patrol Division
21 to Detective Division, and then you would be
22 assigned those cases too.  But I can't recall
23 how that mechanism worked.  But I know there was
24 a mechanism.

52



1    Q.   And did the sergeant assign you to a
2  case?
3    A.   Besides what I just described earlier?
4    Q.   Correct.  Would it be the sergeant who
5  would be the person to convey to you, "This is a
6  case we're going to work, I want you on it"?
7    A.   So I'm confused.  I explained two
8  different ways that you might get cases.
9    Q.   Sorry.  I must have blanked out there
10 for a second.  I caught the second one.  Can you
11 reiterate the first one again for me?
12   A.   So a crime happens, Patrol does a
13 preliminary investigation where they generate a
14 report.  And then they would make a
15 notification.  I'm assuming they made some type
16 of notification to the Detective Division.
17 Depending upon what the crime was, I believe in
18 '95 the sergeant could say, for example, "Davis
19 and Daly, go conduct a follow-up investigation
20 for this."  And we would go.
21   Q.   On a larger homicide case, was there
22 generally a lead detective assigned?
23   A.   I'm not sure.  I guess that term is
24 used now; but to me, I always said that was a TV

53

1  term.
2    Q.   I see.  But was there a different term
3  that was used for the person who was in charge
4  of an investigation, the detective who was in
5  charge?
6    A.   I never knew that -- I mean, of course
7  I knew my place as a new detective versus an
8  experienced detective.  I never knew there was a
9  hierarchy.
10   Q.   Well, you've said several times that
11 you were only assisting on investigations,
12 correct?
13   A.   I did.
14   Q.   So someone was obviously leading the
15 investigation, correct?
16   A.   I wouldn't use the term.  I would say
17 that someone was -- it was someone's case.
18 BY ATTORNEY VAN BRUNT:
19   Q.   Okay.  So was somebody assigned to have
20 the case in 1995?
21   A.   We're speaking of the murder case?
22   Q.   On a murder case, yeah.
23   A.   Period?  A murder case?
24   Q.   Yeah, just generally speaking, would

54

1  somebody be assigned for -- to have -- Let's
2  take that back.
3         Generally speaking, in '95, would
4  someone be assigned to have the case, as you
5  said?
6    A.   Generally, yeah.  So whoever handled
7  the scene, generally, it was considered their
8  case, except if it was midnights.  I think even
9  back then in '95, if it was midnights, then
10 someone on the day shift would also be assigned
11 to follow up on that case too.  And then it
12 would work like a corroboration between
13 midnights and whoever that other team was.
14   Q.   So it's common to investigate cases in
15 teams?
16   A.   When I said "teams," I meant partners.
17 So basically, generally, it would be two sets of
18 partners.
19   Q.   Got it.  Okay.
20         What was the chain of command on a
21 major homicide investigation?
22   ATTORNEY MEADOR:  Objection:  Form.
23   THE WITNESS:  I don't know.  I'm assuming the
24 same as any investigation.

55

1  BY ATTORNEY VAN BRUNT:
2    Q.   Okay.  And what was that?
3    A.   The lieutenant was over Violent Crimes.
4  There were sergeants underneath the lieutenant.
5  And then there were detectives underneath the
6  sergeants.
7    Q.   So could more than one sergeant be in
8  charge of a homicide investigation?
9    A.   My understanding, or my remembrance, my
10 remembrance -- my understanding of what was
11 going on back then, it's not like now where
12 there are sergeants that have a homicide team.
13 It's not like you had Violent Crime sergeants
14 and you had the lieutenant over them.  I don't
15 think they would say that they were attached to
16 any one case or any set of particular
17 detectives.  They were a Violent Crimes
18 sergeant.  But you would have to ask a Violent
19 Crimes -- a former Violent Crimes sergeant how
20 he felt about it.
21   Q.   Got it.
22         If multiple partners were collaborating
23 on a case, as we just mentioned, was one team or
24 one detective generally in charge of maintaining

56



1 the police reports in the case?
2     A.   I don't know if I could speak on what
3 was general about that.
4     Q.   Did you ever investigate any other
5 cases during your time at Area 1, current time
6 at Area 1, involving a crime committed at an
7 auto lot?
8     A.   I don't think so.
9     Q.   You said you had a recollection that
10 there were auto lots around 70th and Western in
11 the mid '90s, correct?
12     A.   Correct.
13     Q.   Were you familiar with what types of
14 criminal activity occurred at those lots in that
15 time period?
16     A.   No.
17     Q.   Sitting here today, you couldn't say
18 any types of offenses that generally occurred at
19 those lots?
20     A.   Charging too much money for the cars
21 they were selling.
22     Q.   Okay.  Other than that?
23     A.   No.
24     Q.   You testified regularly in court in the

57

1 mid '90s --
2     A.   I'm sorry.  Some case did pop up.  And
3 I'm not sure if I was assigned to sexual
4 assaults at the time, but I investigated a
5 sexual assault or abuse, probably an abuse,
6 where the girl went for a test drive, and the
7 guy and the salesman did something to her in the
8 car.  And I believe that was a car dealership on
9 Western.
10     Q.   All right.  That's the only auto lot
11 case that comes to mind?
12     A.   Yes.
13     Q.   Did you testify regularly in court in
14 the mid '90s as part of your job?
15     A.   Regularly?  I don't know what your
16 definition of regularly is.  But I did testify.
17     Q.   How frequently in a given month?
18     A.   I couldn't tell you.
19     Q.   Once a week kind of thing?
20     A.   No.  That would be too much.
21     Q.   A couple of times a month?
22     A.   Maybe.
23     Q.   And what kind of proceedings were you
24 testifying in?

58

1     A.   Felony and misdemeanor proceedings.
2     Q.   Okay.  And those were cases in which
3 you had assisted on the investigation?
4     A.   At least.
5     Q.   Great.  And would you testify in motion
6 hearings?
7     A.   In '95?
8     Q.   Yeah.
9     A.   I'm not -- I'm not sure when I first
10 testified in a motion hearing.
11     Q.   What about the grand jury?
12     A.   I'm not sure when I first testified in
13 front of the grand jury.
14     Q.   You definitely testified in trials,
15 correct?
16     A.   I won't say definitely.
17          Well, yeah.  I guess misdemeanors or
18 trial, yeah.
19     Q.   And prior to testifying in the mid
20 '90s, would you meet with the prosecutor
21 beforehand to discuss what you were going to
22 testify about?
23     A.   Meet with, like, before the court date?
24     Q.   Yes.

59

1     A.   So, like, my court date is the 3rd, I
2 would show up the morning of.  The state's
3 attorney talks to me a bit, and then we would
4 testify.
5     Q.   Well, that's what I'm asking.  Would
6 you talk to the prosecutor before testifying
7 about the case?
8     A.   Yes.
9     Q.   Would you testify -- Would you talk to
10 the prosecutor about what you were specifically
11 going to be testifying about before going on the
12 stand?
13     ATTORNEY KUHN:  Objection:  Form.
14     THE WITNESS:  Could you clarify that?
15 BY ATTORNEY VAN BRUNT:
16     Q.   Would you go over your expected
17 testimony with the prosecutor before you took
18 the stand?
19     A.   I don't know if I like the term
20 "expected."
21     Q.   Would you go over what might come up in
22 your testimony prior to taking the stand?
23     A.   I don't think -- No.
24     Q.   Could you describe how those

60

1  conversations went as a general matter?
2      A.  "Officer Davis, what did you see?"  And
3  they might ask me some questions; I might
4  answer.  And then they said -- they give me a
5  status, looks like it's going to go today, or
6  it's going to be continued, something along
7  those lines.
8      Q.  Would you usually, as a general matter,
9  review police reports while you were talking to
10  the prosecutor?
11      A.  Before '95?
12      Q.  In '95, around that time.
13      A.  I don't think so.  It's kind of just
14  like, you know, a real quick thing because
15  mostly, it was at the branch courts.
16      Q.  Okay.  On your own, not with a
17  prosecutor, would you review your police reports
18  prior to testifying?
19      A.  I hope I did, but I can't tell you if I
20  did or not.
21      Q.  Why did you say you hope you did?
22      A.  That would show some preparation.
23      Q.  You can't testify as to your general
24  practice --
61

1      A.  No.
2      Q.  -- sitting here today?
3      A.  No.  '95, no.
4      Q.  When did you first meet James Cassidy?
5      A.  '95.
6      Q.  When you first joined Area 1?
7      A.  No.  I'm sure not then.
8      Q.  Pardon?
9      A.  I'm sure not then.
10      Q.  Sorry.  You met him before '95?
11      A.  No, sometime after I got to Area
12  Central -- I mean, Area 1.
13      Q.  I see.
14          Did you work the same shift back in
15  '95?  Did he work days as well?
16      A.  I believe he did.
17      Q.  Great.
18          Did you investigate cases together?
19      A.  I think first time I ever assisted
20  Detective Cassidy was this case.
21      Q.  The Ibrahim ALI case, correct?
22          What was your impression of Detective
23  Cassidy as an investigator based on your
24  experience working with him on this case?
62

1      A.  I have no impression.
2      Q.  Did you develop an impression working
3  with him on later cases after this one?
4      A.  I don't recall working other cases with
5  Detective Cassidy.
6      Q.  Okay.  Do you, sitting here today,
7  think he's a good cop?
8      A.  I have no opinion on that.
9      Q.  Well, you did work with him on this
10  case, correct?
11      A.  Yes.
12      Q.  And this was on December 5th, 1995,
13  correct?
14      A.  So you said, yes.
15      Q.  Well, do you have any -- I thought you
16  said you worked on December 5th, 1995?
17      A.  Based on you giving me the date of the
18  murder, that's how we computed it.
19      Q.  I see.  Okay.
20          Do you have any reason to believe it
21  wasn't on December 5th, 1995?
22      A.  I have no reason to believe it was not.
23      Q.  Based on your work with Cassidy on that
24  day, do you have an impression of his skills as
63

1  an investigator?
2      A.  No.
3      Q.  What was Detective Cassidy's reputation
4  within Area 1 in 1995?
5      ATTORNEY BAGBY:  Object to form; foundation.
6      ATTORNEY MEADOR:  Join.
7      THE WITNESS:  I think he was highly regarded.
8  BY ATTORNEY VAN BRUNT:
9      Q.  All right.  Did he -- He had a
10  reputation as being an effective officer?
11      ATTORNEY BAGBY:  Objection:  Form.
12      ATTORNEY MEADOR:  Join.
13  BY ATTORNEY VAN BRUNT:
14      Q.  And what makes you say that?
15      A.  He was older.  He had -- I think he had
16  been a detective a while.
17      Q.  Did other detectives at Area 1 talk
18  about him?
19      A.  I don't recall.  I'm sure that -- I'm
20  sure they did, but I don't recall it.
21      Q.  Was he known for being good at
22  interrogations?
23      ATTORNEY BAGBY:  Objection:  Form.
24      ATTORNEY MEADOR:  Objection:  Form.
64



1    ATTORNEY BAGBY:  Foundation.
2    THE WITNESS:  I don't know that.  I don't
3  know.
4  BY ATTORNEY VAN BRUNT:
5    Q.   Was he known as being effective at
6  getting confessions?
7    ATTORNEY MEADOR:  Objection:  Form;
8  foundation.
9    ATTORNEY BAGBY:  Same.
10    THE WITNESS:  I don't know.
11  BY ATTORNEY VAN BRUNT:
12    Q.   Did you, other than -- Are you familiar
13  with the Ryan Harris case?
14    A.   A little.
15    Q.   Do you recall that Detective Cassidy
16  investigated that case?
17    A.   I do recall that.
18    Q.   Do you recall talking to detectives
19  about Cassidy's work on that case?
20    A.   I recall not talking to detectives
21  about Cassidy's work on that case.
22    Q.   You did not discuss Cassidy's work on
23  that case with other detectives?
24    A.   No.

65

1    Q.   Is it fair to say that you were
2  assisting Cassidy in this investigation?
3    A.   No.
4    Q.   You were not assisting Cassidy?
5    A.   It would be fair to say that I assisted
6  on this case, and I was told to go with Cassidy
7  to Dunbar High School or -- I think it was --
8  yeah, I'm pretty sure it was Dunbar High School.
9    Q.   Back in Area 1 in the mid the '90s, did
10  you interact socially with any of the detectives
11  you worked with?
12    A.   I think a few of them came to my
13  wedding.
14    Q.   Anybody who worked on this case?
15    A.   Luke Daly.
16    Q.   And when was your wedding, sir, what
17  year?
18    ATTORNEY BAGBY:  We won't tell her.
19    THE WITNESS:  I would say around '96, '97.
20  Maybe '98.
21    ATTORNEY BAGBY:  I'm going to put that part
22  under protective order.
23  BY ATTORNEY VAN BRUNT:
24    Q.   Did you work with Frank Valadez on

67

1    Q.   Was that intentional?
2    A.   I wouldn't say it was intentional, just
3  none of my business, not in my lane.
4    Q.   What do you recall Cassidy doing on the
5  Ibrahim Ali case sitting here today?
6    A.   I remember going -- riding in the car
7  with him, going to the high school.  I remember
8  him talking with the defendant we got from the
9  high school.
10    Q.   That's McCoy, correct?
11    A.   I don't -- I don't know the names of
12  everyone.  I know Johnson.  Everyone else is
13  kind of sketchy.
14    Q.   Anything else you recall Cassidy doing
15  in this case?
16    A.   No.
17    Q.   Fair to say that the Ali Ibrahim case
18  was Cassidy's case?
19    A.   I wouldn't be the person to say that.
20  But given what generally, when we talked earlier
21  about how cases were, I don't know, assigned to
22  people, it was generally the person who did the
23  scene.  And based on the prep, I don't think
24  Cassidy was the scene detective.

66

1  investigations in the mid '90s?
2    A.   No.
3    Q.   Did you ever work with Frank Valadez on
4  a case?
5    A.   Not that I can recall.  Besides --
6  Well, yeah.  I don't even know what he did on
7  this one.  So not that I can recall.
8    Q.   You do recall that he worked on this
9  case, correct?
10    A.   Actually, no.  Just from the prep, I
11  know that he did.  But remembering him?  No, I
12  don't remember him from the case.
13    Q.   So is it fair to say you don't have any
14  impressions of Valadez as an investigator
15  sitting here today?
16    A.   That would be fair to say.
17    Q.   Back in '95, were you aware of the
18  investigation into the Nina Glover murder?
19    A.   No.
20    Q.   Have you ever heard that name before?
21    A.   I don't know.
22    Q.   Does the term "Englewood Four" mean
23  anything to you?
24    A.   No.

68

1    I'm not -- I want to clarify.  I'm not
2  saying that I did not, but when you say
3  "Englewood Four," that doesn't, like -- stuff
4  doesn't pop up.
5      Q.   Does the name Johnny Douglas mean
6  anything to you?
7      A.   No.
8      Q.   Did you work with Ken Boudreau in 1995?
9      A.   No.
10     Q.   Why do you laugh?
11     A.   He just makes me chuckle.
12     Q.   Why is that?
13     A.   He's a chuckling type of guy.
14     Q.   He's a funny guy?
15     A.   Sometimes.
16     Q.   Was he on the same shift as you?
17     A.   In '95?
18     Q.   Correct.
19     A.   No.
20     Q.   What shift did he work?
21     A.   I think he worked afternoons.
22     Q.   So do you recall working any specific
23  investigations with him?
24     A.   I don't recall any, but we might have.

69

1  I doubt it, though.  So no, I don't recall any.
2      Q.   Did he work on the Ibrahim Ali case?
3      A.   From this, I guess I'm told he did.
4  But I don't recall it.
5      Q.   You don't recall seeing him work the
6  case back then?
7      A.   No.
8      Q.   Do you have any impressions of Boudreau
9  as an investigator?
10     A.   No.
11     Q.   What was his reputation at Area 1 in
12  '95?
13     ATTORNEY BAGBY:  Objection: Form;
14  foundation.
15     ATTORNEY MEADOR:  Join.
16     THE WITNESS:  I think he was -- I think the
17  impression was he was a good investigator.
18  BY ATTORNEY VAN BRUNT:
19     Q.   All right.  Was he particularly skilled
20  at interviewing people?
21     ATTORNEY MEADOR:  Objection: Form;
22  foundation.
23     ATTORNEY BAGBY:  Same.
24     THE WITNESS:  I have no knowledge.

70

1  BY ATTORNEY VAN BRUNT:
2      Q.   Did he have a reputation as being
3  skilled at interviewing people?
4      A.   I don't know.  I think what I would
5  label it is he was generally seen as an
6  experienced -- a good -- an experienced
7  detective or good, experienced detective.
8      Q.   Much like Cassidy?
9      A.   Much like Cassidy.
10     Q.   When is the last time you saw Boudreau?
11     A.   Maybe sometime in the 2000s.
12     Q.   So it's been a while?
13     A.   Yes.
14     Q.   He was not in any of your prep
15  sessions?
16     A.   No.
17     Q.   Now, you, I believe, said you worked
18  with Bernard Ryan for a little bit when he first
19  came to Area 1, correct?
20     A.   Yes.
21     Q.   Was he an experienced detective by that
22  point?
23     A.   Yes.
24     Q.   And how many cases did you work with

71

1  him on when he first came to Area 1?
2      A.   I don't recall.
3      Q.   More than -- More than two?
4      A.   I -- If I had to guess, I would say
5  yes.
6      Q.   Okay.  More than ten?
7      A.   If I had to guess, I would say no.
8      Q.   So somewhere between two and ten?
9      A.   Yes.
10     Q.   Did you think he was a good
11  investigator?
12     A.   I did.
13     Q.   Did he have any particular skills that
14  you remember in investigating crimes?
15     A.   He knew more than I knew.
16     Q.   Anything you thought he was
17  particularly good at?
18     A.   Nothing stands out.
19     Q.   Did he have a particular reputation at
20  Area 1?
21     ATTORNEY BAGBY:  Objection: Form;
22  foundation.
23     ATTORNEY MEADOR:  Join.
24     THE WITNESS:  I'm not sure, but I would

72



1 assume that, though, because he was an
2 experienced detective, he kind of got lumped in
3 the same, you know, experienced detective.
4 BY ATTORNEY VAN BRUNT:
5     Q. Okay. With Cassidy and Boudreau?
6     A. Mm-hmm.
7     Q. And is it your understanding that he
8 also worked on the Ali Ibrahim case?
9     A. Well, I do remember Bernie's.
10     Q. Okay. And what do you recall --
11     A. Well, actually refreshed by all of
12 this.
13     Q. Okay. What do you recall Detective
14 Ryan doing on this case?
15     A. So from the prep that me, him, and Daly
16 went to the one defendant's house and spoke to
17 the grandmother together, and then we then went
18 and arrested the one defendant at a convenience
19 store.
20     Q. That would be LaShawn Ezell?
21     A. Yes.
22     Q. Did you have any other interactions
23 with Detective Ryan on this case?
24     A. Not that I recall.

73

1     Q. What shift was he working back then?
2     A. I'm not sure.
3     Q. Do you think he was on your shift?
4     A. I know at times he was.
5     Q. Okay.
6     A. At least I think he was.
7     Q. So we talked about gang crimes
8 specialists a little bit before. Do you recall
9 a specific gang crimes specialist John Bloore?
10     A. I know -- So when I think of Bloore, I
11 think of his partner. I think of them as a
12 twosome.
13     Q. Thomas Richardson?
14     A. Yes, Richardson. I couldn't tell you
15 the first name.
16     But I couldn't necessarily tell you,
17 and I don't think I have individual -- in my
18 mind, I don't see them individually, so I
19 couldn't tell you who -- which one was what. I
20 just see Bloore and Richardson.
21     Q. Okay. I believe you said, and tell me
22 if I'm wrong, that you worked rarely with the
23 gang crimes specialists in the mid '90s.
24     A. No. You asked me specifically about

74

1 '95.
2     Q. Okay. In '95. Good catch.
3     You worked rarely with the gang crimes
4 specialists in '95?
5     A. I think this was the first time.
6     Q. Okay. Do you recall what John Bloore
7 did on this case in '95?
8     A. So I don't really -- They're like a
9 tandem with me. But from the prep, I think
10 Bloore jumped in a -- at Johnson's residence,
11 jumped in a car with me and rode back to the
12 Area.
13     Q. And that's something you recall now
14 after having your recollection refreshed; is
15 that correct?
16     A. I don't really recall it. I just know
17 from that's what's in the documents.
18     Q. Okay. Do you know if you had any
19 specific interactions with Richardson?
20     A. So again, I don't -- on the documents,
21 it doesn't seem like there's anything there.
22     Q. Okay. Do you recall anything that they
23 did other than what you just discussed on this
24 case?

75

1     A. No.
2     Q. All right. Do you have any knowledge
3 of any specific reputation that those two had at
4 the time when you investigated this case?
5     ATTORNEY MEADOR: Objection: Form.
6     THE WITNESS: They were the gang guys.
7
8 BY ATTORNEY VAN BRUNT:
9     Q. Okay. And what did that mean, to be
10 the gang guys?
11     A. They had information about gangs.
12     Q. Okay. What kind of information?
13     A. I couldn't tell you specifically. Or
14 they -- they could. I don't know. If you had a
15 question about gangs, they could tell you.
16     Q. Do you have any knowledge as to how
17 they would be brought in on a case?
18     A. No.
19     Q. Do you know if that's a decision that
20 the sergeant made or a detective who was --
21 whose case it was?
22     A. So the one -- I have no -- I have no
23 knowledge about that. I do know that I remember
24 a case where they worked with -- with me and

76

1  Daly.  And I believe because it was gang -- gang
2  involved, we asked for their assistance.
3      Q.  Okay.  Who -- You and Daly asked
4  specifically?
5      A.  Correct.
6      Q.  Did you contact them directly, or did
7  you go through your sergeant?
8      A.  Probably directly.
9      Q.  Okay.  You're familiar with the name
10  Joseph Fine?
11     A.  Yes.
12     Q.  And he's deceased, correct?
13     A.  That's what I'm told.
14     Q.  When is the last time you saw Joseph
15  Fine?
16     A.  I couldn't tell you that.
17     Q.  All right.  Do you recall that he
18  worked on the Ibrahim Ali investigation?
19     A.  No.
20         From the documents, yes.  But
21  independent, no.
22     Q.  But no -- What is your understanding as
23  to what he did on this case?
24     A.  From the documents that he might have

                                              77

1  been on the scene, or went out on the scene.
2      Q.  So by your definition earlier, does
3  that mean he was one of the guys in charge of
4  the case?
5      A.  That's your definition.  That's your
6  term, "charge."  It would have been -- From what
7  I -- My understanding back then, it would have
8  been him and Coughlin, his partner, their case.
9  But I will say I don't know if I knew it back
10  then; but over time, I've learned that bigger
11  cases, it's kind of, you know, you start off
12  with that overall, it's the scene detective.
13  But on bigger cases, it's kind of hard, that
14  definition doesn't hold stead.
15     Q.  All hands on deck kind of thing?
16     A.  I don't know about that, that
17  definition doesn't hold steady.
18     Q.  Okay.  How is it different on a bigger
19  case?
20     A.  It seems like there are a lot more
21  people involved.
22     Q.  Okay.  Different -- More people with
23  responsibility for the investigation?
24     A.  Yes.

                                              78

1      Q.  All right.  Did Joseph Fine have a
2  particular reputation at Area 1 back in '95?
3      ATTORNEY BAGBY:  Objection:  Form;
4  foundation.
5      ATTORNEY MEADOR:  Join.
6      THE WITNESS:  I don't know much about Joseph
7  Fine.
8  BY ATTORNEY VAN BRUNT:
9      Q.  Did you work with him on any
10  investigations in '95?
11     A.  Aside from --
12     Q.  Aside from this one?
13     A.  No, not that I can recall.
14     Q.  Thomas Coughlin, you know that name,
15  correct?
16     A.  Yes.
17     Q.  The person you just mentioned who was
18  probably on the scene with Fine, correct?
19     A.  Based on the documentation.
20     Q.  And he's also deceased?
21     A.  That's what I'm told.
22     Q.  Okay.  When is the last time you saw
23  him?
24     A.  I couldn't tell you.

                                              79

1      Q.  Did you work with him on any
2  investigations other than this one in '95?
3      A.  I know I worked with him or -- Well, I
4  didn't work with him, but I knew he worked on
5  another case of mine -- a case of mine.  I think
6  it was later.  If it was a case of mine, it had
7  to be later.  So '95, though, I don't think
8  anything else.
9      Q.  When you worked with him later, did you
10  develop an opinion about his skills as an
11  investigator?
12     A.  No.
13     Q.  Did he have a particular reputation at
14  Area 1?
15     ATTORNEY BAGBY:  Objection:  Form;
16  foundation.
17     ATTORNEY MEADOR:  Join.
18     THE WITNESS:  I'm unaware.
19  BY ATTORNEY VAN BRUNT:
20     Q.  Now, Luke Daly was your partner in '95,
21  correct?
22     A.  Yes.
23     Q.  How long were you partners with him?
24     A.  More than a couple of years.

                                              80



1  Q.  When did the partnership end?
2  A.  He -- I couldn't tell you when, but he
3  transferred to Area 3 it was called at the time.
4  Q.  Was that his choice?
5  A.  Yes.
6  Q.  Do you know why he transferred?
7  A.  Closer to home, I think.
8  Q.  And then who became your partner after
9  that?
10  A.  No one.
11  Q.  You worked solo for a while?
12  A.  For the rest of my career.
13  Q.  Was that just a change in how things
14  were structured at the Area?
15  A.  No.
16  Q.  Why did you work solo after that?
17  A.  I like it.
18  Q.  I see.  And why is that?
19  A.  I'm accountable to only me.
20  Q.  I see.
21      So you currently have no partner?
22  A.  Correct.
23  Q.  Back when Daly was your partner, did
24  you have a good working relationship?

81

1  complemented one another, then?
2  A.  I think we were a good team.
3  Q.  Of all the things you mentioned --
4  A.  Effective, effective team.
5  Q.  Of all the things you mentioned you did
6  on this case, did Daly do each of those tasks
7  with you?
8  A.  He did not drive back to Area 1 from
9  the Johnson's residence with me.
10  Q.  That was with Bloore?
11  A.  Yes.
12  Q.  Anything else?
13  A.  Not that I can recall.
14  Q.  Is there anything that he did in this
15  case to your knowledge that you did not
16  participate in?
17  A.  I don't know exactly what he did.
18  Q.  We mentioned Larry Tuider earlier.  He
19  was your sergeant during this case, one of the
20  sergeants on the case?
21  A.  I wouldn't say on the case.  He was a
22  sergeant at Area 1 Violent Crimes.
23  Q.  How many years was he a sergeant in
24  Violent Crimes while you were there?

83

1  A.  I think so.
2  Q.  Did you have different styles in how
3  you worked investigations?
4  ATTORNEY MEADOR:  Objection:  Form.
5  THE WITNESS:  We brought different things to
6  the table.
7  BY ATTORNEY VAN BRUNT:
8  Q.  How so?
9  A.  Well, I do remember that I would say,
10  like, I remember when we got assigned the death
11  investigations, he -- he would handle the body.
12  That was his thing.  I didn't want to go near
13  the bodies.
14  Q.  I see.
15  A.  Just different things like that.  I
16  want to say that he handled the paper, he did
17  the reports, but I doubt if he could have --
18  that could be totally true.  But I want to say
19  that he was the paper guy.
20  Q.  Any particular reason why he was the
21  paper guy?
22  A.  No.  I mean, I'm sure there was, I just
23  don't remember how we slid into that.
24  Q.  Fair to say that your styles

82

1  A.  I have no knowledge.
2  Q.  Did he supervise you on many cases?
3  A.  So again, it's not like it's structured
4  now, so I wouldn't say he supervised me on any
5  case.  He was a Violent Crimes sergeant at the
6  time.
7  Q.  Okay.  So what were the Violent Crimes
8  sergeants' duties to your knowledge in the
9  mid '90s?
10  A.  I don't know.
11  Q.  Well, would they check in with you to
12  see what your progress was on the investigation?
13  A.  Some of them would.  Well, I know
14  that I remember Fred Bonke doing that, and I
15  remember Lieutenant Reagan.  I remember -- my
16  memory and opinion as to Lieutenant Reagan was
17  somehow able to know about every case that was
18  going on in the Area, which I found fascinating.
19  Q.  And you said Bonke would also do that?
20  A.  I know he would ask you about your
21  cases.
22  Q.  Okay.  Would he want updates on what
23  was going on?
24  A.  He would ask you about your cases.  So

84

1 you would tell him about your cases.
2  Q.  Okay.  Would you tell him if you had
3 suspects in the crime?
4  A.  I would tell him whatever -- what was
5 going on with the case.  Or actually Daly talked
6 to Bonke.
7  Q.  Why was Daly the one who talked to
8 Bonke?
9  A.  He just slid into that role.
10  Q.  Okay.  So he was the guy who
11 communicated with the sergeant?
12  A.  Bonke.
13  Q.  Okay.  And how frequently would you
14 have these kinds of communications?  Would it be
15 once a shift, multiple times a shift if you were
16 working a homicide case?
17  A.  Not that frequent.  I guess whenever he
18 had a question.
19  Q.  Whenever he had a question?
20  A.  Bonke.
21  Q.  Okay.  So you wouldn't proactively go
22 update him on a case; you would wait for him to
23 come to you with a question?
24  ATTORNEY BAGBY:  Object to form.

85

1  THE WITNESS:  Bonke?
2 BY ATTORNEY VAN BRUNT:
3  Q.  Yes?
4  A.  So again, it seems like you're trying
5 to shape what is now currently to back then.
6 And my understanding, I don't remember it like
7 that.
8  Q.  Okay.  I'm trying not to shape it.  I'm
9 just trying to understand.  So please tell me
10 how you remember it.
11  A.  So the only person who to me was -- I
12 mean, sergeants had responsibilities.  I know
13 they did.  But the only person who was following
14 your cases was the lieutenant closely.  Seemed
15 to me it was the lieutenant.  He was reading
16 your reports, he was looking at your notes.  He
17 would come, and he would call you in his office.
18 He would ask you questions.  If he didn't -- If
19 he didn't see progress, he would call us in and
20 say, "Hey, what's going on with this case?"  I
21 don't remember the sergeants doing that.
22  Q.  Okay.  And that was --
23  A.  Except for Bonke.  I know Bonke did
24 occasionally -- occasionally would do that.

86

1  Q.  Okay.  What was Bonke's reputation in
2 Area 1?
3  ATTORNEY BAGBY:  Objection:  Form;
4 foundation.
5  ATTORNEY MEADOR:  Join.
6  THE WITNESS:  I couldn't tell.  I wouldn't be
7 the person to speak for Area 1.  I can tell you
8 what I thought about him.
9 BY ATTORNEY VAN BRUNT:
10  Q.  What did you think of him?
11  A.  I thought that he was -- I guess at the
12 time, I thought he was hands-on.
13  Q.  Hands-on?
14  A.  Mm-hmm.
15  Q.  And what do you mean by that?
16  A.  He would ask us about our cases or some
17 of our cases.
18  Q.  And that wasn't true of all the
19 sergeants you worked with?
20  A.  I don't recall other sergeants asking
21 us, so I don't know if it was true or not.  I
22 just remember Bonke asking and Lieutenant
23 Reagan.
24  Q.  We talked about this a little already,

87

1 but you're familiar with the Felony Review Unit
2 in the state's attorney's office?
3  A.  I am.
4  Q.  And what is that unit to your
5 understanding?
6  A.  It's the unit of the state's attorney's
7 office that the Chicago Police Department, and
8 I'm assuming -- well, I know, or I'm assuming
9 other police departments in Cook County contact
10 if they are asking for felony charges on a case.
11  Q.  Okay.  What's the role of the felony
12 review assistant to your knowledge?
13  A.  I believe their role is to come out and
14 to review all aspects of the case.
15  Q.  To what end?
16  /SKWRAOP:  Objection:  Foundation.
17  THE WITNESS:  To -- Deciding if charges
18 should be placed on the offender in custody or
19 whatever is being asked of them.  Because it
20 could be multiple things.  But they decide if
21 there's legality, I guess.  I don't know.  But I
22 do know that we have certain things we have to
23 get their approval for doing.
24 BY ATTORNEY VAN BRUNT:

88

1    Q.   And what things are those?
2    A.   Filing felony charges on subjects.
3  They're involved in arrest warrant -- Well, I
4  think they're involved in all warrant processes.
5  And when we -- when we think or want a witness
6  or victim interview, of course by them, we have
7  to go through them.
8    Q.   Okay.  We talked about Joe Alesia
9  before.  Do you recall him working on this case?
10   A.   No.
11   Q.   Do you recall seeing him at the Area on
12 December 5th?
13   A.   No.
14   Q.   Do you recall working with him on any
15 other cases?
16   A.   No.
17   Q.   Can you visualize him sitting here
18 today?
19   A.   Yes.
20   Q.   And how do you know what he looks like?
21   A.   How do I know?  I'm assuming at some
22 point I saw him.
23   Q.   On the job?
24   A.   Yeah.

89

1    Q.   Can you recall the last time you saw
2  Joe Alesia on the job?
3    A.   No.
4    Q.   How many cases have you worked on in
5  which Joe Alesia was the felony review assistant
6  assigned?
7    A.   I don't recall any.  I know from the
8  documentation, this one.
9    Q.   And how many cases do you think you
10 worked on in which Joe Alesia was the assigned
11 felony review assistant?
12   A.   I don't recall any.
13   Q.   I'm sorry if I asked this, but you did
14 not meet with Joe Alesia in preparation for your
15 deposition?
16   A.   You mean recently?
17   Q.   Recently.
18   A.   No.  Deposition, no.  No.  Sorry.
19   Q.   Did you meet with him in preparation
20 for testifying in the criminal cases related to
21 this case?
22   A.   So I'm not -- I didn't meet with him,
23 per se.  Could he have been around?  It's
24 possible he could have been around.

90

1    Q.   What makes you say that?
2    A.   Because he was still in the state's
3  attorney's office.
4    Q.   Okay.
5    ATTORNEY VAN BRUNT:  Should we take a quick
6  break before we --
7    THE VIDEOGRAPHER:  This ends Disk 1.  Now
8  going off the record at 11:10 a.m.
9                 (whereupon, a short break was
10                taken.)
11   THE VIDEOGRAPHER:  This begins Disk 2.  Now
12 going back on the record at 11:25 a.m.
13 BY ATTORNEY VAN BRUNT:
14   Q.   Okay.  So we talked about detective
15 school a little bit before.  And do you recall
16 any of the training you received in detective
17 school?
18   A.   No.
19   Q.   Was -- What was the format of the
20 school?  Was it a classroom setting, live
21 simulation, out in the field training, a little
22 mix of everything?
23   A.   It's hard to -- I've been to so much
24 training over my career, it's hard to separate

91

1  Detective Division from the other stuff I've
2  gone through.
3    Q.   Does anything stick out in your mind
4  about detective school?
5    A.   I met my wife.
6    Q.   That's a big event.
7         Anything else?
8    A.   Mostly her.
9    Q.   Were you trained on the Detective
10 Division's Standard Operating Procedures in
11 detective school?
12   A.   I believe it was around -- it was
13 around.
14   ATTORNEY VAN BRUNT:  Okay.  So everybody
15 should have a copy of what was previously marked
16 Exhibit 2, Detective Division Standard Operating
17 Procedures.
18 BY ATTORNEY VAN BRUNT:
19   Q.   And they should be probably in front of
20 you.
21   A.   Yes.
22   Q.   Do you see those?
23        Do you recognize this large document?
24   A.   No.

92

1    Q.   Have you ever seen this before?
2    A.   Probably.
3    Q.   Okay.  Feel free to leaf through it.  I
4  am going to ask you whether you were trained on
5  this large document in detective school.
6    A.   I have no idea.  I'm assuming.
7    Q.   Why are you assuming?
8    A.   Because it was around -- I see it's
9  dated 1992, and I was a detective in '95, so I'm
10  assuming yes.
11    Q.   Fair to say you were familiar with the
12  Standard Operating Procedures of the Detective
13  Division at the time you started working at
14  Area 1?
15    A.   Fair to say.
16    Q.   All right.
17    A.   Well, I should say it's a lot, but I'm
18  sure the highlights.
19    Q.   The highlights of the SOPs?
20    A.   Say again.
21    Q.   The highlights of the Standard
22  Operating Procedures you were familiar with?
23    A.   Yes.
24    Q.   Okay.  So maybe we'll do a little -- Do

93

1  you mind passing this out.
2    ATTORNEY BOWMAN:  I do not.
3    ATTORNEY VAN BRUNT:  That one's for the
4  deponent.  This is going to be Exhibit 5.
5         (Whereupon, Davis Deposition
6              Exhibit No. 5 was marked for
7              identification.)
8    ATTORNEY MEADOR:  Are there enough copies
9  over there?
10    ATTORNEY FILLER:  We could use one more.
11  BY ATTORNEY VAN BRUNT:
12    Q.   All right.  For the record, this is the
13  general order pertaining to interrogations,
14  field and custodial, City 80 to 83.
15         Have you seen this general order
16  before?
17    A.   I have no firsthand knowledge, but I
18  assume I have.
19    Q.   And why do you assume that?
20    A.   Because of the date it was issued.
21    Q.   October 31st, 1987?
22    A.   Yes.
23    Q.   Do you believe you received training on
24  general orders of CPD in detective school?

94

1    A.   One more time.
2    Q.   Do you believe you received training on
3  CPD general orders in detective school?
4    A.   Yes, some.
5    Q.   Some general orders?
6    A.   Yes.
7    Q.   Which ones were those?
8    A.   The ones that they deemed are relevant
9  to detectives, I would assume.
10    Q.   Fair to say that interrogations are
11  relevant to detectives?
12    A.   Fair to say.
13    Q.   So you probably received training on
14  these in detective school prior to joining Area
15  1?
16    A.   Probably.
17    Q.   Right.  So you can put that aside.
18  We'll come back to that later.
19         Same procedure.  This is going to be
20  Exhibit 6.
21    ATTORNEY VAN BRUNT:  How many do you guys
22  need over there?
23    ATTORNEY McGINNIS:  The original plus two.
24    ATTORNEY VAN BRUNT:  Do you mind passing that

95

1  over there.
2         (Whereupon, Davis Deposition
3              Exhibit No. 6 was marked for
4              identification.)
5    ATTORNEY VAN BRUNT:  And for the record, this
6  is Exhibit 6, the general order governing lineup
7  procedures, City 17474 to 17479.
8  BY ATTORNEY VAN BRUNT:
9    Q.   Have you seen this before, sir?
10    A.   Again, no firsthand knowledge, but I'll
11  assume that I have.
12    Q.   Were you trained on this general order
13  in detective school?
14    A.   Again I'll have to assume that I was.
15    Q.   Agree lineup procedures are pertinent
16  to the work of detectives, right?
17    A.   Yes.
18    Q.   So it's something you likely did
19  receive training on prior to joining Area 1?
20    A.   Yes.
21    Q.   Okay.  You can set that aside too.
22  We'll come back to it later.
23         This one is going to be Exhibit 7.
24

96



1           (Whereupon, Davis Deposition
2           Exhibit No. 7 was marked for
3           identification.)
4   BY ATTORNEY VAN BRUNT:
5       Q.   So this is basically a group exhibit of
6   special orders, Exhibit 7, pertaining to
7   processing of juveniles.  The Bates range is
8   City 17480 to 17495.  Feel free to take your
9   time and look through these.  My question is
10  going to be whether you have seen these special
11  orders before?
12          Have you seen these before, sir?
13      A.   I would say based on the date, I've
14  probably seen some or even most.
15      Q.   All right.  Did you cover department
16  special orders in detective school?
17      A.   Some.
18      Q.   All right.  Again, ones that were
19  pertinent to the work of detectives?
20      A.   Yes.
21      Q.   And the top sheet of this exhibit lists
22  processing of juveniles.  Would you say that the
23  processing of juveniles is pertinent to the work
24  of detectives?

97

1       A.   I would say some.  We did have Youth
2   officers back then.  So I don't know how much
3   was more designed for them, per se.  But I would
4   say you would have to have -- a detective would
5   have to have basic knowledge.
6       Q.   Okay.  Let's turn to part of this group
7   exhibit which is Bates numbered City 17490,
8   Detective Division Memorandum No. 92-8-6.
9           Interrogation procedures for juveniles,
10  reference Detective Division Standard Operating
11  Procedures, Chapter 13.  And the date of this is
12  August 31, 1992.  I believe it is two pages.
13          Have you seen this before?
14      A.   I have no idea.  I would assume I did,
15  but I have no idea.
16      Q.   Fair to say that the interrogation
17  procedures for juveniles is relevant to your
18  work as a detective?
19      A.   Yes.
20      Q.   And it was relevant to your work as a
21  detective in 1995?
22      A.   Yes.
23      Q.   Looking at the procedures here on both
24  pages, are these procedures you were familiar

98

1   with at the time you started work at Area 1 in
2   '95?
3       A.   I couldn't answer that.
4       Q.   Do you assume that you were familiar
5   with them?
6       A.   I would hope.
7       Q.   Did you work with juveniles in the
8   course of your work as a detective?
9       A.   Over my career?
10      Q.   Yes.
11      A.   Yes, I have.
12      Q.   You've interacted with juveniles who
13  were witnesses to crimes, correct?
14      A.   Yes.
15      Q.   And who were suspects in crimes?
16      A.   Yes.
17      Q.   And that was true also in 1995?
18      A.   Prior to this, I don't know.  I have no
19  idea.
20      Q.   This case obviously involved juveniles,
21  right?
22      A.   I'm sorry, this case, yes.
23      Q.   All right.  In detective school, did
24  you learn specific investigative skills?

99

1       A.   Could you define "investigative
2   skills"?
3       Q.   Well, we can get specific.  Did you
4   learn how to conduct interrogations in detective
5   school?
6       A.   I don't know.
7       Q.   Either in detective school or on the
8   job, did you learn how to conduct
9   interrogations?
10      A.   In my career?
11      Q.   Yes.
12      A.   Yes.
13      Q.   Did you learn to read suspects their
14  rights in interrogations or prior to
15  interrogating them?
16      A.   Did I learn how to read their rights?
17      Q.   Did you learn how to read their rights,
18  their Miranda rights, prior to interrogating
19  them?
20      A.   I don't believe anyone ever taught me
21  how to read it, no.
22      Q.   Did you learn what the Miranda rights
23  were at some point in time prior to starting
24  work at Area 1?

100

1    A.   I couldn't tell you.  I would assume I
2  did.  I couldn't tell you, though.
3    Q.   By the time you worked on this case in
4  1995, you were familiar with Miranda rights,
5  correct?
6    A.   I knew of -- I knew that -- I think I'm
7  pretty sure I had heard the term.  I know what I
8  know now.  It's hard to distinguish what I knew
9  in '95.
10    Q.   Do you believe that as a detective
11  working cases in '95, you would know how -- you
12  knew how to read a suspect their Miranda rights
13  prior to interrogating them?
14    A.   So when you say know how to read, that
15  means yes, I do know how to read.  When a
16  juvenile is taken, I do know how to read.  I
17  don't exactly know what you're asking me when
18  you say know how to read.
19    Q.   Okay.  Do you know what Miranda
20  warnings are?
21    A.   Yes.
22    Q.   What is your definition of a Miranda
23  warning?
24    A.   Rights of that -- each person who's

101

1  being questioned, interviewed, arrested -- well,
2  I think it's just being interviewed or
3  questioned about a crime is the -- these are
4  that person's rights.
5    Q.   Okay.  And you knew to provide those
6  rights to a person who was going to be
7  interrogated back in 1995?
8    A.   Yes.  I think I did.
9    Q.   All right.  Did you know to obtain a
10  proper waiver of those rights prior to
11  interrogating somebody about a crime?
12    ATTORNEY BENJAMIN:  Object to form.
13    ATTORNEY MEADOR:  Objection.  Join.
14    THE WITNESS:  I don't necessarily know that
15  -- what that definition is.  I think I always
16  knew that they had to agree to talk to you or
17  not.
18  BY ATTORNEY VAN BRUNT:
19    Q.   Okay.  Do you agree with the statement,
20  a proper waiver means you obtain an express
21  statement by the person in custody that he
22  understands the meaning of the rights, and that
23  he nonetheless wishes to answer questions
24  without speaking to a lawyer or having a lawyer

102

1  present?
2    A.   Am I aware about that, of how you just
3  read it?
4    Q.   No.  I'm asking if you agree with that
5  definition of a proper waiver.
6    A.   Currently, as we --
7    Q.   Currently.
8    A.   Could you reread it.
9    Q.   Sure.  A proper waiver means you obtain
10  an express statement by the person in custody
11  that he understands the meaning of the rights
12  and that he nonetheless wishes to answer
13  questions without speaking to a lawyer or having
14  a lawyer present.
15    A.   I would also add that with a lawyer
16  present, they can say they'll speak to you also.
17    Q.   Got it.
18    Do you agree that it was required back
19  in 1995 to receive a proper waiver from a
20  suspect you wished to interrogate before
21  speaking to them?
22    A.   I would say that you couldn't force
23  someone to talk to you if they didn't want to
24  talk to you.

103

1    Q.   All right.  Did you understand it to be
2  required CPD policy that you -- that you obtain
3  an express statement by the person that they
4  understand the meaning of their rights and they
5  nonetheless wished to answer questions?
6    A.   Again, I would say my -- I believe my
7  understanding is and was is that you can't talk
8  to someone or -- someone who's in custody --
9  well, anybody now, if they don't want to talk to
10  you.
11    Q.   Right.  And my question is a little
12  different.  I'm wondering if you knew at that
13  time that you needed to obtain an express
14  statement of the sort I just said.
15    A.   So that wouldn't be my term.  I'm
16  telling you what -- what my understanding was.
17  That was my understanding.
18    Q.   All right.  Did you know in
19  interrogations to ask open-ended questions back
20  in 1995?
21    ATTORNEY BENJAMIN:  Object to form.
22    THE WITNESS:  You -- You can only -- You
23  can't make any statements; you can only ask
24  questions during interviews?  Is that what

104



1 you're saying?
2 BY ATTORNEY VAN BRUNT:
3     Q.   Well, I'm asking, in an interview, did
4 you know that the best way to conduct an
5 interview was to ask open-ended questions?
6     ATTORNEY BENJAMIN:  Object to form.
7     ATTORNEY MEADOR:  Objection:  Form.
8     THE WITNESS:  So did I know to find
9 information out, you have to ask questions?
10 Yes.  That would be correct.
11 BY ATTORNEY VAN BRUNT:
12     Q.   And I'm asking specifically, open-ended
13 ones.  Do you know what -- what I mean by that?
14     A.   So I don't really know, like, if -- I
15 don't even really know what a closed-ended
16 question would be if I'm expecting someone to
17 tell me something.  So I guess, yes.
18     Q.   Okay.  Agree that in 1995, it was not
19 proper to feed information to suspects during an
20 interrogation?
21     ATTORNEY BENJAMIN:  Object to form.
22     ATTORNEY MEADOR:  Object to form and calls
23 for a legal conclusion.
24     THE WITNESS:  What do you mean by "feed
105

1 information"?
2 BY ATTORNEY VAN BRUNT:
3     Q.   Give information to a suspect that you
4 wished them to then relay back.
5     ATTORNEY MEADOR:  Same objection.
6     THE WITNESS:  So currently, I do sex assault
7 investigations.  When I'm speaking to someone
8 who's accused of a sexual assault, I generally
9 tell them what the victim is alleging.  I don't
10 know how that plays into what you just said,
11 but ...
12 BY ATTORNEY VAN BRUNT:
13     Q.   What about if I narrow it and say
14 nonpublic details about the crime, would you
15 agree it was not proper practice in '95 to feed
16 nonpublic details about a crime to a suspect you
17 were interrogating about that crime?
18     ATTORNEY BENJAMIN:  Object to form --
19     THE WITNESS:  If I have a victim --
20     ATTORNEY BENJAMIN:  -- calls for speculation.
21     ATTORNEY MEADOR:  I would object to form and
22 calls for a legal conclusion.
23     THE WITNESS:  Again, my victims, I would hope
24 that most of their cases aren't public.  I'm
106

1 still telling the offender that "She's accusing
2 you of this."
3 BY ATTORNEY VAN BRUNT:
4     Q.   Okay.  Let's focus specifically on 1995
5 and the cases you were investigating then.  You
6 did interview suspects, correct, in the course
7 of your work back then?
8     A.   I have no idea.
9     Q.   In the '90s generally at Area 1, did
10 you interview suspects?
11     A.   In the '90s?
12     Q.   Yes.
13     A.   Yes.
14     Q.   And those included suspects in homicide
15 cases, correct?
16     A.   Yes.
17     Q.   All right.  And when you were
18 interviewing them, would you make it a point not
19 to provide them with nonpublic details of the
20 crime you were interviewing them about?
21     ATTORNEY BENJAMIN:  Can you read back that
22 question.
23         (whereupon, the record was read
24          as requested.)
107

1     ATTORNEY BENJAMIN:  I'll object to form;
2 calls for speculation.
3         Or just to form.
4     THE WITNESS:  I don't know how to answer
5 that.  I can think of an instance, a guy
6 investigating a stabbing.  I don't think the
7 general public knew that the person was stabbed
8 multiple times.  But in speaking to the alleged
9 offender, I probably said the person was stabbed
10 over and over.  So I don't know -- I don't know
11 how to answer your question.
12 BY ATTORNEY VAN BRUNT:
13     Q.   So then fair to say that you would, on
14 occasion, provide nonpublic details of a crime
15 to a suspect you were interrogating?
16     A.   It's fair to say what I just said.
17     Q.   My question is --
18     A.   I don't know how to answer your
19 question.
20     Q.   I'm just going to get it out for the
21 record, then we'll go from there.
22         On occasion, would you provide
23 nonpublic details about a crime to a suspect you
24 were interviewing about that crime?
108



1    A.  I'm not understanding your question.  I
2  don't know how to answer your question.  I gave
3  you the instance of an interview I can remember.
4  I don't know how that falls into what you're
5  trying to get out of me.
6    Q.  Would it be fair to say that in 1995,
7  you would not ask leading questions in an
8  interrogation?
9    A.  In 1995, I'm not sure I was doing any
10 questioning.
11   Q.  All right.  In the mid '90s.
12   A.  Okay.  Could you repeat your question?
13   Q.  Fair to say that you would not use
14 leading questions in an interrogation?
15   ATTORNEY MEADOR:  Object as to form.
16   THE WITNESS:  Meaning something like, "You
17 stabbed her, didn't you"?  Is that ...
18 BY ATTORNEY VAN BRUNT:
19   Q.  What's your understanding of a leading
20 question?
21   A.  What's your definition of a leading
22 question?
23   Q.  Well, let's start with yours.  What is
24 your definition of a leading question?

109

1    A.  I just gave -- I gave the example.
2  That's -- I can give an example.  That's what I
3  just gave you.
4    Q.  Okay.  A leading question where you
5  expected a certain answer, where you're
6  suggesting to the suspect a certain answer.
7    A.  Where I'm pursuing the truth?
8    Q.  Just what I said right now.
9    A.  I never asked any question that I
10 wasn't pursuing the truth.
11   Q.  Okay.  Would you use questions that
12 suggested a particular answer to the suspect?
13   A.  Again, I can't answer that.  I don't
14 know what you mean by that.
15   Q.  Do you not know what I mean by "leading
16 questions"?
17   ATTORNEY MEADOR:  Objection: Argumentative.
18   THE WITNESS:  I don't know how that plays
19 into an interviewing of a suspect.  I mean, do I
20 -- am I trying to put words in that person's
21 mouth?  No, I'm not.
22 BY ATTORNEY VAN BRUNT:
23   Q.  You would agree --
24   A.  I'm trying to get the facts out of the

110

1  person.
2    Q.  Right.  And you would agree it would be
3  improper to try to put words in a suspect's
4  mouth?
5    A.  Again --
6  ATTORNEY MEADOR:  Wait, wait, wait.
7      Objection: Form; calls for a legal
8  conclusion.
9      Sorry for the interruption.
10 ATTORNEY BENJAMIN:  Same objection.
11 ATTORNEY MEADOR:  Go ahead.
12   THE WITNESS:  I don't know what I was going
13 to say now.
14      I don't know how to answer this
15 question either, ma'am.
16 BY ATTORNEY VAN BRUNT:
17   Q.  My question is, you would agree it's
18 not proper in the mid '90s to put words in a
19 suspect's mouth when you were interviewing that
20 suspect?
21   A.  I don't know how to answer that
22 question, ma'am.
23   Q.  And why not?
24   A.  Okay.  Because in an interview process,

111

1  I'm seeking the truth.  I might say something,
2  say a fact -- fact of what happened to the
3  person.  And so then if the person then makes a
4  confession and includes part of what I just
5  said, I don't know.  It seems like that's
6  playing into your question.  But I don't think
7  your question is taking into account the
8  totality of interviewing a suspect.  So I don't
9  know how to answer your question.
10   Q.  You learned, or knew, rather, in the
11 mid '90s not to use physical force against a
12 suspect in an interrogation?
13   A.  That one I can agree.  Yes, I did.
14   Q.  Okay.  You knew not to use threats
15 against a suspect during an interrogation?
16   ATTORNEY BENJAMIN:  Object to form.
17   THE WITNESS:  Again, that's a -- that's
18 something I can't -- it's hard -- I mean, I
19 don't understand how to answer that.
20 BY ATTORNEY VAN BRUNT:
21   Q.  Do you believe it was appropriate to
22 threaten a suspect in your custody during an
23 interview in the mid '90s?
24   ATTORNEY BENJAMIN:  Object to form.

112



1    THE WITNESS: So I don't understand -- I
2  don't know your definition of "threats," and I
3  don't know how it relates to if we're looking at
4  it in the same way in an interview process in
5  the '90s.
6  BY ATTORNEY VAN BRUNT:
7    Q.   Do you think it was appropriate in the
8  mid '90s to threaten a suspect in your custody
9  who you were interviewing with life in prison if
10 they didn't confess?
11   A.   Again, I don't know what your
12 definition of "threatening" is. So I can't
13 answer that one.
14   Q.   Well, my definition was in the
15 question, saying to them, "You will receive life
16 in prison if you do not confess"?
17   A.   If you don't tell the truth -- who says
18 "confess"? If you don't tell the truth?
19   Q.   Okay. We'll go from there.
20        Do you think it was appropriate in the
21 mid '90s when you were a detective at Area 1 to
22 tell a suspect who you were interviewing, who
23 was in your custody, that if they do not confess
24 to the crime you were investigating, they will

113

1  receive life in prison?
2    A.   Again, I've never said that, so I
3  can't -- other than saying that, no, I've never
4  said that.
5    Q.   Do you think it was -- it would be
6  proper to have said that back in the day?
7    A.   I have no opinion.
8    Q.   You don't know if it was proper, don't
9  know if it was improper; can't say either way?
10   A.   I don't know what -- can't say one way
11 or the other. I don't know what context that
12 would have been used in.
13   Q.   Is it fair to say in the mid '90s when
14 you were a detective at Area 1 that it was not
15 proper to offer suspects you were interrogating
16 about a crime false promises of leniency if they
17 confessed?
18   A.   I think it's fair to say that I would
19 not offer -- what did you say?
20   Q.   A false promise of leniency?
21   A.   A false promise of leniency.
22   Q.   And you would not do that because that
23 would not be proper police procedure?
24   A.   That, and I don't know if that was

114

1  morally right.
2    Q.   Fair to say that could make any
3  statement you received from a suspect less
4  reliable if you did that?
5    A.   I would not comment -- I have no
6  comment on that.
7    Q.   Would you consider an interview that
8  included a false promise of leniency coercive?
9    ATTORNEY MEADOR: Objection: Calls for a
10 legal conclusion.
11   ATTORNEY BENJAMIN: Objection: Calls for
12 speculation; calls for a legal conclusion.
13   THE WITNESS: I couldn't -- I couldn't make a
14 judgment on that.
15 BY ATTORNEY VAN BRUNT:
16   Q.   All right. I am going to read to you
17 another statement and ask you if you agree or
18 disagree with this statement.
19   ATTORNEY MEADOR: Counsel, can you tell us
20 where you're reading it from?
21   ATTORNEY VAN BRUNT: Sure. City 82,
22 Section F.
23   ATTORNEY MEADOR: Exhibit 5?
24   ATTORNEY VAN BRUNT: Yes. Sorry.

115

1    ATTORNEY MEADOR: Thank you.
2  BY ATTORNEY VAN BRUNT:
3    Q.   I'm sorry. I would ask you not to look
4  at it. Sorry. I'm going to read it to you, and
5  you can look at it after.
6    ATTORNEY MEADOR: I'm just going to object
7  that you're specifically referencing an exhibit
8  that you've provided to him, and now you're
9  directing him not to look at it so that he can
10 see it in its appropriate context.
11 BY ATTORNEY VAN BRUNT:
12   Q.   "It is not enough that the person to be
13 questioned is warned" -- I'll start over.
14        It is not enough that the person to be
15 questioned is warned and decides nonetheless to
16 answer questions. Any circumstances of lengthy
17 incommunicado custody, deception, promises, or
18 suggestion of benefits, or other forms of
19 psychological pressure will invalidate the
20 acceptability of anything the person questioned
21 states or writes."
22        Do you agree with that statement, sir?
23   A.   I have no opinion.
24   Q.   Is that a statement you were familiar

116



1  with at the time you were working at Area 1 in
2  1995?
3      A.  I don't recall.
4      Q.  You don't recall one way or another?
5      A.  No.
6      Q.  Do you believe that that is a -- Well,
7  never mind.  We'll leave it there.
8          Did you learn the importance either in
9  detective school or on the job of verifying --
10 of verifying any information you received from a
11 suspect in a confession?
12     A.  I don't -- I don't recall.
13     Q.  Okay.  Well, do you agree with the
14 proposition that it's important to verify any
15 information you receive from a suspect in a
16 confession?
17     A.  I would say that what the person is
18 telling you has to match the crime, has to match
19 the facts that are known of the crime.
20     Q.  Okay.  And that might include the
21 physical evidence gathered at the crime?
22     A.  I'm going to leave it where I said it.
23     Q.  Would you agree with the proposition
24 that it's important to obtain information from a

117

1  suspect that can be corroborated by other
2  evidence in the case?
3      ATTORNEY MEADOR:  Objection:  Form and
4  incomplete hypothetical.
5      THE WITNESS:  Could you repeat the question,
6  ma'am?
7      ATTORNEY VAN BRUNT:  Would you mind reading
8  it back.
9              (Whereupon, the record was read
10             as requested.)
11     THE WITNESS:  I have no opinion.
12 BY ATTORNEY VAN BRUNT:
13     Q.  Are you familiar with the concept of
14 false confessions?
15     A.  Yes.  Or -- Yes, I'm familiar.
16     Q.  Do you believe that they happen?
17     A.  Yes.
18     Q.  Do you agree that people can and do
19 falsely confess to a crime they did not commit?
20     A.  Yes.
21     Q.  Were you trained on how to avoid false
22 confessions in your work as a detective?
23     A.  I don't know.
24     Q.  Were you ever trained on how to

118

1  recognize that a confession you had taken was
2  false?
3      A.  I don't know.
4      Q.  Have you ever taken a false confession,
5  to your knowledge?
6      A.  Not to my knowledge.
7      Q.  Have you ever heard of a false
8  confession being taken at CPD?
9      A.  Not that I can recall.
10     Q.  To your knowledge, are any of the
11 confessions that were taken in this case false?
12     A.  Not to my knowledge.
13     Q.  You are aware that false -- I take that
14 back.
15         You are aware that there were
16 statements taken from the suspects in this case?
17     A.  From prep, yes.
18     Q.  Okay.  You believe sitting here today
19 that they're all truthful?
20     A.  I have no reason to believe they
21 weren't.
22     Q.  Are you aware that the defendants, the
23 once defendants in this case, have all been
24 issued certificates of innocence?

119

1      A.  I've heard that term.
2      Q.  All right.  Did you know what those
3  are?
4      A.  Not exactly.
5      Q.  Do you know that they're issued by the
6  Circuit Court of Cook County?
7      A.  Now I do.
8      Q.  All right.  Does the fact that they
9  received those certificates change your opinion
10 one way or another as to whether the confessions
11 in this case were truthful?
12     A.  No.
13     Q.  All right.  Do you have any knowledge
14 about the fingerprint testing that was done in
15 this case after their convictions?
16     A.  No.
17     Q.  Do you know anything about who the
18 fingerprints that were later tested pointed to?
19     A.  No.
20     Q.  Does the name Davion Allen ring a bell
21 to you?
22     A.  What was the name?
23     Q.  Davion Allen?
24     A.  Sounds like a sexual assault that I had

120

1 once.  Other than that, no.
2     Q.   Are you familiar with anybody named
3 James Allen?
4     A.   Not that I know.
5     Q.   Marshan Allen?
6     A.   Not that I know of.
7     Q.   Floyd Watson?
8     A.   No.
9     Q.   Lemont Campbell?
10     A.   No.
11     Q.   Did you learn at some point in time
12 during either detective school or on the job
13 that juveniles were entitled to specific and
14 special protections while they were in custody?
15     A.   Yes.
16     Q.   And which protections, sitting here
17 today, would you say applied to juveniles?
18     A.   I can tell you what I think my
19 understanding is as it currently stands.  And
20 it's that -- that if -- we need to locate the
21 parent or guardian if we want to interview a
22 juvenile.
23     Q.   All right.  And you would agree that a
24 juvenile should be warned and questioned only in

121

1 the presence of an adult if an adult can be
2 located?
3     A.   I would go with what I -- I told you
4 that that is our requirement, that we need to
5 locate -- we need to have a parent or guardian
6 if we're going to speak with a juvenile.
7     Q.   Okay.  And including if you were going
8 to give them a Miranda warning, correct?
9     ATTORNEY BENJAMIN:  Object to form.  We're
10 clarifying, he answered currently.  So if you
11 could clarify.
12 BY ATTORNEY VAN BRUNT:
13     Q.   Sure.  Back in the mid '90s at Area 1,
14 did you -- did abide by the proposition that a
15 juvenile should be warned and questioned only in
16 the presence of an adult where such an adult can
17 be located?
18     A.   I know at some point in the
19 department's -- in the, not policy, but at some
20 point, a Youth officer, if a parent or guardian
21 cannot be located, or they refuse to come in, a
22 Youth officer could -- what's the right term --
23 assure the juvenile's rights.  I couldn't tell
24 you when that went -- what period, you know,

122

1 when that changed.  But I do know that was part
2 of it was that a juvenile -- juvenile -- Youth
3 officer could sit in.
4     Q.   Okay.  Could we refer to Exhibit 7.  It
5 should be in front of you.  It's the one on
6 processing of juveniles.
7     A.   Refer to, that means I can look at it?
8     Q.   Yes, please.
9          And looking at City 17491, it's that
10 Detective Division memorandum midway through --
11 well, now it's near the end of the exhibit.
12     A.   Which exhibit was it?
13     Q.   7.
14     A.   And where am I going?
15     Q.   17491 Bates number.
16     ATTORNEY BENJAMIN:  Second page of that.
17 BY ATTORNEY VAN BRUNT:
18     Q.   And just for the record, this is,
19 again, the Detective Division memorandum dated
20 August 31st, 1992, on interrogation procedures
21 for juveniles.  I'm going to call your attention
22 specifically to No. 3 under the heading
23 Interrogations.
24          Do you see where I am?

123

1     A.   I see it.
2     Q.   And it says "Detectives who interrogate
3 juveniles will obtain an express statement from
4 the juvenile that he understands his
5 constitutional rights and understands that he
6 may be prosecuted as an adult before accepting
7 any admission or statement."
8          Is it fair to state that it was your
9 practice in the mid '90s to follow this
10 paragraph laid out in No. 3?
11     ATTORNEY MEADOR:  Objection as to form.
12     THE WITNESS:  One more time.  Can you read --
13 BY ATTORNEY VAN BRUNT:
14     Q.   Well, No. 3, do you see where I just
15 read?
16     A.   Yes.
17     Q.   Okay.  Were you following this
18 instruction when you were interviewing juveniles
19 in the mid '90s at Area 1?
20     A.   I'm not sure I ever interviewed a
21 juvenile who could be tried as an adult.
22     Q.   Okay.  Including in this case?
23     A.   I didn't interview any in this case.
24     Q.   You sat in --

124

1    A.   I mean, I listened to someone say
2  something, make a statement, but I didn't
3  interview them.  I wasn't part of that process.
4    Q.   Did you ever interview a juvenile in
5  the '90s?
6    A.   About any case?
7    Q.   About a homicide.
8    A.   I don't think so.
9    Q.   All right.  Let's look at No. 4.
10  "Detectives who interrogate juveniles will
11  ensure the juvenile is warned and questioned in
12  the presence of an adult, parent, other
13  relative, friend, if such an adult can be
14  located."
15        Did you follow --
16    A.   You said 4?
17    Q.   Yes.
18    A.   Okay.
19    Q.   Did you follow that procedure in your
20  work as an Area 1 detective in the mid '90s?
21    A.   I'm a little confused.  When it says
22  here "ensure the juvenile is warned," does that
23  mean notified of their rights?
24    Q.   The Miranda warnings.

125

1    A.   Yes.
2    Q.   Is that a procedure you followed in
3  this case?
4    A.   I didn't -- It did not -- I was not in
5  a position to -- to follow or not follow.  This
6  did not come up for me in this case.
7    Q.   Okay.  The last one is No. 6 that I'm
8  going to point you to.  "Detectives who
9  interrogate juveniles will ensure the presence
10  of a Youth officer to fulfill the requirements
11  of the Juvenile Court Act.  Which states that a
12  juvenile taken into custody will be taken to the
13  nearest Youth officer without delay."
14        Did this requirement inform your
15  practice in the mid '90s as an Area 1 detective?
16    A.   If I have a juvenile, I know that a
17  Youth officer had to at some point process the
18  juvenile.  What they -- What their
19  responsibilities were, I couldn't tell you.
20    Q.   Right.  And specifically, you had to
21  get a Youth officer without delay in the case of
22  a juvenile being in custody?
23    A.   Without delay?
24    Q.   Correct, per No. 6.

126

1    A.   So you -- Let's be clear.  Are you
2  asking me what's on the paper?  I can say yeah,
3  it's on the paper.  I thought you were asking me
4  what my policy was.
5    Q.   I am.  I'm asking your policy and
6  whether it accords with what's on the paper, or
7  your
8  pra- -- Let's take that back.
9        I'm asking whether your practice in the
10  mid '90s at Area 1 followed what's on the paper
11  here.
12    A.   I'm not really understanding 6, because
13  if you read this, it sounds like that just
14  because they're taken into custody, you're
15  supposed to take them to -- to the Youth officer
16  right away, but before you do whatever
17  investigation.  So
18  that -- I don't really -- I'm not understanding
19  it.  So I couldn't say.
20    Q.   So to you, it's not correct that you
21  would get a Youth officer for a juvenile in your
22  custody prior to doing an investigation?
23    A.   To me, I don't understand exactly what
24  No. 6 is saying.

127

1    Q.   All right.  I'm just asking about your
2  practice at this point, not what's on the paper.
3    A.   Well, I can't have a practice if I
4  don't understand it.  I don't know how my
5  practice relates when I don't understand what
6  No. 6 is actually saying.
7    Q.   Right.  And I'm not asking about what's
8  on the paper anymore, so we don't have to worry
9  about how it relates.  What I'm asking is, when
10  you had a juvenile in your custody, would you
11  continue investigating the case that juvenile
12  was potentially involved in prior to getting a
13  Youth officer?
14    A.   Yes.
15    Q.   Did you ever learn in your training
16  that juveniles are more susceptible to coercion
17  during interviews?
18    A.   I don't know.
19    Q.   Do you think that's true sitting here
20  today?
21    A.   I don't know.
22    Q.   Did you think that was true when you
23  were working at Area 1 in the mid '90s?
24    A.   I couldn't tell you.

128



1    Q.  Do you -- Well, back in the mid '90s,
2   did you take special care to protect juveniles
3   who were in your custody?
4       ATTORNEY MEADOR:  Objection:  Form.
5       ATTORNEY BENJAMIN:  Same.
6       THE WITNESS:  Special care?
7   BY ATTORNEY VAN BRUNT:
8       Q.  Right.
9       A.  I don't understand that.  I took care
10  for everyone.
11      Q.  Did juveniles who were in custody
12  receive any special protections from you on
13  account of their being under the age of 17?
14      A.  My answer would be I try to take
15  special care of everyone who is in custody.
16      Q.  You conducted lineups in the mid '90s
17  as an Area 1 detective, correct?
18      A.  I believe so.
19      Q.  Did you conduct any in 1995 in
20  particular?
21      A.  I couldn't -- I don't know.
22      Q.  In the mid '90s, did you know it was
23  important that a lineup not be suggestive?
24      ATTORNEY MEADOR:  Objection:  Calls for a
                                                    129

1       ATTORNEY MEADOR:  Objection:  Calls for
2   speculation, form, and calls for a legal
3   conclusion.
4       ATTORNEY BENJAMIN:  Join.
5       THE WITNESS:  So I don't know -- What do you
6   mean by "suggestive"?
7   BY ATTORNEY VAN BRUNT:
8       Q.  Meaning that the person conducting the
9   lineup suggested to a viewer a specific suspect
10  who they should pick.
11      A.  So if the person conducting the lineup
12  tells someone who they should pick, was that
13  against CPD policy?
14      Q.  Yes.
15      A.  I would hope so.
16      Q.  Was it also against CPD policy to
17  include more than one suspect in a lineup?
18      A.  I don't know.
19      Q.  Were you trained in detective school in
20  what should be included in the report, a police
21  report?
22      A.  I would hope so.
23      Q.  Great.  Do you have any recollection of
24  that training sitting here today?
                                                    131

1   legal conclusion.
2       ATTORNEY BENJAMIN:  Object to form.
3       THE WITNESS:  I think so.
4   BY ATTORNEY VAN BRUNT:
5       Q.  Okay.  Would you agree that in the mid
6   '90s, you knew that the person who was
7   conducting the lineup should not suggest a
8   suspect to the viewer?
9       A.  Yes.
10      Q.  Do you agree that in the mid '90s, you
11  knew only one suspect was supposed to be
12  included in a lineup?
13      A.  I'm not sure about that.
14      Q.  All right.  Do you agree with the
15  proposition -- Take that back.
16          In the mid '90s, were you operating
17  under the belief that if more than one suspect
18  was included in a lineup, then you needed at
19  least four non suspects as well?
20      A.  I think so.
21      Q.  Would you agree that any lineup that
22  failed to abide -- Well, strike that.
23          Would you agree that a lineup that was
24  suggestive would violate CPD policy?
                                                    130

1       A.  No.
2       Q.  Did you receive any training on the job
3   about what to include in a police report?
4       A.  "On the job"?  What does that mean?
5       Q.  Right.  Meaning while you were working
6   with other detectives, did you receive training
7   in report writing?
8       A.  Did I discuss report writing with other
9   detectives?  Yes.
10      Q.  Okay.  And what do you recall
11  discussing?
12      A.  No specifics.
13      Q.  Did you learn prior to coming to Area 1
14  that it was important to document events in an
15  investigation as they happened?
16      ATTORNEY MEADOR:  Objection:  Form.
17      THE WITNESS:  I can't remember exactly what
18  my understanding was when I arrived at Area
19  Central, Area 1.
20  BY ATTORNEY VAN BRUNT:
21      Q.  Did you learn prior to arriving at Area
22  1 that it was important to be thorough in your
23  report writing?
24      A.  I don't know.
                                                    132

1     Q.   Did you learn that it was important to
2  reduce all pertinent information in an
3  investigation to writing?
4     A.   I don't -- I don't recall what -- where
5  we were at with report writing at that time.
6     Q.   Did you learn prior to starting at Area
7  1 that it was important that all police reports
8  be accurate?
9     A.   That one I can assume, yes.
10    Q.   In 1995, is it fair to say that
11  detectives were required to record and preserve
12  all relevant information during their
13  investigation?
14    A.   Again, I don't recall.  But I -- I
15  would hope.
16    Q.   That was your practice, to record and
17  preserve all relevant information during an
18  investigation?
19    A.   In '95?
20    Q.   Correct.
21    A.   I don't -- I don't really think that I
22  was in a position -- that position in '95.
23    Q.   You were a detective in '95, correct?
24    A.   I was a detective.
133

1     Q.   So why do you say you were not in a
2  position to record and preserve all relevant
3  information in an investigation?
4     A.   I'm not sure that I was given any cases
5  that I would be doing -- take that role.
6     Q.   I see.  What is --
7     A.   At some point, yes, but I don't know if
8  it was end of '95 or '96.
9     Q.   I see.
10         Is it your understanding that you did
11  not have to take -- Strike that.
12         Is it your understanding that you did
13  not have to record all activities you did on a
14  given investigation?
15    A.   In '95?
16    Q.   Yes.
17    A.   One more time.
18    Q.   I'll rephrase that.
19         Is it your understanding sitting here
20  today that you were not obligated to record all
21  of your investigative activities in a given
22  investigation in 1995?
23    A.   I think my understanding was I tried to
24  record as much of my investigation as I could.
134

1     Q.   Okay.  Was it your belief that you were
2  in fact required to record everything you did on
3  an investigation to the best of your ability?
4     A.   I don't know.  I don't know.
5     Q.   Do you know the term "permanent
6  retention file"?
7     A.   Permanent?
8     Q.   Retention file.
9     A.   I've heard -- I've heard the term.
10    Q.   What's your understanding as to what it
11  is?
12    A.   A permanent file.
13    Q.   All right.  Do you know the term
14  "investigative file"?
15    A.   I've heard it.
16    Q.   Okay.  What's your understanding as to
17  what it is?
18    A.   I'm not quite sure about that.
19    Q.   I see.
20         Is that a term you were not familiar
21  with in 1995?
22    A.   I don't think so.
23    Q.   Did you receive any training on the
24  retention of police reports back in 1995?
135

1     A.   I don't think so.
2     Q.   Did you receive any training on note
3  taking back in 1995?
4     A.   I don't know, but I would assume.
5     Q.   All right.  What do you assume you
6  learned back in 1995 about note taking?
7     A.   I don't recall, but I would think that
8  would be something they would have taught us,
9  said something about.
10    Q.   Were there any guidelines related to
11  note taking on the job that you recall right
12  now?
13    A.   No.
14    Q.   In 1995?
15    A.   No.
16    Q.   Did you have to take notes in the
17  course of your job in 1995?
18    A.   I don't know.  I'm not sure if it was
19  required.
20    Q.   Did you -- If you did take notes, did
21  you have to keep those notes?
22    A.   I think if you -- Yeah.  I think if you
23  took notes, you were supposed to keep them, yes.
24    Q.   Where were you supposed to keep them?
136

1    A.   Well, I guess the better answer, we had
2 general progress reports.  You were supposed to
3 write them on the general progress report and
4 then turn them in with your paperwork.
5    Q.   Turn them in where?
6    A.   I think the sergeant would review your
7 paperwork back then.
8    Q.   Okay.  And can you discuss or tell me
9 how you would file or turn in a report, the
10 process you would follow back then in '95?
11    A.   I couldn't tell you.  I don't remember.
12 I know what we do now, but I couldn't tell you
13 then.
14    Q.   Do you have any memory of filling out a
15 GPR back in 1995?
16    A.   Period?  No.
17    Q.   At all.
18    A.   Actually, no.  1995, no.
19    Q.   Do you have any memory of writing a
20 supplementary report back in 1995?
21    A.   No.
22    Q.   Is it your belief that you did not
23 write either a supplementary report or a GPR in
24 1995?

137

1    A.   I believe that I did, I just don't have
2 any memories of it.
3    Q.   Is it your belief that a sergeant would
4 take that report after you were done with it?
5    A.   I don't think that, say, so the
6 supplementary report, you would -- once you were
7 done with it, you would submit it, and a
8 sergeant had to review it.  GPRs were a little
9 different.  They were -- No.  I guess the same
10 ultimately.  So when you finished with your
11 case, you would turn over everything to the
12 sergeant, and they would review it, I guess,
13 yes.
14    Q.   Did you ever take notes on anything
15 that wasn't a GPR in the mid '90s?
16    A.   I'm sure.
17    Q.   And what would you do with those?
18    A.   Transpose them to GPRs.  Or cut -- Cut
19 it out and tape it onto a GPR.
20    Q.   All right.  If you transposed them to a
21 GPR, what would you do with the original notes?
22    A.   I would just include it and get asked
23 about it.  Because usually, it wasn't legible.
24 So I don't think you can throw this stuff away,

138

1 so you have to include it.  But so that it was
2 legible, I would transpose it.
3    Q.   And what would you do with the original
4 notes?
5    A.   Include it with my documentation, my
6 paperwork.
7    Q.   Okay.  So they would all get submitted
8 to the supervisor or the sergeant?
9    A.   Yes.
10    Q.   All right.  Have you seen the permanent
11 retention file in this case?
12    A.   No.
13    Q.   Have you seen the investigative file in
14 this case?
15    A.   No.  Whatever that is.  I'm not quite
16 sure what that is.
17    Q.   I probably know the answer to this, but
18 do you have any knowledge as to the difference
19 between a permanent retention file and an
20 investigative file?
21    A.   So -- What I use is felony file,
22 meaning the file that is the -- so you have your
23 file, you -- your case gets approved, whatever.
24 You -- It gets approved, you turn it in for

139

1 retention, and that's a felony file.  This whole
2 investigative file versus permanent retention
3 file, I know felony file.  I've heard those
4 terms, but I don't exactly know what they are.
5 The felony file is what goes to court.
6    Q.   Were GPRs included in the felony file?
7    A.   Is included, yes.
8    Q.   Back in 1995, were GPRs included in the
9 felony file?
10    A.   I don't know firsthand, but I'm
11 assuming yes.
12    Q.   All right.  What about supplementary
13 reports?
14    A.   Yes.
15    Q.   What about arrest reports?
16    A.   Yes.
17    Q.   What about rap sheets that you looked
18 up on a suspect?
19    A.   I would think so.
20    Q.   So any investigative material in a case
21 would be in the felony file?
22    A.   Yes.
23    Q.   All right.
24    A.   Or whatever it was called back then.

140



1    Q.   And is it your understanding that back
2  then, there was one felony file for each
3  investigation?
4    A.   Yes.
5    Q.   Okay.  Was it the practice of
6  detectives working a case to make copies of the
7  felony file for their personal use?
8    A.   I couldn't tell you what other
9  detectives did.
10   Q.   Was it your practice to do that?
11   A.   No.
12   Q.   When you were first assigned to a case,
13 would you review the reports that were already
14 submitted in the felony file if the case --
15   A.   So a felony file is charges have been
16 approved.  So you wouldn't be assigned to a
17 felony file case.  It's already charged.
18   Q.   What was the file called on an open
19 case?
20   A.   I remember the term runner.
21   Q.   A runner file?
22   A.   Runner.  Just runner.  The runner.
23   Q.   Just runner.
24        Where was the runner kept on an open

141

1  case?
2    A.   For homicides, it was in the sergeant's
3  office.
4    Q.   Just on the desk?
5    A.   There was, like, a section, I think,
6  and they were stacked up.
7    Q.   All right.  Could you go and look at it
8  whenever you wanted in a given case?
9    A.   As long as somebody else didn't have it
10 and was out working on it or was working on it.
11   Q.   Could you check out the runner?  Was
12 that the procedure?
13   A.   I don't know.  It was a little more of
14 what do you call it, looser than that.  I don't
15 think you had to -- I think it was expected that
16 if it was your case, you would be, when you're
17 working, you would have the runner and hopefully
18 be doing stuff on the case.  Now, if the case
19 was a little older and it wasn't something
20 people were going out actively on, then, say,
21 for whatever reason, if I wanted to look at
22 someone else's case, then I might say, "Hey,
23 Sarge, I'm taking," whatever, blah, blah,
24 "murder, I'm going to look at the runner, see if

142

1  there's anything to do."
2    Q.   Got it.
3        Who was responsible for maintaining the
4  runner on an open homicide case?
5    A.   Maintaining?  What is your -- What do
6  you mean by "maintaining"?
7    Q.   Making sure the police reports that
8  were made in the course of the investigation
9  were put in it.
10   A.   I don't know if anyone was responsible.
11   Q.   Did you ever have -- Did you -- Strike
12 that.
13        Back in the mid '90s, did you ever keep
14 a runner on a case you were working on at your
15 desk?
16   A.   Of non murder?
17   Q.   A murder.
18   A.   No.
19   Q.   Did you ever keep a non murder case on
20 your desk?
21   A.   Yes.
22   Q.   All right.  And on this case, did you
23 have other detectives working on the
24 investigation?

143

1    A.   Non murders?
2    Q.   Yes.
3    A.   Generally, no.
4    Q.   How come you never had a murder runner
5  on your desk?
6    A.   Because they were kept on the
7  sergeant's desk.
8    Q.   I thought you said that the detective
9  working the case could take it off the
10 sergeant's desk.  Did I get that wrong?
11   A.   I'm assuming that when you meant
12 storage wise or, like, if you weren't actively
13 doing something on it.  So if I'm going home,
14 I'm not doing something on the cases, the
15 homicide would be on the sergeant's desk.
16   Q.   Okay.  So let me be more specific.
17 When you were working a homicide case in the mid
18 '90s, did you ever take the runner off the
19 sergeant's desk while you were working on the
20 case?
21   A.   Yeah, to -- Yeah.  You're working on
22 it.
23   Q.   Okay.  And were other detectives also
24 working on that case?

144

1    A.   I'm sure sometimes there were other
2  detectives working on the same case as I was.
3    Q.   Okay.  And if you had the runner at
4  your desk, would other officers then bring their
5  reports to add into the runner file while you
6  were -- ?
7    A.   So you're not understanding what I'm
8  saying.  So I come to work, me and my partner,
9  Daly, and we've been working ABC murder.  So we
10  would go get the file.  We would look and see if
11  anyone had done anything on it.  And then we
12  would decide what we were going to do on it that
13  day.  We go out, do it, whatever, come back,
14  done for the day, put the file back.  Write our
15  notes up so anyone who else picked -- if anybody
16  else was going to pick it up, they could see
17  what we did and work what needs to be done.
18    Q.   Got it.
19        What happened to the runner file after
20  a case was closed?
21    A.   I think it got turned in to the -- what
22  I'm calling the felony file.
23    Q.   Who was in charge of doing that to your
24  knowledge?

145

1    A.   I think whoever -- I think whoever --
2  it was the general practice, whoever did the
3  closing sup.
4    Q.   Did you ever make copies --
5    A.   So I should say, they would go through
6  the runner and amass the documentation and then
7  put it somewhere within this felony -- what I
8  call the felony file to be created.  I don't
9  think the detective actually created the felony
10  file.  There would have been someone else in
11  that process.  So either when you were
12  submitting your sup to be -- your final sup to
13  be approved, you put everything as part of a
14  packet and then gave it to the sergeant, or I
15  think sometimes maybe people got their reports
16  approved, then they put together their package,
17  and then they put it somewhere for that package
18  to actually be turned -- put in a nice little
19  folder and prepared.
20    Q.   After you got your report approved,
21  would it go back to you?
22    A.   No.
23        Well, how would you know ... I don't
24  know.  How would I know that there wasn't --

146

1  didn't need any changes?  Back then, I think
2  they just would seek you out, "Hey, there's a
3  spelling," or something like that or something.
4    Q.   Were there times you don't know
5  whether -- Were there times where you didn't
6  find out whether the report was approved or not
7  because you never heard anything after you
8  submitted it?
9    A.   I guess.  Especially on -- Yeah, I
10  guess.
11    Q.   Sometimes a sergeant would come back to
12  you about reports you submitted and say, "Hey,
13  you need to make some changes"?
14    A.   Oh, yeah.
15    Q.   What kind of changes were those?
16    A.   We were typing typewriters back then.
17  I can't say for everybody, but I know I was
18  making typos.
19    Q.   Did you ever get feedback from a
20  sergeant that you needed to do -- make
21  substantive changes to the report, meaning you
22  needed to go do additional investigation?
23    A.   Me?
24    Q.   Yeah.

147

1    A.   I hope not.
2    Q.   You don't recall that ever happening?
3    A.   I would like to consider that I'm
4  thorough.
5    Q.   Okay.  Did you hear of that happening
6  to anybody else at Area 1?
7    A.   Don't know.
8    Q.   Did Bonke ever do that to your
9  knowledge?
10    A.   I don't know.
11    Q.   Do you know the term "street file"?
12    A.   I've heard -- I've heard the term used.
13    Q.   Okay.  How have you heard it used?
14    A.   In the news.
15    Q.   Did -- Was that term used in Area 1 in
16  '95?
17    A.   Not -- Not that I heard.
18    Q.   Have you ever seen anything you believe
19  to be a street file?
20    A.   I think that maybe a runner is what
21  they're talking about.  But I don't know how it
22  got called a street file.  Or maybe when I got
23  there, they stopped calling it a street file and
24  started calling it a runner.  I don't know.

148



1    Q.   Did you ever see the runner in this
2  case?
3    A.   No.
4    Q.   And you're sure about that?
5    A.   I'm pretty sure.
6    Q.   Why do you say -- Why do you say that?
7    A.   It was early.  It was the case.  But I
8  mean, I could have.  I could have saw.  It's
9  possible.  It's possible.
10   Q.   Based on your knowledge of who did what
11 on this case after reviewing the -- after
12 reviewing the reports you did, do you have any
13 knowledge as to who would have maintained the
14 runner during the investigation?
15   A.   No.
16   Q.   When you did prepare reports in the mid
17 '90s at Area 1, did you generally do so at the
18 end of the shift, during an actual task that you
19 were completing, several days later?  Did you
20 have a general practice as to when you completed
21 a report?
22   A.   When you're referencing reports, you're
23 talking about a supplementary report?
24   Q.   Well, let's start with a GPR.

149

1  a lot that's happened, I would like to do a
2  report just to bring it up-to-date at that time.
3  And then also, if I think that this case might
4  have some interest
5  in -- interest meaning supervisors might be
6  looking at it, asking questions about it,
7  instead of them having to seek me out, I'd like
8  to do a report.  But today, they can just click
9  a button and look at my report in a computer.
10 Back then, it was a little different.
11   Q.   What was the procedure followed for
12 lineup reports?  Would those be prepared at the
13 same time as the lineup or a couple of days
14 later?
15   A.   I don't remember the practice.  But --
16 I don't remember the practice, how soon.
17   Q.   Fair to say that most supplementary
18 reports were prepared within at least days of
19 the events in question?
20   A.   So I just laid it all out.  That's how
21 I would answer it.
22   Q.   Was it unusual for a supplementary
23 report about a closed case to be prepared after
24 the case was closed?

151

1    A.   Well, the whole idea of GPRs is just
2  notes, you're writing down your notes.  So that
3  would be an ongoing thing.
4    Q.   Okay.  So a GPR would be prepared
5  contemporaneously with the investigative task
6  you're conducting?
7    A.   You saw I went to a lot of colleges.  I
8  don't know what you mean.
9    Q.   It would be prepared at the same time;
10 is that right?
11   A.   Yes.
12   Q.   Okay.  And what about a sup report,
13 when would that generally be prepared?
14   A.   I don't know the definition, but
15 definitely at the end of a case.  Me personally,
16 as things -- as a lot of stuff has happened, I
17 would like to do it, I would like to do them
18 because then you don't end up with a 20 pager at
19 the end.  So I don't know what the hard
20 definition is today or was back then; but for
21 me, definitely at the end of an investigation,
22 or where maybe there wasn't any more
23 investigative leads.  That's a good place too.
24 Or in the midst of an investigation when there's

150

1    ATTORNEY BENJAMIN:  Objection:  Foundation;
2  objection:  Form.
3    THE WITNESS:  One more time.
4    ATTORNEY VAN BRUNT:  Can you read it back.
5           (whereupon, the record was read
6              as requested.)
7    THE WITNESS:  So a case gets closed, and was
8  it unusual to type up a closing sup for that
9  case?
10 BY ATTORNEY VAN BRUNT:
11   Q.   Just a report generally about that case
12 after the case was closed, was that unusual?
13   A.   So the closing report was done, and
14 then something -- then they did another report
15 after the case was closed?
16   Q.   Correct.
17   ATTORNEY BENJAMIN:  Objection:  Foundation.
18   THE WITNESS:  I don't know.  But I can say
19 that I do sex investigations, and I'm constantly
20 typing after a case has been closed, when I get
21 evidence back from the State crime lab, I do
22 another sup documenting that I received
23 evidence.  So based on that, I would say no.
24 BY ATTORNEY VAN BRUNT:

152



1    Q.   Okay.  So it's -- you would say it
2  would be common to write a report after a case
3  was closed if you received new evidence, for
4  instance, about the case?
5    A.   I would say just what I said before
6  that.
7    Q.   Do you think that notes were important
8  in any investigation that you did in 1995?
9    A.   Did I think what -- what was important?
10   Q.   Did you think taking notes was an
11 important thing to do in your investigations in
12 1995?
13   ATTORNEY BENJAMIN:  Object to form.
14   THE WITNESS:  In '95, I can't -- I can't say.
15 BY ATTORNEY VAN BRUNT:
16   Q.   Did you use notes to help you
17 accurately remember what happened in an
18 investigation?
19   A.   In '95?
20   Q.   Yes.
21   A.   I can't say.
22   Q.   Did you use notes as recall for when
23 you testified in a case in '95?
24   A.   I don't know if that was ever -- if I

153

1  ever testified in '95 on a case.
2    Q.   Did you use notes that you prepared in
3  '95 to testify at any point after that fact?
4    A.   I don't recall.
5    Q.   Do you think notes were important to
6  inform the prosecutor about what you did on a
7  case?
8    ATTORNEY BENJAMIN:  Objection:  Form.
9    ATTORNEY MEADOR:  Join.
10   THE WITNESS:  I would hope my report would
11 have anything, because then my notes would be in
12 the report.
13 BY ATTORNEY VAN BRUNT:
14   Q.   Okay.  So it's your position that there
15 was never anything in your notes that wasn't
16 then included in a supplementary report?
17   ATTORNEY BENJAMIN:  Objection:  Form;
18 mischaracterizes his testimony.
19   ATTORNEY MEADOR:  Join.
20   THE WITNESS:  I would hope that my -- what
21 was in my notes would be documented in my
22 reports.
23 BY ATTORNEY VAN BRUNT:
24   Q.   Was that your practice?

154

1    A.   That's my practice.
2    Q.   Was it in '95?
3    A.   I'm not sure how many reports I was
4  doing in '95.
5    Q.   If you did write a report, was that
6  your practice?
7    A.   I don't know.  I don't know if I did a
8  report in '95.
9    Q.   Okay.  Did you in '95 conduct any
10 witness interviews, to your recollection?
11   A.   I don't recall.
12   Q.   How many witness interviews have you
13 conducted over the course of your career?
14   A.   Thousands.
15   Q.   And suspect interviews, how many over
16 the course of your career?
17   A.   Thousands.
18   Q.   In '95, or in the mid '90s, did you
19 take notes of those interviews at the same time
20 as you were interviewing the person?
21   A.   It varied.  I tried different things.
22   Q.   What did you try?
23   A.   Sometimes taking notes as they're
24 talking; sometimes taking notes right after

155

1  they're finished talking; sometimes highlights
2  of the key terms; sometimes completely after the
3  interview, writing up notes; sometimes just
4  typing up the interview after the interview is
5  over with.
6    Q.   Is it fair to say that you always took
7  notes of any witness interviews in which you
8  participated?
9    A.   I just said what I -- the different
10 practices I did, and one of those practices was
11 typing right after the interview, not taking
12 notes.
13   Q.   Okay.  Let me rephrase.  Is it fair to
14 say that at some point, either during an
15 interview or after, you always took notes of a
16 witness interview in the mid '9s?
17   ATTORNEY MEADOR:  Objection:  Form;
18 mischaracterizes his testimony.
19   THE WITNESS:  I don't believe that what I
20 just said was -- would make that fair to say.
21 BY ATTORNEY VAN BRUNT:
22   Q.   How so?  Can you explain?
23   A.   All right.  So I'll go again.
24      So in the course of my career, I can't

156

1 say the mid '90s or -- I can say what's going on
2 currently today, but I can't say the mid
3 '90s, I have gone -- I have tried the different
4 approaches. I've tried trying to, as I'm
5 talking to the person, writing down everything.
6 I've tried just writing keywords down. I've
7 tried after the interview, going and then trying
8 to write down everything. I've tried after the
9 interview, typing up the interview. I've tried
10 hybrids of both of those. And as we sit here
11 today, it varies depending upon what the case is
12 and the person I'm talking to, what I will do.
13     Q.   Have there ever been -- Let me take
14 that back.
15         In the mid '90s, did you ever
16 participate in a witness interview in which you
17 never took any notes of that interview at any
18 point?
19     A.   A witness interview. I don't know.
20     Q.   Is that --
21         So Locke clarified for me what the
22 possible hangup is here. Did you ever fail to
23 document a witness interview in which you
24 participated in the mid '90s?

157

1 that in any interview I was part of was not --
2 what's the word -- documented either by me or my
3 partner.
4 BY ATTORNEY VAN BRUNT:
5     Q.   Got it.
6         That leads to a follow-up question. If
7 you were sitting in on a witness interview
8 conducted by another detective, was it your
9 practice to document it?
10     A.   No. Not necessarily.
11     Q.   What about if you were sitting in on an
12 interview conducted by -- a suspect interview
13 conducted by another detective, was it your
14 practice to document it?
15     A.   No. Not necessarily.
16     Q.   What would determine whether you
17 documented it or not?
18     A.   Whether I was going to have some
19 reporting responsibilities.
20     Q.   And how did you determine whether you
21 had reporting responsibilities?
22     A.   If it was my case, then my cases, I do
23 the reports on my cases.
24     Q.   I see.

159

1     ATTORNEY BENJAMIN: Object to form.
2     ATTORNEY MEADOR: Join.
3     THE WITNESS: I hope not.
4 BY ATTORNEY VAN BRUNT:
5     Q.   Because that would be against CPD
6 policy?
7     ATTORNEY MEADOR: Objection: Form; calls for
8 speculation; incomplete hypothetical.
9     ATTORNEY BENJAMIN: Join.
10     THE WITNESS: That's not my reason.
11 BY ATTORNEY VAN BRUNT:
12     Q.   What is your reason?
13     A.   I would -- It's my goal to document all
14 my interviews.
15     Q.   Did you ever fail to document a suspect
16 interview in which you participated in the
17 mid '90s?
18     ATTORNEY MEADOR: Objection: Form.
19     ATTORNEY BENJAMIN: Same.
20     THE WITNESS: I hope not.
21 BY ATTORNEY VAN BRUNT:
22     Q.   Was it your practice to document an
23 interview in which --
24     A.   Can I back up? I should say I hope

158

1         And if it wasn't your case, you
2 wouldn't do the reports?
3     A.   If I was in on an interview with
4 someone else?
5     Q.   Yeah.
6     A.   Oh, you said the reports. No. It's
7 not my case -- Well, sometimes -- It all
8 depends. So that's kind of a broad statement.
9 So, like, if someone asked me to administer a
10 lineup for them, I would do a report because
11 I've administered the lineup for them. But I
12 wouldn't -- So that's a lineup report. That's a
13 specific report. So I would do that. But I
14 wouldn't be doing another type of report on
15 their case or a closer on their case when it's
16 their case.
17     Q.   Got it.
18         Speaking of lineups, fair to say you've
19 conducted a fair number of lineups over the
20 course of your career?
21     A.   A few.
22     Q.   How many would you guess?
23     A.   I wouldn't.
24     Q.   Hundreds?

160

1    A.   Maybe.
2    Q.   Did you conduct any in '95?
3    A.   I doubt it.
4    Q.   Why do you say that?
5    A.   I didn't do much in '95.
6    Q.   Were lineups a significant
7  investigative tool for Chicago Police back in
8  1995?
9        ATTORNEY MEADOR: Objection: Form.
10       THE WITNESS: I couldn't say.
11  BY ATTORNEY VAN BRUNT:
12       Q.   What about in the mid '90s, were they a
13  significant investigative tool?
14       ATTORNEY MEADOR: Same objection.
15       THE WITNESS: I don't know what you mean by
16  "significant." But were they conducted? Yes.
17  BY ATTORNEY VAN BRUNT:
18       Q.   So were they valuable in amassing
19  evidence against a suspect in a case?
20       ATTORNEY MEADOR: Objection: Form.
21       THE WITNESS: I would be comfortable saying
22  that it was something that was done in the
23  course of investigations.
24  BY ATTORNEY VAN BRUNT:

161

1  And who was with the person viewing the lineup,
2  if I had to -- if I had to say, I would say
3  probably the person who had the better rapport
4  with that person.
5       Q.   Was it your practice to take GPR notes
6  of lineups in which you participated?
7       A.   It has been. It has been. I can't
8  tell you from the beginning.
9       Q.   Do you have a recollection as to
10  whether you took GPR notes of lineups back in
11  the
12  mid '90s?
13       A.   I don't.
14       Q.   What was the practice at Area 1 about
15  reporting on lineups in 1995 if a witness failed
16  to pick out anybody in the lineup?
17       ATTORNEY BENJAMIN: Object to foundation.
18       ATTORNEY MEADOR: Join.
19       THE WITNESS: I have no idea.
20  BY ATTORNEY VAN BRUNT:
21       Q.   What was your practice back in the
22  mid '90s at Area 1 if a witness failed to pick
23  anybody out of a lineup as far as reporting?
24       A.   I think my practice was to put it in

163

1       Q.   Including homicide investigations?
2       A.   Including homicide.
3       Q.   At Area 1 in the mid '90s, what was the
4  practice as to filling out sup reports for
5  lineups? Was it the detective who sat with the
6  viewer or the detective who was with the
7  suspects that filled out the sup report?
8       ATTORNEY BENJAMIN: Object to foundation.
9       THE WITNESS: I don't know. I don't know.
10  BY ATTORNEY VAN BRUNT:
11       Q.   What was your practice?
12       A.   Me and my partner, I don't recall, but
13  he generally did the paper. I don't know if it
14  mattered if he was inside or if I was inside.
15       Q.   If your partner was in with the
16  suspects, not with the viewers, would he still
17  be the person reporting on the lineup?
18       A.   I'm not sure that it mattered. I'm not
19  even sure -- I don't recall, basically. But I'm
20  assuming on our pattern, he did most of the
21  paper. I think -- I think he did most of the
22  paper, but I'm not positive on that either.
23  Given that thought process, I would think that
24  he was the one doing the -- doing the paper.

162

1  the narrative of a sup. I don't think it -- I
2  don't think we. I'm not positive, but I don't
3  think we -- my practice was to do a lineup sup,
4  but to include that the lineup was conducted,
5  and the person was unable to make an
6  identification.
7       Q.   Same question to what was your practice
8  as far as reporting on a lineup in which a
9  witness picked out a filler?
10       A.   That's a negative lineup.
11       Q.   Okay. Is there any difference to you
12  as far as reporting when a witness picked out a
13  filler as opposed to no one?
14       A.   That's a negative lineup.
15       Q.   Either case, negative lineup? In
16  either case, you would write a report about
17  that?
18       A.   Back then?
19       Q.   Back then.
20       A.   I said -- well, so when you said "You
21  would write a report," I just said I would
22  include it in the report. It would be mentioned
23  in the report.
24       Q.   You would include it --

164



1     A.   So there's a difference between
2  mentioned in the report and conducting -- and
3  doing a whole lineup supplementary report.
4     Q.   Got it.
5          So you would document it somewhere in
6  an official report?
7     A.   Yes.  I would have, yes.  Or my
8  partner.
9     Q.   Got it.
10         Would you agree that it was important
11 that every lineup be documented one way or
12 another, regardless of whether it was a positive
13 or negative?
14    A.   I have no opinion.  I have no opinion.
15    Q.   You have no opinion?
16    A.   I can tell you what was my practice.
17    Q.   Do you know what CPD policy was at the
18 time regarding whether to document -- when a
19 lineup had to be documented?
20    A.   I don't.
21    Q.   You did say it was your practice to
22 document every lineup, correct?
23    A.   Yes.  To document, yes.
24    Q.   Do you have any knowledge as to what

165

1  happened to reports after they were signed off
2  by your supervising sergeant?
3     A.   In the '90s?
4     Q.   Correct.
5     A.   Cases that were felony cases that were
6  charged, some type of felony file was created.
7  I don't know what the term was back then.  But
8  the equivalent of a felony file was created.
9          Misdemeanor cases, I think they just --
10 there was a drawer for misdemeanor case reports,
11 and I just think stuff got added with the case
12 report.  And I guess that covers all, yeah.
13    Q.   Where was the felony file kept after a
14 case was closed?
15    A.   I don't recall.  It would have been
16 kept in some file cabinet somewhere, I just
17 don't remember where that was back then.
18    Q.   Was it kept at Area 1?
19    A.   Yeah.
20    Q.   Was it ever transferred to the Records
21 Division?
22    A.   I don't know.  I think we -- For a
23 period of time, we keep a physical copy of the
24 felony file.  Now, at some point, I can't tell

166

1  you about retention, like, as far as when it
2  leaves Area 1, goes to permanent retention, if
3  that's the term, to somewhere else.  But
4  currently, we have some files dating back.  I
5  don't know how far they date back, but at least
6  a few years.
7     Q.   Where are those files currently kept at
8  Area 1?
9     A.   There's a file -- Currently, there's a
10 file room.
11    Q.   And you don't know how far back those
12 files go?
13    A.   No.
14    Q.   To the '90s?
15    A.   No.  No.
16    Q.   Was Area 1 -- Well, was there
17 construction done on Area 1 over your tenure?
18    A.   Oh, yeah.
19    Q.   Was there major construction done at
20 one point?
21    A.   A reconfiguration.
22    Q.   Yeah.  When did that happen?
23    A.   I don't know.
24    Q.   Early 2000s, late the '90s?

167

1     A.   So it would definitely have to be late
2  -- late -- after the late '90s.  I know it
3  didn't happen the last eight to ten years.  So
4  somewhere in between that.
5     Q.   Did you have to move out of that
6  building while they were doing construction?
7     A.   We did.
8     Q.   Where did you go?
9     A.   Somewhere on 39th and -- on Pershing.
10 Somewhere just west of Ashland, a whole series
11 of buildings that look like the same.  But I
12 think it used to be an Army base at one point,
13 or Army facility at one point.
14    Q.   How long were you there for?
15    A.   I want to say a year, but maybe less
16 than two.
17    Q.   And did everything in the Area get
18 transferred to that location on Pershing?
19    ATTORNEY BENJAMIN:  Object to foundation.
20    ATTORNEY MEADOR:  Join.
21    THE WITNESS:  I don't know.
22 BY ATTORNEY VAN BRUNT:
23    Q.   What happened to the files that were at
24 Area 1?

168

1    ATTORNEY BENJAMIN: Objection: Foundation.
2    ATTORNEY MEADOR: Join.
3  BY ATTORNEY VAN BRUNT:
4    Q.  Well, did the files that you were
5  working on when you got transferred over to
6  Pershing go with you?
7    A.  I hope.  I don't remember, though.
8    Q.  And then a year later, you moved back
9  to Area 1?
10   A.  Or two.
11   Q.  And what had changed about the
12 building?
13   A.  About our floor?  The interview rooms
14 were now -- So it used to be, like, say if this
15 was the floor, the interview rooms were on this
16 side.  They were gone.  They were in the back
17 here.  Nice interview rooms divided by two
18 sections.  There was a bathroom added back there
19 too.  I think even the offices that are at the
20 perimeter of the floor were changed around, the
21 sizes changed around, maybe created some or
22 whatever.
23   Q.  And what was the motivation for the
24 change?

169

1    ATTORNEY BENJAMIN: Object to foundation.
2    ATTORNEY MEADOR: Join.
3    THE WITNESS:  I don't know.
4  BY ATTORNEY VAN BRUNT:
5    Q.  You were kind of indicating where
6  certain things were before the reconfiguration.
7  I was wondering if you would be willing to do a
8  diagram of what the second floor of Area 1
9  looked like in the mid '90s?
10   A.  Sure.
11   Q.  Do you have a pen?
12   A.  I do, actually.
13   Q.  I'll try my best to follow you from
14 here.
15   ATTORNEY MEADOR:  While he's drawing, are you
16 planning on taking a lunch break?
17   ATTORNEY VAN BRUNT:  Definitely.  Why don't
18 we do this, and I have a couple of questions,
19 and then we'll take a break.
20 BY ATTORNEY VAN BRUNT:
21   Q.  Can you just hold it up, and I can talk
22 you through it a little bit.
23     So can you describe what's in the
24 middle there with all those little lines?

170

1    A.  Desks.  Desks.
2    Q.  Those are desks.
3      And is that considered the general
4  office area?
5    A.  Yeah.
6    Q.  And where would the interview rooms be?
7      Right there?  How many were there?
8    A.  I don't know.  About -- At least four,
9  I think.
10   Q.  Would you mind --
11   A.  Drawing lines?
12   Q.  -- demarcating for me?  Yeah.  That
13 would be great.
14   A.  Oh, I did five.
15   Q.  And was one of those a lineup room?
16   A.  Oh, it was.  You are right.
17   Q.  So that's the lineup room, and then the
18 other three were interview rooms?
19   A.  Four.  I did five rooms.
20   Q.  How many were there, just so we know?
21   A.  I don't know.
22   Q.  Okay.  Did any of them have windows in
23 them?
24   A.  The interview rooms?

171

1    Q.  Yeah.
2    A.  No.
3    Q.  Did any of them have -- What about the
4  lineup room, it had a window obviously, right,
5  so that --
6    A.  Between -- It was divided in two.  So
7  yeah.
8    Q.  So the viewer would stand in one room
9  and the suspects in the other?
10   A.  Correct.
11   Q.  So the room next to the lineup room
12 would be the one that the viewer would stand in;
13 is that right?
14   A.  Actually, I just made it one big room.
15 So yeah.  Maybe.  Maybe you can go like that, or
16 you can divide it.
17   Q.  Okay.  And what else was in those
18 interview rooms?  Were there benches, tables?
19   A.  I think there was a bench.  No table.
20   Q.  Was there a room with tables, a
21 separate room that had a table in it somewhere
22 on the floor?
23   A.  I think the lineup rooms had tables,
24 and then the offices, they had tables, or desks

172

1  at least.
2      Q.  Where would the sergeant's office be?
3      A.  Somewhere around there.
4      Q.  What about the lieutenant's office?
5      A.  Right next door.
6      Q.  Any other offices in the room on the
7  floor?
8      A.  Yeah.  That was around, yeah.  I guess.
9      Q.  Who were in those offices?
10     A.  Couldn't tell you.
11     Q.  Were they high-ranking officers?
12     A.  No.  The lieutenant is the highest
13  ranking officer that could be.
14     Q.  Were there telephones in any of these
15  rooms?
16     A.  In these rooms?
17     Q.  Any of the rooms on the floor.
18     A.  Sergeant and lieutenant's office had
19  telephones I remember.
20     Q.  What about in the interview rooms?
21     A.  No.
22     Q.  Was -- Okay.
23         So if a call came in from the outside,
24  where would it go?

173

1      A.  I think for our section, so there was
2  others, there was Robbery, I think they had
3  something going on down here (indicating).  And
4  Youth, they had something going on down this way
5  (indicating).  There was, like, this quarter led
6  to a whole different section.  Youth was over
7  there.  So if it was Violent Crimes, it would
8  come into the sergeant's office.
9      Q.  Okay.  And the Youth officers were on
10  the same floor?
11     A.  Yes, but you couldn't -- they weren't,
12  like, in here (indicating).  They were down the
13  hallway.
14     Q.  If you were in the middle of -- Thank
15  you.
16     ATTORNEY VAN BRUNT:  Can we actually mark
17  that as Exhibit --
18     THE WITNESS:  Now am I passing it back?
19     ATTORNEY VAN BRUNT:  Please, because I have
20  the stickers in here.
21     ATTORNEY BENJAMIN:  Are you about to move on
22  to something new?
23     ATTORNEY VAN BRUNT:  No.  This is just to
24  finish up with the report writing.

174

1             (Whereupon, Davis Deposition
2             Exhibit No. 8 was marked for
3             identification.)
4  BY ATTORNEY VAN BRUNT:
5      Q.  If you were in the middle of an
6  investigation and you were going off duty, would
7  you make sure any reports you had written on
8  that shift were included in the runner?
9      A.  Okay.  So going back, are we talking
10  about homicide investigations?
11     Q.  Homicide investigations.
12     A.  So any -- Yeah.  Any -- Yeah.  There
13  would be documentation about what me and my
14  partner had done in the runner.
15     Q.  You wouldn't take that report home with
16  you?
17     A.  No.
18     Q.  All right.  And if you were coming on
19  duty and assigned to an investigation that had
20  already been opened, was it your practice to get
21  up to speed on the case by looking at the
22  reports that were in the runner?
23     A.  So I don't know what type of
24  investigation you're talking about.  A murder

175

1  that had happened already?
2      Q.  Yes, an open murder investigation.
3      A.  So if there was anything -- anything in
4  the runner as of yet, yeah, you would look at
5  the runner.  If there was a runner, you would
6  look at the runner.
7      ATTORNEY VAN BRUNT:  All right.  Let's take a
8  break.
9      THE VIDEOGRAPHER:  Now going off the record
10  at 12:50 p.m.  This ends Disk 2.
11             (Whereupon, a short break was
12             taken.)
13     THE VIDEOGRAPHER:  This begins Disk 3.  Now
14  going back on the record at 1:36 p.m.
15  BY ATTORNEY VAN BRUNT:
16     Q.  Good afternoon, sir, again.
17     A.  Good afternoon.
18     Q.  In '95, did you have an investigative
19  practice where you would collect background
20  information on a suspect that you were
21  investigating for a potential crime?
22     A.  I don't know.
23     Q.  Well, would you run a suspect's rap
24  sheet, for instance?

176

1    A.   I don't know.
2    Q.   When you say you don't know, do you not
3  recall?
4    A.   I'm sorry.  I do not recall.
5    Q.   Okay.  Right now, what is your
6  practice?  Would you run a suspect's rap sheet
7  if you were investigating for a crime?
8    A.   I run everyone.
9    Q.   "Everyone" being witnesses, suspects?
10   A.   Everyone.
11   Q.   Got it.
12        But back in the mid '90s, you're not
13 sure if you would run a suspect's rap sheet?
14   A.   Correct.
15        Well, you said '95.  In the mid '90s, I
16 would suspect that I would run -- have ran the
17 suspects' rap sheet, yes.
18   Q.   How would you do that in the mid '90s?
19   A.   That's a good question.  That's a good
20 question.
21   Q.   Were there computers at the Area?
22   A.   I don't recall any computers.
23   Q.   Would you call down to Records?
24   A.   I know there was -- I guess you could

177

1  always call.  But I know there was a form that
2  you would fill out and fax to them.  But I kind
3  of believe you had to have the guy's -- the
4  person's IR number, Individual Record Number,
5  already, and I just don't know how we would have
6  gotten that.  I don't remember.
7    Q.   Was it your practice to have the
8  background information on a suspect before you
9  interviewed him in the mid '90s?
10   A.   I hope so.
11   Q.   It would be useful information to have
12 going into an interview?
13   A.   I believe so.
14   Q.   In the mid '90s when you were
15 investigating a homicide, was it your practice
16 to obtain background information on the victim
17 or victims of that homicide?
18   A.   I don't know.
19   Q.   Did you have a practice relating to
20 creating a profile of the victim?
21   A.   I don't know what a profile is.
22   Q.   Well, finding out who the victim
23 associated with.
24   A.   I don't know if that -- No.  I wouldn't

178

1  say that was my practice, no.
2    Q.   Was it your practice to find out if the
3  victim had ever previously been a victim of a
4  crime?
5    A.   My practice was establishing motive.
6  If that was part of establishing motive, yes.
7    Q.   Okay.  To that end, would you
8  investigate whether the victim had a criminal
9  history?
10   A.   If it was -- If it would help establish
11 motive, yes.  If not, no.
12   Q.   How would you determine --
13   A.   I'm speculating because I don't
14 remember mid '90s.  But I'm speculating that's
15 what I would have done.
16   Q.   How would you determine whether it
17 would help you establish motive or not?
18   A.   So if a husband killed a wife, and I
19 was investigating that, I don't think what her
20 background was would have mattered.
21   Q.   So it depends on the crime?
22   A.   Yes.
23   Q.   Okay.  And where the victim's
24 background could be relevant to the motive, you

179

1  would obviously want to investigate that?
2    A.   I would hope I did.
3    Q.   Okay.  And that would include
4  investigating the victim's family life?
5    ATTORNEY BENJAMIN:  Objection:  Calls for
6  speculation.
7    THE WITNESS:  Again, it depends on the crime.
8  If the crime warranted.
9    BY ATTORNEY VAN BRUNT:
10   Q.   But that kind of information about the
11 victim could be important in a murder
12 investigation depending on the facts of the
13 case?
14   A.   Depending on the facts of the case.
15   Q.   All right.  We talked a little bit
16 about Felony Review before, and I just wanted to
17 follow up on a couple of things.  It was the
18 Felony Review officer's job to recommend charges
19 in a case, correct?
20   ATTORNEY MEADOR:  Objection:  Calls for
21 speculation; foundation.
22   MR. McGINNIS:  Join.
23   THE WITNESS:  I'm sorry.  Could you repeat.
24

180

1          (whereupon, the record was read
2               as requested.)
3     THE WITNESS:  No.
4  BY ATTORNEY VAN BRUNT:
5     Q.   What was your understanding as to the
6  Felony Review officer's position?
7     A.   Who's Felony Review officer?  What is
8  that?
9     Q.   Felony Review assistant.  Apologies.
10    ATTORNEY MEADOR:  I'll object to form.
11         Do you mean assistant state's attorney?
12    ATTORNEY VAN BRUNT:  The Felony Review
13  assistant, assistant state's attorney.
14    THE WITNESS:  I'm sorry.
15  BY ATTORNEY VAN BRUNT:
16    Q.   Let me just start over.
17         What is your understanding as to what
18  the job of the Felony Review assistant state's
19  attorney was in the mid '90s?
20    A.   In the mid '90s, I thought they
21  approved -- they reviewed cases and approved --
22  decided if felony charges should be placed on
23  the person or not.
24    Q.   Okay.  In cases where a witness gave a

                                              181

1  statement, was it the role of the Felony Review
2  assistant to sit in on that witness interview
3  while he gave the statement?
4     ATTORNEY BENJAMIN:  Objection:  Foundation.
5     ATTORNEY KUHN:  Join.
6     ATTORNEY MEADOR:  Join.
7     THE WITNESS:  Again, please.
8          (whereupon, the record was read
9               as requested.)
10    THE WITNESS:  I don't think you understand
11  the process, so I can't answer that because I
12  don't think your question is not the way the
13  process works.
14  BY ATTORNEY VAN BRUNT:
15    Q.   How did the process work?
16    A.   You said witness.  So a witness was
17  brought in, interviewed, the -- by the police
18  department.  Someone from the police department
19  would interview that witness.  And then if at
20  some point charges were sought with Felony
21  Review or with the state's attorney's office,
22  someone from Felony Review would interview -- if
23  they felt it was relevant, they would interview
24  that person.

                                              182

1     Q.   Did you ever have a Felony Review
2  assistant in a case you were heading decline
3  charges on a case on which you did seek charges?
4     ATTORNEY MEADOR:  Objection:  Form.
5     THE WITNESS:  I'm sorry.  I missed -- She
6  said something, and I missed the beginning of
7  her question.
8          (whereupon, the record was read
9               as requested.)
10    THE WITNESS:  In my career?
11  BY ATTORNEY VAN BRUNT:
12    Q.   Correct.
13    A.   Oh, yes.
14    Q.   Is that a common occurrence?
15    ATTORNEY KUHN:  Objection:  Form.
16    ATTORNEY BENJAMIN:  Objection:  Foundation.
17    THE WITNESS:  I wouldn't say common.
18  BY ATTORNEY VAN BRUNT:
19    Q.   Did it ever happen in a case in which
20  your lead suspect confessed to the crime?
21    A.   My lead suspect?
22    Q.   Strike that.  Did you ever have that
23  happen in a case where the suspect confessed to
24  the crime?

                                              183

1     A.   Yes.
2     Q.   How common is that?
3     ATTORNEY MEADOR:  Objection:  Asks for
4  speculation.
5     ATTORNEY KUHN:  Foundation.
6     THE WITNESS:  You're talking about my cases,
7  right?
8  BY ATTORNEY VAN BRUNT:
9     Q.   Your cases, yeah.
10    A.   Not common in my cases.
11    Q.   But it happens?
12    A.   In my cases?
13    Q.   Correct.
14    A.   I think it happened over the course of
15  my career once or twice.
16    Q.   And in those instances, do you know why
17  the Felony Review assistant declined charges?
18    ATTORNEY KUHN:  Objection:  Speculation;
19  foundation.
20  BY ATTORNEY VAN BRUNT:
21    Q.   I'm talking about your cases.
22    A.   I know for one of them, I know what she
23  said.
24    Q.   And what did she say?

                                              184

1      A.   She said that she didn't approve cases
2  where there -- it was just age was the only
3  violation.
4      Q.   And that's a statutory rape case?
5      A.   Correct.
6      Q.   Got it.
7           And what about the other case, do you
8  recall?
9      A.   I don't recall.
10     Q.   Okay.  You mentioned earlier that you
11 thought you and Davis were an effective team
12 because you had slightly different styles?  Is
13 that --
14     A.   Daly?
15     Q.   Sorry.  Daly.  Yes.
16     A.   Yes, I did mention that.
17     Q.   And I think you said Daly was the one
18 who would deal with the body if there was a body
19 in the case, correct?
20     A.   Yes.
21     Q.   And that Daly would deal with the
22 paper?
23     A.   I said that?
24          ATTORNEY BENJAMIN:  Objection:

185

1  Mischaracterizes his testimony.
2           But you can answer.
3      THE WITNESS:  I mean, of course I had to do
4  some paper.  I just think that generally there's
5  some -- he -- I don't know how to describe it.
6  I think he did more paper than I did.  I'll say
7  that.
8  BY ATTORNEY VAN BRUNT:
9      Q.   Were there certain skills that you
10 brought to the table in particular that you were
11 in charge of rather than Daly?
12     A.   I hope.
13     Q.   Which ones were those?
14     A.   Organization.
15     Q.   Organization of what?
16     A.   Just the investigation, just as far as
17 what needed to be done next and keeping us on --
18 on a straight path.
19     Q.   You would make the plan?
20     A.   I would suggest the plan maybe.
21     Q.   Anything else?
22     A.   I thought that was pretty good, I
23 think.
24          I'm ashamed to say that's what stands

186

1  out.
2      Q.   You agree --
3      ATTORNEY MEADOR:  Don't be ashamed.
4      THE WITNESS:  I wish there was more.  I wish
5  I could say a whole bunch of stuff.
6  BY ATTORNEY VAN BRUNT:
7      Q.   You agree that when you were an Area 1
8  detective back in 1995, you were obliged to
9  abide by the Chicago Police Department's
10 Standard Operating Procedures for detectives?
11     ATTORNEY BENJAMIN:  I'll object to form.
12     ATTORNEY MEADOR:  Yeah.  Join.
13     THE WITNESS:  Required?
14 BY ATTORNEY VAN BRUNT:
15     Q.   Correct.
16     A.   They're my employer.
17     Q.   And you were also --
18     A.   Yes.
19     Q.   You were also required to abide by
20 CPD's general orders at the time you were an
21 Area 1 detective in 1995, correct?
22     A.   As it related to my duties?
23     Q.   Yes.
24     A.   Yes.

187

1      Q.   And you were also required to abide by
2  CPD's special orders as they related to your
3  duties in 1995 as an Area 1 detective, correct?
4      A.   Yes.
5      Q.   When -- When did you first learn of the
6  Ibrahim Ali murders?
7      A.   So actually, I'm just learning the
8  names today.  But --
9      Q.   You knew their names back in 1995,
10 right?
11     A.   No.
12     Q.   You didn't know who had been murdered
13 in 1995?
14     A.   No.
15     Q.   And how do you know that sitting here
16 today?
17     A.   Or I don't recall that I knew.  It's
18 just --
19     Q.   Do you think it likely that you knew
20 the names of the victims of the case you were
21 working on investigating?
22     A.   I knew Ali because -- Later on, I knew
23 Ali.  I didn't know initially because Ali, I
24 believe, had a relative who worked for the

188

1  police department.
2      Q.   Which relative was this?
3      A.   I don't know, just an officer
4  downstairs.
5      Q.   Whose last name is also Ali?
6      A.   I believe so.
7      Q.   And downstairs is what?
8      A.   2nd District.
9      Q.   Got it.
10         That relative was a police officer?
11     A.   Yes.
12     Q.   A patrol officer?
13     A.   If memory serves me correct, a
14  tactical -- he's a police officer assigned as a
15  tactical officer, if memory serves me correct.
16     Q.   Got it.
17         And you're saying you did not know at
18  the time Khaled Ibrahim's name?
19     A.   No, not -- Two people were killed,
20  murdered.  That's what I knew.
21     Q.   You found out at some point that two
22  people had been murdered at an auto lot on the
23  7000 block of South Western?
24     A.   Yes.

189

1      Q.   And when did you find that out?
2      A.   That I think I initially found out from
3  my first beginning involvement.
4      Q.   And that was the morning of December
5  5th?
6      A.   If -- whatever date we have
7  established, yes.
8      Q.   Okay.  And you came on shift that day
9  at 7:00 a.m.?
10     A.   I believe so.
11     Q.   And at what time did you find out about
12  the murders?
13     A.   I don't remember.  I don't remember.
14     Q.   How did you first become aware of the
15  murders?
16     A.   I don't remember.  I think that -- I
17  don't remember.  I don't know if a sergeant
18  called me and my partner over or if my partner
19  -- I don't know.
20     Q.   Were you assigned to the case by a
21  sergeant?
22     A.   Asked to assist by a sergeant?  I don't
23  know.  I'm assuming that it was with the
24  sergeant's authority.

190

1      Q.   Were you asked to assist James Cassidy
2  on the case?
3      A.   Yes.
4      Q.   Okay.  And were you asked to assist in
5  some particular regard or just assist generally
6  with the investigation?
7      A.   If memory serves me correctly, it was
8  for the purpose of going to the high school to
9  pick up the -- or make contact with one of the
10  defendants.
11     Q.   Okay.  At the point you were assigned
12  to assist, did you do anything to get up to
13  speed on the murders?
14     A.   I think Detective Cassidy briefed us on
15  what had happened and that an anonymous call had
16  been received stating that the subject we were
17  going to the school about had -- had made a
18  statement about his involvement.
19     Q.   Were you present for that phone call?
20     A.   Did I receive the anonymous phone call?
21  Is that your question?
22     Q.   No.  Were you present when the phone
23  call came in to Area 1?
24     A.   I don't know when it came in, but I

191

1  believe I was.
2      Q.   Okay.  Can you describe to me how the
3  call came in to the Area?
4      A.   The phone rang.
5      Q.   Which phone?
6      A.   The Violent Crime phone, I'm assuming.
7  I don't know.
8      Q.   When you say you don't know, you don't
9  remember; or you don't have personal knowledge
10  about it?
11     A.   I'm not sure if I had personal
12  knowledge.  I don't remember what I don't
13  remember, so I don't know if I had personal
14  knowledge.
15     Q.   And where was the Violent Crime phone
16  located?
17     A.   In the sergeant's office.
18     Q.   Okay.  And --
19     A.   And I do believe that that front desk
20  thing, I think that that person -- I don't know.
21  No.  I don't think he had a phone.  So yeah,
22  just the Violent Crimes, the sergeant, Violent
23  Crimes sergeant's office.
24     Q.   How did calls come in to the Violent

192

1    Crimes, the sergeant's office -- Well, take that
2    back.
3          How did this call -- How did this call
4    come in?  Was it -- Did it call in directly, or
5    was it referred from 911 dispatch?
6       A.   I don't know.
7       Q.   Did you speak to the person at any
8    point who was on the phone?
9       A.   No.
10      Q.   Who did?
11      A.   I don't know.
12      Q.   Did Cassidy?
13      A.   I don't know.
14      Q.   Did the sergeant?
15      A.   I don't know.
16      Q.   You said you were present, I thought,
17   at the time of the phone call.  Can you explain
18   what you mean by that?
19      A.   I was on the floor.
20      Q.   Where on the floor were you when the
21   phone call came in?
22      A.   I don't know.  I don't know when the
23   phone call came in.
24      Q.   Well, how do you know you were on the

193

1    floor when the call came in, then?
2       A.   Well, I'm assuming it came in after I
3    reported to work, and I don't remember -- I
4    don't think that morning I had left out yet
5    because if the sergeant was able to say, or
6    whoever said assist, I had to be on the floor.
7       Q.   You were not next to Cassidy at the
8    time he took the phone call; is that -- do I
9    have that right?
10      A.   I'm pretty sure I wasn't.
11      Q.   Did Cassidy tell you anything about
12   that phone call after the fact?
13      A.   Yes.
14      Q.   What did he tell you?
15      A.   That he -- That a call had been
16   received.  I don't know at the time if I knew it
17   was Cassidy who received it or not, I think I
18   did, and that it had given the name of a person.
19   And the caller had stated that the person had
20   been -- had made statements implicating that
21   they had been involved in the murders.
22      Q.   Did the caller provide a name?
23      A.   I don't know.
24      Q.   An alias?

194

1       A.   I don't know.
2       Q.   Any identifying details?
3       A.   I don't know.
4       Q.   Did you know sitting -- Did you know at
5    the time, or is this information you never had?
6       A.   I don't know what I don't know.
7       Q.   Do you believe that Cassidy passed on
8    any identifying details about the caller at the
9    time?
10      A.   No.  I believe it was characterized as
11   an anonymous caller.
12      Q.   Cassidy characterized it as such?
13      A.   I don't know.  I just know that the
14   call was characterized as that.
15      Q.   What information was received from the
16   caller about the person implicated in the crime?
17           ATTORNEY MEADOR:  Objection:
18   Mischaracterizes the facts and the witness'
19   testimony.
20           THE WITNESS:  So is that different than what
21   I just previously said?
22
23   BY ATTORNEY VAN BRUNT:
24      Q.   Did the caller give a full first name

195

1    of the alleged perpetrator?
2       A.   I don't know.
3       Q.   Did the caller give a nickname?
4       A.   I don't know.
5       Q.   Did the caller say anything about where
6    the perpetrator went to school?
7       A.   I think so, yeah.
8       Q.   And where --
9       A.   But I'm not positive, actually.
10      Q.   And where did they say?
11      A.   I don't know.  I know where we went,
12   and I know from the reports.
13      Q.   Where did you go?
14      A.   Dunbar High School.
15      Q.   But you don't know whether that
16   information was received on the phone call?
17      A.   No.  I don't know if that was received
18   on the phone call or that's something we had to
19   find out.  I don't know.
20      Q.   Did the caller provide his or her
21   relationship to the suspect?
22      A.   I don't know.
23      Q.   Did the caller provide information
24   about why he or she knew or had knowledge about

196



1  the murders?
2      A.  I don't know.
3      Q.  Did the caller say how he found out
4  about how the murders took place?
5      A.  I don't know.
6      Q.  At the time you were assigned to the
7  case, what did Cassidy tell you about the crime
8  scene itself?
9      A.  I don't recall.
10     Q.  Did you find out anything about where
11 the victims were -- Well, first of all, did you
12 find out the manner in which they had been
13 killed?
14     A.  I don't know.  I know I assumed
15 gunshot, but I don't know.
16     Q.  Is it likely that you were told the
17 manner in which it happened so that you could --
18 when you were working on the case?
19     A.  Given my involvement?
20     Q.  Yeah.
21     A.  It's not likely.
22     Q.  It's not likely you were told the
23 manner of death even though you were
24 investigating the case?

197

1      A.  So when you say "investigating," that
2  to me, it's a whole different term than what
3  you're implying.  When someone -- When you're
4  asked to go ride with someone to a school,
5  you're probably given enough reason to -- for
6  you to go do that.  But beyond that, no.  If I
7  was going to then be conducting -- doing a whole
8  bunch of other stuff, yeah, I probably at some
9  point would have been given information or asked
10 information.  But given what I thought was my
11 limited scope at the time, I'm not sure how many
12 questions I would have had.  And definitely
13 given that my position as a detective at that
14 particular time.
15     Q.  Were you given any information about
16 any witnesses to the crime when you were first
17 assigned to assist Cassidy?
18     A.  I don't know.  I don't know.
19     Q.  Were you given any information about
20 any physical evidence that had been collected at
21 the crime scene?
22     A.  I don't know.
23     Q.  Do you know who worked the crime scene?
24     ATTORNEY MEADOR:  Objection:  Form.

198

1      THE WITNESS:  From this --
2      ATTORNEY MEADOR:  Go ahead.
3      THE WITNESS:  So when you say "worked the
4  crime scene," what do you mean by "worked the
5  crime scene"?
6  BY ATTORNEY VAN BRUNT:
7      Q.  Well, the detectives who responded to
8  the crime scene, do you know who those were?
9      A.  I know from the reports that at least
10 Fine and Coughlin.  Whoever else went, and
11 I'm -- given the fact that it's a double murder,
12 I'm sure other people went.  But I couldn't tell
13 you.
14     Q.  Were Fine and Coughlin at the Area when
15 you arrived on the 5th?
16     A.  I don't know, but I don't believe so.
17     Q.  Did you talk to them at the time or
18 around the time you were assigned to assist
19 Cassidy?
20     A.  Seeing that I don't know if they were
21 there, I would have to say no, I did not.
22     Q.  Well, I mean, either in person or on
23 the phone, did you talk to them?
24     A.  No.

199

1      Q.  Do you have any understanding as to why
2  you were asked to assist Cassidy in this
3  investigation?
4      A.  You want me to -- I can theorize that
5  me and Luke were new detectives, we were sitting
6  around, and Cassidy -- I don't think Cassidy
7  ever had a partner, at least not while I was
8  assigned to Area Central or Area 1.  So that
9  doesn't seem like something that one person
10 would do.  So we were probably sent to assist
11 them.
12     Q.  Why doesn't it seem like something one
13 person would do?
14     A.  So if this defendant had stated that he
15 participated in a double murder, that would --
16 might be a dangerous situation, so not something
17 I would want to go do by myself.
18     Q.  Okay.  So you and Daly were backup?
19     ATTORNEY BENJAMIN:  Objection:  Form.
20     THE WITNESS:  No.
21 BY ATTORNEY VAN BRUNT:
22     Q.  Is there anything sitting here today
23 that you found that you can tell or tell me that
24 you found out about the case when you were first

200



1  assigned to it on the 5th?
2     ATTORNEY MEADOR:  Can you read the question
3  back, please.
4               (whereupon, the record was read
5               as requested.)
6     ATTORNEY MEADOR:  Other than what he's
7  testified to?
8     ATTORNEY VAN BRUNT:  Sure.
9     THE WITNESS:  Other than I testified to?  No.
10 BY ATTORNEY VAN BRUNT:
11    Q.   Did you learn on the morning of the 5th
12 whether any witnesses had been at Area 1 the
13 night before?
14    A.   I don't know.  I highly doubt it.
15    Q.   Did you ever learn that in the course
16 of your work on --
17    A.   I don't know.  But I highly doubt it.
18    Q.   Do you know a Detective Holmes?
19    A.   Yes.  Retired.
20    Q.   He was a Violent Crimes detective in
21 '95?
22    A.   Yes.
23    Q.   Who was his partner?
24    A.   I don't know.

                                          201

1     Q.   Did he do any work on the Ibrahim Ali
2  murder investigation?
3     A.   From this, I've heard that he did.  I
4  have no firsthand knowledge.
5     Q.   Okay.  Do you know the name Munther
6  Tadros?
7     A.   Say again.
8     Q.   Do you know the name Munther Tadros?
9     A.   No.
10    Q.   Talking about Yousef Ali's relative,
11 how did you come to find out that they were --
12 there was a relation of Yousef Ali working on
13 the first floor of the building?
14    A.   I vaguely remember someone trying to, I
15 think, comfort him.
16    Q.   Someone trying to comfort who?
17    A.   The officer.
18    Q.   The relative?
19    A.   Yes.
20    Q.   I see.  And when did that occur?
21    A.   I don't know.  Around the date of the
22 murder.
23    Q.   And who was trying to comfort him?
24    A.   I don't know.

                                          202

1     Q.   And how did you find out they were
2  related?  Did someone tell you that?
3     A.   I think someone had to have told me.
4     Q.   All right.  Did you personally discuss
5  the death with the relative?
6     A.   No.
7     Q.   Okay.  Were there photo albums of gang
8  members kept at Area 1 back in 1995?
9     A.   I've heard that question before.  I
10 don't remember there being any.
11    Q.   Have you ever heard the term "gang
12 book"?
13    A.   I'm not sure.
14    Q.   Were there photo albums of any kind
15 kept at Area 1 with potential suspects?
16    ATTORNEY BENJAMIN:  Object to form.
17    ATTORNEY MEADOR:  Join.
18    THE WITNESS:  I don't know.  I want to say
19 something, but I don't know.  I don't remember.
20 BY ATTORNEY VAN BRUNT:
21    Q.   And what makes -- Why do you say -- Why
22 do you want to say something?  What are you
23 referring to?
24    A.   Because I seem to remember at some

                                          203

1  point that we would get people something and
2  say, "Look through here."  But I don't recall
3  what it was called, the practice.  I just seem
4  to remember there were instances where we would
5  give someone something and say, "See if the sus-
6  -- Look and see if you recognize somebody, the
7  offender."  But I'm not positive.
8     Q.   But you have no recollection of where
9  the photographs in that book came from?
10    A.   I'm not even sure that the book is
11 listed.  I just -- I think, but I'm not
12 positive.
13    Q.   Did you learn any information about
14 the -- relating to a theft of cars at the auto
15 lot where the murders occurred when you first
16 started assisting on the case on December 5th?
17    A.   I'm not sure.
18    Q.   Would you agree that if this had been
19 your case, meaning it had been assigned to you
20 as opposed to just assigned as an assisting
21 matter, it would have been important to learn
22 the facts relating to the crime scene?
23    A.   You mean if I hadn't been assigned
24 to go work on -- assigned to the crime scene?

                                          204

1    Q.   Let me ask this.  That was a bad
2  question.
3         If you were in fact the primary
4  detective assigned to the case, it would have
5  been important to learn facts relating to the
6  crime scene?
7    ATTORNEY MEADOR:  Objection:  Form.
8    THE WITNESS:  So I think I've said that in my
9  understanding of how cases are assigned to
10  people, the person who went to the -- the
11  partners -- some other term they used to call
12  partners, but I can't think of it -- the
13  partners who went to the scene that they were --
14  it was their case.  So if I had went -- If me
15  and my partner had been assigned to the scene,
16  yeah, it would be important for me and my
17  partner to know everything that could be learned
18  from the scene.
19  BY ATTORNEY VAN BRUNT:
20    Q.   Yeah.  And if it was your case, you
21  also would want to know the results of any
22  canvasses, correct?
23    A.   Would have, yes.
24    Q.   You also would have wanted to know what

205

1  any witnesses were saying about what they saw
2  relating to the crime?
3    A.   If it was me and my partner's case,
4  yes.
5    Q.   And it would be important to gather all
6  that evidence as you continue your
7  investigation, correct?
8    A.   Yes.
9    Q.   Did you personally ever go to the scene
10  of the Ibrahim Ali crime?
11    A.   Not -- Not -- I don't really -- So I
12  know the address, but I kind of don't have a
13  picture of it.  But I didn't go around that
14  time.  I don't know if I ever drove past it,
15  like, just in passing because I'm a South-Sider.
16  But as far as the crime scene, going and
17  checking out the crime scene, no.
18    Q.   Were you familiar prior to this, prior
19  to December 5th, with an auto lot called
20  Elegant?
21    A.   So the name stands out.  I don't know
22  if it stood out because I have driven past it
23  and noticed it or if it's just because at some
24  point, I had heard the name of the lot

206

1  associated with the homicide.
2    Q.   Same question related to Prestige.  Had
3  you been familiar --
4    A.   Same thing.
5    Q.   Were you familiar with any Violent
6  Crimes happening on this stretch of car lots in
7  1995?
8    A.   No.
9    Q.   Did you have any knowledge about the
10  physical description of the potential
11  perpetrators at the time you were -- you went to
12  the high school with Cassidy and Daly?
13    A.   I don't recall.
14    Q.   Did you do any follow-up investigation
15  relating to the phone call that came in on
16  December 5th before leaving the Area for the
17  high school?
18    A.   The reports indicate that the -- not
19  the reports, my previous testimony in court, I
20  referred to something.  But I don't recall it.
21    Q.   Do you have any independent
22  recollection of doing any investigation?
23    A.   No.
24    Q.   Did you make any phone calls, sitting

207

1  here today that you recall, to conduct an
2  investigation about that phone call?
3    A.   That I recall, no.
4    Q.   How common were anonymous tips in 1995
5  at Area 1?
6    ATTORNEY BENJAMIN:  Objection:  Foundation.
7    ATTORNEY MEADOR:  Join.
8    THE WITNESS:  I don't know.  I don't know.
9  BY ATTORNEY VAN BRUNT:
10    Q.   Well, that year, do you recall any
11  other cases involving anonymous tips?
12    A.   That I worked?
13    Q.   Yeah.
14    A.   I don't -- This is the only case that I
15  now can think of of '95.  So I don't have much
16  to go on.
17    Q.   How many cases in the course of your
18  career that you've worked have involved
19  anonymous tips?
20    A.   I don't know.  But I've had cases -- I
21  mean, whodunit sexual assaults.  I've had cases
22  that we've gotten loads of tips on.
23    Q.   Is it your general practice when you
24  receive these tips to conduct investigation into

208



1  them?
2      A.   Yes.
3      Q.   To investigate them to see if they're
4  reliable?
5      A.   Yes.
6      Q.   Why are you smiling?
7      A.   I mean, that's what I get paid to do.
8      Q.   Right.
9           So you wouldn't just assume they were
10  reliable, right?  You would go conduct some
11  follow-up investigation to see if what the
12  person is tipping you off about has solid
13  information?
14      A.   Wow.  I've never got -- I don't think
15  I've ever gotten a name of -- I've gotten things
16  like, "I saw the guy who was riding the bike at
17  Starbucks.  He's there at 8:00 o'clock every
18  day."  Those are the types of anonymous tips
19  I've gotten.
20      Q.   Okay.  How many cases have you
21  personally solved based an anonymous call that
22  came in?
23      ATTORNEY MEADOR: Objection: Form.
24      THE WITNESS: Maybe a few.  Maybe a few.

209

1  BY ATTORNEY VAN BRUNT:
2      Q.   Can you think of any offhand?
3      A.   Specifically, there was a sexual
4  assault in the 8th District, and -- well, there
5  was multiple.  He was grabbing girls off the
6  street and raping them.  And we got some
7  anonymous tips.  And they -- None of the girls
8  could make a good identification, but I strongly
9  suspect that -- and he wasn't charged in our
10  case; he was charged in other cases.  But I
11  strongly suspect he was our guy in the two cases
12  I was investigating.  So I would say at least
13  one, and that was the circumstance.
14      Q.   All right.  And you received a tip it
15  was the guy you suspected?
16      A.   Mm-hmm.
17      Q.   Okay.  And then did you conduct --
18      A.   Well, I received the tip, and then I
19  investigated and then suspected that it was him,
20  even though he didn't get charged for it.
21      Q.   Got it.
22           So you received the tip, and then you
23  conducted follow-up investigation that led you
24  to believe that it was in fact the person who

210

1  responsible?
2      A.   Mm-hmm.
3      Q.   And what did that --
4      A.   Yes.  Sorry.
5      Q.   -- follow-up investigation consist of?
6      A.   I don't -- I don't recall.  I mean,
7  some type of lineup, questioning of him, find
8  out his whereabouts.  I don't know for sure.
9      Q.   DNA testing in that case?
10      A.   Was there any DNA?
11      Q.   Yeah.
12      A.   Not when he was -- when I received the
13  information.  There was DNA, DNA that came back
14  at some point, but not initially.
15      Q.   And a match to him?
16      A.   Did it come back a match to him?  In my
17  case?
18      Q.   Yes.
19      A.   I want to say no, because that would
20  have been a pretty good reason for him to be
21  charged.  So I want to say no.  I think in my
22  case, the DNA must have been -- didn't have a
23  good profile.
24      Q.   Okay.  Did Area 1 have caller ID in

211

1  1995?
2      A.   I don't think we ever had caller ID.
3      Q.   Did Area 1 have the ability to trace
4  calls that came in to it?
5      A.   Not that I'm aware of.
6      Q.   So Area 1 had absolutely no way to tell
7  who was calling the Area in 1995?
8      ATTORNEY BENJAMIN: Objection: Foundation.
9      ATTORNEY MEADOR: Join.
10      THE WITNESS: I don't think we've ever had
11  it.
12  BY ATTORNEY VAN BRUNT:
13      Q.   You don't have that now?
14      A.   Not that I know.
15      Q.   So if someone makes a call to the Area
16  and hangs up, you have no idea, no way to find
17  out who made that phone call?
18      ATTORNEY MEADOR: Same objection.
19          Go ahead.
20      THE WITNESS: Not that I know of.
21  BY ATTORNEY VAN BRUNT:
22      Q.   I take it you didn't write a general
23  progress report about the anonymous phone call?
24      A.   You take it right.

212

1    Q.   Did Cassidy, to your knowledge?
2    A.   I have no knowledge.
3    Q.   Would it have been proper procedure for
4  him to have written a phone call -- written a
5  report about the phone call?
6    ATTORNEY BENJAMIN:  Object to form.
7    THE WITNESS:  I would say it would have been
8  proper for him to document there was an
9  anonymous phone call.  How he chose to do it ...
10 BY ATTORNEY VAN BRUNT:
11   Q.   Would it have been proper for him to
12 write down everything the caller said to him
13 that implicated somebody in a double homicide?
14   ATTORNEY MEADOR:  Objection:  Form; calls for
15 speculation.
16   THE WITNESS:  Relevant facts.
17 BY ATTORNEY VAN BRUNT:
18   Q.   And what are the relevant facts?
19   A.   I didn't take the call.  I don't know.
20   Q.   Generally speaking, when you say
21 "relevant facts," what do you mean?
22   A.   Depends on what the person said.  If
23 the person said his zodiac sign is Gemini, I
24 don't think that's relevant.

213

1    Q.   Did you see any notes about that phone
2  call in the course of reviewing documents for
3  this case?
4    ATTORNEY MEADOR:  Objection as to form.
5    THE WITNESS:  I don't know.  I definitely
6  didn't take note.
7  BY ATTORNEY VAN BRUNT:
8    Q.   I'm asking if you just saw any in the
9  course of reviewing and preparing for the
10 deposition.
11   ATTORNEY MEADOR:  Same objection.
12   THE WITNESS:  I don't know.
13 BY ATTORNEY VAN BRUNT:
14   Q.   You don't recall seeing any notes?
15   A.   No.
16   Q.   Did you go straight to Dunbar High
17 School after leaving the Area, or did you stop
18 somewhere else first?
19   A.   I don't know for sure.  I don't know.
20 I think we just went straight to Dunbar, but I
21 don't know.
22   Q.   Did you go to any other high schools at
23 all in the course of your investigation?
24   A.   I don't think so.

214

1    Q.   Did you ever talk to Troshawn McCoy's
2  mother?
3    A.   Was that the Dunbar boy, kid?
4    Q.   Correct.
5    A.   I don't believe so.
6    Q.   Did Cassidy, to your knowledge?
7    A.   I don't know.
8    Q.   Did he ask you to call his mother?
9    A.   I don't know.
10   ATTORNEY MEADOR:  Wait.  Hold on.
11      Objection as to form as to -- can you
12 clarify, Counsel.
13 BY ATTORNEY VAN BRUNT:
14   Q.   Did Cassidy ask --
15   ATTORNEY MEADOR:  Thank you.
16
17 BY ATTORNEY VAN BRUNT:
18   Q.   -- you to call Troshawn McCoy's mother?
19   A.   I don't remember.
20   ATTORNEY VAN BRUNT:  I'm going to one that's
21 been previously marked.
22 BY ATTORNEY VAN BRUNT:
23   Q.   1995, were you familiar with Dunbar
24 High School?

215

1    A.   I don't know what your definition of
2  familiar, but I knew of it.
3    Q.   Had you been there before?
4    A.   I actually had played a basketball game
5  there in high school.
6    Q.   Had you ever responded to it in the
7  course of your work?
8    A.   I don't know.  I don't think so,
9  though.
10   Q.   Were you familiar with the principal of
11 the school?
12   A.   I doubt it.
13   Q.   Were you familiar with the school
14 resource officer?
15   A.   I doubt it.
16   Q.   This is the cleared/closed sup report
17 in this case.  It's previously been marked as
18 Exhibit 4.
19   ATTORNEY MEADOR:  Do you have the original?
20   ATTORNEY VAN BRUNT:  No.  There is not an
21 original.  I'm sorry, they're just copies.
22   ATTORNEY MEADOR:  Oh, fine.  Fine.  I just
23 want to make sure.
24   ATTORNEY VAN BRUNT:  It's just copies of the

216

1  uploaded ones.
2  BY ATTORNEY VAN BRUNT:
3      Q.  If I say -- Actually, can you turn to
4  page 4, City 51.
5          All right.  Have you seen this report
6  before, sir?
7      A.  Yes.
8      Q.  And when is the last time you saw it?
9      A.  Within the last 30 days.  A couple of
10  weeks ago.
11      Q.  Sorry.  I jumped the gun a little bit.
12  If you could turn just to the first page where
13  it says "The reporting officers."
14      A.  Yes.
15      Q.  It lists Cassidy in the first box,
16  correct?
17      A.  It does.
18      Q.  Does that indicate that he's the one
19  who wrote this report?
20      A.  Generally.
21      Q.  All right.  And you and Daly are in the
22  second box, correct?
23      A.  We are.
24      Q.  What does that mean that you are listed

217

1  as the reporting officer?
2      A.  It generally -- In my book, it means we
3  help author the report.
4      Q.  Okay.  When you say "help author," what
5  does that mean?
6      A.  Well, I think only one person would
7  type the report.  But have some input into the
8  report.
9      Q.  All right.  And how do you provide
10  input, or how did you provide input to somebody
11  who was typing the report back in '95?  Did you
12  do so verbally, notes, reports?
13      A.  In general?
14      Q.  Yeah.
15      A.  Or are we speaking about this case?
16      Q.  Generally first.
17      A.  I'm sorry.
18      Q.  How would you assist the reporting
19  detective who was actually typing the report in
20  providing information?
21      A.  So the only -- In my book, the only
22  person who I would be putting in Box 2 of a
23  report I generated would have been my partner.
24  And we would have conducted an investigation

218

1  together, and then one of us would have been
2  decided one of us would have typed it up, and
3  then hopefully, the other the person, that
4  person who typed it up would have given it to
5  the second person to review before it gets
6  turned in.
7      Q.  Is that what you did in this case?
8      A.  That is not.
9      Q.  Pardon?
10      A.  That is not.
11      Q.  Okay.  What happened in this case?
12      A.  I couldn't tell you.  I just learned
13  that my name was on it after I got served with
14  the lawsuit.
15      Q.  Does that surprise you that your name
16  was on it?
17      A.  It doesn't surprise me.
18      Q.  Why doesn't it surprise you?
19      A.  For whatever reason, that was a common
20  practice back then.
21      Q.  What was?
22      A.  Putting people's names on a -- list --
23  putting them on the reporting officer, listing
24  multiple people as a reporting officer.

219

1      Q.  What did you do to assist in the
2  creation of this report?
3      A.  Nothing.
4      Q.  Did you review this report after it was
5  typed for accuracy?
6      A.  No.
7      Q.  Did you provide details to Jim Cassidy
8  to include in this report?
9      A.  No.  I didn't even know he had prepared
10  it.
11      Q.  When's the first time you found out
12  that this report had been prepared?
13      A.  Whenever the first time I had met with
14  my attorney.
15      Q.  If you go to the last page on page 7.
16      A.  No.  Let me back up.  It's possible I
17  knew about it when we were in trial.  But I'm
18  not positive.  I don't recall it, but it's
19  possible.
20      Q.  The trial, the criminal trials in this
21  case?
22      A.  Yes.
23      Q.  And why do you say that it's possible?
24      A.  Because I go -- you know, in trials

220

1  now, I mean, you -- you know, you have the
2  documentation handy.  I just don't know how much
3  was given out back then.
4      Q.  So you're assuming you may have seen
5  this at trial while you were prepping?
6      A.  I might have.
7      Q.  Got it.
8          And that assumption is based on your
9  current practice now?
10     A.  Yes.
11     Q.  Right.  So the final page, 7, has a
12 list of detectives.  Do you see that?
13     A.  I do.
14     Q.  And were all those detectives assigned
15 to assist on the case to your knowledge?
16     A.  To my knowledge, I think so.
17     Q.  Detective Fine isn't on there, correct?
18     A.  I don't see his name.
19     Q.  Any idea why that is?
20     A.  I don't have any idea.
21     Q.  You and Daly obviously are on here.  Do
22 you know why your names are listed on here?
23     A.  I don't.
24     Q.  This -- Did you ever talk to Sergeant

221

1  Bonke about the submission of this report?
2      A.  No.
3      Q.  Did he ever follow up and ask you any
4  questions about this report?
5      A.  No.
6      Q.  Did Sergeant Bonke talk to you period
7  about this case at any point in time?
8      A.  I highly doubt it.
9      Q.  Why do you say that?
10     A.  He didn't talk to me much.
11     Q.  And why is that?
12     A.  He talked to my partner.
13     Q.  He talked to Daly?
14     A.  Mm-hmm.
15     Q.  And why was Daly the person to speak
16 with Bonke?
17     A.  They seemed to get along better.
18     Q.  Did you not get along with Bonke?
19     A.  He's my supervisor.  I didn't not get
20 along with my supervisor.
21     Q.  Did Sergeant Tuider ask you any
22 questions about this case at any point?
23     A.  I don't recall.
24     Q.  Do you recall Daly speaking to Bonke

222

1  about this case at any point?
2      A.  I don't know.
3      Q.  If you go to 4.
4      ATTORNEY BENJAMIN:  Page 4?
5  BY ATTORNEY VAN BRUNT:
6      Q.  The first paragraph I'll represent to
7  you contains a synopsis of the anonymous phone
8  call that was received at Area 1 on December
9  5th.  And it says about three-quarters of the
10 way down that paragraph, "He," presumably the
11 caller, "also related that McCoy's mother's name
12 was Collette, and her phone number was
13 374-6962."
14         Does that refresh your recollection --
15 Well, strike that.
16         So it's clear you knew who Troshawn
17 McCoy's mother was right after the phone call
18 came in, correct?
19     ATTORNEY MEADOR:  Objection:  Form and
20 mischaracterizes the witness' testimony;
21 argumentative.
22     ATTORNEY BENJAMIN:  Join.
23     THE WITNESS:  It's not clear.
24 BY ATTORNEY VAN BRUNT:

223

1      Q.  It's not clear?
2          Do you believe you knew the name of
3  Troshawn McCoy's mother after the phone call
4  came in?
5      A.  I don't know.
6      Q.  Did Cassidy tell you her name?
7      A.  I don't know.
8      Q.  Did you at any point come to learn the
9  name of Troshawn McCoy's mother?
10     A.  Right now.
11     Q.  Just right now?
12     A.  I'm taking note of it right now.
13     Q.  Did you know an Officer Spann prior to
14 working on this case?
15     A.  I don't believe so.  I don't know,
16 though.  I don't remember him so -- but I don't
17 think so.
18     Q.  Did you call Officer Spann before going
19 over to Dunbar High School?
20     A.  I don't know.
21     Q.  You don't know, or you don't remember?
22     A.  I don't -- I don't remember what I
23 don't know.
24     Q.  Did Daly ask you to call Mr. Spann?

224

1    A.  I don't know.
2    Q.  Did you have a conversation with
3  Cassidy and Daly after the phone call came in
4  about what your next steps in the investigation
5  were going to be?
6    A.  Besides accompanying Detective Cassidy
7  to Dunbar?
8    Q.  Anything, any conversation.
9    A.  I know we had some -- we had some
10  conversation, because I didn't take the phone
11  call.  But I don't know what it was.
12    Q.  Do you have any recollection about that
13  conversation at all?
14    A.  No.
15    Q.  Was anyone else present other than you
16  and Daly and Cassidy?
17    A.  I don't know.
18    Q.  What happened after you got to Dunbar?
19    A.  Based on the reports or based on my
20  memory?
21    Q.  Let's start with your memory.
22    A.  Made -- I remember made contact with
23  the young man and brought the young man back to
24  the Area.

225

1    Q.  The young man is Troshawn McCoy?
2    A.  Yeah.
3    Q.  Did you go to find the principal first
4  when you arrived?
5    A.  I don't recall.
6    Q.  Did you go and meet up with Officer
7  Spann?
8    A.  I think we -- I think we did talk to
9  Officer Spann.  But I'm not positive.
10    Q.  Where at the school did you find McCoy?
11    A.  I don't recall.
12    Q.  Was he with anyone when you first saw
13  him at the school?
14    A.  He might have been with Officer Spann,
15  but I'm not sure.
16    Q.  Before going to the school, did anyone
17  run McCoy's rap sheet?
18    A.  I don't know.
19    Q.  Do you have any recollection of doing
20  this.
21    A.  No.
22    Q.  Is it likely that somebody did this?
23    A.  I don't remember how rap sheets were
24  run, so I don't know.

226

1    Q.  Well, is it likely that somebody tried
2  to track down McCoy's criminal history if he had
3  any prior to going and interviewing him?
4    ATTORNEY MEADOR:  Objection:  Calls for
5  speculation.
6    THE WITNESS:  I don't know.
7  BY ATTORNEY VAN BRUNT:
8    Q.  How long were you at Dunbar?
9    A.  A few minutes.  My memory -- From
10  memory, I would say a few minutes.
11    Q.  Is there anybody else you talked to
12  there other than McCoy and Officer Spann?
13    A.  I don't know, but I don't believe so.
14    Q.  At the time you went to Dunbar, did you
15  have the name of any other possible suspects in
16  the case other than Troshawn McCoy?
17    ATTORNEY BENJAMIN:  One second.
18    THE WITNESS:  Sorry.
19  BY ATTORNEY VAN BRUNT:
20    Q.  At the time you went to Dunbar, did you
21  have the name of any other possible suspects in
22  the case other than Troshawn McCoy?
23    A.  Me personally?
24    Q.  Yeah.

227

1    A.  I'm sorry.  You said when we were
2  headed to Dunbar?
3    Q.  Right.
4    A.  I don't believe so.
5    Q.  Were there any suspects in the case at
6  the time you headed to Dunbar?
7    A.  I don't -- I don't know.  I don't know.
8    Q.  Did Cassidy discuss anything about
9  possible suspects in the case with you when you
10  were first assigned to assist him?
11    A.  Besides McCoy?
12    Q.  Right.
13    A.  I don't think so.  But I don't know.
14    Q.  What was the purpose of going to
15  Dunbar?
16    A.  Make contact with McCoy.
17    Q.  Were you intending to arrest him?
18    A.  I don't know.  My -- The way I remember
19  it is the purpose was to bring him in for
20  questioning.  But I don't know.
21    Q.  Were you armed when you went to the
22  school?
23    A.  I hope so.
24    Q.  Did you have a baton?

228

1    A.   No.
2    Q.   Did you regularly have a baton on you
3 in 1995 as a detective?
4    A.   No, ma'am.
5    Q.   Is that because detectives don't carry
6 batons?
7    A.   Generally not.
8    Q.   Are there times when they do?
9    A.   I was detailed to Madison and State
10 Street on the 4th of July this past year in
11 uniform.  I did wear a baton.
12    Q.   Do you have a personal one in your --
13 that you keep in a locker for purposes when you
14 need to have it, or does it get handed out to
15 you on those special instances?
16    ATTORNEY MEADOR:  Objection:  Form.
17    ATTORNEY BENJAMIN:  Same.
18    THE WITNESS:  When -- well, back when I
19 became a police officer, you received a baton as
20 part of your equipment they gave you when you
21 became a police officer.
22
23 BY ATTORNEY VAN BRUNT:
24    Q.   And when you were made detective, you

                                                  229

1 just kept it?
2    A.   Yes.
3    Q.   Did you have a warrant when you went to
4 Dunbar High School for Troshawn McCoy's arrest?
5    A.   No.
6    Q.   And why not?
7    A.   I don't know.
8    Q.   Did you have probable cause to arrest
9 Troshawn McCoy at the time you went to Dunbar
10 High School?
11    A.   When you say "arrest," I think we had
12 probable cause to ask him to come in.
13    Q.   And what was the probable cause based
14 upon?
15    A.   That he was telling -- he had told
16 someone that he had been involved in the murder.
17    Q.   So the probable cause to bring him into
18 custody was the anonymous phone call that had
19 come in that day?
20    A.   I think --
21    ATTORNEY MEADOR:  Wait, wait, wait, wait.
22       Objection:  Form; and mischaracterizes
23 the witness' testimony.
24    ATTORNEY BENJAMIN:  Join.

                                                  230

1    THE WITNESS:  I think I phrased it that we
2 had probable cause to bring him in for
3 questioning; yes?
4 BY ATTORNEY VAN BRUNT:
5    Q.   You did.
6    A.   So based on that, what's your question?
7    ATTORNEY VAN BRUNT:  Would you mind reading
8 it back.
9             (whereupon, the record was read
10                as requested.)
11    ATTORNEY MEADOR:  I maintain my objection.
12    THE WITNESS:  So the probable cause to bring
13 him in for questioning was the phone call.
14 BY ATTORNEY VAN BRUNT:
15    Q.   Do you distinguish between probable
16 cause to bring someone in for questioning and
17 probable cause for arrest?
18    A.   Currently?  I'm not even sure anymore.
19       Currently, probably -- Currently,
20 probably the same.
21    Q.   Back then, was it the same?
22    A.   I don't think so.
23    Q.   What was the difference back then?
24    A.   I think you had a little bit more

                                                  231

1 leeway with just questioning.
2    Q.   Meaning you could bring somebody in for
3 questioning without having probable cause?
4    ATTORNEY MEADOR:  Objection:  Form.
5    ATTORNEY BENJAMIN:  Mischaracterizes his
6 testimony.
7    ATTORNEY MEADOR:  Join.
8    THE WITNESS:  Meaning you had a little bit
9 more leeway when you brought someone in just for
10 questioning.
11 BY ATTORNEY VAN BRUNT:
12    Q.   What was Troshawn McCoy's reaction when
13 you first saw him at Dunbar?
14    A.   I don't know.
15    Q.   Was he scared?
16    ATTORNEY MEADOR:  Objection:  Calls for
17 speculation.
18    THE WITNESS:  I don't know.
19 BY ATTORNEY VAN BRUNT:
20    Q.   Did you read McCoy his rights at the
21 school, his Miranda rights?
22    A.   Me personally, or were they read?
23    Q.   Were they read to him?
24    A.   I don't know.

                                                  232



Dwayne Davis 10/02/2019

1    Q.  Did you personally read them to him?

2    A.  I don't believe so.

3    Q.  And why do you say that?

4    A.  Because I just don't believe I did.

5    Q.  You don't have a memory of doing so?

6    A.  No.

7    Q.  Whose job would it have been to read

8 his rights?

9    A.  If it called for his rights to be read,

10 there would be no person assigned do it.  One of

11 us just would have did it.

12    Q.  Was it appropriate to read his rights

13 at the time you were bringing him in for

14 questioning?

15    ATTORNEY BENJAMIN:  Object to form.

16    THE WITNESS:  So -- So if you're asking my

17 opinion, I think rights are given when you're

18 about to talk to people.  I think what was

19 should have been -- what in that instance should

20 have been explained why we were asking -- why we

21 wanted to talk to him.

22 BY ATTORNEY VAN BRUNT:

23    Q.  Did McCoy come voluntarily with you

24 back to Area 1?

233

1    A.  I don't remember forcing him to.

2    Q.  Was he -- Was he free to leave your

3 presence at any point at the time you got him at

4 the school?

5    A.  Between the high school and the Area?

6    Q.  Correct.

7    A.  I don't know.  I'm glad he didn't go

8 that way, but I don't know.

9    Q.  Well, what would have happened if he

10 had chosen not to go with you?

11    ATTORNEY BENJAMIN:  Objection: Calls for

12 speculation.

13    THE WITNESS:  I don't know.

14 BY ATTORNEY VAN BRUNT:

15    Q.  Would you have detained him?

16    A.  I don't know.  I probably would have

17 went on Cassidy's lead.

18    Q.  Because he was the one leading the

19 arrest?

20    ATTORNEY MEADOR:  Objection:  Form.

21 BY ATTORNEY VAN BRUNT:

22    Q.  Strike that.

23    He was the one leading bringing McCoy

24 in for questioning?

234

1    A.  Because he was the more experienced

2 detective.  I would have -- As long as I didn't

3 think it was wrong, I would have followed his

4 lead.

5    Q.  Did Spann give you any information

6 about McCoy at the time you were at the school?

7    A.  I don't know.

8    Q.  Did you find it unusual that McCoy

9 agreed to go with you voluntarily?

10    A.  No.

11    Q.  Why is that?

12    A.  Because we're not boogymen.  And

13 contrary to how the press puts it, people don't

14 run from the police, not even today.

15    Q.  What did you tell McCoy you needed him

16 for questioning about?

17    A.  I'm not sure I told him anything.

18    Q.  Did anybody tell him anything about

19 what he was needed for questioning?

20    A.  I'm sure someone told him something.

21    Q.  What was said exactly?

22    A.  I don't know.

23    Q.  Would anything refresh your

24 recollection as to that?

235

1    A.  No.

2    Q.  Did anybody -- Well, did you take any

3 notes of this trip to Dunbar to get McCoy?

4    A.  Not that I recall.

5    Q.  Did Cassidy, to your knowledge?

6    A.  I don't know.

7    Q.  Should he have?

8    A.  I don't know.

9    Q.  Was it Chicago Police policy to take

10 notes of getting somebody for questioning in a

11 homicide case?

12    ATTORNEY BENJAMIN:  Object to form.

13    ATTORNEY MEADOR:  Join.

14    THE WITNESS:  I'm not sure.  I can just say

15 that it should have been memorialized somehow.

16 BY ATTORNEY VAN BRUNT:

17    Q.  Did McCoy ask to speak to anyone when

18 you first spoke to him or when you first saw

19 him?

20    A.  I don't know.  I don't think so, but I

21 don't know.

22    Q.  Did he ask to speak to his mom?

23    A.  I don't know, but I don't think so.

24    Q.  Why do you say you don't think so?

236

1    A.   That's not my memory.
2    Q.   And then you went back to Area 1?
3    A.   That's -- I believe we did.
4    Q.   Was McCoy handcuffed?
5    A.   I don't believe he was.
6    Q.   And what makes you say that?
7    A.   Because he wasn't under arrest.
8    Q.   Who drove?
9    A.   I don't know.
10   Q.   Do you know whose car you were driving
11   at the time?
12   A.   Who had signed the vehicle out that
13   morning?  No, I do not.
14   Q.   Did you talk to McCoy while you were in
15   the car on the way back to Area 1?
16   A.   Probably not.
17   Q.   Why do you say that?
18   A.   Because I was not -- I was a new
19   detective.
20   Q.   Did Cassidy talk to McCoy at all?
21   A.   I don't know.
22   Q.   Did McCoy ever ask during that trip
23   back why he was being detained?
24   A.   I don't remember that he did.

237

1    Q.   Did you stop anywhere on the way back?
2    A.   I doubt it.
3    Q.   Did you stop for lunch?
4    A.   I doubt it.
5         No, I know we didn't stop for lunch.  I
6    never ate lunch with Cassidy.
7    Q.   Why do you say that?
8    A.   Because I never did.
9    Q.   Did -- Do you have any idea what time
10   the phone call came in to Area 1?
11   A.   I do not.
12   Q.   Do you have any idea what time you went
13   to the school?
14   A.   So I'm just assuming when you ask me
15   these questions, you're talking about what I
16   remember.
17   Q.   Let's start there.  What do you
18   remember about what time you got to the school?
19   A.   I don't.
20   Q.   Do you have any refreshed recollection
21   after reviewing your testimony and reports about
22   what time you went to the school?
23   A.   I could look down and try to ascertain
24   if you want me to.  But no.

238

1    Q.   It was in the morning of December 5th?
2    A.   I don't know.
3    Q.   Do you know what time you got back to
4    the Area?
5    A.   I don't know.
6    Q.   Does it say anywhere in Exhibit 4 what
7    time you got back to the Area?
8    A.   I doubt it.
9         I don't see any.
10   Q.   Does it say anywhere in that exhibit
11   what time the phone call came in?
12   A.   I don't see any.
13   Q.   Does it say anywhere what time you went
14   to Dunbar?
15   A.   I don't see any.
16   Q.   What happened upon your return to
17   Area 1?
18   A.   The defendant was placed -- was put in
19   a room.  I don't remember if it was -- I don't
20   remember what room it was.  And at some point,
21   Cassidy went in to interview him.
22   Q.   By "the defendant," you mean McCoy?
23   A.   Yes.
24   Q.   Okay.  How long after getting back to

239

1    Area 1 was he interviewed?
2    A.   I don't know.
3    Q.   And does it say anywhere in that
4    report, Exhibit 4?
5    A.   How long after we got back?  It doesn't
6    say when we got back, so no, I don't think so.
7    Q.   Does it say when he started, he was
8    interviewed?
9    A.   No.
10   Q.   What did you do personally when you got
11   back to Area 1?
12   A.   I don't know.
13   Q.   Do you have any way to refresh your
14   recollection about that?
15   A.   No.
16   Q.   Did you participate in an interview of
17   McCoy?
18   A.   No.
19   Q.   Did you give McCoy his Miranda rights
20   when you returned to the Area?
21   A.   I doubt it.
22   Q.   Did Cassidy?
23   A.   I don't know.
24   Q.   Did anyone in your presence?

240



1    A.   I doubt it.
2    Q.   And why do you say that?
3    A.   Because I don't remember.  Besides
4  McCoy being called into the room and McCoy
5  making a statement to me, I don't recall being
6  there at the beginning when Miranda would have
7  been given.  So no, I don't think so.
8    Q.   Whose decision was it to interview
9  McCoy?
10   A.   Huh?
11   Q.   Whose decision was it to interview
12 McCoy in this case?
13   A.   I don't know.
14   Q.   Was it Cassidy's?
15   A.   I don't know.
16   Q.   Was it your decision?
17   A.   It wasn't my decision.
18   Q.   The purpose of going to get McCoy at
19 Dunbar was to bring him back for questioning,
20 correct?
21   A.   Yes.  I believe so.
22   Q.   Whose decision was it to go and get him
23 and bring him back for questioning?
24   A.   I don't know.

                                              241

1    Q.   Did you, Cassidy, and Daly discuss a
2  plan about how he was going to be questioned?
3    A.   No.
4    Q.   Did you discuss a plan about what
5  questions were going to be asked?
6    A.   No.
7    Q.   Did you have any idea what Cassidy was
8  going to ask him when he brought him in for
9  questioning?
10   A.   No.
11   Q.   Did you discuss anything about McCoy's
12 interview with Cassidy prior to it taking place?
13   A.   No.
14   Q.   Was he interviewed --
15   A.   Let me back that up.  I highly doubt
16 it.  I don't remember, but I highly doubt it.
17   Q.   And why do you say you highly doubt it?
18   A.   Because Cassidy was a one-man -- he
19 worked by himself.
20   Q.   McCoy, was he kept in the general
21 office area for any of point in time at the
22 Area?
23   A.   What is the general office area?
24   Q.   Where all the desks were.

                                              242

1    A.   I don't know.
2    Q.   Was he interviewed in one of the
3  interview rooms you drew earlier?
4    A.   I don't know.  I seem to remember
5  reading something like he was interviewed in an
6  office, but I don't know.
7    Q.   Were the interview rooms, I think I
8  don't remember if you said, do they have benches
9  in them?
10   A.   The interview rooms did.
11   Q.   Did they have rings in the wall where
12 suspects could be handcuffed?
13   A.   I'm pretty sure they did.
14   Q.   Was McCoy handcuffed when he was put in
15 the interview room?
16   A.   I'm pretty sure he was not.
17   Q.   And why do you say that?
18   A.   Because I don't believe he was ever
19 handcuffed, at least not in the Dunbar to the
20 Area, Cassidy interview, me coming in hearing
21 his statement process.
22   Q.   And what makes you say that?
23   A.   Because he came in on his own.  And, I
24 mean, I don't know if it would be good business

                                              243

1  when someone is telling you what happened to
2  slap cuffs on them, because they would stop
3  telling you what happened.  So I highly doubt
4  it.
5    Q.   At some point, you were in the
6  interview room with Cassidy and McCoy, correct?
7    A.   Or an office.
8    Q.   And at what point in the interview did
9  you go in the room with them?
10   A.   I believe the interview was --
11 Cassidy's interview with him was over with when
12 I was called in.
13   Q.   You believe you were called in after
14 the interview was concluded?
15   A.   Correct.
16   Q.   And what makes you say that?
17   A.   Because I think, if my memory serves me
18 correct, Cassidy was -- said something about
19 "Come in and hear this person's statement."
20   Q.   Was Daly with you then?
21   A.   What do you mean, was he with me?
22   Q.   When --
23   A.   Did he come into the school with us?
24   Q.   Let me step back.  Where were you when

                                              244

1  Cassidy said, "Come in here and hear this
2  person's statement"?
3      A.  I don't know.  I think, somewhere on
4  the floor.
5      Q.  Okay.  Did he ask Daly to come in too?
6      A.  No.  I think he just asked me.
7      Q.  Do you know why he just asked you?
8      A.  Do I want to speculate?
9      Q.  Sure.
10     A.  Because I was black.
11     Q.  I don't -- What does that have to do
12  with anything?
13     A.  I don't know.  I just think it was
14  favorable.
15     Q.  Okay.  Do you think Cassidy was trying
16  to make Troshawn McCoy more comfortable?
17     A.  In repeating his statement?  No.  I
18  think -- I think the long game, Cassidy was
19  thinking about the long game.
20     Q.  Which was what?
21     A.  A black offender, white investigators.
22  I guess -- This is all speculation.
23     Q.  What's your speculation based on?
24     A.  Chicago.

245

1      Q.  Is that a typical Chicago practice?
2      A.  I don't know.
3      ATTORNEY BENJAMIN:  Form.
4      ATTORNEY MEADOR:  Object to form.
5      THE WITNESS:  I don't know.  I couldn't tell
6  you.
7  BY ATTORNEY VAN BRUNT:
8      Q.  Is that a practice that in your
9  experience has been used?
10     ATTORNEY MEADOR:  Same objection.
11     THE WITNESS:  I don't know.
12  BY ATTORNEY VAN BRUNT:
13     Q.  When you say "the long game," are you
14  referring to a hearing in a courtroom?
15     A.  Correct.
16     Q.  Okay.  Do you believe that Jim Cassidy
17  was anticipating that the interview with McCoy
18  would lead to an hearing in a courtroom?
19     ATTORNEY BENJAMIN:  Objection:  Calls for
20  speculation.
21     ATTORNEY MEADOR:  Join.
22     THE WITNESS:  Seeing as he just admitted that
23  he was involved in a double murder and
24  implicated three other people, yeah, Cassidy

246

1  probably did think it was going to go to trial.
2  BY ATTORNEY VAN BRUNT:
3      Q.  Do you think he anticipated a motion to
4  suppress?
5      A.  That's a bigger long game than I was
6  talking about.
7      Q.  What was McCoy's demeanor when he went
8  in the room?
9      A.  I don't recall.
10         Well, I sort of like -- just like,
11  what's the word -- I don't recall.  I want to
12  say like a kid -- like a kid who is admitting
13  that he broke something.  But I don't recall.  I
14  don't really recall.
15     Q.  Did he seem scared?
16     A.  No.  But again, I'm going to go
17  backwards and say I don't really recall.  But I
18  don't think he was scared.
19     Q.  What makes you think he wasn't scared?
20     A.  Because I don't remember seeing visible
21  signs of him being scared.  But it was a serious
22  thing; so like I said, I don't know.
23     Q.  How did you find out that he had
24  confessed to the crime?

247

1      A.  When he told his statement to me.
2      Q.  Did Cassidy tell you he had confessed
3  before that?
4      A.  He said -- The way I remember it,
5  "Dwayne, come in here and listen to this
6  statement."
7      Q.  And where was McCoy at the time you
8  came into the room?  Was he on the bench?
9      A.  If it was a, what do you call it, an
10  interview room.  But I think it was an office.
11  But I'm not positive.
12     Q.  Was he sitting?
13     A.  When he made his statement, I believe
14  he was.
15     Q.  And you're sure he wasn't handcuffed?
16     A.  I'm pretty sure, yeah.
17     Q.  And where was Cassidy when you entered
18  the room?
19     A.  He entered with me.
20     Q.  Where did Cassidy go once you entered
21  the room; sit, stand?
22     A.  I don't think the room was that huge.
23  But I think he stood beside me.
24     Q.  Were you standing the whole time?

248



1    A.   I think I was.  I'm not positive.
2    Q.   Did you have your gun on you at that
3  point?
4    A.   I'm pretty sure.
5    Q.   Did you have your baton on you?
6    ATTORNEY MEADOR:  Objection:  Asked and
7  answered.
8    THE WITNESS:  No.
9  BY ATTORNEY VAN BRUNT:
10    Q.   Did you talk at all during the
11  subsequent interview?
12    A.   I don't think so.
13    Q.   Did Cassidy?
14    A.   Subsequent statement?  No.  I did not
15  talk.
16    Q.   Did Cassidy say anything?
17    A.   He must have said something.  I'm
18  assuming he said something along the lines, Can
19  you tell this detective what you told me.  But I
20  don't -- I don't know.
21    Q.   And what -- Did McCoy give a statement?
22    A.   He did tell me something.
23    Q.   And what did he tell you?
24    A.   That I remember?

249

1    Q.   That you remember.
2    A.   Absolutely -- I don't remember
3  absolutely nothing.
4    Q.   Okay.  Did you take any notes?
5    A.   Well, I shouldn't say that.  I do
6  remember -- I do remember that he said something
7  that showed his involvement in the crime and
8  that there were multiple people, he named other
9  people involved in the crime.  I do know that
10  much, that when I left out there was stuff --
11  there were people to try to check up on, I
12  think.  And there was stuff -- You know, he gave
13  us some information.  I do remember that much.
14    Q.   Is --
15    A.   Now, I'm talking about off the top of
16  my head, not refreshed.
17    Q.   And did you say that he gave you some
18  information that showed he was involved in the
19  crime?
20    A.   One more time.
21    Q.   Did you say he gave you information to
22  show he was involved in a crime?
23    A.   Gave information that indicated he was
24  involved in the crime.

250

1    Q.   Okay.  And what information was that?
2    A.   I think -- I think his involvement was
3  that he was -- or I think he said he was a
4  lookout or something.
5    Q.   And again, at this point in time,
6  you're unaware how the two victims were
7  murdered, correct?
8    A.   You mean back in '95?
9    Q.   Yeah.
10    A.   I don't know.
11    Q.   Well, do you believe you had knowledge
12  about how they were murdered at the time you
13  were sitting in the McCoy interview room?
14    A.   Well, after he said they were shot?
15    Q.   Prior to him giving that information.
16    A.   I don't know.
17    Q.   Do you believe that you had information
18  about how the victims' bodies were found at that
19  point in time?
20    A.   By who or what position?
21    Q.   What position they were found in.
22    A.   I believe I didn't have any knowledge
23  of that.
24    Q.   Did you have information as to what

251

1  time the -- what time the perpetrators entered
2  the car lot and shot the victims?
3    A.   We're talking about prior to ...
4    Q.   McCoy giving his statement.
5    A.   His statement.  I believe -- I don't
6  know.  I don't know if I knew, I had heard what
7  time the murder occurred.  I believe -- I don't
8  know.
9    Q.   Were you familiar with any eyewitness
10  statements about how the murders had occurred
11  prior to McCoy giving the statement?
12    A.   I don't believe I was.
13    Q.   Did you know prior to McCoy giving his
14  statement what, if anything, had been stolen
15  from the car lots?
16    A.   I don't know.
17    ATTORNEY BOWMAN:  Is this a breaking point?
18    ATTORNEY VAN BRUNT:  Sure.  We can take a
19  quick break.
20    THE VIDEOGRAPHER:  This ends Disk 3.  Now
21  going off the record at 2:50 p.m.
22             (whereupon, a short break was
23             taken.)
24    THE VIDEOGRAPHER:  This begins Disk 4.  Now

252

1 going back on the record at 3:09 p.m.
2 BY ATTORNEY VAN BRUNT:
3    Q.   How long were you in the room with
4 McCoy and Cassidy?
5    A.   I don't recall.  I would think a few
6 minutes.
7    Q.   And again, you didn't take any notes
8 while you were in that room?
9    A.   Correct.
10    Q.   Was Cassidy taking notes?
11    A.   When I was in the room?
12    Q.   Yes.
13    A.   I don't know.
14    Q.   Would it have been proper procedure for
15 him to have done so?
16    A.   I don't know.
17    Q.   Did he ever show you any notes he took
18 from an interview with Troshawn McCoy?
19    A.   I don't know.  I doubt it.
20    Q.   Did McCoy say anything to you while you
21 were in the room with him?
22    A.   Besides his statement?
23    Q.   Yeah.  Did he make any comment to you?
24    A.   Besides his statement?

253

1    Q.   Correct.
2    A.   I don't recall.
3    Q.   Can you say anything that McCoy said to
4 you personally on December 5th sitting here
5 today?
6    A.   Besides his statement?
7    Q.   Yes.
8    A.   I don't recall him saying anything
9 besides his statement.
10    Q.   Can you say anything -- Focusing back
11 on Dunbar, can you say anything that Cassidy
12 said to McCoy sitting here today?
13    A.   No.
14    Q.   Can you say anything about what Daly
15 said to McCoy at Dunbar sitting here today?
16    A.   No.
17    Q.   Can you say anything about what you
18 said to McCoy in the car, if anything, on the
19 way back from Area 1 sitting here today [sic]?
20    A.   Besides I think I probably didn't say
21 anything to him?  No.
22    Q.   Can you say anything about what Cassidy
23 said to McCoy in the car ride back to Area 1
24 from Dunbar sitting here today?

254

1    A.   No.  And I highly doubt he said
2 anything in the car.
3    Q.   Is it your belief that it was
4 completely silent the entire way back?
5    A.   Yes.
6    Q.   And why do you say that?
7    A.   Generally, that's how it was.
8    Q.   Back then?
9    A.   Yes.
10    Q.   But you have no specific recollection
11 of what was said, if anything, in this case?
12    A.   Correct.
13    Q.   Do you have any specific recollection
14 of whatever Cassidy said to Troshawn McCoy when
15 you were in the room with him back at Area 1?
16    A.   No, except something along the lines,
17 Could you tell the detective what you told me.
18    Q.   Anything else?
19    A.   No.
20    Q.   Did Daly ever talk to McCoy to your
21 knowledge?
22    A.   I don't know.
23    Q.   Do you have any recollection of Daly
24 saying anything to McCoy on December 5th?

255

1    A.   I have no recollection.
2    Q.   And McCoy gave a statement in your
3 presence, correct?
4    A.   Yes.
5    Q.   What happened after he gave the
6 statement?
7    A.   I don't recall, but I think that we
8 left the room, and then we started working on
9 getting information about the people that he had
10 named.
11    Q.   How much time passed between when McCoy
12 arrived at the station and when he gave the
13 statement?
14    A.   I don't know.
15    Q.   Is that written anywhere?
16    A.   I don't know.
17    Q.   Should it have been?
18    ATTORNEY BENJAMIN:  Object to form.
19    THE WITNESS:  I can tell you what I do now.
20 BY ATTORNEY VAN BRUNT:
21    Q.   What do you do now?
22    A.   I try to write times down generally.
23    Q.   And why is that important?
24    A.   I don't know.  I just thought that's

256

1  the way it should be.
2      Q.   Fair to say that it's important to
3  detail all time lines in a major investigation?
4      ATTORNEY BENJAMIN:  Object to form.
5      ATTORNEY MEADOR:  Join.
6      THE WITNESS:  Fair to say that in me trying
7  to do my job effectively, I try to jot down as
8  many times about different things as possible.
9  BY ATTORNEY VAN BRUNT:
10     Q.   How many statements did McCoy give
11 while he was in custody?
12     A.   I don't know.
13     Q.   After you left the room, did McCoy stay
14 there?
15     A.   I don't know.
16     Q.   Who was in charge of McCoy at that
17 point?
18     ATTORNEY BENJAMIN:  Object to form.
19     ATTORNEY MEADOR:  Join.
20     THE WITNESS:  I don't know if anybody was in
21 charge of him.  I don't know what you mean by
22 that.
23 BY ATTORNEY VAN BRUNT:
24     Q.   Well, was he just left in the room?

257

1      A.   I don't know what happened to him.
2      Q.   If he needed to use the restroom, what
3  would he do?
4      A.   He would have told somebody.
5      Q.   Who would he have told?
6      A.   Whoever he saw, I guess.
7      Q.   Was somebody in charge of making sure
8  he had something to eat?
9      A.   I don't know.
10     Q.   Was someone in charge of making sure he
11 was able to use the restroom?
12     A.   You're asking questions, that it's not
13 how it is.  But I would think if he needed to
14 use the restroom, seeing that we brought him
15 there, it would probably the first person --
16 first people would be us.
17     Q.   To your recollection, did he ask to use
18 the restroom ever?
19     A.   I don't recall.
20     Q.   Did he ever ask for food?
21     A.   I don't recall.
22     Q.   Did you ever provide him with food?
23     A.   I don't recall and don't think so.
24     Q.   Did Cassidy?

258

1      A.   I don't know.
2      Q.   Did the interview rooms at Area 1 lock
3  from the outside?
4      A.   The interview rooms did.
5      Q.   What about the offices?
6      A.   I don't think they did.  I'm not sure.
7      Q.   What was the general practice in '95 if
8  you had a suspect in the Area, would you lock
9  them in the room if an officer wasn't in with
10 them?
11     ATTORNEY MEADOR:  Can you read the question
12 back, please.
13          (whereupon, the record was read
14           as requested.)
15     ATTORNEY MEADOR:  Objection as to form and
16 calls for speculation.
17     ATTORNEY BENJAMIN:  Object to foundation.
18     THE WITNESS:  "Room" being office or
19 interview room?
20 BY ATTORNEY VAN BRUNT:
21     Q.   Wherever they were being held.
22     A.   Depended.  I don't really think offices
23 could be locked.  Interview rooms did have
24 locks, or a sliding bolt I think is more

259

1  accurate.
2      Q.   Do you have any knowledge as to whether
3  McCoy was locked in a room after you left him?
4      A.   I don't.
5      Q.   What time was Troshawn McCoy put under
6  arrest?
7      A.   I don't know.
8      Q.   Was he arrested in your presence?
9      A.   McCoy was Dunbar?
10     Q.   Yes.
11     A.   So no.
12     Q.   He was not arrested in your presence?
13     A.   No.
14     Q.   Did you ever read Troshawn McCoy his
15 Miranda rights?
16     A.   I don't think so.  I don't know, but I
17 don't think so.
18     Q.   Do you have any recollection of anybody
19 reading his Miranda rights to him in your
20 presence?
21     A.   I do not.
22     Q.   This is going to be Exhibit 9.
23     ATTORNEY MEADOR:  Is this 8?
24     THE COURT REPORTER:  No, 8 was the drawing.

260



1    ATTORNEY MEADOR:  Oh, the drawing.  I have to
2  make a note.
3           (Whereupon, Davis Deposition
4            Exhibit No. 9 was marked for
5            identification.)
6  BY ATTORNEY VAN BRUNT:
7    Q.   For the record, this is Bates numbered
8  City 29, arrest report of Troshawn McCoy.  Have
9  you seen Exhibit 9 before, sir?
10   A.   I think I have.
11   Q.   When is the last time you saw it?
12   A.   I don't know.
13   Q.   Is that Cassidy's signature to your
14  knowledge in the bottom left-hand corner?
15   A.   I don't know.
16   Q.   Did you write this report?
17   A.   I don't know and don't think so.
18   Q.   Why do you not think so?
19   A.   Because I don't recall my -- as we went
20  over, my independent recollection of what -- of
21  me doing on the case was very limited, and this
22  wasn't part of it.
23   Q.   And I'm sorry if I asked this already,
24  but you don't believe you wrote any reports in

261

1  this case; is that correct?
2    A.   That's correct.
3    Q.   And your name is on here as the second
4  arresting officer, correct?
5    A.   Yes.
6    Q.   And why are you listed as that?
7    A.   I didn't author it, so I don't know.
8    Q.   Okay.  There are a list of officers
9  where it says Arresting Officers Continued.  Do
10  you see that?
11   A.   I do.
12   Q.   And it says Daly, Posluzny, Rajkovich,
13  Ryan, G. S. J. Bloore, and T. Richardson,
14  correct?
15   A.   Correct.
16   Q.   Do you know why those officers are
17  listed there?
18   A.   I do not.
19   Q.   Daly went with you and Cassidy to
20  Dunbar to get McCoy, correct?
21   A.   Correct.
22   Q.   Do you have any idea what Posluzny did
23  in this case?
24   A.   No.

262

1    Q.   Rajkovich?
2    A.   I do not.
3    Q.   Was Ryan at all involved in arresting
4  Troshawn McCoy?
5    A.   At Dunbar, no.
6    Q.   Was he involved in putting him under
7  arrest back at Area 3 to your knowledge?
8    A.   Area 1.
9    Q.   Sorry.  Area 1 to your knowledge?
10   A.   I don't have any knowledge.
11   Q.   Did you ever see Ryan interacting with
12  McCoy?
13   A.   I don't recall seeing it.
14   Q.   What about Bloore, did you ever see
15  Bloore interacting with McCoy?
16   A.   I don't exactly remember who Bloore is,
17  so I don't know.
18   Q.   Richardson, did you ever see him
19  interacting with McCoy?
20   A.   They are combined in my mind, so I
21  don't know.
22   Q.   So on the date of arrest here, is
23  December 5th, 1995, and the time is 1500 or
24  3:00 o'clock.  Was Troshawn McCoy arrested at

263

1  3:00 o'clock to your knowledge?
2    A.   You're seeing what I see.
3    Q.   Okay.  So you have no way to say one
4  way or another what time he was put formally
5  under arrest, correct?
6    A.   No.
7    Q.   Again, because you weren't there when
8  it happened?
9    A.   Correct.
10   Q.   Do you know who formally arrested him?
11   A.   I do not.
12   Q.   Pardon?
13   A.   I do not.
14   Q.   Do you assume it's Cassidy based on
15  this report?
16   A.   I try to make no assumptions.
17   Q.   Was it general practice in 1995 for the
18  arresting officer to issue and write the arrest
19  report?
20     ATTORNEY BENJAMIN:  Object to foundation.
21     THE WITNESS:  I can say -- tell you in the
22  '90s that if I was the arresting officer, I
23  would generally, either me or my partner would
24  do the arrest report.

264

BY ATTORNEY VAN BRUNT:

Q. Got it.

Now, up there up on the top of this, I think it's Box 24, it says that Troshawn McCoy went to DuSable High School; do you see that?

A. DuSable; yes, I do. I do see that.

Q. He did not go to DuSable High School, correct?

A. I don't know. I do believe that it was Dunbar we went to.

Q. Do you know why it says DuSable here?

A. I do not.

Q. Have you ever been to DuSable?

A. I think I played basketball in high school at DuSable too.

Q. Did you ever go to DuSable High School in the course of your work as a Chicago Police officer?

A. Nothing jumps off the page that I remember.

Q. Did anyone working on the Ibrahim Ali case ever go to DuSable High School as part of the investigation?

A. I don't know.

265

Q. Do you know anything about the connection between DuSable High School and this case?

A. I do not.

Q. This says that McCoy's gang affiliation is GD. Do you see that underneath Also Arrested in the narrative box?

A. Oh, okay. Yes.

Q. Were you aware at the time that McCoy was in Area 1 custody that he was a Gangster Disciple?

A. I don't recall.

Q. Did you have any knowledge at the time that he was a Gangster Disciple?

A. I don't recall.

Q. Did you have any knowledge at the time you were assisting in the case as to the gang affiliation of any of the suspects in the case?

A. I don't recall.

Q. Do you recall any discussions about the suspects' gang affiliation in the case?

A. I don't recall.

Q. Do you agree this arrest report does not say anything about what McCoy confessed to

266

in the narrative, correct?

ATTORNEY MEADOR: Objection: Mischaracterizes the exhibit.

BY ATTORNEY VAN BRUNT:

Q. Well, let me restate that. You'll agree that the narrative of the arrest report does not have details about what McCoy confessed to on December 5th?

ATTORNEY BENJAMIN: Object to form.

THE WITNESS: I would say that I do not see anywhere in the arrest report any detail about his statement.

BY ATTORNEY VAN BRUNT:

Q. Did Troshawn McCoy -- We already established that no Miranda rights were given to him in your presence, correct?

ATTORNEY BENJAMIN: Objection: Form. Mischaracterizes testimony.

BY ATTORNEY VAN BRUNT:

Q. Is that correct?

A. I don't think so. I think I said I didn't, and I don't know if they were.

Q. Do you have any recollection of anybody giving him his Miranda rights in your presence?

267

A. No. I don't have any recollection.

Q. Do you have any recollection of him waiving his Miranda rights in your presence?

A. No. I don't have any recollection.

Q. Is there anything that would refresh your recollection on that point?

A. No.

Q. Did you do anything to investigate the veracity of McCoy's statement that he gave in your presence on the 5th?

ATTORNEY MEADOR: Objection: Form.

THE WITNESS: Veracity?

BY ATTORNEY VAN BRUNT:

Q. Did you do any follow-up investigation about the facts that were provided by McCoy in his statement?

A. It did -- His statement did cause a string of events.

Q. And we'll definitely talk about those. I'm just wondering if you did any independent investigation yourself.

A. Outside of the police department?

Q. Well, no. Within the police department, did you conduct any investigation of

268

1  the facts that McCoy confessed to on December
2  5th?
3      A.  I'm not sure what you're asking because
4  I've already said that I went and assisted in
5  the arrest of another subject.  So are you --
6  what specifically are you asking, trying to get
7  out of me?  I don't understand.
8      Q.  I'm not trying to get anything out of
9  you.  I'm just trying to understand what else
10  you did in the case.  You went and arrested
11  LaShawn Ezell, correct?
12     A.  Yes.
13     Q.  Did you do any other investigation
14  related to McCoy's statement?
15     A.  I don't recall.
16     Q.  Did McCoy ever offer an alibi for the
17  night of the crime in your presence?
18     A.  No.  I don't believe so.
19     Q.  Did you ever ask him for his alibi?
20     A.  No, I did not.
21     Q.  Did Cassidy in your presence?
22     A.  I don't believe so, not in my presence.
23     Q.  Did a discussion of McCoy's whereabouts
24  on the night of the crime ever come up in any

269

1  context?
2      A.  Besides he said he was looking out as
3  two people were murdered, no.
4      Q.  What did you do-- We started talking
5  about this, but what's the first thing you did
6  after the McCoy statement?
7      A.  I don't know.
8      Q.  Did you ever discuss with Cassidy
9  writing down what McCoy said?
10     A.  I don't know, and I doubt it.
11     Q.  And why do you say that?
12     A.  Because it was Cassidy's.  It was his
13  interview.
14     Q.  So at this point in the investigation,
15  you had not taken a single note about your
16  assistance on the case, correct?
17     A.  There is a GPR out there that I saw
18  during prep that looked like it had my scribble
19  on it.  I just don't know when I scribbled it on
20  there.  And it looks like it's something in
21  reference -- I don't know.  I don't even
22  remember what the scribble said.  So there's
23  some scribble that looks like it's mine on one
24  of the GPRs, but I couldn't tell you when I did

270

1  it.
2      ATTORNEY BENJAMIN:  There was already a
3  marked group of GPRs.
4      ATTORNEY VAN BRUNT:  So this is the question
5  I have for you.  Do we want to -- If I have
6  questions about individual GPRs that were marked
7  as a group, should I pull out the GPR or keep it
8  as a group?
9      ATTORNEY BENJAMIN:  I find it easier to keep
10  them all separate.  I think it's clearer.
11     ATTORNEY VAN BRUNT:  I think they were marked
12  as GPRs that Tuider had signed.  So they had a
13  specific grouping that I think --
14     ATTORNEY BENJAMIN:  If that was the intent, I
15  don't think it was all of them.
16     ATTORNEY VAN BRUNT:  Then I'm going to mark
17  it separately.
18     ATTORNEY BENJAMIN:  I think that's best.
19     ATTORNEY VAN BRUNT:  So this will be
20  Plaintiff's Exhibit 10.
21          (whereupon, Davis Deposition
22           Exhibit No. 10 was marked for
23           identification.)
24  BY ATTORNEY VAN BRUNT:

271

1      Q.  So this is Plaintiff's Exhibit 10,
2  Bates numbered CCSAO MP4 016862.
3          Is this the GPR to which you were just
4  referring, sir?
5      A.  Yes.
6      Q.  All right.  What -- It looks like it's
7  signed by Luke Daly; is that correct?
8      A.  Yes.
9      Q.  Is that his signature?
10     A.  Looks familiar.
11     Q.  All right.  What on here is your
12  handwriting?
13     A.  Okay.  So at the bottom where it says
14  "Constance Ezel Harper [High School]," maybe
15  even "Hispanic," and then "Ezell LaShawn Lashon
16  Ezzel [grandma] Jacquell 7316 S. Claremont
17  434-8351 2 Jan 80," that looks like me.  And
18  then we go up and off to the right, "Aunt
19  Bernadette Mc-" something, "374 8133" also
20  looks like me.
21     Q.  Anything else look like your
22  handwriting on here?
23     A.  No.
24     Q.  Okay.  Whose handwriting is it?

272



1    A.    The other stuff?
2    Q.    Yes.
3    A.    I don't know.
4    Q.    Does it look like Daly's handwriting?
5    A.    I don't know his handwriting well
6 enough to say.
7    Q.    Sitting here today, do you have a
8 recollection of where any of the phone numbers
9 on this GPR match to?
10   A.    No.
11   Q.    Who is Aunt Bernadette?
12   A.    I don't know.
13   Q.    When did you write these notes that you
14 just assessed as being yours?
15   A.    The date put on as the 5th of December,
16 I have no reason to believe that that wasn't the
17 date.
18   Q.    Do you know when on the day?
19   A.    No.  But -- So I'm assuming after
20 McCoy -- after McCoy made his statement.
21   Q.    And why are you assuming that?
22   A.    Because I think it looks like at least
23 the scribble I put down was in reference to what
24 he said, some of the information that he said.

273

1    Q.    Okay.  Do you see how this GPR seems to
2 be split in half with a line through the middle?
3    A.    Yes.
4    Q.    Do you know why that is?
5    A.    I do not.
6    ATTORNEY CAMPBELL:  Ask what date does he
7 read that to be.
8 BY ATTORNEY VAN BRUNT:
9    Q.    The date of this report, do you know
10 what that says at the top right-hand corner?
11   A.    I took it to be 5th, 5, but I guess
12 that could be 6 too.
13   Q.    Got it.
14   A.    6 December.
15   Q.    So is it fair to say that the notes you
16 described here are the sum total of the notes
17 you wrote in this case?
18   A.    I don't know.  I don't know.
19   Q.    Have you ever seen any other notes that
20 you wrote other than these?
21   A.    No.
22   Q.    Do you have any belief that you wrote
23 other notes other than these?
24   A.    No.

274

1    Q.    So agree that it seems you took notes
2 about LaShawn Ezell on this GPR?
3    A.    I definitely wrote his name.
4    Q.    And where did the name come from?
5    A.    I don't know.
6          Well, I'm assuming it came from McCoy.
7    Q.    And why are you assuming that?
8    A.    Because I know that he named
9 codefendants.
10   Q.    All right.  And Harper High School, is
11 that where Ezell went?
12   A.    I don't know.
13   Q.    Do you know who Constance Ezell is
14 sitting here today?
15   A.    I do not.
16   Q.    And because there are multiple
17 spellings of Ezell, is that presumably because
18 you didn't know the true spelling of his name at
19 the point you wrote these notes?
20   A.    I don't know.
21   Q.    Did you ever use any threats against
22 Troshawn McCoy when you were in the room with
23 him?
24   A.    No.

275

1    Q.    Did anybody in your presence?
2    A.    No.
3    Q.    And how do you know that?
4    A.    I know that I did not issue any threats
5 because I've never threatened anyone in custody.
6 And I can reasonably say that no one has ever
7 done it in my presence.
8    Q.    Can you say for certain that Jim
9 Cassidy did not threaten Troshawn McCoy in your
10 presence?
11   A.    Yes.
12   Q.    Because if he had, you would have
13 written a report about it?
14   A.    I would have did something.
15   Q.    What would you have done?
16   A.    I don't know.
17   Q.    Would you have reported him to your
18 sergeant?
19   ATTORNEY BENJAMIN:  Objection:  Calls for
20 speculation.
21   THE WITNESS:  I don't know.
22 BY ATTORNEY VAN BRUNT:
23   Q.    Have you ever reported another
24 detective for misconduct committed in your

276

1  presence?
2       ATTORNEY MEADOR:  Objection:  Form.
3       THE WITNESS:  All depends what your
4  definition of misconduct is.
5  BY ATTORNEY VAN BRUNT:
6       Q.   Have you ever reported a detective for
7  violating CPD policies or procedures in your
8  presence?
9       A.   Maybe.
10      Q.   Do any specific instances come to mind?
11      A.   No.  No.  But -- No.  I say maybe
12  because I'm not one to tolerate much
13  shenanigans.  So maybe.
14      Q.   Has a detective ever used racist words
15  or slogans or phrases in your presence?
16      A.   No.
17      Q.   Would you have reported them had they
18  done so?
19      A.   I don't know.
20      Q.   Did you ever tell Troshawn McCoy you
21  would break his fingers if he didn't confess?
22      A.   No.
23      Q.   Did Jim Cassidy do that?
24      A.   In my presence?

277

1       Q.   Yes.
2       A.   No.
3       Q.   Did you ever tell McCoy you would beat
4  his ass if he didn't confess?
5       A.   No.
6       Q.   Did Jim Cassidy in your presence?
7       A.   No.
8       Q.   Is it possible Jim Cassidy did that not
9  in your presence?
10      A.   I don't know.
11      Q.   You can't say what he did or didn't do
12  when you weren't there, right?
13      A.   I don't know.
14      Q.   Did you swear at McCoy?
15      A.   No.
16      Q.   Have you ever sworn at a witness or
17  civilian on the job?
18      ATTORNEY MEADOR:  Objection:  Compound.
19  BY ATTORNEY VAN BRUNT:
20      Q.   Have you ever sworn at a civilian on
21  the job?
22      ATTORNEY MEADOR:  Objection:  Form.
23      THE WITNESS:  So a civilian employee,
24  probably.

278

1  BY ATTORNEY VAN BRUNT:
2       Q.   A civilian non CPD employee.
3       A.   Ever swore, probably.
4       Q.   But to be clear, you didn't swear at
5  Troshawn McCoy in this case?
6       A.   To be clear.
7       Q.   Did Cassidy in your presence?
8       A.   To be clear, no.
9       Q.   And how is it that you recall that
10  Cassidy didn't do that?
11      A.   I didn't hit him.
12      Q.   You would have hit him if he had sworn
13  at McCoy?
14      A.   Well, not hit.  Curse, curse or call
15  him a derogatory term.  Swear at him?  I don't
16  know.  I wouldn't hit him for that.
17      Q.   But if he used -- Cassidy used a
18  derogatory term, you would have hit him?
19      A.   Oh, yeah.
20      Q.   Have you had to do that before?
21      A.   People generally don't do that kind of
22  stuff around me.
23      Q.   Did anyone tell McCoy in your presence
24  that if he confessed to the double homicide he

279

1  could go home?
2       A.   No.
3       Q.   Agree that would constitute a promise
4  of leniency, right?
5       A.   I don't know.
6       Q.   Do you know what a promise of leniency
7  is?
8       A.   I know the definition, but I don't know
9  if I want to weigh in on that.
10      Q.   Well, I would like you to weigh in on
11  this.  Do you consider a promise for a suspect
12  for a double homicide that he could go home if
13  he confesses to that murder to be a false
14  promise of leniency?
15      ATTORNEY BENJAMIN:  Object to form.
16      ATTORNEY MEADOR:  Join.
17      THE WITNESS:  Again, I don't know.  It would
18  have to be -- I would not do it.  How's that?
19  That I will say.
20  BY ATTORNEY VAN BRUNT:
21      Q.   Because that would be morally wrong?
22      A.   Because it's not something I would want
23  to do.
24      Q.   And why not?

280

1    A.   I just would not.
2    Q.   If another detective did that in your
3  presence, would you take issue with that?
4    A.   Take issue?
5    Q.   Would you report it to a supervisor?
6    A.   Now?
7    Q.   Okay.  Now, would you report it?
8    A.   Luckily, I don't have to work with
9  people.  So that doesn't come up.
10    Q.   If you saw it happening now, would you
11  report it?
12    A.   I don't work with people.
13    Q.   Okay.  If you saw it happening back in
14  the mid '90s when you did work with people,
15  would you have reported it?
16    A.   I don't know.
17    Q.   Is it something that should have been
18  reported if you saw it?
19    ATTORNEY BENJAMIN:  Object to form.
20    ATTORNEY MEADOR:  I'm going to object as to
21  speculation and incomplete hypothetical.
22  BY ATTORNEY VAN BRUNT:
23    Q.   If you saw a detective in your presence
24  offer a suspect a false promise of leniency,

                                              281

1  should that have been reported?
2    A.   I don't know.  It depends on exactly
3  what's said.
4    Q.   If you saw a suspect in a double
5  homicide who was -- who had given a statement to
6  that homicide being offered a false promise of
7  leniency, should that have been reported?
8    A.   Again, it depends upon what exactly was
9  said.
10    Q.   Did anyone use any violence against
11  McCoy at all in your presence?
12    A.   In my presence, no.
13    Q.   Did anyone strike him?
14    A.   No.
15    Q.   Did anyone throw him against a wall?
16    A.   No.
17    Q.   Did anyone threaten to strike him?
18    A.   No.
19    Q.   Did you ever strike a baton on the
20  table when McCoy was being questioned at Area 1?
21    A.   Me?
22    Q.   Yes.
23    A.   No.
24    Q.   Did Cassidy?

                                              282

1    A.   While in my presence?
2    Q.   Correct.
3    A.   No.
4    Q.   Did any officer do that in your
5  presence?
6    A.   No.
7    Q.   Have you ever threatened to strike
8  someone in the course of your job as a police
9  officer?
10    ATTORNEY MEADOR:  Can you read the question
11  back, please.
12        (whereupon, the record was read
13         as requested.)
14    ATTORNEY MEADOR:  Objection:  Form.
15    THE WITNESS:  Yes.
16  BY ATTORNEY VAN BRUNT:
17    Q.   On what occasion?
18    A.   This guy was about to spit on me.
19    Q.   When was that?
20    A.   I was in Patrol.  20 -- 28 years ago,
21  27.
22    Q.   What did you say to him?
23    A.   "If you spit on me, I'm going to hit
24  you," something like that.

                                              283

1    Q.   Did he spit on you?
2    A.   He did not.
3    Q.   Have you ever threatened to strike
4  someone other than that occasion?
5    A.   No.  Spitting was my line.
6    Q.   Have you ever physically struck someone
7  in the course of your job as a police officer?
8    A.   Struck someone?
9    Q.   Correct.
10    ATTORNEY MEADOR:  Objection:  Form, and is an
11  incomplete hypothetical.
12    ATTORNEY BENJAMIN:  Form.
13    THE WITNESS:  Yes.
14  BY ATTORNEY VAN BRUNT:
15    Q.   You have physically struck someone in
16  the course of your job?
17    A.   Oh, yes.
18    Q.   How many times?
19    A.   I don't know.  I don't know.  More than
20  once, probably less than ten.
21    Q.   On what occasions have you struck
22  somebody?
23    A.   All back in Patrol days.  Had a guy
24  break my finger once.  I struck him with a shock

                                              284



1    thingy.
2        Q.    With a what?
3        A.    A stun blow.
4              I had a guy try to take my gun out my
5    holster.  I think I -- I know we wrestled.  I
6    might have hit him in his arms a couple times to
7    get his hand off my gun.
8              I was once talking to this kid with my
9    walkie-talkie -- well, I was holding him because
10   he was -- I was taking him into custody, and I
11   was talking to him on the walkie-talkie, and the
12   antenna on my walkie-talkie hit him -- poked him
13   in the eye.
14             Oh.  Guy came at me -- came at me and
15   my partner with a knife once.  I think I hit him
16   with my baton.
17             That's all that comes to mind.
18       Q.    Were you -- Did you receive any
19   internal discipline from CPD for any of those?
20       A.    The inadvertent striking of the kid
21   with the antenna of the walkie-talkie, yes.
22       Q.    What discipline did you receive?
23       A.    Initially, I think they tried to give
24   me five days, then it got reduced to three days,

                                              285

1    and then it got totally, what do you call it --
2    I think I got -- it got reversed, no time off.
3        Q.    Was that at George Armstrong High
4    School?
5        A.    No.  It wasn't a high school.  I think
6    it was a grammar school.
7        Q.    Did you ever -- A grammar school?
8        Q.    Did you ever strike anyone in the
9    course of your work as a detective?
10       A.    No.
11       Q.    Have you ever struck somebody outside
12   the course of your job as a police officer?
13       A.    Have I struck someone in my personal
14   life?
15       ATTORNEY BENJAMIN:  Objection: Relevance.
16       ATTORNEY MEADOR:  Join.
17       THE WITNESS:  Yes.
18   BY ATTORNEY VAN BRUNT:
19       Q.    How many times?
20       A.    I couldn't tell you.
21       ATTORNEY MEADOR:  Same objection.
22       THE WITNESS:  I couldn't tell you.
23   BY ATTORNEY VAN BRUNT:
24       Q.    Did you suffer any criminal

                                              286

1    consequences as a result?
2        A.    No.
3        Q.    Did you suffer any discipline by CPD as
4    a result?
5        A.    No.
6        Q.    Have you ever thrown someone against a
7    wall in the course of your job as a police
8    officer?
9        A.    Maybe the guy with the knife.  I think
10   we were in close quarters.  Maybe the guy with
11   the knife.
12       Q.    Do you recall that guy's name?
13       A.    No.
14       Q.    And what happened to him?  Was he
15   charged?
16       A.    Domestic battery.  We didn't charge him
17   with -- back then, we didn't charge folks with
18   doing stuff against the police, just the call
19   was a domestic battery.
20       Q.    Would you agree that if anyone had hit
21   McCoy while he was in custody at Area 1, that
22   would have constituted a violation of police
23   procedure?
24       A.    Depends.

                                              287

1        Q.    What does it depend on?
2        A.    What were the circumstances.
3        Q.    What are the circumstances in which
4    hitting McCoy would have been warranted and not
5    a violation of police procedure?
6        ATTORNEY BENJAMIN:  Objection:  Calls for
7    speculation.
8        ATTORNEY MEADOR:  Join.
9        THE WITNESS:  If McCoy had attacked an
10   officer, tried to disarm an officer.
11   BY ATTORNEY VAN BRUNT:
12       Q.    There's no evidence that happened in
13   this case, correct?
14       A.    There's no evidence that that happened.
15       Q.    Would you agree it would constitute a
16   violation of police procedure if anyone had
17   threatened to hit him in the police custody?
18       A.    Again --
19       ATTORNEY MEADOR:  Same objection; calls for
20   speculation.
21             Go ahead.
22       THE WITNESS:  Again, it depends on the
23   circumstances.
24   BY ATTORNEY VAN BRUNT:

                                              288

1    Q.   Do you have any knowledge whatsoever
2  what happened to McCoy after you left the room
3  in which he gave a statement?
4    A.   I know he was subsequently charged with
5  a homicide, first degree murder.  I think, I'm
6  pretty sure.
7    Q.   Did you see him after that?
8    A.   I don't recall seeing him again.
9    Q.   You didn't take him to lockup?
10   A.   I don't think so, but I don't know for
11 sure.
12   Q.   And did somebody give you instructions
13 as to what to do next on the case?
14   A.   Give me instructions?
15   Q.   Correct.
16   A.   I don't think so.
17   Q.   Did you and Cassidy have a discussion
18 about what should be done next?
19   A.   I don't think -- A discussion?  Yeah.
20 I think it was discussed what needed to be done
21 next, yes.
22   Q.   And was Daly part of that conversation?
23   A.   I think so.
24   Q.   Any other detectives at this point?

289

1    A.   No.  I don't recall.  I don't see -- I
2  don't know if anyone else would have at that
3  point, but I'm not sure.
4    Q.   And what did you discuss?
5    A.   I don't know.  If we discussed -- I'm
6  pretty sure we discussed something.  I couldn't
7  tell you.  But probably trying to get
8  information about the people that McCoy had
9  named.
10   Q.   And what information did you try to
11 gather?
12   A.   I would suspect that we were trying to
13 get, like, real names, addresses, identifiers,
14 that kind of stuff.
15   Q.   Did you in fact get that information?
16   A.   I suspect we did.
17   Q.   And what did you do after obtaining
18 that information?
19   A.   What did I do?
20   Q.   What did you personally do?
21   A.   Sat around.
22   Q.   What were you waiting for?
23   A.   I guess to be -- what was the next
24 thing that was going to happen.

290

1    Q.   And what was the next thing that
2  happened?
3    A.   I can't say it was the next thing, but
4  I know the next thing I remember is we
5  formulated -- a plan was formulated to go out
6  and arrest the codefendants, and we executed
7  that plan, "we" being members of the police
8  department.
9    Q.   And the codefendants, do you mean
10 Charles Johnson, Larod Styles and LaShawn Ezell?
11   A.   Yes.
12   Q.   Anybody else?
13   A.   Anybody else what?
14   Q.   Any other suspects that you were going
15 to pick up?
16   A.   No.  Not that I recall.
17   Q.   And who formulated this plan?
18   A.   I don't know.
19   Q.   Well, was Cassidy part of that?
20   A.   I don't know, actually.  I don't know.
21   Q.   Davis?
22   A.   That would be me.
23   Q.   Daly.  I'm so sorry.  It's been a long
24 day.

291

1        Daly?
2    A.   Yes.  He was -- Yeah.  We were still
3  working together.  He was still there.
4    Q.   What other detectives were working on
5  the case by then?
6    A.   I know for sure I think it's Bloore and
7  Ryan from the reports.  Everybody else, I'm sure
8  if Bloore, generally Bloore was there,
9  Richardson is there.  So I would assume,
10 Richardson.
11   Q.   Valadez?
12   A.   I don't remember Valadez being around,
13 but he could have been.
14   Q.   Were Fine and Coughlin back in the area
15 by that point?
16   A.   I don't know.
17   Q.   Did they participate in arresting
18 suspects?
19   A.   I don't know.
20   Q.   Did you try to make contact with any
21 witnesses to the incident prior to effectuating
22 the arrest?
23   A.   I think one of my testimonies said
24 something about that.  But I don't recall that.

292



1    Q.    You have no recollection of calling any
2  witnesses?
3    A.    No.
4    Q.    Or going to find any witnesses?
5    A.    I don't have any recollection. I'm not
6  saying I didn't, but I don't remember it.
7    Q.    Sitting here today, do you have any
8  independent recollection of who were the
9  witnesses to the crime in this case?
10   A.    No.
11   Q.    And to be clear, you never talked to
12  any third party witnesses in this case?
13   A.    I said I don't have any memory --
14  memory of it.
15   Q.    Have you seen any reports indicating
16  you did so?
17   A.    I saw that I think that I tried -- I
18  mean, I said something like we -- "we" could be
19  me and my partner or could be CPD. But I didn't
20  see anything indicating that I actually spoke to
21  anyone.
22   Q.    Would anything refresh your
23  recollection on that point?
24   A.    No.

293

1    Q.    So what was the plan that you all
2  formulated in terms of the arrests?
3    A.    From what I can remember, I thought we
4  hit all the places at once. But from the
5  reports, I see that wasn't the case. But I
6  guess it turned out we hit two places at one
7  time, and then we met back up again and went to
8  Johnson's place.
9    Q.    And who made that plan?
10   A.    I don't know.
11   Q.    Did you make the plan?
12   A.    I'm almost positive that I did not make
13  that plan.
14   Q.    And why is that?
15   A.    Because I wasn't making any plans.
16   Q.    Did Cassidy make the plan?
17   A.    I don't know.
18   Q.    Well, is it fair to say he had been
19  directing the action that day thus far?
20  ATTORNEY BENJAMIN:  Object to form.
21  ATTORNEY MEADOR:  Join.
22  THE WITNESS:  Yeah. I don't know.
23  BY ATTORNEY VAN BRUNT:
24   Q.    Well, he was the one who decided to go

294

1  get Troshawn McCoy?
2    A.    I don't know if he decided or if he was
3  told, but I know he went.
4    Q.    Was he the primary interviewer of
5  Troshawn McCoy?
6    A.    As far as I know, before me going in,
7  he was the only one who interviewed McCoy.
8    Q.    Did you all leave Area 1 together, all
9  the detectives who were going to make the
10  arrests?
11   A.    I don't know. I don't recall what I
12  read. But my memory is that we left -- we
13  talked before we left the Area, and then we went
14  and met somewhere else again -- and met
15  somewhere and talked, and then went to
16  residences, and then we met back up again and
17  then went to Johnson's.
18   Q.    Where did you first meet?
19   A.    Say again.
20   Q.    I think you said you met somewhere, and
21  then you went and did the rest, and then you met
22  again, and then you went to Johnson's. Did I
23  get that right?
24   A.    I don't know. Better for me to just

295

1  repeat it.
2         At the Area, we talked, and then we
3  left the Area and went somewhere else and talked
4  and met and talked.
5    Q.    Sorry to cut you off, but do you know
6  where that is, that somewhere else?
7    A.    It might be indicated in the reports.
8  I don't really remember.
9    Q.    If I say 67th and Bell does that sound
10  right? Any reason to dispute that?
11   A.    I don't have any reason to -- If it's
12  in the reports, I don't have any reason to
13  dispute it.
14   Q.    All right. And then after that, where
15  di you go?
16   A.    I think we went to -- me and Luke and
17  Ryan went to Ezell's house.
18   Q.    Got it.
19         And then you went where?
20   A.    From Ezell's house?
21   Q.    Yeah.
22   A.    Then we went to a convenience store. I
23  don't remember that, but from the reports, we
24  went to a convenience store and took Ezell into

296

1  custody.
2   Q.  You arrested him at the store?
3   A.  That's what the reports say.
4   Q.  And then you went where?
5   A.  Then we went somewhere and met up
6  again.
7   Q.  Do you know where that is?
8   A.  I do not.
9   Q.  71st and Western sound right?
10   Then where after that?
11   A.  Then to Johnson's place.
12   Q.  And then where did you go after that?
13   A.  I -- Me and, I think Bloore was in the
14  car at that point, we went back to the Area.
15   Q.  I think you said you talked prior to
16  leaving the Area with the other detectives.
17  What did you discuss?
18   A.  I can't recall.  I mean, I'm assuming,
19  you know, we're going here, then we're going
20  there do this, and then we're going to do that.
21  Something like that.
22   Q.  At the point you all left Area 1, had
23  everyone then working on the case been briefed
24  as to what McCoy had stated?

297

1   A.  I don't know.
2   Q.  Did you fill in Daly about what McCoy
3  had stated?
4   A.  I don't know.  I'm sure -- He's my
5  partner.  I would assume that he knew.
6   Q.  Do you agree it would have been
7  important for everyone working the case to know
8  the developments in the case prior to arresting
9  suspects?
10   ATTORNEY BENJAMIN:  Objection:  Form.
11   ATTORNEY MEADOR:  Join.
12   THE WITNESS:  I think it's important to know
13  if probable cause exists.
14  BY ATTORNEY VAN BRUNT:
15   Q.  And what was the probable cause for the
16  three suspects' arrest?
17   A.  That McCoy had implicated them.
18   Q.  Got it.
19   So McCoy's statement provided the
20  probable cause to arrest Styles and Johnson and
21  Ezell?
22   A.  I think so.
23   Q.  Does that make you believe, then, that
24  everyone was filled in on what McCoy had said

298

1  implicating them in the crime?
2   A.  I don't know.
3   Q.  Pardon me?
4   A.  I don't know.
5   Q.  You have no recollection of what was
6  said at that discussion?
7   A.  No.
8   Q.  Have you ever seen any notes about that
9  discussion?
10   A.  To tell you the truth, all this stuff,
11  I just really concentrated on -- and I can't
12  even say concentrated, just looked at what was
13  associated to me.  And everything else, I didn't
14  really -- haven't really bothered to review.
15   Q.  But you don't have an independent
16  recollection sitting here today of anything that
17  was said in that discussion?
18   A.  No.
19   Q.  Are you aware of any other evidence
20  other than McCoy's statement at the time you
21  went to do the arrests that tied those three to
22  the crime?
23   A.  No.  I'm not aware.
24   Q.  Were you aware of those three

299

1  individuals prior to arresting them?  Had you
2  ever heard their names, come across them?
3   A.  I don't believe so.
4   Q.  Did you know anything about them at the
5  time you went out to the arrest them?
6   A.  I don't know what we found that day.
7  I'm sure whatever information we found out about
8  them that day.
9   Q.  Okay.  Had you found their rap sheets?
10   A.  I don't know.
11   Q.  Had you learned their family members'
12  names?
13   A.  I don't know.
14   Q.  Is that something you typically would
15  have done in that time period prior to arresting
16  a suspect?
17   A.  I don't know.  I mean, depends.  It's
18  no set policy.  It would depend on the
19  circumstances.
20   Q.  Well, you obviously knew where they
21  lived, correct?
22   A.  Obviously.  We had -- We knew somewhere
23  to start at least.
24   Q.  And how did you find out that

300

1  information?
2      A.  I don't know.
3      Q.  So where would you have, as a general
4  matter, found out the residence of a suspect in
5  1995?
6      A.  I don't know.
7      Q.  You just don't recall?
8      A.  I'm sure I knew then.  But without a
9  computer, I don't know what we were doing
10 without a computer.
11     Q.  Fair enough.
12         So you said you left the Area and then
13 met somewhere else to make a plan; is that
14 correct?
15     A.  I think -- I don't know why we had
16 to -- why we couldn't just -- maybe it was
17 just -- I think it was along the lines that we
18 met somewhere so that then we -- because I don't
19 think the defendants lived too far from each
20 other, and we could then zoom to both houses and
21 hit them at the same time so they didn't warn
22 each other.  But I don't really know how that
23 plays into Johnson because it seems like he
24 would have been warned.  So I don't know.

301

1      Q.  Did you have any reason to believe they
2  would warn each other?
3      A.  Except that if somebody was after me
4  and my brother, I would warn them if I could.
5  No other reason.
6      Q.  Did you have any information that those
7  three were friends at the time you went to
8  arrest them?
9      A.  Me?  No.  I didn't have any
10 information.
11     Q.  What time was it when you left the
12 Area?
13     A.  I don't know.
14     Q.  Is there any report that would refresh
15 your recollection?
16     A.  I don't know.  I can tell you it was
17 during the third watch, and I began at
18 4:00 o'clock.
19     Q.  And how do you know that?
20     A.  Because some of the guys whose names
21 are listed are afternoon people.
22     Q.  Valadez?
23     A.  Yeah.  I think he never worked days.
24 He was always afternoon.

302

1      Q.  Ryan?
2      A.  Bernie I think worked days sometimes,
3  so I don't know about Bernie.
4      Q.  Who else worked the third watch that
5  participated in the arrest?
6      A.  I want to say Bloore and Richardson,
7  but they might have had, like, a hybrid
8  schedule, meaning that they started, like, at
9  12:00 or something like that.
10     Q.  So what was your role in the arrest
11 plan?  What were you to do?
12     A.  What was I told to do?
13     Q.  Sure.  Yeah.  What were you told to do?
14     A.  I think I was part of the Ezell team.
15     Q.  And who else was part of that team?
16     A.  Daly and Ryan.
17     Q.  And who told you to arrest Ezell?
18     A.  How it was decided, I couldn't tell
19 you.
20     Q.  Are you sure somebody told you to do
21 that, though?
22     A.  Somebody told somebody something, and
23 decisions were made.
24     Q.  Do you have any knowledge as to who

303

1  made those decisions?
2      A.  Might have just been a, what do you
3  call it, group decision.  I don't know.
4      Q.  Who was tasked with arresting Styles?
5      A.  I don't know because I don't remember
6  surge and pause.  I don't know.
7      Q.  Did you have a warrant when you went
8  out to arrest Ezell?
9      A.  No.
10     Q.  How come?
11     A.  I don't recall.
12     Q.  Did you typically try to get a warrant
13 prior to arresting a suspect in the mid '90s?
14     ATTORNEY MEADOR:  Objection:  Form.
15     THE WITNESS:  No.
16 BY ATTORNEY VAN BRUNT:
17     Q.  How come?
18     ATTORNEY MEADOR:  Calls for speculation.
19     THE WITNESS:  I didn't set policy.  I don't
20 know why.
21 BY ATTORNEY VAN BRUNT:
22     Q.  So it just wasn't general practice to
23 get a warrant before arresting suspects in the
24 mid '90s?

304



1    ATTORNEY MEADOR: Objection: Form.
2    ATTORNEY BENJAMIN: Objection: Form;
3 foundation.
4    ATTORNEY MEADOR: Join.
5    THE WITNESS: Not that I knew of.
6 BY ATTORNEY VAN BRUNT:
7    Q.   Who drove the car to Ezell's house?
8    A.   I don't know.
9    Q.   Do you know where you were sitting in
10 the car?
11    A.   No.
12    Q.   What happened when you got to Ezell's
13 house?
14    A.   From the reports, I see that we went
15 inside, we spoke to his grandmother, got some
16 information from his grandmother. I think I
17 might have read that we got a picture from his
18 grandmother and information about where he might
19 be, which was a convenience store. And we then
20 left and went to that convenience store, and he
21 was taken into custody.
22    Q.   What you're just relaying, is that
23 based on your recollection or a review of your
24 transcripts?

305

1    A.   Review of transcripts.
2    Q.   Entirely?
3    A.   Entirely.
4    Q.   What about that that you just related
5 do you independently recall?
6    A.   Nothing.
7    Q.   Can you picture Ezell's grandmother in
8 your mind sitting here today?
9    A.   No.
10    Q.   Do you know what her name is?
11    A.   No.
12    Q.   Who else was present in Ezell's house
13 when you got there?
14    A.   I think I read something that there was
15 either one woman or another woman, but I don't
16 know.
17    Q.   Is it possible there were multiple
18 family members there?
19    A.   It's possible.
20    Q.   Multiple adult family members?
21    A.   It's possible. I don't know.
22    Q.   Did you talk to anyone other than his
23 grandmother?
24    A.   I don't know.

306

1    Q.   You could have, you just don't
2 remember?
3    A.   Correct.
4    Q.   Did someone give one of the adults at
5 the house a business card?
6    A.   In the reports, it said that Bernie
7 Ryan gave a business card.
8    Q.   Do you recall that?
9    A.   No.
10    Q.   And it's your belief that Ezell's
11 grandmother gave you all a picture of Ezell?
12    A.   I think that's what I read in the
13 reports.
14    Q.   Again, that's not something you
15 remember independently?
16    A.   No.
17    Q.   Do you know what happened to that
18 picture?
19    A.   No.
20    Q.   Did you file it?
21    A.   I didn't file it.
22    Q.   Who took possession of it?
23    A.   I don't know.
24    Q.   Do you recall the neighborhood where

307

1 Ezell lived?
2    A.   Not off the top of my head.
3    Q.   Do you know generally what neighborhood
4 that was?
5    A.   No.
6    Q.   Do you know, was it a high crime
7 neighborhood?
8    A.   I don't know.
9    Q.   What did you say generally to the
10 grandmother when you got there?
11    A.   I know from the reports it said
12 something along the lines of we wanted to talk
13 to Ezell about an investigation.
14    Q.   Did you tell her what kind of
15 investigation you were conducting?
16    A.   I don't recall.
17    Q.   Did you mention that you were
18 investigating a double homicide?
19    A.   I don't recall.
20    Q.   Did you tell her that you wanted Ezell
21 for questioning?
22    A.   I think -- I don't recall what we said.
23 I would assume it was said we wanted to talk to
24 him. But I don't recall what we said.

308



1    Q.   At the time you went to the
2  grandmother's house, you intended to arrest
3  Ezell for the double homicide, correct?
4    A.   I would say that's safe to say.
5    Q.   Did the grandmother say anything to you
6  that you recall sitting here today?
7    A.   No.
8    Q.   Did any of the other adults in the
9  household?
10    A.   I don't recall.
11    Q.   If they did, you have no memory of it?
12    A.   That is correct.
13    Q.   Did you ever say anything about how you
14  were looking for Ezell's friends?
15    A.   I don't recall, but I highly doubt it.
16    Q.   Why do you say that?
17    A.   Too much information.  If we're going
18  to look for them, then the whole idea was we're
19  hitting houses at the same time to keep the
20  chances of them communicating with each other.
21  So then we're going to tell one house and then
22  leave?  Just seemed like we wouldn't want to do
23  that.
24    Q.   So you weren't trying to provide too

309

1  much information to the grandmother when you
2  talked to her about trying find Ezell?
3    ATTORNEY BENJAMIN:  I object to the form of
4  the question.
5    ATTORNEY MEADOR:  And objection:  It
6  mischaracterizes the witness' testimony.
7    THE WITNESS:  That's not what you said.  You
8  said about --
9  BY ATTORNEY VAN BRUNT:
10    Q.   Well, I'm just asking if it's true.
11    A.   You said about the other people.
12    Q.   Right.  I'm just asking if it's true
13  you were trying to not give the grandmother too
14  much information about the investigation so as
15  not to tip anyone off at the time you were at
16  her house?
17    ATTORNEY MEADOR:  Objection:
18  Mischaracterizes the witness' testimony.
19  BY ATTORNEY VAN BRUNT:
20    Q.   You can answer.
21    A.   Whatever you said is not right.
22    Q.   Why is that?
23    A.   Because I don't even -- that's not what
24  I said.  So if you want me to repeat what I

310

1  said, I'll say it again.
2    We did have a conversation with Ezell's
3  grandmother, based on the reports, and we did
4  tell her that we wanted to talk to Ezell; that
5  we were looking for Ezell.  And she did provide
6  a picture and information where he might be.  I
7  think you asked me something along the lines did
8  we tell her that we were looking for his
9  friends.  I said no, that would be tipping --
10  that would be telling her, and she might tip off
11  his friends or his friends' families that we
12  were now looking for them.
13    Q.   Do you know whether -- whether you
14  mentioned you were investigating a double
15  homicide when you were at Ezell's house?
16    A.   Mentioned what?
17    Q.   A double homicide at Ezell's house?
18    A.   I do not know if we mentioned that.
19    Q.   How did the grandmother react?
20    A.   I don't recall.
21    Q.   Do you know if she was upset?
22    A.   I don't think so.  I mean, she gave us
23  a picture and told us where he might be.  So I
24  don't think she was upset.  But I don't know.

311

1    Q.   You're just -- You're speculating about
2  that?
3    A.   Yes, ma'am.
4    Q.   Did she -- Do you recall her asking any
5  questions of you?
6    A.   I don't recall.
7    Q.   Do you recall the store where Ezell was
8  supposed to have been?
9    A.   It says -- I think it's labeled a
10  convenience store.
11    Q.   But I'm asking now, sitting here today,
12  do you have any recollection of the name of the
13  convenience store?
14    A.   No.
15    Q.   And where was the convenience store
16  located?
17    A.   I don't know.  73 and Western pops off
18  my memory, but I could be totally wrong.
19    Q.   Did you take any notes of your
20  interaction with the adults at Ezell' house?
21    A.   I don't believe --
22    ATTORNEY MEADOR:  Hold on.
23    Objection:  Mischaracterizes the
24  witness' testimony.

312

1    THE WITNESS: I don't believe so.
2  BY ATTORNEY VAN BRUNT:
3      Q.   Did anyone in your presence?
4      A.   Take notes while we were standing their
5  living room?
6      Q.   Yeah.
7      A.   I don't think so. And I highly doubt
8  it.
9      Q.   Why do you say that?
10     A.   Because we were in a person -- No. We
11  wouldn't be taking -- If notes were going to be
12  taken, they would be taken once we left out the
13  place.
14     Q.   Did anyone do that then?
15     A.   I don't know.
16     Q.   Did you?
17     A.   I don't know, and I highly doubt it.
18     Q.   And why, because you were just
19  assisting?
20     A.   No, because they -- she just told us --
21  gave us an address.
22     Q.   So you went to that address directly?
23     A.   I think we did.
24     Q.   Did you stop anywhere?

313

1      A.   I think we went directly.
2      Q.   And where was -- Did you find LaShawn
3  at the store?
4      A.   The reports say we did.
5      Q.   Do you have any reports of seeing him
6  in the store?
7      A.   No.
8      Q.   Can you describe LaShawn signature here
9  today as he looked in the store?
10     A.   No.
11     Q.   What did you do once you found him?
12     A.   I think it says I read him his Miranda
13  warnings.
14     Q.   Do you have any reason to doubt you did
15  that?
16     A.   I have no reason to doubt that.
17     Q.   And you did that because he was under
18  arrest at that point?
19     A.   Okay.
20     Q.   Well, was he under arrest at that
21  point?
22     A.   Yes.
23     Q.   Was he handcuffed?
24     A.   Yes, I believe he was.

314

1      Q.   And you put him in the backseat of your
2  car?
3      A.   He was put in the backseat of the car,
4  yes.
5      Q.   Where were you sitting at that point?
6      A.   I think I saw something in the reports
7  that said I was sitting next to him, but I'm not
8  positive. I don't have any kind of
9  recollection.
10     Q.   Did you know how old Ezell was at that
11  time?
12     A.   I'm not sure.
13     Q.   Did you know he was a minor at the time
14  you arrested him?
15     A.   I don't know.
16     Q.   Is that something you generally would
17  have known at the time as part of your practice
18  when arresting somebody, whether or not they
19  were a minor?
20     A.   So I didn't have any practices at that
21  point in time.
22     Q.   What about in later '90s when you did?
23     A.   Yeah.
24     Q.   Generally it's good to know whether the

315

1  person you're arresting is a minor or an adult,
2  correct?
3      A.   Mm-hmm.
4      Q.   Because there are specific procedures
5  you're supposed to follow with minors when you
6  arrest them, correct?
7      A.   Okay. Yeah.
8      Q.   And one of them is that minors are
9  supposed to have their parents or guardians
10  present for questioning?
11     A.   For questioning?
12     ATTORNEY MEADOR: I'm going to object as to
13  form of the question. It's conflating two
14  issues.
15  BY ATTORNEY VAN BRUNT:
16     Q.   Well, let me back up and restate it,
17  then. Would you agree that minors are supposed
18  to be warned in front of parents or guardians?
19     ATTORNEY MEADOR: Objection as to form.
20     THE WITNESS: I don't know.
21  BY ATTORNEY VAN BRUNT:
22     Q.   You don't know whether it was CPD
23  policy at the time in 1995 that juveniles had to
24  be warned in front of a parent or guardian if

316



1  they could be located?
2      A.   Correct.
3      ATTORNEY MEADOR:  I apologize.  You answered
4  a little fast.  I'm going to have a belated
5  objection as to form.
6  BY ATTORNEY VAN BRUNT:
7      Q.   Did you use the FOP back to read Ezell
8  his rights?
9      A.   I believe that's what the report said.
10 Not the report, my testimony, previous testimony
11 said.
12     Q.   Do you recall that the FOP book that
13 was in use in '95 explicitly stated that a minor
14 should be warned only in the presence of an
15 adult?
16     A.   I don't remember what the -- what the
17 warning said.
18     Q.   Did you make any attempt to bring
19 LaShawn's guardian to the store with you when
20 you went to arrest him?
21     A.   I did not make any attempt.
22     Q.   Did you tell her, LaShawn's grandmother
23 that she could come with you in the car when you
24 went to go arrest him?

317

1      A.   I did not tell his grandmother that.
2      Q.   Okay.  Well, at the time you arrested
3  Ezell, you obviously knew where his guardian
4  lived, correct?
5      ATTORNEY MEADOR:  Objection:  Assumes -- I'll
6  object to form.
7      THE WITNESS:  I knew where his grandmother
8  lived.
9  BY ATTORNEY VAN BRUNT:
10     Q.   Okay.  Did you know the grandmother was
11 his guardian?
12     A.   I don't know.
13     Q.   Did you ever talk to Ezell's mother?
14     A.   I don't know.  I don't know.
15     Q.   Did you ever learn that Ezell's
16 grandmother [sic] was deaf and could not speak?
17     A.   I don't know.
18     Q.   Do you have any recollection of that
19 one way or another?
20     A.   Do not.
21     Q.   Do you have any recollection of
22 attempting to get a sign language interpreter
23 for Ezell's mother?
24     A.   I do not.

318

1      Q.   Did anybody, to your knowledge?
2      A.   I do not have knowledge.
3      Q.   After you located Ezell at the corner
4  store, did you go back to the location where you
5  talked to the guardian to alert his grandmother
6  that he was under arrest?
7      ATTORNEY MEADOR:  Objection:  Form.
8      THE WITNESS:  We did not.
9  BY ATTORNEY VAN BRUNT:
10     Q.   And why not?
11     A.   I don't know.
12     Q.   Would it have been proper procedure to
13 tell them that LaShawn Ezell was under arrest
14 because he was a juvenile?
15     A.   You asked if we went back to the house.
16     Q.   Correct, to alert the grandmother that
17 he was under arrest.
18     A.   There's other ways to notify.  You
19 don't have to take him back to the house.
20     Q.   Did you notify the grandmother in any
21 other respect after you had him under arrest?
22     A.   I personally didn't.  But reports say
23 that -- or my testimony said that I was under
24 the impression that it was being done.

319

1      Q.   Who did it?
2      A.   I don't know.
3      Q.   Was it somebody's job to do that?
4      A.   I would think it would be somebody's.
5      Q.   Well, you were the arresting officer,
6  correct?
7      A.   I was.  I did assist with that arrest.
8      Q.   But that wasn't your job to do that?
9      A.   Not -- I mean, it could have been, or I
10 could have done it, or someone else could have
11 done it.
12     Q.   Do you have any knowledge as to whether
13 anyone did in fact notify the grandmother after
14 he was arrested that he was being taken to
15 Area 1 for questioning?
16     A.   I don't recall totally, but I think my
17 testimony said something along the lines that
18 someone attempted.  That's -- I'll stand by my
19 testimony.
20     Q.   Okay.  But you did not attempt to do
21 that?
22     A.   My testimony was someone else, yes.  I
23 didn't.  My testimony was that I did not.
24     Q.   And Daly didn't attempt to do that to

320

1  your knowledge?
2      A.   I have no knowledge.
3      Q.   And Ryan didn't attempt to do that to
4  your knowledge?
5      A.   I have no knowledge.
6      Q.   How far away was the convenience store
7  from Ezell's grandmother's house?
8      A.   I don't recall.
9      Q.   A short distance?
10     A.   I don't recall.
11     Q.   Was there any reason you couldn't stop
12 at the grandmother's house to alert her that you
13 had just arrested her grandson?
14     ATTORNEY BENJAMIN:  Objection: Calls for
15 speculation.
16     ATTORNEY MEADOR:  Join.
17     THE WITNESS:  So I can speculate on that.
18 Let's say that we do go back to the house, and
19 the grandmother seemed like a nice woman, but
20 maybe, say, his uncles or brothers are over
21 there, and they're not so nice about seeing
22 their loved one in the car.  And they come out,
23 and like what kind of happened at Johnson's
24 residence, they come out to the car and attempt

321

1  to do something.  So generally, it's not a good
2  practice to go back to the person's house that
3  you just arrested.  Better to try to, even back
4  in '95, the phone call or go -- send someone
5  back later or something.  I'm just assuming.
6  BY ATTORNEY VAN BRUNT:
7      Q.   And that was the practice whether or
8  not the person you arrested was a juvenile?
9      A.   I'm just saying, you asked me -- maybe
10 you didn't ask me.  Maybe I just did it on my
11 own, I'm just assuming.
12     Q.   Did you tell the grandmother when you
13 left her house that she could come down to
14 Area 1 shortly because Ezell was going to be
15 taken there?
16     ATTORNEY MEADOR:  Could you read the question
17 back.
18          (whereupon, the record was read
19           as requested.)
20     THE WITNESS:  I don't think we knew that we
21 were going to find Ezell.
22 BY ATTORNEY VAN BRUNT:
23     Q.   Did you tell her that you intended to
24 arrest him when you talked to her?

322

1      A.   I don't recall.  But I don't think so.
2      ATTORNEY VAN BRUNT:  All right.  Are we on
3  11?
4          (whereupon, Davis Deposition
5           Exhibit No. 11 was marked for
6           identification.)
7      ATTORNEY BENJAMIN:  What number are we on
8  now?
9      THE COURT REPORTER:  11.
10 BY ATTORNEY VAN BRUNT:
11     Q.   For the record this is the arrest
12 record of LaShawn Ezell, and this Bates number
13 is
14 Johnson 34587.
15          Have you seen this before, sir?
16     A.   I don't know.
17     Q.   Does it look familiar?
18     A.   I don't know.
19     Q.   All right.  So agree your name is on
20 here as the second arresting officer?
21     A.   It is.
22     Q.   And Daly is the first arresting
23 officer?
24     A.   It is.

323

1      Q.   Does that suggest to you that Daly
2  wrote this report?
3      A.   It does.
4      Q.   And is that his signature, to your
5  knowledge?
6      A.   I don't.
7      Q.   You don't know if that's his signature?
8      A.   That's correct.
9      Q.   Okay.  So this says LaShawn Ezell was
10 arrested on 12/5/95 at 5:15 p.m.; is that
11 correct?
12     A.   Yes.  Correct.
13     Q.   Is there any reason to dispute that
14 time?
15     A.   No.
16     Q.   Do you have any independent
17 recollection that that's the time you arrested
18 him?
19     A.   I do not.
20     Q.   So this says that "Above subject was
21 named as an offender in the murder reported
22 under RDZ594269 by a co-offender," and that co
23 offender is McCoy?
24     A.   I didn't author it, but I'm assuming.

324



Q. Okay. "Above subject's mother and guardian were contacted initially at the residence, but subject was not at home." Does that refresh your recollection that Ezell's mother was at the house when you initially went there?

A. It does not.

Q. "Subject located at 7355 South Western and transported to Area 1."

You see that his residence address on this is listed as 7316 South Claremont, correct?

A. I do.

Q. Do you know how far apart 7316 South Claremont and 7355 South Western is?

A. I do not. I speculate within five blocks, but I do not.

Q. All right. "Officers Bloore and Richardson attempted to contact guardians with negative results."

Stopping there, do you know when they did that?

A. I do not.

Q. Did you ask them to do that?

A. I did not.

325

Q. Did you pass on contact information for Ezell's grandmother to Bloore and Richardson?

A. I would -- I would pretty much say I did not.

Q. How do you -- How would they have found out the contact information for Ezell's guardian?

ATTORNEY BENJAMIN: Objection: Calls for speculation.

BY ATTORNEY VAN BRUNT:

Q. You can answer.

A. From someone else.

Q. Any idea who that would have been?

A. I didn't -- No.

Q. Did you put his contact information in the runner?

A. I don't know.

Q. Would that have been practice to put information, contact information for suspects in the runner if you were going to go off duty so that other officers working the case could have that at hand?

A. So with the exception of one time when no one could work overtime, generally -- so

326

whoever was responsible, whoever was taking responsibility for Ezell, interviewing him and whatever is going to happen to him, they would be there. They would not have left. So obviously, in my mind, it wasn't me and my partner. We didn't stay till 4:00 in the morning. It was somebody else who was going forth with Ezell.

Q. Do you have any knowledge as to how Bloore and Richardson came to be the ones who contacted LaShawn's guardians?

A. I do not.

Q. Do you have any personal knowledge as to why they were unable to get in touch with the guardian?

A. I do not.

Q. Did the grandmother ever tell you she intended to leave the house that night?

A. I don't know.

Q. Have you seen that written anywhere?

A. Do I see that?

Q. Have you seen that written anywhere, that she intended to leave the house?

A. I do not -- I don't recall seeing it.

327

Q. You were supposed to go off duty about 3:00; is that right?

A. I think 3:30 was my official time off.

Q. Okay. And this was obviously after 3:30 at the time you arrested LaShawn. Why were you still working?

A. I think more than likely just to assist on the arrest.

Q. Did somebody ask you to stay overtime?

A. I don't know.

Q. Is that typically how it went down, if you were going to work overtime, would somebody have to officially ask you to do so?

ATTORNEY BENJAMIN: Object to form.

THE WITNESS: No, not back then.

BY ATTORNEY VAN BRUNT:

Q. Would it have to be approved by the sergeant?

A. Eventually.

Q. But not at the point in time when you stayed?

A. So, like, a double homicide was something that was big enough where there was talk, We're going to go arrest the other people

328



1  later.  That's something you didn't have --
2  someone didn't have to specifically say, "You
3  can stick around."  But it depends -- it really
4  depends on what you're trying to investigate,
5  what your reason for sticking around.  But back
6  then, you had a lot more leeway, I should say.
7  So you didn't necessarily say, "Hey, Sarge," you
8  might casually say, "I'm sticking around on
9  that."  Like that.  I think that's how we would
10  do it, "I'm going to stick around and work on
11  that, continue to work on that," and they would
12  give you their approval or say no, too many guys
13  are here or whatever.
14     Q.   Did Cassidy ask you to stick around in
15  this case?
16     A.   I don't know.
17     Q.   Same place we were reading before, the
18  next line says "Coughlin made phone contact and
19  advised them of his status, but they did not
20  show up at Area 1."
21        Did you ever talk to Coughlin about
22  Ezell's guardians?
23     A.   No.
24     Q.   Did you ever give him the contact

329

1  information for Ezell's grandmother?
2     A.   I don't recall.
3     Q.   Did you talk to Coughlin at all
4  personally about Ezell's arrest?
5     A.   I don't recall, and I highly doubt it.
6     Q.   You did not interview Ezell once he was
7  brought into custody, correct?
8     A.   That is correct.
9     Q.   And why did you not do that?
10     A.   I don't know.
11     Q.   Well, you were the arresting officer,
12  correct, or one of them?
13     A.   I was.
14     Q.   Would it have been general practice
15  then for you to take the lead on the interview?
16        ATTORNEY MEADOR:  Objection:  Form;
17  foundation.
18        THE WITNESS:  No.
19  BY ATTORNEY VAN BRUNT:
20     Q.   How was it decided who would interview
21  LaShawn?
22     A.   I don't know.
23     Q.   Do you have any recollection of meeting
24  at Area 1 or anywhere else to discuss who would

330

1  interview which suspect?
2     A.   I do not.
3     Q.   Do you believe that such a meeting
4  probably took place?
5     A.   Yes.
6     Q.   And why do you say that?
7     A.   Somebody had to interview him.
8     Q.   Was there a general practice as to
9  which detectives would take interviews if there
10  were multiple suspects to be interviewed?
11        ATTORNEY BENJAMIN:  Object to form;
12  foundation.
13        THE WITNESS:  So again, double homicides
14  didn't happen often.  There's no set rules for
15  double homicides, I don't believe.
16  BY ATTORNEY VAN BRUNT:
17     Q.   There's nothing like well, these
18  detectives have more experience, so they should
19  take the lead on the interviews?
20     A.   If it's my case, you know, someone --
21  if it's my case, someone else is not going --
22  they're not going to pull someone just -- well,
23  generally, they're not going to push me off my
24  case.  So there was no set rules.

331

1     Q.   Okay.  Do you have any knowledge as to
2  why you did not do the interview sitting here
3  today?
4     A.   Do I have any knowledge?
5     Q.   Correct.
6     A.   No.
7     Q.   Once you arrested Ezell, I think you
8  said he was put in the backseat of the car next
9  to you.  Did I get that right?
10     A.   Yes.
11     Q.   Great.  Did you have a conversation
12  with him?
13     A.   I don't recall.
14     Q.   Do you recall --
15     A.   Oh, from -- Yeah.  I'm pretty sure I
16  did say a couple of things to him, because
17  things got hectic at Johnson's residence.
18     Q.   Okay.  So before you got to Johnson's
19  residence, did you say anything to Ezell?
20     A.   I don't recall.
21     Q.   Did he say anything to you?
22     A.   I don't recall.
23     Q.   So he might have, you just don't
24  recall?

332



1     A.   Correct.
2     Q.   And you might have said something to
3   him, but you just have no recollection?
4     A.   Correct.
5     Q.   All right.  And you said, I think,
6   earlier, you went to another meeting place after
7   arresting Ezell to meet back up with the
8   officers who had gone to get Styles?
9     A.   Yes, I think we did.  I think we did.
10    Q.   And do you know why you did that, why
11  you had another meeting?
12    A.   I think just to see where we were at.
13  We didn't -- I don't think we had cell phones
14  and all that kind of stuff.  So I think we
15  just -- I'm assuming that's why we set up
16  another place.
17    Q.   Okay.  And at that point, did you get
18  the rundown on how this -- the arrest of Styles
19  had gone?
20    A.   No.
21    Q.   There was no discussion of the Styles
22  arrest?
23    A.   Not to me.
24    Q.   Is it possible there was a discussion

333

1   of that arrest, you just don't recall it?
2     A.   There was no discussion to me.  I don't
3   know if some other people talked about it.
4     Q.   Well, when you got to the place, did
5   everybody get out of their cars?
6     A.   I don't think -- I don't think I would
7   have got out the car.  Somebody would have had
8   to stay with Ezell.
9     Q.   Did you see Styles at that point?
10    A.   I don't recall.
11    Q.   Was he in the backseat of a car?
12    A.   I don't recall.  From the reports, I'm
13  assuming he was.
14    Q.   Did Ryan and Daly get out of the car to
15  talk to the other detectives?
16    A.   I don't recall.
17    Q.   So you have no idea what was said at
18  that meeting?
19    A.   Correct, except I can assume that we
20  were then headed to Johnson's.
21    Q.   All right.  Why was Johnson the last
22  one arrested?
23    A.   I don't recall.
24    Q.   Any reason to that, for that?

334

1     A.   I don't recall.
2     Q.   And then after that, you went to
3   Johnson's house, correct?
4     A.   After the meeting?
5     Q.   Yes.
6     A.   If there was a meeting, yes.  I'm not
7   positive about that, but then we did go to
8   Johnson's.
9     Q.   And what happened once you got to
10  Johnson's house?
11    A.   I know from the reports, and I kind of
12  think I kind of vaguely remember it, I stayed in
13  the car with -- with Ezell.  Ryan and Daly got
14  out.  Some other people got -- whoever else was
15  around, I guess they got out their cars.  And I
16  don't know where Johnson's arrest was, was he
17  arrested on the street or arrested in the
18  residence.  I don't remember.  I don't know.
19  But Johnson was taken into custody.  And then I
20  remember -- well, I don't, from the reports, I
21  kind of remember, things got kind of hectic
22  whereas people started coming toward the car I
23  was in with -- with Ezell.  The report said I
24  told him to get down and put his jacket over his

335

1   head.  I kind of vaguely remember that.  And
2   then the report says that Bloore jumped into the
3   car with me, and then we took off, and we went
4   to -- back to the Area.  I don't remember -- I
5   vaguely or without -- remember Bloore, who
6   jumped in.  I know I wouldn't have driven by --
7   I couldn't have driven by myself.  But ...
8     Q.   So is most of what you just stated
9   stuff that you recall based on your testimony,
10  looking at your testimony in this case?
11    A.   Most of the stuff I told you is stuff
12  that is in my testimony.  My memory of it is
13  pretty limited.
14    Q.   So what -- just to be very clear for
15  the record -- do you independently recollect?
16    A.   Going to Johnson's.  Well, I didn't
17  know it was Johnson at the time.  Going to --
18  Going to defendant's, scene getting chaotic, and
19  driving back to the Area.
20    Q.   You said you didn't know it was Johnson
21  at the time?
22    A.   No, not -- I mean independent
23  recollection, I didn't know any of their names.
24    Q.   But at the time, you did know who you

336



1    were -- you probably knew who you were
2    arresting?
3        A.   Yes.
4        Q.   You said it got chaotic.  What does
5    that mean?
6        A.   I said people were rushing toward the
7    car trying to look in.
8        Q.   Which people was that?
9        A.   I don't know.
10       Q.   Were they people who had come out of
11   Charles's house?
12       A.   On my testimony, I said something along
13   the lines that I think I also said something
14   about looked like it was neighborhood people
15   too.  But they could be related to him, and they
16   just weren't in the house.
17       Q.   You said they rushed the car?
18       A.   I said they came up to the car trying
19   to peek in, see who was in there.
20       Q.   And at that point, you told Ezell to
21   duck down?
22       A.   I think I told him to duck down before
23   they got to the car.
24       Q.   And why did you tell him to do that?
                                                    337

1        A.   Because they were looking -- I think
2    they were -- they were going along the lines of
3    since they saw people in the backseat, they
4    thought somebody had fingered Johnson.
5        Q.   So you were trying hide Ezell?
6        A.   Yeah.  I hope they did that with the
7    other guy too, Styles.
8        Q.   Did you ever leave the car at Johnson's
9    house?
10       A.   I don't believe so.
11       Q.   Did Daly or Ryan?
12       A.   Yes.
13       Q.   Both of them?
14       A.   Yes.
15       Q.   And what did they do, to your
16   knowledge?
17       A.   I don't know.
18       Q.   What did you say to Ezell while you
19   were at Johnson's house?
20       A.   "Get" -- Speculation again, "Get down.
21   Put your jacket over your head."
22       Q.   Had you discussed by that point in any
23   way the double homicide with Ezell?
24       A.   No.
                                                    338

1        Q.   Did you tell him at any point that he
2    was in the car with you that he was suspected of
3    committing a double homicide?
4        A.   I don't recall, but I seriously doubt
5    it.
6        Q.   Why do you say that?
7        A.   Because I did not -- did not expect to
8    be interviewing him, so that wouldn't be my
9    place to even begin giving information.
10       Q.   So you already did not expect to
11   interview him, even at that point?
12       A.   Correct.
13       Q.   And why is that?
14       A.   Because I wasn't -- I hadn't
15   interviewed many people, and especially not on
16   other people's cases.
17       Q.   So did you tell him that McCoy had
18   implicated him?
19       A.   I don't think I told him anything.
20       Q.   Did you tell him he had been named at
21   all by somebody else in this murder, these
22   murders?
23       A.   I don't know if we told him why he was
24   being picked up.  I don't know what was said to
                                                    339

1    him.
2        Q.   Did he ask?
3        A.   I don't know what was said or what he
4    said.
5        Q.   Did you have any role in seizing
6    Charles Johnson's vehicle at the house?
7        A.   I did not.
8        Q.   Do you recall that happening?
9        A.   In my testimony, I said -- I mentioned
10   something about it, so maybe I saw it going on.
11       Q.   All right.  What was the legal cause
12   for seizing his vehicle?
13       A.   I don't know.
14       Q.   Was it your understanding that McCoy
15   had implicated Charles's vehicle in the -- in
16   the crime?
17       A.   I think, based on my testimony, it was.
18       Q.   But sitting here today, no independent
19   recollection?
20       A.   No.
21       Q.   And you had nothing to do with the car
22   in this case?
23       A.   No, not that I can recall.
24       Q.   With the processing of the car?
                                                    340



1    A.  Not that I can recall.
2    Q.  What happened after Charles was
3  arrested?
4    A.  I drove -- I think I drove, maybe
5  Bloore, one of us drove back to the Area.
6    Q.  And whose car was Charles put in?
7    A.  I don't know.
8    Q.  Why did -- what happened to Ryan and
9  Daly? Did they go back with you?
10   A.  No, they did not.
11   Q.  Whose car did they drive in?
12   A.  I don't know.
13   Q.  And do you know why you left with
14 Bloore as opposed to the people you had been
15 driving with previously?
16   A.  Because the scene became chaotic, and
17 we just tried to get out of there.
18   Q.  Was Bloore involved in any of the
19 arrests with you?
20   A.  Say again.
21   Q.  Had Bloore been involved in Ezell's
22 arrest?
23   A.  I don't believe so. I'm not sure. I'm
24 not positive, but I don't think so.

341

1    Q.  Did you stop --
2    A.  Actually, I believe, like, some of the
3  testimony, I think I saw something about there
4  was -- when we drove up to the convenience
5  store, there was another car, squad car behind
6  us. Was he in that maybe? I don't know.
7    Q.  All right. Do you know why the Gang
8  Crimes specialists were involved in these
9  arrests?
10   A.  I do not. I can speculate.
11   Q.  Please do.
12   A.  Well, Gangster Disciples were listed
13 for the offenders, which seemed like this would
14 be a great case for them to assist on.
15   Q.  Did Gang Crimes specialists get
16 involved in all arrests where the suspects were
17 believed to be part of a gang?
18   ATTORNEY BENJAMIN:  Objection: Foundation.
19   ATTORNEY MEADOR:  Calls for speculation.
20 BY ATTORNEY VAN BRUNT:
21   Q.  And by way of pointing in time, I'm
22 talking mid '90s, Area 1.
23   A.  I would speculate that it would have to
24 be a more serious crime.

342

1    Q.  Okay. So they would be involved in
2  arrests for more serious crimes --
3    A.  Possibly.
4    Q.  -- that were under investigation?
5    A.  Possibly, yes. It definitely
6  wouldn't -- If I had a domestic battery and I
7  knew the guy was a P Stone, I don't think I
8  would be calling them to say, "Hey, can you help
9  me get this guy for domestic battery."
10   Q.  Did you stop anywhere on the way back
11 from the Area -- or the way back to Area 1?
12   A.  I don't recall, but I don't believe so.
13   Q.  Did you get any food at that point?
14   A.  I don't recall, and I highly doubt it.
15   Q.  Why is that?
16   A.  Because we had a prisoner in the back.
17   Q.  All right. Did you ever stop for food
18 on the way back or on the way anywhere with
19 prisoners?
20   A.  Over the course of my career?
21   Q.  Sure.
22   A.  Probably.
23   Q.  That wasn't general practice?
24   A.  Probably not.

343

1    Q.  If you were going to feed somebody who
2  was in custody, how would you do that then?
3    A.  Me?
4    Q.  Sure. Let's start with you.
5    A.  So there was a McDonald's across the
6  street. I bought a lot of McDonald's meals. So
7  say, like, I've got a guy out of County and
8  brought him back to the Area, I might ask him,
9  "what do you want," and we would stop and get
10 it. It really depended on who the subject --
11 who the person was.
12   Q.  So it wasn't a general practice as to
13 feeding people who were in custody?
14   A.  They could also -- Probably was the
15 general practice was you could always get
16 baloney sandwiches from the lockup.
17   Q.  Got it.
18       When you got back to the Area, what
19 happened?
20   A.  I don't recall. I'm pretty sure we
21 brought him upstairs, and he was placed in some
22 room.
23   Q.  Was he placed in an interview room?
24   A.  I don't recall.

344

1    Q.   Are you able to indicate on the diagram
2  you drew earlier where Ezell was put?
3    A.   No.
4    Q.   Are you able to indicate where Styles
5  was put?
6    A.   No.
7    Q.   Do you believe he was put in an
8  interview room?
9    A.   Styles is how old?
10   Q.   He was 16.
11   A.   I don't know where he was put.
12   Q.   What about Johnson?
13   A.   Johnson was how old?
14   Q.   He was 19.
15   A.   Probably in one of the interview rooms.
16   Q.   What does age have to do with where
17  they were put?
18   A.   I think back then, it was something
19  about secured -- there was something along the
20  lines, some reference to secured, what do you
21  call it, secured room or something like that.
22  Juveniles, weren't supposed to put them in
23  secured rooms.  But I'm not positive.
24   Q.   Did you personally put Ezell in a room?

                                                    345

1    A.   It's possible.
2    Q.   Was he handcuffed?
3    A.   I believe Ezell was handcuffed, but I'm
4  not positive.
5    Q.   Do you know who had custody of Styles
6  at this point?
7    A.   I do not.
8    Q.   Do you know who had custody of Johnson?
9    A.   I do not.
10   Q.   Were there other investigations going
11  on at the Area at this point in time, other
12  cases?
13   A.   I don't know.
14   Q.   Were there typically more than one
15  investigation going on at a time?
16   A.   Typically, I don't know if you can
17  describe typically for the Area.
18   Q.   Do you have any recollection of others
19  that may or may not have been going on at the
20  time?
21   A.   I do not.
22   Q.   Okay.  Do you remember if interview
23  rooms were full?
24   A.   I do not.

                                                    346

1    Q.   Were there any witnesses at Area 1 in
2  this case at the time you arrived back at
3  Area 1?
4    A.   I don't know.
5    Q.   Did you take any notes about the
6  arrests that you participated in?
7    A.   I don't know.
8    Q.   Have you ever seen any?
9    A.   Not in the last decade at least.
10   Q.   Okay.  Should there have been?  Should
11  you have taken notes of the arrests you
12  participated on?
13   A.   I could have.
14   Q.   Should you have as a matter of CPD
15  policy?
16   A.   I think it's more that the information
17  is, what do you call it, documented.
18   Q.   And was all the information related to
19  the arrests documented somewhere to your
20  knowledge?
21   A.   I don't know.
22   Q.   But it should have been?
23   A.   Documentation -- Documented?
24   Q.   Yes.

                                                    347

1    A.   I would hope so.
2    Q.   Was there a plan -- Well, strike that.
3         Once you got back to the Area, did you
4  and the other detectives make a plan as to how
5  the interviews were going to take place?
6    A.   I don't know.
7    Q.   The intention of the police officers
8  working on this case was in fact to interview
9  each of these people, right, who had just been
10  picked up?
11   A.   That would be speculation.  I would
12  hope so.
13   Q.   That was the plan for Ezell, correct?
14   A.   Again, it would be speculation, but I
15  would hope so.
16   Q.   Did you have -- Do you know where McCoy
17  was by the time you got back?
18   A.   I do not.
19   Q.   Did you have any role in interviewing
20  any of the suspects beyond what you talked about
21  with McCoy?
22   A.   No.
23   Q.   What happened after you got back?  What
24  did you do personally?

                                                    348

1    A.  I don't recall.
2    Q.  Do you have -- You mentioned at some
3  point you had an interaction with somebody you
4  believed to be a relative of Charles Johnson
5  holding a Coca-Cola vest?
6    A.  So I was going -- I remember I was
7  going to the washroom.  And so as you went to
8  the washroom, there was this hallway, and
9  relatives and people could come up to that
10  hallway.  And as I was leaving, going into the
11  washroom, I remember this -- I believe it was a
12  woman; I'm pretty sure it was a woman, standing
13  there and lifting up a red vest, like, Coca-Cola
14  vest, and saying, "He couldn't have done this.
15  He has a job."  I don't think she said he was at
16  work.  I think she said "He has a job," which I
17  thought was odd.  I think.
18    Q.  And that happened after you got back
19  from arresting Ezell?
20    A.  Yes.
21    Q.  Do you know how long after?
22    A.  I do not.
23    Q.  Do you know who that woman was?
24    A.  I do not.

349

1    Q.  Can you describe her, sitting here
2  today?
3    A.  I cannot.
4    Q.  What did you do with that information?
5    A.  That there was a woman in the hall with
6  a red vest saying that he didn't -- he couldn't
7  have committed the murder?
8    Q.  Yes.
9    A.  I didn't do anything about that.
10    Q.  Did you write a report about it?
11    A.  I didn't do anything with it.
12    Q.  Did you think of informing Cassidy
13  about it?
14    A.  I didn't do anything with it.
15    Q.  Why not?  You didn't think it was
16  important?
17    A.  That there -- There were people who
18  would come up and say that their loved one
19  couldn't do something?  That wasn't -- was not
20  infrequent.
21    Q.  And it wasn't important in this case?
22    A.  If she had been saying, "He was with
23  me.  He was at work.  He was at the North Pole,"
24  that would have been important.  The fact that

350

1  someone says, "My loved one couldn't do it
2  because he wouldn't do something like that," no,
3  that wasn't.
4    Q.  Did you notify a Youth officer once you
5  had gotten Ezell in custody?
6    A.  I don't recall.
7    Q.  Was that your job to do that as the
8  arresting officer?
9    A.  I'm not sure.  So I'm not sure the
10  practice was right when you brought them in or
11  when the questioning started.  I'm not sure what
12  the practice was.
13    Q.  Do you have any recollection of trying
14  to find a Youth officer for Ezell?
15    A.  I have no recollection.
16    Q.  Do you have any recollection of Daly
17  trying to do so?
18    A.  I have no recollection.
19    Q.  Can you tell me any recollection you
20  have whatsoever about attempts to get a Youth
21  officer for Ezell?
22    A.  What was the beginning of your
23  question?
24    Q.  Do you have any recollection whatsoever

351

1  about trying to get a Youth officer for Ezell?
2    A.  I do not.
3    Q.  Did you ever talk to a Youth officer in
4  this case?
5    A.  I don't recall.
6    Q.  Fair to say, though, that a Youth
7  officer should have been notified as soon as
8  Ezell was brought back into Area 1?
9    A.  As I said maybe a minute ago, I really
10  don't know if that was the practice that as soon
11  as he's brought in the station versus when you
12  want to talk to them.
13    Q.  But clearly, a Youth officer should
14  have been notified by the time he was going to
15  be questioned, right?
16    ATTORNEY BENJAMIN:  Object to form; asked and
17  answered.
18    ATTORNEY MEADOR:  Join.
19    THE WITNESS:  Again, I'm not sure if it's
20  when they're brought in or when they're
21  questioned.
22  BY ATTORNEY VAN BRUNT:
23    Q.  Right.  So maybe it's not when they're
24  brought in, but definitely by the time they're

352

1  going to be questioned, correct?
2      A.   That a Youth officer -- Unless you have
3  the parent.  That was my understanding.
4      Q.   Right.  If there's no parent and the
5  minor is going to be questioned, then at least
6  by then, the Youth officer should be notified,
7  correct?
8      A.   If there's no parent or guardian, then
9  there should be a Youth officer.
10     Q.   Present for questioning?
11     A.   Yes.
12     Q.   Did you conduct any additional
13 investigation on December 5th?
14     A.   I don't recall, and I don't think so.
15     Q.   When did you go off duty?
16     A.   I don't recall, but I would assume -- I
17 don't know.  I don't recall.
18     Q.   Did you participate, or did you discuss
19 with any detectives intention to conduct lineups
20 in this case?
21     A.   I don't recall, and I don't think so.
22     Q.   Did you ever talk to any detectives
23 after the fact about lineups that had been
24 conducted in this case?

353

1  A.   I don't recall, and I don't think so.
2      Q.   Why do you say you don't think so?
3      A.   That was probably getting -- diving
4  deeper into the case than I would want to dive
5  into it.
6      Q.   Did you eventually learn there were
7  statements taken in the case from Ezell and
8  Styles and Johnson?
9      A.   I did.
10     Q.   And how did you learn that?
11     A.   When I was prepped for testimony.
12     Q.   Did you learn it back in December '95?
13     A.   I don't know.  I just now know
14 definitely by the time I was testify- --
15 prepping to testify.
16     Q.   Is it your belief that you went off
17 duty before the statements were taken?
18     A.   What time were the statements taken?
19     Q.   A range of times between 10:30 and
20 early the next day.
21     A.   It's my belief.
22     Q.   Did you work on the 6th, to your
23 knowledge?
24     A.   I don't know.

354

1      Q.   Do you recall talking about this case
2  the next time you worked with any detectives?
3      A.   I do not recall.
4      Q.   Did you ever do any work checking on
5  any of the suspects' alibis in this case?
6      A.   I don't recall.  I don't believe so.
7      Q.   All right.  Did you do any work -- Did
8  you obtain search warrants for any of the
9  suspects' houses?
10     A.   I did not obtain any search warrants.
11     Q.   Did anybody to your knowledge?
12     A.   I don't know.
13     Q.   At some point, you testified in this
14 case, correct?
15     A.   Yes.
16     Q.   A few times; you reviewed that,
17 correct?
18     A.   I did.
19     Q.   All right.  And that was, I will
20 represent, in January of '98 and November of
21 '98.  Any reason to disagree with me about that?
22     A.   No reason.
23     Q.   All right.  So that was a few years
24 after, two and a half to three years after the

355

1  case had happened, correct?
2      A.   Whatever the math works out, yes.
3      ATTORNEY MEADOR:  Just for clarification,
4  Counsel, I assume you're not meaning every time
5  he testified?  You referenced two.
6      ATTORNEY VAN BRUNT:  No.  I just mean he
7  testified in the Johnson case was January '98;
8  the Ezell case was November '98.  So it's about
9  two and a half to three years after the actual
10 investigation.
11     ATTORNEY MEADOR:  And April of '98.
12     ATTORNEY VAN BRUNT:  Right.  And April of
13 '98.
14 BY ATTORNEY VAN BRUNT:
15     Q.   But every time you testified, it was
16 two and a half to three years after the actual
17 case happened?
18     ATTORNEY MEADOR:  Yeah.  All 1998.
19     ATTORNEY VAN BRUNT:  All 1998.
20     ATTORNEY MEADOR:  January April, June,
21 November.
22     ATTORNEY VAN BRUNT:  Got it.
23 BY ATTORNEY VAN BRUNT:
24     Q.   How did you come to testify in each of

356

1    these cases?
2        A.   I received some type of notification to
3    appear in court, and I was told by the state's
4    attorney's office that they wanted me to
5    testify.
6        Q.   And who told you in particular?
7        A.   I remember that Assistant State's
8    Attorney Brian Sexton was working on the case.
9    He had a partner at the time.  I don't recall
10   what his partner's name was.
11       Q.   Did you personally speak to Sexton?
12       A.   During prep?
13       Q.   Yeah.
14       A.   Correct.  Yes.
15       Q.   How many times did you speak to him do
16   you think?
17       A.   I don't know.
18       Q.   Multiple?
19       A.   I think I testified three times, yes.
20            Four.
21       Q.   So every time before you testified, you
22   spoke to ASA Sexton?
23       A.   I would say that would be a good bet.
24   I don't recall, though, but I would say that's a

357

1    good chance.
2        Q.   Were you familiar with him at the time
3    you testified at -- testified relating to this
4    case?
5        A.   I don't remember when I first met
6    Brian.
7        Q.   But you testified in cases that he
8    prosecuted multiple times over the years?
9        A.   I know this one.  I don't know of any
10   other instances actually.
11       Q.   Okay.  What was the state of your
12   memory about this investigation at the time you
13   were called to testify?
14       A.   I don't recall.
15       Q.   Well, how many cases do you think you
16   investigated in the interim time period between
17   December '95 and when you first testified about
18   this case in January '98?
19       A.   What type of cases?
20       Q.   Let's start with serious ones,
21   homicides.
22       ATTORNEY BENJAMIN:  Object to form.
23       THE WITNESS:  If I had to guess, I would say
24   maybe ten.

358

1    BY ATTORNEY VAN BRUNT:
2        Q.   Okay.  And what other kind of cases
3    were you investigating around that time period?
4        A.   Besides homicides?
5        Q.   Correct.
6        A.   I think the general practice was, I
7    guess, you worked homicides, but then you also
8    got handouts, meaning, like, case reports were
9    given to you as assignments of not homicides.
10   And I think that, like, domestic batteries --
11   I'm not sure.  I know sex cases went to specific
12   detectives.  I think everything else was just
13   passed around.  So that means I could have been
14   doing -- there was no Robbery at the time, so
15   that means I could have been doing robberies,
16   domestic batteries, maybe -- maybe thefts.  I
17   don't know.  But robberies and domestic
18   batteries and regular batteries, like, assaults,
19   I could have been doing those too.
20       Q.   So how many non homicide cases total do
21   you think you investigated in the time period
22   between the end of this case, December '95, and
23   January '98?
24       A.   I have no idea.

359

1        Q.   Can you estimate?
2        A.   I cannot.
3        Q.   More than ten?
4        A.   Yeah, in multiple, yes, more than ten.
5        Q.   More than 20?
6        A.   Yes.  I would probably say more than
7    20.
8        Q.   More than 50?
9        A.   I don't know about that.
10       Q.   All right.  Somewhere between 20 and
11   50?
12       A.   Sure.
13       Q.   All right.  So fair to say you had
14   conducted a fair number of investigations
15   between December '95 and January '98?
16       ATTORNEY MEADOR:  Objection:  Form.
17       THE WITNESS:  Fair to say I investigated
18   20 -- between 20 and 50.
19   BY ATTORNEY VAN BRUNT:
20       Q.   All right.  How did you prepare to
21   testify in these cases?
22       A.   We didn't say charge cases.  We said
23   investigate.  It's totally different.  Every
24   case you investigate doesn't mean you get

360

1 charges.
2  Q. Right. Okay. Fair enough.
3   How did you prepare to testify in these
4 cases, in these criminal cases, Johnson, Styles,
5 Ezell --
6  A. Oh, I'm sorry. I'm sorry.
7  Q. -- and McCoy?
8  A. I think I read over the reports at the
9 time.
10  Q. Okay. And whose reports did you read?
11  A. Whose reports?
12  Q. Yes.
13  A. What do you mean?
14  Q. Well, you didn't read reports that you
15 had written, correct?
16  A. Correct.
17  Q. So you read reports written by other
18 detectives?
19  A. Correct.
20  Q. And did that provide you go -- did that
21 refresh your recollection as to what you had
22 done in the case?
23  A. I had testified, so I know I testified
24 after I -- at the time.

            361

1  Q. Well, at the time you testified, did
2 you have a pretty good recollection of
3 everything you had done in December '95?
4  A. That was 21 years? I don't know.
5  Q. You can't say sitting here today?
6  A. I would hope so.
7  Q. Did you have any involvement in the
8 case after testifying?
9  A. No.
10  Q. Do you know why you were asked to
11 testify on the cases?
12  A. I do not.
13   Well -- No, I do not.
14  Q. Was Daly also asked to testify?
15  A. I think he might have. I'm not
16 positive, actually.
17  Q. Do you recall meeting with other
18 detectives who worked the case prior to
19 testifying?
20  A. I think when we -- I can't -- I vaguely
21 remember at least one prep where we were all, or
22 there were several of us there.
23  Q. And was Sexton also there?
24  A. Yes.

            362

1  Q. Okay. And which detectives were there?
2  A. I don't know. I just remember there
3 was multiple.
4  Q. Was Cassidy there?
5  A. I don't know.
6  Q. Daly?
7  A. I don't know.
8  Q. Valadez?
9  A. I don't know.
10  Q. What was discussed in that prep
11 session?
12  A. I don't know.
13  Q. Do you have any recollection?
14  A. No.
15  Q. Was it likely that the events related
16 to the investigation were discussed?
17  A. I'm sure.
18  Q. Who did what?
19  A. I'm sure.
20  Q. The time line of the investigation?
21  A. I'm sure.
22  Q. And did you refer to your -- to the
23 report?
24  A. Say again.

            363

1  Q. Was part of the preparation referring
2 to the reports that had been prepared in the
3 case?
4  A. I'm sure at some point.
5  Q. Were you ever contacted by state's
6 attorney investigators relating to this case?
7  A. No.
8  Q. Have you ever been interviewed about
9 this case?
10  A. No.
11  Q. Do you have any regrets concerning this
12 case?
13  ATTORNEY BENJAMIN: Object to form.
14  ATTORNEY MEADOR: Join.
15  THE WITNESS: No.
16 BY ATTORNEY VAN BRUNT:
17  Q. Is there anything you wish you could
18 have done differently sitting here today?
19  A. No.
20  Q. Are you proud of the work you did on
21 this case?
22  A. I'm not proud or unproud.
23  Q. Do you have any belief sitting here
24 today as to the guilt of the four plaintiffs in

            364



1  this case?
2      A.   Any beliefs?
3      Q.   Yes.
4      A.   I believe that they committed the
5  crimes -- crime -- crimes actually.
6      Q.   And what is that based on?
7      A.   Largely on McCoy's statement.  I think
8  that other people -- Well, initially, McCoy's
9  statement, and I think my understanding is other
10  people made statements.  So their statements of
11  admission.
12      Q.   Would any evidence change your mind
13  about their guilt?
14      A.   A dead person, one of the dead people
15  saying they didn't do it.
16      Q.   Any realistic evidence change your mind
17  about their guilt?
18      ATTORNEY MEADOR:  Objection:  Form.
19      THE WITNESS:  Depends.
20  BY ATTORNEY VAN BRUNT:
21      Q.   Nothing you can think of sitting here
22  today?
23      ATTORNEY MEADOR:  Objection:  Calls for
24  speculation.
                                              365

1      THE WITNESS:  I could go into a few different
2  scenarios.
3  BY ATTORNEY VAN BRUNT:
4      Q.   Like what?
5      A.   Someone coming up and saying that they
6  committed the murders and then providing -- I
7  don't know what was recovered in this case, but
8  let's say this person theoretically had the gun
9  that was used and came back, and I don't know,
10  admitted it.  Some admission with some factual
11  evidence that proved that this person had done
12  it.  Then I would be like, Oh, okay.
13      ATTORNEY VAN BRUNT:  Can we take a quick
14  break.
15      THE VIDEOGRAPHER:  Now going off the record
16  at 4:50.
17              (whereupon, a short break was
18               taken.)
19      THE VIDEOGRAPHER:  This begins Disk 5.  Now
20  going back on the record at 5:08 p.m.
21  BY ATTORNEY VAN BRUNT:
22      Q.   Sir, are you in a position to say how
23  long Cassidy was in the room with Troshawn McCoy
24  on December 5th?
                                              366

1      A.   A position?  I don't recall.
2      Q.   You have no idea how long that time
3  was?
4      A.   I don't think it was long, but I don't
5  recall.
6      Q.   Why do you say you don't think it was
7  long?
8      A.   Because I don't remember taking away
9  that it was long, or that being my memory.
10      Q.   Do you have a memory of that certain
11  point in time?
12      A.   I remember -- I remember being
13  called -- I vaguely remember him asking me to
14  come into the room to listen to the statement.
15  And I don't remember thinking, Wow, you've been
16  in there a long time.  So I don't think it was a
17  long time.
18      Q.   But can you say one way or another how
19  many minutes it was?
20      A.   No.  I can't -- I couldn't put an exact
21  time limit on it.
22      Q.   Do you know sitting here today what
23  time you all returned from Dunbar?
24      A.   No.
                                              367

1      Q.   And you can't say what time Cassidy
2  went in the room with Troshawn, right?
3      A.   No, I couldn't.
4      Q.   And you couldn't say what time he left
5  the room?
6      A.   No.
7      Q.   All right.  And we looked at the arrest
8  report earlier of Troshawn McCoy.  It was
9  Exhibit 9.  Do you still have that somewhere?
10  Is it right in front of you?
11      A.   Yes.
12      Q.   Okay.  Great.
13           There is an arrest time on there of
14  1503 p.m.  Do you know what that signifies, that
15  time?  Was that the time he had his Miranda
16  rights formally read to him?  Was it the time
17  that he finished his statement?  Is it a random
18  time?  Do you have any knowledge as to what that
19  time signifies?
20      ATTORNEY BENJAMIN:  Object to form; compound.
21      THE WITNESS:  I do not.  That would probably
22  be whoever prepared it.  But I can speculate.
23  BY ATTORNEY VAN BRUNT:
24      Q.   What would you -- Sure.
                                              368

1     A.    After he made the statement implicating
2  himself, I'm assuming that was roughly around
3  the time.
4     Q.    And the person who prepared it, again,
5  was Cassidy, right?
6     A.    I don't know who prepared it.  I
7  would -- My assumption it would be Cassidy.
8     Q.    So he's the person we should ask about
9  this?
10    A.    Wouldn't be my call.
11    ATTORNEY VAN BRUNT:  That's all I have.  I'm
12  going to turn it over to other counsel.
13        Oh, do you have a microphone?  I'll
14  switch.  I'll be very fast.
15    ATTORNEY OPPENHEIMER:  I'll only be a couple
16  of hours.
17    ATTORNEY BENJAMIN:  Okay.  So we're leaving
18  at 7:00.  So bye.
19    ATTORNEY OPPENHEIMER:  I'm kidding.  I'll be
20  a couple of minutes.
21              EXAMINATION
22  BY ATTORNEY OPPENHEIMER:
23    Q.    How you doing, Detective?
24    A.    Doing well.  Yourself?

369

1     Q.    Good.  Detective, my name is Michael
2  Oppenheimer.  We've met each other before in the
3  past.  I'm going to be really brief.  So -- And
4  I also represent Troshawn McCoy, just so you
5  know.
6        So you, as you sit here today, are not
7  sure of how long Cassidy was in the room with
8  Troshawn, correct?  You just said that?
9     A.    Yes.  I'm just trying to make sure
10  which defendant.  Yes.
11    Q.    Okay.  All right.  So when you went --
12  When you went to pick up Troshawn at Dunbar, you
13  went with Luke Daly?
14    A.    Yes.
15    Q.    Is that correct?
16        And Cassidy also went, correct?
17    A.    Correct.
18    Q.    You did not go in the same car as
19  Cassidy, or did you?
20    A.    I think we did.
21    Q.    Okay.  And on the way there, did
22  Cassidy discuss anything about the case with
23  you?
24    A.    I don't recall.  I would not be

370

1  surprised.
2     Q.    Okay.  If he did not discuss it with
3  you?
4     A.    That he did discuss some things.
5     Q.    Okay.  But you don't remember what he
6  said?
7     A.    If something was said or what.
8     Q.    Okay.  And all you knew at the time
9  that you were going to Dunbar was that somebody
10  had called in with a tip about Troshawn; is that
11  correct?
12    A.    Implicating him, that he was expressing
13  being a participant in a murder.
14    Q.    Okay.  And you at that time had no idea
15  who had called in?
16    A.    No.
17    Q.    You had never met that person?
18    A.    I don't know.
19    Q.    Where did you get that information
20  from?  Is that what Cassidy told you?
21    A.    It's highly possible.  But it also
22  could have been the sergeant.
23    Q.    Okay.  And you did not take that phone
24  call, correct?

371

1     A.    I did not.
2     Q.    All right.  And so you had no idea at
3  the time if there was any truth to that rumor or
4  that tip or that statement that Troshawn McCoy
5  alledgedly made, right?
6     A.    I'm sorry?
7     Q.    You had no idea about the truth --
8     A.    That he had been talking to --
9     Q.    -- of that statement, correct?
10    A.    --had made the statement to the --
11    Q.    Person?
12    A.    -- to someone?
13    Q.    Correct.
14    A.    Right.
15    Q.    And so when you went, your
16  understanding was, We're just going to go talk
17  to Troshawn, correct?
18    A.    No.  I thought we were going to bring
19  him in for questioning.
20    Q.    Okay.  And so when you got there, did
21  you say anything to Troshawn at the Dunbar High
22  School?
23    A.    I don't know.  I doubt it.
24    Q.    Okay.  And did -- You got Troshawn in

372

1  the car, correct?
2      A.  Yes.
3      Q.  And did anybody -- we may have already
4  said this -- but did anybody talk to Troshawn in
5  the car about the case?
6      ATTORNEY BENJAMIN:  Objection: Asked and
7  answered.
8      THE WITNESS:  I don't know.  I doubt it.
9  BY ATTORNEY OPPENHEIMER:
10     Q.  Okay.  And you did not hear Cassidy say
11 anything in front of you while you guys were in
12 the car; is that correct?
13     A.  I don't know.
14     Q.  And was it your interpretation at that
15 time that Cassidy was the lead on this part of
16 the case?
17     ATTORNEY MEADOR:  Objection:
18 Mischaracterizes the witness' testimony.
19     ATTORNEY BENJAMIN:  Object to form.
20     THE WITNESS:  What I can say is it was my
21 understanding we were assisting Cassidy.
22 BY ATTORNEY OPPENHEIMER:
23     Q.  And then you got to the station, and
24 Troshawn was taken into an office, correct?

373

1      A.  I believe so.
2      Q.  And you had not talked to Troshawn at
3  all up until the point of him being taken in the
4  office, correct?  Aside from maybe, "How you
5  doing," or something like that?
6      ATTORNEY BENJAMIN:  Object to form;
7  mischaracterizes his testimony.
8      THE WITNESS:  Can you repeat?
9  BY ATTORNEY OPPENHEIMER:
10     Q.  Sure.  You don't have any recollection
11 of really saying anything to Troshawn about the
12 case prior to him going into the conference room
13 or the holding room, right?
14     A.  Correct.
15     Q.  All right.  And so when he was placed
16 in the room, Cassidy went in with him; is that
17 correct?
18     A.  Correct.
19     Q.  All right.  And you did not got into
20 the room?
21     A.  Initially.
22     Q.  Initially.
23     A.  Correct.
24     Q.  You stayed out?

374

1      A.  Correct.
2      Q.  And Luke Daly stayed out?
3      A.  My memory is that yes, me and Luke did
4  not go in the room.
5      Q.  So your memory is that Detective
6  Cassidy was the only one in the room with
7  Troshawn?
8      A.  That's my memory.
9      Q.  And you had not heard Detective Cassidy
10 questioning in your presence up until going into
11 the room Troshawn, correct?
12     A.  Correct.
13     Q.  And so for whatever period of time they
14 were in there, at some point, Detective Cassidy
15 came out of the room?
16     A.  Correct.
17     Q.  And did he say -- What did he say?
18     ATTORNEY BENJAMIN:  Objection: Asked and
19 answered.
20     THE WITNESS:  I think he said something along
21 the lines of, "Dwayne, come in here and listen
22 to this statement."
23 BY ATTORNEY OPPENHEIMER:
24     Q.  Okay.  And he called you by your name,

375

1  Dwayne?
2      A.  I hope.
3      Q.  Is it possible he could have called you
4  by not your name or something different?
5      A.  He could have said, "Come in here,"
6  maybe.
7      Q.  Okay.  So when you went in there, and
8  Detective Cassidy said, "Hey, Dwayne," or
9  something to that effect, "come in here and
10 listen to this statement," you had some
11 speculation as to why Detective Cassidy asked
12 you to come in to listen to the statement?
13     A.  You know what?  Let's back up.  I think
14 he more than likely said that -- that McCoy was
15 making -- giving an admission.
16     Q.  Okay.
17     A.  And he wanted me to listen to his
18 statement.
19     Q.  Okay.
20     A.  Because I think I went in there not
21 thinking he was going to talk about a baseball
22 game, but he was going to make some statement
23 about the murder, the double murder.
24     Q.  And you had -- You said before that you

376

1 had a feeling that Detective Cassidy was asking
2 you in particular to go in there because?
3      ATTORNEY BENJAMIN:  Is that your question?
4      ATTORNEY OPPENHEIMER:  Well, it was an
5 unfinished.
6 BY ATTORNEY OPPENHEIMER:
7      Q.  Because why?
8      ATTORNEY BENJAMIN:  So your question is
9 because why?
10      ATTORNEY OPPENHEIMER:  Yes, if he understands
11 the question.
12      ATTORNEY BENJAMIN:  Object to form of the
13 question; mischaracterizes his testimony.
14           And if you understand, you can answer.
15      THE WITNESS:  So you're asking me why did
16 Cassidy ask me to come into the room?
17 BY ATTORNEY OPPENHEIMER:
18      Q.  Well, when I started to ask you that,
19 you kind of made a smile and said "Hm."  And so
20 why do you think Detective Cassidy asked you to
21 come into the room?
22      A.  Well, this is speculation, because I
23 don't know.
24      Q.  Sure.

377

1      A.  I think the bottom line is he thought
2 it would be beneficial to the case.
3      Q.  Because why?
4      A.  Because of -- it could be speculation;
5 I could be a little jaded on this -- but I
6 suspect that my color, being African-American,
7 did not -- factored in, but that could just be
8 me.  I could be totally wrong.
9      Q.  And you said before that was because
10 you have a black or African-American
11 defendant --
12      A.  Yes.
13      Q.  -- or suspect, it would give more
14 credibility to the statement or to the
15 confession if you as an African-American
16 detective were hearing the statement, correct?
17      ATTORNEY BENJAMIN:  Objection:
18 Mischaracterizes his testimony.
19      ATTORNEY MEADOR:  Join.
20 BY ATTORNEY OPPENHEIMER:
21      Q.  Well, would you agree with what I just
22 said?
23      A.  I didn't say all of that.  I think what
24 I said was I thought that Detective Cassidy

378

1 would be thinking down the long road, something
2 along that line.  I'll still stand by that.
3      Q.  Right.  And what's the long road?
4      A.  Of a prosecution, of this case going to
5 court and prosecution.
6      Q.  And why do you think that?  I mean, I'm
7 not asking why you think it might go to
8 prosecution.  I'm asking why you think it would
9 be helpful hearing the statement if it went down
10 that road.
11      ATTORNEY BENJAMIN:  I'll object to the form
12 of the question.  So now you're asking for him
13 to doubly speculate as to what Cassidy was
14 thinking and why Cassidy was thinking that.  Is
15 that really where your question is going?
16 BY ATTORNEY OPPENHEIMER:
17      Q.  I can be very clear.  You have said
18 that you may be speculating, but you believe
19 Cassidy brought you in because you're
20 African-American, it's an African-American
21 suspect, and he was thinking long term leading
22 to prosecution.  And my question to you is, why?
23      ATTORNEY BENJAMIN:  I'll object to the form
24 of the question.  It mischaracterizes his

379

1 testimony.
2 BY ATTORNEY OPPENHEIMER:
3      Q.  How would you being black and listening
4 to a confession from a black suspect help in a
5 prosecution in your mind?
6      A.  I think it would give the impression
7 that it's more fair, that the investigation was
8 more fair.
9      Q.  And you think Cassidy was worried
10 because he was taking the confession it would be
11 deemed as not being fair?
12      ATTORNEY BENJAMIN:  Objection:  Calls for
13 speculation.
14      ATTORNEY MEADOR:  Join.
15      THE WITNESS:  No.  I wouldn't get into that,
16 no.
17 BY ATTORNEY OPPENHEIMER:
18      Q.  Okay.  And -- Go ahead.
19      A.  I just want to add, back then, I didn't
20 know of any issues with Cassidy.
21      Q.  Understood.
22      A.  I didn't know if any issues were -- at
23 that point were known.
24      Q.  I understand.

380



1        How many times had you prior to that
2 occasion worked with Cassidy on serious cases
3 like homicides?
4        A.    I don't think any.
5        Q.    Okay.  You had said earlier that you
6 believed Cassidy liked to work alone?
7        A.    That was the, what do you call it, what
8 did she say, what was the general opinion.
9        Q.    Okay.  Why -- Did you have that same
10 opinion?
11        A.    I didn't have it one way or the other.
12        Q.    Well, Cassidy did not include you in on
13 the interrogation of Troshawn McCoy, correct?
14        A.    The interview of Troshawn McCoy?
15        Q.    Yes.
16        A.    No.
17        Q.    And he did not have you there as a
18 witness while he was talking to or interrogating
19 Troshawn McCoy, right?
20        A.    Wasn't that the same thing?
21        Q.    I guess it is.
22              So he -- he went in, closed the door,
23 and then when he was done, he said, "Can you
24 come in and hear this statement or confession"?

381

1        A.    Basically, yes.
2        Q.    And did you ask Troshawn anything when
3 Troshawn made the statement to you?
4        A.    I don't recall.
5        Q.    Or did Troshawn just simply -- Did
6 Cassidy say to him, "Tell this detective what
7 you told me"?
8        A.    I would -- I don't recall, but I
9 speculate something along those lines.
10        Q.    And did Detective Cassidy question
11 Troshawn during that process in front of you
12 when he said, "Tell the detective what you told
13 me"?  Did he ask him questions during that, or
14 did Troshawn just speak?
15        A.    I don't recall.  But -- I think he just
16 spoke, but I don't recall.  I don't know.
17        Q.    Did you ask Troshawn any questions
18 while he was reading his statement to you?
19        A.    I don't recall, but I don't think so.
20        Q.    Would you have memorialized in writing,
21 or would that be in some sort of paperwork if
22 you had asked him any questions during that?
23        A.    Would I have?
24        Q.    If you had actually questioned

382

1 Troshawn.
2        A.    I don't -- In those circumstances, I
3 don't know if -- you're saying would have I, or
4 would have it been documented?
5        Q.    Let me ask you this.  Did you -- Do you
6 believe that you asked Troshawn any questions at
7 all about this case?
8        A.    I don't believe I did.
9        Q.    And did you sign off anywhere as a
10 witness, or are you listed as a witness to this
11 statement?
12        A.    I don't know.
13        Q.    And --
14        A.    I think -- I think I've read somewhere
15 in the report it does say that -- something.
16        Q.    Did you have any questions about the
17 statement that Troshawn gave to you?
18        ATTORNEY MEADOR:  Objection:  Form.
19        THE WITNESS:  What do you mean?
20 BY ATTORNEY OPPENHEIMER:
21        Q.    In other words, you walked in, you
22 heard his statement, and then what did you --
23 Strike that.
24              You walked in, you heard his statement

383

1 in front of Detective Cassidy, right?
2        A.    Correct.
3        Q.    And then what did you do?
4        A.    I think I walked back out.
5        Q.    Did you say anything to Cassidy in the
6 room?
7        A.    No.
8        Q.    And you asked no questions of Troshawn,
9 correct?
10        ATTORNEY MEADOR:  Asked and answered.
11        ATTORNEY BENJAMIN:  Objection:  Asked and
12 answered.
13        THE WITNESS:  Again, this is all I don't
14 recall, but I doubt it.
15 BY ATTORNEY OPPENHEIMER:
16        Q.    Did Cassidy say anything to you in the
17 room after Troshawn gave his statement?
18        A.    I don't remember.  I doubt it.
19        Q.    Why do you doubt it?
20        A.    What would he say to me in the room in
21 front of McCoy?
22        Q.    Well, he could say, "Dwayne, do you
23 have any questions?  Is there anything else you
24 would like to know?"

384

1    A.   He could have.
2    Q.   Did he say that?
3    A.   I don't recall.
4    Q.   Is there anything else you wanted to
5  know?
6    A.   Say again.
7    Q.   Is there anything else that you wanted
8  to know?
9    A.   I don't recall.
10   Q.   Were you concerned that all you guys
11 are a team on this case, it's a double homicide,
12 and Cassidy goes in alone with the door closed
13 and comes out with a statement and didn't
14 include any of you guys on the statement?
15   ATTORNEY BENJAMIN:  Object to the form of the
16 question.
17   ATTORNEY MEADOR:  And I'll also object that
18 it mischaracterizes the witness' testimony.
19   THE WITNESS:  "You guys" being me and Luke?
20 BY ATTORNEY OPPENHEIMER:
21   Q.   Sure.
22   A.   The new detectives?  No, I was not
23 concerned.
24   Q.   Why not?
                                              385

1    A.   Because we were the new detectives.
2    Q.   Okay.  Do you believe that -- Just one
3  more question.  Do you believe that Detective
4  Cassidy had any issues with race?
5    ATTORNEY BENJAMIN:  Object to form.
6    THE WITNESS:  No.  Actually, no.  No, I
7  don't, actually.
8  BY ATTORNEY OPPENHEIMER:
9    Q.   Do you believe Detective Cassidy had
10 any issues with you?
11   A.   Besides being new, no, I don't.
12   Q.   Or he just liked to work alone?
13   ATTORNEY BENJAMIN:  Objection: Form;
14 objection: Calls for speculation.
15   THE WITNESS:  I'm not going to say that I --
16 it was rumored or I thought Jimmy didn't like
17 being around people.  I just -- You know, I'm
18 just, like, I'm at this period in my career
19 where I like to do things by myself.
20 BY ATTORNEY OPPENHEIMER:
21   Q.   Did you ever socialize with Cassidy?
22   ATTORNEY MEADOR:  Did you finish your answer?
23   THE WITNESS:  I did not.  But that's okay.
24 BY ATTORNEY OPPENHEIMER:
                                              386

1    Q.   I didn't mean to interrupt you.
2    ATTORNEY BENJAMIN:  You can absolutely finish
3  your answer.
4    THE WITNESS:  It was kind of like he kind of
5  knocked it out of my head.
6  BY ATTORNEY OPPENHEIMER:
7    Q.   You said you're at the point now you
8  like to do things by yourself?
9    A.   Yes.  And to that, to me, I can
10 understand.  I believe that Jimmy was close to
11 the same period in his career.  So I can totally
12 understand why he would want to do things by
13 yourself.
14   Q.   Did you ever socialize with James
15 Cassidy?
16   A.   Never.
17   Q.   Never?
18   Ever have lunch with him?
19   A.   Never.
20   Q.   Coffee?
21   A.   Never.
22   Q.   Ever meet his family?
23   A.   No.
24   Q.   And why are you laughing?
                                              387

1    A.   Because I did not.
2    Q.   But that's funny?
3    A.   I didn't -- The only person that, as
4  I've said earlier, that I socialized with at the
5  Area would have been my partner.  And then some
6  other people when I got married, did come to my
7  wedding.
8    Q.   But Cassidy was not invited to your
9  wedding?
10   A.   No, he was not invited, and he did not
11 come.
12   ATTORNEY OPPENHEIMER:  I'm done.
13   THE WITNESS:  Say again?
14   ATTORNEY OPPENHEIMER:  I'm done.
15        EXAMINATION
16 BY MR. CAMPBELL:
17   Q.   Good afternoon, Detective.
18   A.   Good afternoon.
19   Q.   My name is Terry Campbell.  I represent
20 Larod Styles.
21        Did you ever have any interaction with
22 Larod on December 5th?
23   A.   No, sir.
24   ATTORNEY MEADOR:  I thought that was your
                                              388

Dwayne Davis 10/02/2019

1  only question.
2  BY ATTORNEY CAMPBELL:
3      Q.  I just want to follow up on a handful
4  of things from earlier today.  Have you ever --
5  did you ever see in your career Detective
6  Cassidy engage in a practice that you thought
7  violated CPD policies or orders?
8      A.  No.
9      ATTORNEY MEADOR:  Sorry.  He answered too
10 fast.
11             Objection as to form.
12 BY ATTORNEY CAMPBELL:
13     Q.  Have you ever seen any Chicago Police
14 officer or detective act in a manner that was in
15 violation of any police order or policy?
16     ATTORNEY MEADOR:  Objection:  Asked and
17 answered.
18     THE WITNESS:  That I was aware of?
19 BY ATTORNEY CAMPBELL:
20     Q.  Yes, sir.
21     A.  I mean, maybe something minor.
22     Q.  Did you ever see anyone do anything
23 that is in violation of any of the general
24 orders, special orders, or policy directives in
                                              389

1  the exhibits that we've looked at today?
2      ATTORNEY MEADOR:  Objection:  Form.
3      ATTORNEY BENJAMIN:  Object to form; calls for
4  speculation.  We haven't gone through the
5  exhibits in any great detail, all of them.
6      THE WITNESS:  I don't know.
7  BY ATTORNEY CAMPBELL:
8      Q.  Did you see Detective Cassidy do
9  anything improper or that you would have done
10 differently in the context of interrogating or
11 interacting with any of the suspects in this
12 case?
13     ATTORNEY BENJAMIN:  Object to form.
14     ATTORNEY MEADOR:  Join.
15     THE WITNESS:  No.
16 BY ATTORNEY CAMPBELL:
17     Q.  Is it a good practice to interrogate
18 someone without having a second detective there?
19     ATTORNEY MEADOR:  Objection:  Form;
20 foundation; incomplete hypothetical; calls for
21 speculation.
22     ATTORNEY BENJAMIN:  Join.
23     THE WITNESS:  I hope so.
24 BY ATTORNEY CAMPBELL:
                                              390

1      Q.  I'm sorry.  What do you mean?
2      A.  I've been working by myself for the
3  last 15 years, so I hope so.
4      Q.  You talked earlier today about the use
5  of leading questions in an interrogation.  Do
6  you remember that?
7      A.  Vaguely.
8      Q.  And you were asked questions about
9  whether or not you believe it is proper to
10 provide a suspect with nonpublic details about a
11 crime that you're investigating and
12 interrogating them about.  Do you recall that?
13     A.  I'm sorry.  Repeat just the end.
14 Sorry.
15     Q.  Yeah.  Let me ask it directly.  Is it
16 appropriate when you are interrogating a suspect
17 to provide them, to tell them nonpublic details
18 about the crime?
19     ATTORNEY BENJAMIN:  Object to the form of the
20 question; incomplete hypothetical.
21     ATTORNEY MEADOR:  I'll join and add asked and
22 answered.
23     THE WITNESS:  I believe that it -- in some
24 circumstances, it can be.
                                              391

1  BY ATTORNEY CAMPBELL:
2      Q.  Okay.  Would it be appropriate if you
3  were investigating a double murder at a used car
4  lot, for example, and you were interrogating a
5  suspect to tell them where the victims were
6  shot, meaning where on their bodies they were
7  shot?
8      ATTORNEY BENJAMIN:  Objection:  Incomplete
9  hypothetical.
10     ATTORNEY MEADOR:  Calls for speculation.
11 BY ATTORNEY CAMPBELL:
12     Q.  Let me reask the question.  If you're
13 investigating this double homicide, would it be
14 appropriate to tell a suspect specific details
15 like where in their bodies the victims were
16 shot?
17     ATTORNEY BENJAMIN:  Objection:  Calls for
18 speculation.
19     ATTORNEY MEADOR:  Object as to form as well.
20     THE WITNESS:  It would be hard for me to
21 answer because I would have to know all the
22 facts of the case and what the person -- what
23 the person across from me is saying for me to
24 make that decision.
                                              392

1  BY ATTORNEY CAMPBELL:
2      Q.   And suppose it's the facts that you
3  knew about this case when the suspects here were
4  brought in, would it be appropriate to provide
5  them that specific fact about where the victims
6  were shot?
7      ATTORNEY BENJAMIN:  Form; calls for
8  speculation.
9      ATTORNEY MEADOR:  Join.
10     THE WITNESS:  Well, I -- me, myself, my
11 understanding, or what I can say, I only had a
12 baseline understanding.  So I don't think I
13 should have been talking to anybody at that
14 point.
15 BY ATTORNEY CAMPBELL:
16     Q.   Would it be appropriate to provide a
17 suspect that you're questioning details of the
18 crime that only the perpetrator would know?
19     ATTORNEY MEADOR:  Objection: Form and
20 incomplete hypothetical; calls for speculation.
21     ATTORNEY BENJAMIN:  Join.
22     THE WITNESS:  So as I said earlier, if -- it
23 depends on the crime and the circumstances.  I
24 have in sexual assault investigations, if the

393

1  guy is trying to tell me that he did one thing,
2  and I know that -- I know for sure that
3  something else happened, I might say, "No,
4  dude," you know, tell him something about what
5  really occurred.  It really depends on the whole
6  total circumstances of the investigation.
7  BY ATTORNEY CAMPBELL:
8      Q.   So sometimes it is appropriate to give
9  a suspect you're questioning details of the
10 crime that only the perpetrator would know?
11     A.   So again I will say if the guy is
12 telling me "I vaginally penetrated her," when I
13 know she was anally penetrated, I might say,
14 "No.  Her trauma was to her anus."
15     Q.   So that's an example of an occasion
16 where, in your view, it is appropriate to give a
17 suspect you're interrogating a detailed fact
18 about the crime?
19     A.   Okay.  Yeah.  That's an example in my
20 cases.  My cases.
21     Q.   And therefore, sometimes it is
22 appropriate to give a suspect you're
23 interrogating details of a crime that are not
24 known to anybody but the perpetrator?

394

1      A.   In my cases.
2      Q.   Okay.  And you operate in your cases
3  pursuant to Chicago Police Department orders,
4  rules, directives, and policies, correct?
5      A.   I hope so.
6      Q.   There are times where you go into an
7  interrogation with a suspect, and you believe,
8  based on what you know at that point, that they
9  are in fact guilty, correct?
10     ATTORNEY MEADOR:  Objection:  Calls for a
11 legal conclusion.
12     THE WITNESS:  I try to keep a pretty open
13 mind.  Experience has taught me to keep a pretty
14 open mind.
15 BY ATTORNEY CAMPBELL:
16     Q.   Back in --
17     A.   So unless that person is caught, I have
18 witnesses catch them in the act, I'm keeping an
19 open mind.
20     Q.   So back in 1995, '96, when you didn't
21 have experience, were you more likely to believe
22 when you went into an interrogation, at least at
23 certain times, that you had the right person?
24     A.   So '95, I don't know if I had -- I

395

1  don't know if I had much involvement with
2  suspects.  But so let's say '96 on, I think I
3  probably was not as open minded that -- no.  No.
4  I would say it's about the same, because I
5  wasn't doing sexual assaults, and most of those
6  cases were whodunits.  I didn't know who did it.
7  So no, I would not say what you said.
8      Q.   After hearing Troshawn McCoy's
9  statement, did you believe he was telling the
10 truth?  And I'm talking about the statement you
11 were called in to hear by Detective Cassidy
12 after Detective Cassidy had interrogated him?
13     A.   Yes.  I believed he was telling the
14 truth.
15     Q.   And did you believe that the other
16 three individuals that Troshawn McCoy named,
17 that is, Charles Johnson, Larod Styles, and
18 LaShawn Ezell, did you believe at that point
19 that they were in fact involved in this double
20 murder?
21     A.   I did.  Or I believed there was a high
22 possibility.
23     Q.   And that was before you had talked to
24 them, correct?

396



1    A.   That it was a high possibility; that's
2  correct.  But see --
3    Q.   Before -- I'm sorry.  Go ahead.
4    A.   This opinion was based on McCoy's
5  statement.
6    Q.   That was before any detective had
7  actually talked to any of those three
8  individuals, correct?
9    A.   I am unaware of -- that any -- at that
10 point any detective had talked to them.
11   Q.   And before any detective had collected
12 any information about any possible alibis or
13 anything else, correct?
14   ATTORNEY MEADOR:  Objection as to form.
15   ATTORNEY BENJAMIN:  Object to form.
16   THE WITNESS:  I am unaware that any detective
17 had talked to them about the case.
18 BY ATTORNEY CAMPBELL:
19   Q.   And it was before there was any
20 physical evidence linking any of them to the
21 double murder, correct?
22   A.   I'm not aware if there was physical
23 evidence at the time linking them or not.
24   Q.   Well, you know as you sit here now that
                                              397

1  there was no physical evidence of any sort
2  linking any of the defendants to that crime,
3  don't you?
4    A.   I don't know.  No, I don't know.
5    Q.   Can you think of any of piece of
6  physical evidence that you were ever aware of
7  that linked any of these four individuals to
8  this double murder?
9    A.   Since I had very limited knowledge of
10 the case, no, there's nothing I can think of.
11   Q.   You said earlier that you do believe
12 that false confessions occur, correct?
13   A.   I do believe that.
14   Q.   Am I right that you said you are not
15 aware of any confession that you have taken from
16 an individual that turned out to be false?
17   A.   I did say that.  But now actually I
18 think something just -- when you said it,
19 something just popped in my head.  I don't
20 remember the circumstances, but I kind of
21 remember, I want to say he was a serial --
22 serial confessor.  Something along those lines.
23 But I don't remember the circumstances.
24   Q.   So it may have been one case that you
                                              398

1  were involved in where you took a confession,
2  and it turned out the confession was false?
3    A.   I don't know if I took it or, you know,
4  it was taken in a case I was on, and it didn't
5  appear that it was true.
6    Q.   Was that person prosecuted and
7  convicted based on that confession?
8    A.   No, he wasn't.
9    Q.   So the falseness of the confession was
10 caught before he was prosecuted?
11   A.   Yes.
12   Q.   Are you aware of any false confessions
13 that have been taken at any point during your
14 career with the Chicago Police Department, any
15 confessions that turned out to be false after
16 that person was convicted?
17   A.   I don't have any personal knowledge,
18 no.
19   Q.   Well, do you believe that there are
20 cases where Chicago Police officers or
21 detectives have obtained a confession, that the
22 person who gave that confession was convicted,
23 and that it turns out that confession was false?
24   A.   I don't know.  That wouldn't be
                                              399

1  something I would be able to speak of.  I can
2  only speak of my cases.
3    Q.   You said earlier -- Let me ask one more
4  question on that.  Do you have any reason to
5  believe that there has ever been a case in the
6  Chicago Police Department's history where they
7  obtained a false confession from a suspect?
8    ATTORNEY BENJAMIN:  Objection:  Asked and
9  answered.
10   ATTORNEY MEADOR:  Join.
11 BY ATTORNEY CAMPBELL:
12   Q.   Who was then convicted based on that
13 false confession?
14   ATTORNEY MEADOR:  Same objection.
15   THE WITNESS:  Do I have any reason to
16 believe?
17 BY ATTORNEY CAMPBELL:
18   Q.   Yes, sir.
19   A.   No.  I don't have any reason.
20   Q.   Have you seen any articles in the
21 newspapers over the past 20 years that would
22 give you reason to think that that has in fact
23 happened?
24   A.   I've given articles that -- I've read
                                              400

1  articles or read -- or seen things on the news
2  that allege it.  Again, I've never dived in
3  those cases to have an opinion one way or the
4  other.
5      Q.    You were asked some questions earlier
6  about whether or not you had any reason to
7  believe that the confessions obtained in this
8  case were false, and you said, "I have no reason
9  to believe that those confessions were false."
10         Do you recall that?
11     A.    Yes, sir.
12     Q.    If the facts were that there was no
13  physical evidence connecting any of these four
14  defendants to this double murder, would that
15  give you some reason to believe that maybe the
16  confessions were not true?
17     A.    No.  I would need to know the totality
18  of the case.
19     Q.    If in addition to that you knew that
20  there were fingerprints collected at the scene
21  of the crime on cars that were perused by the
22  perpetrators that matched a person named Davion
23  Allen, who has no connection to these four
24  defendants, would that gave you some reason to

401

1  think that maybe these confessions were not
2  true?
3      ATTORNEY BENJAMIN:  Object to the form of the
4  question; calls for speculation.
5      ATTORNEY MEADOR:  Join.
6      ATTORNEY BENJAMIN:  Incomplete hypothetical.
7      THE WITNESS:  And do we know, is it known
8  that that car, he could have had availability to
9  that car outside of the window that the homicide
10  occurred?
11  BY ATTORNEY CAMPBELL:
12     Q.    Let me add a fact to maybe help you
13  along.  If it was also the fact that Davion
14  Allen was interviewed and gave a false
15  exculpatory statement saying that he had never
16  been at that car lot where his fingerprints were
17  found, would that give you some reason to
18  believe that possibly these confessions were
19  false?
20     ATTORNEY BENJAMIN:  Same objection; calls for
21  speculation; incomplete hypothetical.
22     THE WITNESS:  And Davion loves the police and
23  didn't feel any pressure by talking to the
24  police?

402

1  BY ATTORNEY CAMPBELL:
2      Q.    I'm just asking you if those facts were
3  true, would that gave you some reason to think
4  that there's a possibility that these
5  confessions were false?
6      A.    I guess I'm saying, sir, in a
7  roundabout way, based on that limited
8  information you're giving me, I would not make a
9  decision one way or the other.  I would ask for
10  much, much, much, much, much more information.
11     Q.    If you were also told that one of the
12  cars that was stolen from the car lot of this
13  double murder was left across the gangway from
14  Davion Allen's house, would that fact, along
15  with the others I've articulated, give you some
16  reason to think that maybe the confessions of
17  these four individuals were false?
18     ATTORNEY BENJAMIN:  Objection:  Calls for
19  speculation; incomplete hypothetical.
20     THE WITNESS:  To me, that would -- I'll tell
21  you what it would lead me to do.  If I was
22  investigating, it would lead me to maybe look
23  more into Davion.
24         Is that his name, Davion?

403

1  BY ATTORNEY CAMPBELL:
2      Q.    Davion.
3         If you added to that collection of
4  facts that there was a fingerprint of Davion
5  Allen obtained from the sticky side of a price
6  sticker that was peeled off one of the stolen
7  cars, would those facts in combination give you
8  some reason to believe that maybe these
9  confessions were false?
10     ATTORNEY BENJAMIN:  Objection:  Calls for
11  speculation; incomplete hypothetical; form of
12  the question.
13         You can answer.
14     ATTORNEY MEADOR:  Join.
15     THE WITNESS:  Without repeating the whole
16  question, where was the fingerprint found?
17  BY ATTORNEY CAMPBELL:
18     Q.    On the sticky side of a sticker that
19  was a price sticker on the windshield of one of
20  the cars that was stolen from the Elegant Auto
21  lot.
22     A.    And where was this piece of paper
23  found?
24     Q.    It appears that it was recovered off

404



1  site, off of the Elegant lot.
2      A.   Separate from the car?
3      Q.   That's right.
4      ATTORNEY MEADOR:  Same objections.
5      ATTORNEY BENJAMIN:  Yes, same objections.
6      ATTORNEY MEADOR:  And I would say
7  mischaracterizes the facts a bit.
8      THE WITNESS:  I would need much more.  I
9  would still need much more information.
10  BY ATTORNEY CAMPBELL:
11      Q.   And maybe that's the point.  If you
12  were presented with those facts, you would want
13  to do much more investigation before relying on
14  these confessions; is that fair?
15      ATTORNEY BENJAMIN:  Object to the form of the
16  question.  It assumes facts not in evidence, and
17  you're distorting time frames here by your
18  question.  So that's pretty improper.
19      ATTORNEY MEADOR:  Join.
20      ATTORNEY BENJAMIN:  You can answer.
21      THE WITNESS:  So you're telling me that all
22  this information was known on the 5th of
23  December?
24  BY ATTORNEY CAMPBELL:

405

1      Q.   No, sir.  I didn't represent that at
2  all.  We're talking about whether or not now,
3  after these -- my client spent 21 years in
4  prison, whether based on all the information we
5  know now, whether or not you have some reason to
6  believe that these confessions were false, I'm
7  articulating facts that are facts and asking you
8  if those would give you some reason to believe
9  that these confessions may be false.
10      A.   What if --
11      ATTORNEY MEADOR:  Wait.
12      Objection:  Form; calls for
13  speculation.  And I don't know, it's an
14  incomplete hypothetical.  The whole thing is a
15  hypothetical.
16      ATTORNEY BENJAMIN:  Join.
17      THE WITNESS:  What I'll say is that if I
18  received that information, that I would want to
19  -- if I was your client, I would want someone to
20  look into that information.
21  BY ATTORNEY CAMPBELL:
22      Q.   And if you were a detective that wanted
23  to make sure you had the right person, wouldn't
24  you want to investigate those facts?

406

1      A.   After the fact, after everything, 20
2  years later?  Is that what you're asking.
3      Q.   Well, sure.  I'll ask you that.
4      A.   If that came to -- Say a sexual
5  assault, I got information that -- that maybe
6  the wrong person or another person was involved
7  in it, and I was allowed to investigate, I
8  would -- I might try.
9      Q.   How about this situation.  I'll
10  represent to you that in this case, the state's
11  attorney's office, the prosecutor's office of
12  Cook County, agreed that each of these four
13  individuals involved in this case were entitled
14  to a Certificate of Innocence, and that a judge
15  entered an order granting them a Certificate of
16  Innocence, which means that they have proven by
17  a preponderance of the evidence that they are
18  actually innocent of the crime.  And, second,
19  that all charges were dropped, and there is no
20  one now who has been charged or convicted for
21  the double murder at those used car lots.  With
22  the information and facts that I've just
23  recited, do you think that an investigation
24  should be done into who actually committed these

407

1  murders?
2      A.   What I --
3      ATTORNEY BENJAMIN:  Hold on.
4      ATTORNEY KUHN:  Objection:  Form; foundation;
5  speculation; incomplete hypothetical.  Or,
6  alternatively, attorney testifying.
7      ATTORNEY BENJAMIN:  Same objection, and I'll
8  add mischaracterizes the evidence.
9      ATTORNEY MEADOR:  Join both.
10      THE WITNESS:  They knocked it out of my head.
11      But I think you're oversimplifying
12  things.  I really think you're way
13  oversimplifying things.  And in my personal
14  opinion, that whole process you're talking
15  about, there's a lot of politics in it.  It's
16  just not cut and dry, this person is innocent or
17  this person is not, who the state's attorney's
18  office chooses to retry or go -- I don't know
19  what the term is -- about these certificates of
20  innocence.  So no, sir, you've lost me.  I would
21  not agree.  No.  Not -- No.  I'm now a
22  hundred -- like total opposite direction.
23  BY ATTORNEY CAMPBELL:
24      Q.   Okay.  So based on the evidence that

408



1  I've articulated about Davion Allen's
2  fingerprints being at the scene of the crime,
3  Davion Allen's fingerprints being on the sticky
4  side of a sticker that was pulled off one of the
5  cars that was stolen the night of the Elegant
6  Auto murders, and the fact that one of the
7  stolen cars was found across the gangway from
8  Davion Allen's house, and the fact that there is
9  no evidence of any sort in the record that there
10 was any connection between any of these four
11 defendants and Davion Allen, and the fact that
12 Davion Allen is not mentioned in any of the
13 confessions, based on those facts, you see no
14 reason to investigate whether Davion Allen was
15 involved in these murders; is that correct?
16      ATTORNEY BENJAMIN:  Object to the form of the
17 question; incomplete hypothetical; misstating
18 evidence.
19      ATTORNEY MEADOR:  And asked and answered.
20      ATTORNEY KUHN:  Join.
21      THE WITNESS:  My opinion, sir, is that --
22 well, I sit here and believe that the four
23 defendants were guilty of the crime that they
24 were convicted of.

409

1  BY ATTORNEY CAMPBELL:
2      Q.   Okay.  But you understand my question,
3  which was different, which was based on the
4  evidence that I've articulated --
5      A.   No.
6      Q.   -- you see no reason to investigate --
7      A.   I don't want to cut you off, but no.
8  We're not -- We're not having a meeting of the
9  mind on your question.  And I don't believe that
10 your question is something that I can answer,
11 because I don't even know what that
12 investigation, I don't know even know who does
13 that, what that entails.  All I know is what
14 occurred.  And -- Or some of what occurred.  And
15 I can't -- I can't speculate on what you're
16 asking me because that's not my place.  I don't
17 even know what you're saying.  I don't even know
18 how that's done, who does that.
19      Q.   You said I had oversimplified things.
20 Let me ask you this.  It's rare to have a double
21 murder, correct?
22      A.   In my experience, yes.  They don't
23 happen all the time.
24      Q.   Wasn't this about the simplest

410

1  investigation you can imagine to solve a double
2  murder?
3      ATTORNEY BENJAMIN:  Object to the form of the
4  question.
5      ATTORNEY MEADOR:  Join.
6      ATTORNEY BENJAMIN:  Argumentative.
7      THE WITNESS:  I don't know enough about this
8  investigation to even make that -- I don't know.
9  BY ATTORNEY CAMPBELL:
10      Q.   Well, you know that it was solved
11 within about 30 hours --
12      A.   My answer is still going to be I don't
13 know.
14      Q.   You do know that this matter was solved
15 within about 30 hours of the commission of the
16 crime based on four confessions, right?
17      A.   I --
18      ATTORNEY MEADOR:  Wait, wait, wait, wait.
19      Objection:  Form and argumentative.
20      ATTORNEY CAMPBELL:  That's not argumentative.
21 BY ATTORNEY CAMPBELL:
22      Q.   I'm asking, do you know this crime was
23 solved within 30 hours of its commission based
24 on four confessions?

411

1      ATTORNEY MEADOR:  Same objection.
2      THE WITNESS:  Now I do.
3  BY ATTORNEY CAMPBELL:
4      Q.   That's a pretty simple investigation to
5  clear and close a double murder, correct?
6      ATTORNEY BENJAMIN:  Object to form.
7      ATTORNEY MEADOR:  Join.
8      THE WITNESS:  Again, I'm not going to, at
9  this point, make an opinion about something I
10 don't know enough facts about.  If you were
11 asking me about one of my cases, I could go with
12 you, give you your answers.  This is not one of
13 my cases, so I'm not in a position to give you
14 the answers you're seeking.
15 BY ATTORNEY CAMPBELL:
16      Q.   Well, based on your 20-plus years of
17 experience, you would agree that this was a
18 pretty quick solve of a double murder?
19      A.   I have 20 years experience --
20      ATTORNEY MEADOR:  Wait, wait, wait.
21      Objection:  Asked and answered.
22      ATTORNEY BENJAMIN:  And form.
23      THE WITNESS:  I have 20 years experience
24 almost in sexual assaults.  I don't have 20

412



1  years experience in solving double homicides.
2  So again, sir, I cannot answer that question.
3  BY ATTORNEY CAMPBELL:
4      Q.   Is it correct that when you're
5  interrogating a suspect that you should document
6  all statements made by that suspect relating to
7  the allegations?
8      ATTORNEY BENJAMIN:  Object to form.
9      ATTORNEY MEADOR:  Object to form and
10  incomplete hypothetical.
11      THE WITNESS:  It is true that when I'm
12  interviewing my people on my cases, I try to
13  document everything that they tell me.  That is
14  true.
15  BY ATTORNEY CAMPBELL:
16      Q.   And so if you're interrogating
17  someone --
18      A.   I like interviewing.  But ...
19      Q.   Okay.  If you're interviewing somebody
20  and they give you an alibi, you would want to
21  document that, correct?
22      A.   I'll do one better.  In my cases, when
23  someone -- when I'm interviewing someone and
24  they give me an alibi, I would like to document

413

1      A.   I would consider that my practice.
2      Q.   Do you consider it to be a good police
3  practice to document what a suspect tells you
4  during an interrogation?
5      A.   I consider it to be my practice.
6      Q.   I know --
7      A.   That's as far as you're going to get
8  out of me, sir.  I'm not going to make an
9  opinion about policing.
10      Q.   I'm asking you to based on your
11  experience as a --
12      A.   I don't know.  I don't have enough
13  experience to make a whole opinion about the
14  state of policing.  I can talk about me.
15      Q.   Okay.  So you've been a police officer
16  for how may years?
17      A.   I've been a police officer for 29 years
18  and five months.
19      Q.   And you have no opinion as to whether
20  or not it is a good police practice to document
21  the statements that a suspect makes during an
22  interrogation?
23      ATTORNEY MEADOR:  Objection.
24  BY ATTORNEY CAMPBELL:

415

1  and investigate what they have told me.
2      Q.   And that's what you're directed to do
3  by the general orders, isn't it?  And the
4  policies of the Chicago Police Department?
5      ATTORNEY MEADOR:  Objection as to form.
6      THE WITNESS:  I couldn't say.  I couldn't
7  say.
8  BY ATTORNEY CAMPBELL:
9      Q.   You would agree that it is particularly
10  important to document what somebody says if
11  you're interrogating them over the course of
12  hours because you want to make sure that you
13  catch any inconsistencies; is that fair?
14      ATTORNEY MEADOR:  Incomplete hypothetical;
15  objection to form.
16      THE WITNESS:  So you're asking me in my cases
17  if someone -- if a subject gives me multiple
18  statements, do I make notes about the multiple
19  statements?
20  BY ATTORNEY CAMPBELL:
21      Q.   Yes, sir.
22      A.   Yes, I do.
23      Q.   And you would consider that good police
24  practice, correct?

414

1      Q.   Is that your testimony?
2      ATTORNEY BENJAMIN:  Mischaracterizes his
3  testimony; argumentative; and asked and
4  answered.
5      ATTORNEY MEADOR:  Join.
6      THE WITNESS:  First of all, I don't even call
7  it an interrogation.  I call it an interview.
8  So no, I don't.  I don't have an opinion.
9  BY ATTORNEY CAMPBELL:
10      Q.   And interviews you're referring to are
11  interviews, sometimes at least, where the
12  suspect is not free to leave, correct?
13      A.   My interviews?  Yes.  In some certain
14  circumstances, the subject is not free to leave.
15      Q.   Would you ever interrogate a juvenile
16  without getting a parent or Youth officer
17  present first?
18      A.   One more time.
19      Q.   Would you ever interrogate a juvenile
20  suspect without having either a parent or
21  guardian or Youth officer present before you
22  interrogate them?
23      ATTORNEY BENJAMIN:  Object to form; calls for
24  speculation.

416



1    THE WITNESS:  Would I not -- I'm sorry.  What
2  was the status of the juvenile?  Is he in
3  custody or not?
4  BY ATTORNEY CAMPBELL:
5    Q.   He's going to be interviewed by you.
6    A.   In custody or not?
7    Q.   Do you have different rules if they're
8  in custody versus not in custody?
9    A.   Yes.
10   Q.   Okay.  Tell me what the different rules
11 are.  Would you interview --
12   A.   You asked me the scenario.  Is he in
13 custody or if he isn't?
14   Q.   I'll ask them both.
15   A.   Okay.
16   Q.   So if they are in custody, would you do
17 that?
18   ATTORNEY BENJAMIN:  Object to form;
19 foundation; calls for speculation.
20   THE WITNESS:  If I was interviewing a
21 juvenile in custody, I would try to get a parent
22 or guardian.  I do believe that there's some
23 provision that if you can't get those, you can
24 go forward, even in this day and age, you can go

417

1  forth with a Youth.  But I wouldn't do it.  But
2  I believe there is a provision.
3  BY ATTORNEY CAMPBELL:
4    Q.   With a Youth officer?
5    A.   Yes.  But I wouldn't do it.
6    Q.   Okay.  So you would wait to have a
7  parent or guardian, or other concerned relative?
8    A.   Personally, yes, I would today.
9    Q.   And that's consistent with what you
10 have in front of you, Exhibit 7?  Do you have
11 that?
12   ATTORNEY BENJAMIN:  Do you have a specific
13 page?
14   ATTORNEY CAMPBELL:  Yes, I do.  17491.
15   THE WITNESS:  From 1978?
16 BY ATTORNEY CAMPBELL:
17   Q.   No, sir.  I think it's dated at the top
18 31 August 1992.
19   A.   Exhibit 7, you said?
20   ATTORNEY BENJAMIN:  Yeah, but it's page ...
21   THE WITNESS:  Okay.
22 BY ATTORNEY CAMPBELL:
23   Q.   So you see the heading about a quarter
24 of the way down saying Interrogations?

418

1    A.   From 1992?
2    Q.   Yes, sir.
3    A.   What's your question?
4    Q.   I'm going to ask it.  Do you see the
5  heading that says Interrogations?
6    A.   Yes.
7    Q.   And so I'll represent to you that this
8  has been presented to us as the policies that
9  were in effect in December of 1995.
10   A.   Okay.
11   Q.   I'm representing that to you.
12   A.   Okay.
13   Q.   Do you see the heading Interrogations?
14   A.   Yes, sir.
15   Q.   And it says "Detectives who interrogate
16 juveniles will:  No. 4:  Ensure the juvenile is
17 warned and questioned in the presence of an
18 adult (parent, other relative, friend) if such
19 an adult can be located."
20       Do you see that?
21   A.   I see that.
22   Q.   Did you follow that order or directive
23 in 1995 and afterwards?
24   ATTORNEY MEADOR:  Objection:  Asked and

419

1  answered.
2    THE WITNESS:  I don't recall, sir.
3  BY ATTORNEY CAMPBELL:
4    Q.   You don't know if you followed that?
5    A.   I don't know.  I don't know if this
6  is -- I don't know if this is all that is to be
7  said about this.  So I can't answer that.
8    Q.   Did you ever interview a juvenile
9  suspect in custody without the presence of an
10 adult, parent, other relative, or friend?
11   A.   I don't know.
12   Q.   Do you see No. 6, so detectives who
13 interrogate juveniles will, No. 6:  "Ensure the
14 presence of a Youth officer to fulfill the
15 requirements of the Juvenile Court Act which
16 states that juveniles taken into custody will be
17 taken to the nearest Youth officer without
18 delay"?
19       Do you see that?
20   A.   I see that.
21   Q.   Did you do that in 1995 and afterwards?
22   A.   Did I?
23   Q.   Yes, whenever a juvenile suspect was in
24 custody?

420

1    ATTORNEY MEADOR: Objection as to form.
2    THE WITNESS: When I had a juvenile suspect
3 in custody? Was that your question?
4 BY ATTORNEY CAMPBELL:
5    Q.  Yes, sir.
6    A.  I don't know.
7    Q.  May have; may not have?
8    A.  I don't remember any instances of where
9 I had a juvenile in custody, so I can't tell you
10 what I did.
11    Q.  Did you know that was the rule?
12    ATTORNEY MEADOR: Objection: Form.
13    ATTORNEY BENJAMIN: Objection: Form.
14    THE WITNESS: I've never seen -- Or I don't
15 recall seeing that once you take them into
16 custody, you've got to get a Youth officer.
17 BY ATTORNEY CAMPBELL:
18    Q.  After the arrest of LaShawn Ezell --
19    A.  Yes.
20    Q.  -- and this isn't a document I'm
21 pointing to, but after -- you went and found
22 LaShawn Ezell at a convenience store, correct?
23    ATTORNEY BENJAMIN: Objection: Asked and
24 answered.

421

1    ATTORNEY CAMPBELL: I'm just trying to bring
2 him back to the point.
3    ATTORNEY BENJAMIN: Okay.
4    THE WITNESS: Yes.
5 BY ATTORNEY CAMPBELL:
6    Q.  You put him in the car, correct?
7    ATTORNEY BENJAMIN: Objection: Asked and
8 answered.
9    THE WITNESS: He was put in the car, yes.
10 BY ATTORNEY CAMPBELL:
11    Q.  My question is this: Did you ever ask
12 LaShawn Ezell anything about this case during
13 the time that you were in the car with him?
14    A.  I don't know. I highly doubt it.
15    Q.  If you had, would you have documented
16 what was said?
17    A.  Since I don't know, and I highly doubt
18 it, it's my -- I didn't talk to people in cars.
19 So it wasn't my practice to talk to people in
20 cars.
21    Q.  The drive back to Area 1 with LaShawn
22 Ezell was after the commotion at Charles
23 Johnson's house, correct?
24    A.  Correct.

422

1    Q.  Were people's emotions high; that is,
2 were your emotions high?
3    ATTORNEY MEADOR: Object as to form.
4    ATTORNEY BENJAMIN: Object to form.
5    THE WITNESS: After I drove off?
6 BY ATTORNEY CAMPBELL:
7    Q.  After the commotion at Charles
8 Johnson's house that you described earlier.
9    A.  After I drove off from his residence?
10    Q.  While you were there or after you drove
11 off.
12    ATTORNEY MEADOR: Same objection.
13    THE WITNESS: Emotions high, I don't know
14 what you mean by "emotions high." Was I
15 concerned when people were charging toward my
16 car? Yes, I was concerned. Emotions high, I
17 don't know. Emotions to me is, like, crying and
18 stuff. So I'm not sure about that.
19 BY ATTORNEY CAMPBELL:
20    Q.  When I said emotions high, I meant, was
21 your adrenaline flowing?
22    A.  That's a different question. I'm sure
23 as people were running towards my car, I was
24 trying to figure out what's going on. So I

423

1 would say at that point, my adrenaline was
2 pumping.
3    Q.  Remind me, who else, officer-wise, was
4 in the car, officers or detectives.
5    A.  I'm sorry?
6    Q.  What other officers or detectives were
7 in the car with you when you rode back to Area 1
8 with LaShawn Ezell?
9    A.  From the reports or my testimony, I
10 think -- I think it indicated Gang Specialist
11 Bloore.
12    Q.  Do you recall any raised voices by
13 either you or Detective Bloore in that car ride
14 back to Area 1?
15    A.  Directed toward --
16    Q.  Anybody.
17    A.  No.
18    Q.  Okay. So it didn't matter whether it
19 was directed towards Ezell or anybody else,
20 there were no raised voices in that car ride?
21 Or were there?
22    A.  What I was thinking you were going at
23 was did my voice ever raise, and I think I did
24 yell for him to get down and cover up his face

424

1  when they ran toward the car.
2      Q.  Other than that, did anyone raise their
3  voice at all?
4      A.  I don't recall that being done.
5      Q.  If you would turn to Exhibit 6.
6          Do you have that?
7      A.  Yes.
8      Q.  It is a general order of the Chicago
9  Police Department, correct?
10     A.  From 1988.
11     Q.  I'll represent to you this has been
12 produced to us with the representation that this
13 is a general order that was in effect in
14 December of 1995.  Okay?
15     A.  Okay.
16     Q.  And Chicago Police detectives and
17 police officers are obliged to follow any
18 general orders, special orders, or policies of
19 the Chicago Police Department, correct?
20     ATTORNEY BENJAMIN:  Object to form:  Asked
21 and answered.
22     THE WITNESS:  I think so, yes.
23 BY ATTORNEY CAMPBELL:
24     Q.  Okay.  So I want you to -- Exhibit 6

425

1  has to do with lineup procedures.  Do you see
2  that?
3      A.  I do.
4      Q.  All right.  On bottom of the first
5  page,
6  paragraph G are you there?
7      A.  Yes.
8      Q.  Okay.  I'm going to read the first
9  couple of sentences.  "In cases where there is
10 only one suspect in the lineup, the lineup,
11 whenever possible, should consist of at least
12 five persons.  When more than one suspect is
13 placed in a lineup, the lineup ideally should
14 consist of at least four non suspects in
15 addition to the number of suspects in the
16 lineup."
17         Did I read that correctly?
18     A.  It appears, yeah, sounded like you did.
19     Q.  And if someone conducted a lineup that
20 did not conform with that directive, you would
21 agree that would be a violation of this general
22 order?
23     A.  I would agree it would not be what you
24 just read.

426

1      Q.  You would agree that if they -- if, for
2  example, someone conducted a lineup that had
3  four suspects and one filler, that would not be
4  consistent with paragraph G of this general
5  order that is Exhibit 6, correct?
6      A.  Repeat the circumstances again.
7      Q.  If someone conducted a lineup that had
8  four suspects and only one filler, that would be
9  inconsistent with this general order, Exhibit 6?
10     ATTORNEY BENJAMIN:  Objection:  Calls for
11 speculation.
12     ATTORNEY MEADOR:  Join.
13     THE WITNESS:  So because of the word "ideally
14 used," I cannot agree with that.  I don't know
15 what "ideally" means in that circumstance.
16 BY ATTORNEY CAMPBELL:
17     Q.  Would you agree that it was -- if
18 someone conducted a lineup that had four
19 suspects and only one filler, that is not an
20 ideal lineup based on this general order, which
21 is Exhibit 6?
22     A.  I'm not going to be able to agree with
23 that.
24     Q.  You're not?

427

1      A.  Because it says "lineup ideally should
2  consist."
3      Q.  And that's why I said, you would agree
4  it would not be an ideal way to conduct a
5  lineup?
6      A.  So I don't know what they mean by
7  "ideally."  In a perfect world, and if it's not
8  a perfect world, can you make different
9  allowances?  I don't know.  I didn't author
10 this.
11     Q.  Did you ever conduct a lineup where you
12 had four suspects and one filler?
13     A.  Myself personally?
14     Q.  Yes.
15     A.  No, sir.
16     Q.  Do you think that would be an
17 appropriate way to conduct a lineup based on
18 your 20-plus years as a police detective?
19     A.  Well, prior to reading --
20     ATTORNEY BENJAMIN:  Objection:  Calls for
21 speculation.
22     THE WITNESS:  Prior to you pointing this out
23 to me, I would have thought.  But now, I'm not
24 so sure.

428

BY ATTORNEY CAMPBELL:

1   BY ATTORNEY CAMPBELL:
2       Q.   I'm sorry.  Prior to reading this, you
3   would have thought that was improper?
4       A.   Right.
5       Q.   And now reading a general order which
6   is Exhibit 6, paragraph 2(g), you believe it is
7   appropriate to conduct a lineup that has four
8   suspects and only one filler?
9       A.   I said I'm not so sure.  Still that's
10  my answer.  I'm not so sure.
11      Q.   Before reading this answer, you would
12  have said no, that's inappropriate?
13      A.   Correct.
14      Q.   And you've never done it?
15      A.   Correct.
16      Q.   And you don't think that's a good
17  police practice; is that fair?
18      ATTORNEY BENJAMIN:  Object to form.
19  BY ATTORNEY CAMPBELL:
20      Q.   To have four suspects and only one
21  filler in a lineup?
22      A.   That's --
23      ATTORNEY MEADOR:  Join.
24  BY ATTORNEY CAMPBELL:

                                        429

1       Q.   I'm sorry?  That's right?
2       THE WITNESS:  You were slow on that one.
3       ATTORNEY MEADOR:  Well, because he keeps
4   adding stuff after I think he's finished.  So I
5   didn't want to cut him off.
6       THE WITNESS:  No.  What did you say?  Is it
7   fair?  I was, like, it's not fair to believe I
8   would echo that.
9   BY ATTORNEY CAMPBELL:
10      Q.   Okay.  Do you believe it is a good
11  police practice to conduct lineups that have
12  four suspects and only one filler in them?
13      ATTORNEY BENJAMIN:  Object to form.
14      ATTORNEY MEADOR:  Join.
15      THE WITNESS:  Again, before you pointed this
16  out to me, I would have said that.  But now that
17  you've pointed this out, I'm not so -- I don't
18  know.
19  BY ATTORNEY CAMPBELL:
20      Q.   I'm asking what you think.
21      A.   You want my personal opinion?  My
22  personal opinion is now I don't know.
23      Q.   Yeah based on -- Based on your 20-plus
24  years of experience, do you think that is a good

                                        430

1   police practice?
2       ATTORNEY MEADOR:  Asked and answered.
3   BY ATTORNEY CAMPBELL:
4       Q.   It's been asked.
5       ATTORNEY MEADOR:  It's been answered twice.
6       THE WITNESS:  I keep telling you I don't
7   know.  I don't know how you want me to say it in
8   a different way.  Now that you pointed -- You
9   brought this information to me.  Now I don't
10  know.  You've given me something to think about.
11  I don't know.
12  BY ATTORNEY CAMPBELL:
13      Q.   Take a look at Exhibit 4, if you would.
14      ATTORNEY BENJAMIN:  While you're looking for
15  that page, can you tell me how much time is
16  left?
17      THE VIDEOGRAPHER:  Assuming that we're at
18  seven hours, it's 12 minutes remaining.
19  BY ATTORNEY CAMPBELL:
20      Q.   Do you have Exhibit 4 in front of you?
21      A.   Yes.
22      Q.   You were asked a few questions about
23  this earlier.  Do you recall that?  And I'm just
24  going to direct your attention to the bottom of

                                        431

1   the first page.  There's a box in the middle
2   saying -- with the title Reporting Officer,
3   Print Name.  Do you see that?
4       A.   I do.
5       Q.   It has D. Davis.  That's you, correct?
6       A.   I'm assuming, so yes.
7            Well, it has my star, so I know this
8   one.
9       Q.   Okay.  And then below that is a
10  signature block.  Do you see that?
11      A.   I do.
12      Q.   And it looks like there are two
13  signatures there.  Do you see that?
14      A.   I do.
15      Q.   Is that first signature yours?
16      A.   No.
17      Q.   Did someone else sign your name to this
18  report?
19      A.   I did not sign my name.
20      Q.   And if you didn't sign it, and we see a
21  signature there, that means someone else signed
22  your name to this report, correct?
23      A.   All I can say is I didn't sign it.  I
24  don't know what happened there.  I didn't sign

                                        432

1 it.
2 Q. Do you know of other occasions where
3 someone else has placed your signature falsely
4 on a police report?
5 ATTORNEY BENJAMIN: Object to form.
6 ATTORNEY MEADOR: Object to form.
7 BY ATTORNEY CAMPBELL:
8 Q. Well, this isn't your signature, right?
9 ATTORNEY MEADOR: Asked and answered.
10 ATTORNEY BENJAMIN: It's the "falsely" part
11 that's the problem with the question.
12 THE WITNESS: That's not my signature,
13 correct.
14 BY ATTORNEY CAMPBELL:
15 Q. Do you know of other occasions where
16 someone has placed your signature on a police
17 report without your knowledge or consent?
18 ATTORNEY MEADOR: Objection: Assumes facts
19 not in evidence.
20 ATTORNEY BENJAMIN: Join.
21 THE WITNESS: I don't recall.
22 BY ATTORNEY CAMPBELL:
23 Q. Would that be concerning to you if
24 someone was placing your signature on police

433

1 reports?
2 A. Depends on the circumstances.
3 Q. When you sign a police report, isn't
4 that an indication that you have reviewed it and
5 that you are agreeing that what is contained in
6 that police report is true and accurate to the
7 best of your knowledge?
8 A. Is it? I'm not sure if that's the
9 definition of that.
10 Q. What do you understand it to mean when
11 you sign a police report?
12 A. So a GPR, some -- like my partners when
13 I had a partner, when he did GPRs, let's say he
14 was on furlough when it came time to turn that
15 in, and he had generated that GPR. There's a
16 possibility that I might have put a -- not
17 signed his name but wrote his name in the box
18 down there. So is that -- I don't know, is that
19 saying that I'm attesting to the facts in the
20 GPR which are notes are true and reliable? I
21 would just think I would be attesting that they
22 were notes written on the GPR.
23 Q. Am I correct that after you brought
24 Troshawn McCoy to Area 1, you being you and the

434

1 other detectives, after you brought Troshawn
2 McCoy to Area 1, he was not free to leave?
3 A. Well, he definitely wasn't free to
4 leave after he admitted that he was involved in
5 a double murder.
6 Q. Right. After you brought him to Area 1
7 and before he made that inculpatory statement,
8 am I correct he was not free to leave?
9 A. Well, it wouldn't have been my call, so
10 I can't -- I couldn't say.
11 Q. Did you believe he was free to leave as
12 you sat there that day?
13 A. Never thought about it.
14 Q. If you would turn to Exhibit 11.
15 Do you have that in front of you?
16 A. Yes.
17 Q. And you see in the top right corner of
18 Exhibit 11, which is the arrest report for
19 LaShawn Ezell, it's got his date of birth,
20 correct?
21 A. I see that.
22 Q. 2 January 1980?
23 A. Yes.
24 Q. So in December of 1995, he was 15 years

435

1 old?
2 A. That's what the report would indicate.
3 Q. If you go down to about two-thirds of
4 the way down, just above the block where his
5 signatures appear, you see there's a typewritten
6 "Mom: Ezell"?
7 Do you see that?
8 A. Yes.
9 Q. I'm going to read that line and then
10 ask you a question.
11 A. Okay.
12 Q. "Mom: Constance (deaf mute) per legal
13 guardian grandmother Jacqueline," and then
14 "434-8351 NFY 2240."
15 Did I read that correctly?
16 A. Sounds like you did.
17 Q. All right. The 434-8351, is that
18 Ezell's grandmother's phone number to the best
19 of your understanding?
20 A. I have no idea.
21 Q. NFY 2240, what does that mean?
22 A. I have no idea.
23 Q. Could it mean notify family of youth?
24 ATTORNEY BENJAMIN: Objection: Calls for

436

1 speculation.
2    THE WITNESS: I have no idea.
3 BY ATTORNEY CAMPBELL:
4    Q.  Could it be notify Youth officer?
5    A.  I have no idea.
6    Q.  You've never seen the initials NFY
7 before?
8    A.  I don't recall.
9    Q.  You understand that 2240 to indicate a
10 time?
11    A.  I don't know what it is, sir.
12    Q.  In your -- In Chicago Police Department
13 police reports, you use military time, correct?
14    A.  Correct.
15    Q.  So for example, even on Exhibit 11, we
16 see other times up in the top portion, we see
17 1715 indicated as a time of the -- time and date
18 of the arrest?
19    A.  Correct.
20    Q.  And that's in the same format as that
21 2240?
22    A.  If 2240 is a time, yes.
23    Q.  Do you know any other meaning to 2240
24 that is used in the Chicago Police Department?

437

1    ATTORNEY BENJAMIN: Objection: Calls for
2 speculation.
3    ATTORNEY MEADOR: Join.
4    ATTORNEY CAMPBELL: No, it doesn't. I asked
5 if he knows.
6    ATTORNEY MEADOR: He's testified he doesn't
7 know what this indicates.
8    THE WITNESS: So I thought your question was
9 do I know of any other instance that 2240 might
10 represent?
11 BY ATTORNEY CAMPBELL:
12    Q.  Do you know of any meaning that 2240
13 has in the Chicago Police Department other than
14 an indication of a time?
15    A.  22nd District beat, 2240.
16    Q.  Okay. And is that what you understand
17 this to mean?
18    A.  If we still have a District 22.
19       Say again?
20    Q.  Is that what you understand this 2240
21 to be?
22    A.  I don't know what this is, sir.
23    Q.  And you've seen 2240 used to indicate,
24 tell me again?

438

1    A.  You asked me what else it could be, and
2 I know that that could be a beat number. But I
3 don't think it is. But you asked me what it
4 could be, so I'm answering what it could be.
5    Q.  What beat is 2240?
6    A.  What beat is Beat 2240?
7    Q.  What is that?
8    A.  I don't know what -- I'm telling you
9 it's beat -- it could be Beat 2240, and you're
10 saying --
11    Q.  Is that a location?
12    ATTORNEY BENJAMIN: I'm going to object to
13 the form of the question. I think you guys are
14 not communicating very well.
15    THE WITNESS: So yeah. I mean, it's a
16 location, yeah. It would be a location, yeah.
17 BY ATTORNEY CAMPBELL:
18    Q.  What location?
19    A.  In the 22nd District somewhere.
20    Q.  Where is the 22nd District?
21    A.  I couldn't tell you.
22    Q.  Is it anywhere near 70th and Western?
23    A.  I don't think so.
24    Q.  Is it anywhere near Area 1?

439

1    A.  I don't exactly know where it's at.
2 And I don't know what you mean by "near." But
3 again, while you're on this tangent, you asked
4 me what else it could be, and I'm just telling
5 you that it could have been a beat number. But
6 I don't -- I don't know what it was.
7    Q.  Okay. Have you ever seen NFY used as a
8 shorthand for "notify"?
9    ATTORNEY BENJAMIN: Objection: Asked and
10 answered.
11    THE WITNESS: I don't know.
12 BY ATTORNEY CAMPBELL:
13    Q.  You said that it's your practice when
14 you interview suspects as a detective, you have
15 your sidearm on, correct?
16    ATTORNEY BENJAMIN: Objection:
17 Mischaracterizes his testimony.
18    THE WITNESS: No. I didn't say that.
19 BY ATTORNEY CAMPBELL:
20    Q.  No?
21    A.  No, I didn't say that.
22    Q.  Do you often have your sidearm on when
23 you interrogate suspects?
24    ATTORNEY BENJAMIN: Objection:

440

1    Mischaracterizes his testimony about
2    interrogating versus interviewing.
3         But you can answer.
4    THE WITNESS:  Interviewing suspects in, what
5    is this, 2019?  Is that your question.
6    BY ATTORNEY CAMPBELL:
7         Q.   If your -- Has your practice program
8    changed over time?
9         A.   Yes.
10        Q.   Were you wearing your sidearm when you
11   took -- listened to the statement from Troshawn
12   McCoy on December 5th, 1995?
13   ATTORNEY BENJAMIN:  Objection:  Asked and
14   answered.
15   THE WITNESS:  I don't know for sure, but I
16   suspect I might have.  Probably was.
17   BY ATTORNEY CAMPBELL:
18        Q.   All right.  Are you wearing your
19   sidearm today?
20        A.   Yes.
21        Q.   Would you stand up just so we can see
22   how that looks?
23        A.   (Complying.)
24        Q.   Can you turn towards the camera so they

441

1    can see the sidearm.
2         A.   Oh, sorry.
3              Okay.
4         Q.   And that's visible to anybody that
5    you're talking to, correct?
6    ATTORNEY BENJAMIN:  Objection:  Calls for
7    speculation.
8    ATTORNEY MEADOR:  Clearly not to you since
9    you asked him to turn.
10   THE WITNESS:  I don't know.
11   ATTORNEY MEADOR:  So I would say object:
12   Mischaracterizes the evidence.
13   ATTORNEY CAMPBELL:  Let me just check one
14   thing.
15   BY ATTORNEY CAMPBELL:
16        Q.   Were any of the suspects that were
17   brought into Area 1 handcuffed to the wall in
18   any of the interview rooms or handcuffed to any
19   object in the interview rooms?
20   ATTORNEY BENJAMIN:  Objection:  Foundation.
21   THE WITNESS:  I don't know.
22   BY ATTORNEY CAMPBELL:
23        Q.   Would that be appropriate with respect
24   to a juvenile?

442

1    ATTORNEY BENJAMIN:  Objection:  Calls for
2    speculation; object to form.
3    THE WITNESS:  2019 or 19- -- 1995?
4    BY ATTORNEY CAMPBELL:
5         Q.   In December of 1995.
6         A.   I don't know.
7    ATTORNEY CAMPBELL:  Nothing else.  Thank you.
8    ATTORNEY BENJAMIN:  I have just a quick
9    follow-up question.
10             EXAMINATION
11   BY ATTORNEY BENJAMIN:
12        Q.   Detective, when you -- in 1995 at
13   Area 1, was there a room called a Mission Team
14   office?
15        A.   I believe so.
16        Q.   Okay.  And was that a room that was set
17   aside for interviews of witnesses or suspects,
18   or was that used for something else generally?
19        A.   I believe it was the mission -- there
20   was actually a mission team, and that was their
21   office.  But it was any space that is not being
22   occupied when we need it could be
23   reappropriated.
24        Q.   Okay.  And did that room have a ring on

443

1    the wall that you could attach a handcuff to
2    like the interview rooms had?
3         A.   I don't believe so.
4         Q.   Do you recall reviewing your testimony
5    from one of the hearings in the criminal matter
6    in which you testified that Mr. Ezell was taken
7    to the Mission Team office upon arriving at
8    Area 1?
9    ATTORNEY VAN BRUNT:  Objection:  Leading.
10             Sorry.  Go ahead.
11   ATTORNEY CAMPBELL:  Objection:  Leading.
12   BY ATTORNEY BENJAMIN:
13        Q.   Do you recall reading that testimony?
14   ATTORNEY CAMPBELL:  Objection:  Leading.
15   THE WITNESS:  I do.
16   BY ATTORNEY BENJAMIN:
17        Q.   And I think earlier today, you did not
18   recall where Mr. Ezell was taken; is that
19   correct?  Do you remember that testimony
20   earlier?
21        A.   I do.
22        Q.   Okay.  And when you were asked those
23   questions, did you recall your testimony at the
24   hearing?

444

Dwayne Davis 10/02/2019

```
 1      A.  No, I did not.
 2      Q.  Okay.  And did anyone show you that
 3  testimony?
 4      A.  No.
 5      ATTORNEY BENJAMIN:  I don't have any further
 6  questions.
 7      ATTORNEY MEADOR:  No questions.
 8      MR. KUHN:  I don't have any questions.
 9      ATTORNEY BENJAMIN:  We will reserve.
10      THE VIDEOGRAPHER:  This concludes this
11  deposition.  Now going off the record at
12  6:18 p.m.
13          (Off the record at 6:18 p.m.)
14
15
16
17
18
19
20
21
22
23
24
```
445

```
 1  STATE OF ILLINOIS      )
 2                         )  SS:
 3  COUNTY OF C O O K      )
 4      I, TRACY JONES, a notary public within
 5  and for the County of Cook County and State of
 6  Illinois, do hereby certify that heretofore,
 7  to-wit, October 2, 2019, personally appeared
 8  before me, at 160 East Grand Avenue, Chicago,
 9  Illinois, DWAYNE DAVIS, in a cause now pending
10  and undetermined in the United States District
11  Court for the Northern District of Illinois,
12  Eastern Division, wherein LaShawn Ezell, et al.,
13  are the Plaintiffs, and City of Chicago, et al.,
14  are the Defendants.
15      I further certify that the said DWAYNE
16  DAVIS was first duly sworn to testify the truth,
17  the whole truth and nothing but the truth in the
18  cause aforesaid; that the testimony then given
19  by said witness was reported stenographically by
20  me in the presence of the said witness, and
21  afterwards reduced to typewriting by
22  Computer-Aided Transcription, and the foregoing
23  is a true and correct transcript of the
24  testimony so given by said witness as aforesaid.
```
447

```
 1  IN THE UNITED STATES DISTRICT COURT
        NORTHERN DISTRICT OF ILLINOIS
 2          EASTERN DIVISION
    LASHAWN EZELL,               )
 3                               )
        Plaintiff,               )  No. 18 C 1049
 4      v.                       )  Hon. Virginia M.
    CITY OF CHICAGO, et al.,     )  Kendall
 5                               )
        Defendants.              )
 6  -------------------------    )
    LAROD STYLES,                )
 7                               )
        Plaintiff,               )  No. 18 C 1053
 8      v.                       )
    CITY OF CHICAGO, et al.,     )
 9                               )
        Defendants.              )
10  -------------------------    )
    CHARLES JOHNSON,             )
11                               )
        Plaintiff,               )  No. 18 C 1062
12      v.                       )
    CITY OF CHICAGO, et al.,     )
13                               )
        Defendants.              )
14  -------------------------    )
    TROSHAWN MCCOY,              )
15                               )
        Plaintiff,               )  No. 18 C 1068
16      v.                       )
    CITY OF CHICAGO, et al.,     )
17                               )
        Defendants.              )
18      I, DWAYNE DAVIS, being first duly sworn,
    on oath say that I am the deponent in the
19  aforesaid deposition taken on October 2, 2019;
    that I have read the foregoing transcript of my
20  deposition, consisting of pages 1 through 446
    inclusive, and affix my signature to same.
21  _____
                DWAYNE DAVIS
22  Subscribed and sworn to
    before me this        day
23  of              , 2019
24  Notary Public
```
446

```
 1      I further certify that the signature to
 2  the foregoing deposition was reserved by counsel
 3  for the respective parties.
 4      I further certify that the taking of this
 5  deposition was pursuant to notice and that there
 6  were present at the deposition the attorneys
 7  hereinbefore mentioned.
 8      I further certify that I am not counsel
 9  for nor in any way related to the parties to
10  this suit, nor am I in any way interested in the
11  outcome thereof.
12      IN TESTIMONY WHEREOF:  I have hereunto
13  set my hand and affixed my notarial seal this
14  4th day of November 2019.
15
16          Tracy Jones
17
18  _____   _____
19      TRACY JONES, CSR, RPR, CLR
20      LIC. NO. 084-004553
21
22
23
24
```
448

```
 1              McCorkle Court Reporters, Inc.
                200 N. LaSalle Street Suite 2900
 2              Chicago, Illinois 60601-1014
 3
       November 4, 2019
 4
       ROCK FUSCO & CONNELLY, LLC
 5     STACY A. BENJAMIN, ESQUIRE
       321 North Clark Street
 6     Chicago, Illinois 60654
 7     IN RE: Ezell v. City
       COURT NUMBER: 18 C 1049
 8     DATE TAKEN: October 3, 2019
       DEPONENT: DWAYNE DAVIS
 9
       Dear Ms. Benjamin:
10
       Enclosed is the deposition transcript for the
11     aforementioned deponent in the above-entitled
       cause. Also enclosed are additional signature
12     pages, if applicable, and errata sheets.
13     Per your agreement to secure signature, please
       submit the transcript to the deponent for review
14     and signature. All changes or corrections must
       be made on the errata sheets, not on the
15     transcript itself. All errata sheets should be
       signed and all signature pages need to be signed
16     and notarized.
17     After the deponent has completed the above,
       please return all signature pages and errata
18     sheets to me at the above address, and I will
       handle distribution to the respective parties.
19
       If you have any questions, please call me at the
20     phone number below.
21
       Sincerely,
22     Cynthia Alicea         TRACY JONES, CSR, RPR, CLR
       Signature Department  Certified Shorthand Reporter
23                            (312)263-0052
24     cc: ALL COUNSEL OF RECORD
                                              449
```

Dwayne Davis 10/02/2019

**Exhibits**

**Davis Exhibit 2**
4:12 92:16
**Davis Exhibit 4**
4:17 216:18 239:6
240:4 431:13,20
**Davis Exhibit 5**
4:13 94:4,6 115:23
**Davis Exhibit 6**
4:14 95:20 96:3,6
425:5,24 427:5,9,21
429:6
**Davis Exhibit 7**
4:15 96:23 97:2,6
123:4 418:10,19
**Davis Exhibit 8**
4:16 175:2
**Davis Exhibit 9**
4:18 260:22 261:4,9
368:9
**Davis Exhibit 10**
4:19 271:20,22
272:1
**Davis Exhibit 11**
4:20 323:5 435:14,
18 437:15

**-**

**--had**
372:10

**0**

**016862**
272:2
**084-004553**
5:17

**1**

**1**
17:16 20:20 24:18
35:9,23 36:4,9,23
37:9 39:18 41:6 45:4
47:18 49:1 50:23
51:4,18,24 57:5,6
62:6,12 64:4,17 67:9
70:11 71:19 72:1,20
79:2 80:14 83:8,22
87:2,7 91:7 93:14
95:15 96:19 99:1
100:24 107:9 113:21
114:14 117:1 122:13
124:19 125:20
126:15 127:10
128:23 129:17
132:13,19,22 133:7
148:6,15 149:17
162:3 163:14,22
166:18 167:2,8,16,
17 168:24 169:9
170:8 187:7,21
188:3 191:23 200:8
201:12 203:8,15
208:5 211:24 212:3,
6 223:8 233:24
237:2,15 238:10
239:17 240:1,11
254:19,23 255:15
259:2 263:8,9
266:10 282:20
287:21 295:8 297:22
320:15 322:14 325:9
329:20 330:24
342:22 343:11
347:1,3 352:8
422:21 424:7,14
434:24 435:2,6

439:24 442:17
443:13 444:8
**10**
271:20,22 272:1
**1049**
5:11
**10:30**
354:19
**11**
323:3,5,9 435:14,18
437:15
**11:00**
39:4
**11:10**
91:8
**11:25**
91:12
**11:30**
39:4 40:10
**12**
431:18
**12/5/95**
324:10
**12:00**
39:5 303:9
**12:30**
39:5
**12:50**
176:10
**13**
98:11
**15**
391:3 435:24
**1500**
263:23
**1503**
368:14
**16**
345:10
**17**
129:13
**1715**
437:17
**17474**
96:7
**17479**
96:7
**17480**
97:8
**17490**
98:7
**17491**
123:9,15 418:14
**17495**
97:8
**18**
5:11
**180**
23:13
**19**
345:14
**19-**
443:3
**1978**
418:15
**1980**
435:22
**1981**
29:23
**1987**
94:21
**1988**
30:19,24 425:10
**1990**
30:23
**1992**
93:9 98:12 123:20
418:18 419:1
**1995**
20:20 21:23 23:6,22

27:2 38:15 39:18
40:19 42:10 43:9
48:1,6,24 49:4,7
54:20 63:12,16,21
64:4 69:8 98:21
99:17 101:4 102:7
103:19 104:20
105:18 107:4 109:6,
9 117:2 129:19
133:10 134:22
135:21,24 136:3,6,
14,17 137:15,18,20,
24 140:8 153:8,12
161:8 163:15 187:8,
21 188:3,9,13 203:8
207:7 208:4 212:1,7
215:23 229:3 263:23
264:17 301:5 316:23
395:20 419:9,23
420:21 425:14
435:24 441:12
443:3,5,12
**1998**
356:18,19
**1:36**
176:14

**2**

**2**
21:7 91:11 92:16
176:10 218:22
272:17 435:22
**2(g)**
429:6
**20**
36:10 150:18 283:20
360:5,7,10,18
400:21 407:1
412:19,23,24
**20-plus**
412:16 428:18
430:23
**200**
23:13
**2000s**
44:5 71:11 167:24
**2019**
5:5 441:5 443:3
**21**
362:4 406:3
**22**
438:18
**220**
21:7
**2240**
436:14,21 437:9,21,
22,23 438:9,12,15,
20,23 439:5,6,9
**22nd**
438:15 439:19,20
**23rd**
32:4,11 41:23 42:3
47:9
**24**
265:4
**240**
21:13
**245**
21:13
**24th**
32:15,21 47:12
**25**
36:10
**27**
283:21
**28**
283:20
**29**
261:8 415:17

**2:50**
252:21
**2nd**
5:4 189:8

**3**

**3**
81:3 123:22 124:10,
14 176:13 252:20
263:7
**30**
11:4 21:17,18 217:9
411:11,15,23
**300**
36:1
**30s**
21:20
**31**
98:12 418:18
**31st**
94:21 123:20
**34587**
323:14
**374**
272:19
**374-6962**
223:13
**39th**
168:9
**3:00**
38:18,24 39:1,4,7
40:9 263:24 264:1
328:2
**3:09**
253:1
**3:30**
328:3,5
**3rd**
60:1

**4**

**4**
125:9,16 216:18
217:4 223:3,4 239:6
240:4 252:24 419:16
431:13,20
**434-8351**
272:17 436:14,17
**4:00**
38:24 39:1,5 302:18
327:6
**4:50**
366:16
**4th**
23:22 24:5 229:10

**5**

**5**
23:11 94:4,6 115:23
274:11 366:19
**50**
360:8,11,18
**51**
217:4
**51st**
36:7
**5:08**
366:20
**5:15**
324:10
**5th**
24:6,9 25:10 27:2
63:12,16,21 89:12
190:5 199:15 201:1,
11 204:16 206:19
207:16 223:9 239:1
254:4 255:24 263:23

267:8 268:10 269:2
273:15 274:11
353:13 366:24
388:22 405:22
441:12

**6**

**6**
21:7 95:20 96:3,6
126:7,24 127:12,24
128:6 274:12,14
420:12,13 425:5,24
427:5,9,21 429:6
**62nd**
29:21
**64th**
29:19
**67th**
296:9
**6:18**
445:12,13
**6th**
354:22

**7**

**7**
23:11 96:23 97:2,6
123:4,13 220:15
221:11 418:10,19
**7000**
189:23
**70th**
47:2,19,22 57:10
439:22
**71st**
297:9
**73**
312:17
**7316**
272:16 325:11,13
**7355**
325:8,14
**7:00**
38:18 39:7 190:9
369:18

**8**

**8**
175:2 260:23,24
**80**
94:14 272:17
**8133**
272:19
**82**
115:21
**83**
94:14
**8:00**
209:17
**8th**
210:4

**9**

**9**
260:22 261:4,9
368:9
**90**
30:24 31:9 32:12
**90s**
22:8 43:22 44:5,7
47:18,22 57:11 58:1,
14 59:20 67:9 68:1
74:23 84:9 107:9,11
109:11 111:18
112:11,23 113:5,8,
21 114:13 122:13

124:9,19 125:5,20
126:15 127:10
128:23 129:1,16,22
130:6,10,16 138:15
143:13 144:18
149:17 155:18
157:1,3,15,24
158:17 161:12 162:3
163:12,22 166:3
167:14,24 168:2
170:9 177:12,15,18
178:9,14 179:14
181:19,20 264:22
281:14 304:13,24
315:22 342:22
**911**
193:5
**92-8-6**
98:8
**95**
21:12,14 22:8,9,16,
23 23:1 32:18 33:11
34:14 39:7 41:10
42:6,21,23 43:17
45:4 46:6,18 47:1,7
48:12,15,17 50:5,18
51:9,14,18,24 52:4
53:18 55:3,9 59:7
61:11,12 62:3,5,10,
15 68:17 69:17
70:12 75:1,2,4,7
79:2,10 80:2,7,20
93:9 99:2 101:9,11
106:15 133:19,22,23
134:8,15 137:10
148:16 153:14,19,23
154:1,3 155:2,4,8,9,
18 161:2,5 176:18
177:15 201:21
208:15 218:11 251:8
259:7 317:13 322:4
354:12 358:17
359:22 360:15 362:3
395:24
**96**
67:19 134:8 395:20
396:2
**97**
67:19
**98**
67:20 355:20,21
356:7,8,11,13
358:18 359:23
360:15
**9s**
156:16

**A**

**a.m.**
91:8,12 190:9
**ABC**
145:9
**abide**
122:14 130:22
187:9,19 188:1
**ability**
9:13,17 24:13 135:3
212:3
**absolutely**
43:13 212:6 250:2,3
387:2
**abuse**
58:5
**academy**
31:10,13 34:3,17
35:5
**acceptability**
116:20
**accepting**
124:6



accompanying
17:9 225:6
accords
127:6
account
112:7 129:13
accountable
81:19
Accounting
30:21
accuracy
220:5
accurate
9:20 16:13 21:11
133:8 260:1 434:6
accurately
153:17
accused
106:8
accusing
107:1
act
126:11 389:14
395:18 420:15
action
294:19
actively
142:20 144:12
activities
134:13,21
activity
57:14
actual
49:17 149:18 356:9,
16
add
103:15 145:5 380:19
391:21 402:12 408:8
added
166:11 169:18 404:3
adding
430:4
Addison
47:10
addition
401:19 426:15
additional
147:22 353:12
address
206:12 313:21,22
325:10
addresses
290:13
administer
5:15 160:9
administered
160:11
admission
124:7 365:11 366:10
376:15
admitted
246:22 366:10 435:4
admitting
247:12
adrenaline
423:21 424:1
adult
122:1,16 124:6,21
125:12,13 306:20
316:1 317:15
419:18,19 420:10
adults
307:4 309:8 312:20
advised
329:19
affect
9:13,17 42:9
affiliation
266:5,18,21

African-american
378:6,10,15 379:20
afternoon
176:16,17 302:21,24
388:17,18
afternoons
40:8 69:21
age
23:14 129:13 185:2
345:16 417:24
agg
44:17
aggravated
44:15
agree
96:15 102:16,19
103:4,18 105:18
106:15 110:23
111:2,17 112:13
115:17 116:22
117:13,23 118:18
121:23 130:5,10,14,
21,23 165:10 187:2,
7 204:18 266:23
267:6 275:1 280:3
287:20 288:15 298:6
316:17 323:19
378:21 408:21
412:17 414:9
426:21,23 427:1,14,
17,22 428:3
agreed
235:9 407:12
agreeing
434:5
ahead
39:21 111:11 199:2
212:19 288:21
380:18 397:3 444:10
albums
203:7,14
alert
319:5,16 321:12
Alesia
28:17 29:4 89:8
90:2,5,10,14
Alexa
6:10
Ali
12:6 14:14 16:16
23:18 27:8 41:3
62:21 66:5,17 70:2
73:8 77:18 188:6,22,
23 189:5 202:1,12
206:10 265:21
Ali's
202:10
alias
194:24
alibi
269:16,19 413:20,24
alibis
355:5 397:12
alledgedly
372:5
allegations
413:7
allege
401:2
alleged
108:8 196:1
alleging
106:9
Allen
120:20,23 121:3,5
401:23 402:14 404:5
409:11,12,14
Allen's
403:14 409:1,3,8
allowances
428:9

allowed
37:14 407:7
alternatively
408:6
amass
146:6
amassing
161:18
anally
394:13
Andrews
39:20 40:13
angle
6:13
anonymous
191:15,20 195:11
208:4,11,19 209:18,
21 210:7 212:23
213:9 223:7 230:18
answering
439:4
answers
412:12,14
antenna
285:12,21
anticipated
247:3
anticipating
246:17
anus
394:14
anymore
128:8 231:18
Apologies
181:9
apologize
6:13 317:3
apparently
33:18
appearances
5:13
appears
404:24 426:18
applied
121:17
approaches
157:4
approval
88:23 329:12
approve
185:1
approved
139:23,24 141:16
146:13,16,20 147:6
181:21 328:17
April
356:11,12,20
area
17:12,14,16 20:20
12 263:24 264:10
266:6 269:10 297:2
315:14 318:2 320:14
321:13 322:3,8
324:10,17 328:5
332:7 334:22 335:17
341:3
arresting
24:21 25:16 33:4
262:4,9 263:3
264:18,22 292:17
298:8 300:1,15
304:4,13,23 315:18
316:1 320:5 323:20,
22 330:11 333:7
337:2 349:19 351:8
arrests
294:2 295:10 299:21
341:19 342:9,16
343:2 347:6,11,19
arrived
132:18 199:15 226:4

168:17,24 169:9
170:8 171:4 177:21
187:7,21 188:3
191:23 192:3 199:14
200:8 201:12 203:8,
15 207:16 208:5
211:24 212:3,6,7,15
214:17 223:8 225:24
233:24 234:5 237:2,
15 238:10 239:4,7,
17 240:1,11,20
242:21,22,23 243:20
254:19,23 255:15
259:2,8 263:7,8,9
266:10 282:20
287:21 292:14
295:8,13 296:2,3
297:14,16,22 301:12
302:12 320:15
322:14 325:9 329:20
330:24 336:4,19
341:5 342:22 343:11
344:8,18 346:11,17
347:1,3 348:3 352:8
388:5 422:21 424:7,
14 434:24 435:2,6
439:24 442:17
443:13 444:8
argumentative
110:17 223:21
411:6,19,20 416:3
armed
228:21
arms
285:6
Armstrong
286:3
Army
168:12,13
arrest
89:3 140:15 228:17
230:4,8,11 231:17
234:19 237:7 260:6
261:8 263:7,22
264:5,18,24 266:23
267:6,11 269:5
291:6 292:22
298:16,20 300:5
302:8 303:5,10,17
304:8 309:2 314:18,
20 316:6 317:20,24
319:6,13,17,21
320:7 322:24 323:11
328:8,24 330:4
333:18,22 334:1
335:16 341:22
368:7,13 421:18
435:18 437:18
arrested
73:18 102:1 260:8,

256:12 347:2
arriving
132:21 444:7
articles
400:20,24 401:1
articulated
403:15 409:1 410:4
articulating
406:7
ASA
357:22
ascertain
238:23
ashamed
186:24 187:3
Ashland
168:10
Asks
184:3
aspects
88:14
ass
278:4
assault
58:5 106:6,8 120:24
210:4 393:24 407:5
assaults
58:4 208:21 359:18
396:5 412:24
assessed
273:14
assign
53:1
assigned
7:1 36:4 37:9,12
42:10 51:4 52:5,22
53:22 54:19 55:1,4,
10 58:3 66:21 82:10
90:6,10 141:12,16
175:19 189:14
190:20 191:11 197:6
198:17 199:18 200:8
201:1 204:19,20,23,
24 205:4,9,15
221:14 228:10
233:10
assignments
33:21 359:9
assist
46:8 48:23 190:22
191:1,4,5,12 194:6
198:17 199:18
200:2,10 218:18
220:1 221:15 228:10
320:7 328:7 342:14
assistance
77:2 270:16
assistant
28:24 88:12 90:5,11
181:9,11,13,18
182:2 183:2 184:17
357:7
assisted
43:6,15 59:3 62:19
67:5 269:4
assisting
24:21 42:18 54:11
67:2,4 204:16,20
266:17 313:19
373:21
Associates
31:5
assume
9:1 25:15 48:19 73:1
94:18,19 95:9 96:11,
14 98:14 99:4 101:1
133:9 136:4,5 209:9
264:14 292:9 298:5
308:23 334:19
353:16 356:4

assumed
197:14
assumes
318:5 405:16 433:18
assuming
17:15 20:10 34:16,
18 40:22 50:20
53:15 55:23 88:8
89:21 93:6,7,10
140:11 144:11
162:20 190:23 192:6
194:2 221:4 238:14
249:18 273:19,21
275:6,7 297:18
322:5,11 324:24
333:15 334:13 369:2
431:17 432:6
assumption
221:8 369:7
assumptions
264:16
assure
122:23
ate
238:6
attach
444:1
attached
56:15
attacked
288:9
attempt
317:18,21 320:20,24
321:3,24
attempted
320:18 325:18
attempting
318:22
attempts
351:20
attended
30:15
attention
123:21 431:24
attesting
434:19,21
attorney
6:7 12:15 20:21,24
21:16,19,23 22:3
27:13,15 45:8,10,13,
16,18 46:2 48:18,21
54:18 55:22 56:1
60:3,13,15 64:5,6,8,
11,12,13,23,24 65:1,
4,7,9,11 67:18,21,23
70:13,15,18,21,23
71:1 72:21,23 73:4
76:5,8 79:3,5,8
80:15,17,19 82:4,7
85:24 86:22 87:3,5,9
88:24 91:5,13 92:14,
18 94:2,3,8,10,11
95:21,23,24 96:5,8
97:4 102:12,13,18
104:21 105:2,6,7,11,
21,22 106:2,5,12,18,
20,21 107:3,21
108:1,12 109:15,18
110:17,22 111:6,10,
11,16 112:16,20,24
113:6 115:9,11,15,
19,21,23,24 116:1,2,
6,11 118:3,7,12
122:9,12 123:16,17
124:11,13 129:4,5,7,
24 130:2,4 131:1,4,7
132:16,20 152:1,4,
10,17,24 153:13,15
154:8,9,13,17,19,23
156:17,21 158:1,2,4,
7,9,11,18,19,21
159:4 161:9,11,14,



17,20,24 162:8,10
163:17,18,20
168:19,20,22 169:1,
2,3 170:1,2,4,15,17,
20 174:16,19,21,23
175:4 176:7,15
180:5,9,20 181:4,10,
11,12,13,15,19
182:4,5,6,14 183:4,
11,15,16,18 184:3,5,
8,18,20 185:24
186:8 187:3,6,11,12,
14 195:17,23 198:24
199:2,6 200:19,21
201:2,6,8,10 203:16,
17,20 205:7,19
208:6,7,9 209:23
210:1 212:8,9,12,18,
21 213:6,10,14,17
214:4,7,11,13
215:10,13,15,17,20,
22 216:19,20,22,24
217:2 220:14 223:4,
5,19,22,24 227:4,7,
17,19 229:16,17,23
230:21,24 231:4,7,
11,14 232:4,5,7,11,
16,19 233:15,22
234:11,14,20,21
236:12,13,16 246:3,
4,7,10,12,19,21
247:2 249:6,9
252:17,18 253:2
256:18,20 257:4,5,9,
18,19,23 259:11,15,
17,20 260:23 261:1,
6 264:20 265:1
267:2,4,9,13,17,19
268:11,13 271:2,4,9,
11,14,16,18,19,24
274:6,8 276:19,22
277:2,5 278:18,19,
22 279:1 280:15,16,
20 281:19,20,22
283:10,14,16
284:10,12,14
285:10,16,18,21,23
288:6,8,11,19,24
294:20,21,23
298:10,11,14
304:14,16,18,21
305:1,2,4,6 310:3,5,
9,17,19 312:22
313:2 316:12,15,19,
21 317:3,6 318:5,9
319:7,9 321:14,16
322:6,16,22 323:2,7,
10 326:8,10 328:14,
16 330:16,19
331:11,16 342:18,
19,20 352:16,18,22
356:3,6,11,12,14,18,
19,20,22,23 357:8
358:22 359:1
360:16,19 364:6,13,
14,16 365:18,20,23
366:3,13,21 368:20,
23 369:11,15,17,19,
22 373:6,9,17,19,22
374:6,9 375:18,23
377:3,4,6,8,10,12,17
378:17,19,20
379:11,16,23 380:2,
12,14,17 383:18,20
384:10,11,15
385:15,17,20 386:5,
8,13,20,22,24 387:2,
6 388:12,14,24
389:2,9,12,16,19
390:2,3,7,13,14,16,
19,22,24 391:19,21
392:1,8,10,11,17,19
393:1,7,9,15,19,21

394:7 395:10,15
397:14,15,18 400:8,
10,11,14,17 402:3,5,
6,11,20 403:1,18
404:1,10,14,17
405:4,5,6,10,15,19,
20,24 406:11,16,21
408:3,4,6,7,9,23
409:16,19,20 410:1
411:3,5,6,9,18,20,21
412:1,3,6,7,15,20,22
413:3,8,9,15 414:5,
8,14,20 415:23,24
416:2,5,9,23 417:4,
18 418:3,12,14,16,
20,22 419:24 420:3
421:1,4,12,13,17,23
422:1,3,5,7,10
423:3,4,6,12,19
425:20,23 427:10,
12,16 428:20 429:1,
18,19,23,24 430:3,9,
13,14,19 431:2,3,5,
12,14,19 433:5,6,7,
9,10,14,18,20,22
436:24 437:3 438:1,
3,4,6,11 439:12,17
440:3,12,16,19,24
441:6,13,17 442:6,8,
11,13,15,20,22
443:1,4,7,8,11
444:9,11,12,14,16
445:5,7,9

**attorney's**
88:2,6 91:3 182:21
357:4 407:11 408:17

**August**
98:12 123:20 418:18

**Aunt**
272:18 273:11

**author**
14:10,17 218:3,4
262:7 324:24 428:9

**authored**
14:20

**authority**
190:24

**auto**
57:7,10 58:10
189:22 204:14
206:19 404:20 409:6

**availability**
402:8

**avoid**
118:21

**aware**
19:6 27:7 68:17
103:2 119:13,15,22
190:14 212:5 266:9
299:19,23,24 389:18
397:22 398:6,15
399:12

**awkward**
6:13

**— B —**

**back**
17:12,14 21:12
22:10,23 23:5 24:17,
23 25:1 29:9 37:6,
10,12 41:10 49:20
50:4 52:11 55:2,9
56:11 62:14 67:9
68:17 70:6 74:1
75:11 78:7,9 79:2
81:23 83:8 86:5
91:12 95:18 96:22
98:2 102:7 103:18
104:19 106:4 107:7,
21 114:6 118:8
119:14 122:13 127:8

**background**
176:19 178:8,16
179:20,24

**backseat**
315:1,3 332:8
334:11 338:3

**backtrack**
26:12

**backup**
200:18

**backwards**
247:17

**bad**
205:1

**BAGBY**
20:21 27:13 64:5,11,
23 65:1,9 67:18,21
70:13,23 72:21 79:3
80:15 85:24 87:3

**baloney**
344:16

**base**
168:12

**baseball**
376:21

**based**
40:4 41:5 48:3 62:23
63:17,23 66:23
79:19 97:13 149:10
152:23 209:21 221:8
225:19 230:13 231:6
245:23 264:14
305:23 311:3 336:9
340:17 365:6 395:8
397:4 399:7 400:12
403:7 406:4 408:24
409:13 410:3
411:16,23 412:16
415:10 427:20
428:17 430:23

**baseline**
393:12

**basic**
98:5

**basically**
41:14 55:17 97:5
162:19 382:1

**basketball**
216:4 265:14

**Bates**
97:7 98:7 123:15
261:7 272:2 323:12

**bathroom**
141:8

**baton**
228:24 229:2,11,19
249:5 282:19 285:16

**batons**
229:6

**batt**
44:17

**batteries**
359:10,16,18

**battery**
44:15 287:16,19
343:6,9

**beat**
278:3 438:15 439:2,
5,6,9 440:5

**bed**
23:2

**began**
302:17

**begin**
339:9

**beginning**
34:19 163:8 183:6
190:3 241:6 351:22

**begins**
91:11 176:13 252:24
366:19

**belated**
317:4

**belief**
130:17 135:1 137:22
138:3 255:3 274:22
307:10 354:16,21
364:23

**beliefs**
365:2

**believed**
342:17 349:4 381:6
396:13,21

**bell**
120:20 296:9

**bench**
172:19 248:8

**benches**
172:18 243:8

**beneficial**
378:2

**benefits**
116:18

**Benjamin**
10:10 11:24 102:12
104:21 105:6,21
106:18,20 107:21
108:1 111:10
112:16,24 115:11
122:9 123:16 129:5
130:2 131:4 152:1,
17 153:13 154:8,17
158:1,9,19 162:8
163:17 168:19 169:1
170:1 174:21 180:5
182:4 183:16 185:24
187:11 200:19
203:16 208:6 212:8
213:6 223:4,22
227:17 229:17
230:24 232:5 233:15
234:11 236:12
246:3,19 256:18

**blackened**
53:9

**block**
189:23 432:10 436:4

**blocks**
325:16

**Bloore**
74:9,10,20 75:6,10
83:10 262:13
263:14,15,16 292:6,
8 297:13 303:6
325:17 326:2 327:10
336:2,5 341:5,14,18,

257:4,18 259:17
264:20 267:9,17
271:2,9,14,18
276:19 280:15
281:19 284:12
286:15 288:6 294:20
298:10 305:2 310:3
312:14 323:7 326:8
328:14 331:11
342:18 352:16
358:22 364:13
368:20 369:17
373:6,19 374:6
375:18 377:3,8,12
378:17 379:11,23
380:12 384:11
385:15 386:5,13
387:2 390:3,13,22
391:19 392:8,17
393:7,21 397:15
400:8 402:3,6,20
403:18 404:10
405:5,15,20 406:16
408:3,7 409:16
411:3,6 412:6,22
413:8 416:2,23
417:18 418:12,20
421:13,23 422:3,7
423:4 425:20 427:10
428:20 429:18
430:13 431:14
433:5,10,20 436:24
438:1 439:12 440:9,
16,24 441:13 442:6,
20 443:1,8,11
444:12,16 445:5,9

**Bernadette**
272:19 273:11

**Bernard**
19:10 38:2 71:18

**Bernie**
10:23 37:17,18
303:2,3 307:6

**Bernie's**
73:9

**bet**
357:23

**big**
49:10 92:6 172:14
328:23

**bigger**
78:10,13,18 247:5

**bike**
209:16

**birth**
435:19

**bit**
22:18,19 32:8 44:17
60:3 71:18 74:8
91:15 170:22 180:15
217:11 231:24 232:8
405:7

**black**
49:11 50:1 245:10,
21 378:10 380:3,4

**blacks**
16:10

**blah**
142:23

21 424:11,13

**blow**
285:3

**bodies**
82:13 251:18 392:6,
15

**body**
82:11 185:18

**bolt**
259:24

**Bonke**
39:19 40:6 84:14,19
85:6,8,12,20 86:1,23
87:22 148:8 222:1,6,
16,18,24

**Bonke's**
87:1

**boogymen**
235:12

**book**
203:12 204:9,10
218:2,21 317:12

**bothered**
299:14

**bottom**
261:14 272:13 378:1
426:4 431:24

**Boudreau**
38:5 69:8 70:8 71:10
73:5

**bought**
344:6

**bounced**
37:24

**BOWMAN**
94:2 252:17

**box**
217:15,22 218:22
265:4 266:7 432:1
434:17

**boy**
215:3

**branch**
61:15

**break**
9:7 91:6,9 170:16,19
176:8,11 252:19,22
277:21 284:24
366:14,17

**breaking**
252:17

**Brian**
357:8 358:6

**briefed**
191:14 297:23

**bring**
145:4 151:2 228:19
230:17 231:2,12,16
232:2 241:19,23
317:18 372:18 422:1

**bringing**
17:12 233:13 234:23

**broad**
160:8

**Broadway**
47:11

**broke**
247:13

**brother**
302:4

**brothers**
321:20

**brought**
76:17 82:5 182:17
186:10 225:23 232:9
242:8 258:14 330:7
344:8,21 351:10
352:8,11,20,24
379:19 393:4 431:9
434:23 435:1,6
442:17



**Brown**
36:1

**Brunt**
6:7,10 12:15 20:24
21:19 22:3 27:15
45:10,16 46:2 48:21
54:18 56:1 60:15
64:8,13 65:4,11
67:23 70:18 71:1
73:4 76:8 79:8 80:19
82:7 86:2 87:9 88:24
91:5,13 92:14,18
94:3,11 95:21,24
96:5,8 97:4 102:18
105:2,11 106:2,12
107:3 108:12 109:18
110:22 111:16
112:20 113:6
115:15,21,24 116:2,
11 118:7,12 122:12
123:17 124:13 129:7
130:4 131:7 132:20
152:4,10,24 153:15
154:3,12,23 156:21
158:4,11,21 159:4
161:11,17,24 162:10
163:20 168:22 169:3
170:4,17,20 174:16,
19,23 175:4 176:7,
15 180:9 181:4,12,
15 182:14 183:11,18
184:8,20 186:8
187:6,14 195:23
199:6 200:21 201:8,
10 203:20 205:19
208:9 210:1 212:12,
21 213:10,17 214:7,
13 215:13,17,20,22
216:20,24 217:2
223:5,24 227:7,19
229:23 231:4,7,14
232:11,19 233:22
234:14,21 236:16
246:7,12 247:2
249:9 252:18 253:2
256:20 257:9,23
259:20 261:6 265:1
267:4,13,19 268:13
271:4,11,16,19,24
274:8 276:22 277:5
278:19 279:1 280:20
281:22 283:16
284:14 286:18,23
288:11,24 294:23
298:14 304:16,21
305:6 310:9,19
313:2 316:15,21
317:6 318:9 319:9
322:6,22 323:2,10
326:10 328:16
330:19 331:16
342:20 352:22
356:6,12,14,19,22,
23 359:1 360:19
364:16 365:20
366:3,13,21 368:23
369:11 444:9

**building**
168:6 169:12 202:13

**buildings**
168:11

**bullet**
44:20

**bunch**
35:24 36:3 187:5
198:8

**business**
66:3 243:24 307:5,7

**businesses**
48:6

**button**
151:9

**bye**
369:18

---

## C

**cabinet**
166:16

**call**
33:7 86:17,19
123:21 142:14 146:8
173:23 177:23 178:1
191:15,19,20,23
192:3 193:3,4,17,21,
23 194:1,8,12,15
195:14 196:16,18
205:11 207:15 208:2
209:21 212:15,17,23
213:4,5,9,19 214:2
215:8,18 223:8,17
224:3,18,24 225:3,
11 230:18 231:13
238:10 239:11 248:9
279:14 286:1 287:18
304:3 322:4 345:21
347:17 369:10
371:24 381:7 416:6,
7 435:9

**called**
6:3 7:22 36:13,15
40:16 81:3 140:24
141:18 148:22
190:18 204:3 206:19
233:9 241:4 244:12,
13 358:13 367:13
371:10,15 375:24
376:3 396:11 443:13

**caller**
194:19,22 195:8,11,
16,24 196:3,5,20,23
197:3 211:24 212:2
213:12 223:11

**calling**
145:22 148:23,24
212:7 293:1 343:8

**calls**
45:14 105:22
106:20,22 108:2
111:7 115:9,11,12
129:24 131:1,2
158:7 180:5,20
192:24 207:24 212:4
213:14 227:4 232:16
234:11 246:19
259:16 276:19
288:6,19 304:18
321:14 326:8 342:19
365:23 380:12
386:14 390:3,20
392:10,17 393:7,20
395:10 402:4,20
403:18 404:10
406:12 416:23
417:19 427:10
428:20 436:24 438:1
442:6 443:1

**camera**
441:24

**Campbell**
121:9 274:6 388:16,
19 389:2,12,19
390:7,16,24 392:1,
11 393:1,15 394:7
395:15 397:18
400:11,17 402:11
403:1 404:1,17
405:10,24 406:21
408:23 410:1 411:9,
20,21 412:3,15
413:3,15 414:8,20
415:24 416:9 417:4
418:3,14,16,22
420:3 421:4,17

**canvasses**
205:22

**car**
24:23 48:8,14 58:8
66:6 75:11 207:6
207:10,15 252:2,15
254:18,23 255:2
297:14 305:7,10
315:2,3 317:23
321:22,24 332:8
334:7,11,14 335:13,
22 336:3 337:7,17,
18,23 338:8 339:2
340:21,24 341:6,11
342:5 370:18 373:1,
5,12 392:3 402:8,9,
16 403:12 405:2
407:21 422:6,9,13
423:16,23 424:4,7,
13,20 425:1

**card**
307:5,7

**care**
9:12 129:2,6,9,15

**career**
81:12 91:24 99:9
100:10 155:13,16
156:24 160:20
183:10 184:15
208:18 343:20
386:18 387:11 389:5
399:14

**carry**
229:5

**cars**
57:20 204:14 334:5
335:15 401:21
403:12 404:7,20
409:5,7 422:18,20

**case**
5:10 6:12 7:20,22
8:3 9:22 14:11,13,14
15:2,7,9 17:4,8
19:16,20 20:8 27:3,
8,20 28:6,12 29:1,5,
8,12,13 41:3 43:4,16
44:3,22 51:16,17
52:5,20 53:2,6,21
54:17,20,21,22,23
55:4,8,11 56:16,23
57:1 58:2,11 60:7
62:20,21,24 63:10
65:13,16,19,21,23
66:5,15,17,18 67:6,
14 68:4,9,12 70:2,6
73:8,14,23 75:7,24
76:4,17,21,24 77:23
78:4,8,19 80:5,6
83:6,15,19,20,21
84:5,17 85:5,16,22
86:20 88:10,14 89:9
90:21 99:20,22
101:3 118:2 119:11,
16,23 120:11,15
124:22,23 125:6
126:3,6,21 128:11
138:11 139:11,14,23
140:20 141:6,12,14
17,19 142:1,8,16,18,
22 143:4,14,19,22
144:9,17,20,24
145:2,20 149:2,7,11
150:15 151:3,23,24
152:7,9,11,12,15,20

153:2,4,23 154:1,7
157:11 159:22
160:1,7,15,16
161:19 164:15,16
166:10,11,14 175:21
180:13,14,19 183:2,
3,19,23 185:4,7,19
188:20 192:14 200:24
204:16,19 205:4,14,
20 206:3 208:14
210:10 211:9,17,22
214:3 216:17 218:15
219:7,11 220:21
221:15 222:7,22
223:1 224:14
227:16,22 228:5,19
236:11 241:12
255:11 261:21
262:1,23 265:22
266:3,17,18,21
269:10 270:16
274:17 279:5 288:13
289:13 292:5 293:9,
12 294:5 297:23
298:7,8 326:21
329:15 331:20,21,24
336:10 340:22
342:14 347:2 348:8
350:21 352:4
353:20,24 354:4,7
355:1,5,14 356:1,7,
8,17 357:8 358:4,18
359:8,22 360:24
361:22 362:8,18
364:3,6,9,12,21
365:1 366:7 370:22
373:5,16 374:12
378:2 379:4 383:7
385:11 390:12
392:22 393:3 397:17
398:10,24 399:4
400:5 401:8,18
407:10,13 422:12

**cases**
5:9 8:7,9 28:7 42:21
43:8,17,19,20,22,24
44:2,6,13 45:1,2
47:6 51:10 52:22
53:8 55:14 57:5 59:2
62:18 63:3,4 66:21
71:24 78:11,13 84:2,
21,24 85:1 86:14
87:16,17 89:15 90:4,
9,20 101:11 106:24
107:5,15 134:4
144:14 159:22,23
166:5,9 181:21,24
184:6,9,10,12,21
185:1 205:9 208:11,
17,20,21 209:20
210:10,11 339:16
346:12 357:1 358:7,
15,19 359:2,11,20
360:21,22 361:4
362:11 381:2 394:20
395:1,2 396:6
399:20 400:2 401:3
412:11,13 413:12,22
414:16 426:9

**Cassidy**
14:22,23 17:10 38:7
62:4,20,23 63:5,23
65:15 66:4,14,24
67:2,4,6 71:8,9 73:5
191:1,14 193:12
194:7,11,17 195:7,
12 197:7 198:17
199:19 200:2,6
207:12 213:1 215:6,
14 217:15 220:7
224:6 225:3,6,16
228:8 236:5 237:20

238:6 239:21 240:22
242:1,7,12,18
243:20 244:6,18
245:1,15,18 246:16,
24 248:2,17,20
249:13,16 253:4,10
254:11,22 255:14
258:24 262:19
264:14 269:21 270:8
276:9 277:23 278:6,
8 279:7,10,17
282:24 289:17
291:19 294:16
329:14 350:12 363:4
366:23 368:1 369:5,
7 370:7,16,19,22
371:20 373:10,15,21
374:16 375:6,9,14
376:8,11 377:1,16,
20 378:24 379:13,
14,19 380:9,20
381:2,6,12 382:6,10
384:1,5,16 385:12
386:4,9,21 387:15
388:8 389:6 390:8
396:11,12

**Cassidy's**
64:3 65:19,21,22
66:18 234:17 241:14
244:11 261:13
270:12

**casually**
329:8

**catch**
75:2 395:18 414:13

**caught**
53:10 395:17 399:10

**CCSAO**
272:2

**cell**
333:13

**Center**
5:7

**Central**
17:12,16 36:13,16
62:12 132:19 200:8

**Certificate**
407:14,15

**certificates**
28:3 119:24 120:9
408:19

**Certified**
5:2

**chain**
55:20

**chance**
358:1

**chances**
309:20

**change**
36:19 81:13 120:9
169:24 365:12,16

**changed**
123:1 169:11,20,21
441:8

**chaotic**
336:18 337:4 341:16

**Chapter**
98:11

**characterize**
16:21

**characterized**
195:10,12,14

**charge**
49:15 54:3,5 56:8,24
78:3,6 145:23
186:11 257:16,21
258:7,10 287:16,17
360:22

**charged**
141:17 166:6 210:9,

10,20 211:21 287:15
289:4 407:20

**charges**
88:10,17 89:2
141:15 180:18
181:22 182:20 183:3
184:17 361:1 407:19

**charging**
57:20 423:15

**Charles**
6:12 291:10 340:6
341:2,6 349:4
396:17 422:22 423:7

**Charles's**
337:11 340:15

**check**
84:11 142:11 250:11
442:13

**checking**
206:17 355:4

**Chicago**
5:3,8 6:22 7:24 9:24
10:4 29:19,21 30:5,6
88:7 161:7 187:9
236:9 245:24 246:1
265:17 389:13 395:3
399:14,20 400:6
414:4 425:8,16,19
437:12,24 438:13

**choice**
33:21 81:4

**choose**
33:24

**chooses**
408:18

**chose**
33:22 213:9

**chosen**
234:10

**chronological**
24:14

**chuckle**
69:11

**chuckling**
69:13

**church**
44:20

**Circuit**
120:6

**circumstance**
210:13 427:15

**circumstances**
44:11,12 116:16
288:2,3,23 300:19
383:2 391:24 393:23
394:6 398:20,23
416:14 427:6 434:2

**City**
5:8 7:16,19,24 30:13
94:14 96:7 97:8 98:7
115:21 123:9 217:4
261:8

**civil**
28:12

**civilian**
26:19 278:17,20,23
279:2

**Claremont**
272:16 325:11,14

**clarification**
356:3

**clarified**
157:21

**clarify**
60:14 69:1 122:11
215:12

**clarifying**
122:10

**Clark**
47:13



class
35:24 41:12
classes
34:20
classroom
91:20
Claude
16:15
Claxton
44:19
clear
8:14 9:6 127:1
223:16,23 224:1
279:4,6,8 293:11
336:14 379:17 412:5
clearance
45:6
cleared/closed
13:16 216:16
clearer
271:10
clerk
31:6
click
151:8
client
406:3,19
Cliff
37:19
close
12:16 287:10 387:10
412:5
closed
145:20 151:23,24
152:7,12,15,20
153:3 166:14 381:22
385:12
closed-ended
105:15
closely
86:14
closer
81:7 160:15
closing
146:3 152:8,13
co-offender
324:22
Coca-cola
17:18 18:22 349:5,
13
codefendants
28:13 275:9 291:6,9
coercion
128:16
coercive
115:8
Coffee
387:20
collaborating
56:22
collect
176:19
collected
198:20 397:11
401:20
collection
404:3
college
29:24 30:2,15
colleges
30:13 150:7
Collette
223:12
color
378:6
combination
38:24 404:7
combined
263:20

comfort
202:15,16,23
comfortable
6:16 161:21 245:16
command
55:20
comment
115:5,6 253:23
commission
411:15,23
commit
118:19
committed
57:6 276:24 350:7
365:4 366:6 407:24
committing
339:3
common
41:6,9,12 55:14
153:2 183:14,17
184:2,10 208:4
219:19
commotion
422:22 423:7
communicated
85:11
communicating
309:20 439:14
communications
85:14
complemented
83:1
completed
24:14,16,17,18,20,
21,23 25:1 149:20
completely
156:2 255:4
completing
149:19
Complying
441:23
compound
278:18 368:20
computed
63:18
computer
151:9 301:9,10
computers
177:21,22
concentrated
299:11,12
concept
118:13
concerned
385:10,23 418:7
423:15,16
concluded
244:14
concludes
445:10
conclusion
105:23 106:22 111:8
115:10,12 130:1
131:3 395:11
conduct
53:19 100:4,8 105:4
129:19 155:9 161:2
208:1,24 209:10
210:17 268:24
353:12,19 428:4,11,
17 429:7 430:11
conducted
129:16 155:13
159:8,12,13 160:19
161:16 164:4 210:23
218:24 353:24
360:14 426:19
427:2,7,18
conducting
33:4 130:7 131:8,11
150:6 165:2 198:7

308:15
conference
374:12
confess
113:10,16,18,23
118:19 277:21 278:4
confessed
114:17 183:20,23
247:24 248:2 266:24
267:7 269:1 279:24
confesses
280:13
confession
112:4 117:11,16
119:1,4,8 378:15
380:4,10 381:24
398:15 399:1,2,7,9,
21,22,23 400:7,13
confessions
65:6 118:14,22
119:11 120:10
398:12 399:12,15
401:7,9,16 402:1,18
403:5,16 404:9
405:14 406:6,9
409:13 411:16,24
confessor
398:22
conflating
316:13
conform
426:20
confused
53:7 125:21
confusing
26:15
connecting
401:13
connection
266:2 401:23 409:10
consent
433:17
consequences
287:1
considered
33:15 37:7 50:14,15
55:7 171:3
consist
211:5 426:11,14
428:2
consistent
418:9 427:4
consoling
33:5
Constance
272:14 275:13
436:12
constant
22:15
constantly
152:19
constitute
280:3 288:15
constituted
287:22
constitutional
124:5
construction
167:17,19 168:6
contact
77:6 88:9 191:9
225:22 228:16
292:20 325:18
326:1,6,15,19
318,24
contacted
325:2 327:11 364:5
contained
434:5

contemporaneous
ly
150:5
content
13:24
context
114:11 116:10 270:1
390:10
continue
128:11 206:6 329:11
continued
61:6 262:9
contrary
235:13
convenience
73:18 296:22,24
305:19,20 312:10,
13,15 321:6 342:4
421:22
conversation
225:2,8,10,13
289:22 311:2 332:11
conversations
61:1
convey
53:5
convicted
27:5 28:9 399:7,16,
22 400:12 407:20
409:24
convictions
29:11 120:15
Cook
88:9 120:6 407:12
cop
63:7
copies
94:8 141:6 146:4
216:21,24
copy
92:15 166:23
corner
261:14 274:10 319:3
435:17
correct
6:22 10:10 12:7,10
14:8 16:16 18:10
19:10,11 21:8 25:24
26:17,18 28:10,11
32:19 33:13 36:14
40:17 41:3,4 42:4
46:4,9 50:12,13 53:4
54:12,15 57:11,12
59:15 62:21 63:10,
13 66:10 68:9 69:18
71:19 75:15 77:5,12
79:15,18 80:21
81:22 99:13 101:5
105:10 107:6,15
122:8 126:24 127:20
129:17 133:20,23
152:16 165:22 166:4
172:10 177:14
180:19 183:12
184:13 185:5,19
187:15,21 188:3
189:13,15 205:22
206:7 215:4 217:16,
22 221:17 223:18
234:6 241:20 244:6,
15,18 246:15 253:7
253:9 254:1 255:12
256:3 262:1,2,4,14,
15,20,21 264:5,9
265:8 267:1,16,20
269:11 270:16 272:7
283:2 284:9 288:13
289:15 300:21
301:14 307:3 309:3,
12 316:2,6 317:2
318:4 319:16 320:6
324:8,11,12 325:11

330:7,8,12 332:5
333:1,4 334:19
335:3 339:12 348:13
353:1,7 355:14,17
356:1 357:14 359:5
361:15,16,19 370:8,
15,16,17 371:11,24
372:9,13,17 373:1,
12,24 374:4,14,17,
18,23 375:1,11,12,
16 378:16 381:13
384:2,9 395:4,9
396:24 397:2,8,13,
21 398:12 409:15
410:21 412:5 413:4,
21 414:24 416:12
421:22 422:6,23,24
425:9,19 427:5
429:13,15 432:5,22
433:13 434:23
435:8,20 437:13,14,
19 440:15 442:5
444:19
correctly
191:7 426:17 436:15
corroborated
118:1
corroboration
55:12
Coughlin
78:8 79:14 199:10,
14 292:14 329:18,21
330:3
counsel
6:11 10:8 11:5
115:19 215:12 356:4
369:12
counsels'
5:12
County
88:9 120:6 344:7
407:12
couple
11:7 23:15 41:15
44:8 58:21 80:24
151:13 170:18
180:17 217:9 285:6
332:16 369:15,20
426:9
court
5:10,12,14,16 8:15,
17 13:10 57:24
58:13 59:23 60:1
120:6 126:11 140:5
207:19 260:24 323:9
357:3 379:5 420:15
courtroom
246:14,18
courts
61:15
cover
97:15 424:24
covers
166:12
CPD
10:4 30:22 31:24
94:24 95:3 104:2
119:8 130:24
131:13,16 158:5
165:17 277:7 279:2
285:19 287:3 293:19
316:22 347:14 389:7
CPD's
187:20 188:2
created
146:8,9 166:6,8
169:21
creating
178:20
creation
220:2

credibility
378:14
crime
27:5 33:3 50:17 52:7
53:12,17 56:13 57:6
85:3 102:3,11
106:14,16,17 107:20
108:14,23,24 113:24
114:16 117:18,19,21
118:19 152:21
176:21 177:7 179:4,
21 180:7,8 183:20,
24 192:6,15 195:16
197:7 198:16,21,23
199:4,5,8 204:22,24
205:6 206:2,10,16,
17 247:24 250:7,9,
19,22,24 269:17,24
293:9 299:12
308:6 340:16 342:24
365:5 391:11,18
393:18,23 394:10,
18,23 398:2 401:21
407:18 409:2,23
411:16,22
crimes
50:10,15 51:10,13,
19,23 52:15 56:3,17,
19 72:14 74:7,9,23
75:3 83:22,24 84:5,7
99:13,15 174:7
192:22,23 193:1
201:20 207:6 342:8,
15 343:2 365:5
criminal
15:1,7,9 28:7 57:14
90:20 179:8 220:20
227:2 286:24 361:4
444:5
crying
423:17
CSR
5:17
cuffs
244:2
current
44:1 57:5 221:9
curse
279:14
custodial
94:14
custody
88:18 102:21 103:10
104:8 112:22 113:8,
23 116:17 121:14
126:12,22 127:14,22
128:10 129:3,11,15
230:18 257:11
266:10 276:5 285:10
287:21 288:17 297:1
305:21 330:7 335:19
344:2,13 346:5,8
351:5 417:3,6,8,13,
16,21 420:9,16,24
421:3,9,16
cut
138:18 296:5 408:16
410:7 430:5
CV
5:11

---

D

D-A-V-I-S
6:20
D-W-A-Y-N-E
6:20
Daly
10:21 12:1,2,5 17:10
19:9 23:5 35:12 39:6
41:2,20 42:12 53:19
67:15 73:15 77:1,3



80:20 81:23 83:6
85:5,7 145:9 185:14,
15,17,21 186:11
200:18 207:12
217:21 221:21
222:13,15,24 224:24
225:3,16 242:1
244:20 245:5 254:14
255:20,23 262:12,19
272:7 289:22 291:23
292:1 298:2 303:16
320:24 323:22 324:1
334:14 335:13
338:11 341:9 351:16
362:14 363:6 370:13
375:2

**Daly's**
273:4

**dangerous**
200:16

**dark**
23:7

**darker**
22:12,14

**date**
23:17 24:4,10 36:21
59:23 60:1 63:17
94:20 97:13 98:11
167:5 190:6 202:21
263:22 273:15,17
274:6,9 435:19
437:17

**dated**
93:9 123:19 418:17

**dates**
24:2,7

**dating**
167:4

**Davion**
120:20,23 401:22
402:13,22 403:14,
23,24 404:2,4 409:1,
3,8,11,12,14

**Davis**
5:6 6:2,19,20 36:1
53:18 61:2 94:5 96:2
97:1 175:1 185:11
261:3 271:21 291:21
323:4 432:5

**day**
22:13,22 23:3 31:4
39:2,14,24 40:24
55:10 63:24 114:6
145:13,14 190:8
209:18 230:19
273:18 291:24
294:19 300:6,8
354:20 417:24
435:12

**days**
11:4 38:16 40:2
62:15 149:19
151:13,18 217:9
284:23 285:24
302:23 303:2

**daytime**
39:15

**dead**
365:14

**deaf**
318:16 436:12

**deal**
185:18,21

**dealership**
58:8

**dealerships**
48:8,14

**death**
82:10 197:23 203:5

**decade**
347:9

**deceased**
77:12 79:20

**December**
23:22 24:5,6,9 25:10
27:2 34:16 38:15
39:7 51:24 63:12,16,
21 89:12 190:4
204:16 206:19
207:16 223:8 239:1
254:4 255:24 263:23
267:8 269:1 273:15
274:14 353:13
354:12 358:17
359:22 360:15 362:3
366:24 388:22
405:23 419:9 425:14
435:24 441:12 443:5

**deception**
116:17

**decide**
88:20 145:12

**decided**
181:22 219:2 294:24
295:2 303:18 330:20

**decides**
116:15

**Deciding**
88:17

**decision**
76:19 241:8,11,16,
17,22 304:3 392:24
403:9

**decisions**
303:23 304:1

**deck**
78:15

**decline**
183:2

**declined**
184:17

**deemed**
95:8 380:11

**deeper**
354:4

**defendant**
7:20 8:9 24:20 66:8
73:18 200:14
239:18,22 370:10
378:11

**defendant's**
17:13 18:15 73:16
336:18

**defendants**
15:2,19 17:15 19:12,
16 25:17 119:22,23
191:10 301:19 398:2
401:14,24 409:11,23

**defendants'**
24:19 25:21

**define**
100:1

**definition**
19:21 20:16,17,22
22:1 25:13 47:3
58:16 78:2,5,14,17
101:22 102:15 103:5
109:21,24 113:2,12,
14 150:14,20 216:1
277:4 280:8 434:9

**degree**
30:7,16 289:5

**delay**
126:13,21,23 420:18

**demarcating**
171:12

**demeanor**
247:7

**demoted**
45:22

**demotions**
45:17 46:3

**dep**
28:14,20

**department**
6:22 9:24 10:4 88:7
97:15 182:18 189:1
268:22,24 291:8
395:3 399:14 414:4
425:9,19 437:12,24
438:13

**department's**
122:19 187:9 400:6

**departments**
88:9

**depend**
288:1 300:18

**depended**
37:24 259:22 344:10

**depending**
33:20 53:17 157:11
180:12,14

**depends**
46:10 160:8 179:21
180:7 213:22 277:3
282:2,8 287:24
288:22 300:17
329:3,4 365:19
393:23 394:5 434:2

**deponent**
94:4

**deposed**
19:5

**deposition**
5:5 7:7,14 10:13
11:6 12:19 13:9
15:15 18:24 19:5
90:15,18 94:5 96:2
97:1 175:1 214:10
261:3 271:21 323:4
445:11

**depositions**
8:13

**derogatory**
279:15,18

**describe**
16:9 21:1 47:24
60:24 170:23 186:5
192:2 314:8 346:17
363:1

**description**
16:11 21:12 207:10

**designed**
98:3

**desk**
142:4 143:15,20
144:5,7,10,15,19
145:4 192:19

**desks**
171:1,2 172:24
242:24

**detail**
257:3 267:11 390:5

**detailed**
229:9 394:17

**details**
106:14,16 107:19
108:14,23 195:2,8
220:7 267:7 391:10,
17 392:14 393:17
394:9,23

**detained**
234:15 237:23

**detective**
6:19 7:2,4 10:21
12:2,4,5 14:22,23
33:10,18,21,23,24
34:4,7,9,10,11,18,20
35:3,9,12,21,23
36:6,24 37:1,2 41:12
42:21 45:12,21 46:1
52:18,21 53:16,22
54:4,7,8 56:24

**directive**
419:22 426:20

**directives**
389:24 395:4

**directly**
77:6,8 193:4 313:22
314:1 391:15

**disagree**
23:22 115:18 355:21

**disarm**
288:10

**Disciple**
266:11,14

**Disciples**
49:11,21 342:12

**discipline**
9:23 285:19,22
287:3

**discuss**
37:3 59:21 65:22
132:8 137:8 203:4
228:8 242:1,4,11
270:8 290:4 297:17
330:24 353:18
370:22 371:2,4

**discussed**
12:18,20 18:24 19:1,
2,15 28:12 45:7
75:23 289:20 290:5,
6 338:22 363:10,16

**discussing**
132:11

**discussion**
12:13 269:23
289:17,19 299:6,9,
17 333:21,24 334:2

**discussions**
25:17 266:20

**Disk**
91:7,11 176:10,13
252:20,24 366:19

**dismissed**
8:5

**dispatch**
193:5

**dispute**
296:10,13 324:13

**distance**
321:9

**distinguish**
101:8 231:15

**distorting**
405:17

**district**
5:9,10 32:4,11,15,21
42:3 45:23 47:9,12
189:8 210:4 438:15,
18 439:19,20

**districts**
37:6

**dive**
354:4

**dived**
401:2

**divide**
172:16

**divided**
51:18 169:17 172:6

**diving**
354:3

**Division**
52:17,18,20,21
53:16 92:1,16 93:13
98:8,10 123:10,19
166:21

**Division's**
92:10

**DNA**
211:9,10,13,22

**do--**
270:4

**doctor's**
9:12

**document**
52:11 92:23 93:5
132:14 157:23
158:13,15,22 159:9,
14 165:5,18,22,23
213:8 413:5,15,21,
24 414:10 415:3,20
421:20

**documentation**
79:19 90:8 139:5
146:6 175:13 221:2
347:23

**documented**
154:21 159:2,17
165:11,19 347:17,
19,23 383:4 422:15

**documenting**
152:22

**documents**
12:10,12 13:8 15:14
75:17,20 77:20,24
214:2

**domestic**
287:16,19 343:6,9
359:10,16,17

**door**
173:5 381:22 385:12

**double**
44:22 199:11 200:15
213:13 246:23
279:24 280:12 282:4
308:18 309:3
311:14,17 328:22
331:13,15 338:23
339:3 376:23 385:11
392:3,13 396:19
397:21 398:8 401:14
403:13 407:21
410:20 411:1 412:5,
18 413:1 435:5

**doubly**
379:13

**doubt**
23:4 70:1 82:17
161:3 201:14,17
216:12,15 222:8
238:2,4 239:8
240:21 241:1
242:15,16,17 244:3
253:19 255:1 270:10
309:15 313:7,17
314:14,16 330:5
339:4 343:14 372:23
373:8 384:14,18,19
422:14,17

**Douglas**
69:5

**downstairs**
189:4,7

**drawer**
166:10

**drawing**
170:15 171:11
260:24 261:1

**drew**
243:3 345:2

**drive**
48:11 58:6 83:8
341:11 422:21

**driven**
206:22 336:6,7

**driving**
17:14 237:10 336:19
341:15

**dropped**
407:19

**drove**
206:14 237:8 305:7
341:4,5 342:4 423:5,



9,10
**dry**
408:16
**duck**
337:21,22
**dude**
394:4
**duly**
6:4
**Dunbar**
24:17 67:7,8 196:14
214:16,20 215:3,23
224:19 225:7,18
227:8,14,20 228:2,6,
15 230:4,9 232:13
236:3 239:14 241:19
243:19 254:11,15,24
260:9 262:20 263:5
265:10 367:23
370:12 371:9 372:21
**Dusable**
265:5,6,7,11,13,15,
16,22 266:2
**duties**
33:2 84:8 187:22
188:3
**duty**
175:6,19 326:20
328:1 353:15 354:17
**Dwayne**
5:6 6:2,19 248:5
375:21 376:1,8
384:22

**E**

**earlier**
53:3 66:20 78:2
83:18 185:10 243:3
333:6 345:2 368:8
381:5 388:4 389:4
391:4 393:22 398:11
400:3 401:5 423:8
431:23 444:17,20
**early**
34:14,16 149:7
167:24 354:20
**easier**
271:9
**eat**
258:8
**echo**
430:8
**effect**
376:9 419:9 425:13
**effective**
64:10 65:5 83:4
185:11
**effectively**
257:7
**effectuating**
292:21
**elderly**
44:18
**Elegant**
206:20 404:20 405:1
409:5
**Ellen**
37:20
**else's**
142:22
**emotions**
423:1,2,13,14,16,17,
20
**employed**
6:21 31:1 45:24
**employee**
278:23 279:2
**employer**
187:16

**end**
81:1 88:15 123:11
134:8 149:18
150:15,18,19,21
179:7 359:22 391:13
**ends**
91:7 176:10 252:20
**engage**
389:6
**Englewood**
68:22 69:3
**ensure**
125:11,22 126:9
419:16 420:13
**entail**
38:17
**entails**
410:13
**entered**
248:17,19,20 252:1
407:15
**entire**
255:4
**entitled**
121:13 407:13
**equipment**
229:20
**equivalent**
166:8
**establish**
179:10,17
**established**
190:7 267:15
**establishing**
179:5,6
**estimate**
11:15 42:24 44:3
46:20,22 360:1
**et al**
5:8 29:11
**evening**
31:7
**event**
92:6
**events**
132:14 151:19
268:18 363:15
**eventually**
328:19 354:6
**evidence**
117:21 118:2
152:21,23 153:3
161:19 198:20 206:6
288:12,14 299:19
365:12,16 366:11
397:20,23 398:1,6
401:13 405:16
407:17 408:8,24
409:9,18 410:4
433:19 442:12
**exact**
36:21 367:20
**EXAMINATION**
6:6 369:21 388:15
443:10
**examined**
6:4
**exception**
326:23
**exculpatory**
402:15
**executed**
291:6
**exhibit**
92:16 94:4,6 95:20
96:3,6,23 97:2,5,6,
21 98:7 115:23
116:7 123:4,11,12
174:17 175:2 216:18
239:6,10 240:4
260:22 261:4,9

267:3 271:20,22
272:1 323:5 368:9
418:10,19 425:5,24
427:5,9,21 429:6
431:13,20 435:14,18
437:15
**exhibits**
390:1,5
**exists**
298:13
**expect**
339:7,10
**expected**
60:16,20 110:5
142:15
**expecting**
105:16
**experience**
42:19 62:24 246:9
331:18 395:13,21
410:22 412:17,19,23
413:1 415:11,13
430:24
**experienced**
37:13 54:8 71:6,7,21
73:2,3 235:1
**experiences**
34:5 41:6
**expert**
49:3
**explain**
156:22 193:17
**explained**
53:7 233:20
**explicitly**
317:13
**express**
102:20 103:10
104:3,13 124:3
**expressing**
371:12
**eye**
16:5 285:13
**eyewitness**
252:9
**Ezel**
272:14
**Ezell**
5:8 26:15 27:20 28:7
73:20 269:11 272:15
275:2,11,13,17
291:10 296:24
298:21 303:14,17
304:8 307:11 308:1,
13,20 309:3 310:2
311:4,5 312:7
315:10 317:7 318:3
319:3,13 322:14,21
323:12 324:9 327:2,
8 330:6 332:7,19
333:7 334:8 335:13,
23 337:20 338:5,18,
23 345:2,24 346:3
348:13 349:19
351:5,14,21 352:1,8
354:7 356:8 361:5
396:18 421:18,22
422:12,22 424:8,19
435:19 436:6 444:6,
18
**Ezell'**
312:20
**Ezell's**
296:17,20 305:7,12
306:7,12 307:10
309:14 311:2,15,17
318:13,15,23 321:7
325:4 326:2,6
329:22 330:1,4
341:21 436:18

**Ezzel**
272:16

**F**

**face**
424:24
**facility**
168:13
**fact**
19:4 27:5,21 42:8
112:2 120:8 135:2
154:3 194:12 190:11
205:3 210:24 290:15
320:13 348:8 350:24
353:23 393:5 394:17
395:9 396:19 400:22
402:12,13 403:14
407:1 409:6,8,11
**factor**
45:11
**factored**
378:7
**facts**
110:24 117:19
180:12,14 195:18
204:22 205:5
213:16,18,21 268:15
269:1 392:22 393:2
401:12 403:2 404:4,
7 405:7,12,16 406:7,
24 407:22 409:13
412:10 433:18
434:19
**factual**
366:10
**fail**
157:22 158:15
**failed**
130:22 163:15,22
**fair**
16:24 42:17 66:17
67:1,5 68:13,16
82:24 93:11,15
95:10,12 98:16
108:13,16 109:6,13
114:13,18 115:2
124:8 133:10 151:17
156:6,13,20 160:18,
19 257:2,6 274:15
294:18 301:11 352:6
360:13,14,17 361:2
380:7,8,11 405:14
414:13 429:17 430:7
**falls**
109:4
**false**
114:16,20,21 115:8
118:14,21 119:2,4,7,
11,13 280:13 281:24
282:6 398:12,16
399:2,12,15,23
400:7,13 401:8,9
402:14,19 403:5,17
404:9 406:6,9
**falsely**
118:19 433:3,10
**falseness**
399:9
**familiar**
8:13 47:1,4 48:16
49:12 57:13 65:12
77:9 88:1 93:11,22
98:24 99:4 101:4
116:24 118:13,15
121:2 135:20 206:18
207:3,5 215:23
216:2,10,13 252:9
272:10 323:17 358:2
**families**
311:11

**family**
180:4 300:11
306:18,20 387:22
436:23
**fascinating**
84:18
**fast**
317:4 369:14 389:10
**favorable**
245:14
**fax**
178:2
**feed**
105:19,24 106:15
344:1
**feedback**
147:19
**feeding**
344:13
**feel**
93:3 97:8 402:23
**feeling**
377:1
**Felicia**
36:1
**felony**
28:24 59:1 88:1,10,
11 89:2 90:5,11
139:21 140:1,3,5,6,
9,21 141:2,7,14,15,
17 145:22 146:7,8,9
166:5,6,8,13,24
180:16,18 181:6,7,9,
12,18,22 182:1,20,
22 183:1 184:17
**felt**
56:20 182:23
**field**
30:20 91:21 94:14
**Fighting**
33:3
**figure**
423:24
**file**
135:6,8,12,14 137:9
139:11,13,19,20,21,
22,23 140:1,2,3,5,6,
9,21 141:2,7,14,15,
17,18,21 145:5,10,
14,19,22 146:8,10
148:11,19,22,23
166:6,8,13,16,24
167:9,10 307:20,21
**filed**
5:9
**files**
167:4,7,12 168:23
169:4
**Filing**
89:2
**fill**
178:2 298:2
**filled**
162:7 298:24
**filler**
94:10 164:9,13
427:3,8,19 428:12
429:8,21 430:12
**filling**
137:14 162:4
**final**
146:12 221:11
**find**
27:19,23 105:8
147:6 179:2 190:1,
11 196:19 197:10,12
202:11 203:1 211:7
212:16 226:3,10
235:8 247:23 271:9
293:4 300:24 310:2
314:2 322:21 351:14

**finding**
178:22
**fine**
7:5 10:6 77:10,15
79:1,7,18 199:10,14
216:22 221:17
292:14
**finger**
284:24
**fingered**
338:4
**fingerprint**
120:14 404:4,16
**fingerprints**
120:18 401:20
402:16 409:2,3
**fingers**
277:21
**finish**
174:24 386:22 387:2
**finished**
138:10 156:1 368:17
430:4
**firsthand**
48:20 94:17 96:10
140:10 202:4
**floor**
169:13,15,20 170:8
172:22 173:7,17
174:10 193:19,20
194:1,6 202:13
245:4
**flowing**
423:21
**Floyd**
121:7
**focus**
107:4
**Focusing**
254:10
**folder**
146:19
**folks**
287:17
**follow**
52:13 55:11 124:9
125:15,19 126:5
137:10 170:13
180:17 222:3 316:5
389:3 419:22 425:17
**follow-up**
52:9,17 53:19 159:6
207:14 209:11
210:23 211:5 268:14
443:9
**food**
258:20,22 343:13,17
**foot**
21:7
**FOP**
317:7,12
**force**
103:22 112:11
**forced**
41:17
**forcing**
234:1
**forgetting**
36:2
**forgot**
12:16
**forgotten**
50:8
**form**
20:21 21:23 27:13
45:8,13,48 48:18 55:22
60:13 64:5,11,23,24
65:7 70:13,21 72:21
76:5 79:3 80:15 82:4
85:24 87:3 102:12
104:21 105:6,7,21,



22 106:18,21 108:1,
3 109:15 111:7
112:16,24 118:3
122:9 124:11 129:4
130:2 131:2 132:16
152:2 153:13 154:8,
17 156:17 158:1,7,
18 161:9,20 178:1
181:10 183:4,15
187:11 198:24
200:19 203:16 205:7
209:23 213:6,14
214:4 215:11 223:19
229:16 230:22 232:4
233:15 234:20
236:12 246:3,4
256:18 257:4,18
265:15 267:9,17
268:11 277:2 278:22
280:15 281:19
283:14 284:10,12
294:20 298:10
304:14 305:1,2
310:3 316:13,19
317:5 318:6 319:7
328:14 330:16
331:11 352:16
358:22 360:16
364:13 365:18
368:20 373:19 374:6
377:12 379:11,23
383:18 385:15
386:5,13 389:11
390:2,3,13,19
391:19 392:19
393:7,19 397:14,15
402:3 404:11 405:15
406:12 408:4 409:16
411:3,19 412:6,22
413:8,9 414:5,15
416:23 417:18
421:1,12,13 423:3,4
425:20 429:18
430:13 433:5,6
439:13 443:2
**formally**
264:4,10 368:16
**format**
91:19 437:20
**forms**
116:18
**formulated**
291:5,17 294:2
**Fort**
50:1
**forward**
417:24
**found**
27:11,17 28:2 84:18
189:21 190:2 197:3
200:23,24 220:11
251:18,21 300:6,7,9
301:4 314:11 326:5
402:17 404:16,23
409:7 421:21
**foundation**
45:14 64:5 65:1,8
70:14,22 72:22 79:4
80:16 87:4 88:16
152:1,17 162:8
163:17 168:19 169:1
170:1 180:21 182:4
183:16 184:5,19
208:6 212:8 259:17
264:20 305:3 330:17
331:12 342:18
390:20 408:4 417:19
442:20
**founder**
50:1
**frames**
405:17

**Frank**
10:22 19:9 35:17
67:24 68:3
**Frazier**
37:21
**Fred**
39:19 84:14
**free**
93:3 97:8 234:2
416:12,14 435:2,3,8,
11
**frequent**
85:17
**frequently**
58:17 85:13
**friend**
125:13 419:18
420:10
**friendly**
20:1
**friends**
19:19,21 20:4,7,14,
17,19 302:7 309:14
311:9,11
**friends'**
311:11
**friendship**
20:18,23
**front**
59:13 92:19 123:5
192:19 316:18,24
368:10 373:11
382:11 384:1,21
418:10 431:20
435:15
**fulfill**
126:10 420:14
**full**
6:18 9:20 37:2
195:24 346:23
**full-time**
38:10
**funny**
69:14 388:2
**furlough**
434:14

**G**

**game**
216:4 245:18,19
246:13 247:5 376:22
**gang**
33:22 49:12 50:4,10,
15,17 51:2,3,10,13
74:7,9,23 75:3 76:6,
10 77:1 203:7,11
266:5,17,21 342:7,
15,17 424:10
**gangs**
48:17,24 49:4,7,9,
13,18 50:4,21 76:11,
15
**Gangster**
49:10,21 266:10,14
342:12
**gangway**
403:13 409:7
**gather**
206:5 290:11
**gathered**
117:21
**gave**
52:11 109:2 110:1,3
146:14 181:24 182:3
229:20 250:12,17,
21,23 256:2,5,12
268:9 289:3 307:7,
11 311:22 313:21
383:17 384:17
399:22 401:24

402:14 403:3
**GD**
266:6
**Gemini**
213:23
**general**
13:21 48:7,9,13 57:3
61:1,8,23 94:13,15,
24 95:3,5 96:6,12
149:20 171:3 187:20
208:23 212:22
218:13 242:20,23
259:7 264:17 301:3
304:22 330:14 331:8
343:23 344:12,15
359:6 381:8 389:23
414:3 425:8,13,18
426:21 427:4,9,20
429:5
**generally**
22:12,14 43:19,23,
24 44:8,12,14 45:1
53:22 54:24 55:3,6,
7,17 56:24 57:18
66:20,22 71:5 106:8
107:9 144:3 149:17
150:13 152:11
162:13 186:4 191:5
213:20 217:20
218:2,16 229:7
255:7 256:22 264:23
279:21 292:8 308:3,
9 315:16,24 322:1
326:24 331:23
443:18
**generate**
53:13
**generated**
218:23 434:15
**George**
286:3
**Gerke**
37:19
**get along**
222:17,18
**girl**
58:6
**girls**
210:5,7
**give**
7:13 9:19 16:11 61:4
106:3 110:2 122:8
195:24 196:3 204:5
235:5 240:19 249:21
257:10 285:23
289:12,14 307:4
310:13 329:12,24
378:13 380:6 394:8,
16,22 400:22 401:15
402:17 403:15 404:7
406:8 412:12,13
413:20,24
**giving**
63:17 251:15 252:4,
11,13 267:24 339:9
376:15 403:8
**glad**
234:7
**glasses**
22:10,14
**Glover**
68:18
**goal**
158:13
**God**
5:1 6:8,9 7:6 9:11
10:7 16:22,23,24
63:7 64:21 70:17
71:6,7 72:10,17 75:2
81:24 83:2 150:23
176:16,17 177:19

186:22 210:8
211:20,23 214:24
315:24 322:1 357:23
358:1 362:2 370:1
388:17,18 390:17
414:23 415:2,20
429:16 430:10,24
**governing**
96:6
**GPR**
13:23,24 14:7,17
137:15,23 138:15,
19,21 149:24 150:4
163:5,10 270:17
271:7 272:3 273:9
274:1 275:2 434:12,
15,20,22
**GPRS**
13:21 138:8,18
140:6,8 150:1
270:24 271:3,6,12
434:13
**grabbing**
210:5
**graduate**
29:14,22 35:14
**grammar**
286:6,7
**grand**
59:11,13
**grandma**
272:16
**grandmother**
24:20 26:16 73:17
305:15,16,18 306:7,
23 307:11 308:10
309:5 310:1,13
311:3,19 317:22
318:1,7,10,16 319:5,
16,20 320:13 321:19
322:12 326:2 327:17
330:1 436:13
**grandmother's**
309:2 321:7,12
436:18
**grandson**
321:13
**granted**
28:3
**granting**
407:15
**great**
35:1 39:9 59:5 62:17
131:23 171:13
332:11 342:14
368:12 390:5
**Greg**
37:20
**group**
97:5 98:6 271:3,7,8
304:3
**grouping**
271:13
**guardian**
121:21 122:5,20
316:24 317:19
318:3,11 319:5
325:2 326:7 327:15
353:8 416:21 417:22
418:7 436:13
**guardians**
316:9,18 325:18
327:11 329:22
**guess**
23:12 31:6 52:2
53:23 59:17 70:3
72:4,7 85:17 87:11
88:21 105:17 137:1
138:9,12 147:9,10
160:22 166:12 173:8
177:24 245:22 258:6

274:11 290:23 294:6
335:15 358:23 359:7
381:21 403:6
**guidelines**
136:10
**guilt**
364:24 365:13,17
**guilty**
395:9 409:23
**gun**
217:11 249:2 285:4,
7 366:8
**gunshot**
197:15
**guy**
21:22 45:21 49:24
58:7 69:13,14 82:19,
21 85:10 108:5
209:16 210:11,15
283:18 284:23
285:4,14 287:9,10
338:7 343:7,9 344:7
394:1 11
**guy's**
178:3 287:12
**guys**
76:6,10 78:3 95:21
302:20 329:12
373:11 385:10,14,19
439:13

**H**

**hair**
23:7
**half**
274:2 355:24 356:9,
16
**hall**
350:5
**hallway**
174:13 349:8,10
**hand**
285:7 326:22
**handcuff**
444:1
**handcuffed**
237:4 243:12,14,19
248:15 314:23
346:2,3 442:17,18
**handed**
229:14
**handful**
389:3
**handle**
82:11
**handled**
55:6 82:16
**handouts**
359:8
**hands**
78:15
**hands-on**
87:12,13
**handwriting**
272:12,22,24 273:4,
5
**handy**
221:2
**hangs**
212:16
**hangup**
157:22
**happen**
52:15 118:16 167:22
168:3 183:19,23
290:24 327:3 331:14
410:23
**happened**
34:15 36:20 38:12,
13 52:7 112:2

132:15 145:19
150:16 151:1 153:17
166:1 168:23 176:1
184:14 191:15
197:17 219:11
225:18 234:9 239:16
244:1,3 256:5 258:1
264:8 281:18
288:12,14 289:2
291:2 305:12 307:17
321:23 335:9 341:2,
8 344:19 348:23
349:18 356:1,17
394:3 400:23 432:24
**happening**
148:2,5 207:6
281:10,13 340:8
**hard**
78:13 91:23,24
101:8 112:18 150:19
392:20
**Harper**
272:14 275:10
**Harris**
65:13
**head**
8:20 250:16 308:2
336:1 338:21 387:5
398:19 408:10
**headed**
228:2,6 334:20
**heading**
123:22 183:2 418:23
419:5,13
**hear**
148:5 244:19 245:1
373:10 381:24
396:11
**heard**
45:20 68:20 101:7
119:7 120:1 135:9,
15 140:3 147:7
148:12,13,17 202:3
203:9,11 206:24
252:6 300:2 375:9
383:22,24
**hearing**
59:10 243:20
246:14,18 378:16
379:9 396:8 444:24
**hearings**
59:6 444:5
**heavier**
21:5
**hectic**
332:17 335:21
**height**
21:9
**held**
259:21
**helpful**
379:9
**Hey**
86:20 142:22 147:2,
12 329:7 343:8
376:8
**hide**
338:5
**hierarchy**
54:9
**high**
17:11 18:12 24:17
29:14,16,17 33:19,
20 66:7,9 67:7,8
191:8 196:14
207:12,17 214:16,22
215:24 216:5 224:19
230:4,10 234:5
265:5,7,14,16,22
266:2 272:14 275:10
286:3,5 308:6



372:21 396:21 397:1
423:1,2,13,14,16,20
**high-ranking**
173:11
**highest**
173:12
**highlights**
93:18,19,21 156:1
**highly**
64:7 201:14,17
222:8 242:15,16,17
244:3 255:1 309:15
313:7,17 330:5
343:14 371:21
422:14,17
**Hispanic**
272:15
**history**
179:9 227:2 400:6
**hit**
279:11,12,14,16,18
283:23 285:6,12,15
287:20 288:17
294:4,6 301:21
**hitting**
288:4 309:19
**Hm**
377:19
**hold**
78:14,17 170:21
215:10 312:22 408:3
**holding**
285:9 349:5 374:13
**Holmes**
201:18
**holster**
285:5
**home**
81:7 144:13 175:15
280:1,12 325:3
**homicide**
44:23,24 53:21
55:21 56:8,12 85:16
107:14 125:7 143:4
144:15,17 162:1,2
175:10,11 178:15,17
207:1 213:13 236:11
279:24 280:12
282:5,6 289:5
308:18 309:3
311:15,17 328:22
338:23 339:3 359:20
385:11 392:13 402:9
**homicides**
44:14,15 142:2
331:13,15 358:21
359:4,7,9 381:3
413:1
**Hoover**
49:21
**hope**
61:19,21 99:6
106:23 131:15,22
133:15 148:1
154:10,20 158:3,20,
24 169:7 178:10
180:2 186:12 228:23
338:6 348:1,12,15
362:6 376:2 390:23
391:3 395:5
**hour**
11:1
**hours**
13:2 38:17 40:11
369:16 411:11,15,23
414:12 431:18
**house**
17:13 18:15,19
24:19,22 26:17
44:19,21 73:16
296:17,20 305:7,13

306:12 307:5 309:2,
21 310:16 311:15,17
312:20 319:15,19
321:7,12,18 322:2,
13 325:5 327:18,23
335:3,10 337:11,16
338:9,19 340:6
403:14 409:8 422:23
423:8
**household**
309:9
**houses**
301:20 309:19 355:9
**How's**
280:18
**huge**
248:22
**hundred**
408:22
**Hundreds**
160:24
**husband**
179:18
**hybrid**
303:7
**hybrids**
157:10
**hypothetical**
118:4 158:8 281:21
284:11 390:20
391:20 392:9 393:20
402:6,21 403:19
404:11 406:14,15
408:5 409:17 413:10
414:14

**I**

**Ibrahim**
12:6 14:14 16:15
23:18 27:8 41:3
62:21 66:5,17 70:2
73:8 77:18 188:6
202:1 206:10 265:21
**Ibrahim's**
189:18
**ID**
211:24 212:2
**idea**
23:10 93:6 98:14,15
99:19 107:8 150:1
163:19 212:16
221:19,20 238:9,12
242:7 262:22 309:18
326:13 334:17
359:24 367:2 371:14
372:2,7 436:20,22
437:2,5
**ideal**
427:20 428:4
**ideally**
426:13 427:13,15
428:1,7
**identification**
94:7 96:4 97:3 164:6
175:3 210:8 261:5
271:23 323:6
**identifiers**
290:13
**identifying**
195:2,8
**Illinois**
5:4,10,17
**illness**
9:13
**imagine**
411:1
**implicated**
195:16 213:13
246:24 298:17
339:18 340:15

**implicating**
194:20 299:1 369:1
371:12
**implying**
198:3
**importance**
117:8
**important**
117:14,24 129:23
132:14,22 133:1,7
153:7,9,11 154:5
165:10 180:11
204:21 205:5,16
206:5 256:23 257:2
298:7,12 350:16,21,
24 414:10
**impressed**
34:7
**impression**
62:22 63:1,2,24
70:17 319:24 380:6
**impressions**
68:14 70:8
**improper**
111:3 114:9 390:9
405:18 429:3
**inadvertent**
285:20
**inappropriate**
429:12
**incident**
292:21
**include**
117:20 131:17 132:3
138:22 139:1,5
164:4,22,24 180:3
220:8 381:12 385:14
**included**
51:5 107:14 115:8
130:12,18 131:20
140:6,7,8 154:16
175:8
**includes**
112:4
**including**
122:7 124:22 162:1,
2
**incommunicado**
116:17
**incomplete**
118:4 158:8 281:21
284:11 390:20
391:20 392:8 393:20
402:6,21 403:19
404:11 406:14 408:5
409:17 413:10
414:14
**inconsistencies**
414:13
**inconsistent**
427:9
**inculpatory**
435:7
**independent**
17:3 77:21 207:21
261:20 268:20 293:8
299:15 324:16
336:22 340:18
**independently**
306:5 307:15 336:15
**indicating**
170:5 174:3,5,12
293:15,20
**indication**
434:4 438:14
**individual**
74:17 178:4 271:6
398:16
**individually**
74:18

**individuals**
16:2 300:1 396:16
397:8 398:7 403:17
407:13
**inform**
126:14 154:6
**information**
76:11,12 105:9,19
106:1,3 117:10,15,
24 133:2,12,17
134:3 176:20 178:8,
11,16 180:10 195:5,
15 196:16,23 198:9,
10,15,19 204:13
209:13 211:13
218:20 235:5
250:13,18,21,23
251:1,15,17,24
256:9 273:24 290:8,
10,15,18 300:7
301:1 302:6,10
305:16,18 309:17
310:1,14 311:6
326:1,6,15,19 330:1
339:9 347:16,18
350:4 371:19 397:12
403:8,10 405:9,22
406:4,18,20 407:5,
22 431:9
**informing**
350:12
**infrequent**
350:20
**initial**
52:16
**initially**
188:23 190:2 211:14
285:23 325:2,5
365:8 374:21,22
**initials**
437:6
**innocence**
28:3 119:24 407:14,
16 408:20
**innocent**
407:18 408:16
**input**
218:7,10
**inside**
162:14 305:15
**instance**
108:5 109:3 153:4
176:24 233:19 438:9
**instances**
184:16 204:4 229:15
277:10 358:10 421:8
**institutions**
7:18 8:8
**instruction**
124:18
**instructions**
289:12,14
**intended**
309:2 322:23
327:18,23
**intending**
228:17
**intent**
271:14
**intention**
348:7 353:19
**intentional**
66:1,2
**interact**
67:10
**interacted**
99:12
**interacting**
263:11,15,19 390:11
**interaction**
312:20 349:3 388:21

**interactions**
73:22 75:19
**interest**
151:4,5
**interim**
358:16
**internal**
9:23 285:19
**interpretation**
373:14
**interpreter**
318:22
**interrogate**
103:20 124:2 125:10
126:9 390:17
416:15,19,22 419:15
420:13 440:23
**interrogated**
102:7 396:12
**interrogating**
100:15,18 101:13
102:11 106:17
108:15 114:15
381:18 390:10
391:12,16 392:4
394:17,23 413:5,16
414:11 441:2
**interrogation**
98:9,16 105:20
109:8,14 112:12,15
123:20 381:13 391:5
395:7,22 415:4,22
416:7
**interrogations**
64:22 94:13 95:10
100:4,9,14 104:19
123:23 418:24
419:5,13
**interrupt**
387:1
**interruption**
111:9
**interview**
25:24 89:6 105:3,5
107:6,10 109:3
111:24 112:23 113:4
115:7 121:21 124:23
125:3,4 156:3,4,11,
15,16 157:7,9,16,17,
19,23 158:16,23
159:1,7,12 160:3
169:13,15,17 171:6,
18,24 172:18 173:20
178:12 182:2,19,22,
23 239:21 240:16
241:8,11 242:12
243:3,7,10,15,20
244:6,8,10,11,14
246:17 248:10
249:11 251:13
253:18 259:2,4,19,
23 270:13 330:6,15,
20 331:1,7 332:2
339:11 344:23
345:8,15 346:22
348:8 381:14 416:7
417:11 420:8 440:14
442:18,19 444:2
**interviewed**
102:1,2 124:20
178:9 182:17 240:1,
8 242:14 243:2,5
295:7 331:10 339:15
364:8 402:14 417:5
**interviewer**
295:4
**interviewing**
26:20 70:20 71:3
107:18,20 108:24
110:19 111:19 112:8
113:9,22 124:18
155:20 227:3 327:2

339:8 348:19
413:12,18,19,23
417:20 441:2,4
**interviews**
26:3,6,9 104:24
128:17 155:10,12,
15,19 156:7 158:14
331:9,19 348:5
416:10,11,13 443:17
**invalidate**
116:19
**investigate**
42:22 55:14 57:4
62:18 179:8 180:1
209:3 268:8 329:4
360:23,24 406:24
407:7 409:14 410:6
414:1
**investigated**
27:9 43:4 58:4 65:16
76:4 210:19 358:16
359:21 360:17
**investigating**
43:9 72:14 107:5
108:6 113:24 128:11
176:21 177:7 178:15
179:19 180:4 188:21
197:24 198:1 210:12
308:18 311:14 359:3
391:11 392:3,13
403:22
**investigation**
12:6 16:15,19 17:3,8
24:3,10,14 44:23
52:9,16 53:13,19
54:4,15 55:21,24
56:8 59:3 67:2 68:18
77:18 78:23 84:12
127:17,22 132:15
133:3,13,18 134:3,
14,22,24 135:3
141:3 143:8,24
147:22 149:14
150:21,24 153:8,18
175:6,19,24 176:2
180:12 186:16 191:6
200:3 202:2 206:7
207:14,22 208:2,24
209:11 210:23 211:5
214:23 218:24 225:4
257:3 265:23
268:14,21,24 269:13
270:14 308:13,15
310:14 343:4 346:15
353:13 356:10
358:12 363:16,20
380:7 394:6 405:13
407:23 410:12
411:1,8 412:4
**investigations**
33:5 48:24 54:11
68:1 69:23 79:10
80:2 82:3,11 106:7
152:19 153:11
161:23 162:1
175:10,11 346:10
360:14 393:24
**investigative**
99:24 100:1 134:21
135:14 139:13,20
140:2,20 150:5,23
161:7,13 176:18
**investigator**
62:23 64:1 68:14
70:9,17 72:11 80:11
**investigators**
245:21 364:6
**invited**
388:8,10
**involved**
8:8 16:14 17:20 77:2
78:21 89:3,4 99:20



128:12 194:21
208:18 230:16
246:23 250:9,18,22,
24 263:3,6 341:18,
21 342:8,16 343:1
396:19 399:1 407:6,
13 409:15 435:4
involvement
16:19 190:3 191:18
197:19 250:7 251:2
362:7 396:1
involving
57:6 208:11
IR
178:4
issue
264:18 276:4 281:3,
4
issued
94:20 119:24 120:5
issues
316:14 380:20,22
386:4,10

**J**

Jack
39:22
jacket
335:24 338:21
Jacqueline
436:13
Jacquell
272:16
jaded
378:5
James
62:4 121:3 191:1
387:14
Jan
272:17
January
355:20 356:7,20
358:18 359:23
360:15 435:22
Jim
38:7 220:7 246:16
276:8 277:23 278:6,
8
Jimmy
386:16 387:10
job
58:14 89:23 90:2
100:8 117:9 121:12
132:2,4 136:11,17
180:18 181:18 233:7
257:7 278:17,21
283:8 284:7,16
286:12 287:7 320:3,
8 349:15,16 351:7
Joe
37:20 89:8 90:2,5,
10,14
John
74:9 75:6
Johnny
69:5
Johnson
6:12 15:6 18:17,18,
23 27:21 28:7 29:11
37:20 66:12 291:10
298:20 301:23
323:14 334:21
335:19 336:17,20
338:4 345:12,13
346:8 349:4 354:8
356:7 361:4 396:17
Johnson's
18:19 24:22 75:10
83:9 294:8 295:17,
22 297:11 321:23

join
64:6,12 70:15 72:23
79:5 80:17 87:5
102:13 131:4 154:9,
19 158:9,23 163:18
168:20 169:2 170:2
180:22 182:5,6
187:12 203:17 208:7
212:9 223:22 230:24
232:7 236:13 246:21
257:5,19 280:16
286:16 288:8 294:21
298:11 305:4 321:16
352:18 364:14
378:19 380:14
390:14,22 391:21
393:9,21 400:10
402:5 404:14 405:19
406:16 408:9 409:20
411:5 412:7 416:5
427:12 429:23
430:14 433:20 438:3
joined
36:23 62:6
joining
95:14 96:19
Jones
5:17 7:24 9:22
Joseph
28:17 29:4 77:10,14
79:1,6
jot
257:7
judge
8:16 407:14
judgment
115:14
July
229:10
jumped
75:10,11 217:11
336:2,6
jumps
265:19
June
356:20
jury
8:17 59:11,13
Justice
5:7
juvenile
101:16 121:22,24
122:6,15 123:2
124:4,21 125:4,11,
22 126:11,12,16,18,
22 127:21 128:10,11
319:14 322:8
416:15,19 417:2,21
419:16 420:8,15,23
421:2,9 442:24
juvenile's
122:23
juveniles
97:7,22,23 98:9,17
99:7,12,20 121:13,
17 123:6,21 124:3,
18 125:10 126:9
128:16 129:2,11
316:23 345:22
419:16 420:13,16

**K**

keeping
186:17 395:18
Ken
38:5 69:8

key
156:2
keywords
157:6
Khaled
189:18
kid
215:3 247:12 285:8,
20
kidding
369:19
killed
179:18 189:19
197:13
kind
15:20 42:9 48:6
58:19,23 61:13
66:13 73:2 76:12
78:11,13,15 147:15
160:8 170:5 178:2
180:10 203:14
206:12 279:21
290:14 308:14 315:8
321:23 333:14
335:11,12,21 336:1
359:2 377:19 387:4
398:20
kinds
85:14
Kings
49:11
knew
42:1 49:15,19,20,22,
23 50:2 54:6,7,8
72:15 78:9 80:4
101:6,8,12 102:5,16
104:12 108:7
112:10,14 130:6,11
188:9,17,19,22
189:20 194:16
196:24 216:2 220:17
223:16 224:2 252:6
298:5 300:20,22
301:8 305:5 318:3,7
322:20 337:1 343:7
371:8 393:3 401:19
knife
285:15 287:9,11
knocked
387:5 408:10
knowing
20:16
knowledge
28:6 41:5 45:11
48:3,20 49:6 50:20
70:24 76:2,16,23
83:15 84:1,8 88:12
94:17 96:10 98:5
119:5,6,10,12
120:13 139:18
145:24 148:9
149:10,13 165:24
192:9,12,14 196:24
202:4 207:9 213:1,2
215:6 221:15,16
236:5 251:11,22
255:21 260:2 261:14
263:7,9,10 264:1
266:13,16 289:1
303:24 319:1,2
320:12 321:1,2,4,5
324:5 327:9,13
332:1,4 338:16
347:20 354:23
355:11 368:18 398:9
399:17 433:17 434:7
KUHN
60:13 182:5 183:15
184:5,18 408:4
409:20 445:8

**L**

lab
152:21
label
71:5
labeled
312:9
laid
124:10 151:20
lane
66:3
language
318:22
large
92:23 93:5
Largely
365:7
larger
46:22 53:21
Larod
291:10 388:20,22
396:17
Larry
39:13 49:21 83:18
Lashawn
5:8 73:20 269:11
272:15 275:2 291:10
314:2,8 319:13
323:12 324:9 328:5
330:21 396:18
421:18,22 422:12,21
424:8 435:19
Lashawn's
317:19,22 327:11
Lashon
272:15
late
167:24 168:1,2
Latin
49:11
laugh
69:10
laughing
387:24
launching
25:20
lawsuit
28:1 219:14
lawyer
102:24 103:13,14,15
lead
53:22 183:20,21
234:17 235:4 246:18
330:15 331:19
373:15 403:21,22
leading
54:14 109:7,14,19,
21,24 110:4,15
234:18,23 379:21
391:5 444:9,11,14
leads
150:23 159:6
leaf
93:3
learn
99:24 100:4,8,13,16,
17,22 117:8 121:11
128:15 132:13,21
133:1,6 188:5
201:11,15 204:13,21
205:5 224:8 318:15
354:6,10,12
learned
31:16 40:4 78:10
112:10 136:6 205:17
219:12 300:11
learning
188:7

leave
30:18 117:7,22
234:2 295:8 309:22
327:18,23 338:8
416:12,14 435:2,4,8,
11
leaves
167:2
leaving
207:16 214:17
297:16 349:10
369:17
led
174:5 210:23
leeway
232:1,9 329:6
left
194:4 250:10 256:8
257:13,24 260:3
289:2 295:12,13
296:3 297:22 301:12
302:11 305:20
313:12 322:13 327:4
341:13 368:4 403:13
431:16
left-hand
261:14
legal
5:2 105:23 106:22
111:7 115:10,12
130:1 131:2 340:11
395:11 436:12
legality
88:21
legible
138:23 139:2
Lemont
121:9
Lenehan
38:4
lengthy
116:16
leniency
114:16,20,21 115:8
280:4,6,14 281:24
282:7
level
50:4
lieutenant
39:22 40:18,19 56:3,
4,14 84:15,16 86:14,
15 87:22 173:12
lieutenant's
173:4,18
life
113:9,15 114:1
180:4 286:14
lifetime
22:7
lift
22:6
lifting
22:9 349:13
lighter
21:5
limit
367:21
limited
198:11 261:21
336:13 398:9 403:7
Lindblom
29:17
lines
17:21 61:7 170:24
171:11 249:18
255:16 257:3 301:17
308:12 311:7 320:17
337:13 338:2 345:20
375:21 382:9 398:22
lineup
15:22 96:6,15

129:23 130:7,12,18,
21,23 131:9,11,17
151:12,13 160:10,
11,12 162:17 163:1,
16,23 164:3,4,8,10,
14,15 165:3,11,19,
22 171:15,17 172:4,
11,23 211:7 426:1,
10,13,16,19 427:2,7,
18,20 428:1,5,11,17
429:7,21
lineups
26:11,22,24 129:16
160:18,19 161:6
162:5 163:6,10,15
353:19,23 430:11
linked
398:7
linking
397:20,23 398:2
list
24:13 30:10,11 32:8
219:22 221:12 262:8
listed
204:11 217:24
221:22 262:6,17
302:21 325:11
342:12 383:10
listen
248:5 367:14 375:21
376:10,12,17
listened
125:1 441:11
listening
380:3
listing
219:23
lists
97:21 217:15
Litigation
5:3,18
live
91:20
lived
300:21 301:19 308:1
318:4,8
living
313:5
Lloyd
49:22
loader
31:8
loads
208:22
locate
121:20 122:5
located
29:18 47:9,10 122:2,
17,21 125:14 192:16
312:16 317:1 319:3
325:8 419:19
location
168:18 319:4
439:11,16,18
locations
32:6
lock
259:2,8
Locke
157:21
locked
259:23 260:3
locker
229:13
locks
259:24
lockup
289:9 344:16
long
10:24 32:8,12,16
34:17 36:9 39:2



Dwayne Davis 10/02/2019

80:23 142:9 168:14
227:8 235:2 239:24
240:5 245:18,19
246:13 247:5 253:3
291:23 349:21
366:23 367:2,4,7,9,
16,17 370:7 379:1,3,
21

**locked**
10:14 13:14,23 21:1
140:17 170:9 270:18
299:12 314:9 337:14
368:7 390:1

**lookout**
251:4

**looser**
142:14

**Lords**
49:10,23

**lost**
408:20

**lot**
37:18 48:8 57:7
58:10 78:20 93:17
150:7,16 151:1
189:22 204:15
206:19,24 252:2
329:6 344:6 392:4
402:16 403:12
404:21 405:1 408:15

**lots**
57:10,14,19 207:6
252:15 407:21

**loved**
321:22 350:18 351:1

**loves**
402:22

**lower**
50:3

**Loyola**
30:15,16,18

**Luckily**
281:8

**Luke**
10:18,21 12:1 19:9
23:5 35:12 38:12
67:15 80:20 200:5
272:7 296:16 370:13
375:2,3 385:19

**lumped**
73:2

**lunch**
170:16 238:3,5,6
387:18

**Lynn**
36:1

---
**M**
---

**Macarthur**
5:7

**made**
25:6 53:15 76:20
143:8 172:14 191:17
194:20 212:17
225:22 229:24
248:13 273:20 294:9
303:23 304:1 329:18
365:10 369:1 372:5,
10 377:19 382:3
413:6 435:7

**Madison**
229:9

**maintain**
231:11

**maintained**
149:13

**maintaining**
56:24 143:3,5,6

**major**
55:21 167:19 257:3

**make**
8:22 53:14 104:23
107:18 115:2,13
125:2 141:6 146:4
147:13,20 156:20
164:5 175:7 186:19
191:9 207:24 210:8
216:23 228:16
245:16 253:23 261:2
264:16 292:20
294:11,12,16 295:9
298:23 301:13
317:18,21 348:4
370:9 376:22 392:24
403:8 406:23 411:8
412:9 414:12,18
415:8,13 428:8

**makes**
64:14 69:11 91:1
112:3 203:21 212:15
237:6 243:22 244:16
247:19 415:21

**making**
8:14 143:7 147:18
241:5 258:7,10
294:15 376:15

**male**
16:10 23:7

**man**
28:16 225:23 226:1

**manner**
197:12,17,23 389:14

**March**
30:23

**mark**
174:16 271:16

**marked**
92:15 94:6 96:3 97:2
175:2 215:21 216:17
261:4 271:3,6,11,22
323:5

**married**
388:6

**Marsh**
31:4

**Marshall**
39:19

**Marshan**
121:5

**match**
117:18 211:15,16
273:9

**matched**
41:18 401:22

**material**
140:20

**math**
21:16 356:2

**matter**
5:7 14:6 15:6 19:5
61:1,8 204:21 301:4
347:14 411:14
424:18 444:5

**mattered**
162:14,18 179:20

**matters**
7:13

**Mc-**
272:19

**Mcclennan**
31:5

**Mccorkle**
5:3,17

**Mccoy**
15:9 18:13 25:4,5,24
27:20 28:8 66:10
226:1,10 227:12,16,
22 228:11,16 230:9
232:20 233:23
234:23 235:6,8,15
236:3,17 237:4,14,

20,22 239:22
240:17,19 241:4,9,
12,18 242:20 243:14
244:6 245:16 246:17
248:7 249:21 251:13
252:4,11,13 253:4,
18,20 254:3,12,15,
18,23 255:14,20,24
256:2,11 257:10,13,
16 260:3,5,9,14
261:8 262:20 263:4,
12,15,19,24 265:4
266:9,24 267:7,14
268:15 269:1,16
270:6,9 273:20
275:6,22 276:9
277:20 278:3,14
279:5,13,23 282:11,
20 287:21 288:4,9
289:2 290:8 295:1,5,
7 297:24 298:2,17,
24 324:23 339:17
340:14 348:16,21
361:7 366:23 368:8
370:4 372:4 376:14
381:13,14,19 384:21
396:16 434:24 435:2
441:12

**Mccoy's**
215:1,18 223:11,17
224:3,9 226:17
227:2 230:4 232:12
242:11 247:7 266:5
268:9 269:14,23
298:19 299:20
365:7,8 396:8 397:4

**Mcdonald's**
344:5,6

**Mcginnis**
95:23 180:22

**MEADOR**
21:16,23 45:8,13,18
48:18 55:22 64:6,12,
24 65:7 70:15,21
72:23 76:5 79:5
80:17 82:4 87:5 94:8
102:13 105:7,22
106:5,21 109:15
110:17 111:6,11
115:9,19,23 116:1,6
118:3 124:11 129:4,
24 131:1 132:16
154:9,19 156:17
158:2,7,18 161:9,14,
20 163:18 168:20
169:2 170:2,15
180:20 181:10 182:6
183:4 184:3 187:3,
12 195:17 198:24
199:2 201:2,6
203:17 205:7 208:7
209:23 212:9,18
213:14 214:4,11
215:10,15 216:19,22
223:19 227:4 229:16
230:21 231:11
232:4,7,16 234:20
236:13 246:4,10,21
246:9 257:5,19
259:11,15 260:23
261:1 267:2 268:11
277:2 278:18,22
280:16 281:20
283:10,14 284:10
286:16,21 288:8,19
294:21 298:11
304:14,18 305:1,4
310:5,17 312:22
316:12,19 317:3
318:5 319:7 321:16
322:16 330:16
342:19 352:18
356:3,11,18,20

360:16 364:14
365:18,23 373:17
378:19 380:14
383:18 384:10
385:17 386:22
388:24 389:9,16
390:2,14,19 391:21
392:10,19 393:9,19
395:10 397:14
400:10,14 402:5
404:14 405:4,6,19
406:11 408:9 409:19
411:5,18 412:1,7,20
413:9 414:5,14
415:23 416:5 419:24
421:1,12 423:3,12
427:12 429:23
430:3,14 431:2,5
433:6,9,18 438:3,6
442:8,11 445:7

**meals**
344:6

**meaning**
27:8 102:22 103:11
104:4 109:16 131:8
132:5 139:22 147:21
151:5 204:19 232:2,
8 303:8 356:4 359:8
392:6 437:23 438:12

**means**
101:15 102:20 103:9
123:7 218:2 359:13,
15 407:16 427:15
432:21

**meant**
55:16 144:11 423:20

**mechanism**
52:14,23,24

**medication**
9:16

**meet**
59:20,23 62:4 90:14,
19,22 226:6 295:18
333:7 387:22

**meeting**
10:17,24 11:9,23
12:17 19:17 330:23
331:3 333:6,11
334:18 335:4,6
362:17 410:8

**meetings**
11:5 19:9,13 25:9,
12,14,22

**members**
50:4 203:8 291:7
306:18,20

**members'**
300:11

**memorandum**
98:8 123:10,19

**memorialized**
236:15 382:20

**memories**
138:2

**memory**
16:22 84:16 137:14,
19 189:13,15 191:7
225:20,21 227:9,10
233:5 237:1 244:17
293:13,14 295:12
309:11 312:18
336:12 358:12
367:9,10 375:3,5,8

**mention**
185:16 308:17

**mentioned**
12:9 19:8 25:23
39:13 49:13 50:10
56:23 79:17 83:3,5,
18 164:22 165:2
185:10 311:14,16,18
340:9 349:2 409:12

**met**
10:14 11:7 13:3
25:19 62:10 92:5
220:13 294:7
295:14,16,20,21
296:4 297:5 301:13,
18 358:5 370:2
371:17

**Michael**
370:1

**microphone**
369:13

**mid**
21:20 22:8 43:22
47:18,22 57:11 58:1,
14 59:19 67:9 68:1
74:23 84:9 109:11
111:18 112:11,23
113:8,21 114:13
122:13 124:9,19
125:20 126:15
127:10 128:23
129:1,16,22 130:5,
10,16 138:15 143:13
144:17 149:16
155:18 156:16
157:1,2,15,24
158:17 161:12 162:3
163:12,22 170:9
177:12,15,18 178:9,
14 179:14 181:19,20
281:14 304:13,24
342:22

**middle**
170:24 174:14 175:5
274:2 432:1

**midnights**
40:15 55:8,9,13

**midst**
150:24

**midway**
123:10

**military**
437:13

**mind**
6:17 31:18,21 43:18
58:11 74:18 92:3
94:1 95:24 117:7
118:7 171:10 231:7
263:20 277:10
285:17 306:8 327:5
365:12,16 380:5
395:13,14,19 410:9

**mind's**
16:5

**minded**
396:3

**mine**
80:5,6 270:23

**minor**
315:13,19 316:1
317:13 353:5 389:21

**minors**
316:5,8,17

**minute**
352:9

**minutes**
227:9,10 253:6
367:19 369:20
431:18

**Miranda**
100:18,22 101:4,12,
19,22 122:8 125:24
232:21 240:19 241:6
260:15,19 267:15,24
268:3 314:12 368:15

**mischaracterizes**
154:18 156:18 186:1
195:18 223:20
230:22 232:5 267:3,
18 310:6,18 312:23
373:18 374:7 377:13

378:18 379:24
385:18 405:7 408:8
416:2 440:17 441:1
442:12

**misconduct**
276:24 277:4

**misdemeanor**
59:1 166:9,10

**misdemeanors**
59:17

**missed**
183:5,6

**mission**
443:13,19,20 444:7

**misstating**
409:17

**mix**
91:22

**mm-hmm**
8:20 12:4 73:6 87:14
210:16 211:2 222:14
316:3

**mom**
236:22 436:6,12

**money**
57:20

**month**
11:18 39:10 46:15
58:17,21

**months**
11:20 34:12 415:18

**morally**
115:1 280:21

**morning**
5:1 6:8,9 60:2 190:4
194:4 201:11 237:13
239:1 327:7

**mother**
215:2,8,18 223:17
224:3,9 318:13,23
325:1,5

**mother's**
223:11

**motion**
59:5,10 247:3

**motivation**
169:23

**motive**
179:5,6,11,17,24

**mouth**
110:21 111:4,19

**moved**
169:8

**MP4**
272:2

**multiple**
34:23 56:22 85:15
88:20 108:8 210:5
219:24 250:8 275:16
306:17,20 331:10
357:18 358:8 360:4
363:3 414:17,18

**Munther**
202:5,8

**murder**
12:6 34:15 45:3
54:21,22,23 63:18
68:18 142:24
143:16,17,19 144:4
145:9 175:24 176:2
180:11 199:11
200:15 202:2,22
230:16 246:23 252:7
280:13 289:5 324:21
339:21 350:7 371:13
376:23 392:3 396:20
397:21 398:8 401:14
403:13 407:21
410:21 411:2 412:5,



18 435:5
**murdered**
188:12 189:20,22
251:7,12 270:3
**murders**
16:15 23:18 24:5
46:5,17 144:1 188:6
190:12,15 191:13
194:21 197:1,4
204:15 252:10
339:22 366:6 408:1
409:6,15
**muscular**
21:22,24 22:1,2
**mute**
436:12

**N**

**nail**
43:7
**named**
19:12,16,20 20:8
28:17 121:2 250:8
256:10 275:8 290:9
324:21 339:20
396:16 401:22
**names**
26:15 37:22 44:10
50:3 66:11 188:8,9,
20 219:22 221:22
290:13 300:2,12
302:20 336:23
**narrative**
164:1 266:7 267:1,6
**narrow**
106:13
**nearest**
126:13 420:17
**necessarily**
41:24 74:16 102:14
159:10,15 329:7
**needed**
41:16 104:13 130:18
147:20,22 186:17
235:15,19 258:2,13
289:20
**negative**
164:10,14,15 165:13
325:19
**neighborhood**
307:24 308:3,7
337:14
**news**
148:14 401:1
**newspapers**
400:21
**NFY**
436:14,21 437:6
440:7
**nice**
146:18 169:17
321:19,21
**nickname**
196:3
**night**
22:13 201:13
269:17,24 327:18
409:5
**Nina**
68:18
**nonetheless**
102:23 103:12 104:5
116:15
**nonpublic**
106:14,16 107:19
108:14,23 391:10,17
**North**
350:23
**Northern**
5:9

**note**
136:2,6,11 214:6
224:12 261:2 270:15
**noted**
5:12
**notes**
86:16 136:16,20,21,
23 138:14,21 139:4
145:15 150:2 153:7,
10,16,22 154:2,5,11,
15,21 155:19,23,24
156:3,7,12,15
157:17 163:5,10
214:1,14 218:12
236:3,10 250:4
253:7,10,17 273:13
274:15,16,19,23
275:1,19 299:8
312:19 313:4,11
347:5,11 414:18
434:20,22
**noticed**
206:23
**notification**
8:6 53:15,16 357:2
**notified**
125:23 352:7,14
353:6
**notify**
319:18,20 320:13
351:4 436:23 437:4
440:8
**November**
355:20 356:8,21
**number**
12:24 38:19 123:15
160:19 178:4 223:12
323:7,12 360:14
426:15 436:18 439:2
440:5
**numbered**
98:7 261:7 272:2
**numbers**
273:8

**O**

**oath**
5:15 8:16
**object**
20:21 27:13 64:5
85:24 102:12 104:21
105:6,21,22 106:18,
21 108:1 109:15
112:16,24 116:6
122:9 130:2 153:13
158:1 162:8 163:17
168:19 170:1 181:10
187:11 203:16 213:6
233:15 236:12 246:4
256:18 257:4,18
259:17 264:20 267:9
280:15 281:19,20
294:20 310:3 316:12
318:6 328:14 331:11
352:16 358:22
364:13 368:20
373:19 374:6 377:12
379:11,23 385:15,17
386:5 390:3,13
391:19 392:19
397:15 402:3 405:15
409:16 411:3 412:6
413:8,9 416:23
417:18 423:3,4
425:20 429:18
430:13 433:5,6
439:12 442:11,19
443:2
**objection**
21:23 45:8,13 48:18
55:22 60:13 64:11,

23,24 65:7 70:13,21
72:21 76:5 79:3
80:15 82:4 87:3
88:16 102:13 105:7
106:5 110:17 111:7,
10 115:9,11 118:3
124:11 129:4,24
131:1 132:16 152:1,
2,17 154:8,17
156:17 158:7,18
161:9,14,20 169:1
180:5,20 182:4
183:4,15,16 184:3,
18 185:24 195:17
198:24 200:19 205:7
208:6 209:23 212:8,
18 213:14 214:4,11
215:11 223:19 227:4
229:16 230:22
231:11 232:4,16
234:11,20 246:10,19
249:6 259:15 267:2,
17 268:11 276:19
277:2 278:18,22
283:14 284:10
286:15,21 288:6,19
289:10 304:14
305:1,3 310:5,17
312:23 316:19 317:5
318:5 319:7 321:14
326:8 330:16 342:18
360:16 365:18,23
373:6,17 375:18
378:17 380:12
383:18 384:11
386:13,14 389:11,16
390:2,19 392:8,17
393:19 395:10
397:14 400:8,14
402:20 403:18
404:10 406:12
408:4,7 411:19
412:1,21 414:5,15
415:23 419:24
421:1,12,13,23
422:7 423:12 427:10
428:20 433:18
436:24 438:1 440:9,
16,24 441:13 442:6,
20 443:1 444:9,11,
14
**objections**
45:18 405:4,5
**obligated**
134:20
**obliged**
187:8 425:17
**observe**
26:24
**obtain**
102:9,20 103:9
104:2,13 117:24
124:3 178:16 355:8,
10
**obtained**
399:21 400:7 401:7
404:5
**obtaining**
290:17
**occasion**
108:14,22 283:17
284:4 381:2 394:15
**occasionally**
86:24
**occasions**
284:21 433:2,15
**occupied**
443:22
**occur**
202:20 398:12
**occurred**
11:16 23:18,21

57:14,18 204:15
252:7,10 394:5
402:10 410:14
**occurrence**
51:12 183:14
**October**
5:4 94:21
**odd**
349:17
**offender**
88:18 107:1 108:9
204:7 245:21
324:21,23
**offenders**
342:13
**offenses**
47:17,21 57:18
**offer**
114:15,19 269:16
281:24
**offered**
282:6
**offhand**
210:2
**office**
10:18 12:1 86:17
88:2,7 91:3 142:3
171:4 173:2,4,18
174:8 182:21
192:17,23 193:1
242:21,23 243:6
244:7 248:10 259:18
357:4 373:24 374:4
407:11 408:18
443:14,21 444:7
**officer**
7:1 32:2,23 33:1,22
34:4 50:21 61:2
64:10 122:20,22
123:3 126:10,13,17,
21 127:15,21 128:13
173:13 181:7 189:3,
10,12,14,15 202:17
216:14 218:1
219:23,24 224:13,18
226:6,9,14 227:17
229:19,21 259:9
262:4 264:18,22
265:18 283:4,9
284:7 286:12 287:8
288:10 320:5
323:20,23 330:11
351:4,8,14,21 352:1,
3,7,13 353:2,6,9
389:14 415:15,17
416:16,21 418:4
420:14,17 421:16
432:2 437:4
**officer's**
180:18 181:6
**officer-wise**
424:3
**officers**
98:2 145:4 173:11
174:9 217:13 262:8,
9,16 325:17 326:21
333:8 348:7 399:20
424:4,6 425:17
**offices**
169:19 172:24
173:6,9 259:5,22
**official**
8:6 165:6 328:3
**officially**
328:13
**older**
41:15 44:3 45:2
64:15 142:19
**one's**
94:3

**one-man**
242:18
**ongoing**
150:3
**open**
141:18,24 143:4
176:2 395:12,14,19
396:3
**open-ended**
104:19 105:5,12
**opened**
175:20
**operate**
395:2
**operating**
92:10,16 93:12,22
98:10 130:16 187:10
**opinion**
48:7,9,13 63:8 80:10
84:16 114:7 116:23
118:11 120:9
165:14,15 233:17
381:8,10 397:4
401:3 408:14 409:21
412:9 415:9,13,19
416:8 430:21,22
**Oppenheimer**
369:15,19,22 370:2
373:9,22 374:9
375:23 377:4,6,10,
17 378:20 379:16
380:2,17 383:20
384:15 385:20
386:8,20,24 387:6
388:12,14
**opposed**
164:13 204:20
341:14
**opposite**
408:22
**order**
24:15 67:22 94:13,
15 96:6,12 389:15
407:15 419:22
425:8,13 426:22
427:5,9,20 429:5
**orders**
94:24 95:3,5 97:6,
11,16 187:20 188:2
389:7,24 395:3
414:3 425:18
**Organization**
186:14,15
**original**
15:2 95:23 138:21
139:3 216:19,21
**outcome**
8:2
**oversimplified**
410:19
**oversimplifying**
408:11,13
**overtime**
326:24 328:9,12

**P**

**p.m.**
176:10,14 252:21
253:1 324:10 366:20
368:14 445:12,13
**package**
146:16,17
**packet**
146:14
**pager**
150:18
**pages**
98:12,24
**paid**
209:7

**paper**
82:16,19,21 127:2,3,
6,10 128:2,8 162:13,
21,22,24 185:22
186:4,6 404:22
**paperwork**
137:4,7 139:6
382:21
**parade**
51:2
**paragraph**
124:10 223:6,10
426:6 427:4 429:6
**Parcel**
31:8
**Pardon**
30:9 62:8 219:9
264:12 299:3
**parent**
121:21 122:5,20
125:12 316:24
353:3,4,8 416:16,20
417:21 418:7 419:18
420:10
**parents**
316:9,18
**part**
25:22 51:6 58:14
67:21 98:6 112:4
123:1 125:3 146:13
159:1 179:6 229:20
261:22 265:22
289:22 291:19
303:14,15 315:17
342:17 364:1 373:15
433:10
**participant**
371:13
**participate**
26:22 48:23 83:16
157:16 240:16
292:17 353:18
**participated**
156:8 157:24 158:16
163:6 200:15 303:5
347:6,12
**partner**
12:5 33:6,9 37:8,12,
15,19,20 38:2,10
41:17 42:5 74:11
78:8 80:20 81:8,21,
23 145:8 159:3
162:12,15 165:8
175:14 190:18 200:7
201:23 205:15,17
218:23 222:12
264:23 285:15
293:19 298:5 327:6
357:9 388:5 434:13
**partner's**
206:3 357:10
**partnered**
41:19
**partners**
38:12 41:7,8,10
55:16,18 56:22
80:23 205:11,12,13
434:12
**partnership**
81:1
**parts**
34:19
**party**
293:12
**pass**
326:1
**passed**
195:7 256:11 359:13
**passing**
94:1 95:24 174:18
206:15



Dwayne Davis 10/02/2019

past
206:14,22 229:10
370:3 400:21
path
186:18
patrol
52:17,20 53:12
189:12 283:20
284:23
patrolling
33:3
pattern
162:20
pause
304:6
peek
337:19
peeled
404:6
pen
170:11
pending
9:8
penetrated
394:12,13
people
7:17,18 10:18 18:10
33:4,5 34:1 35:8,24
36:3 37:21 39:1
41:15 49:17 66:22
70:20 71:3 78:21,22
118:18 142:20
146:15 189:19,22
199:12 204:1 205:10
219:24 233:18
235:13 246:24
250:8,9,11 256:9
258:16 270:3 279:21
281:9,12,14 290:8
302:21 310:11
328:24 334:3
335:14,22 337:6,8,
10,14 338:3 339:15
341:14 344:13 348:9
349:9 350:17 365:8,
10,14 386:17 388:6
413:12 422:18,19
423:15,23
people's
219:22 339:16 423:1
perfect
428:7,8
perimeter
169:20
period
54:23 57:15 122:24
137:16 166:23 222:6
300:15 358:16
359:3,21 375:13
386:18 387:11
permanent
37:23 135:5,7,12
139:10,19 140:2
167:2
perpetrator
196:1,6 393:18
394:10,24
perpetrators
207:11 252:1 401:22
Pershing
168:9,18 169:6
person
53:5 54:3 66:19,22
79:17 86:11,13 87:7
101:24 102:6,21
103:10 104:3 108:7,
9 111:1 112:3
116:12,14,20 117:17
130:6 131:8,11
155:20 157:5,12
162:17 163:1,3,4

164:5 181:23 182:24
192:20 193:7
194:18,19 195:16
199:22 200:9,13
205:10 209:12
210:24 213:22,23
218:6,22 219:3,4,5
222:15 233:10
258:15 313:10 316:1
322:8 344:11 365:14
366:8,11 369:4,8
371:17 372:11 388:3
392:22,23 395:17,23
399:6,16,22 401:22
406:23 407:6
408:16,17
person's
102:4 110:20 178:4
244:19 245:2 322:2
personal
48:3 14:17 192:9,11,
13 229:12 286:13
327:13 399:17
408:13 430:21,22
personally
42:22 150:15 203:4
206:9 209:21 227:23
232:22 233:1 240:10
254:4 290:20 319:22
330:4 345:24 348:24
357:11 418:8 428:13
persons
426:12
pertaining
94:13 97:6
pertinent
96:15 97:19,23
133:2
perused
401:21
Pete
5:2
phone
191:19,20,22 192:4,
5,6,15,21 193:8,17,
21,23 194:8,12
196:16,18 199:23
207:15,24 208:2
212:17,23 213:4,5,9
214:1 223:7,12,17
224:3 225:3,10
230:18 231:13
238:10 239:11 273:8
322:4 329:18 371:23
436:18
phones
333:13
phonetic
37:19,21
photo
203:7,14
photograph
15:18,20,24 16:3
photographs
15:17 204:9
phrased
231:1
phrases
277:15
physical
52:11 112:11 117:21
166:23 198:20
207:10 397:20,22
398:1,6 401:13
physically
18:19 284:6,15
pick
131:10,12 145:16
163:16,22 191:9
291:15 370:12

picked
145:15 164:9,12
339:24 348:10
picture
16:6 206:13 305:17
306:7 307:11,18
311:6,23
piece
398:5 404:22
place
11:3 47:18,21 52:14
54:7 150:23 197:4
242:12 294:8 297:11
313:13 329:17 331:4
333:6,16 334:4
339:9 348:5 410:16
places
294:4,6
placing
433:24
plaintiff
8:8
Plaintiff's
271:20 272:1
plaintiffs
6:11 27:20 364:24
plan
186:19,20 242:2,4
291:5,7,17 294:1,9,
11,13,16 301:13
303:11 348:2,4,13
planning
170:16
plans
294:15
Platteville
30:4
played
216:4 265:14
playing
112:6
plays
106:10 110:18
301:23
point
10:23 25:20 27:7
32:7,24 37:14 71:22
89:22 100:23 107:18
121:11 122:18,20
126:8,17 128:2
134:7 154:3 156:14
157:18 166:24
167:20 168:12,13
182:20 189:21
191:11 193:8 198:9
204:1 206:24 211:14
222:7,22 223:1
224:8 234:3 239:20
242:21 244:5,8
249:3 251:5,19
252:17 257:17 268:6
270:14 275:19
289:24 290:3 292:15
293:23 297:14,22
314:18,21 315:5,21
328:20 333:17 334:9
337:20 338:22
339:1,11 343:13
346:6,11 349:3
355:13 364:4 367:11
374:3 375:14 380:23
387:7 393:14 395:8
396:18 397:10
399:13 405:11 412:9
422:2 424:1
pointed
120:18 430:15,17
431:8
pointing
342:21 421:21
428:22

points
10:23
poked
285:12
Pole
350:23
police
6:22 7:1 9:24 10:4
13:10,13 17:3,7
32:2,23 33:1 34:4
57:1 61:9,17 88:7,9
114:23 131:20 132:3
133:7 135:24 143:7
161:7 182:17,18
187:9 189:1,10,14
229:19,21 235:14
236:9 265:17
268:22,23 283:8
284:7 286:12 287:7,
18,22 288:5,16,17
291:7 348:7 389:13,
15 395:3 399:14,20
400:6 402:22,24
414:4,23 415:2,15,
17,20 425:9,16,17,
19 428:18 429:17
430:11 431:1 433:4,
16,24 434:3,6,11
437:12,13,24 438:13
policies
277:7 389:7 395:4
414:4 419:8 425:18
policing
415:9,14
policy
104:2 122:19 127:4,
5 130:24 131:13,16
158:6 165:17 236:9
300:18 304:19
316:23 347:15
389:15,24
politics
408:15
poor
16:24 17:1
pop
58:2 69:4
popped
398:19
pops
312:17
portion
437:16
position
31:23 32:20 36:22
126:5 133:22 134:2
154:14 181:6 198:13
251:20,21 366:22
367:1 412:13
positions
32:6
positive
12:23 15:23 22:17
35:18 162:22 164:2
165:12 196:9 204:7,
12 220:18 226:9
248:11 249:1 294:12
315:8 335:7 341:24
345:23 346:4 362:16
Posluzny
262:12,22
possession
307:22
possibility
396:22 397:1 403:4
434:16
possibly
11:24 30:12 343:3,5
402:18
potential
176:21 203:15

207:10
potentially
128:12
pounds
21:7 23:12
Powell
36:2
pra-
127:8
practice
45:23 46:3 61:24
106:15 124:9 126:15
127:9 128:2,3,5
133:16 141:5,10
146:2 149:20
151:15,16 154:24
155:1,6 158:22
159:9,14 162:4,11
163:5,14,21,24
164:3,7 165:16,21
175:20 176:19 177:6
178:7,15,19 179:1,2,
5 204:3 208:23
219:20 221:9 246:1,
8 259:7 264:17
304:22 315:17
322:2,7 326:18
330:14 331:8 343:23
344:12,15 351:10,12
352:10 359:6 389:6
390:17 414:24
415:1,3,5,20 422:19
429:17 430:11 431:1
440:13 441:7
practices
156:10 315:20
prefer
7:3
preliminary
33:4 53:13
prep
28:18 39:12 66:23
68:10 71:14 73:15
75:9 119:17 270:18
357:12 362:21
363:10
preparation
12:19 13:9 18:7
28:14 61:22 90:14,
19 364:1
prepare
10:12 11:6 149:16
360:20 361:3
prepared
146:19 150:4,9,13
151:12,18,23 154:2
220:9,12 364:2
368:22 369:4,6
preparing
214:9
preponderance
407:17
prepped
354:11
prepping
28:20 221:5 354:15
presence
122:1,16 125:12
126:9 234:3 240:24
256:3 260:8,12,20
267:16,24 268:3,10
269:17,21,22 276:1,
7,10 277:1,8,15,24
278:6,9 279:7,23
281:3,23 282:11,12
283:1,5 313:3
317:14 375:10
419:17 420:9,14
present
10:16 11:22 19:10,
12 25:9 26:2,5,8,11
103:1,14,16 191:19,

22 193:16 225:15
306:12 316:10
353:10 416:17,21
presented
405:12 419:8
preserve
133:11,17 134:2
press
235:13
pressure
116:19 402:23
Prestige
207:2
pretty
8:12 12:23 34:24
51:12 67:8 101:7
149:5 186:22 194:10
211:20 243:13,16
248:16 249:4 289:6
290:6 326:3 332:15
336:13 344:20
349:12 362:2
395:12,13 405:18
412:4,18
previous
13:11 207:19 317:10
previously
92:15 179:3 195:21
215:21 216:17
341:15
Prezano
5:2
price
404:5,19
primary
205:3 295:4
principal
216:10 226:3
Print
432:3
prior
15:15 17:6 18:4
25:16 28:5,19 29:7
59:19 60:22 61:18
95:14 96:19 99:18
100:14,18,23 101:13
102:10 127:22
128:12 132:13,21
133:6 206:18 224:13
227:3 242:12 251:15
252:3,11,13 292:21
297:15 298:8 300:1,
15 304:13 362:18
374:12 381:1
428:19,22 429:2
prison
27:21 49:22,23 50:2
113:9,16 114:1
408:4
prisoner
343:16
prisoners
343:19
proactively
85:21
probable
230:8,12,13,17
231:2,12,15,17
232:3 298:13,15,20
probation
32:24
probationary
32:1,23 37:1,4
problem
433:11
procedure
95:19 114:23 125:19
126:2 142:12 151:11
213:3 253:14 287:23
288:5,16 319:12



**procedures**
92:10,17 93:12,22
96:7,15 98:9,11,17,
23,24 123:20 187:10
277:7 316:4 426:1

**proceed**
5:15

**proceedings**
58:23 59:1

**process**
52:19 111:24 113:4
125:3 126:17 137:10
146:11 162:23
182:11,13,15 243:21
382:11 408:14

**processes**
89:4

**processing**
97:7,22,23 123:6
340:24

**produced**
425:12

**profile**
178:20,21 211:23

**program**
441:7

**progress**
13:22 84:12 86:19
137:2,3 212:23

**promise**
114:20,21 115:8
280:3,6,11,14
281:24 282:6

**promises**
114:16 116:17

**promoted**
33:16,17 50:11

**promotion**
33:13,15

**promotions**
45:12

**proper**
102:10,20 103:5,9,
19 105:19 106:15
111:18 114:6,8,15,
23 213:3,8,11
253:14 319:12 391:9

**Property**
51:19

**proposition**
117:14,23 122:14
130:15

**prosecuted**
124:6 358:8 399:6,
10

**prosecution**
379:4,5,8,22 380:5

**prosecutor**
59:20 60:6,10,17
61:10,17 154:6

**prosecutor's**
407:11

**protect**
129:2

**protections**
121:14,16 129:12

**protective**
67:22

**proud**
364:20,22

**proved**
366:11

**proven**
407:16

**provide**
24:13 42:24 102:5
107:19 108:14,22
194:22 196:20,23
218:9,10 220:7
258:22 309:24 311:5
361:20 391:10,17

**393**:4,16

**provided**
116:8 268:15 298:19

**providing**
218:20 366:6

**provision**
417:23 418:2

**provisions**
37:5

**psychological**
116:19

**public**
106:24 108:7

**pull**
271:7 331:22

**pulled**
409:4

**pumping**
424:2

**purpose**
191:8 228:14,19
241:18

**purposes**
229:13

**pursuant**
395:3

**pursuing**
110:7,10

**push**
331:23

**put**
22:21 41:6,9 67:21
95:17 110:20 111:3,
18 143:9 145:14
146:7,13,16,17,18
163:24 239:18
243:14 260:5 264:4
273:15,23 315:1,3
326:15,18 332:8
335:24 338:21 341:6
345:2,5,7,11,17,22,
24 367:20 422:6,9
434:16

**puts**
235:13

**putting**
218:22 219:22,23
263:6

**Q**

**quarter**
174:5 418:23

**quarters**
287:10

**question**
8:23 9:2,8 48:23
76:15 85:18,19,23
97:9 104:11 105:16
107:22 108:11,17,19
109:1,2,12,20,22,24
110:4,9 111:15,17,
22 112:6,7,9 113:15
118:5 151:19 159:6
164:7 177:19,20
182:12 183:7 191:21
201:2 203:9 205:2
207:2 231:6 259:11
271:4 283:10 310:4
316:13 322:16
351:23 377:3,8,11,
13 379:12,15,22,24
382:10 385:16 386:3
389:1 391:20 392:12
400:4 402:4 404:12,
16 405:16,18 409:17
410:2,9,10 411:4
413:2 419:3 421:3
422:11 423:22
433:11 436:10 438:8
439:13 441:5 443:9

**questioned**
102:1,3 116:13,15,
20 121:24 122:15
125:11 242:2 282:20
352:15,21 353:1,5
382:24 419:17

**questioning**
109:10 211:7 228:20
231:3,13,16 232:1,3,
10 233:14 234:24
235:16,19 236:10
241:19,23 242:9
308:21 316:10,11
320:15 351:11
353:10 372:19
375:10 393:17 394:9

**questions**
61:3 86:18 102:23
103:13 104:5,19,24
105:5,9 109:7,14
110:11,16 116:16
151:6 170:18 198:12
222:4,22 238:15
242:5 258:12 271:6
312:5 382:13,17,22
383:6,16 384:8,23
391:5,8 401:5
431:22 444:23
445:6,7,8

**quick**
61:14 91:5 252:19
366:13 412:18 443:8

**R**

**race**
386:4

**racist**
271:14

**raise**
424:23 425:2

**raised**
424:12,20

**Rajkovich**
262:12 263:1

**ran**
177:16 425:1

**random**
368:17

**rang**
192:4

**range**
97:7 354:19

**ranging**
16:22

**rank**
6:24 10:22

**ranking**
173:13

**rap**
140:17 176:23
177:6,13,17 226:17,
23 300:9

**rape**
185:4

**raping**
210:6

**rapport**
163:3

**rare**
51:12 410:20

**rarely**
74:22 75:3

**rate**
45:3,6

**RD2594269**
324:22

**react**
311:19

**reaction**
232:12

**read**
100:13,16,17,21
101:12,14,15,16,18
103:3 107:21,23
115:16 116:4 118:9
124:12,15 127:13
152:4,5 181:1 182:8
183:8 201:2,4 231:9
232:20,22,23 233:1,
7,9,12 259:11,13
260:14 274:7
283:10,12 295:12
305:17 306:14
307:12 314:12 317:7
322:16,18 361:8,10,
14,17 368:16 383:14
400:24 401:1 426:8,
17,24 436:9,15

**reading**
86:15 115:20 118:7
231:7 243:5 260:19
329:17 382:18
428:19 429:2,5,11
444:13

**ready**
44:20

**Reagan**
39:22 40:18 84:15,
16 87:23

**real**
61:14 290:13

**realistic**
365:16

**reappropriated**
443:23

**reask**
392:12

**reason**
9:19 23:22 34:2,3
63:20,22 82:20
119:20 142:21
158:10,12 198:5
211:20 219:19
273:16 298:10,11,12
302:1,5 314:14,16
321:11 324:13 329:5
334:24 355:21,22
400:4,15,19,22
401:6,8,15,24
402:17 403:3,16
404:8 406:5,8
409:14 410:6

**recall**
7:23 8:2 13:24 14:5,
16 17:6,8,9,24 18:2,
5 23:17 24:8,11
25:3,8 26:19 27:6
30:14 34:12 36:19
37:22 39:16,19,21
42:6 47:8,17,20
48:5,7 49:2 52:22
63:4 64:19,20 65:15,
17,18,22 72:3 73:10,
13,24 74:8 75:6,13,
16,22 77:17 79:13
83:13 87:20 89:9,11,
14 90:1,7,12 91:15
117:3,4,12 119:9
132:10 133:4,14
136:7,11 148:2
153:22 154:4 155:11
162:12,19 166:15
177:3,4,22 185:8,9
188:17 197:9 204:2
207:13,20 208:1,3,
10 211:6 214:14
220:18 222:23,24
226:5,11 236:4
241:5 247:9,11,13,
14,17 253:5 254:2,8

**256**:7 258:19,21,23
261:19 263:13
266:12,15,19,20,22
269:15 279:9 287:12
289:8 290:1 291:16
292:24 295:11
297:18 301:7 304:11
306:5 307:8,24
308:16,19,22,24
309:6,10,15 311:20
312:4,6,7 317:12
320:16 321:8,10
323:1 327:24 330:2,
5 332:13,14,20,22,
24 334:1,10,12,16,
23 335:1 336:9
339:4 340:8,23
341:1 343:12,14
344:20,24 349:1
351:6 352:5 353:14,
16,17,21 354:1
355:1,3,6 357:9,24
358:14 362:17
367:1,5 370:24
382:4,8,15,16,19
384:14 385:3,9
391:12 401:10 420:2
421:15 424:12 425:4
431:23 433:21 437:8
444:4,13,18,23

**receive**
9:23 96:19 103:19
113:15 114:1 117:15
129:12 132:2,6
135:23 136:2 191:20
208:24 285:18,22

**received**
8:6 91:16 94:23
95:2,13 115:3
117:10 120:9 152:22
153:3 191:16
194:16,17 195:15
196:16,17 210:14,
18,22 211:12 223:8
229:19 357:2 406:18

**recently**
4:8 90:16,17

**recited**
407:23

**recognize**
16:2 92:23 119:1
204:6

**recognized**
14:2

**recollect**
336:15

**recollection**
17:2 18:8 31:12,15
40:3 43:13 57:9
75:14 131:23 155:10
163:9 204:8 207:22
223:14 225:12
226:19 235:24
238:20 240:14
255:10,13,23 256:1
258:17 260:18
261:20 267:23
268:1,2,4,6 273:8
293:1,5,8,23 299:5,
16 302:15 305:23
312:12 315:9
318:21 324:17
325:4 330:23 333:3
336:23 340:19
346:18 351:13,15,
16,18,19,24 361:21
362:2 363:13 374:10

**recollections**
18:1

**recommend**
180:18

**reconfiguration**
167:21 170:6

**record**
5:13 6:18 8:14 9:6
12:14 14:14 91:8,12
94:12 96:5 107:23
108:21 118:9 123:18
133:11,16 134:2,13,
20,24 135:2 152:5
176:9,14 178:4
181:1 182:8 183:8
201:4 231:9 252:21
253:1 259:13 261:7
283:12 322:18
323:11,12 336:15
366:15,20 409:9
445:11,13

**recording**
5:5

**Records**
160:20 177:23

**recovered**
366:7 404:24

**red**
349:13 350:6

**reduce**
133:2

**reduced**
285:24

**refer**
7:3 123:4,7 363:22

**reference**
98:10 270:21 273:23
345:20

**referenced**
356:5

**referencing**
116:7 149:22

**referred**
193:5 207:20

**referring**
203:23 246:14 272:4
364:1 416:10

**refresh**
223:14 235:23
240:13 268:5 293:22
302:14 325:4 361:21

**refreshed**
18:8,9 73:11 75:14
238:20 250:16

**refuse**
122:21

**regard**
191:5

**regarded**
64:7

**regrets**
364:11

**regular**
32:24 33:6,9 50:21
359:18

**regularly**
51:9 57:24 58:13,15,
16 229:2

**reinvestigated**
27:17,18

**reiterate**
53:11

**related**
5:9 25:5 90:20
136:10 187:22 188:2
203:2 207:2 223:11
269:14 306:4 337:15
347:18 363:15

**relates**
113:3 128:5,9

**relating**
178:19 204:14,22
205:5 206:2 207:15
358:3 364:6 413:6



**relation**
202:12
**relationship**
81:24 196:21
**relative**
17:16 18:21,22
125:13 188:24
189:2,10 202:10,18
203:5 349:4 418:7
419:18 420:10
**relatives**
349:9
**relay**
106:4
**relaying**
305:22
**Relevance**
286:15
**relevant**
95:8,11 98:17,20
133:12,17 134:2
179:24 182:23
213:16,18,21,24
**reliable**
115:4 209:4,10
434:20
**relying**
405:13
**remaining**
431:18
**remember**
10:19 16:18 17:11
18:18 25:14,18
34:17,22 37:17,18
39:14,15,23 40:8,15
44:18,22,24 45:19
48:9,10 51:16 66:6,7
68:12 72:14 73:9
76:23 82:9,10,23
84:14,15 86:6,10,21
87:22 109:3 132:17
137:11 141:20
151:15,16 153:17
166:17 169:7 173:19
178:6 179:14
190:13,16,17 192:9,
12,13 194:3 202:14
203:10,19,24 204:4
215:19 224:16,21,22
225:22 226:23
228:18 234:1 237:24
238:16,18 239:19,20
241:3 242:16 243:4,
8 247:20 248:4
249:24 250:1,2,6,13
263:16 265:20
270:22 291:4 292:12
293:6 294:3 296:8,
23 304:5 307:2,15
317:16 335:12,18,
20,21 336:1,4,5
346:22 349:6,11
357:7 358:5 362:21
363:2 367:8,12,13,
14,16 398:20,21,23
421:8 444:19
**remembered**
17:13,15 18:16
28:23
**remembering**
68:11
**remembrance**
56:9,10
**Remind**
424:3
**repeat**
109:12 118:5 180:23
296:1 310:24 374:8
391:13 427:6
**repeating**
245:17 404:15

**rephrase**
8:24 134:18 156:13
**report**
13:15,17 14:6,21
33:3 53:14 131:20,
21 132:3,7,8,23
133:5 137:3,9,20,23
138:4,6 146:20
147:6,21 149:21,23
150:12 151:2,8,9,23
152:11,13,14 153:2
154:10,12,16 155:5,
8 160:10,12,13,14
162:7 164:16,21,22,
23 165:2,3,6 166:12
174:24 175:15
212:23 213:5 216:16
217:5,19 218:3,7,8,
11,19,23 220:2,4,8,
12 222:1,4 240:4
261:8,16 264:15,19,
24 266:23 267:6,11
274:9 276:13 281:5,
7,11 302:14 317:9,
10 324:2 335:23
336:2 350:10 363:23
368:8 383:15
432:18,22 433:4,17
434:3,6,11 435:18
436:2
**reported**
194:3 276:17,23
277:6,17 281:15,18
282:1,7 324:21
**reporter**
5:12,14,16 8:17
260:24 323:9
**reporting**
159:19,21 162:17
163:15,23 164:8,12
217:13 218:1,18
219:23,24 432:2
**reports**
10:15 13:10,13,19,
22 14:10 17:3,7 18:4
57:1 61:9,17 82:17
86:16 133:7 135:24
137:2 140:13,15
141:13 143:7 145:5
146:15 147:12
149:12,16,22
151:12,18 154:22
156:3 159:23 160:2,
6 162:4 166:1,10
175:7,22 196:12
199:9 207:18,19
218:12 225:19
238:21 261:24 292:7
293:15 294:5 296:7,
12,23 297:3 305:14
307:6,13 308:11
311:3 314:4,5 315:6
319:22 334:12
335:11,20 359:8
361:8,10,11,14,17
364:2 424:9 434:1
437:13
**represent**
223:6 355:20 370:4
388:19 406:1 407:10
419:7 425:11 438:10
**representation**
425:12
**represented**
10:8
**representing**
419:11
**reputation**
64:3,10 70:11 71:2
72:19 76:3 79:2
80:13 87:1

**request**
41:19
**requested**
107:24 118:10 152:6
181:2 182:9 183:9
201:5 231:10 259:14
283:13 322:19
**required**
103:18 104:2 133:11
135:2 136:19
187:13,19 188:1
**requirement**
122:4 126:14
**requirements**
126:10 420:15
**reread**
103:8
**reserve**
445:9
**residence**
75:10 83:9 301:4
321:24 325:3,10
332:17,19 335:18
423:9
**residences**
25:21 295:16
**resource**
216:14
**respect**
319:21 442:23
**responded**
199:7 216:6
**responsibilities**
51:5 86:12 126:19
159:19,21
**responsibility**
78:23 327:2
**responsible**
143:3,10 211:1
327:1
**rest**
81:12 295:21
**restate**
267:5 316:16
**restroom**
258:2,11,14,18
**result**
287:1,4
**results**
205:21 325:19
**retention**
135:6,8,24 139:11,
19 140:1,2 167:1,2
**retired**
14:23 201:19
**retry**
408:18
**return**
239:16
**returned**
240:20 367:23
**reversed**
286:2
**review**
13:9 15:11 28:24
61:9,17 88:1,12,14
90:5,11 137:6 138:8,
12 141:13 180:16,18
181:6,7,9,12,18
182:1,21,22 183:1
184:17 219:5 220:4
299:14 305:23 306:1
**reviewed**
12:9 14:17,21,24
15:14 181:21 355:16
434:4
**reviewing**
17:7 18:4 149:11,12
214:2,9 238:21
444:4

**Richardson**
74:13,14,20 75:19
262:13 263:18
292:9,10 303:6
325:18 326:2 327:10
**ride**
198:4 254:23
424:13,20
**riding**
66:6 209:16
**right-hand**
274:10
**rights**
100:14,16,17,18,22
101:4,12,24 102:4,6,
10,22 103:11 104:4
122:23 124:5 125:23
232:20,21 233:8,9,
12,17 240:19
260:15,19 267:15,24
268:3 317:8 368:16
**ring**
120:20 443:24
**rings**
243:11
**road**
379:1,3,10
**robberies**
359:15,17
**Robbery**
174:2 359:14
**rode**
75:11 424:7
**Roderick**
5:6
**role**
50:11,17 85:9 88:11,
13 134:5 182:1
303:10 340:5 348:19
**room**
25:5 167:10 171:15,
17 172:4,8,11,14,20,
21 173:6 239:19,20
241:4 243:15 244:6,
9 247:8 248:8,10,18,
21,22 251:13 253:3,
8,11,21 255:15
256:8 257:13,24
259:9,18,19 260:3
275:22 289:2 313:5
344:22,23 345:8,21,
24 366:23 367:14
368:2,5 370:7
374:12,13,16,20
375:4,6,11,15
377:16,21 384:6,17,
20 443:13,16,24
**rooms**
169:13,15,17 171:6,
18,19,24 172:18,23
173:15,16,17,20
243:3,7,10 259:2,4,
23 345:15,23 346:23
442:18,19 444:2
**roughly**
49:14 369:2
**roundabout**
403:7
**rule**
421:11
**rules**
331:14,24 395:4
417:7,10
**rumor**
372:3
**rumored**
386:16
**run**
31:20 176:23 177:6,
8,13,16 226:17,24
235:14

**rundown**
333:18
**runner**
141:20,21,22,23,24
142:11,17,24 143:4,
14 144:4,18 145:3,5,
19 146:6 148:20,24
149:1,14 175:8,14,
22 176:4,5,6 326:16,
20
**running**
423:23
**rushed**
337:17
**rushing**
337:6
**Ruth**
44:19
**Ryan**
10:23 19:10 37:18
65:13 71:18 73:14,
23 262:13 263:3,11
292:7 296:17 303:1,
16 307:7 321:3
334:14 335:13
338:11 341:8
**Ryan's**
38:2

**S**

**safe**
309:4
**sailed**
44:20
**salesman**
58:7
**Sam**
36:1
**sandwiches**
344:16
**Sarge**
142:23 329:7
**sat**
25:4,5,23 124:24
162:5 290:21 435:12
**scared**
232:15 247:15,18,
19,21
**scenario**
417:12
**scenarios**
366:2
**scene**
55:7 66:23,24 78:1,
12 79:18 197:8
198:21,23 199:4,5,8
204:22,24 205:6,13,
15,18 206:9,16,17
336:18 341:16
401:20 409:2
**schedule**
303:8
**school**
17:11 18:12 24:17
29:14,16,17 33:10
34:11,18,21 35:3,9,
12,23 36:6 66:7,9
67:7,8 91:15,17,20
92:4,11 93:5 94:24
95:3,14 96:13 97:16
99:23 100:5,7 117:9
121:12 131:19
191:8,17 196:6,14
198:4 207:12,17
214:17 215:24
216:5,11,13 224:19
226:10,13,16 228:22
230:4,10 232:21
234:4,5 235:6
238:13,18,22 244:23

**265:5,7,15,16,22
266:2 272:14 275:10
286:4,5,6,7 372:22
**schools**
214:22
**scope**
198:11
**scored**
33:19,20
**scribble**
270:18,22,23 273:23
**scribbled**
270:19
**search**
355:8,10
**seasoned**
37:13
**section**
115:22 142:5 174:1,
6
**sections**
169:18
**secured**
345:19,20,21,23
**seek**
147:2 151:7 183:3
**seeking**
112:1 412:14
**seizing**
340:5,12
**selling**
57:21
**send**
52:8 322:4
**sending**
37:6
**sense**
8:22
**sentences**
426:9
**separate**
91:24 172:21 271:10
405:2
**separately**
271:17
**sergeant**
39:9 53:1,4,18 56:7,
18,19 76:20 77:7
83:19,22,23 84:5
85:11 137:6 138:3,8,
12 139:8 146:14
147:11,20 166:2
173:18 190:17,21,22
192:22 193:14 194:5
221:24 222:6,21
276:18 328:18
371:22
**sergeant's**
142:2 144:7,10,15,
19 173:2 174:8
190:24 192:17,23
193:1
**sergeants**
39:15,16 52:10 56:4,
6,12,13 83:20 86:12,
21 87:19,20
**sergeants'**
84:8
**serial**
398:21,22
**series**
168:10
**served**
27:24 28:5 29:5
219:13
**serves**
189:13,15 191:7
244:17
**Service**
31:8



**Services**
5:3,18
**session**
363:11
**sessions**
71:15
**set**
56:16 96:21 300:18
304:19 331:14,24
333:15 443:16
**sets**
55:17
**setting**
91:20
**settled**
8:5
**sex**
106:6 152:19 359:11
**Sexton**
357:8,11,22 362:23
**sexual**
58:3,5 106:8 120:24
208:21 210:3 393:24
396:5 407:4 412:24
**shakes**
8:19
**shape**
86:5,8
**sheet**
97:21 176:24 177:6,
13,17 226:17
**sheets**
140:17 226:23 300:9
**shenanigans**
277:13
**shift**
38:14,19,22 39:3,7
40:6,10,13,21 55:10
62:14 69:16,20 74:1,
3 85:15 149:18
175:8 190:8
**shock**
284:24
**short**
32:10 91:9 176:11
252:22 321:9 366:17
**short-term**
33:8
**shorthand**
440:8
**shortly**
28:4 322:14
**shot**
251:14 252:2 392:6,
7,16 393:6
**show**
60:2 61:22 250:22
253:17 329:20 445:2
**showed**
18:21 250:7,18
**showing**
17:16
**sic**
254:19 318:16
**side**
44:21 169:16 404:5,
18 409:4
**sidearm**
440:15,22 441:10,19
442:1
**sign**
213:23 318:22 383:9
432:17,19,20,23,24
434:3,11
**signature**
261:13 272:9 314:8
324:4,7 432:10,15,
21 433:3,8,12,16,24
**signatures**
432:13 436:5

**signed**
166:1 237:12 271:12
272:7 432:21 434:17
**significant**
161:6,13,16
**signifies**
368:14,19
**signs**
247:21
**silent**
255:4
**simple**
412:4
**simplest**
410:24
**simply**
382:5
**simulation**
91:21
**single**
270:15
**sir**
6:8 10:13 21:2 29:14
67:16 96:9 97:12
116:22 176:16 217:6
261:9 272:4 323:15
366:22 388:23
389:20 400:18
401:11 403:6 406:1
408:20 409:21 413:2
414:21 415:8 418:17
419:2,14 420:2
421:5 428:15 437:11
438:22
**sit**
123:3 157:10 182:2
248:21 370:6 397:24
409:22
**site**
405:1
**sitting**
14:16 16:5 23:18
24:22 28:16 31:18
43:14 48:5 57:17
62:2 63:6 66:5 68:15
89:17 119:18 121:16
128:19 131:24
134:19 159:7,11
188:15 195:4 200:5,
22 207:24 248:12
251:13 254:4,12,15,
19,24 273:7 275:14
293:7 299:16 305:9
306:8 309:6 312:11
315:5,7 332:2
340:18 350:1 362:5
364:18,23 365:21
367:22
**situation**
200:16 407:9
**sizes**
169:21
**sketchy**
66:13
**skilled**
70:19 71:3
**skills**
63:24 72:13 80:10
99:24 100:2 186:9
**SKWRAOP**
88:16
**slap**
244:2
**slid**
82:23 85:9
**sliding**
259:24
**slightly**
6:13 40:11 185:12
**slogans**
277:15

**slow**
430:2
**small**
21:10
**smile**
377:19
**smiling**
209:6
**socialize**
386:21 387:14
**socialized**
388:4
**socially**
19:22 20:12 67:10
**Solange**
5:7
**solid**
209:12
**solo**
81:11,16
**solve**
45:3 411:1 412:18
**solved**
209:21 411:10,14,23
**solving**
413:1
**somebody's**
320:3,4
**someone's**
54:17
**SOPS**
93:19
**sort**
25:19 104:14 247:10
382:21 398:1 409:9
**sought**
182:20
**sound**
9:11 21:7 296:9
297:9
**sounded**
426:18
**sounds**
7:6 8:12 10:7 120:24
127:13 436:16
**South**
189:23 325:8,11,13,
14
**South-sider**
47:4,5 206:15
**space**
443:21
**Spann**
224:13,18,24 226:7,
9,14 227:12 235:5
**speak**
26:14 34:4 57:2 87:7
103:16 122:6 193:7
222:15 236:17,22
318:16 357:11,15
382:14 400:1,2
**speaking**
24:19 26:20 44:13
54:21,24 55:3
102:24 103:13,21
106:7 108:8 160:18
213:20 218:15
222:24
**special**
97:6,10,16 121:14
129:2,6,12,15 188:2
229:15 389:24
425:18
**specialist**
5:2 33:22 50:11,18
74:9 424:10
**specialists**
50:16 51:3,4,10,13
74:8,23 75:4 342:8,
15

**specific**
47:21 49:6 69:22
74:9 75:19 76:3
99:24 100:3 121:13
131:9 144:16 160:13
255:10,13 271:13
277:10 316:4 359:11
392:14 393:5 418:12
**specifically**
6:12 48:15 60:10
74:24 76:13 77:4
105:12 107:4 116:7
123:22 126:20 210:3
269:6 329:2
**specifics**
30:14 132:12
**speculate**
245:8 321:17 325:15
342:10,23 368:22
379:13 382:9 410:15
**speculating**
179:13,14 312:1
379:18
**speculation**
45:14 106:20 108:2
115:12 131:2 158:8
180:6,21 184:4,18
213:15 227:5 232:17
234:12 245:22,23
246:20 259:16
276:20 281:21
288:7,20 304:18
321:15 326:9 338:20
342:19 348:11,14
365:24 376:11
377:22 378:4 380:13
386:14 390:4,21
392:10,18 393:8,20
402:4,21 403:19
404:11 406:13 408:5
416:24 417:19
427:11 428:21 437:1
438:2 442:7 443:2
**speed**
175:21 191:13
**spelled**
6:20
**spelling**
6:17 147:3 275:18
**spellings**
275:17
**spent**
406:3
**spit**
283:18,23 284:1
**Spitting**
284:5
**split**
274:2
**spoke**
34:5 73:16 236:18
293:20 305:15
357:22 382:16
**spoken**
29:4,7,10
**squad**
24:23 342:5
**stabbed**
108:7,9 109:17
**stabbing**
44:24 108:6
**stacked**
142:6
**stand**
43:17,20,23,24 44:2,
7,13 60:12,18,22
172:8,12 248:21
320:18 379:2 441:21
**Standard**
92:10,16 93:12,21
98:10 187:10

**standing**
248:24 313:4 349:12
**stands**
44:3,17 72:18
121:19 186:24
202:20
**star**
432:7
**Starbucks**
209:17
**start**
20:11 30:22 38:22
52:8 78:11 109:23
116:13 149:24
181:16 225:21
238:17 300:23 344:4
358:20
**started**
30:3 31:24 32:4,22
38:23 93:13 99:1
148:24 204:16 240:7
256:8 270:4 303:8
335:22 351:11
377:18
**starting**
32:12 100:23 133:6
**state**
16:21 30:5 124:8
152:21 229:9 358:11
415:14
**state's**
60:2 88:2,6 91:2
181:11,13,18 182:21
357:3,7 364:5
407:10 408:17
**stated**
194:19 200:14
297:24 298:3 317:13
336:8
**statement**
25:6 102:19,21
103:10 104:3,14
115:3,17,18 116:22,
24 124:3,7 125:2
160:8 182:1,3
191:18 241:5 243:21
244:19 245:2,17
248:1,6,13 249:14,
21 252:4,5,11,14
253:22,24 254:6,9
256:2,6,13 267:12
268:9,16,17 269:14
270:6 273:20 282:5
289:3 298:19 299:20
365:7,9 367:14
368:17 369:1 372:4,
9,10 375:22 376:10,
12,18,22 378:14,16
379:9 381:24 382:3,
18 383:11,17,22,24
384:17 385:13,14
396:9,10 397:5
402:15 435:7 441:11
**statements**
104:23 119:16
194:20 252:10
257:10 354:7,17,18
365:10 413:6
414:18,19 415:21
**states**
5:10 116:21 126:11
420:16
**stating**
6:17 191:16
**station**
256:12 352:11
373:23
**stationed**
32:3 50:22
**status**
28:6 61:5 329:19
417:2

**statutory**
185:4
**stay**
257:13 327:6 328:9
334:8
**stayed**
328:21 335:12
374:24 375:2
**stead**
78:14
**steady**
78:17
**stemming**
9:24
**step**
244:24
**steps**
225:4
**stick**
31:21 92:3 329:3,10,
14
**sticker**
404:6,18,19 409:4
**stickers**
174:20
**sticking**
329:5,8
**sticks**
31:18
**sticky**
404:5,18 409:3
**stolen**
252:14 403:12
404:6,20 409:5,7
**Stone**
343:7
**Stones**
49:11 50:1
**stood**
206:22 248:23
**stop**
214:17 238:1,3,5
244:2 313:24 321:11
342:1 343:10,17
344:9
**stopped**
148:23
**Stopping**
325:20
**storage**
144:12
**store**
73:19 296:22,24
297:2 305:19,20
312:7,10,13,15
314:3,6,9 317:19
319:4 321:6 342:5
421:22
**straight**
186:18 214:16,20
**street**
48:11 148:11,19,22,
23 210:6 229:10
335:17 344:6
**stretch**
207:6
**strike**
130:22 134:11
143:11 183:22
223:15 234:22
282:13,17,19 283:7
284:3 286:8 348:2
383:23
**striking**
285:20
**string**
268:18
**strongly**
210:8,11
**struck**
44:21 284:6,8,15,21,



24 286:11,13
**structure**
49:13,20
**structured**
81:14 84:3
**stuck**
45:2
**study**
30:20
**stuff**
69:3 92:1 138:24
142:18 150:16
166:11 187:5 198:8
250:10,12 273:1
279:22 287:18
290:14 299:10
333:14 336:9,11
423:18 430:4
**stun**
285:3
**stupid**
34:2
**styles**
27:20 28:7 82:2,24
185:12 291:10
298:20 304:4 333:8,
18,21 334:9 338:7
345:4,9 346:5 354:8
361:4 388:20 396:17
**subject**
14:6 17:12,24
191:16 269:5 324:20
325:3,8 344:10
414:17 416:14
**subject's**
325:1
**subjects**
89:2
**submission**
222:1
**submit**
138:7
**submitted**
139:7 141:14 147:8,
12
**submitting**
146:12
**subsequent**
249:11,14
**subsequently**
289:4
**substantive**
147:21
**suffer**
286:24 287:3
**suggest**
21:6 130:7 186:20
324:1
**suggested**
110:12 131:9
**suggesting**
110:6
**suggestion**
116:18
**suggestive**
129:23 130:24 131:6
**suing**
7:17,18
**suit**
7:16,19 8:5 10:1
**suits**
7:17
**sum**
274:16
**supervise**
84:2
**supervised**
39:17 84:4
**supervising**
166:2

**supervisor**
35:2 139:8 222:19,
20 281:5
**supervisors**
19:6 151:5
**supplementary**
13:14,16,19 14:21
137:20,23 138:6
140:12 149:23
151:17,22 154:16
165:3
**suppose**
393:2
**supposed**
127:15 130:11
136:23,24 137:2
312:8 316:5,9,17
328:1 345:22
**suppress**
247:4
**surge**
304:6
**surprise**
219:15,17,18
**surprised**
371:1
**sus-**
204:5
**susceptible**
128:16
**suspect**
26:2,6,8 101:12
103:20 106:3,16
108:15,23 110:6,12,
19 111:20 112:8,12,
15,22 113:8,22
115:3 117:11,15
118:1 130:8,11,17
131:9,17 140:18
155:15 158:15
159:12 161:19
176:20 177:16 178:8
183:20,21,23 196:21
210:9,11 259:8
280:11 281:24 282:4
290:12,16 300:16
301:4 304:13 331:1
378:6,13 379:21
380:4 391:10,16
392:5,14 393:17
394:9,17,22 395:7
400:7 413:5,6 415:3,
21 416:12,20 420:9,
23 421:2 426:10,12
441:16
**suspect's**
111:3,19 176:23
177:6,13
**suspected**
210:15,19 339:2
**suspects**
27:4 85:3 99:15
100:13 105:19
107:6,10,14 114:15
119:16 130:19
162:7,16 172:9
177:9 203:15
227:15,21 228:5,9
243:12 266:18
291:14 292:18 298:9
304:23 326:19
331:10 342:16
348:20 390:11 393:3
396:2 426:14,15
427:3,8,19 428:12
429:8,20 430:12
440:14,23 441:4
442:16 443:17
**suspects'**
177:17 266:21
298:16 355:5,9

**swear**
278:14 279:4,15
**switch**
369:14
**swore**
279:3
**sworn**
5:19 6:4 278:16,20
279:12
**synopsis**
223:7

---

**T**

**table**
82:6 172:19,21
186:10 282:20
**tables**
172:18,20,23,24
**tactical**
189:14,15
**Tadros**
202:6,8
**taking**
9:16 33:4 60:22
112:7 136:3,6,11
142:23 153:10
155:23,24 156:11
170:16 224:12
242:12 253:10
285:10 313:11 327:1
367:8 380:10
**talk**
9:4,5 43:5 60:6,9
64:17 102:16
103:23,24 104:7,9
170:21 199:17,23
215:1 221:24 222:6,
10 226:8 233:18,21
237:14,20 249:10,15
255:20 268:19
306:22 308:12,23
311:4 318:13 328:24
329:21 330:3 334:15
352:3,12 353:22
372:16 373:4 376:21
415:14 422:18,19
408:19
**talked**
18:14 28:14 66:20
74:7 85:5,7 87:24
89:8 91:14 180:15
222:12,13 227:11
293:11 295:13,15
296:2,3,4 297:15
310:2 319:5 322:24
334:3 348:20 374:2
391:4 396:23 397:7,
10,17
**talking**
34:9 61:9 65:18,20
66:8 148:21 149:23
155:24 156:1 157:5,
12 175:9,24 184:6,
21 202:10 238:15
247:6 250:15 252:3
270:4 285:8,11
342:22 355:1 372:8
381:18 393:13
396:10 402:23 406:2
408:14 442:5
**talks**
60:3
**tall**
23:8
**tandem**
75:9
**tangent**
440:3
**tape**
138:19

**task**
24:13,16 149:18
150:5
**tasked**
304:4
**tasks**
25:1 42:9 83:6
**taught**
34:20 100:20 136:8
395:13
**teachers**
34:23
**team**
55:13 56:12,23 83:2,
4 185:11 303:14,15
385:11 443:13,20
444:7
**teams**
55:15,16
**Technical**
29:17
**telephones**
173:14,19
**telling**
104:16 107:1 117:18
230:15 244:1,3
311:10 394:12
396:9,13 405:21
431:6 439:8 440:4
**tells**
131:12 415:3
**ten**
72:6,8 168:3 284:20
358:24 360:3,4
**tenure**
167:17
**term**
18:9 28:1 41:11
53:23 54:1,2,16
60:19 68:22 78:6
101:7 104:15 120:1
122:22 135:5,9,13,
20 141:20 148:11,
12,15 166:7 167:3
198:2 203:11 205:11
279:15,18 379:21
408:19
**terms**
140:4 156:2 294:2
**Terry**
388:19
**test**
33:17,18 58:6
**tested**
120:18
**testified**
6:4 15:4 57:24
59:10,12,14 153:23
154:1 201:7,9
355:13 356:5,7,15
357:19,21 358:3,7,
17 361:23 362:1
438:6 444:6
**testify**
9:14,17 58:13,16
59:5,22 60:4,9 61:23
154:3 354:15 356:24
357:5 358:13 360:21
361:3 362:11,14
**testify-**
354:14
**testifying**
58:24 59:19 60:6,11
61:18 90:20 362:8,
19 408:6
**testimonies**
292:23
**testimony**
8:15 9:20 13:11,12
15:11 60:17,22
154:18 156:18 186:1

195:19 207:19
223:20 230:23 232:6
238:21 267:18
310:6,18 312:24
317:10 319:23
320:17,19,22,23
336:9,10,12 337:12
340:9,17 342:3
354:11 373:18 374:7
377:13 378:18 380:1
385:18 416:1,3
424:9 440:17 441:1
444:4,13,19,23
445:3
**testing**
120:14 211:9
**theft**
204:14
**thefts**
359:16
**theoretically**
366:8
**theorize**
200:4
**thing**
37:23 58:19 61:14
78:15 82:12 150:3
153:11 192:20 207:4
247:22 270:5 290:24
291:1,3,4 381:20
394:1 406:14 442:14
**things**
81:13 82:5,15 83:3,5
88:20,22 89:1
150:16 155:21 170:6
180:17 209:15 257:8
332:16,17 335:21
371:4 386:19 387:8,
12 389:4 401:1
408:12,13 410:19
**thingy**
285:1
**thinking**
245:19 367:15
376:21 379:1,14,21
424:22
**Thomas**
74:13 79:14
**thought**
14:2 63:15 72:16
87:8,11,12 127:3
144:8 162:23 181:20
185:11 186:22
193:16 198:10
256:24 294:3 338:4
349:17 372:18
378:1,24 386:16
388:24 389:6 428:23
429:3 435:13 438:8
**Thousands**
155:14,17
**threaten**
112:22 113:8 276:9
282:17
**threatened**
276:5 283:7 284:3
288:17
**threatening**
113:12
**threats**
112:14 113:2 275:21
276:4
**three-quarters**
223:9
**throw**
138:24 282:15
**thrown**
287:6
**tied**
299:21

**till**
32:18 327:6
**time**
9:7 17:17 18:2 23:1,
2 26:7 27:11 30:5
33:19 34:8 35:14
38:4,11,22,23 47:5,
10 57:5,15 58:4
61:12 62:19 71:10
75:5 76:4 77:14
78:10 79:22 81:3
84:6 87:12 90:1
93:13 95:1 97:9 99:1
100:23 101:3 104:13
117:1 121:11 124:12
133:5 134:17 150:9
151:2,13 152:3
155:19 165:18
166:23 187:20
189:18 190:11
193:17 194:8,16
195:5,9 197:6
198:11,14 199:17,18
206:14 207:11 217:8
220:11,13 222:7
227:14,20 228:6
230:9 233:13 234:3
235:6 237:11 238:9,
12,18,22 239:3,7,11,
13 242:21 248:7,24
250:20 251:5,12,19
252:1,7 256:11
257:3 260:5 261:11
263:23 264:4 266:9,
13,16 286:2 294:7
299:20 300:5,15
301:21 302:7,11
309:1,19 310:15
315:11,13,17,21
316:23 318:2
324:14,17 326:23
328:3,5,20 336:17,
21,24 342:21
346:11,15,20 347:2
348:17 352:14,24
354:14,18 355:2
356:4,15 357:9,21
358:2,12,16 359:3,
14,21 361:9,24
362:1 363:20 367:2,
11,16,17,21,23
368:1,4,13,15,16,18,
19 369:3 371:8,14
372:3 373:15 375:13
397:23 405:17
410:23 416:18
422:13 431:15
434:14 437:10,13,
17,22 438:14 441:8
**times**
7:10,15,17 11:8
54:10 58:21 74:4
85:15 108:8 147:4,5
229:8 256:22 257:8
284:18 285:6 286:19
354:19 355:16
357:15,19 358:8
381:1 395:6,23
437:16
**tip**
210:14,18,22 310:15
311:10 371:10 372:4
**tipping**
209:12 311:9
**tips**
208:4,11,19,22,24
209:18 210:7
**tired**
31:20
**title**
28:22 432:2



today
7:4 9:20 10:8 14:16
16:5 22:13 23:19
28:16 31:19 43:5,14
44:7 48:5 57:17 61:5
62:2 63:6 66:5 68:15
89:18 119:18 121:17
128:20 131:24
134:20 150:20 151:8
157:2,11 188:8,16
200:22 208:1 235:14
254:5,12,15,19,24
273:7 275:14 293:7
299:16 306:8 309:6
312:11 314:9 332:3
340:18 350:2 362:5
364:18,24 365:22
367:22 370:6 389:4
390:1 391:4 418:8
441:19 444:17
told
8:4 23:21 34:1 52:12
67:6 70:3 77:13
79:21 122:3 197:16,
22 203:3 230:15
235:17,20 248:1
249:19 255:17
258:4,5 295:3
303:12,13,17,20,22
311:23 313:20
335:24 336:11
337:20,22 339:19,23
357:3,6 371:20
382:7,12 403:11
414:1
tolerate
277:12
Tony
36:2
tool
161:7,13
top
97:21 250:15 265:3
274:10 308:2 418:17
435:17 437:16
total
13:2,5 29:13 274:16
359:20 394:6 408:22
totality
112:8 401:17
totally
82:18 286:1 312:18
320:16 360:23 378:8
387:11
touch
327:14
trace
212:3
track
227:2
Tracy
5:16
trained
92:9 93:4 96:12
118:21,24 131:19
training
35:5 91:16,21,24
94:23 95:2,13 96:19
128:15 131:24
132:2,6 135:23
136:2
transcripts
10:15 13:11 14:24
305:24 306:1
transferred
81:3,6 166:20
168:18 169:5
transported
325:9
transpose
138:18 139:2

transposed
138:20
trauma
394:14
trial
59:18 220:17,20
221:5 247:1
trials
15:1 59:14 220:20,
24
trip
236:3 237:22
Troshawn
25:24 215:1,18
223:16 224:3,9
226:1 227:16,22
230:4,9 232:12
245:16 253:18
255:14 260:5,14
261:8 263:4,24
265:4 267:14 275:22
276:9 277:20 279:5
295:1,5 366:23
368:2,8 370:4,8,12
371:10 372:4,17,21,
24 373:4,24 374:2,
11 375:7,11 381:13,
14,19 382:2,3,5,11,
14,17 383:1,6,17
384:8,17 396:8,16
434:24 435:1 441:11
trucks
31:8
true
22:16 82:18 87:18,
21 99:17 128:19,22
275:18 310:10,12
399:5 401:16 402:2
403:3 413:11,14
434:6,20
truth
110:7,10 112:1
113:17,18 299:10
372:3,7 396:10,14
truthful
1:19:19 120:11
Tuider
39:13,23 40:2 83:18
222:21 271:12
turn
98:6 137:4,5,9
138:11 139:24
217:3,12 369:12
425:5 434:14 435:14
441:24 442:9
turned
145:21 146:18 219:6
294:6 398:16 399:2,
15
Turner
36:1
turns
399:23
TV
53:24
two-thirds
436:3
twosome
74:12
type
25:17 52:19 53:15
69:13 152:8 160:14
166:6 175:23 211:7
218:7 357:2 358:19
typed
219:2,4 220:5
types
57:13,18 209:18
typewriters
147:16

typewritten
436:5
typical
246:1
typically
300:14 304:12
328:11 346:14,16,17
typing
147:16 152:20
156:4,11 157:9
218:11,19
typos
147:18

U

uh-uh
8:20
ultimately
138:10
unable
164:5 327:14
unambiguously
8:19
unaware
80:18 251:6 397:9,
16
uncles
321:20
undercover
34:6
underneath
56:4,5 266:6
understand
8:23 86:9 104:1,4
112:19 113:1 127:23
128:4,5 129:9
182:10 269:7,9
377:14 380:24
387:10,12 410:2
434:10 437:9
438:16,20
understanding
50:24 56:9,10 73:7
77:22 78:7 86:6 88:5
104:7,16,17 109:1,
19 121:19 127:12,18
132:18 134:10,12,
19,23 135:10,16
141:1 145:7 181:5,
17 200:1 205:9
340:14 353:3 365:9
372:16 373:21
393:11,12 436:19
understands
102:22 103:11
124:4,5 377:10
understood
9:2 380:21
unfinished
377:5
uniform
229:11
unit
20:10 88:1,4,6
United
5:10 31:7
University
30:3,5,15
unproud
364:22
unsolved
44:23,24 45:1
unusual
151:22 152:8,12
235:8
up-to-date
151:2
update
85:22

updates
84:22
uploaded
217:1
upset
311:21,24
upstairs
344:21

V

vaginally
394:12
vaguely
202:14 335:12
336:1,5 362:20
367:13 391:7
Valadez
10:22 19:9 35:17
67:24 68:3,14
292:11,12 302:22
363:8
Valdez's
42:5
valuable
161:18
Van
6:7,10 12:15 20:24
21:19 22:3 27:15
45:10,16 46:2 48:21
54:18 56:1 60:15
64:8,13 65:4,11
67:23 70:18 71:1
73:4 76:8 79:8 80:19
82:7 86:2 87:9 88:24
91:5,13 92:14,18
96:5,8 97:4 102:18
105:2,11 106:2,12
107:3 108:12 109:18
110:22 111:16
112:20 113:6
115:15,21,24 116:2,
11 118:7,12 122:12
123:17 124:13 129:7
130:4 131:7 132:20
152:4,10,24 153:15
154:13,23 156:21
158:4,11,21 159:4
161:11,17,24 162:10
163:20 168:22 169:3
170:4,17,20 174:16,
19,23 175:4 176:7,
15 180:9 181:4,12,
15 182:14 183:11,18
184:8,20 186:8
187:6,14 195:23
199:6 200:21 201:8,
10 203:20 205:19
208:9 210:1 212:12,
21 213:10,17 214:7,
13 215:13,17,20,22
216:20,24 217:22
223:5,24 227:7,19
229:23 231:4,7,14
232:11,19 233:22
234:14,21 236:16
246:7,12 247:2
249:9 252:18 253:2
256:20 257:9,23
259:20 261:6 265:1
267:4,13,19 268:23
271:4,11,16,19,24
274:8 276:22 277:5
278:19 279:1 280:20
281:22 283:16
284:14 286:18,23
288:11,24 294:23
298:14 304:16,21
305:6 310:9,19
313:2 316:15,21
317:6 318:9 319:9

322:6,22 323:2,10
326:10 328:16
330:19 331:16
342:20 352:22
356:6,12,14,19,22,
23 359:1 360:19
364:16 365:20
366:3,13,21 368:23
369:11 444:9
varied
155:21
varies
157:11
vehicle
237:12 340:6,12,15
veracity
268:9,12
verbal
25:6
verbally
8:19 218:12
verify
117:14
verifying
117:9,10
version
21:3,5
versus
54:7 140:2 352:11
417:8 441:2
vest
17:17 18:22 349:5,
13,14 350:6
Vice
49:10,22
victim
89:6 106:9,19
178:16,20,22 179:3,
8 180:11
victim's
179:23 180:4
victims
106:23 178:17
188:20 197:11 251:6
252:2 392:5,15
393:5
victims'
251:18
video
5:2 6:14
view
394:16
viewer
130:8 131:9 162:6
172:8,12
viewers
162:16
viewing
16:3 163:1
violate
130:24
violated
389:7
violating
277:7
violation
185:3 287:22 288:5,
16 389:15,23 426:21
violence
282:10
Violent
51:19,23 56:3,13,17,
18,19 83:22,24 84:5,
7 174:7 192:6,15,22,
24 201:20 207:5
visible
247:20 442:4
visualize
89:17
voice
424:23 425:3

voices
424:12,20
voluntarily
233:23 235:9

W

wait
85:22 111:6 215:10
230:21 406:11
411:18 412:20 418:6
waiting
290:22
waiver
102:10,20 103:5,9,
19
waiving
268:3
walked
383:21,24 384:4
walkie-talkie
285:9,11,12,21
wall
243:11 282:15 287:7
442:17 444:1
wanted
40:23 52:8,12 142:8,
21 180:16 205:24
233:21 308:12,20,23
311:4 357:4 376:17
385:4,7 406:22
warn
301:21 302:2,4
warned
116:13,15 121:24
122:15 125:11,22
301:24 316:18,24
317:14 419:17
warning
101:23 122:8 317:17
warnings
101:20 125:24
314:13
warrant
89:3,4 230:3 304:7,
12,23
warranted
180:8 288:4
warrants
355:8,10
washroom
349:7,8,11
watch
40:16 302:17 303:4
Watson
121:7
ways
53:8 319:18
wear
22:10,12,14,18,20
23:1 229:11
wearing
441:10,18
wedding
67:13,16 388:7,9
week
46:6,13 58:19
weeks
217:10
weigh
280:9,10
weight
21:9,12
weights
22:6,9
Wentworth
36:7
west
168:10



Dwayne Davis 10/02/2019

**Western**
47:2,19,22 48:8,14
57:10 58:9 189:23
297:9 312:17 325:8,
14 439:22
**whatsoever**
9:19 289:1 351:20,
24
**When's**
220:11
**whereabouts**
19:7 211:8 269:23
**whichever**
6:15
**white**
23:7 245:21
**whodunit**
208:21
**whodunits**
396:6
**wife**
36:2 92:5 179:18
**Willie**
49:22
**window**
172:4 402:9
**windows**
171:22
**windshield**
404:19
**Wisconsin**
30:4
**wise**
144:12
**wished**
103:20 104:5 106:4
**wishes**
102:23 103:12
**witness'**
195:18 223:20
230:23 310:6,18
312:24 373:18
385:18
**witnesses**
26:19 99:13 177:9
198:16 201:12 206:1
292:21 293:2,4,9,12
347:1 395:18 443:17
**Wolcott**
29:19,21
**woman**
44:18 306:15 321:19
349:12,23 350:5
**wondering**
104:12 170:7 268:20
**word**
159:2 247:11 427:13
**words**
110:20 111:3,18
277:14 383:21
**wore**
22:19
**work**
8:13 17:17 19:23
20:2,6,10,12 22:4
34:7,10 38:14 40:7,
14,21 41:14 43:8
46:5,7 51:9,13 52:5
53:6 55:12 62:14,15
63:9,23 65:19,21,22
67:24 68:3 69:8,20
70:2,5 71:24 79:9
80:1,4 81:16 96:16
97:19,23 98:18,20
99:1,7,8 100:24
107:7 118:22 125:20
145:8,17 182:15
194:3 201:16 202:1
204:24 216:7 265:17
281:8,12,14 286:9
326:24 328:12

329:10,11 349:16
350:23 354:22
355:4,7 364:20
381:6 386:12
**worked**
17:19 20:20 24:2,10
35:8,21,22 40:22
41:3,23,24 45:21,22
46:18 47:6 52:23
63:16 67:11,14 68:8
69:21 71:17 73:8
74:22 75:3 76:24
77:18 80:3,4,9 81:11
82:3 87:19 90:4,10
101:3 188:24 198:23
199:3,4 208:12,18
242:19 302:23
303:2,4 355:2 359:7
362:18 381:2
**working**
27:4 30:22 31:4,7
37:17,18 39:6 40:8,
15 44:22 46:11
62:24 63:2,4 69:22
74:1 81:24 85:16
89:9,14 93:13
101:11 117:1 128:23
132:5 141:6 142:10,
17 143:14,23 144:9,
17,19,21,24 145:2,9
169:5 188:21 197:18
202:12 224:14 256:8
265:21 292:3,4
297:23 298:7 326:21
328:6 348:8 357:8
391:2
**works**
20:3 182:13 356:2
**world**
428:7,8
**worn**
22:17
**worried**
380:9
**worry**
128:8
**Wow**
209:14 367:15
**wrestled**
285:5
**write**
137:3,23 145:14
153:2 155:5 157:8
164:16,21 212:22
213:12 256:22
261:16 264:18
273:13 350:10
**writes**
116:21
**writing**
14:3 132:7,8,23
133:3,5 137:19
150:2 156:3 157:5,6
174:24 270:9
**written**
175:7 213:4 256:15
276:13 327:20,22
361:15,17 434:22
**wrong**
11:2 13:6 74:22
144:10 235:3 280:21
312:18 378:8 407:6
**wrote**
217:19 261:24
274:17,20,22 275:3,
19 324:2 434:17

**Y**

**year**
29:22 30:18 31:9
32:13 34:19 39:17

40:7 42:19,22 43:21
44:1,4 45:7 46:23
67:17 168:15 169:8
208:10 229:10
**years**
23:15 32:17 36:10
43:19 80:24 83:23
167:6 168:3 283:20
355:23,24 356:9,16
358:8 362:4 391:3
400:21 406:3 407:2
412:16,19,23 413:1
415:16,17 428:18
430:24 435:24
**yell**
424:24
**young**
225:23 226:1
**younger**
21:3 23:16
**Yousef**
16:16 202:10,12
**youth**
33:22 51:21,22 98:1
122:20,22 123:2
126:10,13,17,21
127:15,21 128:13
174:4,6,9 351:4,14,
20 352:1,3,6,13
353:2,6,9 416:16,21
418:1,4 420:14,17
421:16 436:23 437:4

**Z**

**zodiac**
213:23
**zoom**
301:20

