# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| LASHAWN EZELL, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No. 18 C 1049 |
| | ) | No. 18 C 1053 |
| | ) | No. 18 C 1062 |
| | ) | No. 18 C 1068 |
| v. | ) | |
| | ) | Judge Sara L. Ellis |
| CITY OF CHICAGO, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

Plaintiffs LaShawn Ezell, Charles Johnson, Larod Styles, and Troshawn McCoy

challenge the admissibility of Defendants' proposed experts Mr. John P. Black [358], Mr. Joseph

P. Buckley [361], Mr. Brian Sexton [363], and Dr. John Wixted [364]. Defendants James

Cassidy, Kenneth Boudreau, Luke Daly, Francis Valadez, Bernard Ryan, John Bloore, Thomas

Richardson, J. Fine, Dwane Davis, Larry Tuider, Fred Bonke, Cheryl Green, Joseph Alesia,

Estate of Thomas Coughlin, Cook County, and the City of Chicago challenge the admissibility of

Plaintiffs' proposed experts Mr. Brent Stratton [357], Dr. Brian Cutler [362], Mr. Gregg

McCrary [367], and Professor Lindsay Malloy [368].[1] The Court rules as follows:[2]

- The Court grants in part and denies in part Plaintiffs' motion to exclude Mr. Black's testimony [358].
- The Court grants Plaintiffs' motion to exclude Mr. Buckley's testimony [361].
- The Court grants in part and denies in part Plaintiffs' motion to exclude Mr. Sexton's testimony [363].

---

[1] Plaintiff Charles Johnson did not retain Dr. Malloy as an expert in this case.

[2] Both sides also moved to exclude certain experts on Rule 403 grounds. The Court declines to issue any rulings on this basis at this time and will instead allow the parties to raise these arguments when they file motions *in limine*.

- The Court grants in part and denies in part Plaintiffs' motion to exclude Dr. Wixted's testimony [364].
- The Court grants in part and denies in part Defendants' motion to exclude Mr. Stratton's testimony [357].
- The Court denies Defendants' motion to exclude Dr. Cutler's testimony [362].
- The Court grants in part and denies in part Defendants' motion to exclude Mr. McCrary's testimony [367].
- The Court grants in part and denies in part Defendants' motion to exclude Dr. Malloy's testimony [368].

## BACKGROUND

The Court assumes familiarity with the facts of this case, which were discussed more fully in the court's August 12, 2019 Memorandum Opinion and Order, Doc. 130. *Ezell v. City of Chicago*, 2019 WL 3776616 (N.D. Ill. Aug. 12, 2019). To summarize, this is a wrongful conviction case stemming from Plaintiffs' 1998 convictions for the murders of Khaled Ibrahim and Yousef Ali. Plaintiffs allege that several Chicago Police Department Officers and the Assistant State's Attorney Joseph Alesia worked in concert to coerce or fabricate the confession evidence used to secure their convictions at trial. Ezell, who was fifteen when CPD arrested him, was sentenced to twenty years in prison and served ten years in custody. Johnson and Styles both received life sentences without the possibility of parole, and McCoy received a cumulative eighty-eight-year sentence.

On January 22, 2018, the Circuit Court of Cook County granted Plaintiffs Certificates of Innocence. Plaintiffs filed near-identical actions on February 12, 2018, which the court consolidated on May 16, 2018. Plaintiffs allege, among other things, that Defendants worked in concert to deny them their right to a fair trial by coercing or outright fabricating their confessions that prosecutors used to secure Plaintiffs' convictions. The parties have completed discovery and have filed the present motions in preparation for trial.

**LEGAL STANDARD**

Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), govern the admissibility of expert evidence. *See Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 893 (7th Cir. 2011). Together, Rule 702 and Daubert provide that an expert's testimony is admissible if: (1) the expert is qualified, (2) the expert's methodology is reliable, and (3) the testimony is relevant, *i.e.*, it will help the trier of fact understand the evidence or determine a fact in issue. *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 779 (7th Cir. 2017); *Myers v. Ill. Cent. R.R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010). "*Daubert's* list of specific factors neither necessarily nor exclusively applies to all experts or in every case." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999). An expert's opinion may be grounded in "personal knowledge or experience" rather than pure scientific analysis. *Id.* at 150 ("[T]here are many different kinds of experts, and many different kinds of expertise."). "The Rule 702 inquiry is 'a flexible one,'" and the Seventh Circuit grants "the district court wide latitude in performing its gate-keeping function." *Bielskis*, 663 F.3d at 894 (quoting *Daubert*, 509 U.S. at 594). "Determinations on admissibility should not supplant the adversarial process; 'shaky' expert testimony may be admissible, assailable by its opponents through cross-examination" or the presentation of contrary evidence. *Gayton v. McCoy*, 593 F.3d 610, 616 (7th Cir. 2010) (citation omitted); *see also Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."). The party seeking to admit the expert's testimony must show that it satisfies this test by a preponderance of the evidence. *Gopaltatnam*, 877 F.3d at 782.

**ANALYSIS**

I.     **Plaintiffs' Motions to Exclude Defendants' Retained Experts**

A.     **Mr. John P. Black**

Defendants retained Mr. Black to provide fingerprint and crime scene consulting in connection with this case.  Although Plaintiffs do not argue that Mr. Black is unqualified to testify as an expert,[3] crediting his many decades in the field of latent print and crime scene analysis, nonetheless, this Court finds that he is qualified to offer testimony on the subject for which he has been retained.  Mr. Black is certified by the International Association for Identification as a Senior Crime Scene Analyst and a Latent Print Examiner; he has over twenty-seven years of experience in latent print examination, both as a member of law enforcement and as a consultant; he has extensive work as a crime scene analyst, which includes performing latent print analysis and crime scene examination; and he has provided expert testimony on the subjects of crime scene analysis and latent print examination on over 100 occasions.  Mr. Black is well-qualified as an expert to testify on the issues for which he has been retained.

Mr. Black offers three opinions in his written report.  First, he opines that "[a]dditional latent prints could have potentially been recovered" from the surfaces examined by the evidence technicians who investigated the crime scene.  Doc. 358-1 at 4. Second, Mr. Black identifies six prints from the crime scene deemed "not suitable for comparison" and writes that "the Plaintiffs cannot be excluded as potential sources" of these prints.  *Id.* at 5.  Third, Mr. Black offers rebuttal opinion against opinions that Plaintiffs' expert Mr. McCrary offered concerning

---

[3] Plaintiffs observe in passing that although Mr. Black is experienced with "crime scene examination" he has no such experience in "criminal investigations."  Doc. 358 at 3 n.1.  Although the Court appreciates that there is a distinction between the two fields, the Court is unconvinced that any differences would be meaningful in the context of Mr. Black's opinions.

fingerprint evidence.  *Id.* at 5–7.  Plaintiffs challenge each of these opinions as "nothing more than unreliable speculation, improper argument, or unnecessary observations."  Doc. 358 at 4.

### 1. Mr. Black's opinion that "[a]dditional latent prints could have potentially been recovered."

Mr. Black writes that his review of the investigative records "indicate that the Evidence Technicians may not have processed all reasonable surfaces on which latent prints could have been deposited."  Doc. 358-1 at 4.  He identifies additional surfaces that they could have examined for prints including "the office area of the auto lot, the key rack, and Plaintiff Johnson's car."  *Id.*  Mr. Black states that the available documentation does not explain why the evidence technicians did not process these surfaces, with the available information suggesting that "additional latent prints could have been recovered."  *Id.*

Plaintiffs argue that this opinion has no basis in "sufficient facts or data" and is not the product of a reliable methodology.  Doc. 358 at 6; Fed. R. Evid. 702(b).  Plaintiffs focus on Mr. Black's use of probabilistic language in his report and cast Mr. Black's testimony that he "was not convinced" that the evidence technician who originally examined the crime scene, Chicago Police Department Officer John Karalow, "did all he could do" with the key cabinet, Doc. 369-3 at 85:3-87:11, as "*ipse dixit* opinion testimony."  Doc. 358 at 6.  Defendants counter that Mr. Black properly applied his decades of experience in crime scene processing and fingerprint analysis to arrive at his conclusions.  They argue that his reliance on "personal experience and industry customs" is appropriate, and that his analysis is grounded in his careful review of casefile documents that include "scene photos, police reports, and testimony from the crime scene evidence technicians about their forensic print work."  Doc. 369 at 7.

The Court finds that Mr. Black can testify regarding the availability of latent print evidence from other surfaces.  The methods by which Mr. Black reached his opinion that latent

prints could have been taken from "the office area of the auto lot, the key rack, and Plaintiff

Johnson's car" are reliable. Doc. 358-1 at 4. In his report, Mr. Black refers to his analysis of the

available records to conclude that there is missing information concerning certain surfaces that

may have contained print evidence. *Id.* And, when asked during his deposition, Mr. Black

explained at length the different kinds of testing that the crime scene examiners could have

performed in order to generate additional print evidence and other reasons for his opinion that

the examiners' original print analysis was not as effective in generating prints as it could have

been. *See* Doc. 369-3 at 87:14–23 ("[Officer Karalow] says it's a wooden surface, and he's

processing it at the crime scene. If that wooden surface is indeed porous and he used powder

that would not be the ideal reagent or process, I should say, to look for latent prints. He should

have actually removed that and actually could have done chemical processing back in the

laboratory with a chemical called ninhydrin . . . that would have been more appropriate on a

porous wood surface."); *id.* at 88:2–3 ("It's ambiguous as to how extensive the processing

was."); *id.* at 89:2–9 ("[Officer Karalow] is correct [that a rough surface might not be conducive

to receiving suitable latent prints], but he does not – we don't need a smooth surface to get a

viable fingerprint. He says we need it to get an ideal fingerprint, it's a smooth surface, but you

don't need a smooth surface to get a suitable print for comparison. You can, you can develop

those on rougher surfaces if you know how to properly process the rougher surfaces."); *id.* at

99:3–100:3 ("Q: If an item of evidence was not recovered from a crime scene but obtained by

police officers later . . . how would that item of evidence be examined? . . . Who would make the

request for the item of evidence to be examined? . . . A. If I understand your question correctly, if

an item is not found initially at the scene but later recovered by law enforcement or another party

. . . [t]hen that – the person who recovers the item could submit that item and make the request

that it be processed.").  The specific points of disagreement and suggestion of different methods through which additional prints could have been extracted raised by Mr. Black convinces this Court that he applied his decades of experience in the field to arrive at his opinions.  The application of such experience is a reliable method of arriving at an expert conclusion.  *See Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000) ("Rule 702 specifically contemplates the admission of testimony by experts whose knowledge is based on experience[.]" (quoting *Walker v. Soo Line R.R. Co.*, 208 F.3d 581, 591 (7th Cir. 2000))).  Turning to the final prong of the Court's analysis, the Court finds that Mr. Black's opinion regarding the availability of latent print evidence from other surfaces would be relevant to assist the jury.  Whether the original evidence technicians missed prints at the Elegant Auto Car Lot or on Johnson's car that would tie Plaintiffs to the crime scene is relevant to Defendants' argument that Plaintiffs genuinely confessed to the crimes because they committed the murders in question.

Plaintiffs further take issue with Mr. Black's opinion, expressed in his deposition, that Officer Karalow did not have sufficient qualifications to determine the suitability of certain surfaces to collect prints of sufficient quality for comparison.  Plaintiffs argue that Mr. Black's reliance on a lack of discussion of Officer Karalow's qualifications in his 1998 trial testimony fails to account for the limitations the court system imposed on testifying witnesses and is thus the product of unsound methodology.  Doc. 358 at 7 (citing *Cage v. City of Chicago*, 979 F. Supp. 2d 787, 830–31 (N.D. Ill. 2013)).  Defendants respond that an expert in Mr. Black's position would expect to see certain documentation related to the processing or lack of processing of the various surfaces from which print evidence could be taken, and that the lack of such recorded evidence provides an appropriate basis for Mr. Black's opinion that surfaces like the key cabinet and Johnson's car could have had additional latent print samples.

The Court agrees with Plaintiffs that Mr. Black cannot testify about Officer Karalow's qualifications or the qualifications of the other evidence technicians who first analyzed the auto lot and vehicles. Mr. Black can only speculate that Officer Karalow lacked the qualifications to properly assess the crime scene due to the absence of certain documents that Mr. Black expected would have been created—he does not identify specific documents in the record or other evidence to support this opinion. *See* Doc. 369-3 at 97:1–15 ("[Q:] [D]o you have any basis to conclude that [Officer Karalow] was not qualified to make the determinations that he did as to the quality of the prints he was tasked with finding? [A:] There is nothing – how – there is nothing that is obvious indicating that he was not thorough or not qualified or competent. But, again, based upon the context, that's the conclusion that I came to."). To the extent that Mr. Black's concerns are rooted in a lack of discussion in Officer Karalow's testimony during the 1998 trial about his training, *see id.* at 96:5–9 ("That based upon my assessment of the testimony and the context, I am not confident that [Officer Karalow] had the proper training to make those judgment calls on smudges and overlays."), this constitutes inadmissible speculation, *see Cage*, 979 F. Supp. 2d at 831 (barring testimony when expert did not take "into account the constraints of the legal system and the impact those constraints may have had" on the testimony criticized by the expert).

Thus, with respect to his first opinion, Mr. Black may testify that additional latent prints could have potentially been recovered from the crime scene. However, he cannot testify regarding his opinions of Officer Karalow's qualifications and more generally his views on the qualifications of the original crime scene examiners to analyze the surfaces at the car lot or on Johnson's car.

**2.      Mr. Black's opinion that "the Plaintiffs cannot be excluded as potential sources" of the recovered prints.**

Mr. Black writes that "there are several prints that were deemed not suitable for comparison" from the initial crime scene analysis.  Doc. 358-1 at 4.  He identifies six different sources of prints that had "at least one latent print" that "was not suitable for comparison" including two prints taken from a 1995 Impala (inside the driver's door handle and steering wheel), two prints taken from a 1994 Pontiac (CD Control and outside of the driver's door), a print from the hood of a 1992 Pontiac Bonneville, and a sixth print labeled L-4 from a report titled "Many Extras Sticker."  *Id.* at 5.  Because these prints are not suitable for comparison, Mr. Black opines that "it is possible the source of these prints could be any number of people, including the Plaintiffs."  *Id.*  Mr. Black also discusses different factors that might prevent points of contact from creating suitable prints for comparison, including insufficient skin residue, non-conducive surfaces, and environmental factors.  *Id.*

Plaintiffs argue that Mr. Black should not be allowed to offer this opinion.  They cite to a prior ruling by Magistrate Judge Cole for support that Mr. Black's opinion is "obvious" and "simply common sense."  Doc. 358 at 9 (quoting Doc. 355 at 3).  Plaintiffs assert that expert testimony is unhelpful when it "can be derived from common sense, common experience, the jury's own perceptions, or simple logic."  *Id.* (quoting *United States v. Christian*, 673 F.3d 702, 710 (7th Cir. 2012)).  Defendants disagree with Plaintiffs' characterization of Mr. Black's opinion.  Defendants argue that it is "well-settled" that experts can testify regarding the absence of print evidence and the difficulty in recovering latent prints from different surfaces.  Doc. 369 at 10.  In support, Defendants point to *United States v. Common*, 818 F.3d 323, 330 (7th Cir. 2016) (finding expert testimony on lack of fingerprint evidence relevant "because it helps the jury decide how much weight to give the fact that no prints were found"), and *United States v.*

*Washington*, No. 16-cr-477, 2017 WL 3642112 at *10–11 (N.D. Ill. Aug. 24, 2017) (applying

*Common* to admit expert testimony about lack of fingerprint evidence from gun), which they

claim demonstrate the admissibility of Mr. Black's challenged opinion. Defendants claim that

"Black's Opinion . . . is necessary to directly rebut Plaintiffs' theory that the absence of

fingerprint evidence connecting them to the crime scene equates to their innocence." Doc. 369 at

10–11.

The Court finds that Mr. Black cannot testify that "the Plaintiffs cannot be excluded as

potential sources" of the prints. None of the cases that Plaintiffs or Defendants cite are directly

on point. On the one hand, *Christian* related to an FBI Agent's expert testimony concerning arm

movements, which the Seventh Circuit deemed admissible because what "might seem like

innocuous conduct to an untrained jury, might, to the trained eye, be indicative of criminal

activity." 637 F.3d at 711. *Common* and *Washington*, on the other hand, dealt with experts'

respective testimonies about the process of retrieving prints, the examination of specific items for

prints, and the overall statistical likelihood of successfully retrieving prints from firearms.

*Common*, 818 F.3d at 330; *Washington*, 2017 WL 3642112, at *10–11. Although the courts in

both cases admitted and upheld the challenged pieces of testimony, the experts presented their

opinions to dispel the commonly held lay belief (rightly or wrongly attributed to the jury) that a

person's contact with a surface (like the trigger of a gun) would always leave a print that can be

used to implicate or exonerate the suspect. *Common*, 818 F.3d at 330 ("[T]he district court

correctly pointed out that there is a common misconception about the prevalence of fingerprint

evidence. [The expert]'s testimony was relevant to helping jurors overcome this

misconception."); *Washington*, 2017 WL 3642112, at *11 ("[T]his testimony arms the jury with

sufficient information about what inferences are reasonable to draw from the facts."). That is not

the kind of testimony Mr. Black offers in his report—he only seeks to make the simpler point that the poor quality of the prints means that the jury cannot exclude Plaintiffs as their sources. A jury will readily understand that the inability to *compare* Plaintiffs' prints to the ones in question is not the same as *establishing* that Plaintiffs could not have left those prints in the first place. This is the kind of "common sense" and "simple logic" that is well within the jury's ability to determine for itself. *Christian*, 637 F.3d at 710. Thus, Mr. Black may not testify to his opinion that Plaintiffs cannot be excluded as potential sources of the recovered prints because it would impermissibly put an "expert gloss" on a commonsense point that a lay jury can easily understand.

However, Mr. Black may discuss the different circumstances under which print evidence will be rendered unsuitable for comparison. That knowledge is the product of Mr. Black's decades of experience and is relevant to help the jury understand why the surfaces in question would have prints that are not suitable for comparison. *See Common*, 818 F.3d at 330. In other words, Mr. Black can provide testimony that the jury can use to draw an inference that Plaintiffs may (or may not) have been the source of the unsuitable prints; however, he cannot force that conclusion upon them by coating that basic point in the veneer of an expert opinion. *See Christian*, 637 F.3d at 710.

