**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | | |
|---|---|---|---|
| LASHAWN EZELL | | ) | Case No. 18 CV 01049 |
| | Plaintiff, | ) | |
| | | ) | Judge Sara L. Ellis |
| v. | | ) | |
| | | ) | |
| CITY OF CHICAGO, et al., | | ) | |
| | | ) | |
| | Defendants. | ) | |
| LAROD STYLES | | ) | Case No. 18 CV 01053 |
| | Plaintiff, | ) | |
| v. | | ) | Consolidated with Ezell v. City |
| | | ) | |
| CITY OF CHICAGO, et al., | | ) | 18 CV 1049 |
| | Defendants. | ) | |
| CHARLES JOHNSON | | ) | Case No. 18 CV 01062 |
| | Plaintiff, | ) | |
| v. | | ) | Consolidated with Ezell v. City |
| | | ) | |
| CITY OF CHICAGO, et al., | | ) | 18 CV 1049 |
| | Defendants. | ) | |

**BRIEF OF PLAINTIFFS EZELL, STYLES, AND JOHNSON IN OPPOSITION TO
DEFENDANT ALESIA'S MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................ii-iii

INTRODUCTION ...................................................................................................1

FACTUAL SUMMARY ..........................................................................................2

I.     Alesia's role as a felony review ASA included an array of investigative tasks.................2

II.    Alesia works alongside the Defendant Officers to coerce and fabricate false confessions from Plaintiffs. ...................................................................................................3

      A.     Alesia is briefed by Detective Cassidy and is fully apprised of the status of the police investigation. ..........................................................................................3

      B.     Alesia assists Cassidy with obtaining a coerced confession from McCoy ............4

      C.     Alesia coerces confessions from Ezell and Styles .................................................5

      D.     Alesia fabricates a confession which he tricks Johnson into signing ....................6

      E.     Alesia ignores the inconsistencies between the statements and the evidence, and fails to pursue additional leads after fabricating the confessions. ..........................7

III.     The police conduct unreliable and highly suggestive line-ups. .........................................8

IV.     Alesia causes Plaintiffs to be charged and prosecuted for the Elegant Auto murders, and commits perjury during their criminal proceedings. ........................................................8

STANDARD OF REVIEW........................................................................................9

ARGUMENT..............................................................................................................9

I.     Defendant Alesia is Not Entitled to Absolute Immunity....................................................9

      A.     Probable cause does not render Defendant Alesia's actions prosecutorial in nature, nor does it automatically trigger absolute immunity................................10

      B.     Probable cause did not exist to arrest and charge Plaintiffs Styles, Ezell, and Johnson with the Elegant Auto murders. ...........................................................16

II.     Defendant Alesia is not entitled to qualified immunity for failure to intervene..............20

CONCLUSION..........................................................................................................21

# TABLE OF AUTHORITIES

## CASES

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ................................................................9

*Brown v. City of Chicago*, 633 F. Supp. 3d 1122 (N.D. Ill. 2022) ........................................12, 15

*Buckley v. Fitzsimmons*, 509 U.S. 259 (1993) .......................................................................9, 10

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). ..........................................................................9

*Chatman v. City of Chicago,* No. 14-cv-2945, 2015 WL 1090965 (N.D. Ill. Mar. 10, 2015) ......20

*Fields v. Wharrie*, 672 F.3d 505 (7th Cir. 2012) ........................................................................9

*Forrester v. White*, 484 U.S. 219 (1988)) ..................................................................................9

*Genzler v. Longanbach*, 410 F.3d 630 (9th Cir. 2005) ..............................................................10

*Gray v. City of Chicago*, No. 18-cv-2624, 2022 WL 910601 (N.D. Ill. Mar. 29, 2022) .. 14, 19, 20

*Harris v. City of Chicago,* 15-cv-3859, 2015 WL 5445012 (N.D. Ill. Sept. 15, 2015) ...............20

*Hill v. Coppleson*, 627 F.3d 601 (7th Cir. 2010) ....................................................................9, 12

*Hope v. Pelzer*, 536 U.S. 730 (2002) ........................................................................................20

*Hunt v. Jaglowski*, 926 F.2d 689 (7th Cir. 1991) ................................................................11, 12

*Lewis v. Mills*, 677 F.3d 324 (7th Cir. 2012) .................................................................. 13, 14, 15

*Patrick v. City of Chicago,* 14-cv-3658, 2014 WL 7204501 (N.D. Ill. Dec. 17, 2014) ...............20

*Patrick v. City of Chicago*, 213 F. Supp. 3d 1033 (N.D. Ill. 2016) ................................. 15, 17, 18

*Resendiz v. City of Chicago,* 2017 WL 11569364 (N.D. Ill. Aug. 10, 2017) .............................20

*Rivera v. Lake County,* 974 F. Supp. 2d 1179 (N.D. Ill. 2013) ..................................................20

*Runyon v. Applied Extrusion Tech*, 619 F.3d 735 (7th Cir. 2010) ..............................................12

*Smith v. Burge*, No. 16-cv-3404, 2016 WL 6948387 (N.D. Ill. Nov. 28, 2016) ........................20

*Starks v. City of Waukegan*, 123 F. Supp. 1036 (N.D. Ill. 2015)) ..............................................18

*Stinson v. Gauger*, 799 F.3d 833 (7th Cir. 2015) ......................................................................10

*Taylor v. Anderson*, 1989 WL 152585 (N.D. Ill. 1989) .............................................................11

*Taylor v. Riojas*, 141 S. Ct. 52 (2020) .......................................................................20

*Whitlock v. Brueggemann*, 682 F.3d 567 (7th Cir. 2012) ...................................13, 20

*Yang v. Hardin*, 37 F.3d 282 (7th Cir. 1994)................................................................20

*Young v. City of Chicago*, 987 F.3d 641 (7th Cir. 2021) .....................................16, 17

## INTRODUCTION

Viewed in the light most favorable to Plaintiffs Ezell, Styles, and Johnson[1], the summary judgment record reveals an egregious miscarriage of justice. Three innocent teenagers who had absolutely nothing to do with the Elegant Auto murders and who were tricked into giving confessions that were coerced or fabricated (or both) by agents of the state, were as a result prosecuted, convicted, and sent to prison for decades for heinous crimes they did not commit. One common thread in the injustice suffered by each of the three Plaintiffs is the central involvement of Defendant Joseph Alesia, a felony review Assistant State's Attorney who on December 5 and the early morning hours of December 6, 1995 spent more than 12 hours working shoulder-to-shoulder with the Chicago Police detectives[2] assigned to the Elegant Auto investigation.

