**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| LASHAWN EZELL, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No. 18 C 1049 |
| | ) | No. 18 C 1053 |
| | ) | No. 18 C 1062 |
| | ) | No. 18 C 1068 |
| v. | ) | |
| | ) | Judge Sara L. Ellis |
| CITY OF CHICAGO, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**OPINION AND ORDER[1]**

Plaintiffs LaShawn Ezell, Charles Johnson, Larod Styles, and Troshawn McCoy spent a combined 73 years in prison for a double-murder and armed robbery that the State of Illinois now agrees they did not commit. Upon their release from prison and receipt of Certificates of Innocence, Plaintiffs sued Officers James Cassidy, Kenneth Boudreau, Luke Daly, Francis Valadez, Bernard Ryan, John Bloore, Thomas Richardson, Dwane Davis, and the respective Estates of J Fine and Thomas Coughlin[2] (collectively with the foregoing Defendants, the

---

[1] The Court consolidated these four cases for the purpose of discovery and dispositive motions on May 16, 2018. Doc. 39. All references to docket entries refer to Case No. 18 C 1049.

[2] Plaintiffs may only pursue claims against Fine and Coughlin to the extent that the City of Chicago has agreed to entry of judgment against it if a jury finds Fine or Coughlin liable for violating Plaintiffs' civil rights pursuant to § 1983. *See* Docs. 81-1, 81-2, 81-3, 81-4 (Limited Consents to Judgment as to each Plaintiff); Doc. 130 at 15 (entering the City's proposed Limited Consent to Judgment); Doc. 462 at 9 n.1 (Defendants' acknowledgment that Plaintiffs' claims against Fine and Coughlin are subject to the City's Limited Consents). Plaintiffs do not have state law claims against Fine and Coughlin's estates because they failed to timely seek appointment of special representatives for the estates. *See* Docs. 175, 214.

1

"Defendant Officers"),[3] Youth Officers Cheryl Green and Steven Terrell,[4] Sergeant Larry Tuider, former Assistant State's Attorney ("ASA") Joseph Alesia,[5] the City of Chicago, and Cook County for coercing or fabricating the confession evidence against them in violation of their Fifth and Fourteenth Amendment rights, unlawfully detaining them in violation of their Fourth Amendment rights, failing to intervene against their co-defendants' constitutional wrongs, committing the state law torts of malicious prosecution and intentional infliction of emotional distress ("IIED"), and conspiring to violate Plaintiffs' federal and state rights. Plaintiffs also bring *respondeat superior* or indemnification claims against Chicago and Cook County.

The parties have completed discovery and Defendants agree that at least some of Plaintiffs' claims must proceed to a trial because material disputes of fact exist. However, Defendants have nonetheless moved for partial summary judgment because they dispute Plaintiffs' legal basis for suing all Defendants for obtaining their false confessions; argue that some Defendants are completely immune from suit; and deny that some of Plaintiffs' claims are legally valid. For the reasons fully set out in this Opinion, Court grants in part and denies in part Defendants' respective motions for summary judgment. The Court summarizes Plaintiffs' surviving claims against each Defendant in Appendix A.

## BACKGROUND

### I.     Motion to Strike

Before reciting the facts relevant to resolution of the motions for summary judgment, the

---

[3] Plaintiffs originally included Fred Bonke in their complaints but informed Defendants prior to the filing of Defendants' motion for summary judgment that Plaintiffs no longer intended to bring claims against him. *See* Doc. 462 at 9. The Court therefore enters judgment for Bonke, dismisses Plaintiffs' claims against him, and does not make further reference to him in this Opinion.

[4] Only Ezell pursues claims against Green, and only Styles pursues claims against Terrell.

[5] McCoy did not name Alesia as a defendant. *See* Doc. 463 ¶ 5.

Court must address the pending motion to strike. In connection with their responses to Defendants' motions for summary judgment, Plaintiffs filed separate statements of disputed material facts that they contend preclude summary judgment. See Docs. 477, 478. Defendants (with the exception of Alesia) moved to strike Plaintiffs' separate statement of disputed material facts. See Doc. 499. Defendants argue that many of Plaintiffs' disputed facts are irrelevant, contradict the Joint Statement of Facts, or are unsupported by the record, and so the Court should strike Plaintiffs' entire filing on these bases. This the Court will not do. As Defendants acknowledge in the parties' Joint Statement of Facts, the Court's standing order allows Plaintiffs "to include facts in [their] response . . . that [they] contend[] are disputed in order to demonstrate that a genuine issue of material fact exists that warrants denying the motion for summary judgment." Doc. 463 at 2 n.1 (quoting *Case Procedures: Summary Judgment Practice*, https://www.ilnd.uscourts.gov/judge-info.aspx?VyU/OurKKJRDT+FUM5tZmA==). Although Plaintiffs did not include their disputed facts in the body of their response, the Court appreciates that doing so would have turned an already oversized brief into an unwieldy tome. It thus accepts Plaintiffs' contemporaneous filing of their statement of disputed facts as a legitimate means of presenting facts that they claim are in dispute. The Court also appreciates Defendants' point that several of Plaintiffs' disputed facts contradict the Joint Statement of Facts or are unnecessarily argumentative. *See, e.g.*, Doc. 477 ¶ 35 ("The coercion was amplified by the fact that McCoy was in a custodial setting and the power imbalance between a 17-year-old and a seasoned Chicago Police Detective."). The Court will focus only on the substantive facts included in statements that the record properly supports. *See Outley v. City of Chicago*, 354 F. Supp. 3d 847, 856 (N.D. Ill. 2019) ("[T]he paragraphs in a statement of facts should be short and not argumentative or conclusory[.]").

The Court thus denies Defendants' motion to strike Plaintiffs' filing. The Court takes the facts set forth below from the parties' submissions and exhibits attached thereto, and construes them in the light most favorable to Plaintiffs. *See Wehrle v. Cincinnati Ins. Co.*, 719 F.3d 840, 842 (7th Cir. 2013). In doing so, however, the Court notes that Rule 56 still requires Plaintiffs to submit admissible evidence to show that a *legitimate* dispute of fact exists—therefore, to the extent that their contended material disputes are illusory or unsupported by evidence, the Court disregards them. *See* N.D. Ill. LR 56.1(e)(3) ("To dispute an asserted fact, a party must cite specific evidentiary material that controverts the fact and must concisely explain how the cited material controverts the asserted fact."); *Outley*, 354 F. Supp. 3d at 856.

## II. Events of December 4, 1995

### A. The Murders

Around 6:30 p.m. on December 4, 1995, two men entered the premises of the Elegant Auto and Prestige Auto car lots ("Elegant Auto"), located at 7004 S. Western Avenue in Chicago, Illinois. One of the men wore a white jacket; the other wore a green jacket. The pair briefly examined the available vehicles, entered the business' office, and shot the owners, Khaled Ibrahim and Yousef Ali.[6] Two employees, Ali Ali and Frank Neira, witnessed the killings. Ali and Neira attempted to play dead to avoid drawing the perpetrators' fire. Noticing the pair in the office, one of the perpetrator's remarked to Neira that he would shoot him if Neira stood up. Ali, Neira, and the police report from that night each provide slight variations of the perpetrators' other comments, but all agree that one of the perpetrators said that Yousef was still alive and that he should be shot again. After killing Ibrahim and Yousef, the perpetrators stole two cars and fled the scene. The police recovered the stolen vehicles—a green Chevrolet Impala and a white

---

[6] To distinguish between Yousef Ali and Ali Ali, the Court will refer to these men by their first names in this Opinion.

Pontiac Bonneville—seven hours later at 7911 S. Ingleside Street.

Munther Tadros, a salesman at Prestige Auto, observed the perpetrators before the shooting. He testified that one perpetrator was wearing a white jacket while the other individual was wearing a green jacket.

Andrew Hudley was in a liquor store nearby Elegant Auto when he heard gunshots. Hudley testified that he walked toward the sound of the shooting and saw two men run toward cars parked in the Elegant Auto parking lot. Hudley saw a man wearing a green jacket and skullcap move toward a white vehicle, and another man wearing a white jacket enter a green vehicle. According to Hudley's account, the man in the green jacket ran back toward the office, although Hudley was uncertain whether the man actually reentered the building. Hudley then heard one or two additional gunshots before the man in the green jacket entered the white vehicle. Hudley also witnessed two young Black men sitting in a dark Chevy in front of Elegant Auto.

## B.    Preliminary Investigation

Police officers from the Chicago Police Department's Area One Detective Division Headquarters ("Area One") arrived at the Elegant Auto crime scene at approximately 7:00 p.m. Detectives Coughlin and Fine were the first to assess the scene, and identified Ali, Neira, and Tadros as witnesses. Ali and Tadros looked through photo books at Area One to identify the suspects, and Tadros helped construct a computerized composite sketch of the offender with whom he spoke prior to the shootings. Ali agreed that the composite Tadros created looked like one of the men he saw commit the shooting.

### C. Plaintiffs' Alibis for December 4, 1995[7]

#### 1. Ezell and Styles

Ezell and Styles, who were respectively fifteen and sixteen years old in December 1995, claim that they spent the day of December 4, 1995 together. They first attended freshman classes at Harper High School before meeting that evening at Ezell's house at 73rd Street and Claremont Avenue in Chicago, Illinois for approximately thirty minutes. While at Ezell's house, Ezell's cousin drove over and informed them of the Elegant Auto murders and robbery. Ezell and Styles then went to Prestige Liquor, located at 71st Street and Western Avenue in search of marijuana, but their usual supplier was out of stock. While at the convenience store, Johnson arrived in the parking lot. Ezell asked Johnson if he wanted to join them on their search, but Johnson demurred. After Johnson left, Ezell and Styles continued looking for a dealer, running into one of Ezell's friends along the way. This friend confirmed Ezell's cousin's story about the Elegant Auto murders. After searching further for marijuana, Ezell and Styles returned to Ezell's place, seemingly unsuccessful. However, they encountered Ezell's neighbor, Sherman Coleman, who was able to find marijuana for them. Ezell and Styles smoked together before Styles went to his grandmother's house, where he lived. Styles' girlfriend, Crystal Jenkins, then joined him and the two had sex. Styles walked Jenkins halfway home around 11:00 p.m.

#### 2. Johnson

Prior to his arrest, Johnson, who was nineteen years old in December 1995, lived between his grandmother's house and his mother's house, and worked at the Coca-Cola bottling company. Johnson worked on December 4, 1995, and left work around 4:30 p.m. He arrived at his grandmother's house at 5:00 p.m. and then went to his girlfriend's, Genoa Flournoy's,

---

[7] The Court notes that Defendants dispute the truth of Plaintiffs' alibis.

residence, arriving around 5:35 p.m. Several of Flournoy's relatives and one of Flournoy's friends were at or arrived at Flournoy's house while Johnson was there. Around 6:30 p.m., Johnson, Flournoy, and her friend decided to order pizza, which arrived around 7:30 p.m. Realizing that Flourney had no soda, Johnson returned to his grandmother's house to retrieve his car and went to Prestige Liquor to buy some. Johnson saw a friend, Theolonious Atkins, at the store, as well as Ezell and Styles. After Johnson refused to accompany them on their journey, he drove back to Flourney's house and arrived approximately twenty minutes after he had initially left. Johnson, Flournoy, and her friend ate the pizza, and her friend subsequently left. Johnson and Flournoy then went to Johnson's mother's house, where the pair had sex, after which Johnson returned Flourney to her home.

### 3. McCoy

McCoy, who was seventeen years old in December 1995, claims that he was at his friend Tracy Hunt's house. Hunt lived approximately five blocks away from McCoy's mother's residence, where McCoy also lived at the time. Tracy's mother, Christine Hunt, purportedly saw McCoy at 5:00 p.m. in Tracy's room, and again at 6:30 p.m. when they ate dinner together. Christine stated that McCoy stayed at her house until 10:00 p.m., which she recalls because children in the house were watching news reports about the Elegant Auto murders.

## III. Plaintiffs' Arrests and Interrogations

### A. McCoy

Around 11:00 a.m. on December 5, 1995, Tuider—who solely held a supervisory role during the course of the Elegant Auto murders investigation[8]—instructed Cassidy to take a phone call from a person with the alias "Big Wheels" who claimed to have information relevant

---

[8] The parties agree that "Tuider did not conduct any interrogations, witness interviews, or lineups. He did not collect evidence or process the scene of the Ibrahim/Yousef homicide investigation." Doc. 463 ¶ 35.

to the murder investigation. Cassidy testified that the caller implicated McCoy in the murders and provided Cassidy with McCoy's mother's name and phone number. Cassidy further testified that the caller said he was McCoy's friend. Cassidy could not recall if he investigated Big Wheels' identity or inquired further into the pseudonymous tip's credibility.

Cassidy went with Davis and Daly to Dunbar High School, which McCoy attended, to investigate Big Wheel's accusation that McCoy participated in the Elegant Auto murders. Cassidy, Davis, and Daly transported McCoy from the school to Area One without handcuffing or informing him that he was under arrest. After arriving at Area One around 12:00 p.m., Cassidy took McCoy to a vacant room and left him alone for fifteen to thirty minutes. Cassidy then returned to the room to interview McCoy. Cassidy claims that McCoy volunteered that he acted as a lookout with Ezell while Johnson and Styles committed the murders at Elegant Auto. McCoy testified that he in fact had no knowledge of the murders, that Cassidy yelled at him multiple times over a period of several hours, and that Cassidy fed him a false story implicating him in the crime. McCoy also testified that he provided the names of his soon to be co-defendants in response to Cassidy's questioning, and that Cassidy promised that he could go home if he cooperated. Cassidy then summoned Davis to act as a prover—a second detective in the room—to hear McCoy repeat his confession. Although McCoy testified that several other officers entered and exited his interrogation room during his time there, McCoy could not name them. He described one officer "as a possibly Hispanic officer with black hair and stocky build, and the other as a tall black officer with black hair and dark skin." Doc. 477 ¶ 38. Davis was the only Black officer who investigated the Elegant Auto murders, and Daly had black hair, was 5'9", and weighed about 175 pounds.

At approximately 3:00 p.m., after McCoy repeated his confession in Davis' presence, Cassidy placed him under arrest. Cassidy contacted the Cook County State's Attorney Felony Review Unit and the Felony Review Unit dispatched Alesia to manage the case. Alesia met with McCoy for almost thirty minutes in Cassidy's presence, starting around 4:30 p.m. McCoy did not tell Alesia during their conversation that Cassidy coerced or fabricated his confession. McCoy repeated the allegedly fabricated story to Alesia, who then gave McCoy a choice between having Alesia write a summary of McCoy's confession or having a court reporter transcribe a colloquy between Alesia and McCoy. At approximately 8:30 p.m., with Cassidy present in the room, a court reporter transcribed Alesia's questions and McCoy's answers.