### 3. Mr. Black's rebuttal opinions regarding pages 46–49 of Mr. McCrary's report.

Mr. Black identifies three areas of disagreement between himself and Mr. McCrary, Plaintiffs' police practices expert, related to fingerprint evidence. Mr. Black rebuts Mr. McCrary's opinions that (1) the presence of Davion Allen's fingerprint on the adhesive side of a sticker taken from the windshield of one of the stolen vehicles shows that Mr. Allen "ripped the sticker off the windshield," Doc. 358-1 at 6; Doc. 367-1 at 48; (2) Mr. Allen's fingerprints

11

placing him "at both the murder site and the site where the stolen getaway cars were abandoned

. . . shows that he almost certainly was involved in the murders," Doc. 358-1 at 6; Doc. 367-1 at

49; and (3) "it is most likely the latent impressions lifted from [the stolen] vehicles on the day of

the homicide were left in close temporal proximity to the murders." Doc. 358-1 at 6; Doc. 367-1

at 49–50.

The Court finds that Mr. Black can offer these rebuttal opinions. Notwithstanding

Plaintiffs' arguments that Mr. Black is unqualified to opine on Mr. McCrary's conclusions (they

claim he is only an expert in "the technical side of law enforcement activity," namely the

physical acts of processing a crime scene, Doc. 358 at 10), Mr. Black brings the same

qualifications in latent print and crime scene analysis to bear when reviewing Mr. McCrary's

work as he does when issuing his other opinions in his report. Although Plaintiffs raise many

concerns with Mr. Black's rebuttal analysis (for example, that Mr. Black misconstrues Mr.

McCrary's first opinion, Doc. 358 at 11), these concerns are best left for "vigorous cross-

examination." *Daubert*, 509 U.S. at 596.

To summarize the Court's holding with respect to Mr. Black's testimony, he may not

challenge the crime scene examiners' qualifications nor testify that that the inability to compare

unsuitable prints to Plaintiffs' prints fails to exclude them as sources of the unsuitable prints.

The remainder of his testimony is admissible.

### B.     Mr. Joseph P. Buckley III

Defendants retained Mr. Buckley to "serve as an expert witness on interview and

interrogation techniques and false confessions in general, and specifically on the interrogations

and disputed statements (confessions) given by [Plaintiffs]." Doc. 361-1 at 2. Mr. Buckley

issued a thirty-page report that opens with a recitation of the facts according to Defendants (and

12

noting that Plaintiffs contest those facts), *id.* at 2–8, and continues with a lengthy discussion of background information relevant to his opinions, *see id.* at 8–22 (entitling sections "False Confession Issues," "Confession Voluntariness," "The Influence of Psychological Factors on Confession Trustworthiness," "Interrogation Research," "Juvenile Consideration," and "Chicago Police Department Training Regarding Interview and Interrogation Techniques"). Mr. Buckley then engages in a "Case Specific Analysis," which consists of a list of twenty-four questions and answers posed by Mr. Buckley that summarize "issues and testimony that [he] considered in formulating [his] opinions." *Id.* at 22–31. Mr. Buckley then sets forth six opinions about the confession evidence, which, for convenience, the Court enumerates as follows:

> Opinion 1: [T]he Chicago Police Department in 1995 had written directives and training on interviews, interrogations and the handling of juvenile suspects that were appropriate.

> Opinion 2: [T]here are many indicia that the Plaintiffs' confessions are reliable and trustworthy.

> Opinion 3: [I]t is undisputed that some of the factors identified by Dr. Malloy as indicators of false confessions are not present, such as sleep/food deprivation, lengthy interrogations, presence of mental or psychological factors affecting Plaintiffs' cognitive abilities, or physical abuse to make him confess.

> Opinion 4: [T]here is a lack of reliable empirical data to support the research underlying Dr. Malloy's opinions.

> Opinion 5: [E]ven if the jury believes some of the Plaintiffs testimony and disbelieves some of the Defendant Police Officers and ASA Alesia, as well as other records as discussed above, then there is no support for the claim the statements are coerced confessions or that the Officers and the ASA conducted inappropriate interviews/interrogations/questionings that were designed to coerce and/or induce false confessions.

> Opinion 6: [E]ven if the jury believes some of the Plaintiffs' testimony, and disbelieves some of the Defendant

13

> Officers', ASA Alesia's, and other witnesses'
> testimony, there is still indicia that Plaintiffs'
> confessions have characteristics of being reliable and
> trustworthy.

Doc. 361-1 at 31.

Plaintiffs argue that Mr. Buckley is not qualified to offer his opinions about the credibility of their confessions in this case. Plaintiffs also argue that, even if Mr. Buckley is qualified, he did not apply a sound methodology to reach his opinions. Finally, if the Court finds that Mr. Buckley is qualified and used an acceptable methodology, Plaintiffs ask the Court to limit his testimony to the "primary causes" and "contributing factors" leading to coerced false confessions. Doc. 361 at 3. The Court need only address the issue of qualifications to resolve Plaintiffs' motion, as it finds that Mr. Buckley is not qualified to offer opinions concerning "false confessions in general, and specifically on the interrogations and disputed statements (confessions) given by [Plaintiffs]." Doc. 361-1 at 2.

"Whether a witness is qualified as an expert can only be determined by comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony." *Carroll v. Otis Elevator Co.*, 896 F.2d 210, 212 (7th Cir.1990). "Anyone with *relevant* expertise enabling him to offer responsible opinion testimony helpful to judge or jury may qualify as an expert witness." *Tuf Racing Prod., Inc. v. Am. Suzuki Motor Corp.*, 223 F.3d 585, 591 (7th Cir. 2000) (emphasis added). "In any field of social science, an expert should have to testify, at a minimum, to the longevity of that particular field, the amount of literature written about the subject, the methods of peer review among its scholarly journals, the quantity of observational or other studies conducted in that field, the comparative similarity of observations obtained, the reasons why those studies are deemed valid and reliable, and the general consensus or debate as to what the raw data means. In addition, the particular

expert who wishes to testify must establish that he is sufficiently familiar with the topics mentioned above to render an informed opinion about them." *United States v. Hall*, 974 F. Supp. 1198, 1203 (C.D. Ill. 1997); *see also Harris v. City of Chicago*, No. 14 C 4391, 2017 WL 3142755, at *4 (N.D. Ill. July 25, 2017) (finding expert offering testimony about coercive interview techniques and false confessions but who had not researched or systematically analyzed the social science unqualified). Although "[t]he fact that an expert may not be a specialist in the field that concerns [his] opinion typically goes to the weight to be placed on that opinion, not its admissibility," *Hall v. Flannery*, 840 F.3d 922, 929 (7th Cir. 2016), the witness must still rise above a "threshold of knowledge, skill, experience, training, or education to qualify as an expert," *Walden v. City of Chicago*, 755 F. Supp. 2d 942, 950 (N.D. Ill. 2010).

Here, Mr. Buckley does not have the requisite knowledge or experience to testify as an expert on false confessions. Although Defendants chiefly argue that Mr. Buckley's experience qualifies him, a closer examination of his resume shows that this is not the case. Since 1982, Mr. Buckley has served as the President of John Reid and Associates, Inc., which he describes as "the leading source of instruction for law enforcement personnel in the country on proper interviewing and interrogation techniques." Doc. 361-1 at 2. John Reid and Associates, Inc. provides training services in interviewing and interrogation techniques to police departments and private companies. The company primarily trains its customers in the "Reid technique," a nine-step interrogation program that attempts to convince suspects that their own self-interest is best served by confessing to an accused crime. *See* Miriam S. Gohara, *A Lie for A Lie: False Confessions and the Case for Reconsidering the Legality of Deceptive Interrogation Techniques*, 33 Fordham Urb. L.J. 791, 808-809 (2006).[4] Mr. Buckley has spent his entire career at John

---

[4] Critics of the Reid technique argue that it leads to false confessions by, among other things, convincing innocent suspects that a jury would convict them regardless of their actual guilt or innocence. *See*

Reid and Associates, Inc., starting as a Licensed Polygraph Examiner and Forensic Interviewer in 1971, before quickly advancing through the ranks as the Chief Polygraph Examiner (1979-80), Director (1980-82), and then President. He has conducted over 2,000 training programs on interviewing and interrogation techniques since 1976. Mr. Buckley has also led a "few hundred" interviews of suspects in criminal custody, most of which took place in the 1970s and 1980s. Doc. 371-5 at 177:2–10. These experiences do not relate to the topic of false confessions (aside from the fact that false confessions occasionally result from police interrogations) and certainly do not qualify Mr. Buckley to opine on the social science of false confessions. *See Carroll*, 896 F.2d at 212.

Nor is Mr. Buckley qualified by education or contribution to the scholarship of the field of false confessions. Mr. Buckley graduated from Loyola University in 1971 with a bachelor's degree in English and obtained a "Detection of Deception" master's degree from the Reid College of Detection of Deception in 1973.[5] This certificate followed a six-month course of study that developed technical skills related to polygraph examinations, investigative interviews, and interrogations, which do not relate to the issue of false confessions. Mr. Buckley wrote a thesis to obtain this degree, entitled "Abdominal and Thoracic Respiration recordings in the Detection of Deception," which does not bear on false confessions. Doc. 371-5 at 27:12-16; Doc. 371-3 at 3. In terms of other written works, Mr. Buckley helped co-author the 3rd, 4th, and 5th editions of Criminal Interrogation and Confessions, which "presents interviewing and interrogation techniques, based on actual criminal cases, which have been used successfully by

---

Gohara, *supra*, at 817–20 (describing criticisms of the Reid technique); *see also Critics Corner*, John Reid and Associates, Inc., https://reid.com/resources/critics-corner.

[5] The Reid College of Detection of Deception is not a nationally accredited school but was rather commissioned by the State of Illinois to train polygraph examiners.

thousands of criminal investigators." *Criminal Interrogations And Confessions – 5th Edition*, John E. Reid & Associates, Inc., https://reid.com/store/criminal-interrogations-and-confessions-5th-edition. Although these more recent editions discuss false confessions, *see id.* ("Chapter 15 (Distinguishing between True and False Confessions) has been updated to include new cases throughout and contains two new sections; 'The Issue of False Confessions in the Courtroom – The Testimony of Expert Witnesses' and 'The Issue of False Confessions in the Courtroom – Court Decisions'."), Defendants do not elaborate on whether Mr. Buckley contributed to that chapter specifically. Notwithstanding Justice Warren's apparent praise of the late John Reid's original work, *see Miranda v. Arizona*, 384 U.S. 436, 449 (1966) (noting that the 1962 edition of Reid's manual "professedly present[s] the most enlightened and effective means . . . to obtain statements through custodial interrogation"), such kind words have no bearing on whether Mr. Buckley's authorship of subsequent editions gives him knowledge or experience related to false confessions or police practices—it does not.

Nor does Mr. Buckley's co-authorship of a 1994 study that questioned whether interviewers could determine whether their subjects were telling the truth or being deceptive through visual cues give him the requisite experience. Jayne Horvath and Joseph Buckley, *Differentiation of Truthful and Deceptive Criminal Suspects in Behavior Analysis Interviews*, 39 Journal of Forensic Science 793, No. 3 (May 1994). As Mr. Buckley agreed in his deposition, the subject matter of that study does not greatly impact the bases of his opinions (though he asserts that it has some general applicability). *See* Doc. 371-5 at 35:6–18.

Although Mr. Buckley has extensive experience in police instruction, there is also much that Mr. Buckley has *not* studied and has *not* experienced. "There is no indication in the record that [Mr. Buckley] has researched the specialized area of coercive interrogations and false

confessions drawing on the principles of rational decision making, perception, and interpersonal influence, or that he has systematically analyzed documented factors that correlate with false confessions." *Harris*, 2017 WL 3142755, at *4. Rather, the record shows that Mr. Buckley has, at most, a surface-level understanding of basic psychological concepts relevant to the study of false confessions. *See, e.g.*, Doc. 371-5 at 30:24–31:5 (demonstrating no understanding of behavior science other than the "Study of behavior"); *id.* at 119:15–120:16 (not understanding the "fundamental attribution error" or "secondary confessions").

Nor does Mr. Buckley's testimony as an expert witness in at least three cases qualify him as an expert in this case. First and foremost, other courts' decisions to allow Mr. Buckley to testify as an expert witness do not bind this Court. *See Camreta v. Greene*, 563 U.S. 692, 709 n.7 (2011) ("A decision of a federal district court judge is not binding precedent in either a different judicial district, the same judicial district, or even upon the same judge in a different case." (quoting 18 J. Moore et al., Moore's Federal Practice § 134.02[1] [d], p. 134–26 (3d ed. 2011))). Moreover, the record Defendants developed to support this argument is insufficient to help the Court glean the necessary information to find Mr. Buckley qualified as an expert in *this* case on *these* subjects: they do not discuss, except at the highest level, the opinions he issued or put before the court in the other cases; they do not state whether there were any challenges to his expert testimony (or the results of such challenges); and they do not compare the facts of those cases to those present in this one. The Court must rely on the record before it, and, as discussed, that record does not support Mr. Buckley's ability to offer the opinions he offers here.

Although Mr. Buckley is no doubt qualified to opine on the Reid technique, and possibly qualifies as an expert in police instruction or interrogations generally, nothing in his nearly four-and-a-half-decades of experience convinces this Court that he is qualified to opine on indicia of

confession reliability, false confessions, factors that contribute to their occurrence, or the body of social science research generated by the field. These are not areas where he has "superior . . . experience . . . with the subject matter of [his] testimony." *Carroll*, 896 F.2d at 212. Though he is conversant in the studies related to false confessions, *see* Doc. 371-5 at 122:5–126:2 (critiquing the design of studies in false confessions as not having "any direct impact on what happens in the real world"), being knowledgeable about a subject does not qualify him to opine on them as an expert, *see Hall*, 974 F. Supp. at 1203.

Furthermore, Mr. Buckley's unassailable expertise in the Reid technique (or, potentially, interrogation techniques generally) does not qualify him to opine on police practices or whether they are "appropriate," particularly given that Mr. Buckley has not identified in his report how to determine the appropriateness of a policy. There is no indication that Mr. Buckley has studied police procedures or otherwise has experience working with them, either as a long-serving member of a police department or a police instructor on subjects different from the Reid technique. Thus, Mr. Buckley cannot offer the opinion in his report that the Chicago Police Department's policies were "appropriate" because his experience is inapplicable to the subject. *Carroll*, 896 F.2d at 212.

In short, Defendants asked Mr. Buckley to stretch his experience with administering and teaching one interrogation technique to cover a wide range of subjects that spawn from police interrogations gone bad. But the topics they asked him to cover stray too far from his expertise. It is not that Mr. Buckley merely lacks specialization in a given field related to police interrogations, *see Flannery*, 840 F.3d at 929, it is that the area of his expertise and the realm of false confessions are different fields altogether and would require different educational or experiential qualifications, *see Harris*, 2017 WL 31342755, at *4.

The Court takes seriously its role as "an evidentiary gatekeeper." *Gopaltatnam*, 877 F.3d at 778. It recognizes that "the rejection of expert testimony is the exception rather than the rule," Fed. R. Evid. 702 (Advisory Note, 2000 amends.), and that even "'shaky' expert testimony may be admissible, assailable by its opponents through cross-examination," *Gayton*, 593 F.3d at 616. But that "shaky" expert must first have "scientific, technical, or other specialized knowledge [that] will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). Mr. Buckley does not possess the kind of knowledge or experience necessary to opine on the subjects Defendants put before him. The Court excludes his testimony.[6]

### C.  Dr. John Wixted

Defendants retained Dr. Wixted to "analyze certain aspects of eyewitness testimony and respond to a report provided by eyewitness expert Brian Cutler, Ph.D." Doc. 364-1 at 1. Dr. Wixted is a Distinguished Professor of Psychology at University of California, San Diego, where he has taught since 1988. Dr. Wixted's research pertains to the brain physiology of memory, with a particular focus on eyewitness memory. He has written over 150 articles and book chapters on the subject, has served as an editor for several journals, and has won one of psychology's most prestigious research awards, the Warren Medal. Dr. Wixted's opinions are all issued in response to Dr. Cutler's expert report and discuss points of contention between his view of the science concerning eyewitness testimony and Dr. Cutler's opinions on the subject.

---

[6] Even if the Court concluded that Mr. Buckley had the requisite qualifications, the Court would still find that Mr. Buckley's "methodology" to draw his conclusions is lacking. He offers no basis in his report for the twenty-four questions he poses in his "Case Specific Analysis," *see* Doc. 361-1 at 22–31, nor does he explain how he uses those questions or the answers to them that he derives from the record to develop any of his opinion, *see id.* at 31. To the extent that Defendants argue his methodology derives from "his decades of practical experience," Doc. 371 at 7, the Court has already discussed at length why that experience does not qualify Mr. Buckley as an expert for the purposes of his report.

Plaintiffs do not challenge Dr. Wixted's competency to testify as an expert, nor do they take issue with his methodology's reliability. Rather, Plaintiffs challenge two sections of Dr. Wixted's "preliminary remarks"—which he titled "Translating science into policy" and "These are recommendations, not binding directives," *id.* at 1, 3; Doc. 364 at 3–4—as irrelevant. Plaintiffs also challenge Dr. Wixted's opinions on (1) voice identification, (2) the number of non-suspect "fillers" required to compose a sufficient lineup, (3) the typical practices of officers recording eyewitness statements, and (4) whether non-DNA exonerations are "less conclusive" than others as improperly disclosed. Doc. 364 at 4–9. The Court will first consider the issue of disclosure and then the opinions offered in Dr. Wixted's preliminary remarks.

### 1. Disclosure

Plaintiffs argue that Dr. Wixted revealed four opinions for the first time during his expert deposition and ask the Court to bar them on this basis. Rule 26(a)(2)(B) requires a retained expert to provide a report containing "a complete statement of all opinions the witness will express and the basis and reasons for them." Fed. R. Civ. P. 26(a)(2)(B)(i). Expert reports must "convey the substance of the expert's opinion[s] . . . so that the opponent will be ready to rebut, to cross-examine, and to offer a competing expert if necessary." *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 762 (7th Cir. 2010) (quoting *Walsh v. Chez*, 583 F.3d 990, 994 (7th Cir. 2009). "Questions elicited at [the expert deposition] that go beyond the reports may well have a bearing on the permissible scope of testimony at trial." *In re Sulfuric Acid Antitrust Litig.*, 235 F.R.D. 646, 659 (N.D. Ill. 2006) (citing Gregory P. Joseph, *Expert Approaches*, 28 Litigation 20, 21 (Summer 2002) ("If you decide to take an expert deposition, you must be careful what you ask.")).