Alesia does not dispute that, construed in Plaintiffs' favor, the summary judgment record reveals his personal involvement in a litany of egregious, unconstitutional misconduct. Nor—with the exception of a single one of Plaintiffs' legal claims—does he dispute that the law proscribing this unconstitutional misconduct was clearly established in 1995 such that he would be entitled to qualified immunity. His sole challenges at summary judgment are his argument that, no matter how egregious his misconduct, his role as a prosecutor entitles him to absolute immunity, and his invocation of qualified immunity on the claim that he had an obligation to intervene to stop constitutional violations being committed before his very eyes by his confederates in the Chicago Police Department—simply because he had a different job title.

---

[1] "Plaintiffs" as used in this brief refers solely to Ezell, Styles, and Johnson, since their co-Plaintiff Troshawn McCoy does not assert claims against Defendant Alesia.

[2] The liability of the Defendant Officers and City of Chicago is addressed in Plaintiffs' separate summary judgment response briefing.

Alesia's arguments lack merit, and he is not entitled to summary judgment on absolute immunity, or on qualified immunity for failure to intervene. Courts in this district routinely allow claims against felony review ASAs to proceed to trial where the record reveals that the prosecutor was acting alongside police in an investigative capacity, regardless of any claimed existence of probable cause. Moreover, the record properly construed in Plaintiffs' favor shows that there was never probable cause to suspect Plaintiffs of any involvement in the Elegant Auto murders. All the purported evidence against them was the product of police and prosecutorial misconduct in which Alesia was deeply enmeshed, and no reasonable prosecutor watching the events unfold at Area One as Alesia did would believe anything other than that Ezell, Styles and Johnson were being railroaded into a prosecution for crimes they had nothing to do with.

As for qualified immunity, Alesia seeks a free pass for failing to speak up and stop conduct that he knew full well was unconstitutional, simply because his co-conspirators were police and not prosecutors. But the underlying illegality of their conduct was clearly established, and a central purpose of Alesia's role as a felony review ASA was to serve as a safeguard against overzealous or unethical police officers and ensure that only criminal charges supported by legitimate evidence would move forward into the criminal legal system. It was obvious to Alesia in 1995 that he was supposed to step in and stop blatant constitutional violations committed by the police, and his invocation of qualified immunity fails.

## FACTUAL SUMMARY

### I. Alesia's role as a felony review ASA included an array of investigative tasks

As a felony review ASA, Alesia had a wide array of responsibilities to "help the police in their investigation." JSOF[3] ¶93. He was expected to interview witnesses. *Id.* He was expected to

---

[3] Plaintiffs cite to the Joint Statement of Undisputed Material Facts, Dkt. 460, as "JSOF," and to their separately filed Statement of Disputed Material Facts as "PSOF".

participate in questioning suspects in an investigation, and then to reduce those suspects' statements to writing. *Id.* If a suspect's statement was going to be in the form of a handwritten statement rather than a court-reported statement, Alesia had the responsibility of creating the handwritten statement. *Id.* When creating a handwritten statement, Alesia had the responsibility to decide what went in that written statement. PSOF ¶59.

Even though Alesia's duties in a case might eventually include testifying at trial or motions hearings when called as a witness, his focus while working in the felony review unit was on his investigative responsibilities, and he was not thinking forward to potential future courtroom testimony. JSOF ¶93; PSOF ¶60.

One of Alesia's duties as a felony review ASA was to guard against confessions which had been obtained through improper police interrogation tactics. PSOF ¶58. He had an obligation to make sure that the rights of suspects and witnesses were protected and that any statements were given voluntarily. JSOF ¶93.

## II. Alesia works alongside the Defendant Officers to coerce and fabricate false confessions from Plaintiffs.

### A. Alesia is briefed by Detective Cassidy and is fully apprised of the status of the police investigation.

When Alesia first arrived at the detective area within the Area One police station at around 3:15pm on December 5, 1995, he had a lengthy conversation with Detective Cassidy about the Elegant Auto murder investigation. JSOF ¶22, 94; PSOF ¶1. Cassidy gave Alesia a detailed rundown of what was going on in the case, including a summary of everything police knew at that time. JSOF ¶95; PSOF ¶1. Cassidy also gave Alesia the case file and all of the available police reports, which Alesia reviewed. JSOF ¶¶27-28; PSOF ¶2.

Alesia wanted to be fully informed about the status of the investigation, and did everything he could to learn as much as he could about what police had done so far in the case.

3

PSOF ¶4. As part of this effort, Alesia personally interviewed witnesses in the case, including the two men who had been inside the Elegant Auto office at the time of the shooting, Ali Ali and Frank Neira. PSOF ¶3. Over the course of Alesia's work on the Elegant Auto investigation while at Area One on December 5, he spoke to all the detectives who were there working on the case. JSOF ¶96.