In his court-reported statement, McCoy said that he met with Ezell, Styles, and Johnson on December 4, 1995, and Johnson proposed robbing Elegant Auto. McCoy said that the four went to the car lots in a black Chevy Caprice. He claimed that his role was to act as a lookout with Ezell while Styles and Johnson entered the car dealership. McCoy said that he heard six gunshots from inside the car dealership before seeing Styles enter a green car and Johnson enter a white car.

### B. Styles

Based on McCoy's confession, Bloore, Richardson, Coughlin, and Valadez went out to arrest Styles. Styles was at his grandmother's house the evening of December 5, 1995, where the group arrested him at approximately 5:30 p.m. Styles' grandmother, Barbara White, testified that the officers said that they wanted to ask Styles about a murder at 70th Street and Western Avenue, as well as learn where Ezell lived. She recalled that the officers indicated that they would bring Styles home after they questioned him. The officers then drove Styles to Area One.

Styles testified that Bloore struck his knee twice with his baton and elbowed him in the ribs during the ride.

After arriving at Area One, the officers placed Styles in the Sergeant's room. Although the parties agree that Styles appeared in an eyewitness lineup at around 7:50 p.m., they disagree on the events surrounding Styles' interrogation. Bloore testified that at around 8:00 p.m., after telling Styles that he had been identified in the lineup, Styles confessed to participating in the murder and robbery, indicating that he wanted to steal one of the car's transmissions as a Christmas gift for his grandmother. Bloore said that he then waited until approximately 11:00 p.m. to further interrogate Styles because, as a child under the age of sixteen without a guardian present, policy required a youth officer to attend the interrogation. However, Styles testified that around 7:00 p.m., before the lineup, Bloore and Richardson interrogated him in a leading manner such that he would learn more information about the murders. Styles denied involvement in the crime. Styles reported that multiple officers interrogated him several times before the lineups, and that Bloore, Richardson, and these other officers yelled at him. Styles said that Bloore and the other officers fabricated the story that he wanted to give his grandmother a stolen transmission for Christmas.

Shortly after 11:00 p.m., Terrell, a youth officer, joined Styles and Bloore in the interrogation room. This was the first time Styles interacted with a youth officer since his arrest. Terrell never informed Styles that he was entitled to have a parent or guardian present during his interrogation. Styles testified that the officers' interrogation and deception continued after Terrell arrived.

Around 11:30 p.m., Alesia interviewed Styles in Bloore's and Terrell's presences during which Styles confessed to participating in the Elegant Auto murders. A court reporter

memorialized this statement at approximately 1:00 a.m. on December 6, 1995. Styles testified that Alesia tricked him into signing the statement by covering it with his hand and that an officer told him that he would be released to his grandmother after signing the paper. Styles says that he told Alesia that he was innocent before signing the confession.

In his court-reported statement, Styles stated that he told McCoy, Ezell, and Johnson that they should rob the dealerships (in contradiction with McCoy's court-reported statement, which attributed the idea to Johnson). Styles said that McCoy and Ezell were supposed to act as lookouts while he and Johnson robbed the dealership. Styles said that Johnson entered the Elegant Auto office first and held the four men inside at gunpoint. According to the statement, Johnson shot the gun in the air as Styles grabbed four sets of keys. Styles said that as he was running out the office door, he heard three or four more gunshots. Styles testified that he stole a green Chevy while Johnson stole a white Bonneville. Styles said that the pair drove the cars to 74th Street and Campbell Avenue (a location several miles away from where police actually recovered the cars) before he returned to the crime scene to see if any police were investigating.

### C.     Ezell

Also based on McCoy's confession, Daly, Ryan, and Davis left Area One to find and arrest Ezell. They located Ezell at a corner store near 73rd Street and Western Avenue after unsuccessfully trying to locate him at his grandmother's house. After arresting him, Daly, Ryan, and Davis took Ezell to Area One and placed him in a small room. According to Ezell's recollection, he was in the room with Davis and Bloore. After a brief period, during which Ezell testified that the pair berated him and ignored his request to call his grandmother, Coughlin arrived and dismissed Davis and Bloore—Ezell did not see them again. Coughlin and Ezell proceeded to have what Ezell reported as a friendly conversation where Coughlin offered Ezell

food and a cigarette. After the conversation, during which Coughlin learned Ezell's address, phone number, age, and school, Ezell received a meal from McDonald's and was able to sleep before being placed in a suspect lineup.

After participating in the lineup, Ezell moved to a different interrogation room. Although Ezell was again able to get some sleep, Coughlin periodically interrupted his sleep to tell Ezell what McCoy had said about Ezell's participation in the Elegant Auto murders. Coughlin reportedly rejected Ezell's protestations of innocence and told Ezell that if he shared the details of his role as McCoy described them to Alesia, he could go home. Ezell testified that shortly after Coughlin gave him this narrative, Coughlin told him that McCoy went home after telling his story to an investigator. Ezell testified that he said several times that he was innocent, but that Coughlin simply told him to tell the story he provided if Ezell wanted to go home. After relaying this information to Ezell, Coughlin left again for almost an hour, during which Ezell slept.

Later the night of December 5, 1995, Coughlin returned to Ezell's interrogation room with Alesia. Ezell testified that Coughlin told him that Alesia was the one to whom he wanted Ezell to repeat the story. Ezell then repeated the narrative Coughlin wanted him to share, which Alesia took down on a yellow pad. Coughlin and Alesia then left, at which time Green, another youth officer, entered the room. Despite Ezell's minor status and lack of guardian, Green's presence at Area One since 3:45 p.m. that afternoon—before Ezell arrived at the station—and the fact that Coughlin had subjected Ezell to several rounds of interrogation, this was the first time that Green met with Ezell. Green did not advise Ezell of any of his rights. Ezell recalls Green telling him that his grandmother was downstairs, and that McCoy had gone home. Green then left and returned sometime later with Coughlin and Alesia. Alesia was holding some papers,

which Coughlin said were release papers that Ezell had to sign.  In fact, the papers, contained

Ezell's false confession, which Alesia read to him.

In the statement Alesia wrote based on Ezell's oral statement, Ezell said that McCoy

called Styles and himself over to Johnson's vehicle and proposed robbing the Elegant Auto

dealership.  Ezell said that he and McCoy acted as lookouts, heard four gunshots, and saw one

white car and one green car drive away from the car lot.  Ezell's statement further stated that

Styles told Ezell that he believed Johnson shot someone.

### D.  Johnson

Johnson worked at the Coca-Cola bottling company on December 5, 1995.  After his

shift, he returned to his grandmother's house.  After approximately thirty minutes to an hour, at

around 5:30 p.m., Johnson's cousin informed him that police officers were outside and wished to

speak with him.  These officers, Daly, Ryan, Bloore, and Richardson, who were searching for

Johnson on the basis of McCoy's confession, promptly arrested him.  They then drove Johnson

to Area One and placed him in interrogation room 202.  At some point after arresting Johnson,

an officer or officers took Johnson's car—a black Chevy Caprice Classic that was missing all of

its hubcaps—to Area One for photographing because McCoy stated it was used during the

Elegant Auto murders.

At approximately 6:00 p.m., Cassidy spoke with Johnson and informed him that someone

implicated him in the Elegant Auto murders.  Johnson testified that he asked Cassidy several

times to speak with his mother or an attorney, but Cassidy rejected his request.  Johnson did not

interact with Cassidy again after this conversation.  At approximately 10:00 p.m., after the

lineups, Valadez and Ryan interviewed Johnson.  Ryan and Valadez testified that Johnson

provided them with the names of individuals with whom he was present the night of the murders.

Johnson testified that he told them that he was at his girlfriend's house and Prestige Liquor when the murders took place, and that Flournoy, her stepfather, her friend, and Atkins could verify his alibi. However, Johnson claims that Valadez and Ryan insisted that he was near the crime scene and threatened him with the death penalty if he did not confess. Valadez and Ryan admitted in their depositions that they did not investigate Johnson's alibi.

Later the night of December 5 or in the early morning of December 6, 1995, Alesia and another ASA entered Johnson's interrogation room. Alesia asked Johnson several background questions, and Johnson testified that he told Alesia that he was not involved in the murders. According to Johnson, Alesia left and later returned with Valadez, telling Johnson that Ezell, Styles, and McCoy were cooperating in the investigation. Johnson testified that Alesia and Valadez then left him to sleep for some time.

Sometime between the hours of 3:00 a.m. and 4:00 a.m. on December 6, 1995, Alesia and Valadez reentered Johnson's room, woke him up, and took him to a different room down the hall. There, Alesia quickly read the contents of several papers he was holding, which, unbeknownst to Johnson, contained a confession attributed to him. Alesia testified that the pages contained a handwritten summary of what Johnson told him during their conversations. Johnson said that he never confessed to the crimes. According to Johnson, Alesia sat him at an awkward angle, obscured some of the writing on the paper with his hand so Johnson could not read it, and asked him to sign each page. Johnson said that he believed he was signing papers confirming that certain polaroid photographs depicted what Alesia said that they depicted, all while being unable to read the words on the pages. After Johnson finished signing the papers, Alesia read them aloud—Johnson testified that this was the first time he learned he had signed a confession.

In the statement Alesia attributed to Johnson, Johnson said that McCoy asked him to pick up Ezell and Styles in Johnson's black Chevy. Johnson brought a gun with him with five bullets. Johnson and McCoy picked up Ezell and Styles before McCoy proposed the idea of stealing vehicles. The statement Alesia attributed to Johnson further reported that upon arriving at Elegant Auto, Styles asked Johnson to join him while Ezell and McCoy acted as lookouts. Johnson said that he and Styles entered the office, and one of the four men inside asked him if he wanted to buy a car. Johnson drew his gun and shot one of the men as he moved toward him. The statement reported Johnson confessing to shooting a second man as he moved toward him and then to stealing several sets of car keys before driving off in a green car. The statement said that Johnson threw his gun out of his car near 71st or 72nd Street (the police never found the gun).

## IV.    Eyewitness Identifications

At approximately 7:30 p.m. on December 5, 1995, officers constructed a lineup consisting of Styles, McCoy, Johnson, Ezell, and a fifth person named Antonio Moore. Police records name Valadez, Davis, Daly, Bloore, Boudreau, Fine, and Coughlin as participating in the process of creating the lineup. Officers had arrested Moore at the same time they arrested Ezell and Styles, and considered him a suspect at the time they placed him in the lineup.[9] Ali was the first eyewitness to review the lineup in the presence of Boudreau. He testified that no one told him whom he should identify, nor did anyone signal him in any way to make an identification. Ali identified Styles as the man wearing the white jacket with 99% confidence. Ali also identified Johnson with 80-85% confidence as the shooter wearing the green jacket.

---

[9] The officers later released Moore that evening without explanation. No records exist concerning his arrest, detention, and release.

Hudley separately viewed the lineup in Coughlin's presence. Hudley identified Styles as one of the perpetrators. He testified that no one coerced or coached him into making an identification of anyone in the lineup.

Tadros separately viewed the lineup on December 5, 1995, but he could not recall which officer accompanied him. Tadros did not identify anyone in the lineup.

Sometime before 10:00 p.m. the same night, Ali requested to view a second lineup. Reports note that Boudreau, Coughlin, and Valadez helped organize this second lineup, which included Styles, McCoy, Johnson, Ezell, and a non-suspect named Raji Ross. Ali asked Boudreau to instruct the individuals in the lineup to each say, "This one's still alive." Ali then identified Styles with 100% certainty as the man in the white jacket. During his deposition, Boudreau could not recall having any other involvement in the Elegant Auto murder investigation aside from conducting these lineups with Ali.

Neira viewed a lineup several weeks after December 5, 1995. He did not identify anyone in the lineup as one of the perpetrators.

## V. Plaintiffs' Convictions

### A. Pre-Trial Proceedings

Alesia approved felony charges against all four Plaintiffs the morning of December 6, 1995. On December 22, 1995, ASA Myles Hahn indicted Plaintiffs for two counts of murder of Ibrahim and Ali, two counts of aggravated discharge of a weapon as to Ali and Neira, and four counts of armed robbery of Ibrahim, Yousef, Ali, and Neira. ASA Brian Sexton, a member of the Gang Crimes Unit, was lead trial counsel.

Plaintiffs each filed separate motions to suppress their respective confessions. Styles' motion asserted that he received a partial *Miranda* warning, requested a lawyer several times

16

(but never received one), and participated in a lineup. During the hearing on his motion to suppress, Styles' counsel said that Styles described one of his interrogators as "a brown haired officer between 25 and 30 years old, [who] had a rather full mustache, and a rather full face, kind of round face, [was] about five foot ten, eleven . . . and heavy set built." Doc. 466-70 at 4.

Johnson's motion challenged the officers' probable cause to arrest him and lack of a warrant, and detailed the conditions of his interrogation. Johnson claimed that officers questioned him for over ten hours and that at least two ASAs denied his request for a lawyer. Johnson attested to the several threats that different police officers made against him that he would receive the death penalty if he did not cooperate. Johnson further reported that an ASA tricked him into signing a false confession.

McCoy claimed in his motion that he did not recall being read his *Miranda* rights, that he did not voluntarily confess to the crime, that the police denied his family access to him, and that he received several threats from one of the officers interrogating him. McCoy described the officers who participated in his interrogations as follows: one had "black hair, [a] stocky build and [McCoy] believed [him] to be Hispanic" and "another officer had black hair, dark skin, was tall and big and wore a mustache and was black; [and] another officer was about 5'9", had full head of grey hair, medium complexion and no glasses." Doc. 466-69 at 1.

Ezell, in his motion to suppress, claimed that he never received *Miranda* warnings and that "an African American police officer" slapped him and physically coerced his confession. Doc. 466-75 at 4. Ezell also stated that the police made false promises to him about being allowed to go home if he signed a statement. Ezell later recanted the allegation of physical abuse during his deposition for these proceedings.

The trial court denied all four motions to suppress.

### B.     Styles' and Johnson's Double Jury Trial

Styles' and Johnson's trial began on January 12, 1998 before a double jury.[10]  Ali testified that he recognized Styles as the person wearing the white jacket during the Elegant Auto murders during the first lineup he reviewed.  Boudreau testified about Ali's request to have each member of the second lineup say, "This one is still alive," and how Ali's certainty that Styles was one of the perpetrators increased after hearing him say those words.  Hudley also testified that he identified Styles as the man wearing the white jacket, but he admitted that he did not have certainty in his identifications due to the angles at which he saw the perpetrators.  Coughlin testified before Johnson's jury that Hudley tentatively identified Johnson as the man wearing the green jacket.  Tadros appeared before the double jury and identified Johnson, saying that he immediately recognized him during the lineup.  Tadros claimed that he did not make an identification on December 5, 1995 because he was afraid of appearing as a witness at trial (Tadros later recanted this statement in his 2019 deposition in this case).

Cassidy also testified before the double jury about the phone call from Big Wheels and arresting McCoy at Dunbar High School.  Alesia later testified about Styles' confession before Styles' jury, and about Johnson's confession before Johnson's jury.  The court did not allow Johnson to introduce the notes of one of the officers (who is not a defendant in this case) regarding Johnson's alibi.