### a. Voice testimony

The first opinions Plaintiffs challenge as undisclosed relate to Dr. Wixted's opinions on voice testimony. At his deposition, Dr. Wixted opined that having the individuals in the lineup say a phrase during Mr. Ali's second exposure to the lineup was "a very good" reason for his increased confidence in Mr. Ali's identification of Styles. Doc. 364-2 at 182:7. He further said that he thought how the officers conducted the voice test was "a perfectly reasonable thing to do." *Id.* at 185:1–2. Plaintiffs argue that these opinions were undisclosed, that Dr. Wixted has no scientific basis for the opinions, and (in their reply brief) that they contradict Dr. Wixted's opinion that "no later test [of a witness' memory] can provide more reliable information than the first." Doc. 387 at 3 (quoting Doc. 364-1 at 4).

The Court will not prevent Dr. Wixted from offering this testimony. Plaintiffs' counsel specifically asked Dr. Wixted to articulate a reason to expose a witness to a lineup a second time. In responding to this question, Dr. Wixted raised different principles of memory science and explained that the officers made Mr. Ali's experience viewing the lineup closer to his experience of the shooting in the Elegant Auto Shop by adding the vocal element. Doc. 364-2 at 182:4–183:8. Plaintiffs cannot cry foul when an expert renders an opinion after being asked for one. *See In re Sulfuric Acid Antitrust Litig.*, 235 F.R.D. at 659. Moreover, Dr. Wixted's explanation provides a reasonable basis for considering Mr. Ali's second exposure to the lineup more accurate than his first (despite the apparent contradiction with his expert report, which Plaintiffs may explore on cross-examination, *see Gayton*, 593 F.3d at 616). Finally, Dr. Wixted specifically cites to the "Principle of Encoding Specificity" as his basis for believing that the second exposure was more accurate.

### b. Recent research

Plaintiffs also argue that the Court should exclude Dr. Wixted's opinion that "one filler is sufficient" for a police lineup. Doc. 364 at 6 (quoting Doc. 364-2 at 99:7–110:5). Plaintiffs argue that this opinion contradicts Dr. Wixted's expert report (making it improperly disclosed) and is unsupported by the scientific consensus. In response, Defendants claim that this research instead bolsters other claims in Dr. Wixted's report, namely that long-standing science is subject to change. The Court will preclude Dr. Wixted from commenting on this "recent research" when he testifies at trial. Dr. Wixted himself indicated skepticism that the finding that a single filler is sufficient for a police lineup is correct and that it will endure for long in the relevant community's eyes. *See* Doc. 364-2 at 99:16–100:5. Although the Court is sympathetic to and appreciative of Dr. Wixted's desire to provide additional context to his claims, it cannot allow him to cite unnamed articles with doubted conclusions as scientific evidence. *See Baugh v. Cuprum S.A. de C.V.*, 845 F.3d 838, 844 (7th Cir. 2017) (the Court should consider "whether the theory has been accepted in the relevant scientific community").

### c. Police records

The third opinion Plaintiffs seek to exclude as undisclosed is Dr. Wixted's comment that "police officers . . . routinely do not record [in their reports] anything other than whether or not the [identification of a suspect] occurred" following the exposure of an eyewitness to a lineup of suspects. Doc. 364 at 7 (quoting Doc. 364-2 at 127:15–129:12). Plaintiffs argue that "police practices in creating their reports, documenting eyewitness identifications, and determining what information they are required to preserve . . . fall far outside of Dr. Wixted's area of expertise." *Id.* But as Defendants point out, these comments derive directly from Dr. Wixted's own research. Dr. Wixted does not need to be an expert in police procedures to know what

information they routinely record when taking eyewitness testimony. Although Plaintiffs point to a research survey Dr. Wixted cites in his report that purportedly contradicts his testimony as proof that the testimony "is uninformed and without foundation," Doc. 387 at 7, Plaintiffs may instead use this survey to impeach him on cross-examination. *See Gayton*, 593 F.3d at 616.

Turning to the testimony itself, the Court will not bar it because it is related to the subject of Dr. Wixted's report and was solicited by Plaintiffs' counsel. Dr. Wixted's comment that police officers do not routinely record an eyewitness' confidence level came up several times over the course of a lengthy segment of his deposition. *See* Doc. 346-2 at 126:15–137:14. Again, Plaintiffs cannot grill an expert at length about his report and its subject-matter (the series of questions which Plaintiffs grounded in a citation to the report, *see id.* at 126:15–21), conclude that they dislike the answers, and then seek to exclude the testimony. *See* Gregory P. Joseph, *Expert Approaches*, 28 Litigation 20, 21 (Summer 2002) ("If you decide to take an expert deposition, you must be careful what you ask."). Dr. Wixted's answers fall within the scope of his expertise and the topics of his report, *see* Doc. 364-1 at 7 ("The contemporaneous police record does not indicate Andrew Hudley's level of certainty[.]"), so he can testify on this topic.

### d. Non-DNA exonerations

Finally, Plaintiffs ask this Court to prevent Dr. Wixted from opining that an exoneration based on something other than DNA evidence is "less conclusive" than an exoneration supported by DNA evidence. Doc. 364 at 8 (quoting Doc. 364-2 at 203:16–204:15). Plaintiffs argue that this was an undisclosed opinion and that Dr. Wixted is not qualified to opine on the comparative strengths of exonerations based on DNA evidence versus those based on non-DNA evidence. The Court disagrees. Dr. Wixted did not offer the opinion that non-DNA exonerations are "less conclusive" than DNA exonerations. He testified, in response to Plaintiffs' counsel's

questioning, that he has yet to encounter a case where an eyewitness expressed one hundred percent confidence in an identification and then DNA evidence subsequently exonerated the identified suspect. *See* Doc. 364-2 at 200:14–201:5 ("And it's hard to find documented examples of someone being 100 percent sure on an initial ID and there being an exoneration, a DNA exoneration, at the—at the end. Like for the DNA exonerations, we have not yet found one. We've found more than 90 cases of DNA exonerations where on the first test, they weren't 100 percent sure, and literally zero where they were."). To the extent that he said non-DNA exonerations are "less conclusive," he was commenting on an earlier line of questions discussing a similar topic. *See id.* at 77:11–82:1. That is not the same as advancing the claim that Plaintiffs' exonerations are somehow less valid than exonerations based on DNA evidence. And though Dr. Wixted does not discuss DNA evidence or exonerations in his expert report, this is a case where Plaintiffs' questioning beyond Dr. Wixted's report "may well have a bearing on the permissible scope of testimony at trial." *In re Sulfuric Acid Antitrust Litig.*, 235 F.R.D. at 659. Plaintiffs also argue that Dr. Wixted is unqualified to offer this opinion, but he made these comments in the context of eyewitness reliability—the bread-and-butter of his field of expertise. The Court declines to bar this testimony.

### 2.     Relevance

Plaintiffs contend that Dr. Wixted's discussions on how science translates into policy and the non-binding nature of scientific recommendations made by the National Research Council are irrelevant. Defendants argue in response that Plaintiffs will put these topics in play through testimony given by expert witnesses Dr. Brian Cutler and Mr. Gregg McCrary. At this stage, the Court declines to weigh in on what testimony will and will not be relevant at trial. If Dr. Wixted

is asked to discuss the challenged topics from the stand, and if Plaintiffs still believe that they are irrelevant, then Plaintiffs may raise such a challenge at the appropriate time.

For the foregoing reasons, Dr. Wixted cannot testify that "recent research" shows a single filler in a lineup is an acceptable means of conducting a suspect identification. The Court will not prevent him from testifying as to the voice identification, the frequency with which police officers record eyewitness confidence in their post-lineup reports, or his research regarding exonerations based on DNA evidence and eyewitness confidence. And the Court declines to rule on the relevancy issues that Plaintiffs raise unless and until they materialize at trial.

## II.  Defendants' Motions to Exclude Plaintiffs' Retained Experts

### A.  Dr. Brian Cutler

Plaintiffs retained Dr. Cutler to provide expert testimony about "the extent to which the out-of-court procedures arranged by the detectives enhanced the risk of false identifications . . . and led to false confidence in the eyewitness identifications."  Doc. 362-1 ¶ 3.  Dr. Cutler has studied psychology and memory science over his four decade-plus academic career.  He has held several professorships, authored over 100 academic works related to psychology, law, and cross-disciplinary subjects, and has won several awards for his work.  Although Defendants do not challenge Dr. Cutler's qualifications to testify as an expert, based upon Dr. Cutler's experience in the field of eyewitness perception as just described, the Court would find that he possesses sufficient qualifications to offer his opinions in this case.

Dr. Cutler offers five opinions in his expert report:

> [Opinion 1]: Scientific psychological research on eyewitness identification is well-established and well-accepted within the field of psychology.

> [Opinion 2]: Psychological research demonstrates that eyewitness identifications are based on some combination of memory

searching and inference processes. The manner in which
identification procedures are conducted can encourage or
discourage identification by inference processes. In addition,
certain identification procedures afford stronger or weaker
protection to the suspect from identification by inference
processes.

[Opinion 3]: The out-of-court identification procedures arranged
by the detectives were highly suggestive. Suggestive identification
procedures are problematic and have been shown to increase the
risk of false identification. In other words, as applied here, the use
of unduly suggestive identification procedures created a risk of
false identification by the eyewitnesses to the crime.

[Opinion 4]: False confidence refers to inflated and unwarranted
levels of confidence in the accuracy of one's eyewitness
identification. The detectives' actions and words created a risk for
"false confidence" on the part of the eyewitness. False confidence,
in turn, increases the risk of wrongful conviction.

[Opinion 5]: Suggestive identification procedures are more
influential when the eyewitness has a weak memory for the
perpetrator. The conditions under which the crime occurred likely
made it challenging to encode the perpetrators' characteristics,
enhanced the risk of false identification, and enhanced the
influence of suggestive identification procedures.

Doc. 362-1 ¶ 4.

Defendants object to Dr. Cutler's opinions on reliability, relevance, and helpfulness
grounds.

### 1.    Reliability

Defendants argue that the Court should bar Opinions 2, 3, and 4 because they are
unsupported by scientific evidence and are thus unreliable. Defendants argue that "the
psychological research [Dr. Cutler] relies on to support [these] opinions has since been
undermined and called into question by the scientific community." Doc. 362 at 6. Defendants
cite to the National Research Council's 2014 report ("NRC report"), claiming that it "expressed
skepticism of much of the research Dr. Cutler" cites in his report, and highlight four articles on

27

which Dr. Cutler relies to support his opinions that the NRC report purportedly undermined. *Id.* at 6–7. Defendants also argue that Dr. Cutler uses an unreliable methodology because he fails to consider recent developments in the field of eyewitness reliability that—they say—have rejected some of the previously held conclusions relied on by courts to justify the inclusion of eyewitness expert testimony.

The Court finds that Dr. Cutler applied a sound methodology to developing his opinions for his report. *See Lapsley*, 689 F.3d at 805 (holding that an expert's opinion is reliable "if it has the same level of intellectual rigor that characterizes the practice of an expert in the relevant field"). Dr. Cutler bases his opinions on "scientific psychological research on human memory, social influence, and eyewitness identification." Doc. 362-1 ¶ 3. He opens his report with a lengthy discussion of the principles of psychological research into eyewitness identification, *see id.* ¶¶ 5–11, and then describes different methods of administering lineups to eyewitnesses, such as showing single or multiple potential suspects, the use of fillers (individuals who the person conducting the lineup knows to be innocent), and double-blind administration (where the officer conducting the lineup does not know if a suspect is part of the lineup's composition), *id.* ¶¶ 12–23. Then, after summarizing each of his proffered opinions that specifically relate to the eyewitnesses in this case, Dr. Cutler discusses the research that supports his conclusions and provides citations to show his work. *See generally id.* ¶¶ 24–40. Where appropriate, Dr. Cutler summarizes the relevant facts of this case as he understands them and ties the applicable research to his conclusions. *See, e.g., id.* ¶¶ 30(a)-(c). This Court cannot say that Dr. Cutler's report lacks "intellectual rigor" that another expert would apply. *Lapsley*, 689 F.3d at 805.

Turning to the four challenged studies, the Court disagrees with Defendants' assertion that the studies show Dr. Cutler's report is based upon an unreliable methodology. The Court

28

notes that Dr. Cutler relies on many more studies than those purportedly undermined by the NRC report. *See* Doc. 362-1 at 19–24 (collecting sources). Even if the Court were to accept that the NRC's critiques of the studies devalue them to the extent stated by Defendants (a proposition that Plaintiffs vigorously contest), it would not persuade the Court that all of Dr. Cutler's opinions are thus unreliable: a closer examination of the six paragraphs that Defendants seek to undermine reveals that only one has a challenged study as its sole supporting evidence. *Compare id.* ¶ 18 (citing one challenged study), *with id.* ¶ 21 (citing a challenged study and four others); *id.* ¶ 23 (citing a challenged study and two others); *id.* ¶ 30(b) (citing a challenged study and three others); *id.* ¶ 36(a) (citing a challenged study and one other); and *id.* ¶ 36(c) (citing a challenged study and one other). This is not enough to persuade the Court that Dr. Cutler's opinions rely on an unsound methodology.

Nor does Dr. Cutler's purported omission of research suggesting that "highly confident witnesses are highly *accurate* in their identifications" shake this Court's conclusion. Doc. 362 at 8. To the contrary, Dr. Cutler expressly considered this research in his report—and discarded it. Doc. 362-1 ¶ 36 ("Under certain limited circumstances, high levels of eyewitness confidence can be indicative of identification accuracy. . . . Those conditions are not present in this case." (citations omitted)). To the extent that Defendants take issue with Dr. Cutler's decisions, they may raise it on cross-examination. *See Gayton*, 593 F.3d at 616.

Defendants further argue that Dr. Cutler poorly applies his theories to the facts of this case, focusing on his conclusions related to Mr. Ali's, Mr. Tadros', and Mr. Hudley's testimony. But for the purposes of deciding whether to admit expert testimony, "the correct inquiry focuses not on the ultimate correctness of the expert's conclusions, but rather on the soundness and care with which the expert arrived at [his] opinion." *Kirk v. Clark Equip. Co.*, 991 F.3d 865, 873 (7th

Cir. 2021). As discussed above, Dr. Cutler applied a sound, careful methodology to reach the opinions in his report. Again, Defendants may challenge Dr. Cutler's conclusions through cross-examination. *See Gayton*, 593 F.3d at 616.

The Court thus finds that Dr. Cutler's opinions are based on reliable evidence.[7]

## 2. Relevance

Defendants also argue that Dr. Cutler's testimony is generally irrelevant and should be excluded on that basis. Barring success on that argument, Defendants argue that Dr. Cutler should not be allowed to opine on whether psychological research on eyewitness identifications is well-established.

The Court finds that Defendants' general relevance challenge to Dr. Cutler's testimony is unfounded. Expert evidence is relevant if "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a); *see also* Fed. R. Evid. 401 ("Evidence is relevant if it has any tendency to make a fact more or less probable than it would be without the evidence[.]").

Defendants primarily argue that Dr. Cutler's testimony is irrelevant because whether the Defendants used faulty procedures to solicit the eyewitness testimony will not prove that the Defendants violated Plaintiffs' constitutional rights since the "Constitution does not require that police lineups, photo arrays, and witness interviews meet a particular standard of quality." *Alexander v. City of S. Bend*, 433 F.3d 550, 555 (7th Cir. 2006). In response, Plaintiffs offer three reasons why Dr. Cutler's opinions would be relevant to the issues of this case. First,

---

[7] Defendants also challenge Dr. Cutler's opinions as "hold[ing] the officers' work in 1995 to 2022 standards" and seek to exclude his testimony because he is not an expert in policing. Doc. 362 at 13. But Dr. Cutler's opinions challenge the *accuracy* of the eyewitness testimony derived from the lineups—except for one paragraph, Dr. Cutler does not mention Chicago Police Department's procedures. Doc. 362-1 ¶ 31. This argument is unavailing.

Plaintiffs suggest that their right to fair trials (Count I of their Complaint) was violated when unduly suggestive identification techniques were used to convict them, also citing *Alexander*, 433 F.3d at 555. Second, Plaintiffs say they can use Dr. Cutler's testimony to prove Defendants' intent and state of mind. Third, Plaintiffs assert that Dr. Cutler's opinions on eyewitness reliability are relevant to support their case of actual innocence, which relates to damages, citing *Parish v. City of Elkhart*, 702 F.3d 997 (7th Cir. 2012).

The Court finds that Plaintiffs have sufficiently shown how Dr. Cutler's testimony will be relevant in this case because the Court agrees that, at a minimum, Dr. Cutler's opinions speak to Plaintiffs' claims of actual innocence. In *Parish*, the court held that the district court erred by preventing the plaintiff from presenting evidence supporting his claim of actual innocence of the convictions that caused him to spend a decade in prison. 702 F.3d at 998. Here, Dr. Cutler's testimony would undermine the eyewitness testimony implicating Plaintiffs in the murders, helping them make their case that they were factually innocent and that the jury should not credit the eyewitness testimony, a component of their original convictions, because it was faulty. Because Dr. Cutler's testimony is at least relevant for this purpose, the Court will not bar it on relevancy grounds. *See Parish*, 702 F.3d at 1003; *see also Ayers v. City of Cleveland*, 773 F.3d 161, 169 (6th Cir. 2014) ("Evidence concerning [Plaintiff's] innocence is also relevant to the issue of damages."); *Cosenza v. City of Worcester*, --- F. Supp. 3d ----, 2023 WL 131410, at *6 (D. Mass. Jan. 9, 2023) ("[T]he guests' testimony is relevant to innocence and innocence is relevant to damages."). *But see Sanchez v. Duffy*, 416 F. Supp. 3d 1131, 1156 (D. Colo. 2018) ("[The experts'] opinions could only be relevant solely to support factual innocence as it relates to damages, and the Court has already ruled that it will not permit evidence with no other purpose than this.").