### B. Alesia assists Cassidy with obtaining a coerced confession from McCoy

Troshawn McCoy first came to the attention of police in connection with the Elegant Auto murders as the result of an anonymous tip. JSOF ¶14. The tip was documented in police notes reflecting information that a man named "Rosown," "Rashawn" or "Rashaun" had been involved in the murders, and which suggested that police had called around multiple high schools until they located someone with a similar-sounding name. PSOF ¶¶5-6. Alesia read these notes along with the other documents in the police file upon his arrival at area one. JSOF ¶¶27-28; PSOF ¶1. This uncorroborated and ambiguous anonymous tip did not provide probable cause to arrest McCoy. JSOF ¶79, 82.

Prior to Alesia's arrival at Area One, Cassidy and other detectives working on the case used threats and false promises of leniency to coerce McCoy to agree to give a statement implicating himself and others in the Elegant Auto murders. PSOF ¶¶7-10. The narrative in McCoy's statement was manufactured and fed to him by Cassidy, with the exception that McCoy provided the names of Ezell, Styles and Johnson—rivals of McCoy with whom he had physically fought—to fill in the roles of the perpetrators in Cassidy's narrative. JSOF ¶75; PSOF ¶¶7-10.

After Alesia's arrival, Alesia and Cassidy worked together to convince McCoy to memorialize this statement in writing. JSOF ¶29; PSOF ¶¶11-14. As part of this effort, Alesia told McCoy that if he gave a statement, he would get to go home. PSOF ¶14. Alesia purposefully failed to document his conversation with McCoy at this time. PSOF ¶11. Ultimately, Alesia and

Cassidy were able to get McCoy to agree to make a court-reported statement memorializing Cassidy's narrative. PSOF ¶¶8-14; JSOF ¶32. There is a three-and-a-half hour window of time between the time Alesia finished speaking with McCoy and the time of McCoy's court reported statement, which Alesia cannot account for. PSOF ¶15.

### C. Alesia coerces confessions from Ezell and Styles

Ezell, Styles, and Johnson were arrested shortly after 5pm on December 5, 1995, and brought to Area One. JSOF ¶¶35-37. The statement from McCoy was the only evidence police could rely on to provide probable cause to arrest Ezell, Styles, and Johnson. JSOF ¶84.

Alesia and Coughlin spoke with Ezell together at approximately 9pm. JSOF ¶49. Coughlin introduced Alesia to Ezell as "the man I want you to talk to." PSOF ¶17. Neither Coughlin nor Alesia read Ezell his Miranda rights at this time. PSOF ¶17. With Alesia watching, Coughlin told Ezell that his grandmother was downstairs, and that all he needed to do was tell Alesia "the story", and Ezell was going to be free to go. PSOF ¶18. In response to that prompt, Ezell regurgitated a seven or eight bullet point narrative which Coughlin had fed to Ezell during a previous phase of the interrogation. PSOF ¶18. Alesia wrote these seven or eight bullet points down on a legal pad, then left with Coughlin. PSOF ¶18.

Approximately 40 minutes later, Alesia and Coughlin came back, and Alesia handed Ezell a copy of a six-page handwritten statement Alesia had written out, containing far more information and detail than the seven or eight bullet points that Alesia had written down on his legal pad. PSOF ¶19. Alesia told Ezell that these were his "release papers" which he needed to sign. PSOF ¶19.

Later that evening at around 11:30pm, Alesia interrogated Styles with Bloore and Youth Officer Terrell. JSOF ¶57. Styles subsequently gave a court-reported statement to Alesia implicating himself and McCoy, Ezell and Johnson in the Elegant Auto murders. JSOF ¶60.

5

When Alesia returned with a copy of the transcript of the statement to sign, Alesia told Styles "your grandma's outside, sign this paper, you're going home." PSOF ¶22. Styles told Alesia before he signed the transcript that he did not commit the crime. PSOF ¶22.

### D. Alesia fabricates a confession which he tricks Johnson into signing

Before interrogating Charles Johnson, Alesia learned from the detectives about Johnson's alibi for the night of the murder, and learned that Johnson had been in lineups and that no witness had picked him out. PSOF ¶23 Alesia first spoke with Johnson in the company of another ASA. PSOF ¶24. Then, at approximately 1:30am, Alesia returned with Valadez and interrogated Johnson. PSOF ¶25. At this time, Alesia knew that Johnson had not implicated himself in any way in the crime. PSOF ¶26. Alesia took the lead during that interrogation, asking the majority of the questions, although he purposefully failed to take notes or otherwise document this interrogation. PSOF ¶27 . Johnson repeatedly told Alesia that he had nothing to do with the Elegant Auto murders and that he was with his girlfriend at the time of the crime. PSOF ¶27.

Alesia and Valadez uncuffed Johnson, told him to sleep, and left. PSOF ¶28. They returned sometime later, woke Johnson, and escorted him to an office down the hall. PSOF ¶28. Alesia sat down next to Johnson and looked over the papers he was holding which, unbeknownst to Johnson, contained a written statement falsely confessing Johnson's guilt for the double murder. PSOF ¶29. Alesia had written out this statement, attributed to Johnson, sometime before 4 a.m. on December 6. PSOF ¶30. To trick Johnson into signing this confession, Alesia first asked Johnson about the color of his car, then made a change in the text of the statement related to the car color, and told Johnson to initial it. PSOF ¶31. Johnson could not read what the paper Alesia was holding said, and Alesia kept his hand on the paper to conceal it. PSOF ¶31. Next, Alesia showed Johnson a series of photographs, including of Johnson's car, of McCoy, Ezell and

Styles, and of the victims of the crime. PSOF ¶32. Alesia asked Johnson to identify what each photo depicted, and then instructed him to sign a page of the fabricated confession, still concealed from Johnson's view, telling Johnson his signature was just to indicate that what he was saying about the photographs was true. PSOF ¶32.