A fingerprint examiner who examined the crime scene for suitable print evidence testified that none of the evidence that he could examine implicated Styles or Johnson in the murders.

---

[10] A double jury is a criminal procedure that is sometimes used when multiple defendants are tried together but the prosecutor may only constitutionally use certain pieces of evidence against one defendant.  The double jury hears evidence admissible for both defendants, and then each individual jury hears the evidence that is only admissible with respect to their particular defendant.

Styles' and Johnson's respective juries each convicted them of two counts of first-degree murder and two counts of armed robbery. Styles received a natural life sentence. The State pursued the death penalty against Johnson, but he instead received a life sentence without the possibility of parole.

### C.    Ezell's and McCoy's Double Jury Trial

Ezell's and McCoy's double jury trial began on November 17, 1998. Alesia testified about Ezell's confession before Ezell's jury, and about McCoy's confession before McCoy's jury. Each jury received their respective defendant's confessions as evidence. Ali and Hudley testified about how they identified Styles during their reviews of the police lineups. Cassidy also testified about the anonymous tip and how he took McCoy into custody at Dunbar High School. The juries heard the recording of the anonymous phone call, but the court instructed them to not consider it for the truth of its contents but rather to explain Cassidy's and the other officers' subsequent actions.

A fingerprint examiner who examined the crime scene for suitable print evidence testified that none of the evidence that he could examine implicated McCoy or Ezell in the murders.

Ezell's jury convicted him for the armed robbery of Ibrahim but found him not guilty of killing Ibrahim or Yousef. Ezell received a twenty-year sentence.

McCoy's jury convicted him for the armed robbery of Ibrahim and did not return verdicts on the two murder charges. McCoy later pleaded guilty to first-degree murder of Ibrahim in exchange for an agreed sentence of fifty-five years.

### VI.    Post-Conviction Proceedings

In January 2009, upon a post-conviction relief motion McCoy filed in 2008, a court ordered technicians to reexamine fingerprint evidence introduced during Plaintiffs' trials using

19

technology that was unavailable in 1998. The new test matched prints recovered from Elegant Auto to a man named Davion Allen. Allen denied involvement in the Elegant Auto murders to state investigators, and he has never been prosecuted for them. Ezell, Styles, and Johnson filed post-conviction petitions to have their convictions vacated on this basis.

In January 2015, Ezell, Styles, and Johnson amended their post-conviction pleadings to include allegations that the State violated its *Brady* obligations by not disclosing information regarding Hudley's relocation and contempt proceedings.[11] On July 11, 2016, ASA Mark Ertler informed the court that the State was withdrawing its opposition to their motion. On the same day, the court vacated Ezell's, Styles' and Johnson's convictions and ordered a new trial.

On July 19, 2016, McCoy filed a post-conviction petition for a new trial based on the fingerprint evidence. Though the State initially contested the motion, Ertler informed the court on February 15, 2017 that it no longer opposed it. Contemporaneously with the State's motion, the court vacated McCoy's conviction and the State dismissed all the charges against Plaintiffs. In doing so, the State said that it had concluded that, by a preponderance of the evidence, Plaintiffs were factually innocent of the Elegant Auto murders.

On April 21, 2017, Ezell, Styles, and Johnson filed a joint petition for Certificates of Innocence. To obtain a Certificate of Innocence, a petitioner must prove by a preponderance of the evidence that he is innocent of the offenses for which he was charged in the original indictment. *See* 735 Ill. Comp. Stat. 5/2-702(g). On April 26, 2017, McCoy filed his own petition. The State opposed the motions and entered settlement negotiations with the parties. On November 15, 2017, the State reached an agreement with McCoy where he agreed that Alesia did not create his false confession or mistreat him, and that McCoy would not sue Alesia on the

---

[11] The parties do not elaborate on Hudley's relocation or contempt proceedings except to note that these events occurred.

basis of any knowledge he already possessed related to the case. The court granted McCoy his Certificate of Innocence on November 25, 2017. In January 2018, the State entered settlement discussions with Ezell, Styles, and Johnson. On January 22, 2018, the court entered an Agreed Order granting their petitions for Certificates of Innocence.

## LEGAL STANDARD

Summary judgment obviates the need for a trial where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To determine whether a genuine dispute of material fact exists, the Court must pierce the pleadings and assess the proof as presented in depositions, documents, answers to interrogatories, admissions, stipulations, and affidavits or declarations that are part of the record. Fed. R. Civ. P. 56(c)(1); *A.V. Consultants, Inc. v. Barnes*, 978 F.2d 996, 999 (7th Cir. 1992). The party seeking summary judgment bears the initial burden of demonstrating that no genuine dispute of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Bunn v. Fed. Deposit Ins. Corp. for Valley Bank Ill.*, 908 F.3d 290, 295 (7th Cir. 2018). "A genuine issue of material fact exists when 'there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.'" *Brown v. Osmundson*, 38 F.4th 545, 549 (7th Cir. 2022) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). In response, the non-moving party cannot rest on mere pleadings alone but must use the evidentiary tools listed above to identify specific material facts that demonstrate a genuine dispute for trial. Fed. R. Civ. P. 56(c)(1); *Celotex*, 477 U.S. at 324; *Sterk v. Redbox Automated Retail, LLC*, 770 F.3d 618, 627 (7th Cir. 2014). The Court must construe all facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Wehrle*, 719 F.3d at 842. However, a bare contention by the non-moving party that an issue of fact exists does not create a

factual dispute, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), and the non-

moving party is "only entitled to the benefit of inferences supported by admissible evidence, not

those 'supported by only speculation or conjecture,'" *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562,

568 (7th Cir. 2017) (citation omitted).

## ANALYSIS

### I.    Alesia's Motion for Summary Judgment

Plaintiffs[12] claim under § 1983 that Alesia violated their Fifth and Fourteenth

Amendment rights by coercing (Ezell, Styles) or fabricating (Johnson) their confessions; that he

conspired with the Defendant Officers to deprive Plaintiffs of their constitutional rights; that he

failed to intervene against the Defendant Officers' alleged unconstitutional actions; and that he

committed the torts of malicious prosecution and IIED.  Alesia primarily argues that he is

entitled to absolute immunity—that his role as a prosecutor shields him against all of Plaintiffs'

claims, no matter the alleged misconduct.  In the alternative, Alesia argues that qualified

immunity at least protects him from Plaintiffs' failure to intervene claim.  The Court addresses

these arguments in turn.

### A.    Absolute Immunity

Absolute immunity protects prosecutors from civil liability against all federal and state

law claims a plaintiff brings against them.  *See, e.g.*, *Hobbs v. Cappelluti*, 899 F. Supp. 2d 738,

769 (N.D. Ill. 2012) (collecting cases); *Kitchen v. Burge*, 781 F. Supp. 2d 721, 736–37 (N.D. Ill.

2011); *Beaman v. Souk*, 863 F. Supp. 2d 752, 760–64 (C.D. Ill. 2012); *see also Fields v. Wharrie

(Fields II)*, 740 F.3d 1107, 1114–15 (7th Cir. 2014) (discussing Illinois' doctrine of absolute

prosecutorial immunity).  Whether a prosecutor is entitled to absolute immunity depends on the

---

[12] For the purposes of Part I, the Court's references to "Plaintiffs" do not include McCoy.

function of the act he was performing for which the plaintiff is suing. *See Buckley v. Fitzsimmons*, 509 U.S. 259, 268 (1993) ("In determining whether particular actions of government officials fit within a common-law tradition of absolute immunity . . . we have applied a functional approach." (internal quotations omitted)). If a prosecutor's act was "undertaken in furtherance of his prosecutorial duties," then he is entitled to absolute immunity. *Fields v. Wharrie (Fields I)*, 672 F.3d 505, 510 (7th Cir. 2012) (quoting *Imbler v. Pachtman*, 424 U.S. 409, 410 (1976)). But if the prosecutor acted as an investigator—rather than as an officer of the court—then he may only receive qualified immunity if so entitled. *See Buckley*, 509 U.S. at 276 ("When the functions of prosecutors and detectives are the same . . . the immunity that protects them is also the same."). Determining whether a prosecutor acted in his judicial capacity or as an investigator requires the Court to examine his specific actions. *See Lewis v. Mills*, 677 F.3d 324, 330 (7th Cir. 2012); *Anderson v. Simon*, 217 F.3d 472, 475 (7th Cir. 2000) ("[T]he degree of immunity prosecutors are afforded depends on their activity in a particular case."). A prosecutor may be entitled to absolute civil immunity even if his actions were "despicable," or would otherwise open the door to criminal prosecution. *Patterson v. Burge*, No. 03 C 4433, 2010 WL 3894438, at *11 (N.D. Ill. Sep. 27, 2010) (citing *Imbler*, 424 U.S. at 429); *see Gregoire v. Biddle*, 177 F.2d 579, 581 (2d Cir. 1949) (Hand, C. J.) ("[I]t has been thought in the end better . . . to leave unredressed the wrongs done by dishonest officers than to subject those who try to do their duty to the constant dread of retaliation.").

Alesia makes three arguments in support of his absolute immunity defense. First, Alesia analogizes to other cases where courts granted absolute immunity to prosecutors facing civil liability for purportedly similar conduct and asks for a similar result. Next, he asserts that the existence of probable cause for the Defendant Officers to arrest Plaintiffs before his involvement

23

automatically made his role in the Elegant Auto murder investigation a prosecutorial one. Finally, Alesia claims that the Court can grant him immunity despite the significant disputes of fact. The Court addresses these arguments in turn.

### 1. Relevant Cases

Initially, Alesia argues that factual similarities between this case and the facts in *Hunt v. Jaglowski*, 926 F.2d 689 (7th Cir. 1991), and *Harris v. City of Chicago*, 330 F.R.D. 508 (N.D. Ill. 2018), should persuade the Court to grant him absolute immunity.

In *Hunt*, the plaintiff alleged that the ASA assigned to his case assisted the police in obtaining a false confession for an armed robbery and murder. *Hunt*, 926 F.2d at 691. He claimed that the police beat him, deprived him of sleep, and repeatedly interrogated him over the course of a thirty-hour detention. *Id.* The plaintiff testified that he told the prosecutor about the abuse and that the police had coerced his confession. *Id.* The plaintiff further testified that the prosecutor then left the room, one of his interrogators threatened to resume the beatings unless he gave his false confession to the prosecutor, and Hunt capitulated. *Id.* at 691–92. The prosecutor reentered the room and took Hunt's statement. The Seventh Circuit determined that the prosecutor was entitled to absolute immunity from Hunt's resulting lawsuit because he:

> was not present at the time Hunt was arrested and taken to Area 5; [he] was not present during the polygraph test nor the lineup; [he] was not present when Hunt claims he was beaten; and [he] was not present at the particular time Hunt alleges he gave his coerced confession.

*Id.* at 693.

In *Harris*, the plaintiff alleged that two police officers coerced him into confessing to sexually abusing a three-year-old child. 330 F.R.D. at 512. In addition to the officers, the plaintiff sued the prosecutor who took his confession and brought charges against him. The prosecutor reviewed the defendant officers' case report prior to taking Harris' statement. The

court dismissed the plaintiff's claims against the prosecutor based on absolute immunity. In doing so, the court acknowledged the *Hunt* court's decision that "[a] prosecutor who is called in to approve or disapprove charges after the accused has been arrested, taken a polygraph test, participated in a lineup, beaten by officers, and given an allegedly coerced confession is acting as a prosecutor and enjoys absolute immunity." *Id.* at 516–17. The court further noted that even if the officers "fabricated the case report, [the prosecutor's] role in these events was prosecutorial. [He] was under the impression that Harris had already admitted his guilt[.]" *Id.* at 517.

Alesia was at most as involved as the prosecutors in *Hunt* and *Harris* in obtaining Ezell's and Styles' false confessions.[13] Accepting Ezell's testimony as true, the facts show that Coughlin fed him certain details of the Elegant Auto murders over the course of several hours, interrupting his sleep in the process, and made false promises to him in order to obtain his agreement to confess to committing the murders. Crucially, even according to his story, Ezell never interacted with Alesia before giving him this false confession. *Cf. Hill v. Coppleson*, 627 F.3d 601, 605 (7th Cir. 2010) (affirming denial of absolute and qualified immunity when disputes of fact existed concerning whether prosecutor heard suspect say he did not want to confess and fed suspect facts concerning murder). The facts relevant to Styles' claims are similar: he testified that Bloore, Richardson, and several other officers berated him into falsely confessing to participating in the Elegant Auto murders. Styles did not allege that he interacted with Alesia until Alesia entered his interrogation room to take his confession in Bloore's and Terrell's presences. *Cf. id.*; *Patrick v. City of Chicago*, 213 F. Supp. 3d 1033, 1044–46 (N.D. Ill. 2016) (holding crucial distinction from *Hunt* was allegation that the "[prosecutor] helped [the]

---

[13] The Court finds baseless Plaintiffs' argument that the procedural posture the *Hunt* court faced—an appeal from a granted motion for a directed verdict—means Alesia cannot use it to support his absolute immunity claim. The Court can extract general principles of law from cases with a wide range of procedural postures.

detective [] in obtaining [plaintiff's] confession in its final form").  Even the disputed facts do

not show that Alesia worked to develop Ezell's and Styles' false confessions by providing them

with false events, threatening them, or otherwise coercing their stories.  Rather, they—again,

taken in light most favorable to Plaintiffs—show that Alesia only recorded Ezell's and Styles'

confessions after Coughlin and Bloore, respectively, fraudulently obtained them.  Although

Alesia's actions may have been despicable, especially if Ezell and Styles informed him that their

confessions were coerced and untrue, the record reflects that Alesia performed a prosecutorial

function and so is entitled to absolute immunity with respect to Ezell and Styles' claims.  *See*

*Fields I*, 672 F.3d at 517 (prosecutor who brings charges only after police coerce false

confession is absolutely immune); *Andrews v. Burge*, 660 F. Supp. 2d 868, 878 (N.D. Ill. 2009)

("It is within the proper role of an advocate for the State to take a court reported statement, as

well as to see and hear the defendant give the statement, rather than simply take the word of the

police that the defendant has confessed.  The prosecutor acts within his core functions when he

evaluates the evidence gathered by police and, in the case of a confession, takes steps to see that

the words of the defendant are properly preserved."); *cf. Coppleson*, 627 F.3d at 605; *Hunt*, 926

F.2d at 693; *Harris*, 330 F.R.D. at 517; *Patrick*, 213 F. Supp. 3d at 1046.

However, *Hunt* and *Harris* are too dissimilar from Johnson's testimony to persuade this

Court that it should find that Alesia performed a prosecutorial function when he obtained

Johnson's confession.  Johnson states that he repeatedly told Alesia that he had no involvement

in the crime and that he never provided a confession—false or otherwise—for Alesia to

transcribe.  Rather, Johnson claims that Alesia drafted a handwritten statement, hid its contents

from him, and persuaded him to sign the document without informing him that it was in fact a

confession.  If Johnson's testimony is true, then Alesia engaged in misconduct that strayed far

26

afield of prosecutorial conduct, and he would therefore not be entitled to absolute immunity. *See, e.g.*, *Mills*, 677 F.3d at 331 ("Indeed, a showing that a prosecutor investigated and fabricated evidence against a target would automatically defeat absolute prosecutorial immunity, even if that target was later brought to trial.").