31

Turning to Defendants' challenge to Dr. Cutler's opinion that psychological research on eyewitness reliability is irrelevant to the issues of this case and should be barred, the Court notes that Plaintiffs agree that "Dr. Cutler does not intend to offer that as a stand-alone opinion in the case." Doc. 376 at 15. The Court likewise agrees that a seminar on the science underpinning eyewitness testimony will not be relevant, and Dr. Cutler cannot affirmatively bolster his field of study by proclaiming that it is well-established. However, the science itself could be relevant depending on whether and how Defendants choose to undermine his testimony on the stand. The Court will take a wait-and-see approach, preferring to deal with these sorts of relevancy objections as they arise at trial.

The Court finds that Dr. Cutler's opinions are relevant.

### 3.     Helpfulness to the jury

Defendants' last argument is that Dr. Cutler's opinions will be unhelpful to the jury. Defendants argue that Dr. Cutler's inability to quantify his criticisms of the lineup procedures, inability to rule out potentially obvious explanations, use of the term "false confidence," and discussion of factors that the jury could understand without expert testimony all indicate that Dr. Cutler's opinions will ultimately not help the jury assess the facts—or worse, will confuse them. This Court disagrees and finds that Dr. Cutler's testimony will assist the jury evaluate the evidence in this case.

Defendants first argue that Dr. Cutler fails to account for an obvious explanation for the eyewitnesses' identifications of Plaintiffs because he cannot rule out that the eyewitnesses were correct in their identifications. But this argument misses the point of Dr. Cutler's testimony. His opinions set out various factors that call into question the accuracy of the eyewitnesses' identifications—if the jury affords his testimony significant weight, it will reduce their reliance

on those identifications. It is obviously true that the eyewitnesses *may* have been correct in their original identifications; the purpose of Dr. Cutler's testimony is to give the jury additional information to make that determination. That Dr. Cutler focused instead on the risk factors increasing the chance the eyewitnesses were wrong rather than fully crediting their testimony does not force this Court to exclude his opinions. *See United States v. Williams*, 522 F.3d 809, 811 (7th Cir. 2008) ("Perceptual biases and errors are endemic to identification. . . . The normal way of dealing with them is to expose the problem at trial so that a discount may be applied to the testimony, rather than to exclude relevant evidence."). Instead, this is an appropriate topic for cross-examination. *See Gayton*, 593 F.3d at 616.

Defendants next challenge Dr. Cutler's lack of quantitative analysis with respect to the factors that he identifies as contaminating the lineup procedures used to generate eyewitness testimony in this case. Defendants point to the fact that Dr. Cutler does not say "to what degree" the lack of fillers or lack of double-blind administration impacted the eyewitnesses' identifications, or whether selecting different fillers would have led to a different outcome. Doc. 362 at 12–13. Plaintiffs, in response, claim that Dr. Cutler does not need to have precise answers to these questions for his opinions to assist the jury and that Rule 702 does not require him to quantify his analysis. The Court agrees with Plaintiffs. As an expert in psychology and memory, Dr. Cutler is required to draw the same kinds of conclusions that another expert in his field would draw. When questioned during his deposition about whether he could quantify his findings, Dr. Cutler replied that he could not do so for any given individual case. *See, e.g.*, Doc. 362-5 at 126:3–12 ("But it would still be a bit of a stretch to say lighting had this effect in this particular case or exposure time had this amount of an effect in this particular case."); *id.* at 132:2–8 ("I believe the meta-analysis concluded that cross-race identifications were one and a

half times more likely to be incorrect than same race identifications. But it's still a stretch to . . . take that number and apply it to an individual case."). Dr. Cutler is not required to make up from whole cloth a quantitative opinion to assist the jury. *See Bielskis*, 663 F.3d at 896 (an expert's "inability to opine on the ultimate issue for the trier of fact did not mean they could not testify regarding other relevant factual issues"). Should Defendants still believe that Dr. Cutler's inability to provide a quantitative opinion undermines his testimony, they are free to explore that subject on cross-examination. *See Gayton*, 593 F.3d at 616.

Defendants also argue that the "false confidence" label that Dr. Cutler applies to the inflated sense of certainty an eyewitness may have in their identification "is another way of telling the jury they would not believe the eyewitness, impermissibly opining on credibility." Doc. 362 at 14. Plaintiffs respond that Dr. Cutler does not assess the witnesses' credibility, but rather that he says "the science of human memory and perception tells us that their subjective assessment of their own confidence might be wrong." Doc. 376 at 13–14. Having reviewed Dr. Cutler's report and deposition, this Court finds that Dr. Cutler does not impermissibly opine that an eyewitness was incorrect in their identification or otherwise make a credibility determination about an eyewitness. Rather, Dr. Cutler carefully focused his analysis on the various factors that may have contaminated the eyewitnesses' recollection of the individuals who committed the murders. *See, e.g.*, Doc. 362-1 ¶ 30 ("The lineup procedure used in this case was highly suggestive and contaminated subsequent in-court identifications."); *id.* ¶ 36 ("[T]he Detectives' words and actions created a significant risk for false confidence[.]"); *id.* ¶ 37 ("In sum, the lineup procedures were highly suggestive and enhanced the risk of both false identification and false confidence."); *id.* ¶ 40 ("In summary, some of conditions under which the eyewitnesses viewed the perpetrators are known to make encoding of a perpetrator's face challenging."). His opinions

34

do not tell the jury that the eyewitnesses are wrong but instead give it additional information to consider when evaluating their testimony. His opinions on this point are admissible. *See Blackmon v. City of Chicago*, No. 19 C 767, 2022 WL 3908593, at *6 (N.D. Ill. Aug. 30, 2022) ("Instead, [the expert] specifically addresses the <u>reliability</u> of witness identifications considering an array of confounding factors – including the fallibility of memory and human error in conducting photo arrays. . . . As such, his opinions about human perception and memory are the proper subjects of expert testimony here.").

Finally, this Circuit's caselaw refutes Defendants' last contention, that Dr. Cutler's opinions fall within the jury's lay understanding of eyewitness reliability. *See, e.g.*, *Phillips v. Allen*, 668 F.3d 912, 916 (7th Cir. 2012) ("[N]othing is obvious about the psychology of eyewitness identification. Indeed, one point well established in the psychology literature is that most people's intuitions on the subject of identification are wrong."); *Williams*, 522 F.3d at 811 ("If there is one thing known about eyewitness identification, it is that 'common sense' misleads more often than it helps."). This Court will join the others in this district that routinely admit expert opinions on eyewitness testimony as helpful to the jury. *See, e.g.*, *Blackmon*, 2022 WL 3908593, at *5 (collecting cases).

For the foregoing reasons, the Court denies Defendants' motion to exclude Dr. Cutler's testimony, subject to the restriction regarding the relevancy of discussing psychological research at trial.

## B.    Mr. Gregg McCrary

Plaintiffs retained Mr. McCrary to opine on whether Defendants' conduct during their investigation of the double murders "adhered to accepted standards of police practice." Doc. 367-1 at 3. Mr. McCrary offers eight opinions detailing how specific instances of Defendants'

alleged conduct "violated proper police practices in numerous ways," *id.* at 8, as well as an umbrella opinion that the result of Defendants' alleged conduct "resulted in the Plaintiffs' convictions," *id.* at 12.

Defendants do not challenge Mr. McCrary's qualifications, but for completeness' sake this Court finds that he is qualified. Mr. McCrary has a decades-long career in violent crime investigations, including twenty-five years with the FBI. As a Supervisory Special Agent at Quantico, he trained fellow FBI agents in interview and interrogation techniques in the context of violent crime investigations and was actively involved in resolving hundreds of homicide cases. Mr. McCrary worked with or trained agents from a dozen domestic police agencies, as well as agencies from fifteen countries. He contributed to the FBI's 1992 crime classification manual and other works, including authoring a chapter of Criminal Investigative Failures (D. Kim Rossmo ed., 2009), and he served on the editorial boards of The Journal of Aggression and Violence and The Journal of Family Violence. Mr. McCrary also holds a Master of Arts in Psychological Services and has taught graduate-level courses in criminal justice at DeSales University and Nova Southeastern University. These experiences suffice to qualify Mr. McCrary as an expert on police practices.

Defendants challenge essentially all of Mr. McCrary's opinions as unreliable, irrelevant, unhelpful to the jury, or some combination thereof. The Court will assess them on an opinion-by-opinion basis.

### 1.    Causation

Mr. McCrary opines that "the Defendants engaged in a constellation of egregious departures from standard police practices that resulted in Plaintiffs' convictions." Doc. 367-1 at 12. Defendants argue that this opinion departs from Mr. McCrary's area of expertise, is not

based in a sound methodology, and is unhelpful to the jury because it makes an impermissible conclusion and assigns blame to Defendants collectively rather than considering each individual defendant's actions.

The Court at least agrees with Defendants' argument that this opinion does too much of the jury's work for it. "[E]xpert testimony as to legal conclusions that will determine the outcome of the case is inadmissible." *Good Shepherd Manor Found., Inc. v. City of Momence*, 323 F.3d 557, 564 (7th Cir. 2003). At bottom, Mr. McCrary's causation opinion tells the jury that Defendants violated Plaintiffs' constitutional rights. Rather than being helpful to the jury, this opinion would usurp its role. *See Thompson v. City of Chicago*, 472 F.3d 444, 458 (7th Cir. 2006) (barring issue-dispositive expert testimony because the "jury . . . was in as good a position as the experts to judge whether" the defendants violated the plaintiff's constitutional rights). Although Plaintiffs argue that "[t]he ultimate question before the jury is whether Defendants violated Plaintiffs' constitutional rights, not whether their violations of proper police practices resulted in Plaintiffs' convictions," Doc. 378 at 18, the convictions, if secured by police-fabricated evidence as Plaintiffs claim, are part-and-parcel of the constitutional violations. Mr. McCrary's views concerning the impact of Defendants' alleged actions simply goes too far. As such, the Court need not address Defendants' other arguments for excluding this opinion.

### 2. Classification and victimology

Mr. McCrary next opines that the detectives misclassified the homicides and robbery of Elegant Auto as a "homicide/robbery" and that the detectives failed to conduct a proper victimology of Khaled Ibrahim and Yousef Ali. Mr. McCrary says that these amounted to violations of standard police practices. Defendants argue that these opinions are unreliable and unhelpful to the jury. In arguing unreliability, they state that Mr. McCrary fails to sufficiently

identify the standard police practices that he claims Defendants violated through their actions during the murder investigation. To argue that the opinions are unhelpful to the jury, they state that Mr. McCrary impermissibly refers to Defendants as a single unit instead of opining how individual defendants violated procedures through their actions, and that these opinions are irrelevant or "nonsensical." Doc. 367 at 9.

The Court first considers Defendants' argument that Mr. McCrary has not supported his opinion with sufficient references to standard police policies. Because Defendants raise this challenge with respect to several of Mr. McCrary's opinions, the Court will conduct a thorough review of the support Mr. McCrary provides throughout his report here.

In his report's opening, Mr. McCrary states that:

> The standards governing this report are drawn from the Chicago Police Department's Standard Operation Procedures for the Detective Division in effect in 1995, as well as the minimum standards adhered to by other police agencies within the United States in the early 1990's as taught by the Federal Bureau of Investigation (FBI) to police officers at the FBI Academy and in numerous FBI "road schools" and police academies. I taught and practiced these standards as an FBI Agent during the time period as noted above. My conclusions are based on the record and deposition testimony, including relying on the deposition testimony of the witnesses as cited herein.

Doc. 367-1 at 5. Mr. McCrary thus claims a general familiarity with early-1990s era police policies and practices. Given Mr. McCrary's position as an instructor and investigator during this time, it is unsurprising that he would possess a knowledge of relevant police practices and their proper implementation. Applying knowledge and expertise developed as the result of experience is a proper basis for an expert opinion. *See Kumho Tire Co.*, 526 U.S. at 150.

But Defendants take issue with the way Mr. McCrary applies his knowledge. Throughout their brief, Defendants argue that Mr. McCrary fails to point to standard police practices used to measure Defendants' conduct and assess purported departures from them. And

38

Defendants have a point—Mr. McCrary's report is thin on citations to documented police practices, and he is inconsistent with providing documentary support when he opines that certain actions depart from standard police practices. *Compare, e.g.*, Doc. 367-1 at 16 (citing the Crime Classification Manual to support his opinion regarding what a "[r]easonably trained" detective would do), *with id.* at 22 (providing no citation to support what "reasonably trained detectives would have" done). The Court thus faces a choice of either admitting expert testimony that verges on *ipse dixit*, *see Wendler & Ezra, P.C. v. Am. Int'l Grp., Inc.*, 521 F.3d 790, 791 (7th Cir. 2008) (asserting that *ipse dixit* testimony is inadmissible), or barring testimony offered through a qualified expert with an acceptable basis, all because he failed to cite his sources as frequently as might be desired.

Ultimately, this Court returns to the Seventh Circuit's teaching that "[d]eterminations on admissibility should not supplant the adversarial process; 'shaky' expert testimony may be admissible, assailable by its opponents through cross-examination." *Gayton*, 593 F.3d at 616. Mr. McCrary's report ventures into shaky territory at times with its scant citations, but throughout his report he refers to what "minimally competent" officers would do and what "standard police practices" used to be. *See, e.g.*, Doc. 367-1 at 21, 23, 26 (referring to minimally competent officers); *id.* at 8, 28, 43 (referring to standard police practices). This Court understands these references to minimally competent conduct and standard police practice to be grounded in Mr. McCrary's experience as an instructor and investigator. Although admittedly a closer call, because that experience is a proper basis for his opinion, the Court will not disturb Mr. McCrary's report or testimony on the basis that it lacks methodology or specificity. However, should Defendants wish to challenge Mr. McCrary's knowledge of specific police

practices he relies on in his report, they may do so on cross-examination. *Gayton*, 593 F.3d at 616.

Turning to Defendants' unhelpfulness arguments, the Court finds that they likewise miss the mark. First, Mr. McCrary's opinions are not unhelpful simply because he refers to "Defendants" as a collective whole rather than analyzing their individual actions. To support this argument, Defendants cite to Seventh Circuit Pattern Civil Jury Instruction 7.02, which requires Plaintiffs to "prove by a preponderance of the evidence that" each defendant "was personally involved in the conduct that Plaintiff complains about." *Requirement of Personal Involvement*, Federal Civil Jury Instructions of the Seventh Circuit 7.02 (2017). But Defendants present no caselaw, and this Court has found none, indicating that expert testimony must specifically show how each defendant is liable for the alleged injuries. Plaintiffs still possess the burden of proving their claims by a preponderance of the evidence, *see id.*—to the extent Mr. McCrary is imprecise in offering his opinions, that will do a disservice to Plaintiffs' case; but it does not make his opinions inadmissible.

Second, Mr. McCrary's opinions are relevant. The fact that Defendants find it obvious that a robbery and double homicide would be classified as a robbery/homicide indicates that the jury might harbor a similar belief—but Mr. McCrary argues that sound police practices required a more thoughtful, evidence-based approach to rule out other motives for the crime, such as a targeted execution. *See* Doc. 367-1 at 13. Mr. McCrary opines that the police "forced that [robbery/homicide] narrative into a series of coercive interrogations while ignoring a host of disconfirming evidence in violation of standard police practices." *Id.* This is not nonsensical; it is contesting a tempting narrative. *Cf. Common*, 818 F.3d at 330 (allowing expert testimony on absence of fingerprints to challenge commonly-held, but wrong, belief about fingerprint

40

evidence); *Washington*, 2017 WL 3642112, at *10-11 (same). Moreover, Mr. McCrary's victimology opinion is relevant because it will give the jury additional context about the steps normally taken in well-conducted investigations—departures from such standard procedures could indicate intentional misconduct on Defendants' behalf.

### 3. Anonymous "tip" and suspect-driven investigation

Mr. McCrary opines that Defendants' reliance on an anonymous tip to identify McCoy as a suspect improperly deviated from standard police practice, and that the investigation subsequently became "suspect-driven," meaning the focus of the investigation turned away from objectively evaluating the case's evidence to identify the culprit, and instead became an exercise in obtaining confessions from McCoy (the focus of the anonymous tip) and anyone else he identified. *See* Doc. 367-1 at 20–39. Defendants argue that these opinions are unreliable because Mr. McCrary does not properly identify the standard police procedures used to draw his conclusion. They further argue that they are unhelpful to the jury because they are irrelevant to Plaintiffs' claims.

The Court refers to its analysis of Defendants' unreliability argument above and finds that the same reasoning justifies its view that these opinions are likewise reliable. Mr. McCrary ties his evaluations of the case in this section to his experience as an FBI agent and instructor of police investigators—a proper basis for opining on what is and is not proper police procedure. *See, e.g.*, *id.* at 21 ("Minimally competent detectives, following proper police procedures, would never have made this anonymous, unsubstantiated tip a primary focus of the investigation."); *id.* at 26 ("Regardless, minimally competent detectives understand that enemies do not make for co-conspirators."). Defendants can raise specific challenges to his methodology on cross-examination. *Gayton*, 593 F.3d at 616.

As for relevance, Mr. McCrary's opinions will assist the jury in evaluating whether Defendants knowingly and intentionally caused Plaintiffs' prosecutions—Mr. McCrary's opinion will help Plaintiffs highlight the allegedly steep departures from standard police procedures that occurred in this case. Thus, Plaintiffs can introduce this aspect of Mr. McCrary's opinion.

### 4. Interrogation techniques

Next, Mr. McCrary opines that Defendants' actions during their interrogations of Plaintiffs were "a major departure from both Chicago PD policy and national standards of police practices, both for juvenile and adult interrogations." Doc. 367-1 at 39. Defendants argue that this opinion is unhelpful to the jury because there is no need to establish a baseline standard against which intentional misconduct can be measured, with the opinion also containing "nothing more than a regurgitation of evidence" Plaintiffs will already submit to the jury through other means. Doc. 367 at 15. In support of their argument that Plaintiffs do not need to establish any policy baseline to prove their case, Defendants cite *Jimenez v. City of Chicago*, 732 F.3d 710, 721–22 (7th Cir. 2013). This is puzzling, because the passage Defendants quote in favor of their argument is the exact same line that this Court finds lets Mr. McCrary's testimony in. The *Jimenez* court said:

> Expert testimony regarding relevant professional standards can give a jury a baseline to help evaluate whether a defendant's deviations from those standards were merely negligent or were so severe or persistent as to support an inference of intentional or reckless conduct that violated a plaintiff's constitutional rights.