Alesia did not read the statement to Johnson while Johnson was signing his name, nor could Johnson read it. PSOF ¶34. Johnson signed the statement not knowing that he was signing a false confession. PSOF ¶33-34. When Alesia read the confession back to Johnson, Johnson interrupted Alesia to tell him that what Alesia was reading was not true and was not what happened. PSOF ¶35. Alesia told Johnson not to interrupt him, stopped reading the statement, and left the room. PSOF ¶35. Johnson tried to grab the statement from Alesia, but Alesia walked out with it. PSOF ¶35. The "confession" which Johnson ultimately signed was written by Alesia and contained words which Johnson never spoke to Alesia, to Valadez, or to anyone else at the police station—it was completely "made up" by Alesia. PSOF ¶36.

### E. Alesia ignores the inconsistencies between the statements and the evidence, and fails to pursue additional leads after fabricating the confessions.

Alesia knew at the time that each Plaintiff signed their false confessions that the statements did not match the evidence in the case. For example, the statements all asserted that cars had been stolen from the auto lot where the murders occurred but specified incorrect locations for the stolen cars; in fact, the cars had been dumped at 79th and Ingleside. PSOF ¶37. Alesia also never instructed the detectives on the case to follow up on key evidence in the purported statements, including by failing to ask them to search for the murder weapon at the location where Johnson's statement asserted it had been discarded. PSOF ¶38. Alesia ignored other inconsistencies between the statements themselves, between the statements and eyewitness accounts, and between the statements and the objective evidence in the case. PSOF ¶39-41.

### III.    The police conduct unreliable and highly suggestive line-ups.

At the time of the shooting, Ali Ali could not see the faces of or identify the perpetrators of the double murder. PSOF ¶44. Before coming down to Area One to view line-ups on December 5, 1995, Ali Ali had been told by police that the perpetrators had already been arrested, and that he was going to be shown a line-up with the perpetrators in it to see if he could pick them out. PSOF ¶45. However, Ali Ali could not make any identification the first time he saw the line-up he was shown. PSOF ¶¶53-55. He was only able to make any identification after being shown the same line-up a second time, and after police got the line-up participants to repeat a phrase similar to one that the perpetrators had uttered during the shooting. PSOF ¶56. The line-ups viewed by Ali Ali and other witnesses that night contained either 4 or 5 suspects, and either 0 or at most 1 "filler" in them. PSOF ¶¶46-49. All these factors made the lineups highly suggestive and unreliable. PSOF ¶¶46-49, 56.

The police documentation of the line-ups is also highly suspect, with a notable lack of contemporaneous documentation, as well as some documentation of purported identifications that are demonstrably false. PSOF ¶¶51-52, 55-57.

### IV.    Alesia causes Plaintiffs to be charged and prosecuted for the Elegant Auto murders, and commits perjury during their criminal proceedings.

Based on the coerced and fabricated confessions, Alesia recommended felony charges against Plaintiffs, which were ultimately approved by his supervisor. JSOF ¶¶72, 74; PSOF ¶42-43. Alesia had not made the determination to recommend charges against Plaintiffs at the time of McCoy's statement, and it was important to Alesia to get statements from each of them. PSOF ¶42. Alesia does not know if he would have been successful in getting charges against each Plaintiff approved without an inculpatory statement from each Plaintiff. PSOF ¶43.

Alesia testified in the criminal proceedings against each of the Plaintiffs, and committed perjury when he did so, lying about the circumstances of how he obtained their statements to conceal his coercion and fabrication. PSOF ¶61-64.

## STANDARD OF REVIEW

On summary judgment, the moving party bears the initial burden of showing no genuine dispute of material facts. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Credibility determinations are for the jury, and all reasonable inferences must be drawn in the non-movant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## ARGUMENT

### I.      Defendant Alesia is Not Entitled to Absolute Immunity

Defendant Alesia's principal argument is that absolute immunity shields him from liability on all of Plaintiffs' claims. A prosecutor "seeking absolute immunity bears the burden of showing that such immunity is justified for the function in question." *Buckley v. Fitzsimmons*, 509 U.S. 259, 269 (1993) (internal quotations and citations omitted). The Supreme Court has "been 'quite sparing' in recognizing absolute immunity for state actors" in the Section 1983 context. *Id.* (quoting *Forrester v. White*, 484 U.S. 219, 224 (1988)).

Prosecutors are "absolutely immune from suit for all actions and decisions undertaken in furtherance of [their] prosecutorial duties," and whether an action qualifies as "prosecutorial" is a functional test, not a formal one. *Fields v. Wharrie*, 672 F.3d 505, 510 (7th Cir. 2012); *Buckley*, 509 U.S. at 277. Typically, a prosecutor's actions will fall within one of two buckets: those of an advocate that are "intimately associated with the judicial phase of the criminal process," and those of an investigator. *Hill v. Coppleson*, 627 F.3d 601, 605 (7th Cir. 2010) (internal quotation marks and citations omitted); *Buckley*, 509 U.S. at 270. The former enjoys absolute immunity; the latter does not.

9

Alesia falls far short of carrying his heavy burden of demonstrating his entitlement to absolute immunity for his police-like investigative acts of interrogating Plaintiffs, as well as coercing and fabricating their confessions. Given the dispute of fact as to whether Alesia acted as an investigator during Plaintiffs' interrogations—not just evaluating evidence, but intimately involved in creating it, at times out of thin air—he is not entitled to absolute immunity.

### A.  Probable cause does not render Defendant Alesia's actions prosecutorial in nature, nor does it automatically trigger absolute immunity.

Alesia argues that because there was probable cause to arrest Plaintiffs, absolute immunity shields all of his actions after that point. Specifically, Defendant asserts that McCoy's confession, implicating Ezell, Styles, and Johnson, provided probable cause to arrest them, thereby rendering all his actions thereafter prosecutorial. Even if McCoy's confession provided probable cause to arrest the three Plaintiffs—which it did not, *infra* at Section I(B)—this argument misstates the law and oversimplifies the holistic and fact-bound analysis required for applying absolute immunity.