Although Alesia argues that Johnson's statement "further corroborated the previous three confessions [from McCoy, Ezell, and Styles]," Doc. 459 at 21, it is plausible that the reason they provide such corroboration is because Alesia fabricated Johnson's confession to match those the other plaintiffs provided. In this vein, Alesia also takes issue with Plaintiffs' citation to *Mills* because the court there ultimately granted the prosecutor absolute immunity. 677 F.3d at 330–32. But the *Mills* court did so because no evidence suggested that the prosecutor fabricated evidence against the plaintiff and the allegation only gained substance through speculation. *Id.* at 332 ("In sum, [plaintiff's] evidence does little to shed light on his shadowy conspiracy allegations involving [the prosecutor]."). Here, Johnson's testimony, if the jury accepts it, shows that he never gave *any* confession to Alesia, and that Alesia therefore could not have written a summary of what Johnson told him. The inference that Alesia fabricated Johnson's confession follows naturally from that conclusion. Admissible evidence plus a reasonable inference is entitled to significantly more weight than speculation, which is entitled to none. *See Grant*, 870 F.3d at 568 (nonmovant is "only entitled to the benefit of inferences supported by admissible evidence, not those 'supported by only speculation or conjecture'" (citation omitted)).

The Court grants Alesia immunity against Ezell's and Styles' claims. It thus proceeds with its analysis of Alesia's other arguments only with respect to Johnson's claims.

### 2.       Probable Cause

Alesia's argument that the existence of probable cause to arrest Johnson should lead to the Court granting him absolute immunity is unavailing.  It is a bedrock principle of law that a prosecutor can only act as an advocate for the State once it establishes probable cause.  *Buckley*, 509 U.S. at 274; *see also Fields I*, 672 F.3d at 512 ("Prosecutors do not function as advocates before probable cause to arrest a suspect exists."); *see also Wilson v. Est. of Burge*, --- F. Supp. 3d. ---, 2023 WL 2750946, at *32 (N.D. Ill. Mar. 31, 2023) (overstating the degree of which "the line between when a prosecutor's conduct is investigatory and when it is prosecutorial is the presence (or absence) of probable cause" (citations omitted)).  "The question of whether [Alesia] was acting in the role of an advocate or an investigator depends in part on whether probable cause for [Johnson's] arrest existed before [Alesia's]" involvement in the case.  *Hill*, 627 F.3d at 605.  However, "a determination of probable cause does not guarantee a prosecutor absolute immunity from liability for all actions taken afterwards."  *Buckley*, 509 U.S. at 274 n.5.

Here, even if probable cause existed to arrest Johnson, Alesia would not be entitled to absolute immunity.  As previously noted, "a showing that a prosecutor investigated and fabricated evidence against a target would automatically defeat absolute prosecutorial immunity, even if that target was later brought to trial."  *Mills*, 677 F.3d at 331; *see also Buckley*, 509 U.S. at 276 ("A prosecutor may not shield his investigative work with the aegis of absolute immunity merely because, after a suspect is eventually arrested, indicted, and tried, that work may be retrospectively described as 'preparation' for a possible trial; every prosecutor might then shield himself from liability for any constitutional wrong against innocent citizens by ensuring that they go to trial.").  Indeed, Alesia makes no argument that absolute immunity would protect him should the facts indicate that he fabricated Johnson's confession.  The Court thus declines

28

Alesia's invitation to find "a strong presumption" of absolute immunity in light of Johnson's version of events. Doc. 459 at 15.

### 3. Disputes of Fact

Alesia's last argument is that the disputes of fact are all immaterial because even if they all resolve in Plaintiffs' favor the Court would still need to find that he acted in a prosecutorial role. But, as discussed above, if Johnson proves at trial that Alesia fabricated his confession, rather than Johnson having reported it to him, then he will show that Alesia acted in an investigative—not prosecutorial—role. *See Mills*, 677 F.3d at 331; *Coppleson*, 627 F.3d at 605. This is precisely the sort of factual dispute that requires a jury to resolve. *See Brown v. City of Chicago*, 633 F. Supp. 3d 1122, 1153 (N.D. Ill. 2022) ("Factual disputes regarding ASA [Alesia's] role in the process of gathering and creating evidence preclude summary judgment on an absolute immunity theory.").

To summarize, the Court finds that Alesia is entitled to absolute immunity against Ezell's and Styles' claims, but is not entitled to absolute immunity against Johnson's claims.

### B. Qualified Immunity

Alesia also claims that qualified immunity shields him from Johnson's failure to intervene claim. To determine if a defendant is entitled to qualified immunity, the Court considers "(1) whether the facts, taken in the light most favorable to the plaintiff, show that the defendant violated a constitutional right; and (2) whether the constitutional right was clearly established at the time of the alleged violation." *Gonzalez v. City of Elgin*, 578 F.3d 526, 540 (7th Cir. 2009) (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)). Once a defendant claims qualified immunity, the plaintiff bears the burden of showing that the constitutional right was

clearly established when the defendant committed the challenged act. *See Purtell v. Mason*, 527 F.3d 615, 621 (7th Cir. 2008).

Alesia argues that it was not clearly established in 1995 that prosecutors had a duty to intervene against police misconduct. He points to two opinions from this District that found no such duty had been clearly established in 1993, *see Serrano v. Guevara*, 315 F. Supp. 3d 1026, 1038 (N.D. Ill. 2018) ("Whatever the state of the law now, it was not clearly established in 1993 that prosecutors acting as investigators had a duty to intervene when their fellow officers committed constitutional wrongs."), or even 2001, *see Harris*, 330 F.R.D. at 516 n.8 ("[Plaintiff] fails to identify a case establishing that a prosecutor is liable for failure to intervene when he is acting as a prosecutor [in 2001].""). Alesia argues therefore that no such duty could have been clearly established when these events occurred.

To rebut Alesia's argument, Johnson claims that Alesia wrongly places the focus of the analysis on a prosecutor's duty to intervene, contending that Alesia was not acting in a prosecutorial role when he coerced or fabricated their confessions—rather, Johnson argues that Alesia was acting as an investigator, who had a clearly established duty to intervene against fellow officer misconduct, and points to a host of decisions where the reviewing courts denied prosecutors qualified immunity. *See, e.g.*, *Smith v. Burge*, 222 F. Supp. 3d 669, 686 (N.D. Ill. 2016) (declining to dismiss failure to intervene claims against prosecutors for conduct that occurred in 1983 without engaging in a qualified immunity analysis); *Chatman v. City of Chicago*, No. 14 C 2945, 2015 WL 1090965, at *10 (N.D. Ill. Mar. 10, 2015) (finding duty to intervene for prosecutors was established as of 2002); *Rivera v. Lake Cnty.*, 974 F. Supp. 2d 1179, 1191 (N.D. Ill. 2013) (denying prosecutors qualified immunity due to the inappropriateness of using the doctrine at the motion to dismiss stage).

30

Unfortunately for Johnson, the cases he cites do not clearly establish that a prosecutor in 1995—even one working in an investigative capacity—had a duty to intervene against police officers' violations of a third-party's constitutional rights. "[T]he issue is not just whether the plaintiffs' rights were clearly established, but also whether any reasonable official standing in the prosecutors' shoes in 199[5] would have known that their actions—or inaction, as it were—would violate plaintiffs' rights." *Guevara*, 315 F. Supp. 3d at 1038. Although the Seventh Circuit had long established and reemphasized that police officers had a duty to intervene against their fellow officers who violated the constitutional rights of third parties, *see Byrd v. Brishke*, 466 F.2d 6, 11 (7th Cir. 1972) ("[O]ne who is given a badge of authority of a police officer may not ignore the duty imposed by his office and fail to stop other officers who summarily punish a third person in his presence or otherwise within his knowledge."); *Yang v. Hardin*, 37 F.3d 282, 285–86 (7th Cir. 1994) (citing *Brishke*, 466 F.2d at 11), Alesia would not have expected at the time he participated in the Elegant Auto murders case that the same standard might apply to him. True, *Whitlock v. Brueggemann* established that a prosecutor acting as an investigator would be held to the same standard as a police officer. 682 F.3d 567, 583 (7th Cir. 2012) ("[A] prosecutor whose investigatory conduct is the proximate cause of the due process violation that occurs when the false evidence is introduced at trial is held to the same standard of liability as a police officer who does the same thing."). But this decision came out in 2012, "so it had no impact on the notice available to prosecutors in 199[5]." *Guevara*, 315 F. Supp. 3d at 1039. For this reason, other cases Johnson cites, namely *Harris v. City of Chicago*, No. 15 C 3859, 2015 WL 5445012, at *4 (N.D. Ill. Sept. 15, 2015) (declining to dismiss failure to intervene claims because "post-*Whitlock*, a prosecutor acting as an investigator can be held liable for failing to intervene"), and *Patrick v. City of Chicago*, No. 14 C 3658, 2014 WL 7204501, at *10 (N.D. Ill. Dec. 17, 2014)

(declining to dismiss failure to intervene claims on basis of *Whitlock*), are unpersuasive because they do not examine the prosecutors' respective expectations of liability at the time they acted, which would have (hopefully) guided their actions.

Finally, the Court declines to find that it is obvious that Alesia violated Ezell's and Styles' constitutional rights by failing to intervene against the officers' alleged misconduct. *See Doe v. Vill. of Arlington Heights*, 782 F.3d 911, 915 (7th Cir. 2015) (qualified immunity is inappropriate when "the alleged misconduct constituted an obvious violation of a constitutional right" (internal quotations omitted)). The fact that many other courts have spent significant time and effort discussing qualified immunity in the failure to intervene context suggests that this is a tangled legal issue whose resolution depends on the context of each individual allegation. *See Burgess v. Lowery*, 201 F.3d 942, 945 (7th Cir. 2000) (finding of obviousness is appropriate when "the existence of the right was so clear, as a matter of the wording of a constitutional or statutory provision or decisions in other circuits or in the state courts"). As such, the constitutionality of Alesia's actions cannot be as obvious as Ezell and Styles urge. Alesia is thus entitled to qualified immunity on Johnson's failure to intervene claim. *Gonzalez*, 578 F.3d at 540.

The Court grants in part and denies in part Alesia's motion for summary judgment. The Court enters judgment for Alesia on all of Ezell's and Styles' claims against him, as well as on Johnson's failure to intervene claim. Johnson's other claims against Alesia survive to trial.[14]

---

[14] Because Cook County employed Alesia during these events, Johnson's indemnification claim against the County survives to trial as well. However, because Ezell and Styles do not have claims that survive against Alesia, the Court will enter judgment for the County on their respective indemnification claims.

II.     **Remaining Defendants' Motion for Summary Judgment**

The remaining defendants (to whom the Court collectively refers throughout this section as the "Defendant Officers" or "Defendants," excluding Alesia, depending on the context) filed a separate motion for summary judgment challenging several aspects of Plaintiffs' (including McCoy) claims.  The Court takes their arguments in the order they present them.

A.      **Confession Claims**

The Defendant Officers first dispute whom Plaintiffs may sue for allegedly violating their due process rights against fabricated evidence and whom Ezell, Styles, and McCoy may sue for coercing their confessions.[15]  They argue that each Plaintiff casts too wide a net in trying to sue all or most of them for these claims because the evidence is insufficient to show direct involvement in the fabrication of evidence with respect to each Plaintiff or the coercion of Ezell's, Styles' and McCoy's confessions.  But the Defendant Officers concede that the evidence would allow a jury to find at least one of them liable for most of Plaintiffs' confession claims. Plaintiffs respond that the Defendant Officers' overstate the degree of personal involvement required for their claims to survive to trial, and argue that sufficient evidence exists to hold liable each Defendant that Plaintiffs name for their respective claims

A defendant must have "direct personal involvement" in the deprivation of a plaintiff's constitutional rights to be civilly liable under § 1983.  *Pepper v. Vill. of Oak Park*, 430 F.3d 805, 810 (7th Cir. 2005).  But this does not mean that the defendant must have personally participated in the violation of the plaintiff's constitutional rights.  *See Minix v. Canarecci*, 597 F.3d 824, 833–34 (7th Cir. 2010).  The plaintiff "must demonstrate a causal connection between (1) the sued officials and (2) the alleged misconduct."  *Carmody v. Bd. of Trs. of Univ. of Ill.*, 893 F.3d

---

[15] Johnson does not claim that Defendants coerced his confession—he only contends that Defendants fabricated it.

397, 401–02 (7th Cir. 2018). It is sufficient "if the conduct causing the constitutional deprivation occurs at [the officer's] direction or with [the officer's] knowledge and consent.'" *Smith v. Rowe*, 761 F.2d 360, 369 (7th Cir. 1985) (quoting *Crowder v. Lash*, 687 F.2d 996, 1005 (7th Cir.1982)). Put differently, to be liable "an official 'must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye.'" *Knight v. Wiseman*, 590 F.3d 458, 463 (7th Cir. 2009) (quoting *Johnson v. Snyder*, 444 F.3d 579, 583 (7th Cir. 2006)).

Coerced confessions implicate the Fifth Amendment's protection against self-incrimination. *Jackson v. Curry*, 888 F.3d 259, 265 (7th Cir. 2018). Courts evaluate such claims under a totality of the circumstances test "to determine whether the suspect confessed voluntarily, of his own free will, or whether the police overrode his volition." *Id.* "Relevant are the suspect's age, intelligence, and mental state, the length of the detention, the nature of the interrogations, whether the suspect received *Miranda* warnings, whether physical coercion occurred, and the deprivation of food or sleep." *Jakes v. Boudreau*, No. 19 C 2204, 2023 WL 3585629, at *13 (N.D. Ill. May 22, 2023).

Fabricated evidence implicates a suspect's due process rights. "The essence of a due-process evidence-fabrication claim is that the accused was convicted and imprisoned based on knowingly falsified evidence, violating his right to a fair trial and thus depriving him of liberty without due process." *Patrick v. City of Chicago*, 974 F.3d 824, 835 (7th Cir. 2020). A defendant is liable for fabricating a confession if the plaintiff proves that the defendant "(1) knowingly fabricated (2) false evidence (physical or testimonial), (3) the false evidence was used against him in his criminal trial, and (4) it was material to his conviction." *Gray v. City of Chicago*, No. 18 C 2624, 2022 WL 910601, at *12 (N.D. Ill. Mar. 29, 2022) (citing *Patrick*, 974 F.3d at 835).

The Defendant Officers do not claim that Plaintiffs lack sufficient evidence to show that their confessions were the product of coercion or fabrication. As such, the Court's analysis of Plaintiffs' respective claims will focus on whether they have sufficient proof to bring their claims against the named Defendant Officers.