*Id.* To establish their due process claims, Plaintiffs must show that Defendants acted knowingly. *See Daniels v. Williams*, 474 U.S. 327, 328 (1986) (showing negligence is insufficient to bring a civil due process claim); *see also Cairel v. Alderden*, 821 F.3d 823, 832 n.2 (7th Cir. 2016) ("For civil claims for due process violations, though, the general rule is that the defendant must have

acted intentionally or at least recklessly."). Establishing this policy baseline will help Plaintiffs show (if the jury accepts their version of the facts) that Defendants' conduct was intentional, as *Jimenez* teaches. This is true even though Defendants agree that their conduct, if the jury accepts Plaintiffs' account, would amount to a constitutional violation. A jury could accept a version of Plaintiffs' innocence but still believe that, even if the officers involved employed overzealous techniques, the conduct was not so flagrant to amount to a violation. Because Mr. McCrary's testimony would counter this possibility, evidence establishing a policy baseline is relevant for Plaintiffs to prove their case.

### 5. Post-confession investigation

Mr. McCrary opines that the detectives' failure to conduct a post-confession investigation into the murders violated standard police procedures. He identifies numerous conflicts between the confessions, the eyewitness statements, and independent evidence, and observes that the "glaring inconsistencies should have given the Defendants discomfort, not comfort." Doc. 367-1 at 44. Defendants raise the same reliability arguments they made with respect to Mr. McCrary's classification/victimology opinions, and the Court denies them for the same reasons. Defendants also raise the same relevancy arguments that they made with respect to Mr. McCrary's interrogation techniques opinion, and the Court again adopts that analysis here.

Defendants additionally claim that Mr. McCrary overlooks Alesia's role in approving charges against Plaintiffs, asserting that "[i]f the standard was that a confession can 'never' be taken at face value, ASA Alesia would not have been able to approve the charges." Doc. 367 at 17. But this mischaracterizes Mr. McCrary's opinion, which is that the confession cannot be taken at face value *without* corroborating evidence. Doc. 367-1 at 9. Mr. McCrary points to the lack of independent evidence bolstering the confession evidence as the reason that there should

43

have been a post-confession investigation. That Defendant Alesia swiftly approved and filed charges after allegedly being involved in taking the coerced/fabricated confessions does not somehow undermine Mr. McCrary's opinion.[8]

### 6. Opinions related to eyewitness testimony and investigations

Mr. McCrary offers several opinions related to the eyewitness testimony and procedures Defendants used to secure the eyewitness testimony in this case. *See id.* at 50–57. He opens with a discussion of the "research on eyewitness identification" and statistics that he uses to argue that it can be unreliable. *Id.* at 49. He then summarizes the key facts surrounding the different lineups Detectives Fine, Coughlin, and Valadez conducted, identifying departures from police procedures along the way. *Id.* at 51. Mr. McCrary takes issue with the lack of documentation surrounding the lineups, *id.* at 50–53, 56, and with Defendants' lack of follow-up investigation with respect to Mr. Tadros' eyewitness report, *id.* at 53. He further criticizes the procedures used to conduct the lineups as potentially contaminating the eyewitness testimony. *Id.* at 55–57. Mr. McCrary concludes by opining that what "the totality of these circumstances reveal is an enduring pattern that violates basic police practices for properly conducting and adequately documenting suspect lineups." *Id.* at 57.

---

[8] Defendants raise an additional argument (in their reply brief), stating that Mr. McCrary "does not have a reliable methodology that can be applied to these facts where once the decision was made . . . to charge Plaintiffs, further investigative actions in the case would be at the direction of prosecutors." Doc. 394 at 18. But this argument is substantially different from the one they raise in their opening brief. The Court will not strike Mr. McCrary's testimony because Plaintiffs did not anticipate this elaboration. *See Autotech Techs. Ltd. P'ship v. Automationdirect.com, Inc.*, 249 F.R.D. 530, 536 (N.D. Ill. 2008) ("Reply briefs are for replying, not raising new arguments or arguments that could have been advanced in the opening brief."); *Murphy v. Vill. of Hoffman Estates*, Case No. 95 C 5192, 1999 WL 160305, *2 (N.D. Ill., March 17, 1999) ("[I]t is established beyond peradventure that it is improper to sandbag one's opponent by raising new matter in reply. Providing specifics in a reply in support of a general argument in an objection counts as new matter in reply. . . . Raising an argument generally in a motion [ ] does not give a litigant license to be vague in his original submissions and provide the necessary detail in his reply.").

Defendants raise several challenges to Mr. McCrary's opinions related to eyewitness testimony. First, they argue that the Court should bar his "enduring pattern" opinion because the Court previously bifurcated Plaintiffs' *Monell* claim. The Court, however, agrees with Plaintiffs' characterization that Mr. McCrary simply summarizes his findings with regards to Defendants' behavior in this singular case. His use of the term "pattern" does not mean that he opines on a department- or city-wide pattern of behavior that would provide the basis for a *Monell* claim, which would certainly be inappropriate at this stage given the bifurcation decision. *See* Doc. 130 ("[W]hether any of the [challenged] policies constituted a 'widespread practice' . . . is immaterial to the question of whether any individual Defendant Officer coerced a confession, fabricated evidence, or suppressed evidence in one of Plaintiff's cases."). Mr. McCrary says that "the totality of *these circumstances*"—referring to the facts as he set out in his expert report—"reveal [] an enduring pattern that violates basic police practices for" performing suspect lineups. *Id.* at 57. He does not analyze anywhere in his report the actions of detectives in other cases, nor does he comment on, for example, whether there are any formal or informal policies that might cast suspicion on the Chicago Police Department's systematic approach to conducting police lineups. Rather, he focuses entirely on the facts of this case—that is enough for the Court to conclude that Mr. McCrary is not offering a *Monell*-type opinion.[9]

Second, Defendants challenge Mr. McCrary's qualifications to offer testimony summarizing his research into eyewitness testimony. This argument is more availing. Mr. McCrary is not an expert in eyewitness testimony or reliability, and although his experiences as a homicide investigator and an instructor of police officers qualify him to discuss departures from standard police procedures, they do not qualify him to discuss the science behind the reliability

---

[9] To the extent Mr. McCrary's testimony at trial veers into a commentary on Defendants' systematic practices, Defendants may object at that time.

(or unreliability) of eyewitness testimony. *Cf. Harris*, 2017 WL 3193585, at *4 ("In sum, Agent McCrary is not a social scientist and has not contributed to the study of coercive interrogations and false confessions, therefore, his opinions on false confessions are beyond his expertise.").

Third, Defendants argue that Mr. McCrary does not sufficiently tie his opinions to standard police practices. This argument fails for the same reasons discussed above. Mr. McCrary appropriately ties this opinion to his experience, which necessarily draws on the applicable standard police practices as discussed above. *See, e.g.*, Doc. 367-1 at 52 ("The Defendants violated clear police practices by not investigating a supposed eyewitness to the crime."); *id.* at 53 ("However, there is no supplemental report about an interview with Tadros, a clear violation of police practices."). Although Defendants' point that procedures enacted after 1995 cannot provide a basis for evaluating their actions in this case (such as the 1998 International Association of Chiefs of Police standards) is well-taken, Mr. McCrary does not base his opinions solely on such procedures. And if Defendants still believe this opinion lacks support, they may challenge it on cross-examination. *See Gayton*, 593 F.3d at 616.

Finally, Defendants assert that Mr. McCrary does not establish that Defendants violated Plaintiffs' constitutional rights by failing to properly investigate eyewitnesses, which seems to be a relevance challenge. This argument is a non-starter. As discussed above, his opinion could assist the jury with assessing Defendants' states of mind when they conducted the investigation. That suffices for the testimony to be relevant and helpful to the jury.

### 7. Treatment of juvenile suspects

Defendants attribute to Mr. McCrary the "opinion" that factual disputes exist in the record concerning Defendants' efforts to bring a parent or guardian into the station for Ezell's and Styles' interviews. Defendants argue that this opinion is unhelpful to the jury because the

46

jury, not an expert, will decide whose version of the facts is correct.  Doc. 367 at 20.  But

Defendants misstate Mr. McCrary's opinion: Mr. McCrary opines that "[i]f Defendants did not

make reasonable efforts to locate their parents/guardians, or worse actively worked to ensure that

their parents/guardians were not present during the interrogations, that would be a serious

violation of both CPD policy and nationally accepted police standards and practices."  Doc. 367-

1 at 40.  In other words, Mr. McCrary seeks to explain to the jury that if it resolves this factual

conflict in a certain way, the facts would point to a violation of police procedures.  He does not

compel the jury to take any position on the facts.  *See Jimenez*, 732 F.3d at 722 (noting the

admissibility of similar testimony provided by Mr. McCrary when the "effect of his testimony

depended on how the jury resolved conflicts among the testimony of other witnesses").

Defendants also raise similar reliability arguments that they make regarding Mr. McCrary's other

opinions, which the Court denies for the same reasons as discussed above.

In summary, the Court bars Mr. McCrary from testifying to the ultimate conclusion that

Defendants' violations of police procedures caused Plaintiffs' convictions and from offering his

summary of the social science concerning eyewitness testimony.  The Court allows the rest of

Mr. McCrary's testimony.

### C.      Professor Lindsay Malloy

Ezell, McCoy, and Styles retained Dr. Lindsay Malloy to offer expert testimony about

false and coerced confessions.[10]  Dr. Malloy is an Associate Professor at the University of

Ontario Institute of Technology.  Dr. Malloy has a Ph.D. in Psychology and Social Behavior

from University of California, Irvine where she focused her studies on developmental

---

[10] Johnson did not retain Dr. Malloy because he asserts that his confession was fabricated, not coerced.
For the purpose of discussing the admissibility of Dr. Malloy's expert testimony, the Court excludes
Johnson when it refers to "Plaintiffs."

psychology as well as the intersection between psychology and law. Dr. Malloy has served on several editorial boards for prestigious psychological journals, has authored over 100 scholarly works, and co-edited a tome on the research surrounding child testimony. Dr. Malloy summarizes her opinions in eleven main bullets, but the thrust of them is that the circumstances of Plaintiffs' interrogations (including their status as teenagers, their isolation, and actions taken by Defendants) significantly increased the risk that they would give false confessions.

Defendants do not challenge Dr. Malloy's qualifications. Rather, they seek to bar all her testimony as unhelpful to the jury. Alternatively, Defendants seek to exclude six of her opinions on individual bases.

### 1.   Helpfulness to the jury

Defendants first argue that Dr. Malloy's opinions will be unhelpful because they have been "refuted" by studies that she did not cite in her report and of which she seemed to be unaware during her expert deposition. Doc. 368 at 4–5. But they acknowledge, as they must, that this Circuit's precedent cuts against their argument that Dr. Malloy's testimony will not assist the jury. Indeed, since the Seventh Circuit's opinion in *United States v. Hall*, 93 F.3d 1337 (7th Cir. 1996), it has been established law that expert testimony concerning false confessions will assist the jury. As the *Hall* court explained:

> [The expert's] testimony, assuming its scientific validity, would have let the jury know that a phenomenon known as false confessions exists, how to recognize it, and how to decide whether it fit the facts of the case being tried.
>
> The district court's conclusion therefore missed the point of the proffer. It was precisely because juries are unlikely to know that social scientists and psychologists have identified a personality disorder that will cause individuals to make false confessions that the testimony would have assisted the jury in making its decision. It would have been up to the jury, of course, to decide how much weight to attach to [the expert's] theory, and to decide whether

48

> they believed his explanation of Hall's behavior or the more
> commonplace explanation that the confession was true.

*Id.* at 1345. Following *Hall*, courts in this district routinely admit expert testimony on false

confessions as helpful to the jury. *See, e.g.*, *Brown v. City of Chicago*, No. 18 C 7064, 2023 WL

2561728, at *10 (N.D. Ill. Mar. 17, 2023) (admitting false confession expert testimony as helpful

to the jury); *Andersen v. City of Chicago*, No. 16 C 1963, 2020 WL 1848081, at *4 (N.D. Ill.

Apr. 13, 2020) (same); *Harris*, 2017 WL 2436316, at *16 (same); *Caine v. Burge*, No. 11 C

8996, 2013 WL 1966381, at *2–3 (N.D. Ill. May 10, 2013) (same).

Defendants cite three studies that they argue should displace these prior court rulings that

false confession expert testimony will assist the jury. Doc. 368 at 8–9 (citing Angela M. Jones

and Steven Penrod, *Can Expert Testimony Sensitize Jurors to Coercive Interrogation Tactics?*,

16 J. Forensic Psychology Practice, No. 5, 353 (2016) ("Jones and Penrod"), Kelsey S.

Henderson and Lora M. Levett, *Can Expert Testimony Sensitive Jurors to Variations in*

*Confession Evidence*, 40 L. and Human Behavior, No. 6, 638-649 (2016) ("Henderson and

Levett"), and William Douglas Woody et al., *Effects of false evidence ploys and expert testimony*

*on jurors, juries, and judges*, 5 Cogent Psychology 1528744 (2018) ("Woody et al.")).

Defendants argue that these studies show that expert testimony about false confessions makes

jurors generally skeptical of confession evidence rather than increasing their ability to discern

between genuine and coerced confessions. Defendants urge that, because this relatively newer

social science has not been considered by any previous court, this Court may decide anew the

issue of whether expert testimony about false confessions will assist the jury.

The Court cannot displace this Circuit's law in favor of the studies Defendants cite,

however. *See Lewis v. Gaylor*, 914 F. Supp. 2d 925, 927 (S.D. Ind. 2012) ("When presented

with such an argument, the district court's foremost responsibility is to abide by the doctrine of

*stare decisis,* where 'decisions of a superior court in a unitary system bind the inferior courts.'" (quoting *Colby v. J.C. Penney Co.*, 811 F.2d 1119, 1123 (7th Cir. 1987))). True, the three studies display some concerning results. In Jones and Penrod, the researchers found that "expert testimony did not assist jurors in their evaluation of the confession evidence." Doc. 386-4 at 13. But, as Plaintiffs note, that study ignored potential individual characteristics of suspects that may make them more likely to give false confessions or succumb to coercion—factors that Dr. Malloy discusses at length in her report. In Henderson and Levett, one of the studies researchers performed indicated that "expert testimony did not sensitize jurors to variations in confession evidence" but rather "had little effect" on the jurors' perceptions of the case. Doc. 368-3 at 8. But that same paper concluded that "it appears that even though jurors notice information that should cause them to question the reliability of a confession, they do not necessarily do so without the aid of expert testimony." *Id.* at 12. And while Woody et al. reached puzzling results, such as that jurors "who read expert testimony perceived the interrogation as less deceptive, which is contrary to previous research" and the fact pattern submitted to the mock jurors, Doc. 386-2 at 17, it also found that "expert testimony provides knowledge that jurors and perhaps judges do not possess," which indicates helpfulness, *id.* Moreover, although the study acknowledges an increase in juror skepticism, it further notes that the experiment's design, which contained "little evidence beyond the confession to support the defendant's guilt," was more likely to engender skepticism in the jury. *Id.* Thus, although the studies each contain possibly concerning statistics about the impact expert testimony regarding false confessions has on juries, none of the articles conclusively dismantle the current, controlling law. Ultimately, this Court joins the others allowing false confession expert testimony.

Defendants' second argument is that, because Dr. Malloy is not a psychologist and did not examine Plaintiffs or their health records, she cannot offer an opinion as to their specific mental states that could have led to them making a false confession. This argument also fails. Dr. Malloy does not need to tailor her opinions about how the science behind false confessions applies to each plaintiff individually—indeed, if she attempted to do so, she would be straying from the area of her expertise and be offering opinions that she would be unqualified to advance. Dr. Malloy appropriately limits her opinions tying facts surrounding Plaintiffs' interrogations to risk factors that increase the probability that Plaintiffs would have given false confessions. *See* Doc. 368-2 at 27–29. That she stays within her lane of expertise is reason to accept her testimony, not exclude it. *See Caine*, 2013 WL 1966381, at \*3 ("[False confession expert] Dr. Leo will be permitted to testify to various factors that can cause false confessions, and to their presence in this case.").

Lastly, Defendants argue that Dr. Malloy's opinions will be unhelpful because she cannot ultimately discern the truth or falsity of Plaintiffs' confessions. But Defendants offer no law suggesting that an expert on false confessions must be able to know whether a given challenged confession is genuine or coerced. *Cf. Hall*, 93 F.3d at 1341 (proffered expert testimony did not include opinion whether confession was true or false), *Washington v. Boudreau*, No. 16-cv-01893, 2022 WL 4599708, at \*11 (N.D. Ill. Sep. 30, 2022) (same), *Caine*, 2013 WL 1966381, at \*1 (same). The Court agrees with the reasoning of these courts that an expert on false confessions can still provide helpful information to the jury without opining whether any given confession is definitively false.

In short, the Court will not exclude Dr. Malloy's testimony on the grounds that it is unhelpful to the jury.

## 2. Challenges to specific opinions

Defendants argue on varying grounds that Dr. Malloy should be prevented from discussing (1) "exoneration" statistics and prevalence rates, (2) how Plaintiffs' confessions compare with other evidence, (3) Defendants' states of mind when they questioned Plaintiffs, (4) police practices and policies, (5) whether the length of Plaintiffs' interrogations were excessive, and (6) whether her testimony will be helpful to the jury.

### a. Exoneration statistics and prevalence rates

Defendants first ask the Court to bar Dr. Malloy from discussing statistics from the Innocence Project related to the prevalence rates of false confessions. Defendants argue that these statistics will allow Plaintiffs' attorneys to make improper arguments and that they are irrelevant to her analysis of Plaintiffs' interrogations and the likelihood that their confessions were false or coerced. Defendants further criticize Dr. Malloy for her inability to testify about the method by which those statistics were calculated. In response, Plaintiffs argue that such statistics will help convince the jury that the false confession science is real, that the statistics are relied on by experts in the field of false confession studies, and that Dr. Malloy did not need to pass a memory test to offer her testimony.

The Court will allow Dr. Malloy to testify about the Innocence Project statistics so long as Plaintiffs establish the relevancy of her testimony at trial. For example, Dr. Malloy writes in connection with her opinion on "Post-Confession Tunnel Vision, Confirmation Bias, and Cumulative Disadvantage":

> In Drizin and Leo's (2004) archival investigation of 125 cases of proven false confessions, for example, nearly one-third (30%) of the cases involved confessions from multiple defendants. They noted that in this study a (false) confession from one suspect was often used to prompt (false) confessions from the other suspect(s).