Indeed, the Supreme Court rejected Alesia's exact argument in *Buckley*, finding that "a determination of probable cause does not guarantee a prosecutor absolute immunity from liability for all actions taken afterwards." 509 U.S. at 274 n.5. Rather, "[e]ven after that determination . . . a prosecutor may engage in 'police investigative work' that is entitled to only qualified immunity." *Id.* In other words, probable cause does not erect an absolute-immunity-barrier for all a prosecutor's actions taken after it is established. *See also Stinson v. Gauger*, 799 F.3d 833, 840 (7th Cir. 2015), *aff'd on these grounds*, 868 F.3d 516 (7th Cir. 2017) ("[e]ven after probable cause exists, a prosecutor might continue acting as an investigator, in which case absolute immunity remains inapplicable"); *Genzler v. Longanbach*, 410 F.3d 630, 637-38 (9th Cir. 2005) (noting that the Supreme Court has rejected the approach that "once probable cause is

present, or once an arrest has been made, a prosecutor assumes an advocacy-related role and enjoys absolute immunity").

The question thus becomes: Did Alesia engage in investigative work even after McCoy's statement had been obtained, *i.e.* the time Alesia claims probable cause was established as to Ezell, Styles, and Johnson? Given Alesia's lengthy presence at Area One, working side-by-side with the Defendant police officers and directly participating in composing, coercing, and fabricating Plaintiffs' confessions, the answer is a resounding yes. This is not surprising, since Alesia admitted that one of his duties as a felony review ASA was to "help the police in their investigation" and to question witnesses and suspects. JSOF ¶ 93.

To begin, it is undisputed that the police contacted Alesia and Alesia arrived at the police department and had an extensive debrief about the investigation with Defendant Cassidy in the afternoon of December 5, 1995, well *before* Plaintiffs Styles, Ezell, and Johnson's interrogations and confessions took place and *before* Cassidy extracted a written confession from McCoy. Alesia does not dispute that McCoy was the only suspect in custody when he began working on the case, and that Alesia did not speak with the other plaintiffs until almost six hours after his arrival at the police department—during which time Alesia was deeply embedded in the police investigation, reviewing reports, interviewing witnesses, and speaking to every single one of the police detectives working on the case. JSOF ¶¶93-96, PSOF ¶¶1-4. This starkly contrasts with *Hunt v. Jaglowski*, 926 F.2d 689, 693 (7th Cir. 1991), in which the plaintiff did not interact with the prosecutor until after he had confessed and agreed to provide a statement.[4]

---

[4] *Hunt* was decided on an appeal from the granting of a motion for a directed verdict. 926 F.2d at 689. Defendant therefore cannot rely on this case to argue that summary judgment should be denied, given that the plaintiff in *Hunt* proceeded to trial. *See Taylor v. Anderson*, 1989 WL 152585 (N.D. Ill. 1989) (declining to apply a factually similar case involving a directed verdict in the summary judgment posture, because "summary judgment is granted without a full blown presentation of evidence and sometimes without full discovery," such that "slight doubt as to the facts may make judgment inappropriate at the

The timing of Alesia's initial contact with Plaintiffs is critical because a prosecutor's contact with a suspect while the investigation is ongoing is highly probative evidence that the prosecutor was *part* of the investigation. Contact solely after the investigation has concluded, by contrast, is often consistent with a finding that a prosecutor was engaged in routine prosecutorial functions, like evaluating a confession, memorializing it, or recommending charges. *See Hunt*, 926 F.2d at 693 (noting that defendant prosecutor was not present during the investigation or allegedly coerced confession of plaintiff, and that his absence during this phase suggests he was acting in a prosecutorial capacity in seeking review of charges); *Hill*, 627 F.3d at 605 (disputed fact question as to whether prosecutor interacted with suspect before or after he arrived at police station precluded finding of absolute immunity). Alesia arrived at Area One hours before three of the four suspects had confessed, or even been arrested. When Alesia went in to speak with Styles and Johnson, he believed that neither of them had made an inculpatory statement or wished to make one. PSOF ¶¶21,23-27 . This weighs strongly in favor of finding that he acted as an investigator during their interrogations. *See Brown v. City of Chicago*, 633 F. Supp. 3d 1122, 1153 (N.D. Ill. 2022) (distinguishing between a felony review ASA who verifies a confession that suspect had agreed to give—who could receive absolute immunity—and one who interviews a suspect who had not made an inculpatory statement—who is not immune).

Most significantly, after conducting his initial investigation of the case working hand in hand with Cassidy, throughout the evening of December 5th and into the early morning of December 6th, Alesia participated directly in crafting the false factual narratives for Plaintiffs to

---

summary judgment stage," and "[b]ecause the parties have not had an opportunity to fully develop their cases, courts typically resolve these doubts in favor of letting the case go to trial.") *See also Runyon v. Applied Extrusion Tech*, 619 F.3d 735, 739 (7th Cir. 2010) (rejecting argument that directed verdict was error in case where summary judgment had been denied, because plaintiff "had a chance to present his full case-in-chief at the trial").

adopt, and ultimately was intimately involved with coercing and fabricating those confessions, including the process of reducing them to writing and tricking Plaintiffs into signing them. Participating in the taking of a confession is prototypically investigatory in nature; coercing or fabricating a confession contravenes a prosecutor's core functions and nullifies absolute immunity. *See Lewis v. Mills*, 677 F.3d 324, 331 (7th Cir. 2012) ("a showing that a prosecutor investigated and fabricated evidence against a target would automatically defeat absolute prosecutorial immunity"); *Whitlock v. Brueggemann*, 682 F.3d 567, 579 (7th Cir. 2012) (prosecutor was not entitled to absolute immunity given evidence in record that he manufactured false evidence against suspect).