### 1. McCoy's Claims

McCoy sues Cassidy and Davis for coercing his confession and most of the Defendant Officers for allegedly fabricating it. Defendants concede that the evidence allows his claims to proceed against Cassidy but dispute the validity of his claims against the other Defendant Officers he names in these claims.

### a. Coercion Claim

The only question is whether the evidence allows McCoy's coercion claim against Davis to proceed. The Defendant Officers argue that McCoy could only name Cassidy with certainty as one of the officers who coerced him and that even if Davis was involved, his actions did not rise to the level of coercion.

Although McCoy testified that he could only recall with certainty Cassidy's involvement in his interrogation, that does not necessarily mean that Cassidy was the only detective who participated in coercing McCoy's confession. In McCoy's testimony at his motion to suppress hearing in 1997, he described two other detectives who entered his interrogation room as a stocky, potentially Hispanic man with dark hair, and a black man with black hair. McCoy alleges that those officers yelled at and threatened him. He argues that based on his description of the two other officers, a jury could infer that Davis (and Daly, against whom McCoy does not bring a coercion claim) participated in his interrogation and could therefore be held liable.

Although this evidence is thin, it is enough to leave this question for a jury. Despite Defendants' argument that McCoy's testimony is too vague to support a claim against Davis, a reasonable jury could use it to infer that Davis was present for McCoy's interrogation and participated in it. *See Grant*, 870 F.3d at 568 (nonmovant is "entitled to the benefit of inferences supported by admissible evidence"). If the jury infers that Davis participated in McCoy's interrogation, it would be reasonable for the jury to find Davis liable for helping coerce the confession given McCoy's testimony that the other officers present yelled at and threatened him. *See Curry*, 888 F.3d at 265.

### b.        Fabrication Claim

The Court next considers whom McCoy may sue for his due process claim based on a theory of fabricated evidence. The Defendant Officers hold the position that only Cassidy can be liable for fabricating McCoy's confession, while McCoy argues that Davis, Daly, Bloore, Valadez, Ryan, Coughlin, and Richardson are also proper defendants.

The Court finds that McCoy's due process claims may proceed against Bloore, Valadez, Ryan, Coughlin, and Richardson. To impute knowledge of each other's wrongs, McCoy points to evidence that Cassidy briefed several of the other Defendant Officers, that the Defendant Officers were in an information-sharing environment and obtained updates regarding Plaintiffs' individual interrogations throughout the night of December 5, 1995, and that they should have known that McCoy's confession was false "based on their own acts of fabrication." Doc. 475 at 23. Defendants argue that McCoy fails to point to evidence that shows when these officers would have obtained knowledge of the tactics used against him. *See Jakes*, 2023 WL 3585629, at *13 (granting summary judgment when "alleged misconduct occurred many hours before the alleged coercion of Jakes's confession"). But the fact that Bloore, Valadez, Ryan, Coughlin, and

36

Richardson may have known that McCoy's confession was false and chose to do nothing to prevent his subsequent prosecution and conviction could show that they "turn[ed] a blind eye" to the constitutional deprivations. *Knight*, 590 F.3d at 463. Moreover, resolving who knew what and when is ultimately a jury question best dealt with at trial, meaning McCoy's evidence against Bloore, Valadez, Ryan, Coughlin, and Richardson is sufficient to survive summary judgment. *See Brown*, 38 F.4th at 549 (trial is necessary when evidence would allow jury to find for non-moving party).

With respect to Davis and Daly, however, McCoy's claims cannot proceed. McCoy argues that because the physical descriptions of his interrogators would allow a jury to infer that Davis and Daly participated in his interrogation, the jury could subsequently infer that Davis and Daly (1) heard his alibi, (2) would have known that his alibi was true based on the lack of corroborating evidence, and (3) therefore knew that his confession was false. But even if Davis and Daly participated in his interrogation and heard his alibi, it would not be reasonable to infer that they knew his confession was therefore false. *See Coleman v. City of Peoria*, 925 F.3d 336, 346 (7th Cir. 2019) (participation in coercion is insufficient to find liability for fabrication); *see also Avery v. City of Milwaukee*, 847 F.3d 433, 439 (7th Cir. 2017) ("[A] claim that an officer coerced a witness to give incriminating evidence does not, at least standing alone, violate the wrongly convicted person's due-process rights."). Crucially, unlike the rest of the Defendant Officers that McCoy names, no evidence suggests that Davis and Daly were present to learn of the *other* officers' respective acts of coercion and fabrication that may have led them to know that McCoy's confession (and the other Plaintiffs' confessions) was phony. Without that evidence, only speculation supports McCoy's claim against them. *See Carmody v. Bd. of Trs. of*

*Univ. of Ill.*, 893 F.3d 397, 401 (7th Cir. 2018) ("[I]nferences that are supported by only speculation or conjecture will not defeat a summary judgment motion.").

### 2.    Ezell's Claims

The Court turns to Ezell's claims.  He sues Coughlin, Green, and Cassidy for coercing his confession, and all Defendant Officers for allegedly fabricating his confession.  The Defendant Officers concede only that he may bring these claims against Coughlin and Green.

### a.    Coercion Claim

Defendants argue that insufficient evidence exists to support Ezell's claim that Cassidy helped coerce his confession.  But Ezell claims that, as the purported originator of McCoy's false confession—from which the other false confessions necessarily sprung—Cassidy is liable because he would have known that Ezell's confession would also be coerced.  Plaintiffs also cite evidence that suggests that Cassidy told Coughlin and Green about the details of McCoy's confession.  This evidence is similarly as thin as McCoy's evidence, but it is enough for a jury to infer that Cassidy "kn[e]w about [Coughlin and Green's] conduct and facilitate[d] it, approve[d] it, condone[d] it, or turn[ed] a blind eye" because a jury could infer that Cassidy shared the tactics he used against McCoy and encouraged Coughlin and Green to take a similar approach. *Knight*, 590 F.3d at 463.  Defendants argue, that "no one testified to" any of the inferences that Ezell asks a jury to draw, Doc. 505 at 17, but this gripe boils down to a belief that a jury should not make an inference that this Court finds it would be permitted to make, *see Cairel v. Alderden*, 821 F.3d 823, 830 (7th Cir. 2016) (plaintiff is entitled to the benefit of all inferences at the summary judgment stage).

### b.        Fabrication Claim

Defendants argue that Ezell has not provided sufficient evidence to support his claim that Bloore, Boudreau, Cassidy, Daly, Davis, Fine, Richardson, Ryan, and Valadez fabricated his confession. With respect to Cassidy, Ezell's due process claim survives against him for the same reasons discussed with respect to his coercion claim. And, like McCoy's due process allegation against the Defendant Officers who did not allegedly participate in his interrogation, Ezell's claims against Bloore, Boudreau, Fine, Richardson, Ryan, and Valadez survive because the evidence that these Defendant Officers worked in an information-sharing environment and used coercive tactics in the interrogations of Ezell's co-Plaintiffs could support an inference that they all knew that Cassidy, Coughlin, and Green similarly used coercive tactics to fabricate his confession and subsequently turned a blind eye to the unconstitutional conduct. *See Knight*, 590 F.3d at 463. Defendants' contrary contention again pits the inference Ezell asks the jury to make against a lack of direct evidence proving the truth of the inference. This argument, however, does not defeat summary judgment. *See Cairel*, 821 F.3d at 830.

However, because the Court rejected McCoy's effort to hold Davis and Daly liable for fabricating his confession, the same analysis does not apply to them. Plaintiffs cannot otherwise tie Davis and Daly to Ezell's fabricated confession, so the Court grants them summary judgment on Ezell's fabrication claim.

### 3.        Styles' Claims

The Court next considers Styles' claims. He sues Bloore, Cassidy, and Terrell for coercing his confession, and all Defendant Officers for allegedly fabricating it. Defendants concede that he may bring these claims against Bloore, but they argue that he cannot sue the other defendants.

### a. Coercion Claim

Defendants claim that Styles lacks sufficient evidence to bring his claims against Cassidy and Terrell to trial. Styles' claim against Cassidy survives for the same reasons the Court articulated with respect to Ezell's claim—if he coerced McCoy's false confession, then he would have known that Styles' confession was likewise the product of coercion and fabrication. *See Knight*, 590 F.3d at 463.

Styles' claim against Terrell also survives because Terrell testified that he witnessed Bloore's interrogation against Styles and did not inform him of his right to have a guardian present during the questioning. Although Styles does not allege that Terrell joined in Bloore's coercive tactics, it is sufficient that he had knowledge of Bloore's allegedly unconstitutional acts and subsequently failed to perform his duties as a youth officer to protect an underaged suspect. *See id*. (condoning or turning a blind eye to unconstitutional behavior personally witnessed is sufficient for § 1983 liability). In opposition, Defendants first argue that because Styles' grandmother knew he was being questioned for murder that it somehow discharged Terrell's duty to inform Styles that *he* had the right to have her present during his interrogation. But Defendants' linguistic maneuver to substitute his guardian's knowledge for his guardian's presence is unavailing, and, as far as this Court can tell, has no legal support. Defendants' second argument is that Styles' claim that Terrell witnessed his confession and should be held liable for participating in its coercion impermissibly contradicts his prior sworn testimony in 1995 that Terrell was not present for the interrogation. Defendants cite the generally accepted principle of summary judgment practice that a plaintiff cannot "contradict[] deposition testimony with later-filed contradictory affidavits." *Lafary v. Rogers Grp., Inc.*, 591 F.3d 903, 908 (7th Cir. 2010) (quoting *Ineichen v. Ameritech*, 410 F.3d 956, 963 (7th Cir. 2005)). Of course, it is an

important rule that parties cannot skate through summary judgment by fabricating disputes of fact where none exist. But this rule does not stand for the proposition that a party's recollection cannot change over time, or that a plaintiff cannot bring claims when newly-developed evidence supporting those claims contradicts the plaintiff's prior statements. Here, it is true that in 1998 Styles did not identify Terrell as participating in the coercive behavior resulting in his confession. But during the course of this litigation, Styles developed evidence in the form of Terrell's testimony that Terrell witnessed Styles' confession, failed to provide him with *Miranda* warnings, and did not perform any of his other duties as a youth officer. This is not the kind of contradictory evidence against which the principle Defendant Officers cite is meant to guard.

### b. Fabrication Claim

Defendants also contest whether Styles has sufficient evidence to bring a due process fabrication claim against Richardson, Cassidy, Coughlin, Daly, Davis, Ryan, and Valadez. A jury could hold Cassidy liable on Styles' fabrication claim for the reasons outlined above because it could find that Cassidy knew that he coerced McCoy's false confession and that any confessions the other suspects issued would likewise be the product of coercion and fabrication. *See Knight*, 590 F.3d at 463 (knowledge of unconstitutional acts is sufficient for personal liability under § 1983). A jury could also hold Richardson liable for having knowledge of Bloore's acts of fabrication. Richardson was present for Bloore's physical abuse against Styles and for at least one of Bloore's interrogation sessions. That, plus the fact that Richardson and Bloore said they worked as partners during the Elegant Auto murder investigation, is sufficient for a jury to infer that Richardson knew that Bloore fabricated Styles' confession. *See id*. A jury could also hold Valadez, Ryan, and Coughlin liable for knowing that Bloore fabricated Styles' confession for the reasons discussed with respect to McCoy and Ezell. *See id*. For the reasons

41

stated above, however, a jury could not find Davis and Daly liable for fabricating McCoy's confession, and thus Plaintiffs cannot tie them to the knowledge and condonement of Styles' fabricated confession. The Court, therefore, grants Davis and Daly summary judgment on this claim while allowing Styles' claim against the remaining named Defendants to proceed.

### 4. Johnson's Claim

Johnson only brings a due process fabrication claim against Valadez, Ryan, Cassidy, Bloore, Coughlin, Daly, Davis, and Richardson. Defendants argue that Johnson only has evidence that Alesia fabricated Johnson's confession, and that Alesia's decision to pursue criminal charges "broke the chain" between any of the Defendant Officers' alleged acts of fabrication and subsequent liability for their potential wrongs.

The Court starts with Defendants' argument that Alesia's decision to initiate charges against Johnson automatically negates any responsibility they may have for fabricating his confession. Defendants cite two cases, *Whitlock*, which the Court previously discussed, and *Moorer v. Valkner*, No. 18 C 3796, 2021 WL 5998533 (N.D. Ill. Dec. 20, 2021), in support. Neither case provides good reason for this Court to find that Johnson cannot pursue his claims against the Defendant Officers due to Alesia's approval of charges. It is true that the *Whitlock* court noted that "[t]he causal link between a police officer's fabrication and the victim's injury may be broken if that police officer tells a prosecuting attorney before trial about the fabrication." 682 F.3d at 583. But this only relates to a prosecutor who becomes involved in the prosecution after the investigation has concluded, learns of the officers' acts of fabrication, and forms an independent decision to file charges despite that knowledge. *See id.*; *see also Colbert v. City of Chicago*, 851 F.3d 649, 655 (7th Cir. 2017) (stating that independent indictment usually breaks causal chain leading to liability). It does not consider whether a police officer is

42

immunized for his misconduct simply because he engages in it alongside a prosecutor. *See Whitlock*, 682 F.3d at 584 ("One's own conduct cannot be an intervening cause sufficient to defeat a finding of causation."). For similar reasons, *Moorer* is also unpersuasive because it dealt with the independent acts of prosecutors who did not participate in the alleged unconstitutional acts—it did not consider whether a prosecutor's decision to pursue charges terminated any liability for officers with whom the prosecutor allegedly worked to fabricate evidence. *Moorer*, 2021 WL 5998533, at *17 (describing acts of prosecutors uninvolved with investigation who made independent decision to charge plaintiff). Rather, the proper focus for the argument Defendants make here would be whether prosecutors further down the line made decisions to continue pursuing charges after learning about their fabrication. *See Jones*, 856 F.2d at 993 ("The jury was entitled to find that had it not been for the misconduct of the defendants, Jones would neither have been arrested nor charged."). Because Johnson has at least enough proof to survive summary judgment that other Defendant Officers worked with Alesia to fabricate his confession, a jury could find that Alesia did not make an independent decision to pursue charges against Johnson and so the causal chain attaching the Defendant Officers to personal liability remains intact. *See id.*; *see also Rivera*, 974 F. Supp. 2d at 1191 (cooperation between investigators and prosecutor during investigation and decision to indict meant causal chain remained unbroken post-indictment).

Because the Court will not shield the Defendant Officers from liability based on Alesia's actions, it finds that Johnson may pursue his claims against them. Both Ryan and Valadez could be liable for Johnson's fabrication claim because Johnson brings forward evidence that a jury could use to infer knowledge on their behalf that his confession was false. Specifically, Ryan and Valadez both testified that Johnson told them he was innocent and provided them with

names of witnesses who could prove his alibi. Neither worked to verify or discredit Johnson's story. And Valadez was later in the room when Alesia produced a confession based on a story that Johnson claims he never uttered. These facts, combined with the evidence the Court has already discussed that would allow the jury to infer that the Defendant Officers shared information about their respective investigations with each other, are sufficient for a jury to infer that both Ryan and Valadez knew that Alesia fabricated Johnson's confession and hold them liable. *See Knight*, 590 F.3d at 463.