Doc. 368-2 at 10. Dr. Malloy uses these statistics to support her assertion that "[a] confession from one defendant may be used to motivate a confession from co-defendants or co-suspects," *id.*, which is relevant in this case where multiple plaintiffs allege that they gave false confessions due to police coercion, *see* Fed. R. Evid. 702(a); *see also* Fed. R. Evid. 401 ("Evidence is relevant if it has any tendency to make a fact more or less probable than it would be without the evidence[.]"). In arguing that such statistics are not relevant to Dr. Malloy's opinion, Defendants improperly substitute relevance for necessity. Of course, Dr. Malloy does not need to raise the Innocence Project's statistics to make her point—she does not directly fold them into her analysis of Plaintiffs' confessions, and for good reason. Statistics do not bear on any of the individual confessions at issue in this case or tell the jury whether Plaintiffs' confessions were coerced or freely given. But they provide helpful background information that bolsters Dr. Malloy's opinions. They are thus relevant, and the Court will not restrain Dr. Malloy from offering them at this time.

Defendants' other arguments for excluding this portion of Dr. Malloy's opinion, that Plaintiffs will use the statistics to make improper arguments about the nature of the legal system and that Dr. Malloy could not recite the Innocence Project's methodology on-demand, are likewise unavailing. The Court assures Defendants that it will prevent Plaintiffs' attorneys from straying from the path of permissible arguments, and Defendants can raise any objections to arguments they believe are impermissible at the appropriate time. Similarly, to the extent that Defendants take issue with Dr. Malloy's understanding of the Innocence Project's statistics, they may explore the issue on cross-examination. *See Gayton*, 593 F.3d at 616 ("Determinations on admissibility should not supplant the adversarial process; 'shaky' expert testimony may be admissible, assailable by its opponents through cross-examination.").

### b.      Comparing Plaintiffs' confessions with other evidence

Defendants next argue that Dr. Malloy impermissibly compares the confession evidence

to the other evidence in this case, and in any event draws false conclusions from her comparison

of the evidence because she did not consider *all* available evidence in forming her opinion.

Plaintiffs respond that Dr. Malloy simply "identif[ies] a relevant issue for the jury to consider"

and that comparing the physical evidence in the case to the confession evidence helps

"contextualize her opinions."  Doc. 379 at 20–21.

The Court agrees that confession experts cannot compare the confession evidence with

physical evidence.  True, Dr. Malloy does not say that the conflict between the confession

evidence and physical evidence means that Plaintiffs' confessions are definitively false, and she

expressly disavows making such factual determinations.  However, such comparisons, fair as

they may be, are ultimately reserved for the jury to make for themselves, not done for them by an

expert witness.  *See Brown*, 2023 WL 2561728, at *11 ("[The expert] may not testify as to how

the confessions . . . compare with the other evidence of the crime."); *see Caine*, 2013 WL

1966381, at *3 ("However, [the expert] will *not* be allowed to testify as to his opinion that

Caine's and Patterson's confession statements were false.  In particular, he will not be allowed to

testify as to his comparison of the witnesses' confessions and the physical evidence of the crime.

That is decidedly a jury question and allowing [the expert] to opine on that subject would invade

the province of the jury.").

### c.      Defendants' states of mind

Defendants seek to exclude Dr. Malloy's opinion that "Detectives held strong beliefs

about Mr. Styles' and Mr. Ezell's guilt" prior to their interrogations.  Doc. 368-2 at 10.

Defendants claim that the lone passage of testimony Dr. Malloy cites in her report does not

elevate this opinion above speculation, and that, regardless, Defendants' states of mind are left for the jury to decide. In response, Plaintiffs point to the depositions of two detectives who were involved in the interrogations, Detectives Bloore and Davis, and quote from passages where they admit to developing the opinion that Styles and Ezell were guilty of the murders before the interrogations occurred. Plaintiffs also state that Dr. Malloy will not opine that Defendants thought Styles and Johnson were guilty before their interrogations, but rather incorporate Bloore's and Davis' statements into her explanation of the risk factors surrounding potentially coerced confessions.

The Court agrees with Plaintiffs that Dr. Malloy permissibly incorporated Detectives Bloore's and Davis' deposition testimony into her own analysis of the factors that increased the risk that Plaintiffs' confession were false or coerced. Support exists in the record for this fact. *See Andersen*, 454 F. Supp. 3d at 814 ("[An expert] may rely on disputed facts to reach his opinions, as long as there is evidence to support such facts."). Moreover, Dr. Malloy is not opining on an ultimate jury question but rather explaining how Bloore's and Davis' testimony supports one of the risk factors indicating Plaintiffs' confessions were false. So long as Dr. Malloy limits her discussion of the detectives' mental states to this, this Court will permit that testimony.

### d. Police practices and policies

Defendants ask the Court to exclude Dr. Malloy's testimony concerning police practices and policies, arguing that Dr. Malloy is not qualified to opine on these topics, and that she relies on police practice manuals that either (1) were not in effect during Plaintiffs' interrogations or (2) did not govern Defendants' conduct.

Initially, Defendants mischaracterize how Dr. Malloy invokes the challenged police policies in her report. She cites the 2012 version of the International Association of Chiefs of Police guidelines concerning juvenile interviews and the United Kingdom's enactment of the Police and Criminal Evidence Act as examples of "empirical findings [concerning interrogations of juveniles] [being] adopted as policy recommendations and legal requirements in numerous jurisdictions." Doc. 368-2 at 23. Dr. Malloy does not hold Defendants to account for violating these later-in-time or foreign policies; to the contrary, she draws on them to highlight how the social science research concerning juvenile interrogations has been broadly accepted. This gives the Court reason to credit her testimony, not to prevent her from giving it.

The Court further disagrees with Defendants' other argument that Dr. Malloy is unqualified to opine on police policy because it does not believe that she opines *at all* on police policy. Dr. Malloy illustrates the risks of interrogating juvenile suspects without an adult interested in their wellbeing present and ties this discussion back to the facts of this case. This is within her ken as an expert on false confessions—the Court will not block her testimony touching on police procedures so long as it remains connected to her area of expertise.

### e.    Length of Plaintiffs' interrogations

Defendants ask the Court to prevent Dr. Malloy from testifying about the length of Plaintiffs' interrogations. They argue exclusion is appropriate because (1) Dr. Malloy does not profess support for the studies that claim interrogations lasting longer than four or six hours are excessively long; and (2) the record shows that Plaintiffs' interrogations were shorter than four hours, meaning that they would not be of excessive length even if those benchmarks were reliable. Plaintiffs instead cast Dr. Malloy's testimony on interrogation length as one of several points related to the reliability of confession evidence—that the combination of being in custody,

56

being held in isolation, and being interrogated increased the risk of making a false confession. The Court will not disturb her testimony—that Dr. Malloy does not offer full-throated support for every paper she cites in her report does not undermine its conclusions, and the fact that Plaintiffs' interrogations were shorter than the challenged benchmarks does not change the reliability of those studies. Defendants may explore this area on cross-examination. *See Gayton*, 593 F.3d at 616.

### f.    Helpfulness to the jury

Finally, Defendants ask the Court to bar Dr. Malloy from testifying that her opinions would be helpful to the jury. Plaintiffs to not oppose this motion. Doc. 379 at 23. The Court thus bars Dr. Malloy from testifying that her opinions will assist the jury.

In summary, the Court finds that Dr. Malloy cannot testify as to her comparisons between the confession and physical evidence, that the duration of Plaintiffs' interrogations makes it more likely that their confessions are false, and that her opinions will assist the jury. The Court will not bar Dr. Malloy's other testimony.

## III.    Plaintiffs' and Defendants' Motions to Exclude Each Other's Non-Retained Experts

Defendants named Mr. Brian Sexton, the prosecuting Assistant State's Attorney during Plaintiffs' 1998 criminal trial, as a non-retained expert in their Rule 26(a)(2) disclosure on May 2, 2022, and filed an amended disclosure on May 24, 2022, providing additional details about the facts and opinions to which he would testify. On July 25, 2022, Plaintiffs named Mr. Brent Stratton, trial counsel for Johnson, as a non-retained rebuttal expert to Mr. Sexton in their Rule 26(a)(2) disclosure.[11] Both sides have filed motions that, *inter alia*, challenge the propriety of the other side disclosing their respective witness as a non-retained expert under Rule 26(a)(2)(C)

---

[11] McCoy did not join his co-plaintiffs in naming Mr. Stratton an expert, so he is excluded from any references to "Plaintiffs" with respect to the discussion concerning Mr. Stratton's opinions.

rather than a retained expert under Rule 26(a)(2)(B), and seek to exclude the experts' testimony on that basis. *See* Doc. 357 at 4–12; Doc. 363 at 13–14.

Rule 26(a)(2) recognizes two types of expert witnesses: those required to provide a written report, Rule 26(a)(2)(B), and those who are only required to provide a summary of facts and opinions, Rule 26(a)(2)(C). "If . . . the expert comes to the case as a stranger and draws the opinion from facts supplied by others, in preparation for trial, he reasonably can be viewed as retained or specially employed for that purpose, within the purview of Rule 26(a)(2)(B)." *Downey v. Bob's Discount Furniture Holdings, Inc.*, 633 F.3d 1, 7 (1st Cir. 2011); *see also* Rule 26(a)(2)(B) (providing that an expert witness must provide a written report "if the witness is one retained or specifically employed to provide expert testimony in the case . . . ."). A non-retained expert, who does not need to provide a written opinion, is one who formed their opinion during the events related to the case. *See, e.g.*, *Banister v. Burton*, 636 F.3d 828 (7th Cir. 2011) (upholding district court decision to allow treating trauma physician to testify as to effects of injury as non-retained expert when physician formed opinion prior to request by party and had offered similar testimony at earlier criminal trial). "Conceivably, in some cases an on-the-scene expert whose views are not subject to the written report requirement of Rule 26(a)(2)(B) might also be retained or specially employed to develop *additional* opinions for purposes of trial (and would, to that extent, trigger the written report requirement)." *Id.* at 8 n.5 (emphasis in original); *see, e.g.*, *National R.R. Passenger Corp. v. Railway Express, LLC*, 268 F.R.D. 211, 216 (D. Md. 2010) ("[A] party may not circumvent the requirements of Rule 26 by employing a witness, like a treating physician who treated an injured party, to provide testimony extending into classic expert opinion regarding causation and prognosis."). If an expert was improperly disclosed, then "the sanction of exclusion is automatic and mandatory unless the sanctioned party can show that

its violation of Rule 26(a) was either justified or harmless." *Salgado v. Gen. Motors Corp.*, 150 F.3d 735, 742 (7th Cir.1998). However, the Seventh Circuit has left "[t]he determination of whether a Rule 26(a) violation is justified or harmless . . . to the broad discretion of the district court." *Mid–America Tablewares, Inc. v. Mogi Trading Co.*, 100 F.3d 1353, 1363 (7th Cir. 1996).

This Court sees no reason to pass on the threshold issue of whether Mr. Sexton or Mr. Stratton are properly disclosed as non-retained experts because it finds that neither party would suffer any harm related to the purported improper disclosures. The Seventh Circuit has identified four factors to determine whether failure to comply with Rule 26 is justified or harmless: "(1) the prejudice or surprise to the party against whom the evidence is offered; (2) the ability of the party to cure the prejudice; (3) the likelihood of disruption to the trial; and (4) the bad faith or willfulness involved in not disclosing the evidence at an earlier date." *David v. Caterpillar, Inc.*, 324 F.3d 851, 857 (7th Cir. 2003). Here, none of the factors indicate that either side will suffer any harm: in terms of prejudice, both parties were already on notice that the respective witnesses would be called as fact witnesses, so neither party can claim surprise; each side had the opportunity to depose the witnesses after their respective disclosures as non-retained expert witnesses; each side will have had nearly two years to mull over their respective opinion testimony by the time trial takes place; and there was no bad faith on behalf of either party in offering the prosecuting and defending attorneys to opine on the facts of this case. *Cf. Banister v. Burton*, 636 F.3d 828, 834 (7th Cir. 2011) (no prejudice to complaining party when there was no surprise that expert would testify); *David v. Caterpillar, Inc.*, 324 F.3d 851, 857–58 (7th Cir. 2003) (expert's listing as potential witness nearly year and a half before trial and other such factors indicated harmlessness of improper disclosure). The Court thus sees no reason to exclude

either witness on the basis of a technical foul that both parties may have committed. Instead, the Court will evaluate each witness according to the methodology it has been applying thus far: *Daubert* and Rule 702.

### A. Mr. Brian Sexton

Mr. Sexton, the prosecutor in Plaintiffs' 1998 trials, offers fifteen opinions, which the Court will consider as numbered in Plaintiffs' Motion to exclude his testimony. Doc. 363 at 4–6. These opinions touch on matters related to the relationship between the Chicago Police Department and the State's Attorney's Office (Opinion 1), criminal procedure (Opinions 5, 13, and 15), and evaluations of the evidence from the investigations and trials of Plaintiffs (Opinions 2, 3, 4, 6, 7, 8, 9, 10, 11, 12, 14). Plaintiffs challenge Mr. Sexton's testimony on qualification, reliability, and helpfulness grounds.

### 1. Qualifications and Reliability

In moving to exclude Mr. Sexton's testimony, Plaintiffs challenge his qualifications and reliability in tandem, arguing that because he is not qualified to offer his opinions, they are necessarily the product of an unreliable methodology. Doc. 363 at 12–13. The Court finds that Mr. Sexton is qualified to offer expert testimony. Mr. Sexton has three decades of experience as a prosecutor and an additional five years of experience as a defense attorney. He testified in his expert deposition that he has participated in hundreds of trials over his career, which qualifies him to offer his opinions evaluating evidence, commenting on criminal procedure, and analyzing the inner workings of the prosecution side of Chicago's criminal justice system. This is sufficient for Mr. Sexton to offer expert testimony. *See Kumho Tire Co.*, 526 U.S. at 150.

Plaintiffs nonetheless argue that Mr. Sexton cannot testify to his expertise regarding "the criminal law" since he is not the judge in this case, citing *United States v. Caputo*, 517 F.3d 935,

942 (7th Cir. 2008), and that his experience as a prosecutor does not mean he can opine on how a defense attorney would act when faced with different choices on how to act under certain evidentiary circumstances. While the Court has the ultimate legal say in this matter, that does not prevent Mr. Sexton from offering an expert opinion on matters related to criminal prosecutions, the evaluation of evidence, and other issues relevant to this case. *See Kluppelberg v. Burge*, No. 13 C 3963, 2016 WL 6821138 at *2 (N.D. Ill. Sep. 16, 2016) (allowing former prosecutor to testify about what documents would typically be turned over in *Brady* disclosure). At bottom, Mr. Sexton is not offering an opinion on the law's meaning or how it should apply. *Cf. Caputo*, 517 F.3d at 942 ("The 'expert' would have testified about the meaning of the statute and regulations. That's a subject for the court, not for testimonial experts."). Nonetheless, the Court will ensure that Mr. Sexton does not offer impermissible legal conclusions or unduly tread on the jury's realm as the ultimate decider, and Plaintiffs may make appropriate objections to his testimony at trial.

Nor is the fact that Mr. Sexton's experience primarily derives from his tenure as a prosecutor (rather than a defense attorney) grounds to exclude his opinion on what an "experienced and qualified defense attorney" would do when faced with the decision to use or not use certain impeachment evidence (Opinion 15). As a prosecutor who tried hundreds of cases, Mr. Sexton likely went up against many defense attorneys and observed how they operated under different circumstances. And Mr. Sexton would likely have evaluated his own evidence from the defense's perspective in order to assess its strengths and weaknesses. Although the bulk of his experience tilts to one side of the courtroom, that slant does not mean Mr. Sexton is unqualified to opine on how the other side might choose to use the tools available

to it under adversarial circumstances. Of course, if Plaintiffs wish to discredit Mr. Sexton's testimony on this topic, they may do so through cross-examination. *Gayton*, 593 F.3d at 616.

### 2. Helpfulness to the jury

Plaintiffs primarily argue that Mr. Sexton's testimony will not be helpful to the jury, requiring its exclusion. Plaintiffs advance three arguments, and these arguments overlap with respect to several of Mr. Sexton's opinions. First, Plaintiffs claim that Opinions 2, 3, 7, 8, and 12 "clearly derive from common sense," which is impermissible expert testimony. Doc. 363 at 8. Second, Plaintiffs argue that Mr. Sexton impermissibly does the jury's job for it in Opinions 3, 4, 5, 6, 7, 9, 10, 12, and 14. Lastly, Plaintiffs challenge Opinions 1, 2, and 11 as irrelevant.

### a. Common sense

Plaintiffs start by claiming that Opinions 2, 3, 7, 8, and 12 are derived from mere common sense, and thus do not assist the jury with their analysis of the evidence. But Mr. Sexton's testimony goes beyond "common sense, common experience, the jury's own perceptions, or simple logic." *United States v. Christian*, 673 F.3d 702, 710-11 (7th Cir. 2012). As discussed below, Opinions 2, 3, 7, and 8 are admissible. The Court declines to analyze Opinion 12 on this ground because it is inadmissible for other reasons. The Court starts by addressing Plaintiffs' arguments that challenge Mr. Sexton's testimony writ large before individually analyzing the challenged opinions.

Plaintiffs make much ado of Mr. Sexton's repeated use of the phrase "common sense" to support his analysis during his deposition, claiming that it conclusively demonstrates that his opinions do not go "beyond the understanding of the average person." Doc. 363 at 7 (quoting *Davis v. Duran*, 277 F.R.D. 362, 366 (N.D. Ill. 2011)). Ultimately, it is for nothing. First, most of the times that Plaintiffs complain about Mr. Sexton's invocation of the phrase "common

sense" he accompanies it with a qualifier indicating that he is bringing more than everyday thinking to bear. *See, e.g.*, Doc. 363-2 at 159:2–18 ("*My expert opinion* and it *also* uses common sense as well." (emphasis added)). Moreover, the common sense that Mr. Sexton (coming as he is with decades of courtroom experience) applies to his thinking to the facts of this case is highly likely not to be the same common sense that a lay jury would apply. *See id.* at 38:17–20 ("just . . . *my* common sense" (emphasis added)). The Court declines to blanket-ban the challenged opinions on this ground.