The facts, construed in Plaintiffs favor, plainly demonstrate Alesia was engaged in investigative and not prosecutorial conduct, and therefore not entitled to absolute immunity. When Alesia first spoke with Styles, he believed he had not made an inculpatory statement. PSOF ¶21. Alesia participated in the interrogation of Styles, and Alesia used plainly unconstitutional tactics to secure Styles' signature on the false confession, covering it with his hand and tricking Styles to sign it by stating: "Your grandma's outside. Sign this paper. You're going home." PSOF ¶¶21-22.

As for Ezell, Alesia interviewed him alongside Coughlin, and Alesia was in the room when Coughlin told Ezell that he simply needed to tell Alesia the "story" that they had gone over together and Ezell would be released to his grandmother, who was waiting for him downstairs. PSOF ¶¶17-19. Alesia then recorded on his legal pad a short, seven or eight sentence narrative that Coughlin had fed to Ezell and which Ezell regurgitated to Alesia—which Alesia then expanded on his own and outside of Ezell's presence into a fully fleshed-out, six-page

handwritten statement that Alesia had written himself. PSOF ¶¶18-19. Alesia falsely assured Ezell that these were his "release papers" and had him sign each page. PSOF ¶19.

As for Johnson, Alesia went in to interrogate Johnson with the knowledge that he had not made an inculpatory statement and had provided an alibi. Alesia not only participated in questioning him for hours, but—supported by Valadez—he took the lead during the interrogation sessions. PSOF ¶¶23-36. During Alesia's serial interrogations of Johnson in the early morning hours of December 6, Johnson repeatedly told Alesia he had nothing to do with the Elegant Auto murders and that he was with his girlfriend at the time. PSOF ¶¶23-27. Eventually, apparently growing tired of Johnson's repeated assertions of his innocence, Alesia drafted a false confession for Johnson to sign outside of Johnson's presence. PSOF ¶¶29-30. After creating this confession out of thin air—the words which Alesia attributed to Johnson had never been spoken by Johnson that night, voluntarily or otherwise, PSOF ¶36—Alesia returned to Johnson's interrogation room with Valadez and tricked Johnson into signing the statement by covering the page and leading him to believe he was simply acknowledging that he knew Ezell, Styles and McCoy. PSOF ¶¶29-36.

Alesia's actions during the interrogations of Styles, Ezell, and Johnson bear no resemblance to core prosecutorial functions, and clearly fall on the investigative side of the line. The participation in the interrogations alone is enough to find Alesia acted as an investigator. *Gray v. City of Chicago*, No. 18-cv-2624, 2022 WL 910601, at *15 (N.D. Ill. Mar. 29, 2022) (defendant prosecutor's actions were investigatory where "[f]irst and foremost, [he] was present in all four interrogations" of the plaintiff). But coercing or tricking an individual into signing a fabricated confession by presenting them as release papers, as Alesia did with all three plaintiffs, unquestionably defeats absolute immunity. *Lewis*, 677 F.3d at 331. Further, composing a written

14

statement that does not reflect anything said by the individual, as Alesia did with Plaintiffs Ezell and Johnson, is again outside of and entirely inconsistent with proper prosecutorial conduct. *See Brown*, 633 F. Supp. at 1153 (rejecting absolute immunity where prosecutor gave handwritten statement for plaintiff to sign because prosecutor "did not verify the confession—he manufactured it"); *Patrick v. City of Chicago*, 213 F. Supp. 3d 1033, 1051 (N.D. Ill. 2016).

The facts at issue in this case mirror those of *Patrick v. City of Chicago*, in which the court rejected the ASAs' invocation of absolute immunity. There, a teenager falsely confessed to a double homicide and implicated six other individuals in the crime, all of whom later signed false inculpatory statements. The defendant prosecutors argued that probable cause, based on the first individual's confession, triggered absolute immunity for all their actions thereafter, which they claimed were limited to memorializing the co-defendants' confessions. The court did not agree. It reasoned that a jury could infer the ASAs participated in the coercive interrogations, fabricated confessions, and reduced those confessions to writing, actions that were "incompatible with probable cause and the performance of core prosecutorial functions." *Patrick*, 213 F. Supp. 3d at 1051. Critically, the prosecutors' claim that probable cause existed prior to their involvement in the interrogations did not shield their later actions, even if they had "initially and honestly believed probable cause existed." *Id.* at 1057.

So too, here. Given Alesia's presence at the police station prior to Plaintiffs' confessions and his participation in their interrogations and role in composing, coercing, and fabricating those confessions, he is unable to shield his misconduct with the cloak of absolute immunity. *See Lewis*, 677 F.3d at 331. Just as in *Patrick*, *even if* Alesia initially and honestly believed McCoy's confession gave rise to probable cause (which, as discussed below, would require construing the summary judgment record in Alesia's favor, not in Plaintiffs' favor), it does not render his

15

actions prosecutorial in nature. Because Alesia's actions were plainly investigatory, absolute immunity does not apply to shield his misconduct, and Alesia's motion must be denied.

**B.     Probable cause did not exist to arrest and charge Plaintiffs Styles, Ezell, and Johnson with the Elegant Auto murders.**

Even accepting the incorrect premise that the existence of probable cause serves as a bright-line determinate of absolute immunity, there was no probable cause to arrest and charge Plaintiffs with the Elegant Auto murders. Probable cause exists where "an officer or a court has enough information to warrant a prudent person to believe criminal conduct has occurred," based on all the information known to the officer at the time. *Young v. City of Chicago*, 987 F.3d 641, 644 (7th Cir. 2021).