A jury could also hold Cassidy liable for knowing of Valadez's, Ryan's, and Alesia's fabrication of Johnson's confession for the same reasons discussed with respect to Ezell and Styles. *See id.* Bloore, Coughlin, and Richardson may likewise be held liable for knowing that Johnson's confession was a fabrication for the same reasons discussed above, namely their own acts of fabrication and circumstantial evidence that they discussed the coercive tactics they were using against the other Plaintiffs. *See id.*

But once more, a jury could not find Davis and Daly liable for fabricating McCoy's confession, and thus Plaintiffs cannot tie them to the knowledge and condonement of Johnson's fabricated confession. The Court grants them summary judgment on Johnson's claim.

To summarize, although Plaintiffs do not offer the strongest proof of Defendants' conduct, the Court agrees with Plaintiffs' argument that sufficient circumstantial evidence exists for a jury to infer that the Defendant Officers, with the exception of Davis and Daly, potentially knew that Plaintiffs' confessions were the product of coercion or fabrication and that they each condoned the unconstitutional conduct or turned a blind eye to it. *See id.* As such, the Court denies Defendants' motion for summary judgment with respect to Plaintiffs' coercion claim brought under the Fifth Amendment. The Court grants Davis' and Daly's motions for summary

44

judgment with respect to Plaintiffs' due process claim based on the fabrication of evidence, but denies summary judgment to the other Defendant Officers on this claim.

### B.    Other Due Process Theories

In addition to the theory that Defendants fabricated their confessions, Plaintiffs bring their due process claims under *Brady* and unduly-suggestive-lineup-construction theories of liability. The Court considers Defendants' challenges to each theory.

#### 1.    *Brady* Claims

Plaintiffs allege that Defendants withheld evidence that the Defendant Officers coerced and fabricated each of their co-Plaintiffs' respective confessions.[16] "While most commonly viewed as a prosecutor's duty to disclose to the defense, the duty extends to the police and requires that they similarly turn over exculpatory/impeaching evidence to the prosecutor, thereby triggering the prosecutor's disclosure obligation." *Carvajal v. Dominguez*, 542 F.3d 561, 566 (7th Cir. 2008) (citing *Youngblood v. West Virginia*, 547 U.S. 867, 870 (2006)). A civil *Brady*-based due process claim against a police officer requires the plaintiff to demonstrate that the evidence in question was favorable to him, the police suppressed the favorable evidence, and prejudice ensued because the suppressed evidence was material. *See Moran v. Calumet City*, 54 F.4th 483, 492 (7th Cir. 2022); *Carvajal*, 542 F.3d at 566–67; *see also Cairel*, 821 F.3d at 832 &

---

[16] Defendants also moved for summary judgment on Plaintiffs' claims that they withheld evidence related to Neira's failure to identify them as the perpetrators of the Elegant Auto murders when he viewed a suspect lineup and that they withheld evidence regarding their initial consideration of Moore as a suspect. Although Plaintiffs discussed their *Brady* claims in their response with respect to the withholding of information regarding the circumstances of each other's interrogations, see Doc. 475 at 33–36, they only included one generic allegation—in a completely separate part of their brief—that Defendants "failed to properly document and disclose . . . that eyewitness[] . . . Neira . . . failed to identify any of the suspects in the lineup and that Moore . . . was himself a suspect," *id.* at 51. This response does not sufficiently preserve those claims. *See Maclin v. SBC Ameritech*, 520 F.3d 781, 788 (7th Cir. 2008) (finding claim abandoned when plaintiff failed to defend it against defendant's arguments on summary judgment); *Barnes v. Nw. Repossession, LLC*, 210 F. Supp. 3d 954, 970 (N.D. Ill. 2016) (plaintiff's failure to respond to defendant's argument that it was entitled to summary judgment on claim meant that plaintiff conceded that summary judgment on that claim was warranted).

n.2. Evidence is suppressed for *Brady* purposes if the "prosecution failed to disclose evidence that it or law enforcement was aware of before it was too late for the defendant to make use of the evidence" and "the evidence was not otherwise available to the defendant through the exercise of reasonable diligence." *Boss v. Pierce*, 263 F.3d 734, 740 (7th Cir. 2001); *see also Ienco v. Angarone*, 429 F.3d 680, 683 (7th Cir. 2005).

Defendants do not contend that evidence surrounding the circumstances of Plaintiffs' coerced and fabricated confessions was unfavorable or immaterial to Plaintiffs' criminal cases. Rather, they claim that Plaintiffs already knew that the police had coerced their own confessions and those of their respective co-Plaintiffs, so *Brady* never imposed a duty on Defendants to disclose that they did. Plaintiffs respond that Defendants misplace the focus of the disclosure duty on whether the confessions were true, arguing instead that Defendants "suppressed their tactics of coercion and fabrication." Doc. 475 at 34.

Defendants' position is correct—Plaintiffs cooperated throughout their prosecutions, most significantly through Ezell's and McCoy's, and Styles' and Johnson's joint trials, or had the opportunity to otherwise learn about the coercive methods the Defendant Officers employed to obtain their respective confessions by reading each other's motions to suppress. This provided them ample opportunity to gather evidence concerning the Defendant Officers' tactics of coercion and fabrication, removing such evidence from *Brady*'s reach. *See Angarone*, 429 F.3d at 683.

Plaintiffs offer several cases that they claim show that *Brady* obligated Defendants to disclose the specific circumstances surrounding their interrogations, none of which are directly on point. *See Anderson v. City of Rockford*, 932 F.3d 494, 507 (7th Cir. 2019); *Avery*, 847 F.3d at 439; *Newsome v. McCabe*, 319 F.3d 301, 304 (7th Cir. 2003); *Fields II*, 740 F.3d at 1123

46

(Sykes, J., concurring in part); *Wilson*, 2023 WL 2750946, at *40. But the first three of these cases dealt with *witness*—not *suspect*—interrogations, where the police failed to disclose the means they used to obtain inculpatory statements from the witnesses. *See Anderson*, 932 F.3d at 507 ("Due process entitled the plaintiffs to learn before their trial what went on with [witness] Bryce Croft."); *Avery*, 847 F.3d at 439 (holding that accused is entitled to *Brady* disclosure of circumstances surrounding witness interview to "impeach the coerced testimony by pointing to the tactics the officers used to extract it"); *Newsome*, 319 F.3d at 304 (upholding jury verdict holding police officers liable when they "concealed exculpatory evidence—the *details of how they induced the witnesses* to finger Newsome" (emphasis added)). In those cases, the suspects did not have access to the means the police used to obtain the witness testimony because they were not present for the interrogations themselves. That contrasts with the facts of this case, where each plaintiff knew how they were treated at the hands of the police, and knew (or should have exercised reasonable diligence to know) how the police interrogated each of the co-plaintiffs. *See Boss*, 263 F.3d at 740.

Judge Sykes' concurrence in *Fields II* likewise did not consider these specific circumstances, and is equally unhelpful to Plaintiffs. Judge Sykes discussed how plaintiffs bringing wrongful conviction cases could bring *Brady* claims against police officers who suppressed exculpatory evidence. *See Fields II*, 740 F.3d at 1123–24. *Fields II* concerned whether the defendant prosecutors were entitled to absolute immunity—it did not ask whether police officers had a *Brady* obligation to disclose to accused individuals the specific tactics used to obtain their confessions. The Court thus does not take Judge Sykes' statement that "if the police officers working with [prosecutors] withhold exculpatory information about coerced or

fabricated evidence, the aggrieved defendant will have a good § 1983 claim against the officers for violation of *Brady*" as a blanket legal principle that saves Plaintiffs' claims. *Id.* at 1123.

*Wilson*, Plaintiffs' last case, is also distinguishable because of the nature of the evidence that the police allegedly suppressed. In *Wilson*, the plaintiff alleged that in addition to withholding information about his own confession the "Defendants also suppressed the implements of their abuse, buried evidence of systemic abuse, and obstructed investigations into the systematic abuses." *Wilson*, 2023 WL 2750946, at *40. That is, there was physical evidence that the defendants tortured the plaintiff's co-defendant—in the form of the tools they used—as well as evidence of the widespread use of torture against suspects in their police station. *See id.* at *48 (detailing evidence of systemic torture). The plaintiff did not have access to that information. That contrasts with the facts of this case where the only evidence of coercion is Plaintiffs' testimony that the Defendant Officers coerced them using hostile language, sleep deprivation, and trickery into falsely confessing to the Elegant Auto murders. Plaintiffs had access to this evidence—including evidence of their co-Plaintiffs' coercive interrogations— through the exercise of reasonable due diligence, such as reading each other's respective motions to suppress. *See Boss*, 263 F.3d at 740.

At bottom, Plaintiffs claim that Defendants had an obligation to disclose the precise means they used to interrogate them, despite each of the Plaintiffs having experienced the interrogations themselves and testifying as to Defendants' coercive methods. Given that the law does not require the police "to accurately disclose the circumstances of their investigations," *Saunders-El v. Rohde*, 778 F.3d 556, 562 (7th Cir. 2015), and Plaintiffs do not allege that Defendants failed to hand over documents or other physical evidence, it is unclear what additional evidence Plaintiffs could have sought under *Brady*. *Cf. United States v. Roberts*, 534

F.3d 560, 572 (7th Cir. 2008) ("[D]efendant must provide some evidence other than mere speculation or conjecture that evidence was exculpatory and suppressed by the Government." (citation omitted)).

The Court grants Defendants' motion for summary judgment on Plaintiffs' due process claims based on a *Brady*-violation theory.

### 2.      Identification Claims

Plaintiffs' second due process claim relates to the alleged use of unduly-suggestive lineup procedures.  Defendants dispute that Plaintiffs properly pleaded any such claims.  They also argue that faulty identification claims are not cognizable under § 1983 because the Constitution does not guarantee Plaintiffs a fair lineup procedure, and that in any event the undisputed evidence defeats Plaintiffs' claims.  Because the Court agrees that this claim is not cognizable in light of the Supreme Court's holding in *Vega v. Tekoh*, 597 U.S. 134 (2022), it grants Defendants summary judgment on this theory of liability.

In *Vega*, the Court considered the question of whether a plaintiff could sue an officer who obtained an inculpatory statement in violation of the plaintiff's *Miranda* rights, when that statement was later introduced into evidence against the plaintiff in criminal proceedings.  *Id.* at 138.  To answer this question, the Court first noted that *Miranda*'s protections are not substantive rights that flow from the Fifth Amendment but are rather "procedural protections [that are] necessary to prevent the violation of" Fifth Amendment substantive rights.  *Id.* at 141.  Violating these "prophylactic rules . . . does not necessarily constitute a violation of the Constitution, and therefore such a violation does not constitute 'the deprivation of [a] right . . . secured by the Constitution.'"  *Id.* at 149–50 (quoting 42 U.S.C. § 1983).

Although *Vega* only determined that violations of *Miranda* do not give rise to a § 1983 claim, this Court discerns a broader rule that § 1983 does not support constitutional claims when they arise out of alleged violations of judge-made prophylactic rules. *See id.* at 144 (citing *Maryland v. Shatzer*, 559 U.S. 98, 106 (2010) ("A judicially crafted rule is 'justified only by reference to its prophylactic purpose,' and applies only where its benefits outweigh its costs." (quoting *Davis v. United States*, 512 U.S. 452, 458 (1994)))). Because the rule prohibiting "unduly suggestive identification procedures 'is a prophylactic rule designed to protect a core right,'" *Alexander v. City of S. Bend*, 433 F.3d 550, 555 (7th Cir. 2006) (quoting *Hensley v. Carrey*, 818 F.2d 646, 649 (7th Cir. 1987)), Plaintiffs cannot bring a § 1983 claim for its violation, *Vega*, 597 U.S. at 149–50.

Plaintiffs point to several courts within this District that have allowed identical claims to proceed. *See Washington v. Boudreau*, No. 16 C 1893, 2022 WL 4599708, at *22 (N.D. Ill. Sept. 30, 2022); *Gray*, 2022 WL 910601, at *12 (N.D. Ill. Mar. 29, 2022); *Sanders v. City of Chi. Heights*, No. 13 C 221, 2016 WL 2866097, at *7–10 (N.D. Ill. May 17, 2016). But with the exception of *Boudreau*, the respective decisions all issued before the Supreme Court's decision in *Vega*. And *Boudreau* did not grapple with *Vega*'s holding, choosing instead to allow the plaintiffs' identification-related claim to proceed based on the Seventh Circuit's decision in *Holloway v. City of Milwaukee*, 43 F.4th 760, 765 (7th Cir. 2022). *Holloway* explicitly raised— and demurred on—the question of whether the protection against faulty identification procedures is a prophylactic "trial right" or whether "it is more broadly enforceable." *Id.* at 766. The *Holloway* court acknowledged *Vega*'s holding, but the awkward timing of *Vega*'s ruling when compared to the schedule of the briefing and oral argument in *Holloway* meant that the "parties paid no heed to [this 'important question'] until [the court] raised the issue at oral argument." *Id.*

50

The court chose to "flag the issue and save it for another day." *Id.* This Court, with the benefit of the briefing of the parties, is persuaded that it cannot cabin *Vega* to its *Miranda* context.[17]

The Court grants Defendants summary judgment on Plaintiffs' due process claims insofar as the claims rely on theory of unduly suggestive identification procedures.

### C. Fourth Amendment and Malicious Prosecution Claims

Plaintiffs bring unlawful detention claims under the Fourth Amendment, as well as state law malicious prosecution claims, against all Defendant Officers. To succeed on their Fourth Amendment claims, Plaintiffs must show that the Defendant Officers caused their detention despite lacking probable cause, and that the resulting criminal proceedings terminated in their favor. *See Lewis v. City of Chicago*, 914 F.3d 472, 476 (7th Cir. 2019); *Bailey v. United States*, 568 U.S. 186, 192 (2013) ("[T]he general rule [is] that Fourth Amendment seizures are 'reasonable' only if based on probable cause to believe that the individual has committed a crime."). To succeed on their malicious prosecution claims under Illinois law, Plaintiffs must show: "(1) the commencement or continuation of an original criminal or civil judicial proceeding by the defendant; (2) the termination of the proceeding in favor of the plaintiff; (3) the absence of probable cause for such proceeding; (4) the presence of malice; and (5) damages resulting to the plaintiff." *Johnson v. City of Chicago*, No. 20 C 7222, 2021 WL 4438414, at *3 (N.D. Ill. Sept. 28, 2021).