Further, for support, Plaintiffs quote, without analyzing, *United States v. Benson*, 941 F.2d 598 (7th Cir. 1991), and *Hall*, 93 F.3d at 1337. In *Benson*, the expert's testimony "consist[ed] of nothing more than drawing inferences from the evidence that he was no more qualified than the jury to draw." 941 F.2d at 604. Here, Mr. Sexton analyzes the evidence through a prosecutor's lens—going beyond the record to offer something of value for the jury to consider (or disregard, according to the weight they afford his testimony). And in *Hall*, the court reversed the district court's exclusion of a psychological expert who would have explained that defendants sometimes give false confessions under certain circumstances, finding that the expert would have "add[ed] something" to counter a lay jury's perception that all confessions are truthfully given. 93 F.3d at 1343, 1345. Here, Mr. Sexton's expertise adds something—as discussed below, it may counter a jury's perception that gang affiliations predominate personal friendships; that suspects give full accounts of their involvement in crimes when they confess to the police; or that those who have already shot two people in the course of an armed robbery will necessarily attempt to kill all witnesses on the scene to tie up any potential loose ends.

Turning to Plaintiffs' individual challenges of Mr. Sexton's opinions, Opinion 2 says:[12]

---

[12] To assist the reader, where Plaintiffs challenge only certain portions of the proffered opinions, those parts are italicized.

> The double murder at the Elegant Auto car dealership was a gang crime because all 4 criminal defendants admitted to being gang members which is why the criminal case was handled by the Gang Crimes Unit. Even if one of the criminal defendants identified being in a rival gang, they could still be friends.

Doc. 363-1 at 2. Plaintiffs challenge both sentences of this opinion. As previewed above, a jury could believe that gang affiliation determines with whom other gang members would associate (i.e., only members of their own gang) or engage in criminal activity. Mr. Sexton's opinion would counter this belief, adding potential value to the jury's views of the evidence. Further, there is not a commonsense basis for the jury to form a belief of the circumstances under which circumstances the Gang Crimes Unit would be involved in a case. Mr. Sexton's explanation provides such color.

Opinion 3 says:

> The inculpatory statements given by the criminal defendants were given freely and voluntarily and substantially factually accurate even though they contain differences. *There are always going to be some differences. In his experience people do not always want to say everything they were involved in.* In these confessions, all the co-defendants say Johnson had a gun which he showed to them, and Johnson's own statement said the gun was a .38 caliber before the firearms analysis was completed but which later revealed that all the bullets came from one .38 caliber gun.

*Id.* Plaintiffs challenge Mr. Sexton's opinion that, in Plaintiffs' words, "people do not always admit to every aspect of criminal conduct they have been involved in, even while admitting some aspects." Doc. 363 at 8. This Court declines to find that this opinion is primarily common sense. Should the jury credit Defendants' story that the confessions were given voluntarily, this opinion will help explain why discrepancies exist between them despite all deriving from the same circumstances. A jury might expect that co-defendants' stories would all be factually identical—this opinion subverts that expectation.

Opinion 7 says:

> There is insufficient evidence to establish that the perpetrators
> necessarily intended to kill the owners but rather to steal cars.
> *There could be many reasons why only 2 of the occupants of the
> office were shot.*

Doc. 363-1 at 2. Plaintiffs challenge the second sentence of this opinion. As discussed above, a jury might expect that criminals who have already shot two people in the course of an armed robbery will necessarily attempt to kill all witnesses on the scene to tie up any potential loose ends. Mr. Sexton's opinion, as elaborated upon in his expert deposition, *see* Doc. 363-2 at 64:9–73:5 (listing reasons why the homicides did not seem to him like an execution-style killing and explaining that the murders were fundamentally different from execution killings he had prosecuted in the past), counters that expectation.

Opinion 8 says:

> The ability to prosecute the case or truth of the statements by the
> criminal defendants is affected by the lack of fingerprint matches
> to them. *There could be any number of reasons why there was not
> a match, i.e. the car lot was a public lot, it is unclear how long
> prints stay on items.* All of the information went to the jury and
> the issue was for the trier of fact to consider.

Doc. 363-1 at 2. Plaintiffs challenge Mr. Sexton's opinion as common sense that "it is possible for someone to commit a crime and not have any of their fingerprints be recovered from the scene." Doc. 363 at 8. For the reasons discussed above in the analysis of Mr. Black's testimony on this subject, namely that this testimony could dispel the potential belief held by the jury that any contact with a surface will result in a print suitable for comparison, *see Common*, 818 F.3d at 330, the Court declines to find that this is common sense.

### b.    Impermissible legal conclusions

Plaintiffs next argue that Mr. Sexton draws impermissible conclusions in Opinions 3, 4, 5, 6, 7, 9, 10, 12, and 14. An expert cannot "merely tell the jury what result to reach." *United States v. Noel*, 581 F.3d 490, 497 (7th Cir. 2009) (quoting Fed. R. Evid. 704 advisory committee's note to 1972 proposed rules). "An expert who supplies nothing but a bottom line supplies nothing of value to the judicial process." *Id.* (quoting *Mid-State Fertilizer Co. v. Exch. Nat'l Bank of Chi.,* 877 F.2d 1333, 1339 (7th Cir. 1989)). The Court agrees that Opinions 4, 6, 12 and 14 contain impermissible conclusions and thus bars them. The Court finds that Opinions 3 (with limitations), 5, 7, 9, and 10 are admissible.

Opinion 3 is quoted in full above. Plaintiffs contest Mr. Sexton's opinion that "[t]he inculpatory statements given by the criminal defendants were given *freely and voluntarily* and substantially factually accurate even though they contain differences." Doc. 363 at 9 (quoting Doc. 363-1 at 2) (emphasis added). Defendants appear to recognize the problem with this proffered opinion, indicating that they will not seek to have Sexton testify that Plaintiffs' confessions "were given freely and voluntarily." Doc. 370 at 13. That acknowledgment is wise since that opinion goes to the core issues of this case, which are reserved for the jury to decide. Defendants instead argue that Mr. Sexton should be able to "opine . . . that based on his experience, the evidence proffered by Plaintiffs about their confessions, juxtaposed against the totality of the evidence, did not change his perception that the confessions were voluntary." *Id*. This line of testimony would provide more than just "a bottom line" to the jury because it would provide insight about why Mr. Sexton still believed the confessions were valid despite the factual discrepancies between them—this could clear up potential jury confusion because jurors might expect that suspects confessing to the same crime would have identical stories. *Cf. Common*,

818 F.3d at 330 (expert testimony admissible to help dispel commonly-held-yet-inaccurate lay belief). Thus, Mr. Sexton may offer his opinion about the commonality between the differences among Plaintiffs' confessions and how that does not necessarily mean the confessions are invalid or coerced but may not say that Plaintiffs' confessions "were given freely and voluntarily . . . ." Doc. 363-1 at 2.

Opinion 4 states:

> All of the evidence and information establishes that the validity of Johnson's handwritten statement, that Larod Styles was present with Johnson and participated in the double murder at the Elegant Auto lot, and that Lashawn Ezell and Troshawn McCoy were also involved and participated in the double murder on the accountability theory.

*Id.* The Court agrees that this opinion does not assist the jury, but rather concludes for them that Plaintiffs are guilty of the original crimes. Although Defendants argue that Mr. Sexton "will not testify . . . that Plaintiffs are guilty or that their confessions are true" but instead will testify "to his assessment of the evidence . . . and how that assessment impacted his decision-making throughout the prosecutions," Doc. 370 at 13–14, that is really an overarching description of the kind of expert testimony Mr. Sexton is giving in this case. Although Mr. Sexton's prosecutor's-eye opinion will assist the jury, it is unhelpful when, as here, he simply opines that Plaintiffs were—and still are—guilty. *See Noel*, 581 F.3d at 497 (an expert cannot "merely tell the jury what result to reach").

Opinion 5 says:

> The lineups were appropriate and conducted properly in a legal sense even though all 4 suspects were included because 2 (McCoy and Ezell) were not described by and could not be identified by the eyewitnesses. Only the 2 (Johnson and Styles) were seen so McCoy and Ezell were essentially fillers.

Doc. 363-1 at 2.  Plaintiffs argue that this opinion, among others, is "simply a product of Mr. Sexton's own evaluation of the evidence . . . which is the same task the jury must undertake for itself at trial."  Doc. 363 at 10–11.  The Court disagrees—the jury will hear for itself how the lineup was composed and hear other expert testimony on the subject (for example, Mr. McCrary's testimony on the lineup composition).  Mr. Sexton will bring his own experience as a prosecutor who has dealt with many of these lineups to bear, allowing the jury to hear different perspectives on the propriety of the suspect lineup.

> Opinion 6 says:
>
> > There is no evidence that the Pontiac Oldsmobile found running at 2417 W. 70th Street and printed was related to these double murders.

Doc. 363-1 at 2.  This is improper expert testimony because the jury itself is perfectly capable of deciding whether there is or is not evidence regarding the Pontiac Oldsmobile.  *See Noel*, 581 F.3d at 497 ("An expert who supplies nothing but a bottom line supplies nothing of value to the judicial process.").  Mr. Sexton's opinion does not "help the [jury] to understand the evidence or determine a fact in issue."  Fed. R. Evid. 702(a).  Defendants argue that Plaintiffs merely offer a generalized assertion that this opinion is inadmissible and that Mr. Sexton's opinion will help the jury "understand the evidence and determine facts in issue."  Doc. 370 at 14.  But Mr. Sexton does not even try to help the jury understand the evidence—he denies its very existence. The Court excludes this opinion.

Opinion 7 is quoted in full above.  The Court finds this opinion helpful and will admit it. Mr. Sexton here is offering his perspective as a prosecutor that the evidence is insufficient to prove that the murders were a targeted execution rather than the byproduct of a robbery gone wrong.  *See* Doc. 363-2 at 64:9–66:17.  This opinion does not draw an impermissible conclusion

for the jury, but rather gives it additional information to consider when weighing the circumstances surrounding the killings.

Opinion 9 reads:

> The match of prints to Davion Allen and the cars recovered close to his house does not mean he was involved in the double murder. There are too many unresolved questions that would require a new investigation to determine where he was at the time and whether he went to the car lot to buy a car.

Doc. 363-1 at 2. The Court disagrees that this opinion intrudes on the jury's role as decisionmaker. Mr. Sexton offers his opinion as a seasoned prosecutor that the existence of fingerprint evidence concerning a potential suspect in the murders is insufficient to prove that the suspect was definitively involved in the murders. This will assist the jury to assess Plaintiffs' arguments that Mr. Allen committed this crime. It does not tell the jury how to decide that issue.

Opinion 10 says:

> The confessions were not the most significant evidence against the criminal defendants because of the totality of the evidence including the eyewitness identifications, testimony of Ali Ali, Hudley, and Tadros, and Johnson's failed alibi defense.

*Id.* The Court will allow this opinion. Mr. Sexton does not draw a conclusion for the jury, he simply offers his opinion as a prosecutor that other evidence in the case (1) existed and (2) had significant weight. Whether the jury gives Mr. Sexton's opinion any weight of its own is up to them, however this opinion does not impermissibly dictate a result for them.

Opinion 12 says:

> Johnson's claimed alibi does not verify where he was because his girlfriend had him leaving after getting the pizza to get pop at the liquor store where he just happens to run into Larod Styles and came back. The story does not make sense and his girlfriend simply claiming he didn't commit the murders is not a strong alibi particularly in light of Johnson's confession and the testimony of the pizza deliver guy which contradicted Johnson's story.

*Id.* at 3. The Court will exclude the second sentence of this opinion. Defendants provide a

generalized defense to Plaintiffs' "generalized assertion" that Opinion 12 draws an

impermissible conclusion, arguing that Mr. Sexton will help the jury "understand the evidence

and determine facts in issue." Doc. 370 at 14. But it will be the jury's role, not Mr. Sexton's, to

determine whether Johnson's alibi "makes sense." Although Mr. Sexton's evaluation of what

the evidence shows with respect to Johnson's story lends the jury the prosecutor's perspective, it

does not do so by providing a careful, tailored assessment of how he evaluated the evidence as a

prosecutor—it simply discredits it. *See* Doc. 363-1 at 3 (opining that Johnson's "story does not

make sense"). However, the first sentence provides the jury with a more tempered assessment of

the facts, and is admissible because it does not draw the jury's conclusions for it.

Opinion 14 says:

> The evidence establishes that the 4 criminal defendants are guilty
> and not actually innocent even though they have certificates of
> innocence. It was reasonable for the State's Attorney's Office to
> agree to the post-conviction petition and grant a new trial due to
> the new fingerprint evidence. However, considering all of the
> evidence, there should have been new trials and there was no basis
> to agree to or award the certificates of innocence. For example, in
> addition to eyewitness testimony and identifications, the
> defendants tried to get around their own confessions including the
> court reported statements and the stories were make-believe, i.e.
> Johnson never confessed and Alesia wrote it out and made him
> sign it by covering the confession with his hand. It goes beyond
> claiming he was forced to sign to claim that he never said it in the
> first place, with Alesia covering the statement and Johnson just
> blindly signing the confession, which does not comport with his
> experience as a Felony Review ASA and his experience with
> Alesia. Johnson also identified the caliber of the weapon in his
> confession. Johnson's alleged alibi was destroyed by the pizza
> delivery guy who explained on the stand that Johnson's mother
> came to see him but couldn't tell him what kind of pants Johnson
> was wearing or the tip he was given, contradicted the description
> of pants Johnson's girlfriend gave at trial, and that the man he
> delivered the pizza to was taller than Johnson. Someone else's

> fingerprints were identified but it was a public car lot. No DNA
> was found and no one else has confessed with corroboration.
> Johnson's girlfriend tried to provide information consistent with
> Johnson's alleged alibi but the timing was different. Johnson's
> alibi defied common sense that he ordered a pizza and instead of
> eating it when it was delivered, he decided to go get pop when he
> just happened to run into Styles and then came back. Johnson's
> girlfriend also claimed she got the pizza receipt out of the garbage
> but it was in pristine condition. The judge did not find Johnson's
> claims credible.

*Id.* This opinion is inadmissible for substantially the same reasons that Opinions 4 and 12 are

inadmissible. Although Mr. Sexton offers additional commentary in this opinion, it is essentially

an omnibus opinion restating earlier opinions and providing a wordier weighing of the evidence

and drawing conclusions from it. And it does not require an expert to point out that the judge in

the original case did not credit Johnson's alibi.

### c. Relevance

Finally, Plaintiffs challenge Opinions 1, 2, and 11 as irrelevant to issues in this case. The

inquiry is whether Mr. Sexton's opinions "will help the trier of fact to understand the evidence or

to determine a fact in issue." Fed. R. Evid. 702. The Court finds that Opinions 1 and 2 are

relevant, but that Opinion 11 is not unless Plaintiffs place its subject-matter at issue.

Opinion 1 says:

> In his experience, the relationship between the State's Attorney's
> Office's Felony Review Unit and police is professional.

Doc. 363-1 at 2. Plaintiffs argue that this is irrelevant to whether Alesia conspired with the other

defendants to generate false confessions from Plaintiffs. But Mr. Sexton's opinion adds

evidence in favor of an opposite finding—that based on his experience the police and State's

Attorney's Office would not work in tandem to commit such an act. Now, the jury may give Mr.

Sexton's opinion very little weight or it may decide that his opinion overcomes any evidence

Plaintiffs' bring to the contrary—that is not up to the Court to decide. Because this opinion could assist the jury with this determination, it is relevant for the purposes of the Court's inquiry.

Opinion 2 is quoted above. Plaintiffs challenge Mr. Sexton's opinion that the crime was a gang crime (thus involving the Gang Crime Unit) as not "of any relevance to the issues to be decided by the jury in this civil case." Doc. 363 at 12. But that is all Plaintiffs offer—they do not link it to a specific issue or do anything more than gesture at relevance and claim the opinion must be barred. Moreover, the Court agrees with Defendants that Mr. Sexton's testimony on the gang-nature of the crime could be used to rebut arguments that Plaintiffs make related to their innocence. *See* Doc. 370 at 10. If Plaintiffs still believe Mr. Sexton's opinion is irrelevant when he offers it from the stand, they may challenge it then.

Opinion 11 reads:

> Seeking the death penalty was warranted in this case because Johnson went into the office and said: "this guy is still alive" and shoots him in the head, the crime resulted in 2 dead bodies and felony murder.

Doc. 363-1 at 3. Plaintiffs argue that Opinion 11 should be barred because whether seeking the death penalty was justified is not at issue in the case. The Court agrees that whether Mr. Sexton believes the evidence warranted the death penalty in this case is irrelevant. So long as Plaintiffs do not raise the issue and challenge the State's decision to pursue the death penalty at trial, the jury will have no need to deliberate on the subject. Although Defendants' point is well-taken that Mr. Sexton's opinion "will rebut any implication that Defendants participated in or influenced that decision [to pursue the death penalty,]" Doc. 370 at 15, that rebuttal is unnecessary until and unless Plaintiffs first raise the issue.

To summarize the analysis of the challenge to Mr. Sexton's expert testimony, Mr. Sexton may not offer Opinions 4, 6, 12, and 14. Mr. Sexton may also not offer the first sentence of

72

Opinion 3 but may testify as to the remainder of that opinion. He is further restricted from offering Opinion 11 unless Plaintiffs first raise the issue of the State's decision to pursue the death penalty.

### B.    Mr. Brent Stratton

Mr. Stratton represented Johnson in his 1998 criminal trial. Plaintiffs initially called him as a fact witness, and he was deposed on May 3 and 17, 2021, in that capacity. Plaintiffs then disclosed Mr. Stratton as a rebuttal witness to Mr. Sexton on July 25, 2022, and he was deposed for a third time in his expert capacity on August 15, 2022. Mr. Stratton offers eleven rebuttal opinions to Mr. Sexton's disclosed opinions. *See* Doc. 357-4 at 2–6.

Before reaching Defendants' substantive challenges, the Court must address whether its decisions on Mr. Sexton's testimony require excluding any of Mr. Stratton's opinions as well— because Mr. Stratton is testifying as a rebuttal expert to Mr. Sexton, he may only respond to Mr. Sexton's opinions. *See Peals v. Terre Haute Police Dep't*, 535 F.3d 621, 630 (7th Cir. 2008) ("The proper function of rebuttal evidence is to contradict, impeach or defuse the impact of the evidence offered by an adverse party."). Thus, based on the Court's exclusion of certain of Mr. Sexton's opinions above, the Court excludes (as numbered in Doc. 357-4) Mr. Stratton's Opinions 2, 3, 8, and 11,[13] because the Court has now excluded the opinions they would have rebutted. The Court will consider only Opinions 1, 4, 5, 6, 7, 9, and 10 in its analysis.