Defendant Alesia argues that McCoy's confession provided probable cause for suspecting Plaintiffs' involvement in the Elegant Auto murders. In his telling, McCoy's confession "corroborated the anonymous tip Defendant Cassidy received earlier that day" and "established the probable cause to arrest McCoy and the Plaintiffs." Dkt. 456 at 12. The problem with this argument is that Alesia is attempting to derive probable cause from a coerced and false confession (and from a tip that even Cassidy admitted was unreliable and provided no probable cause, *see* Dkt. 463, ¶31). Alesia acknowledges that there was no probable cause to arrest McCoy when he was initially brought to Area One, JSOF ¶82, and the facts regarding the circumstances of McCoy's confession are hotly disputed, PSOF ¶¶7-14. Plaintiffs maintain that Detective Cassidy manufactured the details of McCoy's confession and coerced him into adopting it by promising that he could go home if he did—a promise that Alesia repeated. PSOF ¶¶7-14. Plaintiffs also maintain that Cassidy and Alesia were partners and collaborators during the investigation, including while McCoy's confession was coerced.  JSOF ¶¶ 22-34 (detailing

16

Alesia's conversations with Cassidy about the investigation and their joint interrogation of McCoy); PSOF ¶¶7-14.

Crucially, "an officer may not close his eyes to facts that would clarify the situation and defeat probable cause." *Young*, 987 F.3d at 645 (internal quotation marks and citations omitted). Construing the record in Plaintiffs' favor, Alesia was on notice that McCoy's confession was, at best, shaky and unreliable. Alesia had multiple interactions with McCoy, and was in and out of the interrogation room, supporting the inference that Alesia was not duped by Cassidy into thinking this was a legitimate interrogation, but was working with Cassidy to craft the false narrative to feed to McCoy. PSOF ¶¶7-14. Indeed, revealing not only his knowledge of, but active participation in, the coercive circumstances of McCoy's interrogation, Alesia told McCoy that after he gave his statement, he would be allowed to go home. PSOF ¶14. It strains credulity to accept that Alesia was (as the summary judgment record reveals, and as Alesia does not dispute) intimately involved as a willing co-conspirator with multiple police officers in coercing and fabricating statements from Styles, Ezell, and Johnson—but somehow entirely in the dark and unaware of the exact same misconduct being committed by a sub-set of the same band of officers with regard to McCoy, and is certainly not supported by the facts (and reasonable inferences therefrom) construed in Plaintiffs favor.

Because the facts are disputed as to whether Alesia was aware, at least to some degree, of the unreliable basis of McCoy's initial status as a police suspect and the unreliable and coercive circumstances of McCoy's confession, PSOF ¶¶1-14, and then actively participated in memorializing that confession (including through the use of coercive tactics), PSOF ¶¶7-14, Alesia cannot rely on this confession as furnishing probable cause to arrest and charge Plaintiffs. *See Patrick*, 213 F. Supp. at 1056 ("the confessions [of the co-defendants] themselves do not

necessarily establish probable cause" where the "circumstances surrounding [the initial] confession . . . are far from clear"); *Gray*, 2022 WL 910601, at *9 (denying summary judgment for prosecutor defendant on wrongful detention claim where the "probable cause argument rests almost entirely on disputed facts").

Moreover, probable cause is not a fixed determination that remains static after an individual is arrested; it evolves as the case progresses. *See Patrick*, 213 F. Supp. 3d at 1056 (citing *Starks v. City of Waukegan*, 123 F. Supp. 1036, 1061 (N.D. Ill. 2015)). Thus, the proper time for determining whether probable cause exists in this context is when the charging documents are filed, not during an individual's interrogation. *Id.* at 1056-57. As a result, the Court must look to the entire investigation, up until the point of charging, to determine whether probable cause existed, and in turn, whether absolute immunity applies. Alesia himself acknowledged the point during his deposition: his probable cause determination appropriately came at the end of the night after he had interacted with all of the Plaintiffs. PSOF ¶42. In this regard, Alesia's subsequent involvement in manufacturing false evidence against Ezell, Styles and Johnson weighs strongly against any finding that there was legitimate probable cause at the time Alesia approved charges against them.

Indeed, looking to the investigation as a whole, there are myriad facts undermining probable cause to charge Plaintiffs:

- Alesia tricked Styles into signing his statement by presenting them as release papers and promising he would be released to his grandmother if he signed them. PSOF ¶22.

- Prior to signing the statement, Styles told Alesia he did not commit the crime. PSOF ¶22.

- Detective Coughlin falsely promised, in front of Alesia, that Ezell would be free to go if he told the story to Alesia. PSOF ¶18.

- Ezell provided Alesia seven or eight bullet points that he had memorized, while Coughlin gestured for him to keep going, which Alesia then converted into a full-blown, multi-page written confession outside of Ezell's presence. PSOF ¶¶18-19.

- Alesia tricked Ezell into signing his statement by presenting them as release papers that he could sign and then go home. PSOF ¶19.

- Johnson provided Alesia with his alibi during his interrogations, which Alesia ignored. PSOF ¶23-27.

- When Johnson refused to confess to the crime, Alesia drafted a false inculpatory statement for him outside the interrogation room. PSOF ¶¶28-30

- Alesia tricked Johnson into signing the statement by covering it with his hand and asking Johnson to sign his initials to indicate he recognized photographs of the Ezell, Styles and McCoy. PSOF¶¶30-34

- When Alesia began reading the false confession aloud, Johnson told him it was not true and tried to grab it from him. PSOF¶35.

- Alesia knew that the statements did not match the physical evidence in the case, in particular the location of Johnson's car and the vehicles purportedly stolen from the car lot. PSOF ¶¶37, 39

- Alesia knew that the statements conflicted with the eyewitness accounts. PSOF ¶40.

- Alesia knew that the statements conflicted with each other, PSOF ¶41.

In light of all the information known to Alesia at the time he approved charges, as enumerated above, probable cause did not exist such that a prudent person would have believed Plaintiffs had committed the murders.[5] Accordingly, there was no probable cause to recommend felony charges for Plaintiffs such that even if probable cause were determinative as to absolute immunity, there is no immunity for Alesia's misconduct and his motion must be denied.