#### 1. Styles

The Defendant Officers argue that Ali's and Hudley's respective identifications of Styles as one of the perpetrators of the Elegant Auto murders provided them with sufficient probable

---

[17] As the Court discusses below, however, evidence related to the lineups will be relevant to Styles' Fourth Amendment claims against the Defendant Officers because they argue the lineups provided them with at least arguable probable cause to detain him.

cause to detain him and entitle them to summary judgment on his Fourth Amendment and malicious prosecution claims. Plaintiffs raise concerns regarding the procedures that Boudreau, Valadez, Daly, Davis, and Fine used to construct both of the lineups.[18] Because the lineups are the only evidence on which the Defendant Officers rely for probable cause, if the Court finds that there is sufficient evidence for a jury to find that certain Defendants conducted them in an unconstitutional manner, then Styles' Fourth Amendment and malicious prosecution claims may proceed to trial.

Probable cause "requir[es] only a probability of criminal activity; it exists whenever an officer or a court has enough information to warrant a prudent person to believe criminal conduct has occurred." *Young v. City of Chicago*, 987 F.3d 641, 644 (7th Cir. 2021) (quoting *Whitlock v. Brown*, 596 F.3d 406, 411 (7th Cir. 2010)). "[A]n eyewitness 'identification, even if questionable, is enough to give the police probable cause to arrest." *Moran*, 54 F.4th at 500 (alterations in original) (quoting *Coleman*, 925 F.3d at 351). "To supply probable cause, witness identifications cannot be the product of coercion or manipulation." *Hart v. Mannina*, 798 F.3d 578, 588 (7th Cir. 2015). "The question of probable cause is typically a proper issue for a jury if there is room for a difference of opinion concerning the facts or the reasonable inferences to be drawn from them." *Sornberger v. City of Knoxville*, 434 F.3d 1006, 1013–14 (7th Cir. 2006); *see also Bolden v. Pesavento*, 623 F. Supp. 3d 897, 922 (N.D. Ill. 2022) ("Probable cause rested on the identification, and the record was loaded with evidence supporting an inference that identification was problematic[.]"); *Gray*, 2022 WL 910601, at *9 (denying summary judgment on probable cause grounds when "the validity of [the] lineup [used to identify plaintiff was] in

---

[18] Defendants contest whether Plaintiffs can hold all of these officers liable for participating in the lineup procedures. Because there is documentary evidence tying each of these individuals to the lineups that Ali and Hudley viewed, the Court will allow the Fourth Amendment claim to proceed against them. *See Jimenez v. City of Chicago*, 830 F. Supp. 2d 432, 452 (N.D. Ill. 2011).

question" (citation omitted)); *Jimenez*, 830 F. Supp. 2d at 450 ("Without the [eyewitness] statements . . . [t]he only other evidence against [the plaintiff] was the existence of an alleged motive.  In sum, there is far less evidence to support probable cause[.]").

Plaintiffs point to several facts that they claim would allow a jury to find that the Defendant Officers would have known that the eyewitness identifications were tainted, meaning they could not provide probable cause to detain Styles.  Plaintiffs point to the construction of each lineup: in the first lineup Ali reviewed, all five individuals were under suspicion of participating in the Elegant Auto murders, and the lineup Hudley examined had only one non-suspect filler alongside Plaintiffs.  Plaintiffs argue that these facts, paired with the expert testimony from both their own and Defendants' expert showing that these lineups violated national and Chicago Police Department standards surrounding eyewitness identifications, show that the Defendant Officers could not have reasonably relied on them.  *See Gregory-Bey v. Hanks*, 332 F.3d 1036, 1045 (7th Cir. 2003) ("Eyewitness identification testimony can violate a defendant's constitutional right to due process of law when it creates a 'substantial likelihood of irreparable misidentification.'" (quoting *Neil v. Biggers*, 409 U.S. 188, 198 (1972)); *Sanders*, 2016 WL 2866097, at *8–9 (expert evidence that procedures used to conduct suspect lineups raises "reasonable inference that these identification procedures were unnecessarily suggestive" (citing *Jimenez*, 732 F.3d at 721–22).  Plaintiffs also note that Ali testified that an officer, whom Ali could not identify in his deposition, told him that they had arrested the shooters, which they argue primed Ali to make a positive identification rather than fully consider whether he had actually seen anyone in the lineup.  These facts are sufficient for a jury to find that Ali's and Hudley's identifications were unreliable and thus an insufficient basis for probable cause.  *See, e.g.*, *Pesavento*, 623 F. Supp. 3d at 922 ("Probable cause rested on the identification, and the

record was loaded with evidence supporting an inference that identification was problematic[.]");
*Gray*, 2022 WL 910601 at *9 ("[A] reasonable jury could conclude that the officers would have
been aware that [the witness's] identification of [the plaintiff] was not reasonably reliable.");
*Jimenez*, 830 F. Supp. 2d at 450 ("In short, under [the plaintiff's] version of the facts, which a
reasonable jury could adopt, [the witness's] statements are unreliable and thus cannot be a basis
for a finding that probable cause existed as a matter of law.").

In support of the lineup evidence, the Defendant Officers argue that none of them
pressured Ali or Hudley into making an identification, that the lineups themselves did not single
out any individual suspect through differences in race or particularly distinctive clothing, that the
strength of Ali and Hudley's identifications entitled the Defendant Officers to rely on them, and
that Plaintiffs' evidence is comparatively weak.  The Defendant Officers may ultimately be right
about the relative strength of the parties' respective evidence, but the Court cannot weigh the
evidence to resolve this dispute at the summary judgment phase.  *See Gupta v. Melloh*, 19 F.4th
990, 996 (7th Cir. 2021) ("Where the material facts specifically averred by one party contradict
the facts averred by a party moving for summary judgment, the motion must be denied.").

The Defendant Officers also seek qualified immunity against Styles' Fourth Amendment
claim, arguing that even if the lineups used to obtain Ali's and Hudley's identifications were
faulty, they still had "arguable probable cause" to detain Styles, *Humphrey v. Staszak*, 148 F.3d
719, 725 (7th Cir. 1998), which is sufficient to obtain qualified immunity, *see Spiegel v. Cortese*,
196 F.3d 717, 723 (7th Cir. 1999).  But whether the lineups provided them with arguable
probable cause is also an issue of disputed fact, so the Court will not grant qualified immunity on
this basis.  *See Sornberger*, 434 F.3d at 1013–14 (jury must resolve issues of probable cause
when facts are in dispute).

Because the Court leaves to the jury the issue of probable cause, the Court denies the Defendant Officers' motion for summary judgment on Styles' Fourth Amendment and malicious prosecution claims.

### 2. Johnson

Johnson brings his Fourth Amendment and malicious prosecution claims against all of the Defendant Officers he named in his complaint. The Defendant Officers rely on the same liability chain-breaking argument that they raise above with respect to Johnson's fabrication claim to argue that a jury cannot hold any of them liable for Johnson's Fourth Amendment or malicious prosecution claims. The Defendant Officers' arguments fail for the same reasons discussed above, namely that a question of fact exists concerning whether Alesia played a role in fabricating Johnson's confession: if a jury finds that he did, then Alesia's decision to approve charges against Johnson does not break the chain of liability due to his role in allegedly fabricating Johnson's confession. *See Jones*, 856 F.2d at 993 ("The jury was entitled to find that had it not been for the misconduct of the defendants, Jones would neither have been arrested nor charged.").

Defendants also claim that they are entitled to qualified immunity because no caselaw established "that officers could not reasonably rely on the independent judgment of prosecutors in exercising their prosecutorial discretion." Doc. 462 at 50. But the whole point is that a jury could find that Alesia was *not* exercising "independent judgment" when he fabricated Johnson's confession and subsequently charged him. Defendants cannot obtain immunity for their acts on this basis when the crucial facts that would be at the heart of their qualified immunity claim—such as Alesia's fabrication and the Defendant Officers' respective knowledge of that misconduct—are in dispute. *See Flowers v. Renfro*, 46 F.4th 631, 636 (7th Cir. 2022)

(upholding denial of qualified immunity when material disputes of fact existed surrounding the violation of a clearly established right).

### 3. McCoy and Ezell

Finally, the Defendant Officers argue that McCoy may only sue Cassidy and that Ezell may only sue Coughlin and Green because McCoy and Ezell cannot prove that any other officer had personal involvement in their detention or prosecution. Doc 462 at 51. The Defendant Officers rely entirely on their too-narrow definition of personal involvement that the Court already discussed in connection with McCoy's and Ezell's fabrication and coercion claims. Because the Court rejected these arguments above and because the Defendant Officers did not make any arguments as to why the remaining Defendant Officers are not liable for McCoy's and Ezell's Fourth Amendment and malicious prosecution claims, the Court denies the Defendant Officers' motion for summary judgment on McCoy's and Ezell's Fourth Amendment and malicious prosecution claims and allows them to move forward against all Defendants they named in their complaints.

The Court denies the Defendant Officers' motion for summary judgment on Plaintiffs' Fourth Amendment and malicious prosecution claims.

### D. Supervisory Liability Claims

Plaintiffs each sue Tuider on a theory of supervisory liability. A supervisor is liable for the constitutional violations of a subordinate "if the supervisor, with knowledge of the subordinate's conduct, approves of the conduct and the basis for it." *Chavez v. Ill. State Police*, 251 F.3d 612, 651 (7th Cir. 2001) (quoting *Lanigan v. Vill. of E. Hazel Crest*, 110 F.3d 467, 477 (7th Cir. 1997)). "[S]upervisors who are merely negligent in failing to detect and prevent subordinates' misconduct are not liable. . . . The supervisors must know about the conduct and

56

facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see. They must in other words act either knowingly or with deliberate, reckless indifference." *Jones*, 856 F.2d at 992–93.

Tuider argues that there is insufficient evidence to show that he participated in or directed the other Defendant Officers' conduct aside from initially ordering Cassidy to take the anonymous phone call and assigning Daly and Davis to assist with Cassidy's investigation. Tuider also notes that he was not present at Area One for Ezell's, Styles', and Johnson's interrogations. Plaintiffs point to his decisions to have officers arrest McCoy after Cassidy took the anonymous phone call and to have officers arrest Ezell, Styles, and Johnson after McCoy delivered his false confession; Cassidy's testimony that Tuider was "privy to anything that's going on [in Area One]," Doc. 466-1 at 101:4-15; and to Tuider's signature on two investigative reports that contain information contradicting Plaintiffs' coerced confessions and contradict Johnson's alibi as proof that Tuider would have known that his subordinates were violating their constitutional rights.

The Court agrees that Plaintiffs do not have sufficient evidence to bring their claims against Tuider to a jury. Although some of Tuider's work may have been sloppy, none of the facts Plaintiffs cite would allow a juror to reasonably infer that he had knowledge of and permitted his subordinates' unconstitutional actions to persist. *See Chavez*, 251 F.3d at 651. Crucially, Tuider was not present for any of Ezell's, Styles', or Johnson's interrogations, and he was therefore not a participant in the information-sharing environment that a jury could use to infer that Ezell's, Styles', and Johnson's interrogators shared information throughout the night of the investigation (which, as the Court discussed, would make them all respectively liable to each Plaintiff because they would have had knowledge about the respective fabrications and ignored

them).  And, because Tuider did not participate in McCoy's or the other Plaintiffs'

interrogations, there is no evidence that he would have known that Cassidy or the other officers

withheld information about their respective alibis.  The Court "cannot hold [Tuider] liable for his

subordinates' . . . abuse of [Plaintiffs] absent some suggestion that he knew it was going on."

*Wilson v. O'Brien*, No. 07 C 3994, 2011 WL 759939, at *9 (N.D. Ill. Feb. 25, 2011); *see id.* at

*9–10 ("To accept [plaintiff's] argument would lead to an inappropriate imposition of liability

based only upon [defendant's] position of authority over the other Defendants." (citing *Cygnar v.

City of Chicago*, 865 F.2d 827, 847 (7th Cir. 1989))).

    Although Plaintiffs argue that "given his supervisory role, Tuider would have been aware

of his officers' failure to take the most rudimentary investigator steps," Doc. 475 at 53, it is

unclear that this would rise above the level of negligence, which is insufficient for supervisory

liability.  *See Jones*, 856 F.2d at 992.  As such, Plaintiffs' speculation, without actual evidentiary

support, is insufficient to survive summary judgment, *Grant*, 870 F.3d at 568 (plaintiffs "only

entitled to the benefit of inferences supported by admissible evidence, not those supported by

only speculation or conjecture" (internal citations omitted)).  The Court therefore grants the

motion for summary judgment on Plaintiffs' supervisory liability claims against Tuider.

## E.    Derivative Claims

### 1.    Conspiracy

    A conspiracy is "a combination of two or more persons acting in concert to commit an

unlawful act, or to commit a lawful act by unlawful means."  *Beaman v. Freesmeyer*, 776 F.3d

500, 510 (7th Cir. 2015).  Proving a § 1983 conspiracy requires a plaintiff to show that: "(1) []

state official[s] . . . reached an understanding to deprive the plaintiff of his constitutional rights,

. . . and (2) those individual(s) were willful participants in joint activity."  *Fries v. Helsper*, 146

F.3d 452, 457 (7th Cir. 1998).[19]  Proof requires more than conclusory allegations that Defendants engaged in a conspiracy.  *See Stagman v. Ryan*, 176 F.3d 986, 1003 (7th Cir. 1999).  Direct evidence of the alleged conspiracy is not mandatory, however—a conspiracy "may be inferred through the combination of common sense and circumstantial evidence."  *Patrick*, 213 F. Supp. 3d at 1057; *see also Rivera*, 974 F. Supp. 2d at 1191 ("Under Seventh Circuit precedent, allegations of a pattern of misconduct by a group of individuals can give rise to an inference that the misconduct was the result of a conspiratorial agreement.").

Defendants argue that Plaintiffs lack evidence that they entered into an agreement to frame Plaintiffs for the Elegant Auto murders.  But the Court finds that Plaintiffs have enough evidence (viewed in the light most favorable to them) for a jury to believe that the Defendant Officers entered into an agreement to prosecute them for the Elegant Auto murders despite knowing that the confession evidence was false and that the eyewitness testimony was unreliable.  The Court has already discussed at length how Plaintiffs have mustered sufficient circumstantial evidence for them to pursue charges against the web of officers who participated in their respective interrogations, and the same evidence could provide a jury with cause to infer a conspiratorial agreement.  *See Patrick*, 213 F. Supp. 3d at 1057.  In addition, although a jury could interpret the fact that Plaintiffs' confessions each shared similar details as evidence that Plaintiffs were in fact guilty of the Elegant Auto murders, it could also find that the Defendant Officers conspired together to obtain substantively similar confessions.  *See Hill*, 2009 WL 174994, at *10 (finding that "strikingly similar" nature of suspects' confessions permitted jury to infer the existence of a conspiracy).  The same is true with respect to the officers whose only participation in the investigation resulted from the suspect lineups—if the jury believes that

---

[19] The elements for both federal and state civil conspiracy are largely the same, and so the Court treats them together.  *See Patrick*, 213 F. Supp. 3d at 1057.

Boudreau and Fine participated in creating the lineups in order to obtain identifications that "confirmed" Plaintiffs committed the Elegant Auto murders, then it would be no far stretch for it to infer that they knowingly participated in a conspiracy to convict Plaintiffs. *See Patrick*, 213 F. Supp. 3d at 1057 (noting that the jury is allowed to infer the existence of a conspiracy).