As a preliminary matter, the Court finds that Mr. Stratton has expert qualifications (although Defendants do not challenge them). Mr. Stratton worked in private practice for twenty

---

[13] These opinions essentially say that (2) Mr. Sexton is wrong that Plaintiffs' confessions were given freely and voluntarily, (3) Mr. Sexton is wrong when he says that "all of the evidence and information establishes" that Johnson's handwritten statement was valid, (8) Mr. Sexton's analysis of Johnson's alibi is incorrect, and (11) Mr. Sexton is wrong that the evidence shows that Plaintiffs are guilty. Doc. 357-4 at 3–6.

years between 1985 to 2005 where he focused on criminal defense and served as Johnson's defense attorney. Since 2005 he has served in the Office of the Illinois Attorney General and is currently the Chief Deputy Attorney General.

Defendants frame their challenges to Mr. Stratton's opinions in two ways. First, Defendants challenge Opinions 4 and 7, 9, and 10 on grounds that they are improperly based on credibility determinations. Second, they challenge Opinions 1, 4, 5, 7, and 10 as lacking foundation. This Court will consider the challenges to these opinions in this order.

### 1. Credibility determinations

Defendants argue that Mr. Stratton impermissibly accepts Plaintiffs' versions of events over the Defendants' versions to draw his conclusions for Opinions 4, 7, 9, and 10. Defendants argue that Mr. Stratton bases his opinions "on his personal belief that Plaintiffs are innocent, which constitutes an impermissible credibility determination." Doc. 357 at 12. For support, they cite to a moment in Mr. Stratton's expert deposition where he expresses the belief that Johnson is innocent because "he professed his innocence, he professed the fact that he did not do it, that he was not there . . . and that therefore any information in the statement that connected him to these offenses did not come from him, it came from the police." Doc. 357-6 at 42:19–44:2; *see also* Doc. 357 at 12. Defendants also cite to *Jimenez*, 732 F.3d 710, and *Andersen*, 454 F. Supp. 3d 808, to support their argument that experts may not form their opinions on such a basis.

The Court notes that the quoted language from Mr. Stratton's testimony comes from a line of questioning related to Opinion 2, which the Court has already excluded. He grounds his other opinions on other information. For example, when asked a question about his opinion about the eyewitness testimony in the criminal case (related to Opinion 4), Mr. Stratton discussed how it was strange that Mr. Tadros could not identify Plaintiffs during a police lineup less than

two days after the murders but could then identify them two years later in open court. *See* Doc. 357-6 at 76:12-20.

Moreover, nowhere in Mr. Stratton's summary of facts and opinions does he indicate that his opinions are predicated solely on the fact that he credits Plaintiffs' stories over the perspective offered by Defendants. True, Mr. Stratton says that he believes that Johnson and the other Plaintiffs are innocent—but it would be surprising if the original defense attorney, who believed at the time of trial that his client was innocent, thought otherwise. *See id.* at 41:8–18 (describing his "general recollection from 25 years ago" about his belief that Defendants coerced Plaintiffs' confessions). Experts are allowed to consider disputed facts in forming their opinions, *see Andersen*, 454 F. Supp. 3d at 814 ("[An expert] may rely on disputed facts to reach his opinions, as long as there is evidence to support such facts."), which Mr. Stratton does here.

Nor do the cases Defendants cite compel this Court to bar Mr. Stratton's testimony. *Jimenez* reminds expert witnesses that they cannot "tell the jury whether to believe what any witnesses" say during the trial. 732 F.3d at 723. But as noted Mr. Stratton has more support for his opinions than a blind faith in Plaintiffs' story, so they do not simply cajole the jury to take Plaintiffs' side. Nor does Mr. Stratton offer the (inappropriate) opinion that Plaintiffs are more credible than Defendants. *See Andersen*, 454 F. Supp. 3d at 816 (excluding expert testimony that compared witnesses' credibility). He confines his opinions to his views of the evidence through the lens of a defense attorney involved in the case as rebuttal to the lead prosecutor. Mr. Stratton's testimony is based on permissible grounds, and so the Court will not exclude Opinions 4, 7, 9, and 10 on the basis that Mr. Stratton makes impermissible credibility determinations.

### 2. Foundation

Defendants next argue that the Court should strike Opinions 1, 4, 5, 7, and 10 on the basis that Mr. Stratton "lacks foundation to opine beyond Plaintiff Johnson's case" because he "represented only Johnson during the criminal proceedings" and "admits that he has no knowledge of any facts . . . related to Styles, Ezell, or McCoy's criminal cases." Doc. 357 at 13. Defendants cite several deficiencies in Mr. Stratton's memory as well as several cases that Defendants say require the Court to limit Mr. Stratton's testimony to opinions he draws based on facts he learned from "his ground-level involvement in the events giving rise to the litigation." Doc. 357 at 13 (quoting *Downey*, 633 F.3d at 6).

The Court first notes that, although the cases Defendants cite clearly indicate that a non-retained expert may only testify as to facts learned during the expert's involvement in the events underlying the case, *see, e.g.*, *Downey*, 633 F.3d at 7 ("Consequently, where, as here, the expert is part of the ongoing sequence of events and arrives at his causation opinion during treatment, his opinion testimony is not that of a retained or specially employed expert."), nowhere do their cases indicate that the expert must have perfect recall of the facts on which they rely to offer those opinions. So long as Mr. Stratton offers a factual basis grounded in his experience as Johnson's defense attorney to support his opinions, and there is no indication that Mr. Stratton relied on information learned after his participation in the case concluded, the opinion will stand. *Cf. Banister* 636 F.3d at 834 (allowing treating physician to testify as to effects of injury as non-retained expert when physician had already offered similar testimony at earlier criminal trial).

Opinion 1 states:

> The State's theory that the Elegant Auto robbery and murders was a gang crime perpetrated by Charles Johnson, Larod Styles, LaShawn Ezell and Troshawn McCoy never made any sense. Based on my experience working on criminal cases in Chicago and

> my review of the evidence in the Elegant Auto case, it did not
> make sense that the four plaintiffs, who the State alleged were
> members of more than one gang, would join together to commit
> serious violent felonies. While Mr. Sexton might be correct that
> individuals from rival gangs "could still be friends," that would not
> translate into those individuals joining together to commit serious
> violent felonies. Moreover, the evidence in this case established
> that McCoy was not friends with Johnson, Styles or Ezell at the
> time of the crime.

Doc. 357-4 at 3. Defendants claim that Mr. Stratton cannot recall details about Plaintiffs' gang

affiliation and request that the opinion be struck on that basis as lacking foundation. *See* Doc.

357 at 13–14 (citing Doc. 357-6 at 174:17–175:21). But nothing in Mr. Stratton's opinion

indicates that he bases this opinion on information he learned after his participation in the

criminal case had concluded, and Mr. Stratton testified (again, within the range Defendants cite

in their briefs to support their position, but conveniently omitted from their quote) that he

recalled "not believ[ing] that there was sufficient credible evidence" that Johnson was a gang

member and that "the evidence that the State had of that was slim at best." *Id.* at 175:5–10. This

is enough to support this rebuttal opinion and render it admissible.

Opinion 4 reads:

> Mr. Sexton is incorrect that "[t]he lineups were appropriate and
> conducted properly in a legal sense" even though they included all
> four suspects, and that McCoy and Ezell were essentially fillers
> because only Johnson and Styles were seen by the eyewitnesses.
> Each of the lineups included at most one true filler (and one was
> likely comprised of all suspects). A line-up in which four or five
> of the five total participants are suspects is essentially a multiple
> choice test with no wrong answer. According to the statements
> attributed to the Plaintiffs, Styles and Johnson committed the
> murders in the Elegant Auto office, while McCoy and Ezell waited
> in the car. But even taking those statements as true, *all four* were
> suspected of some involvement. If one of the eyewitnesses had
> identified McCoy or Ezell as a perpetrator in the Elegant Auto
> office, police could not and would not have dismissed such an
> identification as an error; the detectives would likely have
> theorized that McCoy and Ezell were more involved than their

> statements indicated. None of the four persons suspected of
> involvement in the murders can be considered a lineup filler.

Doc. 357-4 at 3–4. Defendants again argue that this opinion should be excluded because Mr.

Stratton cannot recall "what the evidence showed regarding the lineups, or whether the lineups

were legally deficient." Doc. 357 at 14 (parentheticals omitted). And again, a review of Mr.

Stratton's testimony indicates that he has sufficient recall to rebut Mr. Sexton's opinion about the

lineup evidence—he spoke at length about shortcomings with Mr. Tadros' purported

identification of Johnson in a police lineup conducted shortly after the murders, noting that

"there was no report indicating that [Mr. Tadros] could identify Mr. Johnson or any of the other

defendants that he viewed in the lineup." Doc. 357-6 at 74:3–6. This shows that Mr. Stratton

plausibly forms this rebuttal opinion on the basis of facts obtained during his involvement in the

criminal case rather than learning them from Plaintiffs' counsel. Opinion 4 is admissible.

Opinion 5 states:

> I disagree with Mr. Sexton's opinion regarding the totality of the
> evidence as to the perpetrators' motive. I disagree with Sexton's
> statement that "[t]here is insufficient evidence to establish that the
> perpetrators necessarily intended to kill the owners," since the
> perpetrators did shoot and kill the owners, and there is no evidence
> suggesting they did so accidentally. The shootings instead
> suggested execution-style murders, which the detectives failed to
> adequately investigate. To that point, the accounts given by the
> surviving eyewitnesses do not indicate that shooting the two car lot
> owners was a necessary step towards achieving the goal of stealing
> cars (e.g., to overcome physical resistance from the owners, or to
> obtain compliance from other occupants of the office in helping the
> perpetrators gain access to the car keys). A perpetrator with the
> primary goal of stealing cars might well choose to shoot and kill
> individuals present at the car lot for the purpose of eliminating
> potential eyewitnesses who could implicate them in the crime, but
> shooting only two of the four eyewitnesses makes no sense at all,
> since that leaves two witnesses available to identify and testify
> against the alleged perpetrators. Therefore, while it is impossible
> to eliminate other scenarios with absolute certainty, the totality of
> the evidence strongly suggests that the perpetrators had the

> primary and independent objective of murdering the two car lot
> owners, and the theft of the cars was either a secondary goal or an
> attempt at a cover narrative to deflect from the true motive.
> Moreover, the deposition testimony in this case provided by former
> car lot employee Frank Neira, in which he describes threats the
> owners received prior to their deaths, supports the idea of an
> execution-style murder.

Doc. 357-4 at 5. Defendants argue that Mr. "Stratton lacks foundation to testify as to the actions

of any of the Defendant detectives (he does not remember who the detectives were or how any

were involved)." Doc. 357 at 14. But this opinion does not require Mr. Stratton to recall the

identity of the detectives—his recollection is that "the detectives failed to adequately investigate"

the execution theory. Doc. 357-6 at 105:18–106:5. The opinion is proper because it rebuts Mr.

Sexton's opinion that the murders were *not* execution-style killings. *See* Doc. 363-1 at 2.

However, Mr. Stratton cannot support his opinion with the deposition testimony of Frank

Neira, which he learned about after his involvement in the criminal case concluded. *See* Doc.

357-6 at 108:9–111:16. The Court thus strikes the opinion's last sentence and bars Mr. Stratton

from testifying about how Mr. Neira's deposition supports it. *See Downey*, 633 F.3d at 7.

Opinion 7 reads:

> Relatedly, I disagree with Mr. Sexton's opinion downplaying the
> significance of Davion Allen's fingerprints. I have been advised
> that Mr. Allen was the only individual whose fingerprints were
> recovered both from the car lot and from the area where the stolen
> cars were recovered. Moreover, Mr. Allen's fingerprints were
> recovered from the sticky side of a sticker that had been peeled off
> one of the stolen cars; they were not just found generally in the
> vicinity of the stolen cars. There is no plausible scenario that
> would explain the presence of Mr. Allen's fingerprints in both
> locations *other* than that he was one of the perpetrators in the
> robbery and murders. If I had had this fingerprint evidence
> available to me at the time of the original criminal trial, I would
> have made it a central argument of my defense that Davion Allen
> was the real perpetrator of the crimes. Moreover, I would have had
> the opportunity to engage in additional investigation targeted
> towards Mr. Allen, including – as I have been advised – his family

> ties to known car thieves—e.g., his relationship to his brother
> James Allen.
>
> I disagree with Mr. Sexton that the confessions were not the most
> significant piece of evidence against the Plaintiffs in their criminal
> cases. Without the confessions, the cases were exceptionally thin,
> with no physical evidence tying the Plaintiffs to the crime scene,
> wholly unreliable eyewitness identifications, no compelling
> evidence of motive and a fundamental scenario (McCoy
> committing the crime together with Johnson, Styles, and Ezell) that
> made no sense. From my perspective as lead trial counsel, it was
> evident that the confession evidence was devastating to our case
> and that the Plaintiffs would not have been convicted without it.

Doc. 357-4 at 5–6. Defendants argue that Mr. Stratton lacks foundation to offer this opinion

because he cannot recall "the circumstances surrounding the eyewitness identifications [or] what

the evidence showed regarding the lineups." Doc. 357 at 14 (parentheticals omitted). But again,

Mr. Stratton does not need to have perfect recall of all the circumstances or evidence to form the

opinion that "the cases were exceptionally thin" and that "as lead trial counsel, it was evident

that the confession evidence was devastating to our case." Doc. 357-4 at 5–6. And, as already

discussed, Mr. Stratton in fact has sufficient memory of enough circumstances surrounding the

eyewitness identification and lineups to offer an opinion about the strength of that evidence.

As an exercise of its discretion, *see United States v. Kapp*, 419 F.3d 666, 677 (7th Cir.

2005) ("The district court has broad discretion to determine admissibility of evidence[.]"), the

Court will permit Mr. Stratton to comment on how this evidence would have impacted how he

presented his case at trial—that opinion about how he would have reacted under such different

evidentiary circumstances relies only on his knowledge obtained during his involvement in the

case and his expertise. But it cannot allow him to comment on what conclusions about another's

involvement in the murders must be drawn from it (such as saying "[t]here is no plausible

scenario that would explain the presence of Mr. Allen's fingerprints in both locations *other* than

80

that he was one of the perpetrators in the robbery and murders." Doc. 357-4 at 6.). He could not have formed such an opinion based on his involvement as Johnson's defense attorney because he only later learned of this information and the conclusions he now draws about that evidence do not directly bear on his trial strategy. *See Downey*, 633 F.3d at 7. Accordingly, the Court strikes the following from Opinion 7: "I have been advised that Mr. Allen was the only individual whose fingerprints were recovered both from the car lot and from the area where the stolen cars were recovered. Moreover, Mr. Allen's fingerprints were recovered from the sticky side of a sticker that had been peeled off one of the stolen cars; they were not just found generally in the vicinity of the stolen cars. There is no plausible scenario that would explain the presence of Mr. Allen's fingerprints in both locations *other* than that he was one of the perpetrators in the robbery and murders." Doc. 357-4 at 5-6.

Opinion 10 states:

> Regarding the contempt proceedings against Andrew Hudley, I cannot speak to Mr. Sexton's general practice and experience in other cases, but I was not made aware in this case of any contempt proceedings against Hudley. Regardless of my standing as a defense attorney to participate in such proceedings, information about those proceedings was clearly important *Brady* evidence going to the credibility and testimonial motivations of the witness, and I should have been made aware of them. This is particularly true given that Andrew Hudley only identified Mr. Johnson at the time of trial, and after he had been threatened with contempt *and* received benefits from the State's Attorney. As the trial prosecutor, Mr. Sexton is not in a position to testify about the propriety of his own actions. I have been advised that the Illinois Appellate Court has on multiple occasions reversed convictions because of Mr. Sexton's improper trial conduct.

Doc. 357-4 at 6-7. Defendants argue that Mr. Stratton lacks foundation to offer this opinion because he cannot recall "the circumstances surrounding the eyewitness identifications, what the evidence shows regarding the lineups, . . . or Plaintiffs' claims against Defendants' in this case."

81

Doc. 357 at 14 (parentheticals omitted). As already noted, Mr. Stratton does not require perfect recollection or knowledge to opine on whether failing to disclose certain information creates a *Brady* violation, which is essentially the opinion he offers here. Moreover, similar to Opinion 7, Mr. Stratton here is commenting on how this evidence would have impacted his strategy at trial and what he may have done in response to new information. The Court invokes its discretion and permits this testimony for the reasons discussed above. *See Kapp*, 419 F.3d at 677.

However, Mr. Stratton cannot testify that he has "been advised that the Illinois Appellate Court has on multiple occasions reversed convictions because of Mr. Sexton's improper trial conduct." Doc. 357-4 at 6–7. Mr. Stratton did not develop this information or opinion during his participation in the events underlying this case. *See* Doc. 357-6 at 147:19–148:11. If Plaintiffs wish to broach this topic, they may do so when cross-examining Mr. Sexton. *See Gayton*, 593 F.3d at 616.[14]

For the foregoing reasons, Mr. Stratton cannot offer Opinions 2, 3, 8, and 11. Mr. Stratton may offer Opinions 5, 7, and 10 subject to the limitations discussed above, and subject to them being relevant to rebut Mr. Sexton's opinions. Mr. Stratton may offer Opinions 1, 4, 6, and 9 subject to them being relevant to rebut Mr. Sexton's opinions.

## CONCLUSION

For the above reasons, the Court grants Plaintiffs' motion to exclude Mr. Buckley's testimony [361]. The Court grants in part and denies in part the parties' motions to exclude experts Mr. Stratton, Mr. Black, Mr. Sexton, Dr. Wixted, Mr. McCrary, and Dr. Malloy [357, 358, 363, 364, 367, and 368]. The Court denies Defendants' motion to exclude Dr. Cutler [362].

---

[14] As a final note, the Court observes that Mr. Stratton's opinions are offered in direct rebuttal to opinions that Mr. Sexton will offer in his expert capacity. Their relevance will thus depend on the opinions that Mr. Sexton offers at trial.

The Court encourages counsel to carefully review this Opinion to ensure their expert witnesses testify consistent with the Court's rulings.


Dated: August 16, 2023

SARA L. ELLIS
United States District Judge