---

[5] Defendant Alesia asserts that he evaluated Plaintiffs' confessions, in addition to the anonymous tip and lineup identifications, before recommending felony charges to his supervisor, Dkt. 459 at 18, but he does not explicitly argue that the lineup factored into his probable cause determination. Even if he were to make such an argument, it would be unpersuasive given the disputed facts as to the legitimacy and reliability of the identifications during the lineup. *Gray*, 2022 WL 910601, at *9 (finding no probable cause where validity of lineup was in question). PSOF¶¶44-57

**II.     Defendant Alesia is not entitled to qualified immunity for failure to intervene.**

Defendant Alesia argues briefly that he is entitled to qualified immunity on Plaintiffs'

failure to intervene claim because it was not clearly established that prosecutors had a duty to

intervene at the time of the alleged misconduct. This argument misrepresents Alesia's role in

Plaintiffs' interrogations as an advocate for the state. As discussed above, Alesia acted in an

investigatory capacity during his interactions with Plaintiffs, alongside police officers, and is

therefore subject to the same rules as police officers. *See Whitlock*, 682 F.3d at 580. And, as of

1994, police officers were on notice that they had a duty to intervene to prevent constitutional

violations per the Seventh Circuit's ruling in *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994).

Following these principles, numerous courts in this district have denied qualified

immunity to prosecutors and allowed failure to intervene claims against them to proceed. *See

e.g.*, *Gray*, 2022 WL 910601, at *16; *Resendiz v. City of Chicago*, 2017 WL 11569364, at *2

(N.D. Ill. Aug. 10, 2017); *Rivera v. Lake County*, 974 F. Supp. 2d 1179, 1191 (N.D. Ill. 2013);

*Chatman v. City of Chicago*, No. 14-cv-2945, 2015 WL 1090965, at *10 (N.D. Ill. Mar. 10,

2015); *Smith v. Burge*, No. 16-cv-3404, 2016 WL 6948387, at *10 (N.D. Ill. Nov. 28, 2016);

*Harris v. City of Chicago*, 15-cv-3859, 2015 WL 5445012, at *4 (N.D. Ill. Sept. 15, 2015);

*Patrick v. City of Chicago*, 14-cv-3658, 2014 WL 7204501, at *10 (N.D. Ill. Dec. 17, 2014).

Additionally, a plaintiff need not show that case law clearly establishes the constitutional

violation at issue where that violation is obvious. *Hope v. Pelzer*, 536 U.S. 730, 739, 741 (2002)

("officials can still be on notice that their conduct violates established law even in novel factual

circumstances"); *Taylor v. Riojas*, 141 S. Ct. 52, 53-54 (2020) (denying qualified immunity to

defendant who housed plaintiff in abjectly unsanitary conditions, despite lack of on-point case

that doing so was unconstitutional). It is obvious that a prosecutor who witnesses a coercive

interrogation, in which officers are fabricating evidence, feeding facts to suspects, and falsely

20

promising that they will be released if they confess, has a constitutional duty to intervene and stop the interrogation. Indeed, the entire purpose of Alesia's role as a felony review ASA was to serve as a check on overzealous or unscrupulous police officers and ensure that serious criminal charges were in fact supported by probable cause. PSOF ¶58. It is not credible for Alesia to argue that a felony review ASA in 1995 would be unaware of an obligation to step-in and prevent constitutional violations by police from tainting a criminal investigation and ultimately a criminal prosecution.

The record abounds with evidence that Alesia knew Plaintiffs' confessions were false, stood alongside police officers who were playing an active role in fabricating and coercing this false evidence, and could have prevented these violations had he acted. PSOF ¶¶1-41. Whether Alesia failed to intervene during to prevent constitutional violations committed by the police is therefore a question that must be left to the jury, rather than decided prematurely based on a meritless invocation of qualified immunity.

## CONCLUSION

The summary judgment record demonstrates persuasively that Alesia was intimately involved in an investigative capacity with the police investigation of the Elegant Auto murders, categorically defeating his invocation of absolute immunity. Given that involvement, the existence of probable cause to charge Plaintiffs with the murders is irrelevant. But in any event, the facts known to Alesia at the time of his involvement, including information learned from police and from Alesia's direct participation in a litany of abusive, coercive, and deceptive misconduct defeat a finding of probable cause. Alesia also cannot invoke qualified immunity to evade liability for failing to intervene to prevent constitutional violations committed by police when his own job duties expressly obliged him to do so. Alesia's motion for summary judgment must be denied.

RESPECTFULLY SUBMITTED

Plaintiffs Johnson, Styles, and Ezell

/s/ Alexa Van Brunt
Alexa Van Brunt
Noor Tarabishy
MacArthur Justice Center
375 East Chicago Avenue
Chicago, Illinois 60611
(312) 503-1336
a-vanbrunt@law.northwestern.edu
noor.tarabishy@macarthurjustice.org
***Counsel for Plaintiff Charles Johnson***

/s/ Locke Bowman
Locke E. Bowman
Sam Heppell
Arthur Loevy
Jonathan I. Loevy
Joshua A. Tepfer
LOEVY & LOEVY
311 North Aberdeen St., 3rd Floor
Chicago, Illinois 60607
(312) 243-5900
locke@loevy.com
sam@loevy.com
arthur@loevy.com
jon@loevy.com
josh@loevy.com
***Counsel for Plaintiffs Charles Johnson and Lashawn Ezell***

/s/ Terry Campbell
Terence H. Campbell
Michael Maione
Cotsirilos, Tighe, Streicker, Poulos & Campbell, LTD
33 N. Dearborn, Suite 600
Chicago, Illinois 60602
(312) 263-0345
***Counsel for Plaintiff Larod Styles***

## <u>CERTIFICATE OF SERVICE</u>

I, Sam Heppell, an attorney, certify that I served the foregoing document on counsel of record using CM/ECF on September 18, 2023.

<u>Sam Heppell</u>

Attorney for Johnson & Ezell