Defendants also claim that they are entitled to qualified immunity based on the intra-corporate conspiracy doctrine, which "holds that 'a conspiracy cannot exist solely between the members of the same entity.'" *Stone v. Bd. of Trs. of N. Ill. Univ.*, 38 F. Supp. 3d 935, 949 (N.D. Ill. 2014) (quoting *Payton v. Rush-Presbyterian-St. Luke's Med. Ctr.*, 184 F.3d 623, 632 (7th Cir. 1999)). In support, Defendants cite *Haliw v. City of South Elgin*, which justified its decision to grant the defendants qualified immunity based on the intra-corporate conspiracy doctrine because "the legal landscape is foggy on whether it violates the Constitution for officers of a police department to conspire only with one another." No. 19 C 1515, 2020 WL 1304697, *4 (N.D. Ill. March 3, 2020).

Although the Seventh Circuit has not explicitly addressed the intra-corporate conspiracy doctrine, it has on several occasions—including as early as 1984—upheld or reinstated conspiracy claims "involving only police officers from the same department." *Liggins v. City of Chicago*, No. 20 C 4085, 2021 WL 2894167, at *5 (N.D. Ill. July 9, 2021) (citing *Geinosky v. City of Chicago*, 675 F.3d 743, 749 (7th Cir. 2012) (reinstating conspiracy claim against "several members of the same police unit"); *Jones*, 856 F.2d at 992 (affirming jury determination of conspiracy among Chicago police officers); *Bell v. City of Milwaukee*, 746 F.2d 1205, 1253–61 (7th Cir. 1984) (upholding damage award for conspiracy among Milwaukee police officers)). Moreover, several courts in this District have questioned *Haliw*'s reasoning, instead denying qualified immunity to police officers raising the defense on the basis of the intra-corporate

conspiracy doctrine. *See Walker v. City of Chicago*, 559 F. Supp. 3d 747, 752–53 (N.D. Ill. 2021) ("[D]oubts about the applicability of the intracorporate conspiracy doctrine in § 1983 cases do not support a finding of qualified immunity."); *Liggins*, 2021 WL 2894167, at *6 ("The Court believes what must be clearly established is limited to the *underlying constitutional right* that the Defendants conspired to violate."); *Harris v. City of Chicago*, No. 20 C 4521, 2020 WL 7059445, at *5 (N.D. Ill. Dec. 2, 2020) ("Recent uncertainty over the intra-corporate conspiracy doctrine's application to § 1983 cases does not create an opening for qualified immunity on behalf of defendant officers."). This Court agrees with these courts' reasoning that uncertainty regarding the availability of the intra-corporate conspiracy doctrine defense does not entitle Defendants to qualified immunity because it does not challenge whether the law clearly established the underlying right that the Defendant Officers allegedly violated by participating in the conspiracy.[20] *See Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (holding that officials are exempt from liability if their "conduct does not violate *clearly established statutory or constitutional rights*" (emphasis added)).

The Court denies Defendants' motion for summary judgment on Plaintiffs' state and federal conspiracy claims.

---

[20] The Court notes that Defendants' claim to qualified immunity here is qualitatively different from Alesia's claim to qualified immunity on Johnson's failure-to-intervene allegation. The Court granted qualified immunity to Alesia because, as a prosecutor in 1995, he could not have expected to face liability for failing to intervene against police officer colleagues due to his role. By contrast, the Defendant Officers had no such position-based shield from liability, and so they cannot reasonably claim that they would have thought it appropriate to conspire with each other to violate a person's constitutional rights, but inappropriate to conspire with a non-state actor to achieve such illicit ends. *See Brishke*, 466 F.2d at 11 ("[O]ne who is given a badge of authority of a police officer may not ignore the duty imposed by his office and fail to stop other officers who summarily punish a third person in his presence or otherwise within his knowledge."); *see also Jones*, 856 F.2d at 992 (affirming jury determination of conspiracy among Chicago police officers); *Bell*, 746 F.2d at 1253–61 (7th Cir. 1984) (upholding damage award for conspiracy among Milwaukee police officers).

### 2.    Failure to Intervene

Defendants' only argument against Plaintiffs' failure to intervene claims is that the cause of action "has no basis in the Constitution."  Doc. 462 at 53.  Defendants acknowledge that binding Seventh Circuit precedent says otherwise, *see Holloway*, 43 F.4th at 769 (acknowledging validity of failure-to-intervene claims) (citing *Yang*, 37 F.3d at 285), but point to a concurrence by Judge Easterbrook where he suggests that the claim may not exist, *see Mwangangi v. Nielsen*, 48 F.4th 816, 834 (7th Cir. 2022) (Easterbrook, J., concurring) ("The Supreme Court has held many times that § 1983 supports only direct, and not vicarious, liability.  'Failure to intervene' sounds like vicarious liability."  (internal citations omitted)).  The Court follows binding circuit precedent.  *See e.g.*, *Holloway*, 43 F.4th at 769; *Doxtator v. O'Brien*, 39 F.4th 852, 865 (7th Cir. 2022); *Abdullahi v. Madison*, 423 F.3d 763, 774 (7th Cir. 2005); *Lanigan*, 110 F.3d at 478.

The Court denies Defendants' motion for summary judgment on Plaintiffs' failure to intervene claims.

### 3.    IIED

Defendants argue, and Plaintiffs do not contest, that Plaintiffs' IIED claims can only proceed against the Defendants whom Plaintiffs may hold liable for their coercion and fabrication claims.  *See Cooney v. Casady*, 746 F. Supp. 2d 973, 977 (N.D. Ill. 2010) (requiring "evidence of misconduct on defendants' part" for IIED claim).  The Court will thus allow Plaintiffs' IIED claims to proceed on that basis.

### F.    *Respondeat Superior* and Indemnification Claims

Defendants argue that the City of Chicago is entitled to summary judgment on Johnson and Styles' *respondeat superior* claims and Johnson's indemnification claim because none of the individual defendants are liable to either party on a state law claim, and are not liable to Johnson

on a federal law claim.  Doc. 462 at 49.  Because Johnson and Styles have viable state and federal claims, the Court denies their motion for summary judgment with respect to the City's liability.  *See* 745 Ill. Comp. Stat. 10/2-109 ("A local public entity is not liable for an injury resulting from an act or omission of its employee where the employee is not liable."); 745 Ill. Comp. Stat. 10/9-102 (requiring a public entity to pay a judgment or settlement for compensatory damages only if the employee himself is liable).

## CONCLUSION

For the foregoing reasons, the Court denies Defendants' motion to strike [499].  The Court grants in part and denies in part Alesia's motion for summary judgment [458].  The Court grants in part and denies in part the other Defendants' motion for summary judgment [461].  The Court enters judgment for Alesia on Ezell's and Styles' claims against him, and on Johnson's failure to intervene claim against him.  The Court enters judgment for Bonke and Tuider on all Plaintiffs' claims against them and dismisses them from the case.  The Court enters judgment for all Defendant Officers on Plaintiffs' due process claims based on the *Brady* violation and suggestive lineup construction theories of liability.  The Court outlines Plaintiffs' remaining claims against each individual defendant in Appendix A.

Dated: January 24, 2024

SARA L. ELLIS
United States District Judge

63

## Appendix A

| | | **Plaintiffs** | | | |
|---|---|---|---|---|---|
| | | Ezell | Styles | Johnson | McCoy |
| **Individual Defendants** | Alesia | No claims | No claims | 1. Fabrication – Due Process<br>2. Conspiracy (state and federal)<br>3. IIED | No claims |
| | Boudreau | 1. Fourth Amendment<br>2. Malicious Prosecution<br>3. Conspiracy (state and federal)<br>4. Failure to Intervene | 1. Fourth Amendment<br>2. Malicious Prosecution<br>3. Conspiracy (state and federal)<br>4. Failure to Intervene | 1. Fourth Amendment<br>2. Malicious Prosecution<br>3. Conspiracy (state and federal)<br>4. Failure to Intervene | 1. Fourth Amendment<br>2. Malicious Prosecution<br>3. Conspiracy (state and federal)<br>4. Failure to Intervene |
| | Bloore | 1. Fabrication – Due Process<br>2. Fourth Amendment<br>3. Malicious Prosecution<br>4. Conspiracy (state and federal)<br>5. Failure to Intervene<br>6. IIED | 1. Coercion – Fifth Amendment<br>2. Fabrication – Due Process<br>3. Fourth Amendment<br>4. Malicious Prosecution<br>5. Conspiracy (state and federal)<br>6. Failure to Intervene<br>7. IIED | 1. Fabrication – Due Process<br>2. Fourth Amendment<br>3. Malicious Prosecution<br>4. Conspiracy (state and federal)<br>5. Failure to Intervene<br>6. IIED | 1. Fabrication – Due Process<br>2. Fourth Amendment<br>3. Malicious Prosecution<br>4. Conspiracy (state and federal)<br>5. Failure to Intervene<br>6. IIED |
| | Cassidy | 1. Coercion – Fifth Amendment<br>2. Fabrication – Due Process<br>3. Fourth Amendment<br>4. Malicious Prosecution<br>5. Conspiracy (state and federal)<br>6. Failure to Intervene<br>7. IIED | 1. Coercion – Fifth Amendment<br>2. Fabrication – Due Process<br>3. Fourth Amendment<br>4. Malicious Prosecution<br>5. Conspiracy (state and federal)<br>6. Failure to Intervene<br>7. IIED | 1. Fabrication – Due Process<br>2. Fourth Amendment<br>3. Malicious Prosecution<br>4. Conspiracy (state and federal)<br>5. Failure to Intervene<br>6. IIED | 1. Coercion – Fifth Amendment<br>2. Fabrication – Due Process<br>3. Fourth Amendment<br>4. Malicious Prosecution<br>5. Conspiracy (state and federal)<br>6. Failure to Intervene<br>7. IIED |
| | Coughlin (Estate) | 1. Coercion – Fifth Amendment<br>2. Fabrication – Due Process<br>3. Fourth Amendment<br>4. Conspiracy (federal)<br>5. Failure to Intervene | 1. Fabrication – Due Process<br>2. Fourth Amendment<br>3. Conspiracy (federal)<br>4. Failure to Intervene | 1. Fabrication – Due Process<br>2. Fourth Amendment<br>3. Conspiracy (federal)<br>4. Failure to Intervene | 1. Fabrication – Due Process<br>2. Fourth Amendment<br>3. Conspiracy (federal)<br>4. Failure to Intervene |

|  |  | Ezell | Styles | Johnson | McCoy |
|---|---|---|---|---|---|
| **Individual Defendants** | Daly | 1. Fourth Amendment<br>2. Malicious Prosecution<br>3. Conspiracy (state and federal)<br>4. Failure to Intervene<br>5. IIED | 1. Fourth Amendment<br>2. Malicious Prosecution<br>3. Conspiracy (state and federal)<br>4. Failure to Intervene<br>5. IIED | 1. Fourth Amendment<br>2. Malicious Prosecution<br>3. Conspiracy (state and federal)<br>4. Failure to Intervene<br>5. IIED | 1. Fourth Amendment<br>2. Malicious Prosecution<br>3. Conspiracy (state and federal)<br>4. Failure to Intervene<br>5. IIED |
|  | Davis | 1. Fourth Amendment<br>2. Malicious Prosecution<br>3. Conspiracy (state and federal)<br>4. Failure to Intervene<br>5. IIED | 1. Fourth Amendment<br>2. Malicious Prosecution<br>3. Conspiracy (state and federal)<br>4. Failure to Intervene<br>5. IIED | 1. Fourth Amendment<br>2. Malicious Prosecution<br>3. Conspiracy (state and federal)<br>4. Failure to Intervene<br>5. IIED | 1. Coercion – Fifth Amendment<br>2. Fourth Amendment<br>3. Malicious Prosecution<br>4. Conspiracy (state and federal)<br>5. Failure to Intervene<br>6. IIED |
|  | Fine (Estate) | 1. Fourth Amendment<br>2. Conspiracy (federal)<br>3. Failure to Intervene | 1. Fourth Amendment<br>2. Conspiracy (federal)<br>3. Failure to Intervene | 1. Fourth Amendment<br>2. Conspiracy (federal)<br>3. Failure to Intervene | 1. Fourth Amendment<br>2. Conspiracy (federal)<br>3. Failure to Intervene |
|  | Green | 1. Coercion – Fifth Amendment<br>2. Fabrication – Due Process<br>3. Fourth Amendment<br>4. Malicious Prosecution<br>5. Conspiracy (state and federal)<br>6. Failure to Intervene<br>7. IIED | No claims | No claims | No claims |
|  | Richardson | 1. Fabrication – Due Process<br>2. Fourth Amendment<br>3. Malicious Prosecution<br>4. Conspiracy (state and federal)<br>5. Failure to Intervene<br>6. IIED | 1. Fabrication – Due Process<br>2. Fourth Amendment<br>3. Malicious Prosecution<br>4. Conspiracy (state and federal)<br>5. Failure to Intervene<br>6. IIED | 1. Fabrication – Due Process<br>2. Fourth Amendment<br>3. Malicious Prosecution<br>4. Conspiracy (state and federal)<br>5. Failure to Intervene<br>6. IIED | 1. Fabrication – Due Process<br>2. Fourth Amendment<br>3. Malicious Prosecution<br>4. Conspiracy (state and federal)<br>5. Failure to Intervene<br>6. IIED |

| | | Ezell | Styles | Johnson | McCoy |
|---|---|---|---|---|---|
| **Individual Defendants** | Ryan | 1. Fabrication – Due Process<br>2. Fourth Amendment<br>3. Malicious Prosecution<br>4. Conspiracy (state and federal)<br>5. Failure to Intervene<br>6. IIED | 1. Fabrication – Due Process<br>2. Fourth Amendment<br>3. Malicious Prosecution<br>4. Conspiracy (state and federal)<br>5. Failure to Intervene<br>6. IIED | 1. Fabrication – Due Process<br>2. Fourth Amendment<br>3. Malicious Prosecution<br>4. Conspiracy (state and federal)<br>5. Failure to Intervene<br>6. IIED | 1. Fabrication – Due Process<br>2. Fourth Amendment<br>3. Malicious Prosecution<br>4. Conspiracy (state and federal)<br>5. Failure to Intervene<br>6. IIED |
| | Terrell | No claims | 1. Coercion – Fifth Amendment<br>2. Fourth Amendment<br>3. Malicious Prosecution<br>4. Conspiracy<br>5. Failure to Intervene<br>6. IIED | No claims | No claims |
| | Tuider | No claims | No claims | No claims | No claims |
| | City of Chicago | 1. Respondeat Superior<br>2. Indemnification | 1. Respondeat Superior<br>2. Indemnification | 1. Respondeat Superior<br>2. Indemnification | 1. Respondeat Superior<br>2. Indemnification |
| | Cook County | No claims | No claims | 1. Indemnification (Alesia) | No claims |